## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| CHAD EVERET BRACKEEN, JENNIFER KAY BRACKEEN, FRANK NICHOLAS LIBRETTI, HEATHER LYNN LIBRETTI, ALTAGRACIA SOCORRO HERNANDEZ, JASON CLIFFORD, and DANIELLE CLIFFORD, <br><br> and <br><br> STATE OF TEXAS, STATE OF LOUISIANA, and STATE OF INDIANA, <br><br>       Plaintiffs, <br><br> v. <br><br> RYAN ZINKE, in his official capacity as Secretary of the United States Department of the Interior; BRYAN RICE, in his official capacity as Director of the Bureau of Indian Affairs; JOHN TAHSUDA III, in his official capacity as Acting Assistant Secretary for Indian Affairs; the BUREAU OF INDIAN AFFAIRS; and the UNITED STATES DEPARTMENT OF THE INTERIOR, <br><br>       Defendants. | Civil Action No. 4:17-cv-868-O |

## FIRST AMENDED COMPLAINT AND PRAYER FOR
## DECLARATORY AND INJUNCTIVE RELIEF

1.     Chad and Jennifer Brackeen want to adopt A.L.M., a two-year-old boy, and provide

him with a loving, safe, and permanent home. The Brackeens have fostered A.L.M. since he was

ten months old, and A.L.M.'s biological parents and grandmother support the adoption. For

months, their adoption of A.L.M. has been delayed—caught in a terrifying whirlwind of court

proceedings that occurred only because the federal government classifies A.L.M. as an "Indian child."

2.     Because federal law classifies A.L.M. as an "Indian child," when the Brackeens petitioned to adopt A.L.M., the Texas family court applied federal law rather than Texas law to determine whether the Brackeens could adopt A.L.M. Applying that federal law, the Texas family court denied the Brackeens' adoption petition, and ordered A.L.M. transferred to an "Indian family" A.L.M. does not know, in a state A.L.M. has never even visited.

3.     After the Brackeens initiated this civil action to challenge the federal law that drove the Texas family court to deny the Brackeens' petition to adopt A.L.M., the "Indian family" that federal law favored over the Brackeens apparently lost interest in caring for A.L.M. The Second Court of Appeals has therefore vacated the lower court's order, and the Brackeens are preparing—once again—to petition to adopt A.L.M. But that petition, too, could be thwarted if another "Indian family" preferred by federal law seeks to take custody of A.L.M. And even if the Brackeens' petition to adopt A.L.M. is granted, the same federal law that prefers that an "Indian family" adopt A.L.M. would also would subject the Brackeens' adoption to collateral attack for two years—eighteen months more than Texas law allows.

4.     Nick and Heather Libretti want to adopt Baby O., a twenty-month-old girl, and provide her with a safe and permanent home. The Librettis have cared for Baby O. since her birth. She left the hospital with the Libretti family when she was three days old and has been in their care ever since. The Librettis have provided a stable and loving home for Baby O., and have guided her through a series of medical challenges. Altagracia Hernandez, Baby O.'s biological mother, lives near the Librettis and supports the Librettis' efforts to adopt Baby O.

5.      The Librettis are now threatened with separation from Baby O., and Baby O. is threatened with removal from the only home she has ever known, because the Ysleta del sur Pueblo Indian Tribe contends that Baby O. is an "Indian child" under federal law. The Ysleta del sur Pueblo Tribe seeks to use that federal law to take Baby O. from her home in Nevada—where both the Librettis and her birth mother live—and move her to a reservation near El Paso, Texas, which Baby O. has never visited and where she knows no one.

6.      Jason and Danielle Clifford wish to adopt Child P., a six-year-old girl whom the Cliffords have fostered since July 2016. Child P. entered foster care in the summer of 2014, at age three, and spent nearly two years moving from one placement to another before becoming part of the Clifford family. Child P. has thrived with the Cliffords. Now, with the support of Child P.'s guardian ad litem, the Cliffords seek to adopt her.

7.      But Child P.'s maternal grandmother—who the state determined was unfit to serve as a foster placement, and who has limited rights over Child P. under state law—is a registered member of the White Earth Band of Ojibwe Indians. That Tribe argues that Child P. is an "Indian child" under federal law and seeks to use that federal law to take Child P. from the Cliffords—the only stable home she has ever known—and force her adoption by the grandparent previously found to be an unfit placement by the State.

8.      The ordeals now being suffered by the Brackeens, the Librettis, and the Cliffords, and the children they care for, are occurring because Congress decided in 1978 that the federal government—and, in particular, the Department of the Interior's Bureau of Indian Affairs ("BIA")—knew best how to manage the fostering and adoption of Native American children. Though the Constitution reserves domestic relations to the States, and despite the fact that Congress possesses no enumerated power to legislate in this way, Congress enacted the Indian Child

3

Welfare Act ("ICWA"), 25 U.S.C. §§ 1901–1963. ICWA, and the enabling regulations recently promulgated by the BIA, invade every aspect of state family law as applied to Indian children. ICWA commandeers state agencies and courts to become investigative and executive actors carrying out federal policy, and to make child custody decisions based on racial preferences.

9.     By enforcing this racially discriminatory policy, the federal government places Indian children at risk for serious and lasting harm. And States that refuse to follow ICWA risk having their child custody decisions invalidated and federal child welfare funding pulled. Thus, Congress forces ICWA on the States by threatening the stability and well-being of the family lives of their youngest and most vulnerable citizens.

10.     This is an action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706, and the United States Constitution, brought to challenge the validity of a final rule entitled *Indian Child Welfare Act Proceedings*, 81 Fed. Reg. 38,778 (June 14, 2016) (the "Final Rule") (codified at 25 C.F.R. pt. 23), and certain provisions of ICWA that the Final Rule purports to interpret and implement.

11.     ICWA's placement preferences require that, "in any adoptive placement of an Indian child under state law, a preference shall be given in absence of good cause to the contrary to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." 25 U.S.C. § 1915(a); *see also* 25 C.F.R. § 23.130.  The Final Rule provides that "good cause" to depart from ICWA's "placement preferences" should be shown by "clear and convincing evidence."   And ICWA further provides that any adoption of Indian child is subject for two years to collateral attack on the ground that the parent's consent "was obtained through fraud or duress."  25 U.S.C. § 1913(d).

12.     Plaintiffs Chad and Jennifer Brackeen bring this action because ICWA and the Final Rule have been applied to delay their adoption of A.L.M.

13.     Plaintiffs Nick and Heather Libretti bring this action because ICWA and the Final Rule are interfering with their ability to adopt Baby O.

14.     Plaintiff Altagracia Hernandez brings this action because ICWA and the Final Rule are interfering with her wishes to have her biological child adopted in a placement that best suits Baby O.'s interests and needs.

15.     Plaintiffs Jason and Danielle Clifford bring this action because ICWA and the Final Rule are interfering with their ability to adopt Child P.

16.     If ICWA and the pertinent provisions of the Final Rule are invalidated, the Brackeens, the Librettis, and the Cliffords each would be able to adopt the children they are caring for in accordance with State law, and without regard to ICWA's and the Final Rule's discriminatory placement preferences. The Brackeens, the Librettis, and the Cliffords, however, cannot challenge the Final Rule under the APA in state court proceedings, because any such action must be brought in a "court of the United States." 5 U.S.C. § 702

17.     Plaintiffs Texas, Louisiana, and Indiana bring this action because ICWA and the Final Rule intrude upon their sovereign authority over domestic relations in every child custody proceeding, because ICWA demands that their child welfare agencies and courts inquire about Indian children in every foster care, preadoptive, or adoption proceeding.

18.     Plaintiffs thus bring this action for declaratory and injunctive relief and pray that this Court: (1) vacate and set aside the Final Rule; (2) declare that Sections 1901–1923 and 1951–1952 of ICWA violate the Constitution; (3) declare that Sections 1913(d) and 1915 of ICWA violate the Constitution; (4) enjoin the defendants from implementing or administering Sections

1901–1923 and 1951–1952 of ICWA; and (5) enjoin the defendants from implementing or admin-istering Sections 1913(d) or 1915 of ICWA.

## PARTIES

19.     Plaintiffs Chad Everet Brackeen and Jennifer Kay Brackeen are foster parents to the two-year-old child A.L.M., who has lived with them since June 2016. They also are raising two biological children in their home, aged eight and six. Neither Mr. Brackeen nor Mrs. Brackeen is "a member of an Indian tribe," 25 U.S.C. § 1903(3), and therefore the Brackeens are not an "Indian family" within the meaning of ICWA and the Final Rule.

20.     Plaintiffs Nick and Heather Libretti are foster parents to Baby O., a toddler they have fostered since her birth in March 2016. Neither Mr. Libretti nor Mrs. Libretti is "a member of an Indian tribe," 25 U.S.C. § 1903(3), and therefore the Librettis are not an "Indian family" within the meaning of ICWA and the Final Rule.

21.     Plaintiff Altagracia Socorro Hernandez is the biological mother of Baby O., a child fostered by the Librettis since birth. Ms. Hernandez is a resident of Reno, Nevada. She is not a "member of an Indian tribe."  25 U.S.C. § 1903(3).

22.     Plaintiffs Jason and Danielle Clifford are foster parents to Child P., a six-year-old girl they have raised for more than a year. Neither Mr. Clifford nor Mrs. Clifford is "a member of an Indian tribe," 25 U.S.C. § 1903(3), and therefore the Cliffords are not an "Indian family" within the meaning of ICWA and the Final Rule.

23.     Plaintiff Texas possesses sovereign authority over family law issues within its bor-ders. Texas DFPS is the agency responsible for child custody proceedings and ensuring compli-ance with ICWA and the Final Rule. Texas courts possess jurisdiction over child custody proceed-ings arising under the Texas Family Code. When Texas DFPS encounters an Indian child in a child custody proceeding, almost every aspect of the matter is affected. The legal burden of proof for

6

removal is higher, as is the legal burden of proof for obtaining any final order terminating parental rights or restricting a parent's custody. Texas DFPS must serve specific notices regarding ICWA rights on various entities and individuals. ICWA requires the Texas DFPS caseworker to make active efforts to reunify the child and family. Texas state courts and Texas DFPS must place the child according to ICWA's racial preferences. And expert testimony on tribal child and family practices may be necessary, at a cost to Texas, to adjudicate ICWA cases. These are just some of the burdens ICWA imposes on Texas.

24.     Plaintiff Louisiana possesses sovereign authority over family law issues within its borders. The Louisiana Department of Children and Family Services ("Louisiana DCFS") is the agency responsible for child custody proceedings and ensuring compliance with ICWA and the Final Rule. Louisiana courts possess jurisdiction over child custody proceedings arising under the Louisiana Children's Code. When Louisiana DCFS encounters an Indian child in a child custody proceeding, almost every aspect of the matter is affected. The legal burden of proof for removal is higher, as is the legal burden of proof for obtaining any final order terminating parental rights or restricting a parent's custody. Louisiana DCFS must serve specific notices regarding ICWA rights on various entities and individuals. ICWA requires the Louisiana DCFS caseworker to make active efforts to reunify the child and family. Louisiana state courts and Louisiana DCFS must place the child according to ICWA's racial preferences. And expert testimony on tribal child and family practices may be necessary, at a cost to Louisiana, to adjudicate ICWA cases. These are just some of the burdens ICWA imposes on Louisiana.

25.     Plaintiff Indiana possesses sovereign authority over family law issues within its borders. The Indiana Department of Child Services ("Indiana DCS") is the agency responsible for child custody proceedings and ensuring compliance with ICWA and the Final Rule. Indiana courts

possess jurisdiction over child custody proceedings arising under the Indiana Family Law and Juvenile Code. When Indiana DCS encounters an Indian child in a child custody proceeding, almost every aspect of the matter is affected. The legal burden of proof for removal is higher, as is the legal burden of proof for obtaining any final order terminating parental rights or restricting a parent's custody. Indiana DCS must serve specific notices regarding ICWA rights on various entities and individuals. ICWA requires the Indiana DCS caseworker to make active efforts to reunify the child and family. Indiana state courts and Indiana DCS must place the child according to ICWA's racial preferences. And expert testimony on tribal child and family practices may be necessary, at a cost to Indiana, to adjudicate ICWA cases. These are just some of the burdens ICWA imposes on Indiana.

26.     Texas, Louisiana, and Indiana (collectively, "State Plaintiffs") are the guardians of the health, welfare, safety, and property of their citizens. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982). State Plaintiffs represent the interests of the many children within their custody and care, whether in foster care, preadoption, or adoption services. State Plaintiffs also represent the interest of their resident parents who are thinking about fostering and/or adopting a child, and who are currently fostering or in the process of adopting a child, and who are directly and substantially injured by the application of ICWA and the Final Rule's discriminatory mandates. State Plaintiffs cannot remedy these injuries through their sovereign lawmaking powers because Defendants mandate compliance with ICWA.

27.     Defendant Ryan Zinke is the Secretary of the United States Department of the Interior. He is sued in his official capacity.

28.     Defendant Bryan Rice is the Director of the Bureau of Indian Affairs within the United States Department of the Interior. He is sued in his official capacity.

29.     Defendant John Tahsuda, III, is the Acting Assistant Secretary for Indian Affairs at the Bureau of Indian Affairs within the United States Department of the Interior. He is sued in his official capacity.

30.     Defendant Bureau of Indian Affairs ("BIA") is a federal agency within the Department of the Interior.

31.     Defendant United States Department of the Interior (the "Department") is a federal executive department of the United States.

## JURISDICTION AND VENUE

32.     This action arises under the APA and the United States Constitution. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and 5 U.S.C. §§ 701–706 (review of agency action). This Court has authority to award the requested declaratory and injunctive relief, 28 U.S.C. §§ 2201–02, and costs and attorneys' fees, 28 U.S.C. § 2412.

33.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(l) as this is an action against officers and agencies of the United States, a substantial part of the events giving rise to this claim occurred in this district, and no real property is involved in the action.

## ALLEGATIONS

## I.     THE STATUTORY AND REGULATORY FRAMEWORK

### A.     State Power Over Domestic Relations

34.     With few exceptions, regulation of domestic relations is an area of law over which the States possess exclusive power. *Sosna v. Iowa*, 419 U.S. 393, 404 (1975). "The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States." *Ex parte Burrus*, 136 U.S. 586, 593–94 (1890).

35.     The power of States over domestic relations is so well-settled that federal courts lack Article III jurisdiction over domestic relations issues, and child custody disputes in particular. *Burrus*, 136 U.S. at 594.

36.     All States regulate domestic relations, including marriage, divorce, adoption, and the rights and responsibilities of parents and children.

37.     For example, Texas regulates the domestic relations of individuals domiciled within its borders. Title 1 of the Texas Family Code regulates the formation and dissolution of marriage and marital property rights. Tex. Fam. Code §§ 1.101–9.302. Title 1-a regulates the collaborative family law process. *Id*. §§ 15.001–15.116. Title 2 regulates the status of children in relation to their parents. *Id*. §§ 31.001–47.003. Title 3 protects the public and ensures public safety through a juvenile justice code. *Id*. §§ 51.01–61.107. Title 3a regulates truant conduct of children. *Id*. §§ 65.001–65.259. Title 4 protects Texas families from domestic violence. *Id*. §§ 71.001–93.004. And Title 5 regulates the parent-child relationship, including termination of parental rights, foster care, and adoption. *Id*. §§ 101.001–266.013.

38.     Louisiana and Indiana also regulate the domestic relations of individuals domiciled within their borders. *See* La. Child. Code arts. 100–1673; Ind. Code §§ 31-9-1-1 to 31-41-3-1.

39.     Texas recognizes the "best interest of the child" as the "primary consideration" for courts when determining parentage, possession, and access to the child. Tex. Fam. Code § 153.002; *see also id*. § 161.001(b)(2). Texas's "fundamental interest in parental-rights termination cases is to protect the best interest of the child." *In re M.S.*, 115 S.W.3d 534, 548 (Tex. 2003) (citations omitted). The same is true in Louisiana and Indiana. *See, e.g*., La. Child. Code art. 1255; Ind. Code § 31-19-11-1.

40.     In Texas, the best interest of the child standard "is aligned with another of the child's interests—an interest in a final decision on termination so that adoption to a stable home or return to the parents is not unduly prolonged." *In re M.S.*, 115 S.W.3d at 548 (citations omitted). "Indeed, the U.S. Supreme Court has recognized that prolonged termination proceedings can have psychological effects on a child of such magnitude that time is of the essence." *Id*. (quoting *In re J.F.C.*, 96 S.W.3d 256, 304 (Tex. 2002) (Schneider, J., dissenting) (quoting *Lehman v. Lycoming Cty. Children's Servs. Agency*, 458 U.S. 502, 513–14 (1982))). Thus, the Texas Family Code protects children by requiring prompt action on the part of trial and appellate courts when confronting cases that involve the parent-child relationship. Tex. Fam. Code §§ 105.004, 109.002(a-1), 161.002, 162.005. The Texas Family Code further protects the parent-child bond and the health of adoptive children by providing that "the validity of an adoption order is not subject to attack after six months after the date the order was signed."  Tex. Fam. Code § 162.012(a). Louisiana and Indiana also protect adoptive families by limiting the time period for collateral attacks on an adoption order. Ind. Code § 31-19-14-2; La. Child Code art. 1263.

41.     ICWA and the Final Rule alter the application of Texas, Louisiana, and Indiana family law to Indian children and impose significant delays on permanency for those children.

### B.     The Indian Child Welfare Act

42.     In the mid-1970s, there was rising concern over "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989). "Congress found that 'an alarmingly high percentage of Indian families [were being] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies.'" *Adoptive Couple v. Baby Girl*, 133 S. Ct.

2552, 2557 (2013) (quoting 25 U.S.C. § 1901(4)). "This wholesale removal of Indian children from their homes prompted Congress" to enact ICWA, 25 U.S.C. §§ 1901–1963. *Id.*

43.     ICWA establishes "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes." 25 U.S.C. § 1902. An "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." *Id.* § 1903(4).

44.     ICWA mandates placement preferences in foster care, preadoptive, and adoptive proceedings involving Indian children. 25 U.S.C. § 1915.

45.     "In any adoptive placement under State law," ICWA mandates that, "in the absence of good cause to the contrary," "preference shall be given . . . to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." 25 U.S.C. § 1915(a).

46.     ICWA similarly requires that "in any foster care or preadoptive placement preference shall be given, in the absence of good cause to the contrary, to placement with – (i) a member of the child's extended family; (ii) a foster home . . . specified by the Indian child's tribe; (iii) an Indian foster home . . . approved by an authorized non-Indian licensing authority; or (iv) an institution for children approved by an Indian tribe or operated by an Indian tribe." 25 U.S.C. § 1915(b).

47.     ICWA requires state agencies and courts to defer to the alteration of the preferences established by Section 1915(a)–(b), if the Indian child's tribe establishes a different order of preference by resolution. 25 U.S.C. § 1915(c).

48.     ICWA places an affirmative duty on state agencies and courts to notify potential intervenors and the federal government about an Indian child matter. 25 U.S.C. § 1912.

49.     In any involuntary child custody proceeding, ICWA commands state agencies and courts, when seeking foster care placement of, or termination of parental rights to, an Indian child, to notify the parents or Indian custodian and the Indian child's tribe of the pending proceedings and of their right to intervention under 25 U.S.C. § 1911(c). 25 U.S.C. § 1912(a); 25 C.F.R. § 23.11. Copies of these notices must be sent to the Secretary and the BIA. 25 C.F.R. § 23.11. No foster care placement or termination of parental rights proceeding may be held until at least ten days after receipt of the notice by the parent or Indian custodian and tribe or the Secretary. 25 U.S.C. § 1912(a). ICWA grants the Indian custodian or tribe up to twenty additional days to prepare for such proceedings. *Id*.

50.     ICWA demands that state agencies and courts undertake additional duties and costs to implement its federal program.

51.     ICWA requires state agencies charged with serving children in foster care and adoption proceedings to use "active efforts" to prevent the breakup of the family. "Any party [including state agencies] seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proven unsuccessful." 25 U.S.C. § 1912(d).

52.     ICWA requires state courts to apply federal substantive rules of decision and federal procedural requirements in state law causes of action that result in state law judgments.

53.     ICWA requires foster care placement and termination of parental rights proceedings, in the absence of good cause to the contrary, to be transferred to tribal courts for an Indian child, even if he or she is not domiciled or residing on the reservation. 25 U.S.C. § 1911(b).

13

54.     ICWA commands state courts to grant mandatory intervention to an Indian custodian and the child's tribe at any point in the proceedings. 25 U.S.C. § 1911(c).

55.     ICWA prohibits the termination of parental rights for an Indian child in the absence of "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). The BIA is not required to pay for the services of expert witnesses. 25 C.F.R. § 23.81.

56.     ICWA dictates when a parent or Indian custodian may consent to a foster care placement or termination of parental rights, "[a]ny consent given prior to, or within ten days after, birth of the Indian child shall not be valid." 25 U.S.C. § 1913(a). "Any parent or Indian custodian may withdraw consent to a foster care placement under State law at any time and, upon such withdrawal, the child shall be returned to the parent or Indian custodian." *Id*. § 1913(b). And "[i]n any voluntary proceeding for termination of parental rights to, or adoptive placement of, an Indian child, the consent of the parent may be withdrawn for any reason at any time prior to the entry of a final decree of termination or adoption, as the case may be, and the child shall be returned to the parent." *Id*. § 1913(c).

57.     ICWA permits the parent of an Indian child to withdraw consent to a final decree of adoption on the grounds that the consent was obtained through fraud or duress, and upon finding fraud or duress, a state court must vacate the final decree and return the child to the parent. The parent may withdraw consent based on fraud or duress for up to two years after the final judgment of adoption. 25 U.S.C. § 1913(d).

58.     ICWA places recordkeeping duties on state agencies and courts.

59.     State agencies and courts must maintain records demonstrating their compliance with the statute. "A record of each such placement, under State law, of an Indian child shall be maintained by the State in which the placement was made, evidencing the efforts to comply with the order of preference specified in this section. Such record shall be made available at any time upon the request of the Secretary or the Indian child's tribe." 25 U.S.C. § 1915(e).

60.     State courts must maintain records and report to the Indian child his or her tribal affiliation once that child reaches age eighteen. "Upon application by an Indian individual who has reached the age of eighteen and who was the subject of an adoptive placement, the court which entered the final decree shall inform such individual of the tribal affiliation, if any, of the individual's biological parents and provide such other information as may be necessary to protect any rights flowing from the individual's tribal relationship." 25 U.S.C. § 1917.

61.     State courts entering final decrees or orders in an Indian child adoption case must provide the Secretary with a copy of the decree or order, along with the name and tribal affiliation of the child, names of the biological parents, names of the adoptive parents, and the identity of any agency having files or information relating to the adoption. 25 U.S.C. § 1951.

62.     Failure to comply with ICWA may result in final child custody orders or placements to be overturned on appeal or by another court of competent jurisdiction. 25 U.S.C. § 1914.

63.     ICWA also overrides the provisions of state law that promote finality in adoptions by allowing an adoption order to come under collateral attack for up to two years after entry of the order. 25 U.S.C. § 1913(d).

64.     ICWA ensures state agencies and courts comply with its mandates by enabling any Indian child who is the subject of any action for foster care placement or termination of parental rights under state law, any parent or Indian custodian from whose custody the child was removed,

15

and the Indian child's tribe to petition any court of competent jurisdiction to invalidate a state court's decision for failure to comply with ICWA sections 1911, 1912, and 1913. 25 U.S.C. § 1914.

65. Congress further coerces ICWA compliance by requiring states who receive child welfare services program funding through Title IV-B of the Social Security Act to file annual reports detailing their compliance with ICWA. According to Title IV-B:

> (a) In order to be eligible for payment under this subpart, a State must have a plan for child welfare services which has been developed jointly by the Secretary and the State agency designated pursuant to subsection (b)(1), and which meets the requirements of subsection (b).
>
> (b) Each plan for child welfare services under this subpart shall— . . . (9) contain a description, developed after consultation with tribal organizations (as defined in section 4 of the Indian Self-Determination and Education Assistance Act) in the State, of the specific measures taken by the State to comply with the Indian Child Welfare Act.

42 U.S.C. § 622.

## C. The 1979 BIA Guidelines

66. Soon after ICWA's enactment, the BIA promulgated "Guidelines for State Courts; Indian Child Custody Proceedings" (the "1979 Guidelines") that were intended to assist the implementation of ICWA, but were "not intended to have binding legislative effect." 44 Fed. Reg. 67,584, 67,584 (Nov. 26, 1979). The 1979 Guidelines recognized that "[p]rimary responsibility" for interpreting ICWA "rests with the courts that decide Indian child custody cases." *Id*. The 1979 Guidelines emphasized that "the legislative history of the Act states explicitly that the use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." *Id.*

67. As state courts applied ICWA in the ensuing decades, most held that the "good cause" exception to ICWA's placement preferences requires a consideration of the child's best

interests, including any bond or attachment the child had formed with her current caregivers. *See, e.g.*, *In re Interest of Bird Head*, 331 N.W.2d 785, 791 (Neb. 1983); *In re Appeal in Maricopa Cty. Juvenile Action No. A-25525*, 667 P.2d 228, 234 (Ariz. Ct. App. 1983); *In re Adoption of T.R.M.*, 525 N.E.2d 298, 307–08 (Ind. 1988); *In re Adoption of M.*, 832 P.2d 518, 522 (Wash. Ct. App. 1992); *In re Adoption of F.H.*, 851 P.2d 1361,1363–64 (Alaska 1993); *In re Interest of A.E., J.E., S.E., and X.E.*, 572 N.W.2d 579, 583–85 (Iowa 1997); *People ex rel. A.N.W.*, 976 P.2d 365, 369 (Colo. Ct. App. 1999); *In re Interest of C.G.L.*, 63 S.W.3d 693, 697–98 (Mo. Ct. App. 2002); *In re Adoption of Baby Girl B.*, 67 P.3d 359, 370–71 (Okla. Ct. App. 2003); *but see Yavapai–Apache Tribe v. Mejia*, 906 S.W.2d 152 (Tex. App.—Houston [14th Dist.] Aug. 24, 1995, no pet.).

68.    Other state courts, developing and applying the "existing Indian family doctrine," limited ICWA's application to circumstances where the child had some significant political or cultural connection to the tribe. *See, e.g.*, *In re Interest of S.A.M*, 703 S.W.2d 603, 608–09 (Mo. Ct. App. 1986); *Claymore v. Serr*, 405 N.W.2d 650, 653-54 (S.D. 1987); *In re Adoption of T.R.M.*, 525 N.E.2d 298, 303 (Ind. 1988); *Hampton v. J.A.L.*, 658 So. 2d 331, 335 (La. Ct. App. 1995); *Rye v. Weasel*, 934 S.W.2d 257, 261–64 (Ky. 1996); *In re Santos Y.*, 112 Cal. Rptr. 2d 692, 716 n.16 (Cal. App. 2001); *In re Morgan*, No. 02A01-9608-CH-00206, 1997 WL 716880, at *1 (Tenn. Ct. App. Nov. 19, 1997); *Ex parte C.L.J.*, 946 So. 2d 880 (Ala. Civ. App. 2006); *In re N.J.*, 221 P.3d 1255, 1264–65 (Nev. 2009). The existing Indian family doctrine is premised, in part, on the significant equal protection concerns that would arise if ICWA applied to children with no political or cultural connection to a tribe based solely on the child's ancestry. *See In re Bridget R.*, 49 Cal. Rpt. 2d 507, 527–29 (Cal. App. 1996); *cf. Adoptive Couple,* 133 S. Ct. at 2565 (noting that interpreting ICWA's parental termination provisions as applicable in any case where a child has an Indian ancestor, "even a remote one, . . . would raise equal protection concerns").

D.     **The Final Rule**

69.     In June 2016, almost four decades after ICWA's passage, the BIA promulgated *Indian Child Welfare Act Proceedings*, 81 Fed. Reg. 38,778 (June 14, 2016) (the "Final Rule") (codified at 25 C.F.R. pt. 23). The Final Rule purports to "clarify the minimum Federal standards governing implementation of the Indian Child Welfare Act" and to ensure that the Act "is applied in all States consistent with the Act's express language." 25 C.F.R. § 23.101.

70.     The Department characterizes the Final Rule as a "legislative rule" that "set[s] binding standards for Indian child custody proceedings in State courts" and is "entitled to *Chevron* deference." 81 Fed. Reg. at 38,782, 38,786, 38,788.

71.     The Final Rule provides the "minimum Federal standards governing implementation" of ICWA, 25 C.F.R. § 23.101, and "to ensure compliance with ICWA," *id*. § 23.106(a).

72.     The Final Rule requires state agencies and courts to conduct Executive Branch investigations and duties.

73.     The Final Rule requires "State courts [to] ask each participant in an emergency or voluntary or involuntary child custody proceeding whether the participant knows or has reason to know that the child is an Indian child." 25 C.F.R. § 23.107(a). These inquiries "should be on the record," and "State courts must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." *Id*.

74.     When the state agency or court believes the child is an Indian child, the court must confirm, through "a report, declaration, or testimony included in the record," that the state agency or other party used due diligence to identify and work with all of the tribes of which there is reason to know the child may be a member (or eligible for membership). 25 C.F.R. § 23.107(b). The Final Rule specifies that the state court must confirm that the state agency conducted a "diligent search . . . to find suitable placements meeting the preference criteria." *Id*. § 23.132(c)(5).

75.     The Final Rule dictates to state agencies and courts when and how notice of an involuntary foster care placement or termination of parental rights proceeding involving an Indian child must be provided to an Indian tribe, the child's parents, and the child's Indian custodian. 25 C.F.R. § 23.111. The Final Rule prohibits the continuation of foster care placement or termination of parental rights proceedings in state courts until at least 10 days after receipt of the notice by the parent or Indian custodian and by the tribe or Secretary of the Interior. 25 C.F.R. § 23.112. Upon request, the state court must grant the parent, Indian custodian, or tribe up to 20 additional days from the date upon which notice was received to prepare for the hearing. *Id*.

76.     The Final Rule prescribes how a state court may proceed with an emergency removal or placement of an Indian child, including when to hold a hearing, how to notify the Indian child's custodians, how to make a court record of the proceedings, what evidence must be provided to the court, and when to end the proceeding. 25 C.F.R. § 23.113.

77.     In an involuntary foster care or termination of parental rights proceeding, the Final Rule requires state courts to ensure and document that the state agency has used "active efforts" to prevent the breakup of the Indian family. 25 C.F.R. § 23.120.

78.     The Final Rule defines "active efforts" to include "assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan." 25 C.F.R. § 23.2. "To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe." *Id*.

79.     State agencies must tailor active efforts to the facts and circumstances of the case, which may include, for example:

(1) Conducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;

(2) Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;

(3) Identifying, notifying, and inviting representatives of the Indian child's Tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues;

(4) Conducting or causing to be conducted a diligent search for the Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents;

(5) Offering and employing all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's Tribe;

(6) Taking steps to keep siblings together whenever possible;

(7) Supporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child;

(8) Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources;

(9) Monitoring progress and participation in services;

(10) Considering alternative ways to address the needs of the Indian child's parents and, where appropriate, the family, if the optimum services do not exist or are not available;

(11) Providing post-reunification services and monitoring.

25 C.F.R. § 23.2.

      80.    The Final Rule requires state courts to apply federal substantive rules of decision and federal procedural requirements in state law causes of action that result in state law judgments.

      81.    Only the Indian tribe of which it is believed the child is a member (or eligible for membership) may determine whether the child is a member of the tribe or eligible for membership.

25 C.F.R. § 23.108(a). "The State court may not substitute its own determination regarding a child's membership in a Tribe, a child's eligibility for membership in a Tribe, or a parent's membership in a Tribe." *Id*. § 23.108(b).

82.      When an Indian child is a member or eligible for membership in only one tribe, that tribe must be designated as the Indian child's tribe. But when the child meets the definition of "Indian child" for more than one tribe, then the Final Rule instructs state agencies and courts to defer to "the Tribe in which the Indian child is already a member, unless otherwise agreed to by the Tribes," or allow "the Tribes to determine which should be designated as the Indian child's Tribe." *Id*. § 23.109(b)–(c). Only when the tribes disagree about the child's membership may the state courts designate the tribe to which the child belongs, and the Final Rule provides criteria the courts must use in making that designation. *Id*. § 23.109(c)(2).

83.      The Final Rule instructs state courts that they must dismiss a voluntary or involuntary child custody proceeding when the Indian child's residence or domicile is on a reservation where the tribe exercises exclusive jurisdiction over child custody proceedings. 25 C.F.R. § 23.110(a).

84.      The Final Rule requires state courts to terminate child custody proceedings if any party or the court has reason to believe that the Indian child was improperly removed from the custody of his parent or Indian custodian. 25 C.F.R. § 23.114.

85.      The Final Rule instructs state agencies and courts on how to transfer proceedings to tribal courts. The parent, Indian custodian, or the Indian child's tribe may request transfer at any time, orally or in writing. 25 C.F.R. § 23.115. The Final Rule then requires the state court to promptly notify the tribal court in writing of the transfer petition, and it must transfer the proceeding, unless either parent objects, the tribal court declines the transfer, or good cause exists for

denying the transfer. 25 C.F.R. § 23.116–117. The Final Rule establishes when good cause exists to deny the transfer. 25 C.F.R. § 23.118. If the tribal court accepts the transfer, the Final Rule instructs that the state court should expeditiously provide the tribal court with all records related to the proceeding. 25 C.F.R. § 23.119.

86.     The Final Rule prohibits state courts from ordering a foster care placement of an Indian child unless clear and convincing evidence is presented, including expert testimony, demonstrating that the child is in serious emotional or physical danger in the parent's or Indian custodian's custody. 25 C.F.R. § 23.121(a).

87.     The Final Rule prohibits state courts from terminating parental rights for an Indian child unless evidence beyond a reasonable doubt is presented, including expert testimony, that the child is in serious emotional or physical danger. 25 C.F.R. § 23.121(b). The evidence must demonstrate a causal relationship between the conditions in the home and the likelihood of danger to the child. 25 C.F.R. § 23.121(c)–(d). The Final Rule prohibits the state agency caseworker from serving as an expert witness, and dictates that the Indian child's tribe will designate the expert witness. 25 C.F.R. § 23.122.

88.     In voluntary child custody proceedings, the Final Rule mandates that state courts require the participants to state on the record whether the child is an Indian child, or whether they have reason to believe the child is an Indian child. 25 C.F.R. § 23.124(a). "If there is reason to believe the child is an Indian child, the State court must ensure that the party seeking placement has taken all reasonable steps to verify the child's status," including "contacting the Tribe of which it is believed the child is a member (or eligible for membership and of which the biological parent is a member) to verify the child's status." *Id*. § 23.124(b).

89.     The Final Rule describes what evidence a state court may consider when evaluating the voluntary consent for termination of parental rights, foster care, preadoptive, and adoptive placement by a parent or Indian custodian. 25 C.F.R. § 23.125. For foster care placement, consent may be withdrawn at any time. 25 C.F.R. § 23.125(b)(2)(i). For termination of parental rights and adoption, consent may be withdrawn any time prior to the final decree of termination or adoption. 25 C.F.R. § 23.125(b)(2)(ii)–(iii). Consent given prior to, or within 10 days after, the birth of an Indian child is not valid. 25 C.F.R. § 23.125(e). The Final Rule also dictates what information written consent must contain, 25 C.F.R. § 23.126, and how a parent or custodian may withdraw consent, 25 C.F.R. § 23.127–28.

90.     The Final Rule requires state agencies and courts to follow placement preferences based on the child's Indian parentage.

91.     In adoptive placements "preference must be given in descending order . . . to placement of the child with: (1) A member of the Indian child's extended family; (2) Other members of the Indian child's Tribe; or (3) Other Indian families." 25 C.F.R. § 23.130(a).

92.     "If the Indian child's Tribe has established by resolution a different order of preference than that specified in ICWA, the Tribe's placement preferences apply." *Id*. § 23.130(b).

93.     In other words, in adoptive placement proceedings, the tribe designated as the Indian child's tribe may enact a resolution that prefers placement with another Indian family of another tribe, even if the Indian child has extended family with which he or she may be placed.

94.     In foster care or preadoptive placement proceedings, "preference must be given . . . to placement of the child with: (1) A member of the Indian child's extended family; (2) A foster home that is licensed, approved, or specified by the Indian child's Tribe; (3) An Indian foster home licensed or approved by an authorized non-Indian licensing authority; or (4) An institution for

children approved by an Indian Tribe or operated by an Indian organization which has a program suitable to meet the child's needs." 25 C.F.R. § 23.131(b).

95.     "If the Indian child's Tribe has established by resolution a different order of preference than that specified in ICWA, the Tribe's placement preferences apply, so long as the placement is the least-restrictive setting appropriate to the particular needs of the Indian child . . . ." *Id.* § 23.131(c).

96.     In other words, in foster care and preadoptive placement proceedings, the tribe designated as the Indian child's tribe may enact a resolution that prefers placement with an institution for children approved by another Indian organization, even if the Indian child has extended family with which he or she may be placed.

97.     The Final Rule further requires that the State undertake "a diligent search . . . to find suitable placements meeting the preference criteria."  25 C.F.R. § 23.132(c)(5). The Final Rule also demands that the State may not assess the availability of a preferred placement according to generally applicable standards under state law, but instead must adhere to "the prevailing social and cultural standards of the Indian community in which the Indian child's parent or extended family resides or with which the Indian child's parent or extended family members maintain social and cultural ties."  *Id.*

98.     The "diligent search" requirement usurps the State's authority to assess potential placements under the standards of the State, and instead requires the State to expend significant efforts to locate placements that conform to the Tribe's view of suitability. Because the State must adopt the Tribe's standard of suitability, the Final Rule blocks the State from seeking to promote the best interests of the child.

99.     A state court may depart from the placement preferences contained in Sections 23.130–131 of the Final Rule if there is "good cause." 25 C.F.R. § 23.132. The Final Rule prescribes circumstances in which the "good cause" standard is met. *Id.*

100.     After observing that "State courts . . . differ as to what constitutes 'good cause' for departing from ICWA's placement preferences," 81 Fed. Reg. at 38,782, the Final Rule newly mandates that "[t]he party urging that the ICWA preferences not be followed bears the burden of proving ***by clear and convincing evidence*** the existence of good cause" to deviate from such a placement. 81 Fed. Reg. at 38,838 (emphasis added); *see also* 25 C.F.R. § 23.132(b). Though the Final Rule says that its regulations "do not categorically require" that state courts apply a clear-and-convincing standard of proof—the regulation itself says that a party seeking departure from the placement preferences "should bear the burden of proving by clear and convincing evidence that there is good cause," 25 C.F.R. § 23.132(b)—the Final Rule simultaneously says the clear-and-convincing standard "should be followed." 81 Fed. Reg. at 38,843.

101.     The Final Rule also expressly repudiates the Existing Indian Family doctrine. *See* 81 Fed. Reg. at 38,802 ("[T]here is no [Existing Indian Family] exception to the application of ICWA."). Accordingly, the Final Rule provides that state courts "may not consider factors such as the participation of the parents or Indian child in Tribal cultural, social, religious, or political activities, the relationship between the Indian child and his or her parents, whether the parent ever had custody of the child, or the Indian child's blood quantum." 81 Fed. Reg. at 38,868 (codified at 25 C.F.R. § 23.103(c)).

102.     And contrary to the idea—previously embraced by the BIA—that "the use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child," 44 Fed. Reg. 67,584, 67,584 (Nov. 26,

1979), the Final Rule now claims that "Congress intended the good cause exception to be narrow and limited in scope," 81 Fed. Reg. at 38,839. Accordingly, the Final Rule sets forth "five factors upon which courts may base a determination of good cause to deviate from the placement preferences," and further "makes clear that a court may not depart from the preferences based on the socioeconomic status of any placement relative to another placement or based on the ordinary bonding or attachment that results from time spent in a non-preferred placement that was made in violation of ICWA." 81 Fed. Reg. at 38,839; *see also* 25 C.F.R. § 23.132(c)–(e).

103.    The BIA threatens enforcement of the Final Rule through the invalidation of child custody proceedings involving Indian children that do not follow ICWA or the Final Rule's requirements.

104.    The Final Rule requires state courts to vacate adoption decrees, up to two years after their issuance, if the parents of the Indian child file a petition to vacate the order. 25 C.F.R. § 23.136. By contrast, in Texas, "the validity of an adoption order is not subject to attack after six months after the date the order was signed." Tex. Fam. Code § 162.012.

105.    If an Indian child has been adopted, the state court must notify the child's biological parent or prior Indian custodian and the child's tribe whenever the final adoption decree has been vacated or set aside or the adoptive parent has voluntarily consented to the termination of parental rights. 25 C.F.R. § 23.139.

106.    Once an Indian child reaches age 18, the state court that entered the final adoption decree must inform that person of his or her tribal affiliation. 25 C.F.R. § 23.138.

107.    Whenever a state court enters a final adoption decree or an order in a voluntary or involuntary Indian child placement, the Final Rule requires the state court or designated state agency to provide a copy of the decree or order to the BIA within 30 days along with biographical

information about the child, the biological parents, the adoptive parents, the state agency possessing information about the child, and information about tribal membership of the child. 25 C.F.R. § 23.140.

108.    The Final Rule requires states to "maintain a record of every voluntary or involuntary foster care, preadoptive, and adoptive placement of an Indian child and make the record available within 14 days of a request by an Indian child's Tribe or the Secretary." 25 C.F.R. § 23.141.

## II.    FACTS RELEVANT TO THE INTERESTS OF PLAINTIFFS

### A.    A.L.M.'s Adoption Proceedings

109.    A.L.M. was born in Arizona to M.M. and J.J., an unmarried couple. A.L.M. is an "Indian child" as that term is defined in the Final Rule because he is eligible for membership in an Indian tribe, his biological mother is an enrolled member of the Navajo Nation, and his father is an enrolled member of the Cherokee Nation. *See* 25 C.F.R. § 23.2.

110.    A.L.M. has been living with Chad and Jennifer Brackeen for more than 16 months and, with the support of A.L.M.'s biological parents and his paternal grandmother, the Brackeens sought to become his adoptive parents. Because of the Final Rule and Section 1915 of ICWA, the Brackeens have faced great obstacles in their efforts to adopt a child they raised for more than half his life, and A.L.M. faces the possibility of separation from both his prospective adoptive and biological families.

111.    A few days after A.L.M.'s birth, his birth mother took A.L.M. to Fort Worth, Texas to live with A.L.M.'s paternal grandmother. In June 2016, when A.L.M. was ten months old, Child Protective Services ("CPS"), a division of the Texas DFPS, removed him from his grandmother and placed him in the foster care of the Brackeens. A.L.M. was identified as an "Indian child" within the meaning of ICWA, and as required by the Final Rule, 25 C.F.R. § 23.11, both the Cherokee Nation and the Navajo Nation were notified of A.L.M.'s placement with the Brackeens.

112.     Texas DFPS, the Cherokee Nation, and the Navajo Nation were unable to identify an ICWA-preferred foster placement for A.L.M., and he remained with the Brackeens.

113.     The Brackeens have raised A.L.M. for over 16 months and regard him as a member of their family.

114.     The parental rights of A.L.M.'s biological parents were terminated on May 2, 2017, and he is free to be adopted under Texas law.

115.     In June 2017, a year after the Brackeens took custody of A.L.M., the Navajo Nation submitted a letter to the family court suggesting they had located a potential alternative placement for A.L.M. with non-relatives in New Mexico.

116.     On July 19, 2017, the Brackeens brought an original petition to adopt A.L.M. in the 323rd District Court, Tarrant County, Texas.

117.     In accordance with the requirements of the Final Rule, *see* 25 C.F.R. § 23.11, the Cherokee and Navajo Nations were notified of the adoption proceeding.

118.     Neither the Navajo Nation nor the prospective alternative placement located by the Navajo Nation intervened in the Texas adoption proceeding or otherwise formally sought to adopt A.L.M. The Brackeens are the only persons before the Texas family court seeking to adopt A.L.M.

119.     On August 1, 2017, the family court held a hearing regarding the Brackeens' petition for adoption.

120.     At the August 1, 2017 hearing, the Navajo Nation's social worker testified that the two tribes "came up with [an] agreement" among themselves in the hallway prior to the hearing to determine the designation of A.L.M.'s tribe. The tribes ultimately decided to designate the Navajo Nation as A.L.M.'s tribe, but this "determination of [A.L.M.'s] Tribe for purposes of ICWA and

[the Final Rule] do[es] not constitute a determination for any other purpose." 25 C.F.R. § 23.109(c)(3).

121.    The Brackeens argued that ICWA's placement preferences did not apply in their adoption case because they were the only party before the family court formally seeking to adopt A.L.M., *see Adoptive Couple*, 133 S. Ct. at 2564, and that, in any event, good cause existed to depart from ICWA's preferences for placing A.L.M. with an Indian family because A.L.M.'s biological parents wanted him to be adopted by the Brackeens, and an expert in developmental psychology testified that A.L.M. will suffer severe emotional and psychological harm if he is removed from the Brackeens' care.

122.    Although ICWA does not define "good cause," the Final Rule requires the Brackeens—who were the only party to the proceeding seeking adoption—to "bear the burden of proving by clear and convincing evidence" that there was "good cause" to allow them, as a non-Indian couple, to adopt A.L.M. 25 C.F.R. § 23.132(b).

123.    To establish good cause, the Brackeens presented the testimony of A.L.M.'s biological parents, who each testified that they reviewed the placement options and preferred A.L.M.'s adoption by the Brackeens. *See* 25 C.F.R. § 23.132(c)(1). A.L.M.'s biological mother testified that A.L.M. "loves [the Brackeens]." A.L.M.'s biological father testified that the Brackeens are "the only parents [A.L.M.] knows." In addition, A.L.M.'s paternal grandmother also requested that A.L.M. remain with the Brackeens, testifying that they "have been the primaries in his life." A.L.M.'s court appointed guardian recommended that A.L.M. remain with the Brackeens. Other witnesses testified that taking A.L.M. from the Brackeens would also separate him from his biological family, with whom he currently has regular contact. Finally, the Brackeens presented an expert in psychology who concluded that the Brackeens and A.L.M. were strongly emotionally

bonded, and that taking A.L.M. from his family would likely cause significant emotional and phys-iological harm that could last for many years. The expert further testified that A.L.M. is particularly at risk for severe emotional and psychological harm due to trauma he experienced in his infancy before he was placed with the Brackeens, and that he is "four to six times more likely" to experi-ence that harm if he is removed from his home to live with strangers in New Mexico.

124.    Texas DFPS did not dispute that the Brackeens were fit parents to adopt A.L.M., or otherwise suggest any reason unrelated to ICWA why the Brackeens' petition to adopt A.L.M. should be denied. Texas DFPS maintained, however, that notwithstanding the fact that the Brack-eens were the only parties that had petitioned to adopt A.L.M., ICWA's placement preferences applied and could be overcome only upon a showing of "good cause." To rebut the Brackeens' showing of "good cause," Texas DFPS pointed to the Final Rule's clear-and-convincing standard of proof, arguing that the Brackeens did not satisfy the heightened showing required to justify a departure from the placement preferences.

125.    On August 22, 2017, the family court entered an order denying the Brackeens' adoption petition. The Brackeens' petition to adopt A.L.M. was denied solely because the family court concluded that ICWA and the Final Rule applied to the Brackeens' petition and that the Brackeens had failed to satisfy, by the Final Rule's clear and convincing burden of proof, that "good cause" exists to depart from the Final Rule's and ICWA's "placement preferences." *See* 23 C.F.R. § 23.132; *see also* Order Denying Request for Adoption of Child, *In re A.L.M., a Child*, No. 323-105593-17 (323rd Dist. Ct., Tarrant Cty., Texas Aug. 22, 2017).

126.    Although the court acknowledged that "Petitioners are the only party before the Court seeking adoption," it concluded that "25 U.S.C. § 1915 preferences are applicable," and that "preference shall be given to other members of the child's tribe." Order Denying Request for

30

Adoption of Child, *In the Interest of A.L.M.*, No. 323-105593-17 (323rd Distr. Ct., Tarrant County, Tex. Aug. 22, 2017), ¶ 5. The Court held that the Brackeens "did not meet their burden under" the Final Rule, 25 C.F.R. § 23.132 (which imposes the "clear and convincing evidence" burden on the prospective adoptive parents), to "show good cause to depart from" ICWA's preferences. *Id.*

127.    Shortly after the family court denied the Brackeens' petition for adoption, Texas DFPS, applying the placement preferences applicable to foster care and preadoptive placements, *see* 25 C.F.R. § 23.131, stated its intention to immediately move A.L.M. to the Navajo Nation's proposed placement in New Mexico.

128.    The Brackeens sought an emergency order staying any change in placement pending appeal. Texas appeared as *amicus curiae* in support of the Brackeens' stay request, arguing that ICWA violates the right of equal protection of the laws under the United States Constitution.

129.    On September 8, 2017, the family court entered a temporary order staying any change in placement pending the outcome of the Brackeens' appeal to the Texas Second District Court of Appeals, Fort Worth, Texas, holding that such an order was necessary and appropriate to protect A.L.M.'s safety and welfare during the pendency of the appeal. *See* Tex. Fam. Code § 109.001 ("[T]he court may make any order necessary to preserve and protect the safety and welfare of the child during the pendency of an appeal as the court may deem necessary and equitable.").

130.    In accordance with the Final Rule's provisions concerning preadoptive and foster care placements, Texas DFPS stated its intention to move A.L.M. to the Navajo Nation's proposed placement with non-relatives in New Mexico if the family court's ruling is affirmed.

131.    In anticipation of a favorable ruling on appeal, Texas DFPS proposed that, during the pendency of the appeal, it take A.L.M., without either of the Brackeens, to New Mexico for "transitional" overnight visits with the Navajo Nation's proposed alternative placement.

132.    During the pendency of the appeal, Texas DFPS informed counsel for the Brackeens that the Navajo couple previously identified as an alternative placement for A.L.M. was no longer an available placement, and that both the Navajo Nation and Cherokee Nation lacked viable adoptive placements for A.L.M. Based on these developments, the Brackeens, Texas DFPS, and the guardian ad litem entered into a settlement agreement recognizing that the Brackeens are now the only party seeking to adopt A.L.M., that Section 1915(a)'s placement preferences therefore do not apply, and that, even if they did apply, good cause exists to depart from them. Based on that agreement, the Brackeens, Texas DFPS, and the guardian ad litem filed a joint unopposed motion to set aside the trial court's judgment and to remand to the trial court so that it could make a determination as to A.L.M.'s best interest.

133.    The Second Court of Appeals granted the parties' motion on December 7, 2017, setting aside the trial court's prior judgment and remanding to the trial court. *See In the Interest of A.M., A Child*, 02-17-00298-CV, 2017 WL 6047677, at *1 (Tex. App.—Fort Worth Dec. 7, 2017, no pet. h.). The case has been remanded, but no order allowing the Brackeens to adopt A.L.M. has yet been entered. Moreover, the Tribes may contest the adoption, as ICWA requires the State to permit them to participate as a party. Furthermore, under ICWA and the Final Rule, the Brackeens' adoption is subject to collateral attack for two years—eighteen months more than the period provided under Texas law.

134.    The Brackeens are directly and deeply aggrieved by the Final Rule and ICWA because these provisions concerning adoptive placements are currently being applied to delay (and perhaps deny altogether) their adoption of A.L.M.

135.    Even though that the initial denial of their petition for adoption has now been vacated by the Second Court of Appeals, *In the Interest of A.M., A Child*, 02-17-00298-CV, 2017 WL 6047677, at *1 (Tex. App.—Fort Worth Dec. 7, 2017, no pet. h.), the Brackeens' renewed petition to adopt A.L.M. will likewise be subject to ICWA's and the Final Rule's discriminatory mandates, and the Brackeens will be compelled to spend time, effort, and money to demonstrate that they should be permitted to adopt A.L.M. even though they are not an "Indian family" preferred by ICWA and the Final Rule. And even assuming the Brackeens' renewed petition to adopt is granted, because A.L.M. is an "Indian child," their adoption will be subject to collateral attack for eighteen months longer than Texas law would otherwise allow.

136.    The Brackeens are further injured by the Final Rule and ICWA because they are forced to expend substantial sums of money to litigate issues concerning the Final Rule's and ICWA's placement preferences in state court beyond the resources needed to adopt A.L.M. were he not an Indian child within the meaning of the Final Rule and ICWA.

137.    Until their petition to adopt A.L.M. was denied, the Brackeens intended to provide foster care for, and possibly adopt, additional children in need. Because of their experience with the Final Rule and ICWA, the Brackeens are reluctant to provide a foster home for other Indian children in the future. Because the Brackeens are not an Indian family under ICWA, they know that any future foster or adoption placement involving a child who may be an Indian child could subject them and the child to years of delay and litigation. ICWA and the Final Rule threaten to

repeat the trials that A.L.M. and the Brackeens have already endured with any future foster or adoptive children.

138.     ICWA and the Final Rule therefore interfere with the Brackeens' intention and ability to provide a home to additional children as well. This, in turn, damages Texas by limiting the supply of available, qualified homes necessary to provide support for children in need.

**B.     Baby O.'s Adoption Proceedings**

139.     Baby O. was born in Nevada in March 2016. While pregnant with Baby O., Ms. Hernandez decided that she would be unable to provide the support that Baby O. would need to thrive and made the difficult decision to put Baby O. up for adoption at her birth.

140.     Nick and Heather Libretti are a married couple living in Sparks, Nevada. Mr. Libretti is a Marine Corps veteran and works as an auto mechanic. Mrs. Libretti is a marketing and public relations manager for a major antique car show. They are heavily involved in their community, particularly in work that serves at risk youth.

141.     Nick and Heather decided to become foster and adoptive parents several years ago and took in two young boys who needed a home. They have now adopted those children and provide them, and their older brother, with the love and support of a family.

142.     In 2016, the Librettis were overjoyed to have Baby O. come into their lives. Although Baby O. has significant medical needs, the Librettis were eager to welcome her into their family.

143.     Ms. Hernandez met the Librettis and agreed that they would provide a loving and nurturing home to Baby O. When Baby O. was born, the Librettis came to meet her in the hospital; Baby O. went home with the Librettis three days after her birth.

144.     Because of gestational difficulties, Baby O. suffers from a number of medical ailments that require extensive care and management. The Librettis have arranged and ensured that

Baby O. receives all the treatment she needs to achieve full health. So far, this has required two surgeries and one extended hospital stay and frequent medical care. Baby O.'s medical needs are ongoing.

145.    Ms. Hernandez, along with Baby O.'s biological siblings, lives a mere twenty-minute drive from the Librettis and has remained part of Baby O.'s life. She and the Librettis visit one another regularly so that Baby O., Ms. Hernandez, and Baby O.'s biological siblings are able to have a warm and loving relationship. She supports the Librettis' efforts to adopt Baby O. and hopes that they are able to finalize the adoption soon. The Librettis and Ms. Hernandez have agreed to an ongoing visitation agreement which will ensure that Ms. Hernandez remains a part of Baby O.'s life.

146.    Baby O.'s birth father, E.R.G., is descended from members of the Ysleta del sur Pueblo Tribe (also known as the Tigua or Tiwa Tribe), located in El Paso, Texas. At the time of Baby O.'s birth, E.R.G. was not a registered member of the Tribe. E.R.G. and Ms. Hernandez have never been married. They have two children in addition to Baby O.

147.    Baby O.'s biological paternal grandmother is a registered member of the Ysleta del sur Pueblo Tribe. The Tribe has intervened in the court proceedings regarding custody of Baby O. Contrary to the wishes of Baby O.'s parents, the Tribe seeks to remove Baby O. from the Librettis and send her into foster care on the reservation in west Texas. In its effort to justify Baby O.'s removal, the Tribe has repeatedly brought forward potential foster placements.

148.    Because of the Final Rule's "diligent search" requirements, the State cannot conduct its normal review of potential alternate placements before concluding that adoption by the Librettis is in the best interests of Baby O. Instead, the State is made an agent for the Tribe, and

must conduct full reviews of any placement that the Tribe considers more socially or culturally suitable than allowing Baby O. to remain with the only family she has ever known.

149.    The diligent search requirement blocks the Librettis from seeking to adopt Baby O. until the State has completed an exhaustive review of any potential placement identified by the Ysleta del sur Pueblo Tribe. To date, in its efforts to prevent Baby O.'s adoption by the Librettis, the Ysleta del sur Pueblo Tribe has identified thirty-six placements requiring thirty-six full home studies.

150.    Nevada has already conducted seven home studies of individuals designated by the tribe and found them all not suitable to care for Baby O., particularly given her significant medical needs. Most recently, the Tribe has nominated an additional twenty-nine purported foster placements. Nevada child services is in the process of reviewing each.

151.    The Librettis intend to petition for adoption of Baby O. as soon as they are able to do so. At present, the Tribe's involvement in the Nevada custody proceeding, made possible only because of ICWA, prevents the Librettis from petitioning to adopt. The Librettis are the only people who have indicated an intent to formally adopt Baby O., and they are the only family she has ever known.

C.      **Child P.'s Adoption Proceedings**

152.    Child P. was born in July 2011. She was placed in foster care in the summer of 2014 when her biological parents were arrested and charged with various drug related offenses. For her first two years in foster care, Child P. was bounced from one placement to another, staying with various relatives or foster parents, none of whom was able to provide her with a stable or permanent home.

153.    Minnesota also attempted to return Child P. to the care of her birth mother, but Child P. had to be returned to foster care after her birth mother relapsed. Finally, after Child P. had

been in foster care for nearly two years, a Minnesota court terminated the parental rights of her birth parents. Later that month, Child P. joined the Clifford family and has been with them ever since.

154.    Jason and Danielle Clifford, Child P.'s foster and adoptive parents, have been married since 2007. Recognizing the significant need for foster families in their area, the Cliffords chose to become foster parents through the Hennepin County, Minnesota, adoption services, rather than pursuing an adoption internationally or through a private adoption agency. Since Child P. joined the Cliffords' family in July 2016, they have loved and cared for her, guiding her through her entrance into school and helping her through more than a year of child therapy in an attempt to heal the psychological wounds inflicted by the neglect and instability of her early life. The Cliffords love and care for Child P. as their own child. Child P. has made many friends, including through the Girl Scouts and the Cliffords' church, and has been warmly welcomed as a member of the Clifford family.

155.    Child P.'s maternal grandmother is a registered member of the White Earth Band of Ojibwe Tribe. When Child P. first entered state custody, her biological mother informed the court that Child P. was not eligible for tribal membership. In the fall of 2014, several months after Child P. entered foster care, the White Earth Band wrote a letter to the Court confirming that Child P. was not eligible for membership in the tribe. Nevertheless, the Court sent notices, as required under ICWA, in the fall of 2014 and the spring of 2015 informing the White Earth Band that Child P. was in the custody of the state. Not until January 2017—some six months after Child P. was placed with the Cliffords—did the Tribe write to the court and insist, without explanation, that Child P. was eligible for membership.

37

156.    Most recently, in an unsupported assertion made in a brief, counsel for the White Earth Band announced that Child P. was now a member of the Tribe for purposes of ICWA. Considering itself bound by this pronouncement, the Minnesota state court has concluded that ICWA applies to all custody determinations regarding Child P.

157.    The Cliffords wish to adopt Child P. to ensure that she has a permanent home and to make her a part of their family under the law, as she already is in practice. Child P.'s guardian ad litem supports their efforts to adopt and agrees that adoption by the Cliffords is in Child P.'s best interest. The Cliffords intend to file a formal petition for adoption before the end of 2017, but because of ICWA they will face heightened legal barriers to adopting Child P. purely because of her ancestry.

### D.    The Impact of ICWA and the Final Rule on State Plaintiffs

158.    ICWA and the Final Rule harm State agencies charged with protecting child welfare from coast to coast by usurping lawful authority over the regulation of child custody proceedings and the management of child welfare services. It also jeopardizes millions of dollars in federal funding.

159.    Three federally recognized tribes exist in Texas: Ysleta del Sur Pueblo (also known as the Tigua or Tiwa) in El Paso, Texas; Kickapoo Tribe of Texas in Eagle Pass, Texas; and Alabama-Coushatta Tribe of Texas near Livingston, Texas. The Kickapoo and Alabama-Coushatta tribes have reservations in Texas.

160.    Four federally recognized tribes exist in Louisiana:  Chitimacha Tribe in Charenton, Louisiana; Coushatta Tribe in Elton, Louisiana; Tunica-Biloxi Tribe in Marksville, Louisiana; and Jena Band of Choctaw Indians in Jena, Louisiana.

161.    One federally recognized tribe exists in Indiana: Pokagon Band of Potawatomi Indians. This Tribe maintains its official headquarters in Dowagic, Michigan, but some Pokagon members live in Northern Indiana.

162.    In 2010, the U.S. Census Bureau reported that the population of American Indian and Alaska Native persons living in Texas exceeded 315,000. *See* U.S. Census Bureau, *The American Indian and Alaska Native Population: 2010* at 7, Table 2, American Indian and Alaska Native Population for the United States, Regions, and States, and for Puerto Rico: 2000 and 2010 (Jan. 2012), *available at* https://www.census.gov/prod/cen2010/briefs/c2010br-10.pdf.

163.    In 2010, the U.S. Census Bureau reported that California and Oklahoma had the largest American Indian and Alaska Native populations, over 723,000 and 482,000, respectively. *Id*. at 6–7. New Mexico had a population of over 219,000 American Indian and Alaska Native persons. *Id*. at 7.

164.    Given the three federally recognized tribes within Texas's borders, Texas's shared borders with Oklahoma and New Mexico, and the trend of Californians moving to Texas,[1] Texas maintains frequent and ongoing contact with Native Americans.

165.    Similarly, given the number of federally recognized tribes within Louisiana and Indiana's borders, and their shared borders with States that also host tribes, Louisiana and Indiana maintain frequent and ongoing contact with Native Americans.

166.    State Plaintiffs possess sovereign authority over family law issues within their borders. *Sosna*, 419 U.S. at 404.

---

[1]    Katey Psencik, "Everyone is moving to Texas, according to new report," *Austin American-Statesman*, Jan. 31, 2017, *available at* http://austin.blog.statesman.com/2017/01/05/everyone-is-moving-to-texas-according-to-new-report.

167.   ICWA and the Final Rule place significant responsibilities and costs on State agencies and courts to carry out federal Executive Branch directives.

168.   Texas DFPS, Louisiana DCFS, and Indiana DCS each handle several Indian child cases every year.

169.   Texas DFPS, Louisiana DCFS, and Indiana DCS are authorized to file suits affecting the parent-child relationship, Tex. Fam. Code § 262.001; La. Child. Code art. 1004; Ind. Code § 31-34-9-1, and in some circumstances take possession of a child without a court order, *see, e.g.*, Tex. Fam. Code § 262.104.

170.   ICWA and the Final Rule affect each and every child custody matter handled by Texas DFPS, Louisiana DCFS, and Indiana DCS and State Plaintiffs' courts because they must first determine if the child is an Indian child.

171.   Texas, Louisiana, and Indiana law requires their respective State agencies and courts to act in the best interest of the child in foster care, preadoptive, and adoptive proceedings.

172.   ICWA and the Final Rule replace State Plaintiffs' best-interest-of-the-child standard with one that mandates racial or ethnic preferences.

173.   The State Plaintiffs prohibit their agencies and courts from using racial preferences in foster care, preadoptive, and adoptive proceedings. Tex. Fam. Code §§ 162.015, 264.1085; La. Const. art. 1, § 3. Federal law also prohibits racial discrimination in adoption or foster care placements, but exempts child custody proceedings covered by ICWA. 42 U.S.C. § 1996b. Texas law exempts ICWA cases from these nondiscrimination rules, but the public policy of Texas is to prohibit racial or ethnic discrimination in foster care placements and adoptions. But for ICWA, the State Plaintiffs' courts would apply nondiscrimination laws to child custody proceedings.

174.    In an adoption proceeding, the State Plaintiffs' agencies and courts must give pref-
erence, in the absence of good cause to the contrary, to placement of an Indian child with (1) a
member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other
Indian families. 25 U.S.C. § 1915(a).

175.    In a foster care or preadoptive proceeding, the State Plaintiffs' agencies and courts
give preference, in the absence of good cause to the contrary, to placing the child with (1) a mem-
ber of the child's extended family; (2) a foster home specified by the Indian tribe; (3) an Indian
foster home; or (4) an institution for children approved by the Indian tribe or operated by an Indian
tribe. 25 U.S.C. § 1915(b).

176.    ICWA requires the State Plaintiffs' agencies and courts to follow a resolution by
the Indian child's tribe to alter the order of preferences related to the child's placement in any
foster care or adoption proceeding, even if Texas and the Constitution do not recognize that tribe
as an equally footed sovereign deserving full faith and credit. 25 U.S.C. § 1915(c).

177.    ICWA and the Final Rule require the State Plaintiffs' child protective services to
undertake additional responsibilities, inquiries, and costs in every child custody matter it handles.

178.    For example, the Texas CPS Handbook contains Texas DFPS's policies and proce-
dures for compliance with ICWA and the Final Rule. A true and correct copy of the relevant sec-
tions of the Texas CPS Handbook is attached as Exhibit 1 to the Complaint.

179.    Section 1225 of the CPS Handbook states: "CPS policy requires workers in every
abuse or neglect case to determine whether a child or the child's family has Native American
ancestry or heritage. If Native American ancestry is claimed, CPS workers are required to follow
specific procedure to ensure compliance with ICWA." Ex. 1, Texas DFPS, CPS Handbook § 1225,
*available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_1200.asp#CPS_1225.

180.     Section 5340 of the Texas CPS Handbook provides that "[i]f a DFPS lawsuit involves a Native American child, the Indian Child Welfare Act (ICWA) applies and the legal requirements change dramatically." Texas DFPS, CPS Handbook § 5340, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_5300.asp#CPS_5340.

181.     Even though ICWA does not apply in every case, Texas CPS case workers must "*inquire* about Native American history in *every* case." *Id*. (emphasis in original).

182.     Sections 5840–5844 of the Texas CPS Handbook instruct Texas DFPS caseworkers on when and how to apply ICWA and the Final Rule to child custody matters.

183.     Section 5841 of the Texas CPS Handbook notes that "[f]ailure to comply with the ICWA can result in a final order being reversed on appeal." Texas DFPS, CPS Handbook § 5841, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_5800.asp#CPS_5840.

184.     Texas DFPS caseworkers must "routinely ask[] families whether they are Native American; document[] the families' responses; and consult[] with the attorney representing DFPS and the regional attorney, if the caseworker believes that a case may involve a Native American child." *Id*.

185.     Section 5844 of the CPS Handbook provides that if an Indian child "is taken into DFPS custody, almost every aspect of the social work and legal case is affected." Texas DFPS, CPS Handbook § 5844, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_5800.asp#CPS_5840. If ICWA applies, the legal burden of proof for removal, obtaining any final order terminating parental rights, and restricting a parent's custody rights is higher; DFPS must serve the child's parent, tribe, Indian custodian, and the BIA with a specific notice regarding ICWA rights, DFPS and its caseworkers "must make active efforts to reunify the child and family"; the child must be placed according to ICWA statutory preferences; expert testimony on tribal child

and family practices may be necessary; and a valid relinquishment of parental rights requires a parent to appear in court and a specific statutory procedure, just to name a few. *Id.*

186.    Texas DFPS caseworkers must fill out and submit Form 1706 for approval in any ICWA matter. A true and correct copy of Form 1706 is attached as Exhibit 2 to this Complaint. *See* Texas DFPS Form 1706, Indian Child Welfare Act Checklist, *available at* https://www.dfps.state.tx.us/Application/FORMS/showFile.aspx?Name=1706.doc.

187.    Texas DFPS Form 1706 requires CPS case workers to: (1) assess possible Indian child status during the initial interview of every child and family it encounters, and every time an additional family member is located; (2) contact Texas DFPS lawyers regarding possible ICWA cases and consult with them regularly throughout the case; (3) modify removal of custody affidavits to include ICWA information; (4) verify that any foster or adoptive placement follows ICWA's preferences unless the tribe alters those preferences or the court finds good cause not to alter them; (5) send membership query letters to each identified tribe in every Indian child case; (6) send notice of pending custody proceedings involving Indian children to each parent, any Indian custodian, each identified tribe, the Secretary of Interior, and the BIA area director; (7) send notice to the Secretary of Interior and the BIA area director if any parent, custodian, or tribe is unknown or cannot be located; (8) contact the tribe by telephone and fax if CPS receives no response to the formal notice; (9) file notices with proof of service in the relevant court; (10) make active efforts to preserve the Indian family by conferring with tribal social workers and document the services provided; and (11) consult with DFPS attorneys regarding ICWA requirements for in court procedures.

188.    Texas DFPS promulgated Appendices 1226-A and 1226-B of the CPS Handbook, which contain guidelines and checklists for CPS staff, to ensure Texas complies with ICWA and

the Final Rule. *See* Ex. 1, Texas DFPS, CPS Handbook, Appendix 1226-A: Child-Placing Requirements of the Indian Child Welfare Act and Related Guidelines and Regulations, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_px_1226a.aspafd; Ex. 2, Texas DFPS, CPS Handbook, Appendix 1226-B: Checklist for Compliance with the Indian Child Welfare Act, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_px_1226b.asp.

189.    Indiana DCS publishes a Child Welfare Manual that includes a section on ICWA compliance. A true and correct copy of the Indiana DCS Child Welfare Manual, Chapter 2, section 12 is attached as Exhibit 3 to the Complaint.

190.    Indiana DCS requires staff to use active efforts to determine if a child is an Indian child and sustain those efforts throughout its involvement with the child and family. Ex. 3.

191.    Indiana DCS requires staff to inquire about Indian child status prior to any initial removal from the parents; at any detention hearing; prior to any change in foster care placement; prior to any adoptive placement; at review hearings and at permanency hearings; and prior to the filing of any termination of parental rights petition. *Id*.

192.    Indiana DCS family case managers must engage the child and family during the initial contact, to assist in determining whether the child and/or family are of Indian heritage or if the child is eligible for membership in a tribe. They must document the child's tribal identity, complete a verification of tribal membership or eligibility, and continue to review the child and family's Indian status throughout the life of the case. A family case manager supervisor must ensure the family case manager asked each child and family member if he or she is a member of an Indian tribe or eligible for membership, ensure proper completion of the Indian status forms, and otherwise assist the family case manager to ensure adherence to ICWA. The Indiana DCS local

44

office attorney must review the documentation of Indian status and serve notification of that information on BIA and the tribe. *Id.*

193.   Louisiana DCFS publishes Document No. 6-240, "Working with Native American Families," that includes information on how it must comply with ICWA. A true and correct copy of Document No. 6-240 is attached as Exhibit 4 to the Complaint.

194.   Louisiana DCFS must use "active efforts" to reunite an Indian child with his or her family or tribal community. "Active efforts constitute more than reasonable efforts as required by Title IV-E of the Social Security Act (42 USC 671(a)(15))." Ex. 4 at 1.

195.   Louisiana DCFS states that "active efforts" include:

- Engaging the Indian child, the Indian child's parents, the Indian child's extended family members, and the Indian child's custodian(s);

- Taking steps necessary to keep siblings together;

- Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;

- Identifying, notifying, and inviting representatives of the Indian child's tribe to participate;

- Conducting or causing to be conducted a diligent search for the Indian child's extended family members for assistance and possible placement;

- Taking into account the Indian child's tribe's prevailing social and cultural conditions and way of life, and requesting assistance of representatives designated by the Indian child's tribe with substantial knowledge of the prevailing social and cultural standards;

- Offering and employing all available and culturally appropriate family preservation strategies;

- Completing a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;

- Notifying and consulting with extended family members of the Indian child to provide family structure and support for the Indian child, to assure cultural connections, and to serve as placement resources for the Indian child;

- Making arrangements to provide family interaction in the most natural setting that can ensure the Indian child's safety during any necessary removal;

- Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or extended family in utilizing and accessing those services;

- Monitoring progress and participation in services;

- Providing consideration of alternative ways of addressing the needs of the Indian child's parents and extended family, if services do not exist or if existing services are not available;

- Supporting regular visits and tribal home visits of the Indian child during any period of removal, consistent with the need to ensure the safety of the child; and,

- Providing post-reunification services and monitoring.

*Id*. at 1-2.

196.    Louisiana's "active efforts" must be conducted while investigating whether the child is a member of a tribe, is eligible for membership in a tribe, or a biological parent of the child is or is not a member of a tribe. *Id*. at 2.

197.    Louisiana "[s]tate courts must ask if there is reason to believe the child subject to the child custody proceeding is an Indian child by asking each party to the case, including the child's attorney and Department representative, to certify on the record whether they have discovered or know of any information that suggests or indicates the child is an Indian child. If the court does not inquire of the child's Indian status, the FC case manager must ensure documentation is included in the report to the court of the child's Indian status and the responses of all parties asked." *Id*.

198.    Louisiana DCFS publishes Document No. 8-440, "Services to Native American Children-Indian Child Welfare Act Provisions." A true and correct copy of Document No. 8-440 is attached as Exhibit 5 to the Complaint.

46

199.   Document No. 8-440 states that ICWA "affects all placements of Indian children including changes or possible changes in placement of Indian children under DCFS authority." *Id*.

200.   Once Louisiana DCFS becomes involved with an Indian child it must maintain on-going contact with the child's tribe because each tribe may elect to handle ICWA differently. *Id*.

201.   The foregoing requirements and responsibilities are just some of those imposed on the State Plaintiffs, and all States, by ICWA and the Final Rule.

202.   In voluntary child custody proceedings, if the child is an Indian child, State Plaintiffs' courts must ensure that the party seeking placement, often Texas DFPS, Louisiana DCFS, and Indiana DCS, has taken "all reasonable steps" to verify the child's status. 25 C.F.R. § 23.124.

203.   ICWA and the Final Rule require State Plaintiffs' courts to perform federal Executive Branch functions, such as gathering and distributing information for the federal government.

204.   ICWA and the Final Rule require state judges to ask each participant, on the record at the commencement of child custody proceedings, whether the person knows or has reason to know the child is an Indian child and to instruct the parties to inform the court of any such information that arises later. 25 C.F.R. § 23.107(a). If the state court believes the child is an Indian child, it must document and confirm that the relevant state agency (1) used due diligence to identify and work with all of the tribes that may be connected to the child and (2) conducted a diligent search to find suitable placements meeting the preference criteria for Indian families. *Id*. §§ 23.107(b), 23.132(c)(5).

205.   ICWA and the Final Rule require State Plaintiffs' agencies and courts to maintain indefinitely records of placements involving Indian children, and subject those records to inspection by the Secretary and the child's Indian tribe at any time. 25 U.S.C. §§ 1915(e), 1917; 25 C.F.R. §§ 23.140–41. This increases costs for State Plaintiffs' agencies and courts which have to maintain

additional records not called for under state law and hire or assign additional employees to maintain these records indefinitely.

206.    ICWA and the Final Rule require State Plaintiffs' agencies and courts to provide various forms of notification to individuals and entities potentially impacted by a child custody matter above and beyond what they are required to do under state law. This means State Plaintiffs' agencies and courts must spend additional money to comply with ICWA by hiring and training additional employees, and creating and publishing notifications, just to name a few things.

207.    ICWA and the Final Rule (1) require Texas DFPS, Louisiana DCFS, and Indiana DCS to notify an Indian custodian and a tribe of its absolute right to intervene in the proceedings of an Indian child bearing that tribe's heritage; (2) require Texas, Louisiana, and Indiana courts to grant the Indian custodian or tribe additional time to prepare for such proceedings; (3) require Texas DFPS, Louisiana DCFS, and Indiana DCS to satisfy the State courts of active efforts to provide remedial services and rehabilitative programs to keep the family together; and (4) require proof beyond a reasonable doubt that serious emotional or physical damage to the child will result if parental rights are not terminated. 25 U.S.C. §§ 1911–1912; 25 C.F.R. § 23.111–23.121. The State Plaintiffs' laws do not similarly provide for these rights and responsibilities, and permits the termination of parental rights based on clear and convincing evidence. *See, e.g.*, Tex. Fam. Code §§ 161.001(b), 161.206.

208.    For example, Texas and Louisiana laws require their state agencies to make reasonable efforts in child custody proceedings, but ICWA requires "active efforts." This substantially changes the cost and burden imposed on Texas DFPS and Louisiana DCFS. When referring a family or parent to services, reasonable efforts means providing a referral, but leaving the family

to seek out assistance on their own, while the active efforts required by ICWA means arranging services and helping families engage in those services.

209.    State Plaintiffs' courts must notify an Indian child's biological parents, prior Indian custodian, and tribe if a final adoption decree is vacated. 25 C.F.R. § 23.139.

210.    State Plaintiffs' courts must affirmatively notify the Indian child once he or she reaches age eighteen of his or her tribal affiliation, increasing costs of maintaining records and resources to keep track of children for nearly 20 years of their lives in some cases. 25 C.F.R. § 23.138.

211.    ICWA section 1911(c) and the Final Rule change the rules of civil procedure for Texas state family courts, by dictating that an Indian child's custodian and the child's tribe must be granted mandatory intervention. Texas Rule of Civil Procedure 60 permits Texas courts to strike the intervention of a party upon a showing of sufficient cause by another party, but ICWA prevents application of this standard for child custody cases involving Indian children. In Louisiana, any person with a justiciable interest in an action may intervene. La. Code Civ. Proc. art. 1091. In Indiana, a person may intervene as of right or permissively, similar to the Federal Rules of Civil Procedure governing intervention. Ind. R. Tr. Proc. 24. ICWA, however, eliminates these require-ments and allows the Indian child's custodian and the child's tribe mandatory intervention.

212.    State Plaintiffs' agencies and courts must defer to the decisions of the child's Indian tribe when evaluating membership or eligibility for membership. 25 C.F.R. §§ 108–09.

213.    In a termination of parental rights proceedings, ICWA requires evidence beyond a reasonable doubt, and requires Texas DFPS, Louisiana DCFS, and Indiana DCS to hire expert witnesses at the State's expense. 25 U.S.C. § 1912(f). Texas, Louisiana, and Indiana laws require

only clear and convincing evidence. Tex. Fam. Code §§ 161.001(b), 161.206; La. Child. Code art. 1035(A); Ind. Code § 31-37-14-2.

214.    ICWA and the Final Rule purport to override Texas law with respect to when a parent may voluntarily consent to relinquish parental rights. Texas law permits voluntary relinquishment of parental rights 48 hours after birth of the child, Tex. Fam. Code § 161,103(a)(1), Louisiana allows voluntary surrender of paternal rights prior to or after birth of the child and surrender of maternal rights five days after birth of the child, La. Child. Code art. 1130, and Indiana permits voluntary termination of parental rights after birth of the child, Ind. Code § 31-35-1-6, but ICWA and the Final Rule prohibit any consent until 10 days after birth, 25 U.S.C. § 1913(a); 25 C.F.R. § 23.125(e).

215.    ICWA purports to override Texas and Louisiana laws with respect to voluntary relinquishment of parental rights. Texas law permits revocable and irrevocable voluntary relinquishment of parental rights. If the relinquishment is revocable, the revocation must be made before the eleventh day after the revocation affidavit is executed. Tex. Fam. Code § 161.103(b)(10). Louisiana law prohibits a parent from annulling his or her surrender of parental rights 90 days after its execution or after a decree of adoption has been entered, whichever is earlier. La. Child. Code art. 1148. ICWA alters these state laws by permitting revocation of consent for foster care at any time, 25 U.S.C. § 1913(b), and revocation of voluntary termination of parental rights any time prior to entry of a final decree of termination, *id*. § 1913(c).

216.    ICWA significantly alters how long a final adoption decree may be challenged. Under ICWA, the State Plaintiffs' courts must vacate a final decree of adoption involving an Indian child and return the child to the parent if the parent of the child withdraws consent to the final adoption decree on the grounds that the consent was obtained through fraud or duress. The parent

may withdraw consent based on fraud or duress for up to two years after the adoption. 25 U.S.C. § 1913(d); 25 C.F.R. § 23.136. This conflicts directly with Texas, Louisiana, and Indiana law, which provide that an adoption order is subject to direct or collateral attack six months to one year after the date the order was signed by the court. Tex. Fam. Code § 162.012(a) (up to six months); *Goodson v. Castellanos*, 214 S.W.3d 741, 748–49 (Tex. App.—Austin 2007, pet. denied); La. Child. Code art. 1263; Ind. Code § 31-19-14-2. It also betrays the Texas common law principle and Indiana statutory law that the best interest of the child is to reach a final child custody decision so that adoption to a stable home or return to the parents is not unduly delayed. *In re M.S.*, 115 S.W.3d at 548; Ind. Code § 31-19-14-2.

217. ICWA permits the invalidation, by another court of competent jurisdiction, of a State court's final child custody order if a State agency or court did not comply with ICWA. 25 U.S.C. § 1914.

218. Thus, ICWA requires the State Plaintiffs' agencies and courts to undertake additional responsibilities, actions, and costs when caring for an Indian child, and provides Indian custodians and tribes additional procedural protections not expressly afforded other parties to the proceedings.

219. For example, Texas, Louisiana, and Indiana must spend time and money on caseworkers searching for extended family members of the Indian child, contacting those persons, and consulting with them on the case.

220. Texas, Louisiana, and Indiana also must hire expert witnesses, identified by the Indian child's tribe, to testify in the foster care and termination of parental rights proceedings.

221. Texas, Louisiana, and Indiana also must spend money transporting Indian children to their parents or Indian custodian, and to their trial homes.

222.     The requirement that Texas, Louisiana, and Indiana maintain records for nearly 20 years in some child custody cases and provide various forms of notification to the federal government and potential ICWA parties, requires additional money and personnel dedicated to compliance. A good example of this is the Texas CPS Handbook, which dedicates several sections and appendices to documenting and describing how Texas DFPS and Texas courts must comply with ICWA.

223.     If Texas, Louisiana, or Indiana fail to comply with ICWA, they would risk losing Social Security Act funding for child welfare services, which would threaten the elimination of many important social services.

### CLAIMS ALLEGED BY ALL PLAINTIFFS

### COUNT I
### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
### (Not in Accordance with Law – Equal Protection, Tenth Amendment, Article I)

224.     Plaintiffs incorporate previous paragraphs as if fully restated here.

225.     Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the Final Rule complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court," *id.* § 704.

226.     The APA prohibits agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A). The Final Rule is not in accordance with law for a number of independent reasons.

227.     The Final Rule violates the APA because the placement preference regime contained in the unit entitled "Dispositions," 25 C.F.R. § 23.129 *et seq.*, violates the individual plaintiffs' and citizens of State Plaintiffs' equal protection rights under the Fifth Amendment of the

United States Constitution. *Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954). The Final Rule imposes a naked preference for "Indian families" over families of any other race; the Final Rule puts non-Indian families who wish to adopt an "Indian child" to the extraordinary burden of demonstrating good cause to depart from the placement preferences by clear and convincing evidence, while any Indian family would enjoy a presumption that the adoption is in the child's best interests. The Final Rule's classification of Indians and non-Indians, and its discrimination against non-Indians, is based on race and ancestry and violates the constitutional guarantee of equal protection.

228.    The Final Rule further violates the APA because the placement preference regime contained in the unit entitled "Dispositions," 25 C.F.R. § 23.129 *et seq*., unlawfully discriminates against "Indian children" (as defined by the Final Rule) in violation of the Constitution's guarantee of equal protection, by subjecting them to a heightened risk of a placement that is contrary to their best interests and based solely on their race and ancestry. Under State Plaintiffs' laws, a child's placement generally will be made in accordance with his or her best interests. But the Final Rule's placement preferences, its new restriction on evidence that can be considered as a part of an analysis of "good cause" for departing from those preferences, and the new regulation providing that good cause should be shown by clear and convincing evidence combine to substantially increase the risk that an Indian child will be placed in accordance with the placement preferences even when that placement would be contrary to his best interests. This burden applies to Indian children solely by dint of their or their parents' membership in an Indian tribe—eligibility that often (as in this case) turns on blood quantum. The Final Rule thus discriminates against Indian children in State child custody proceedings in violation of equal protection principles under the Fifth Amendment.

53

229.    The Final Rule further violates the APA because the adoption and foster care and preadoptive placement of "Indian children"—the topics regulated by the unit of the Final Rule entitled "Dispositions," 25 C.F.R. § 23.129 *et seq*.,—are not permissible subjects of regulation under the Tenth Amendment. The Final Rule claims that federal regulation of the placement of Indian children is authorized by the Indian Commerce Clause. *See* 81 Fed. Reg. at 38,789; *see also* 25 U.S.C. § 1901(1). But children are not articles of commerce, nor can their placement be said to substantially affect commerce with Indian nations. *See Adoptive Couple*, 133 S. Ct. at 2566–70 (Thomas, J., concurring). The Final Rule therefore is not a valid exercise of federal authority and is unconstitutional.

230.    The Final Rule further violates the APA because the provision concerning post-adoption collateral attacks, 25 C.F.R. § 23.136, violates the Individual Plaintiffs', citizens of State Plaintiffs', and Indian children's equal protection rights under the Fifth Amendment of the United States Constitution. The Final Rule subjects the adoption of an "Indian child" to a period of collateral attack of not less than two years, overriding state laws that provide for shorter periods to attack a voluntary adoption, and thereby disadvantages Indian children and the families that adopt Indian children. This discrimination against Indian children and those that adopt them is based on race and ancestry and violates the constitutional guarantee of equal protection.

231.    The Final Rule further violates the APA because the Final Rule regulates the placement of Indian children not directly, but through State Plaintiffs' governments in violation of the Tenth Amendment. The Final Rule makes this plain when it purports to issue minimum federal standards for "placement of an Indian child *under State law*." 25 C.F.R. §§ 23.130(a), 23.131(a) (emphasis added). And it is not just the portion of State Plaintiffs' child custody regulatory regime administered by state courts that the Final Rule commandeers. The Final Rule also demands that

State Plaintiffs' apply the placement preferences in foster care and preadoptive placements, which, in State Plaintiffs at least, are administered in part by State Plaintiffs' agencies. Even when Congress has power to regulate under one of its enumerated powers, the federal government cannot require a State agency or official to administer a federal regulatory program. *United States v. Printz*, 521 U.S. 898, 935 (1997) ("The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program."). The Final Rule thus violates the anti-commandeering principle under the Tenth Amendment and is unconstitutional.

232.    The Final Rule further violates the APA because the Final Rule delegates to Indian tribes the legislative and regulatory power to pass resolutions in each Indian child custody proceeding that alter the placement preferences state courts must follow in violation of Article I of the Constitution. The Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. 1, § 1. The Constitution authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its general powers. U.S. Const. art. 1, § 8. The Constitution bars Congress and the BIA from delegating to others the essential legislative and administrative functions with which they are vested. The Final Rule thus violates the non-delegation doctrine of Article I, Section 1 of the Constitution and is unconstitutional.

233.    The APA prohibits agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). The Final Rule is arbitrary and capricious agency action for a number of reasons, including that it is an unexplained and unsupported departure from the position adopted in the 1979 Guidelines and held by the defendants for nearly forty years.

234.    The Final Rule further violates the APA because its provision that "[t]he party seeking departure from the placement preferences should bear the burden of proving by clear and convincing evidence that there is 'good cause' to depart from the placement preferences," 81 Fed. Reg. at 38,874 (codified at 25 C.F.R. § 23.132(b)), is contrary to Section 1915 of ICWA and is arbitrary and capricious.

235.    The Final Rule further violates the APA in that its limitation on the evidence that may be considered in the analysis of "good cause," *see* 25 C.F.R. § 23.132(c)–(e), is contrary to Section 1915 of ICWA and is arbitrary and capricious.

236.    The Brackeens are directly aggrieved by the Final Rule's application to their petition to adopt A.L.M., its application to their preadoptive placement of A.L.M., its requirement that the Tribes be permitted to participate as parties to their custody proceeding, and its requirement that two years pass after the issuance of an adoption order before it is immune from collateral attack.

237.    The Librettis are directly aggrieved by the Final Rule's application to Baby O. and by its imposition of heightened standards and substantial burdens (both time and money) in connection with their effort to adopt Baby O.

238.    Ms. Hernandez is directly aggrieved by the Final Rule's application to Baby O. and by its imposition of heightened standards and substantial burdens (both time and money) in connection with her wishes to have her biological child adopted in a placement that best suits Baby O.'s interests and needs.

239.    The Cliffords are directly aggrieved by the Final Rule's application to Child P. and by its imposition of heightened standards and substantial burdens (both time and money) in connection with their effort to adopt Child P.

240.    State Plaintiffs are directly aggrieved by the Final Rule's application to each and every child custody proceeding in their States, and, particularly, to those proceedings in which State Plaintiffs' agencies or courts discover that the child is an Indian child as defined by ICWA. The Final Rule imposes a substantial burden on State Plaintiffs through the expenditure of resources and money in connection with their efforts to comply with the Final Rule for each child custody proceeding. And because of the Final Rule's burden, it necessarily limits prospective foster and adoptive parents so clearly needed to care for children, as now demonstrated by the Brackeens' reluctance to foster additional Indian children.

241.    Plaintiffs have no adequate remedy at law to redress the burdens now being imposed by Final Rule because claims arising under the APA cannot be litigated in State courts.

242.    This Court should declare the Final Rule invalid and set it aside.

## COUNT II
## VIOLATION OF ARTICLE I OF THE CONSTITUTION
### (Commerce Clause)

243.    Plaintiffs incorporate previous paragraphs as if fully restated here.

244.    The Commerce Clause of the United States Constitution provides: "The Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3.

245.    At the time the original Constitution was ratified, commerce consisted of selling, buying, and bartering, as well as transporting for these purposes. *See Adoptive Couple*, 133 S. Ct. at 2567 (Thomas, J., concurring).

246.    At the time the original Constitution was ratified, the Indian Commerce Clause was intended to include "trade with Indians." *See Adoptive Couple*, 133 S. Ct. at 2567 (Thomas, J., concurring).

247.    The Indian Commerce Clause provides Congress with the power to regulate commerce with Indian tribes, but not any Indian person. *See Adoptive Couple*, 133 S. Ct. at 2567 (Thomas, J., concurring).

248.    ICWA locates Congress's authority for the statute in the Indian Commerce Clause. *See* 25 U.S.C. § 1901(1).

249.    Children are not articles of commerce, nor can their placement be said to substantially affect commerce with Indian nations. *See Adoptive Couple*, 133 S. Ct. at 2566–70 (Thomas, J., concurring).

250.    No other enumerated power supports Congress's intrusion into this area of traditional state authority.

251.    ICWA Sections 1901–1923 and 1951–1952 are therefore unconstitutional under the Commerce Clause of Article I.

252.    The Brackeens are directly, personally, and substantially injured by Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences because they are causing delay, and perhaps denial, of their adoption of A.L.M., they require that the Tribes be permitted to participate as parties to A.L.M.'s custody proceeding, and they require the Brackeens to expend substantial resources in an effort to demonstrate "good cause" to depart from them. The Brackeens are further aggrieved by Section 1913(d)'s extended period of collateral attack, and the provision of the Final Rule purporting to implement that provision, 25 C.F.R. § 23.136, because they subject the Brackeen family to a period of uncertainty and mental anguish substantially longer than otherwise would be permitted under Texas law.  The extraordinary burdens imposed by Section 1915 and Section 1913(d), and the portions of the Final Rule

purporting to implement those provisions, have negatively impacted the Brackeens' willingness to foster or adopt other children subject to ICWA in the future.

253. The Librettis are directly aggrieved by the Final Rule's application of Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences to Baby O. because they are causing delay, and perhaps denial, of their adoption of Baby O., and because they impose heightened standards and substantial burdens (both time and money) in connection with the Librettis' efforts to adopt Baby O.

254. Ms. Hernandez is directly aggrieved by the Final Rule's application of Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences to Baby O. because they are causing delay, and perhaps denial, of Ms. Hernandez's preferred placement of Baby O. for adoption by the Librettis, and because they impose heightened standards and substantial burdens (both time and money) in connection with the Librettis' efforts to adopt Baby O.

255. The Cliffords are directly aggrieved by the Final Rule's application of Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences to Child P. because they are causing delay, and perhaps denial, of their adoption of Child P., and they impose heightened standards and substantial burdens (both time and money) in connection with the Cliffords' efforts to adopt Child P.

256. The State Plaintiffs are directly aggrieved by ICWA Sections 1901–1923 and 1951–1952 because those provisions require State Plaintiffs' agencies and courts to carry out the policy objectives of the federal government and execute the federal government's regulatory framework for Indian child in child custody proceedings. State Plaintiffs must abide by ICWA in each and every child custody proceeding, and, particularly, to those proceedings in which State

Plaintiffs' agencies and courts discover that the child is an Indian child as defined by ICWA. ICWA imposes a substantial burden on State Plaintiffs through the expenditure of resources and money in connection with its efforts to comply with ICWA for each child custody proceeding.

257.    Plaintiffs have no adequate remedy at law to redress the injuries they are suffering because of ICWA.

258.    Plaintiffs thus seek a declaration that Sections 1901–1923 and 1951–1952 of ICWA violate Article I of the United States Constitution and are unconstitutional and unenforceable, and an injunction barring the Defendants from implementing or administering that provision by regulation, guideline, or otherwise.

### COUNT III
### VIOLATION OF THE TENTH AMENDMENT
#### (Domestic Relations & Anti-Commandeering )

259.    Plaintiffs incorporate previous paragraphs as if fully restated here.

260.    The Tenth Amendment to the United States Constitution provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

261.    ICWA Sections 1901–1923 and 1951–1952 are not permissible subjects of regulation under the Tenth Amendment.

262.    ICWA's provisions concerning the adoption and foster care and preadoptive placement of "Indian children" are not permissible subjects of regulation under the Tenth Amendment.

263.    Since the adoption of the Constitution, family law and domestic relations have been regarded as being within the virtually exclusive province of the States. *Sosna v. Iowa*, 419 U.S. 393, 404 (1975); *Ohio ex rel. Popovici v. Agler*, 280 U.S. 379, 383–84 (1930).

264.    Adoption proceedings are adjudicated exclusively in state family courts.

265.    Foster care and preadoptive placements also are administered exclusively by States; in Texas, Louisiana, and Indiana they are administered in the first instance by Texas DFPS, Louisiana DCFS, and Indiana DCS.

266.    ICWA locates Congress's authority for the statute in the Indian Commerce Clause. 25 U.S.C. § 1901(1). The Indian Commerce Clause grants Congress the authority "[t]o regulate commerce . . . with the Indian tribes." U.S. Const. art. I, § 8, cl. 3.

267.    Children are not articles of commerce, nor can their placement be said to substantially affect commerce with Indian nations. *See Adoptive Couple*, 133 S. Ct. at 2566–70 (Thomas, J., concurring).

268.    No other enumerated power supports Congress's intrusion into this area of traditional state authority.

269.    ICWA's provisions concerning the adoption and foster care and preadoptive placement of "Indian children" are unconstitutional under the Tenth Amendment because they regulate the placement of Indian children not directly, but through state governments. Even when Congress has power to regulate under one of its enumerated powers, the federal government cannot require a State agency or official to administer a federal regulatory program. *United States v. Printz*, 521 U.S. 898, 935 (1997) ("The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.").

270.    ICWA thus violates the anti-commandeering principle under the Tenth Amendment and is unconstitutional.

271.    ICWA impermissibly commands state governments to administer adoptions and foster care and preadoptive placements according to Congress's instructions. Here, ICWA commands the state family courts to apply ICWA's placement preferences under 25 U.S.C. § 1915(a) to the Individual Plaintiffs' petitions for adopting their children. And it further commands the State Plaintiffs to make foster care or preadoptive placements in accordance with the placement preferences of 25 U.S.C. § 1915(b). ICWA impermissibly commandeers state governments and therefore is unconstitutional.

272.    ICWA Sections 1911, 1912, and 1913, and the Final Rule alter the content of State Plaintiffs' laws by requiring their courts to apply federal substantive rules of decision and federal procedural requirements in state law causes of action that result in state law judgments that form part of the corpus of state law.

273.    ICWA Section 1911 impermissibly alters State Plaintiffs' rules of procedure for foster care placement and termination of parental rights proceedings with federal rules of decision. ICWA grants an Indian custodian of a child and the child's tribe mandatory intervention at any point in the proceedings.

274.    ICWA Section 1912 and the Final Rule increase the standard for termination of parental rights for an Indian child to "evidence beyond a reasonable doubt" and demand expert witness testimony.

275.    ICWA Section 1913 and the Final Rule impermissibly command state governments and courts to change their laws and rules respecting when and how a parent of an Indian child or Indian custodian may give voluntary consent to foster care placement or termination of parental rights.

276.    ICWA Section 1913 also impermissibly commands state courts to allow for revocation of voluntary termination of parental rights any time prior to the final decree of termination.

277.    The Final Rule dictates what State Plaintiffs' agencies and courts must do in cases of emergency removal or placement of an Indian child.

278.    The Final Rule prohibits State Plaintiffs' agencies and courts from making a determination as to an Indian child's membership status with a tribe. State Plaintiffs must defer to the membership determination of the tribe.

279.    The Final Rule commands State Plaintiffs' courts to allow the invalidation of child custody proceeding final orders for up to two years, which is twelve to eighteen months beyond what is permitted under State Plaintiffs' laws. Tex. Fam. Code § 162.012; La. Child. Code art. 1263; Ind. Code § 31-19-14-2.

280.    ICWA requires State Plaintiffs' agencies and courts to undertake administrative actions of the federal government.

281.    ICWA Sections 1911 and 1912 and the Final Rule require state agencies and courts to notify potential intervenors about a proceeding, send copies of the notices to Defendants, and suspend proceedings for at least 10 days.

282.    The Final Rule commands state government agencies and state courts to inquire about Indian child status throughout child custody proceedings.

283.    ICWA Section 1912 and the Final Rule require Texas DFPS, Louisiana DCFS, and Indiana DCS to use "active efforts" to prevent the breakup of an Indian family.

284.    The Final Rule requires State Plaintiffs' courts to confirm that State Plaintiffs' agencies used "due diligence" to work with all of the tribes in which the child may be a member and conducted a "diligent search" for tribal placement of the child.

285.    ICWA Sections 1915, 1917, and 1951 and the Final Rule demand that State Plain-tiffs' agencies and courts collect information and perform recordkeeping functions for the federal government for child custody proceedings involving Indian children.

286.    ICWA is unconstitutional under the Tenth Amendment for the additional reason that it violates the equal footing doctrine and the Full Faith and Credit Clause of the Constitution.

287.    The Constitution provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." U.S. Const., art. IV, § 1. The "Full Faith and Credit Clause does not compel 'a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legis-late.'" *Franchise Tax Bd. of Cal. v. Hyatt*, 538 U.S. 488, 494 (2003) (citations omitted).

288.    The Full Faith and Credit Clause extends only between States, not States and Indian tribes. *Wilson v. Marchington*, 127 F.3d 805 (9th Cir. 1997). "The equal footing clause has long been held to refer to political rights and to sovereignty. . . . The requirement of equal footing was designed not to wipe out those diversities but to create parity as respects political standing and sovereignty." *United States v. Texas*, 339 U.S. 707, 716 (1950) (internal citations and quotation marks omitted).

289.    ICWA demands that State Plaintiffs and other States defer to the resolutions of tribes altering the ICWA placement preferences for Indian children, even though those tribes are not on equal footing with the States and do not deserve full faith and credit under Article IV.

290.    The Final Rule requires State Plaintiffs' agencies and courts to transfer child cus-tody matters to tribal courts when the Indian parent, custodian, or tribe requests it, even though those tribes are not on equal footing with the States and do not deserve full faith and credit under Article IV.

291.   ICWA is unconstitutional for the additional reason that it violates the Guarantee Clause of Article IV, Section 4 of the Constitution, which guarantees to every State a republican form of government. The Guarantee Clause provides that Congress many not interfere with states' autonomy to such an extent that it prevents them from enjoying untrammeled self-government. States are "endowed with all the functions essential to separate and independent existence." *Lane Cty. v. Oregon*, 74 U.S. 71, 76 (1868). A separate and independent state judiciary is an indispensable element of a republican form of government that Congress may not invade.

292.   State Plaintiffs' courts adjudicate family law and domestic relations cases, including child custody proceedings. ICWA violates the Tenth Amendment by removing the guarantee that State Plaintiffs' provide a republican form of government to its citizens, including an independent judiciary that may develop its own substantive law within the areas of responsibility granted it by the United States Constitution and State Plaintiffs' constitutions.

293.   The Brackeens are directly, personally, and substantially injured by Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences because they are causing delay, and perhaps denial, of their adoption of A.L.M., they require that the Tribes be permitted to participate as parties to A.L.M.'s custody proceeding, and they require the Brackeens to expend substantial resources in an effort to demonstrate "good cause" to depart from them. The Brackeens are further aggrieved by Section 1913(d)'s extended period of collateral attack, and the provision of the Final Rule purporting to implement that provision, 25 C.F.R. § 23.136, because they subject the Brackeen family to a period of uncertainty and mental anguish substantially longer than otherwise would be permitted under Texas law.  The extraordinary burdens imposed by Section 1915 and Section 1913(d), and the portions of the Final Rule

purporting to implement those provisions, have negatively impacted the Brackeens' willingness to foster or adopt other children subject to ICWA in the future.

294.    The Librettis are directly, personally, and substantially injured by Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences them because they are causing delay, and perhaps denial, of their adoption of Baby O., and because they impose heightened standards and substantial burdens (both time and money) in connection with the Librettis' efforts to adopt Baby O.

295.    Ms. Hernandez is directly aggrieved by the Final Rule's application of Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences to Baby O. because they are causing delay, and perhaps denial, of Ms. Hernandez's preferred placement of Baby O. for adoption by the Librettis, and because they impose heightened standards and substantial burdens (both time and money) in connection with the Librettis' efforts to adopt Baby O.

296.    The Cliffords are directly, personally, and substantially injured by Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences to Child P. because they are causing delay, and perhaps denial, of their adoption of Child P., and they impose heightened standards and substantial burdens (both time and money) in connection with the Cliffords' efforts to adopt Child P.

297.    State Plaintiffs are directly aggrieved by ICWA's and the Final Rule's commandeering of State power because they require State Plaintiffs' agencies and courts to carry out the directives and policy objectives of the federal government and execute the federal government's regulatory framework for Indian child in child custody proceedings. State Plaintiffs must abide by ICWA in each and every child custody proceeding, and, particularly, to those proceedings in which

State Plaintiffs' agencies and courts discover that the child is an Indian child as defined by ICWA. ICWA imposes a substantial burden on State Plaintiffs through the expenditure of resources and money in connection with its efforts to comply with ICWA and the Final Rule for each child custody proceeding.

298.    Plaintiffs have no adequate remedy at law to redress the injuries they are suffering because of ICWA.

299.    Plaintiffs thus seek a declaration that Sections 1901–1923 and 1951–1952 of ICWA violate the Tenth Amendment and are unconstitutional and unenforceable, and an injunction barring the Defendants from implementing or administering that provision by regulation, guideline, or otherwise.

### COUNT IV
### VIOLATION OF THE FIFTH AMENDMENT
#### (Equal Protection)

300.    Plaintiffs incorporate previous paragraphs as if fully restated here.

301.    The Due Process Clause of the Fifth Amendment mandates the equal treatment of people of all races without discrimination or preference. *Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954).

302.    ICWA defines an "Indian child" as an "unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

303.    ICWA classifies A.L.M. as an "Indian child."

304.    ICWA classifies many children in State Plaintiffs' custody and care as Indian children.

305.    The Brackeens, Librettis, and Cliffords are not "Indian families" within the meaning of ICWA.

306.    Many prospective foster parents and adoptive parents in Texas, Louisiana, and Indiana are not "Indian families" within the meaning of ICWA.

307.    ICWA's placement preferences applicable to an adoption or preadoptive placement of an "Indian child," 25 U.S.C. § 1915(a)–(b), impose a naked preference for "Indian families" over families of any other race and puts non-Indian families who wish to adopt an "Indian child" to the burden of demonstrating good cause to depart from the placement preferences, while any Indian family would enjoy a presumption that the adoption or preadoptive placement is in the child's best interests. ICWA's classification of Indians and non-Indians, and its discrimination against non-Indians, is based on race and ancestry and violates the constitutional guarantee of equal protection.

308.    The Brackeens are directly, personally, and substantially injured by ICWA's placement preferences and the provisions of the Final Rule purporting to implement those preferences because they are causing delay, and perhaps denial, of their adoption of A.L.M., they require that the Tribes be permitted to participate as parties to A.L.M.'s custody proceeding, and they require the Brackeens to expend substantial resources in an effort to demonstrate "good cause" to depart from them. The Brackeens are further aggrieved by Section 1913(d)'s extended period of collateral attack, and the provision of the Final Rule purporting to implement that provision, 25 C.F.R. § 23.136, because they subject the Brackeen family to a period of uncertainty and mental anguish substantially longer than otherwise would be permitted under Texas law.  The extraordinary burdens imposed by Section 1915 and Section 1913(d), and the portions of the Final Rule purporting

to implement those provisions, have negatively impacted the Brackeens' willingness to foster or adopt other children subject to ICWA in the future.

309.    The Librettis are directly, personally, and substantially injured by ICWA's placement preferences and the provisions of the Final Rule purporting to implement those preferences them because they are causing delay, and perhaps denial, of their adoption of Baby O., and because they impose heightened standards and substantial burdens (both time and money) in connection with the Librettis' efforts to adopt Baby O.

310.    Ms. Hernandez is directly aggrieved ICWA's placement preferences and the provisions of the Final Rule purporting to implement those preferences to Baby O. because they are causing delay, and perhaps denial, of Ms. Hernandez's preferred placement of Baby O. for adoption by the Librettis, and because they impose heightened standards and substantial burdens (both time and money) in connection with the Librettis' efforts to adopt Baby O.

311.    The Cliffords are directly, personally, and substantially injured by ICWA's placement preferences and the provisions of the Final Rule purporting to implement those preferences to Child P. because they are causing delay, and perhaps denial, of their adoption of Child P., and they impose heightened standards and substantial burdens (both time and money) in connection with the Cliffords' efforts to adopt Child P.

312.    State Plaintiffs, on behalf of themselves, their residents, parents, and the children in their care, are directly aggrieved by ICWA's placement preferences because they require State Plaintiffs' agencies and courts to violate the Equal Protection Clause of the Fifth Amendment and state law, which prohibit racial preferences in child custody proceedings. ICWA requires State Plaintiffs to carry out the racially discriminatory policy objectives of the federal government and execute the federal government's discriminatory framework against potential foster and adoptive

parents who wish to care for Indian children. State Plaintiffs must abide by ICWA in each and every child custody proceeding, and, particularly, to those proceedings in which State Plaintiffs' agencies and courts discover that the child is an Indian child as defined by ICWA. ICWA imposes a substantial burden on State Plaintiffs through the expenditure of resources and money in connection with their efforts to comply with Section 1915(a) and Section 1915(b) for each child custody proceeding.

313.    Plaintiffs have no adequate remedy at law to redress the injuries they are suffering because of ICWA.

314.    Plaintiffs thus seek a declaration that Section 1915(a) and Section 1915(b) of ICWA violate principles of equal protection and are unconstitutional and unenforceable, and an injunction barring the Defendants from implementing or administering that provision by regulation, guideline, or otherwise.

## CLAIMS ALLEGED BY THE INDIVIDUAL PLAINTIFFS

### COUNT V
### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
#### (Not in Accordance with Law – Substantive Due Process)

315.    Plaintiffs incorporate previous paragraphs as if fully restated here.

316.    Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the Final Rule complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court," *id.* § 704.

317.    The APA prohibits agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

318.    In addition to the reasons set forth in Count I of this Complaint, the Final Rule further violates the APA because the placement preference regime contained in the unit entitled "Dispositions," 25 C.F.R. § 23.129 *et seq*., violates the substantive due process rights of non-Indian prospective adoptive couples raising Indian children, and the rights of those Indian children, insofar as it permits—indeed, requires—the disruption of intimate familial relationships without a showing of an adequate state interest to do so. The intimate familial relationship between a prospective adoptive parent and a child is a substantial liberty interest under the Due Process Clause of the Fifth Amendment that can be vitiated only when necessary to vindicate an important governmental interest. The Final Rule articulates no adequate justification for vitiating an intimate familial relationship between a child and prospective adoptive parents in favor of placement with non-relatives who happen to be "Indian" within the meaning of ICWA, and there is none. The Final Rule thus violates the substantive due process rights under the Fifth Amendment of the prospective adoptive parents of an Indian child, and the rights of that Indian child.

319.    The Final Rule further violates the APA because the placement preference regime contained in the unit entitled "Dispositions," 25 C.F.R. § 23.129 *et seq*., violates the substantive due process rights of non-Indian prospective adoptive couples raising Indian children—and the rights of those Indian children—by excluding from the "good cause" analysis bonding and attachment resulting from their relationship if that relationship later is determined to be "in violation of ICWA." 25 C.F.R. § 23.132(e). The intimate familial relationship between a prospective adoptive parent and a child is a substantial liberty interest under the Due Process Clause of the Fifth Amendment that can be vitiated only when necessary to vindicate an important governmental interest. Ensuring that prospective adoptive couples are not "reward[ed]" by a state agency's or state court's error in failing to comply with ICWA's and the Final Rule's many requirements is not an interest

of the government sufficiently important to justify disrupting the familial bonds between a prospective adoptive couple and the child they are raising. Therefore, the Final Rule's categorical exclusion from consideration of an Indian child's bonding and attachment when it resulted from a placement later determined to be in violation of ICWA violates the substantive due process component of the Fifth Amendment.

320.     The Brackeens are directly, personally, and substantially injured by the Final Rule's application to A.L.M. because the Final Rule is causing delay, and perhaps denial, of their adoption of A.L.M., it requires that the Tribes be permitted to participate as parties to A.L.M.'s custody proceeding, and it requires the Brackeens to expend substantial resources in an effort to demonstrate "good cause" to depart from them. The Brackeens are further aggrieved by Section 1913(d)'s extended period of collateral attack, and the provision of the Final Rule purporting to implement that provision, 25 C.F.R. § 23.136, because they subject the Brackeen family to a period of uncertainty and mental anguish substantially longer than otherwise would be permitted under Texas law.  The extraordinary burdens imposed by Section 1915 and Section 1913(d), and the portions of the Final Rule purporting to implement those provisions, have negatively impacted the Brackeens' willingness to foster or adopt other children subject to ICWA in the future.

321.     The Librettis are directly aggrieved by the Final Rule's application to Baby O. and by the imposition of substantial burdens (both time and money) in connection with the Librettis' efforts to adopt Baby O.

322.     Ms. Hernandez is directly aggrieved by the Final Rule's application to Baby O. and by the imposition of substantial burdens (both time and money) in connection with the Librettis' efforts to adopt Baby O.

323.    The Cliffords are directly aggrieved by the Final Rule's application to Child P. and by the imposition of substantial burdens (both time and money) in connection with the Cliffords' efforts to adopt Child P.

324.    The plaintiffs have no adequate remedy at law to redress the burdens now being imposed by Final Rule because claims arising under the APA cannot be litigated in state court.

325.    This Court should declare the Final Rule invalid and set it aside.

### COUNT VI
### VIOLATION OF THE FIFTH AMENDMENT
### (Due Process—ICWA § 1915)

326.    Plaintiffs incorporate previous paragraphs as if fully restated here.

327.    The United States has a deeply rooted tradition of honoring intimate family relationships. The Brackeens possess a fundamental right of liberty to intimate familial relationships.

328.    ICWA's placement preferences applicable to an adoption or preadoptive placement of an "Indian child," 25 U.S.C. § 1915(a)–(b), violate the Brackeens' substantive due process rights. The preferences permit the disruption of their intimate familial relationship with A.L.M. without a showing of an adequate state interest to do so.

329.    The Brackeens' intimate familial relationship with A.L.M. is a substantial liberty interest under the Due Process Clause of the Fifth Amendment that can be vitiated only when necessary to vindicate an important governmental interest.

330.    Placing A.L.M. with non-relatives who happen to be members of the Navajo Nation is not narrowly tailored to any important government interest.

331.    Unless the existence of an intimate familial relationship such as that which exists between the Brackeens and A.L.M. categorically constitutes "good cause" to depart from the

placement preferences under Section 1915(a) and Section 1915(b), ICWA's placement preferences are unconstitutional under the Due Process Clause of the Fifth Amendment.

332.   The Brackeens due process rights are directly, personally, and substantially impaired by Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences because those laws are causing delay, and perhaps denial, of their adoption of A.L.M., they require that the Tribes be permitted to participate as parties to A.L.M.'s custody proceeding, and they require the Brackeens to expend substantial resources in an effort to demonstrate "good cause" to depart from them. The Brackeens are further aggrieved by Section 1913(d)'s extended period of collateral attack, and the provision of the Final Rule purporting to implement that provision, 25 C.F.R. § 23.136, because they subject the Brackeen family to a period of uncertainty and mental anguish substantially longer than otherwise would be permitted under Texas law.  The extraordinary burdens imposed by Section 1915 and Section 1913(d), and the portions of the Final Rule purporting to implement those provisions, have negatively impacted the Brackeens' willingness to foster or adopt other children subject to ICWA in the future.

333.   The Librettis' intimate familial relationship with Baby O. is a substantial liberty interest under the Due Process Clause of the Fifth Amendment that can be vitiated only when necessary to vindicate an important governmental interest.

334.   Ms. Hernandez's intimate parental relationship with Baby O. and her right to direct the upbringing of Baby O. is a substantial liberty protected by the Due Process Clause of the Fifth Amendment that can be vitiated only when necessary to vindicate an important governmental interest.

335.   Placing Baby O. with non-relatives who happen to be members of an Indian tribe is not narrowly tailored to any important government interest.

336.     Unless the existence of an intimate familial relationship such as that which exists between the Librettis and Baby O. categorically constitutes "good cause" to depart from the placement preferences under Section 1915(a) and Section 1915(b), ICWA's placement preferences are unconstitutional under the Due Process Clause of the Fifth Amendment.

337.     The Librettis and Ms. Hernandez are directly, personally, and substantially injured by ICWA's placement preferences because they are causing delay of their adoption of Baby O. and they are requiring the Librettis to expend substantial resources in an effort to demonstrate "good cause" to depart from them.

338.     The Cliffords' intimate familial relationship with Child P. is a substantial liberty interest under the Due Process Clause of the Fifth Amendment that can be vitiated only when necessary to vindicate an important governmental interest.

339.     Placing Child P. with non-relatives who happen to be members of an Indian tribe, or with relatives who would otherwise be unsuitable but are preferred to the Cliffords because of their race, is not narrowly tailored to any important government interest.

340.     Unless the existence of an intimate familial relationship such as that which exists between the Cliffords and Child P. categorically constitutes "good cause" to depart from the placement preferences under Section 1915(a) and Section 1915(b), ICWA's placement preferences are unconstitutional under the Due Process Clause of the Fifth Amendment.

341.     The Cliffords are directly, personally, and substantially injured by ICWA's placement preferences because they are causing delay, and perhaps denial, of their adoption of Child P. and they are requiring the Cliffords to expend substantial resources in an effort to demonstrate "good cause" to depart from them.

342.     The plaintiffs have no adequate remedy at law to redress the injuries they are suffering because of ICWA.

343.     The plaintiffs thus seek a declaration that Section 1915(a) and Section 1915(b) of ICWA violate principles of substantive due process and are unconstitutional and unenforceable, and an injunction barring the Defendants from implementing or administering those provisions by regulation, guideline, or otherwise.

## CLAIMS ALLEGED BY STATE PLAINTIFFS

### COUNT VII
### VIOLATION OF ARTICLE I OF THE CONSTITUTION
### (Non-Delegation Doctrine)

344.     Plaintiffs incorporate previous paragraphs as if fully restated here.

345.     The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. 1, § 1.

346.     The Constitution authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its general powers. U.S. Const. art. 1, § 8, cl. 18.

347.     The Constitution bars Congress from delegating to others the essential legislative functions with which it is vested.

348.     ICWA Section 1915(c) and the Final Rule Section 23.130(b) delegate to Indian tribes the legislative and regulatory power to pass resolutions in each Indian child custody proceeding that alter the placement preferences state courts must follow.

349.     The Final Rule prohibits State Plaintiffs' agencies and courts from making a determination as to an Indian child's membership status with a tribe. State Plaintiffs must defer to the membership determination of the tribe.

350.    State Plaintiffs are directly and substantially injured by the delegation of power over placement preferences because it violates the Constitution's separation of powers through abdication of Congress's legislative responsibility and requires State Plaintiffs to honor the legislation and regulation passed by tribes in each child custody matter, which can vary widely from one child to the next and one tribe to another.

351.    State Plaintiffs have no adequate remedy at law to redress the injuries they are suffering under ICWA.

352.    State Plaintiffs thus seek a declaration that ICWA Section 1915(c) and Final Rule Section 23.130(b) violate Article I, sections 1 and 8, and are unconstitutional and unenforceable, and an injunction barring the Defendants from implementing or administering those provisions by regulation, guideline, or otherwise.

## COUNT VIII
## VIOLATION OF ARTICLE I OF THE CONSTITUTION
### (Spending Clause)

353.    Plaintiffs incorporate previous paragraphs as if fully restated here.

354.    The Spending Clause of the United States Constitution provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1.

355.    Congress's spending power, however, is not unlimited. *S. Dakota v. Dole*, 483 U.S. 203, 207 (1987).

356.    The Constitution provides that Congress may enact spending conditions that (1) are unambiguous and clearly stated in advance, (2) relate to Congress's purpose in spending the funds,

(3) are not unduly coercive, (4) do not compel state governments to engage in unconstitutional conduct, and (5) promote the general welfare. *Dole*, 483 U.S. at 207–08.

357.    ICWA and the Final Rule violate the Spending Clause because they coerce States, like State Plaintiffs, into complying with their mandates by threatening the withdrawal of child welfare grants under Titles IV-B and IV-E of the Social Security Act. State Plaintiffs stand to lose substantial funding for child welfare programs if they do not certify compliance with ICWA.

358.    ICWA and the Final Rule also violate the Spending Clause because they compel States, like State Plaintiffs, to engage in unconstitutional conduct. The placement preferences that instruct State Plaintiffs' agencies and courts to award foster care, preadoptive, and adoptive placements based on racial classifications, *i.e.*, the Indian child's race, violate the equal protection component of the Fifth Amendment to the United States Constitution.

359.    State Plaintiffs are directly and substantially injured by the coercive nature of ICWA funding and its requirement that State Plaintiffs violate other provisions of the Constitution to maintain compliance and funding.

360.    State Plaintiffs have no adequate remedy at law to redress the injuries they are suffering under ICWA.

361.    State Plaintiffs thus seek a declaration that ICWA and the Final Rule violate Article I, section 8 and are unconstitutional and unenforceable, and an injunction barring the Defendants from implementing or administering those provisions by regulation, guideline, or otherwise.

## PRAYER FOR RELIEF

Plaintiffs pray that this Court:

1.    Declare that the Final Rule violates the APA, hold it invalid, and set it aside;

2.      Issue a declaratory judgment that ICWA, 25 U.S.C. §§ 1901–1923, 1951–1952, is unconstitutional and unenforceable;

3.      Issue a declaratory judgment that Section 1915(a) and 1915(b) of ICWA are unconstitutional and unenforceable;

4.      Issue an injunction prohibiting Defendants from implementing or administering 25 U.S.C. §§ 1901–1923, 1951–1952 by regulation, guidelines, or otherwise;

5.      Issue an injunction prohibiting Defendants from implementing or administering Section 1915(a) and 1915(b) of ICWA by regulation, guidelines, or otherwise;

6.      Award Plaintiffs costs and reasonable attorneys' fees as appropriate; and

7.      Grant such further and other relief as this Court deems just and proper.

Respectfully submitted,


Dated:  December 15, 2017

*/s/ Matthew D. McGill*                  KEN PAXTON
Matthew D. McGill (*pro hac vice*)       Attorney General of Texas
DC Bar No. 481430
Lochlan F. Shelfer (*pro hac vice*)      JEFFREY C. MATEER
DC Bar No. 1029799                       First Assistant Attorney General
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.            BRANTLEY D. STARR
Washington, D.C. 20036                   Deputy First Assistant Attorney General
Telephone: (202) 887-3680
mmcgill@gibsondunn.com                   JAMES E. DAVIS
lshelfer@gibsondunn.com                  Deputy Attorney General for Civil Litigation


Rebekah Perry Ricketts                   */s/ David J. Hacker*
State Bar No. 24074883                    DAVID J. HACKER
Gibson, Dunn & Crutcher LLP              Special Counsel for Civil Litigation
2100 McKinney Ave., Suite 1100          Texas Bar No. 24103323
Dallas, TX 75201                         david.hacker@oag.texas.gov
Telephone: (214) 698-3100
Facsimile: (214) 571-2976                OFFICE OF THE ATTORNEY GENERAL
rricketts@gibsondunn.com                 P.O. Box 12548, Mail Code 009
                                         Austin, TX 78711-2548
*Attorneys for Individual Plaintiffs*     Telephone: (512) 936-1414

Mark Fiddler                             *Attorneys for State Plaintiffs*
FIDDLER LAW OFFICE, P.A.
6800 France Ave. So., Suite 190
Minneapolis, MN 55435
mark@fiddler-law.com
Telephone: (612) 822-4095
Facsimile: (612) 822-4096

*Attorney for Frank and Heather Libretti, and*
*Jason and Danielle Clifford*

## CERTIFICATE OF SERVICE

I hereby certify that, on December 15, 2017, I filed the foregoing document using the Court's ECF system.  Service on all counsel of record for all parties was accomplished electronically using the Court's CM/ECF system.

/s/ Matthew D. McGill
Matthew D. McGill (*pro hac vice*)
DC Bar No. 481430
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-3680
mmcgill@gibsondunn.com
