**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| _____ | ) |
| | ) |
| CHAD EVERET BRACKEEN, | ) |
| JENNIFER KAY BRACKEEN, FRANK | ) |
| NICHOLAS LIBRETTI, HEATHER LYNN | ) |
| LIBRETTI, ALTAGRACIA SOCORRO | ) |
| HERNANDEZ, JASON CLIFFORD, and | ) |
| DANIELLE CLIFFORD, | ) |
| | ) |
| and | ) |
| | ) |
| STATE OF TEXAS, | ) |
| STATE OF LOUISIANA, and | ) |
| STATE OF INDIANA, | ) |
| | ) |
| Plaintiffs, | )   Civil Action No. 4:17-cv-868-O |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES OF AMERICA; RYAN | ) |
| ZINKE, in his official capacity as Secretary of | ) |
| the United States Department of the Interior; | ) |
| BRYAN RICE, in his official capacity as Di- | ) |
| rector of the Bureau of Indian Affairs; JOHN | ) |
| TAHSUDA III, in his official capacity as Act- | ) |
| ing Assistant Secretary for Indian Affairs; the | ) |
| BUREAU OF INDIAN AFFAIRS; the | ) |
| UNITED STATES DEPARTMENT OF THE | ) |
| INTERIOR; ALEX AZAR, in his official ca- | ) |
| pacity as Secretary of the United States De- | ) |
| partment of Health and Human Services; and | ) |
| the UNITED STATES DEPARTMENT OF | ) |
| HEALTH AND HUMAN SERVICES, | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**SECOND AMENDED COMPLAINT AND PRAYER FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**

1.     Chad and Jennifer Brackeen are the adoptive parents of A.L.M., a two-year-old

boy, and have provided him with a loving, safe, and permanent home. The Brackeens fostered

A.L.M. since he was ten months old, and A.L.M.'s biological parents and grandmother supported the adoption. For months, their adoption of A.L.M. was delayed—caught in a terrifying whirlwind of court proceedings that occurred only because the federal government classifies A.L.M. as an "Indian child."

2.     Because federal law classifies A.L.M. as an "Indian child," when the Brackeens petitioned to adopt A.L.M., the Texas family court applied federal law rather than Texas law to determine whether the Brackeens could adopt A.L.M. Applying that federal law, the Texas family court denied the Brackeens' adoption petition, and ordered A.L.M. transferred to an "Indian family" A.L.M. does not know, in a state A.L.M. has never even visited.

3.     After the Brackeens initiated this civil action to challenge the federal law that drove the Texas family court to deny the Brackeens' petition to adopt A.L.M., the "Indian family" that federal law favored over the Brackeens apparently lost interest in caring for A.L.M. The Second Court of Appeals therefore vacated the lower court's order, and the Brackeens successfully petitioned to adopt A.L.M. Now the same federal law that prefers that an "Indian family" adopt A.L.M. may subject the Brackeens' adoption to collateral attack for two years—eighteen months more than Texas law allows.

4.     Nick and Heather Libretti want to adopt Baby O., a twenty-three-month-old girl, and provide her with a safe and permanent home. The Librettis have cared for Baby O. since her birth. She left the hospital with the Libretti family when she was three days old and has been in their care ever since. The Librettis have provided a stable and loving home for Baby O., and have guided her through a series of medical challenges. Altagracia Hernandez, Baby O.'s biological mother, lives near the Librettis. Ms. Hernandez supports the Librettis' efforts to adopt Baby O., as does Baby O.'s biological father.

5.      The Librettis have been threatened with separation from Baby O., and Baby O. has been threatened with removal from the only home she has ever known, because the Ysleta del sur Pueblo Indian Tribe contends that Baby O. is an "Indian child" under federal law. The Ysleta del sur Pueblo Tribe has attempted to use that federal law to take Baby O. from her home in Nevada—where both the Librettis and her birth mother live—and move her to a reservation near El Paso, Texas, which Baby O. has never visited and where she knows no one. It is only now that the Librettis have joined this lawsuit that the Tribe has entered into settlement negotiations which may result in Baby O.'s adoption by the Librettis.

6.      Jason and Danielle Clifford wish to adopt Child P., a six-year-old girl whom the Cliffords have fostered since July 2016. Child P. entered foster care in the summer of 2014, at age three, and spent nearly two years moving from one placement to another before becoming part of the Clifford family. Since entering the foster system, Child P. has been placed in at least six different homes. She finally found stability and began to thrive while living with the Cliffords. With the support of Child P.'s guardian ad litem, the Cliffords have moved to adopt her.

7.      But Child P.'s maternal grandmother—who the State determined was unfit to serve as a foster placement, and who has limited rights over Child P. under state law—is a registered member of the White Earth Band of Ojibwe Indians. That Tribe argues that Child P. is an "Indian child" under federal law and has used that federal law to remove Child P. from the Cliffords—the only stable home she has ever known—and have her placed with the grandparent previously found to be an unfit placement by the State. In January 2018, Child P. was removed from the Cliffords' care and placed her with her grandmother—even though the State had previously suspended the grandmother's foster care license. Because federal law prefers that an "Indian family" adopt Child

P., the Cliffords are now separated from Child P., even though they are the only parties who have petitioned to adopt Child P.

8.    The ordeals now being suffered by the Brackeens, the Librettis, and the Cliffords, and the children they care for, are occurring because Congress decided in 1978 that the federal government—and, in particular, the Department of the Interior's Bureau of Indian Affairs ("BIA")—knew best how to manage the fostering and adoption of Native American children. Though the Constitution reserves domestic relations to the States, and despite the fact that Congress possesses no enumerated power to legislate in this way, Congress enacted the Indian Child Welfare Act ("ICWA"), 25 U.S.C. §§ 1901–1963. ICWA, and the enabling regulations recently promulgated by the BIA, invade every aspect of state family law as applied to Indian children. ICWA commandeers state agencies and courts to become investigative and executive actors carrying out federal policy, and to make child custody decisions based on racial preferences.

9.    By enforcing this racially discriminatory policy, the federal government places Indian children at risk for serious and lasting harm. And States that refuse to follow ICWA risk having their child custody decisions invalidated and federal child welfare funding pulled. Thus, Congress forces ICWA on the States by threatening the stability and well-being of the family lives of their youngest and most vulnerable citizens.

10.    This is an action under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706, and the United States Constitution, brought to challenge the validity of a final rule entitled *Indian Child Welfare Act Proceedings*, 81 Fed. Reg. 38,778 (June 14, 2016) (the "Final Rule") (codified at 25 C.F.R. pt. 23), and certain provisions of ICWA that the Final Rule purports to interpret and implement.

11.     ICWA's placement preferences require that, "in any adoptive placement of an Indian child under state law, a preference shall be given in absence of good cause to the contrary to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." 25 U.S.C. § 1915(a); *see also id.* § 1915(b); 25 C.F.R. § 23.130; *id.* § 23.131. The Final Rule provides that "good cause" to depart from ICWA's "placement preferences" should be shown by "clear and convincing evidence." 25 C.F.R. § 23.132. And ICWA further provides that any adoption of Indian child is subject for two years to collateral attack on the ground that the parent's consent "was obtained through fraud or duress." 25 U.S.C. § 1913(d).

12.     Plaintiffs Chad and Jennifer Brackeen bring this action because ICWA and the Final Rule may expose the finality of their adoption of A.L.M. to attack. The Brackeens also intend to provide foster care for, and possibly adopt, additional children in need.

13.     Plaintiffs Nick and Heather Libretti bring this action because ICWA and the Final Rule are interfering with their ability to adopt Baby O., and, even if their efforts to adopt Baby O. are ultimately successful, may expose the finality of their adoption to attack. The Librettis also intend to provide foster care for, and possibly adopt, additional children in need.

14.     Plaintiff Altagracia Hernandez brings this action because ICWA and the Final Rule are interfering with her wishes to have her biological child adopted in a placement that best suits Baby O.'s interests and needs.

15.     Plaintiffs Jason and Danielle Clifford bring this action because ICWA and the Final Rule are interfering with their ability to adopt Child P., and have caused Child P. to be removed from their home and placed with a grandparent who was previously determined to be an unfit placement by the State.

16.     If ICWA and the pertinent provisions of the Final Rule are invalidated, the Librettis and the Cliffords each would be able to adopt the children they are caring for in accordance with State law, and without regard to ICWA's and the Final Rule's discriminatory placement preferences. And the Brackeens would enjoy the finality afforded their adoption by state law. The Brackeens, the Librettis, and the Cliffords, however, cannot challenge the Final Rule under the APA in state court proceedings, because any such action must be brought in a "court of the United States." 5 U.S.C. § 702.

17.     Plaintiffs Texas, Louisiana, and Indiana bring this action because ICWA and the Final Rule intrude upon their sovereign authority over domestic relations in every child custody proceeding, because ICWA demands that their child welfare agencies and courts inquire about Indian children in every foster care, preadoptive, or adoption proceeding. ICWA also commandeers States to perform executive branch functions and apply racially discriminatory preferences. Moreover, Defendants threaten to strip States of child welfare, foster care, and adoption services funding administered by the Department of Health and Human Services ("HHS") if they do not comply with ICWA's mandates. 42 U.S.C. §§ 622(b)(9), 677(b)(3)(G).

18.     Plaintiffs thus bring this action for declaratory and injunctive relief and pray that this Court: (1) vacate and set aside the Final Rule; (2) declare that Sections 1901–1923 and 1951–1952 of ICWA violate the Constitution; (3) declare that Sections 1913(d), 1914, and 1915 of ICWA violate the Constitution; (4) declare that Sections 622(b)(9) and 677(b)(3)G) of the Social Security Act violate the Constitution; (5) enjoin the defendants from implementing or administering Sections 1901–1923 and 1951–1952 of ICWA; (6) enjoin the defendants from implementing or administering Sections 1913(d), 1914, or 1915 of ICWA; and (7) enjoin the defendants from implementing or administering Sections 622(b)(9) and 677(b)(3)G) of the Social Security Act.

**PARTIES**

19.    Plaintiffs Chad Everet Brackeen and Jennifer Kay Brackeen are adoptive parents to the two-year-old child A.L.M., who has lived with them since June 2016. They also are raising two biological children in their home, aged eight and six. Neither Mr. Brackeen nor Mrs. Brackeen is "a member of an Indian tribe," 25 U.S.C. § 1903(3), and therefore the Brackeens are not an "Indian family" within the meaning of ICWA and the Final Rule.

20.    Plaintiffs Nick and Heather Libretti are foster parents to Baby O., a toddler they have fostered since her birth in March 2016. Neither Mr. Libretti nor Mrs. Libretti is "a member of an Indian tribe," 25 U.S.C. § 1903(3), and therefore the Librettis are not an "Indian family" within the meaning of ICWA and the Final Rule.

21.    Plaintiff Altagracia Socorro Hernandez is the biological mother of Baby O., a child fostered by the Librettis since birth. Ms. Hernandez is a resident of Reno, Nevada. She is not a "member of an Indian tribe." 25 U.S.C. § 1903(3).

22.    Plaintiffs Jason and Danielle Clifford are foster parents to Child P., a six-year-old girl they raised for more than a year and a half. Neither Mr. Clifford nor Mrs. Clifford is "a member of an Indian tribe," 25 U.S.C. § 1903(3), and therefore the Cliffords are not an "Indian family" within the meaning of ICWA and the Final Rule.

23.    Plaintiff Texas possesses sovereign authority over family law issues within its borders. Texas DFPS is the agency responsible for child custody proceedings and ensuring compliance with ICWA and the Final Rule. Texas courts possess jurisdiction over child custody proceedings arising under the Texas Family Code. When Texas DFPS encounters an Indian child in a child custody proceeding, almost every aspect of the matter is affected. The legal burden of proof for removal is higher, as is the legal burden of proof for obtaining any final order terminating parental rights or restricting a parent's custody. Texas DFPS must serve specific notices regarding ICWA

7

rights on various entities and individuals. ICWA requires the Texas DFPS caseworker to make active efforts to reunify the child and family. Texas state courts and Texas DFPS must place the child according to ICWA's racial preferences. Expert testimony on tribal child and family practices may be necessary, at a cost to Texas, to adjudicate ICWA cases. Texas DFPS and courts also must report ICWA compliance to the Department of Interior and the BIA in every child custody case involving an Indian child, and certify compliance with ICWA in annual reports to HHS as a condition of receiving child welfare, foster care, and adoption services funding under Titles IV-B and IV-E of the Social Security Act. These are just some of the burdens ICWA imposes on Texas.

24.     Plaintiff Louisiana possesses sovereign authority over family law issues within its borders. The Louisiana Department of Children and Family Services ("Louisiana DCFS") is the agency responsible for child custody proceedings and ensuring compliance with ICWA and the Final Rule. Louisiana courts possess jurisdiction over child custody proceedings arising under the Louisiana Children's Code. When Louisiana DCFS encounters an Indian child in a child custody proceeding, almost every aspect of the matter is affected. The legal burden of proof for removal is higher, as is the legal burden of proof for obtaining any final order terminating parental rights or restricting a parent's custody. Louisiana DCFS must serve specific notices regarding ICWA rights on various entities and individuals. ICWA requires the Louisiana DCFS caseworker to make active efforts to reunify the child and family. Louisiana state courts and Louisiana DCFS must place the child according to ICWA's racial preferences. Expert testimony on tribal child and family practices may be necessary, at a cost to Louisiana, to adjudicate ICWA cases. Louisiana DCFS and courts also must report ICWA compliance to the Department of Interior and the BIA in every child custody case involving an Indian child, and certify compliance with ICWA in annual reports to HHS as a condition of receiving child welfare, foster care, and adoption services funding under Titles

IV-B and IV-E of the Social Security Act. These are just some of the burdens ICWA imposes on Louisiana.

25.     Plaintiff Indiana possesses sovereign authority over family law issues within its borders. The Indiana Department of Child Services ("Indiana DCS") is the agency responsible for child custody proceedings and ensuring compliance with ICWA and the Final Rule. Indiana courts possess jurisdiction over child custody proceedings arising under the Indiana Family Law and Juvenile Code. When Indiana DCS encounters an Indian child in a child custody proceeding, almost every aspect of the matter is affected. The legal burden of proof for removal is higher, as is the legal burden of proof for obtaining any final order terminating parental rights or restricting a parent's custody. Indiana DCS must serve specific notices regarding ICWA rights on various entities and individuals. ICWA requires the Indiana DCS caseworker to make active efforts to reunify the child and family. Indiana state courts and Indiana DCS must place the child according to ICWA's racial preferences. Expert testimony on tribal child and family practices may be necessary, at a cost to Indiana, to adjudicate ICWA cases. Indiana DCS and courts also must report ICWA compliance to the Department of Interior and the BIA in every child custody case involving an Indian child, and certify compliance with ICWA in annual reports to HHS as a condition of receiving child welfare, foster care, and adoption services funding under Titles IV-B and IV-E of the Social Security Act. These are just some of the burdens ICWA imposes on Indiana.

26.     Texas, Louisiana, and Indiana (collectively, "State Plaintiffs") are the guardians of the health, welfare, safety, and property of their citizens. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592 (1982). State Plaintiffs represent the interests of the many children within their custody and care, whether in foster care, preadoption, or adoption services. State Plaintiffs also represent the interest of their resident parents who are thinking about fostering and/or adopting a

child, and who are currently fostering or in the process of adopting a child, and who are directly and substantially injured by the application of ICWA and the Final Rule's discriminatory mandates. State Plaintiffs cannot remedy these injuries through their sovereign lawmaking powers because Defendants mandate compliance with ICWA.

27.     Defendant United States of America is sued under 28 U.S.C. § 1346.

28.     Defendant Ryan Zinke is the Secretary of the United States Department of the Interior. He is sued in his official capacity.

29.     Defendant Bryan Rice is the Director of the Bureau of Indian Affairs within the United States Department of the Interior. He is sued in his official capacity.

30.     Defendant John Tahsuda, III, is the Acting Assistant Secretary for Indian Affairs at the Bureau of Indian Affairs within the United States Department of the Interior. He is sued in his official capacity.

31.     Defendant Bureau of Indian Affairs ("BIA") is a federal agency within the Department of the Interior.

32.     Defendant United States Department of the Interior (the "Interior") is a federal executive department of the United States.

33.     Defendant Alex M. Azar II is the Secretary of the United States Department of Health and Human Services. He is sued in his official capacity.

34.     Defendant United States Department of Health and Human Services ("HHS") is a federal executive department of the United States.

## JURISDICTION AND VENUE

35.     This action arises under the APA and the United States Constitution. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (United States defendant), and 5 U.S.C. §§ 701–706 (review of agency action). This

Court has authority to award the requested declaratory and injunctive relief, 28 U.S.C. §§ 2201–02, and costs and attorneys' fees, 28 U.S.C. § 2412.

36.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(l) as this is an action against officers and agencies of the United States, a substantial part of the events giving rise to this claim occurred in this district, and no real property is involved in the action.

## ALLEGATIONS

## I.     THE STATUTORY AND REGULATORY FRAMEWORK

### A.     State Power Over Domestic Relations

37.     With few exceptions, regulation of domestic relations is an area of law over which the States possess exclusive power. *Sosna v. Iowa*, 419 U.S. 393, 404 (1975). "The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States." *Ex parte Burrus*, 136 U.S. 586, 593–94 (1890).

38.     The power of States over domestic relations is so well-settled that federal courts lack Article III jurisdiction over domestic relations issues, and child custody disputes in particular. *Burrus*, 136 U.S. at 594.

39.     All States regulate domestic relations, including marriage, divorce, adoption, and the rights and responsibilities of parents and children.

40.     For example, Texas regulates the domestic relations of individuals domiciled within its borders. Title 1 of the Texas Family Code regulates the formation and dissolution of marriage and marital property rights. Tex. Fam. Code §§ 1.101–9.302. Title 1-a regulates the collaborative family law process. *Id*. §§ 15.001–15.116. Title 2 regulates the status of children in relation to their parents. *Id*. §§ 31.001–47.003. Title 3 protects the public and ensures public safety through a juvenile justice code. *Id*. §§ 51.01–61.107. Title 3a regulates truant conduct of children. *Id*. §§ 65.001–65.259. Title 4 protects Texas families from domestic violence. *Id*. §§ 71.001–

93.004. And Title 5 regulates the parent-child relationship, including termination of parental rights, foster care, and adoption. *Id.* §§ 101.001–266.013.

41.  Louisiana and Indiana also regulate the domestic relations of individuals domiciled within their borders. *See* La. Child. Code arts. 100–1673; Ind. Code §§ 31-9-1-1 to 31-41-3-1.

42.  Texas recognizes the "best interest of the child" as the "primary consideration" for courts when determining parentage, possession, and access to the child. Tex. Fam. Code § 153.002; *see also id.* § 161.001(b)(2). Texas's "fundamental interest in parental-rights termination cases is to protect the best interest of the child." *In re M.S.*, 115 S.W.3d 534, 548 (Tex. 2003) (citations omitted). The same is true in Louisiana and Indiana. *See, e.g.*, La. Child. Code art. 1255; Ind. Code § 31-19-11-1.

43.  In Texas, the best interest of the child standard "is aligned with another of the child's interests—an interest in a final decision on termination so that adoption to a stable home or return to the parents is not unduly prolonged." *In re M.S.*, 115 S.W.3d at 548 (citations omitted). "Indeed, the U.S. Supreme Court has recognized that prolonged termination proceedings can have psychological effects on a child of such magnitude that time is of the essence." *Id.* (quoting *In re J.F.C.*, 96 S.W.3d 256, 304 (Tex. 2002) (Schneider, J., dissenting) (quoting *Lehman v. Lycoming Cty. Children's Servs. Agency*, 458 U.S. 502, 513–14 (1982))). Thus, the Texas Family Code protects children by requiring prompt action on the part of trial and appellate courts when confronting cases that involve the parent-child relationship. Tex. Fam. Code §§ 105.004, 109.002(a-1), 161.002, 162.005. The Texas Family Code further protects the parent-child bond and the health of adoptive children by providing that "the validity of an adoption order is not subject to attack after

six months after the date the order was signed." Tex. Fam. Code § 162.012(a). Louisiana and Indiana also protect adoptive families by limiting the time period for collateral attacks on an adoption order. Ind. Code § 31-19-14-2; La. Child Code art. 1263.

44.     ICWA and the Final Rule alter the application of Texas, Louisiana, and Indiana family law to Indian children and impose significant delays on permanency for those children.

### B.     The Indian Child Welfare Act

45.     In the mid-1970s, there was rising concern over "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989). "Congress found that 'an alarmingly high percentage of Indian families [were being] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies.'" *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552, 2557 (2013) (quoting 25 U.S.C. § 1901(4)). "This wholesale removal of Indian children from their homes prompted Congress" to enact ICWA, 25 U.S.C. §§ 1901–1963. *Id.*

46.     ICWA establishes "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes." 25 U.S.C. § 1902. An "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." *Id.* § 1903(4).

47.     ICWA mandates placement preferences in foster care, preadoptive, and adoptive proceedings involving Indian children. 25 U.S.C. § 1915.

48.     "In any adoptive placement under State law," ICWA mandates that, "in the absence of good cause to the contrary," "preference shall be given . . . to a placement with (1) a member of

the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." 25 U.S.C. § 1915(a).

49.     ICWA similarly requires that "in any foster care or preadoptive placement preference shall be given, in the absence of good cause to the contrary, to placement with – (i) a member of the child's extended family; (ii) a foster home . . . specified by the Indian child's tribe; (iii) an Indian foster home . . . approved by an authorized non-Indian licensing authority; or (iv) an institution for children approved by an Indian tribe or operated by an Indian tribe." 25 U.S.C. § 1915(b).

50.     ICWA requires state agencies and courts to defer to the alteration of the preferences established by Section 1915(a)–(b), if the Indian child's tribe establishes a different order of preference by resolution. 25 U.S.C. § 1915(c).

51.     ICWA places an affirmative duty on state agencies and courts to notify potential intervenors and the federal government about an Indian child matter. 25 U.S.C. § 1912.

52.     In any involuntary child custody proceeding, ICWA commands state agencies and courts, when seeking foster care placement of, or termination of parental rights to, an Indian child, to notify the parents or Indian custodian and the Indian child's tribe of the pending proceedings and of their right to intervention under 25 U.S.C. § 1911(c). 25 U.S.C. § 1912(a); 25 C.F.R. § 23.11. Copies of these notices must be sent to the Secretary and the BIA. 25 C.F.R. § 23.11. No foster care placement or termination of parental rights proceeding may be held until at least ten days after receipt of the notice by the parent or Indian custodian and tribe or the Secretary. 25 U.S.C. § 1912(a). ICWA grants the Indian custodian or tribe up to twenty additional days to prepare for such proceedings. *Id.*

53.     ICWA demands that state agencies and courts undertake additional duties and costs to implement its federal program.

54.     ICWA requires state agencies charged with serving children in foster care and adoption proceedings to use "active efforts" to prevent the breakup of the family. "Any party [including state agencies] seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proven unsuccessful." 25 U.S.C. § 1912(d).

55.     ICWA requires state courts to apply federal substantive rules of decision and federal procedural requirements in state law causes of action that result in state law judgments.

56.     ICWA requires foster care placement and termination of parental rights proceedings, in the absence of good cause to the contrary, to be transferred to tribal courts for an Indian child, even if he or she is not domiciled or residing on the reservation. 25 U.S.C. § 1911(b).

57.     ICWA commands state courts to grant mandatory intervention to an Indian custodian and the child's tribe at any point in the proceedings. 25 U.S.C. § 1911(c).

58.     ICWA prohibits the termination of parental rights for an Indian child in the absence of "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). The BIA is not required to pay for the services of expert witnesses. 25 C.F.R. § 23.81.

59.     ICWA dictates when a parent or Indian custodian may consent to a foster care placement or termination of parental rights, "[a]ny consent given prior to, or within ten days after, birth of the Indian child shall not be valid." 25 U.S.C. § 1913(a). "Any parent or Indian custodian may withdraw consent to a foster care placement under State law at any time and, upon such withdrawal, the child shall be returned to the parent or Indian custodian." *Id*. § 1913(b). And "[i]n any

voluntary proceeding for termination of parental rights to, or adoptive placement of, an Indian child, the consent of the parent may be withdrawn for any reason at any time prior to the entry of a final decree of termination or adoption, as the case may be, and the child shall be returned to the parent." *Id*. § 1913(c).

60.     ICWA permits the parent of an Indian child to withdraw consent to a final decree of adoption on the grounds that the consent was obtained through fraud or duress, and upon finding fraud or duress, a state court must vacate the final decree and return the child to the parent. The parent may withdraw consent based on fraud or duress for up to two years after the final judgment of adoption. 25 U.S.C. § 1913(d).

61.     ICWA places recordkeeping duties on state agencies and courts.

62.     State agencies and courts must maintain records demonstrating their compliance with the statute. "A record of each such placement, under State law, of an Indian child shall be maintained by the State in which the placement was made, evidencing the efforts to comply with the order of preference specified in this section. Such record shall be made available at any time upon the request of the Secretary or the Indian child's tribe." 25 U.S.C. § 1915(e).

63.     State courts must maintain records and report to the Indian child his or her tribal affiliation once that child reaches age eighteen. "Upon application by an Indian individual who has reached the age of eighteen and who was the subject of an adoptive placement, the court which entered the final decree shall inform such individual of the tribal affiliation, if any, of the individual's biological parents and provide such other information as may be necessary to protect any rights flowing from the individual's tribal relationship." 25 U.S.C. § 1917.

64.     State courts entering final decrees or orders in an Indian child adoption case must provide the Secretary with a copy of the decree or order, along with the name and tribal affiliation

of the child, names of the biological parents, names of the adoptive parents, and the identity of any

agency having files or information relating to the adoption. 25 U.S.C. § 1951.

65.     Failure to comply with ICWA may result in final child custody orders or placements

to be overturned on appeal or by another court of competent jurisdiction. 25 U.S.C. § 1914.

66.     ICWA also overrides the provisions of state law that promote finality in adoptions

by allowing an adoption order to come under collateral attack for up to two years after entry of the

order. 25 U.S.C. § 1913(d).

67.     ICWA ensures state agencies and courts comply with its mandates by enabling any

Indian child who is the subject of any action for foster care placement or termination of parental

rights under state law, any parent or Indian custodian from whose custody the child was removed,

and the Indian child's tribe to petition any court of competent jurisdiction to invalidate a state

court's decision for failure to comply with ICWA sections 1911, 1912, and 1913. 25 U.S.C.

§ 1914. Section 1914 has also been applied to allow collateral attacks to adoptions after the close

of the relevant window under state law.  *See, e.g.*, *Belinda K. v. Baldovinos*, No. 10-cv-2507, 2012

WL 13571, at *4 (N.D. Cal. Jan. 4, 2012).

68.     In 1994, Congress enacted another mechanism to coerce States to comply with

ICWA. The Social Security Act Amendments of 1994 require states who receive child welfare

services program funding through Title IV-B, Part 1 of the Social Security Act to file annual re-

ports detailing their compliance with ICWA. Pub. L. No. 103–432, § 204, 108 Stat. 4398 (1994).

According to Title IV-B:

>   (a) In order to be eligible for payment under this subpart, a State must have a plan
>   for child welfare services which has been developed jointly by the Secretary and
>   the State agency designated pursuant to subsection (b)(1), and which meets the re-
>   quirements of subsection (b).
>
>   (b) Each plan for child welfare services under this subpart shall— . . . (9) contain a
>   description, developed after consultation with tribal organizations (as defined in

section 4 of the Indian Self-Determination and Education Assistance Act) in the State, of the specific measures taken by the State to comply with the Indian Child Welfare Act.

42 U.S.C. § 622.

69.     States can use Title IV-B funding for a variety of child welfare services, including family preservation, family reunification, services for foster and adopted children, training for child welfare professionals, and adoption promotion activities.

70.     HHS and Secretary Azar shall pay each State that has developed a plan in accordance with section 622. 42 U.S.C. § 624(a). However, "[i]f the Secretary determines that a State has failed to comply with subparagraph (a) for a fiscal year, then the percentage that would otherwise apply for purposes of subsection (a) for the fiscal year shall be reduced by" a certain amount. *Id*. § 624(f)(2)(B).

71.     Each State receives a base amount of $70,000 in Title IV-B funding. 42 U.S.C. § 623(a). Additional funds are distributed in proportion to the State's population of children under age 21 multiplied by the complement of the State's average per capita income.

72.     Congress expanded the requirement for States to comply with ICWA to receive Social Security Act funding in 1999 and 2008, when it amended Title IV-E of the Social Security Act to require States to certify ICWA compliance to receive foster care and adoption services funding. Foster Care Independence Act of 1999, Pub. L. No. 106–169, § 101, 113 Stat. 1822 (1999); Fostering Connections to Success and Increasing Adoptions Act of 2008, Pub. L. No. 110-351, § 301, 122 Stat. 3949 (2008). According to Title IV-E:

> (1) A State may apply for funds from its allotment under subsection (c) of this section for a period of five consecutive fiscal years by submitting to the Secretary, in writing, a plan that meets the requirements of paragraph (2) and the certifications required by paragraph (3) with respect to the plan.
>
> …

(3) Certifications

The certifications required by this paragraph with respect to a plan are the following:

…

(G) A certification by the chief executive officer of the State that each Indian tribe in the State has been consulted about the programs to be carried out under the plan; that there have been efforts to coordinate the programs with such tribes; that benefits and services under the programs will be made available to Indian children in the State on the same basis as to other children in the State; and that the State will negotiate in good faith with any Indian tribe, tribal organization, or tribal consortium in the State that does not receive an allotment under subsection (j)(4) for a fiscal year and that requests to develop an agreement with the State to administer, supervise, or oversee the programs to be carried out under the plan with respect to the Indian children who are eligible for such programs and who are under the authority of the tribe, organization, or consortium and to receive from the State an appropriate portion of the State allotment under subsection (c) for the cost of such administration, supervision, or oversight.

42 U.S.C. § 677(b).

73.     HHS regulations state that the HHS Administration for Children and Families ("ACF") "will determine a title IV–E agency's substantial conformity with title IV–B and title IV–E plan requirements" based on "criteria related to outcomes." 45 C.F.R. § 1355.34(a).

74.     "Criteria related to outcomes" includes:

(2) A title IV–E agency's level of achievement with regard to each outcome reflects the extent to which a title IV–E agency has:

(i) Met the national standard(s) for the statewide/Tribal service area data indicator(s) associated with that outcome, if applicable; and,

(ii) Implemented the following [Child and Family Services Plan] CFSP requirements or assurances:

(E) The requirements in section 422(b)(9) of the Act regarding the State's compliance with the Indian Child Welfare Act.

45 C.F.R. § 1355.34(b).

75.     HHS and Secretary Azar withhold funds for failure to comply with Title IV-B and IV-E requirements, including failure to comply with and implement ICWA by State agencies and courts. 45 C.F.R. § 1355.36.

76.     In Fiscal Year 2018, Texas was appropriated approximately $410 million in federal funding for Title IV-B and Title IV-E programs.

77.     In Fiscal Year 2018, Louisiana was appropriated approximately $64 million in federal funding for Title IV-B and Title IV-E programs.

78.     In Fiscal Year 2014, Indiana was appropriated approximately $189 million in federal funding for Title IV-B and Title IV-E programs.

79.     Titles IV-B and IV-E vest Secretary Azar with discretion to approve or deny a State's compliance with the requirements of 42 U.S.C. §§ 622, 677.

80.     HHS and Secretary Azar administer funding under Titles IV-B and IV-E of the Social Security Act.

81.     Defendants enforce compliance with 42 U.S.C. § 622(b)(9), 677(b)(3)(G) and will reduce or deny funding to States that do not comply with ICWA.

## C.     The 1979 BIA Guidelines

82.     Soon after ICWA's enactment, the BIA promulgated "Guidelines for State Courts; Indian Child Custody Proceedings" (the "1979 Guidelines") that were intended to assist the implementation of ICWA, but were "not intended to have binding legislative effect." 44 Fed. Reg. 67,584, 67,584 (Nov. 26, 1979). The 1979 Guidelines recognized that "[p]rimary responsibility" for interpreting ICWA "rests with the courts that decide Indian child custody cases." *Id*. The 1979 Guidelines emphasized that "the legislative history of the Act states explicitly that the use of the

term 'good cause' was designed to provide state courts with flexibility in determining the disposi-

tion of a placement proceeding involving an Indian child." *Id.*

83.    As state courts applied ICWA in the ensuing decades, most held that the "good

cause" exception to ICWA's placement preferences requires a consideration of the child's best

interests, including any bond or attachment the child had formed with her current caregivers. *See,*

*e.g.*, *In re Interest of Bird Head*, 331 N.W.2d 785, 791 (Neb. 1983); *In re Appeal in Maricopa Cty.*

*Juvenile Action No. A-25525*, 667 P.2d 228, 234 (Ariz. Ct. App. 1983); *In re Adoption of T.R.M.*,

525 N.E.2d 298, 307–08 (Ind. 1988); *In re Adoption of M.*, 832 P.2d 518, 522 (Wash. Ct. App.

1992); *In re Adoption of F.H.*, 851 P.2d 1361,1363–64 (Alaska 1993); *In re Interest of A.E., J.E.,*

*S.E., and X.E.*, 572 N.W.2d 579, 583–85 (Iowa 1997); *People ex rel. A.N.W.*, 976 P.2d 365, 369

(Colo. Ct. App. 1999); *In re Interest of C.G.L.*, 63 S.W.3d 693, 697–98 (Mo. Ct. App. 2002); *In*

*re Adoption of Baby Girl B.*, 67 P.3d 359, 370–71 (Okla. Ct. App. 2003); *but see Yavapai–Apache*

*Tribe v. Mejia*, 906 S.W.2d 152 (Tex. App.—Houston [14th Dist.] Aug. 24, 1995, no pet.).

84.    Other state courts, developing and applying the "existing Indian family doctrine,"

limited ICWA's application to circumstances where the child had some significant political or

cultural connection to the tribe. *See, e.g.*, *In re Interest of S.A.M*, 703 S.W.2d 603, 608–09 (Mo.

Ct. App. 1986); *Claymore v. Serr*, 405 N.W.2d 650, 653-54 (S.D. 1987); *In re Adoption of T.R.M.*,

525 N.E.2d 298, 303 (Ind. 1988); *Hampton v. J.A.L.*, 658 So. 2d 331, 335 (La. Ct. App. 1995);

*Rye v. Weasel*, 934 S.W.2d 257, 261–64 (Ky. 1996); *In re Santos Y.*, 112 Cal. Rptr. 2d 692, 716

n.16 (Cal. App. 2001); *In re Morgan*, No. 02A01-9608-CH-00206, 1997 WL 716880, at *1 (Tenn.

Ct. App. Nov. 19, 1997); *Ex parte C.L.J.*, 946 So. 2d 880 (Ala. Civ. App. 2006); *In re N.J.*, 221

P.3d 1255, 1264–65 (Nev. 2009). The existing Indian family doctrine is premised, in part, on the

significant equal protection concerns that would arise if ICWA applied to children with no political

or cultural connection to a tribe based solely on the child's ancestry. *See In re Bridget R.*, 49 Cal. Rpt. 2d 507, 527–29 (Cal. App. 1996); *cf. Adoptive Couple,* 133 S. Ct. at 2565 (noting that interpreting ICWA's parental termination provisions as applicable in any case where a child has an Indian ancestor, "even a remote one, . . . would raise equal protection concerns").

### D.     The Final Rule

85.     In June 2016, almost four decades after ICWA's passage, the BIA promulgated *Indian Child Welfare Act Proceedings*, 81 Fed. Reg. 38,778 (June 14, 2016) (the "Final Rule") (codified at 25 C.F.R. pt. 23). The Final Rule purports to "clarify the minimum Federal standards governing implementation of the Indian Child Welfare Act" and to ensure that the Act "is applied in all States consistent with the Act's express language." 25 C.F.R. § 23.101.

86.     The BIA characterizes the Final Rule as a "legislative rule" that "set[s] binding standards for Indian child custody proceedings in State courts" and is "entitled to *Chevron* deference." 81 Fed. Reg. at 38,782, 38,786, 38,788.

87.     The Final Rule provides the "minimum Federal standards governing implementation" of ICWA, 25 C.F.R. § 23.101, and "to ensure compliance with ICWA," *id*. § 23.106(a).

88.     The Final Rule requires state agencies and courts to conduct Executive Branch investigations and duties.

89.     The Final Rule requires "State courts [to] ask each participant in an emergency or voluntary or involuntary child custody proceeding whether the participant knows or has reason to know that the child is an Indian child." 25 C.F.R. § 23.107(a). These inquiries "should be on the record," and "State courts must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." *Id*.

90.     When the state agency or court believes the child is an Indian child, the court must confirm, through "a report, declaration, or testimony included in the record," that the state agency

or other party used due diligence to identify and work with all of the tribes of which there is reason to know the child may be a member (or eligible for membership). 25 C.F.R. § 23.107(b). The Final Rule specifies that the state court must confirm that the state agency conducted a "diligent search . . . to find suitable placements meeting the preference criteria." *Id*. § 23.132(c)(5).

91.     The Final Rule dictates to state agencies and courts when and how notice of an involuntary foster care placement or termination of parental rights proceeding involving an Indian child must be provided to an Indian tribe, the child's parents, and the child's Indian custodian. 25 C.F.R. § 23.111. The Final Rule prohibits the continuation of foster care placement or termination of parental rights proceedings in state courts until at least 10 days after receipt of the notice by the parent or Indian custodian and by the tribe or Secretary of the Interior. 25 C.F.R. § 23.112. Upon request, the state court must grant the parent, Indian custodian, or tribe up to 20 additional days from the date upon which notice was received to prepare for the hearing. *Id*.

92.     The Final Rule prescribes how a state court may proceed with an emergency re-moval or placement of an Indian child, including when to hold a hearing, how to notify the Indian child's custodians, how to make a court record of the proceedings, what evidence must be provided to the court, and when to end the proceeding. 25 C.F.R. § 23.113.

93.     In an involuntary foster care or termination of parental rights proceeding, the Final Rule requires state courts to ensure and document that the state agency has used "active efforts" to prevent the breakup of the Indian family. 25 C.F.R. § 23.120.

94.     The Final Rule defines "active efforts" to include "assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan." 25 C.F.R. § 23.2. "To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions

23

and way of life of the Indian child's Tribe and should be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and Tribe." *Id.*

95.     State agencies must tailor active efforts to the facts and circumstances of the case, which may include, for example:

(1) Conducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;

(2) Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;

(3) Identifying, notifying, and inviting representatives of the Indian child's Tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues;

(4) Conducting or causing to be conducted a diligent search for the Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents;

(5) Offering and employing all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's Tribe;

(6) Taking steps to keep siblings together whenever possible;

(7) Supporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child;

(8) Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources;

(9) Monitoring progress and participation in services;

(10) Considering alternative ways to address the needs of the Indian child's parents and, where appropriate, the family, if the optimum services do not exist or are not available;

(11) Providing post-reunification services and monitoring.

25 C.F.R. § 23.2.

96.     The Final Rule requires state courts to apply federal substantive rules of decision and federal procedural requirements in state law causes of action that result in state law judgments.

97.     Only the Indian tribe of which it is believed the child is a member (or eligible for membership) may determine whether the child is a member of the tribe or eligible for membership. 25 C.F.R. § 23.108(a). "The State court may not substitute its own determination regarding a child's membership in a Tribe, a child's eligibility for membership in a Tribe, or a parent's membership in a Tribe." *Id.* § 23.108(b).

98.     When an Indian child is a member or eligible for membership in only one tribe, that tribe must be designated as the Indian child's tribe. But when the child meets the definition of "Indian child" for more than one tribe, then the Final Rule instructs state agencies and courts to defer to "the Tribe in which the Indian child is already a member, unless otherwise agreed to by the Tribes," or allow "the Tribes to determine which should be designated as the Indian child's Tribe." *Id.* § 23.109(b)–(c). Only when the tribes disagree about the child's membership may the state courts designate the tribe to which the child belongs, and the Final Rule provides criteria the courts must use in making that designation. *Id.* § 23.109(c)(2).

99.     The Final Rule instructs state courts that they must dismiss a voluntary or involuntary child custody proceeding when the Indian child's residence or domicile is on a reservation where the tribe exercises exclusive jurisdiction over child custody proceedings. 25 C.F.R. § 23.110(a).

100.     The Final Rule requires state courts to terminate child custody proceedings if any party or the court has reason to believe that the Indian child was improperly removed from the custody of his parent or Indian custodian. 25 C.F.R. § 23.114.

101.    The Final Rule instructs state agencies and courts on how to transfer proceedings to tribal courts. The parent, Indian custodian, or the Indian child's tribe may request transfer at any time, orally or in writing. 25 C.F.R. § 23.115. The Final Rule then requires the state court to promptly notify the tribal court in writing of the transfer petition, and it must transfer the proceeding, unless either parent objects, the tribal court declines the transfer, or good cause exists for denying the transfer. 25 C.F.R. § 23.116–117. The Final Rule establishes when good cause exists to deny the transfer. 25 C.F.R. § 23.118. If the tribal court accepts the transfer, the Final Rule instructs that the state court should expeditiously provide the tribal court with all records related to the proceeding. 25 C.F.R. § 23.119.

102.    The Final Rule prohibits state courts from ordering a foster care placement of an Indian child unless clear and convincing evidence is presented, including expert testimony, demonstrating that the child is in serious emotional or physical danger in the parent's or Indian custodian's custody. 25 C.F.R. § 23.121(a).

103.    The Final Rule prohibits state courts from terminating parental rights for an Indian child unless evidence beyond a reasonable doubt is presented, including expert testimony, that the child is in serious emotional or physical danger. 25 C.F.R. § 23.121(b). The evidence must demonstrate a causal relationship between the conditions in the home and the likelihood of danger to the child. 25 C.F.R. § 23.121(c)–(d). The Final Rule prohibits the state agency caseworker from serving as an expert witness, and dictates that the Indian child's tribe will designate the expert witness. 25 C.F.R. § 23.122.

104.    In voluntary child custody proceedings, the Final Rule mandates that state courts require the participants to state on the record whether the child is an Indian child, or whether they have reason to believe the child is an Indian child. 25 C.F.R. § 23.124(a). "If there is reason to

believe the child is an Indian child, the State court must ensure that the party seeking placement has taken all reasonable steps to verify the child's status," including "contacting the Tribe of which it is believed the child is a member (or eligible for membership and of which the biological parent is a member) to verify the child's status." *Id*. § 23.124(b).

105.    The Final Rule describes what evidence a state court may consider when evaluating the voluntary consent for termination of parental rights, foster care, preadoptive, and adoptive placement by a parent or Indian custodian. 25 C.F.R. § 23.125. For foster care placement, consent may be withdrawn at any time. 25 C.F.R. § 23.125(b)(2)(i). For termination of parental rights and adoption, consent may be withdrawn any time prior to the final decree of termination or adoption. 25 C.F.R. § 23.125(b)(2)(ii)–(iii). Consent given prior to, or within 10 days after, the birth of an Indian child is not valid. 25 C.F.R. § 23.125(e). The Final Rule also dictates what information written consent must contain, 25 C.F.R. § 23.126, and how a parent or custodian may withdraw consent, 25 C.F.R. § 23.127–28.

106.    The Final Rule requires state agencies and courts to follow placement preferences based on the child's Indian parentage.

107.    In adoptive placements "preference must be given in descending order . . . to placement of the child with: (1) A member of the Indian child's extended family; (2) Other members of the Indian child's Tribe; or (3) Other Indian families." 25 C.F.R. § 23.130(a).

108.    "If the Indian child's Tribe has established by resolution a different order of preference than that specified in ICWA, the Tribe's placement preferences apply." *Id*. § 23.130(b).

109.    In other words, in adoptive placement proceedings, the tribe designated as the Indian child's tribe may enact a resolution that prefers placement with another Indian family of another tribe, even if the Indian child has extended family with which he or she may be placed.

110.    In foster care or preadoptive placement proceedings, "preference must be given . . . to placement of the child with: (1) A member of the Indian child's extended family; (2) A foster home that is licensed, approved, or specified by the Indian child's Tribe; (3) An Indian foster home licensed or approved by an authorized non-Indian licensing authority; or (4) An institution for children approved by an Indian Tribe or operated by an Indian organization which has a program suitable to meet the child's needs." 25 C.F.R. § 23.131(b).

111.    "If the Indian child's Tribe has established by resolution a different order of preference than that specified in ICWA, the Tribe's placement preferences apply, so long as the placement is the least-restrictive setting appropriate to the particular needs of the Indian child . . . ." *Id.* § 23.131(c).

112.    In other words, in foster care and preadoptive placement proceedings, the tribe designated as the Indian child's tribe may enact a resolution that prefers placement with an institution for children approved by another Indian organization, even if the Indian child has extended family with which he or she may be placed.

113.    The Final Rule further requires that the State undertake "a diligent search . . . to find suitable placements meeting the preference criteria." 25 C.F.R. § 23.132(c)(5). The Final Rule also demands that the State may not assess the availability of a preferred placement according to generally applicable standards under state law, but instead must adhere to "the prevailing social and cultural standards of the Indian community in which the Indian child's parent or extended family resides or with which the Indian child's parent or extended family members maintain social and cultural ties." *Id.*

114.    The "diligent search" requirement usurps the State's authority to assess potential placements under the standards of the State, and instead requires the State to expend significant

efforts to locate placements that conform to the Tribe's view of suitability. Because the State must adopt the Tribe's standard of suitability, the Final Rule blocks the State from seeking to promote the best interests of the child.

115.    A state court may depart from the placement preferences contained in Sections 23.130–131 of the Final Rule if there is "good cause." 25 C.F.R. § 23.132. The Final Rule prescribes circumstances in which the "good cause" standard is met. *Id*.

116.    After observing that "State courts . . . differ as to what constitutes 'good cause' for departing from ICWA's placement preferences," 81 Fed. Reg. at 38,782, the Final Rule newly mandates that "[t]he party urging that the ICWA preferences not be followed bears the burden of proving **by clear and convincing evidence** the existence of good cause" to deviate from such a placement. 81 Fed. Reg. at 38,838 (emphasis added); *see also* 25 C.F.R. § 23.132(b). Though the Final Rule says that its regulations "do not categorically require" that state courts apply a clear-and-convincing standard of proof—the regulation itself says that a party seeking departure from the placement preferences "should bear the burden of proving by clear and convincing evidence that there is good cause," 25 C.F.R. § 23.132(b)—the Final Rule simultaneously says the clear-and-convincing standard "should be followed." 81 Fed. Reg. at 38,843.

117.    The Final Rule also expressly repudiates the Existing Indian Family doctrine. *See* 81 Fed. Reg. at 38,802 ("[T]here is no [Existing Indian Family] exception to the application of ICWA."). Accordingly, the Final Rule provides that state courts "may not consider factors such as the participation of the parents or Indian child in Tribal cultural, social, religious, or political activities, the relationship between the Indian child and his or her parents, whether the parent ever had custody of the child, or the Indian child's blood quantum." 81 Fed. Reg. at 38,868 (codified at 25 C.F.R. § 23.103(c)).

118.   And contrary to the idea—previously embraced by the BIA—that "the use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child," 44 Fed. Reg. 67,584, 67,584 (Nov. 26, 1979), the Final Rule now claims that "Congress intended the good cause exception to be narrow and limited in scope," 81 Fed. Reg. at 38,839. Accordingly, the Final Rule sets forth "five factors upon which courts may base a determination of good cause to deviate from the placement preferences," and further "makes clear that a court may not depart from the preferences based on the socioeconomic status of any placement relative to another placement or based on the ordinary bonding or attachment that results from time spent in a non-preferred placement that was made in violation of ICWA." 81 Fed. Reg. at 38,839; *see also* 25 C.F.R. § 23.132(c)–(e).

119.   The BIA threatens enforcement of the Final Rule through the invalidation of child custody proceedings involving Indian children that do not follow ICWA or the Final Rule's requirements.

120.   The Final Rule requires state courts to vacate adoption decrees, up to two years after their issuance, if the parents of the Indian child file a petition to vacate the order. 25 C.F.R. § 23.136. By contrast, in Texas, "the validity of an adoption order is not subject to attack after six months after the date the order was signed." Tex. Fam. Code § 162.012.

121.   The Final Rule allows an "Indian child," a parent or Indian custodian, or the child's Tribe seeking to petition a court to invalidate a foster-care placement or termination of parental rights under state law. 25 C.F.R. § 23.137. The petitioner is not required to show that her rights were violated, only that any violation of 25 U.S.C. §§ 1911–1913 occurred during the course of the challenged child-custody proceeding. *Id.*

122.    If an Indian child has been adopted, the state court must notify the child's biological parent or prior Indian custodian and the child's tribe whenever the final adoption decree has been vacated or set aside or the adoptive parent has voluntarily consented to the termination of parental rights. 25 C.F.R. § 23.139.

123.    Once an Indian child reaches age 18, the state court that entered the final adoption decree must inform that person of his or her tribal affiliation. 25 C.F.R. § 23.138.

124.    Whenever a state court enters a final adoption decree or an order in a voluntary or involuntary Indian child placement, the Final Rule requires the state court or designated state agency to provide a copy of the decree or order to the BIA within 30 days along with biographical information about the child, the biological parents, the adoptive parents, the state agency possessing information about the child, and information about tribal membership of the child. 25 C.F.R. § 23.140.

125.    The Final Rule requires states to "maintain a record of every voluntary or involuntary foster care, preadoptive, and adoptive placement of an Indian child and make the record available within 14 days of a request by an Indian child's Tribe or the Secretary." 25 C.F.R. § 23.141.

126.    Prior to adopting the Final Rule, Interior and the BIA accepted public comment on the proposed rule. Commenters raised objections to the proposed, now final, rule on the grounds that it violated federalism, the Tenth Amendment, and equal protection principles. *See, e.g.*, 81 Fed. Reg. 38,788–89, 38,794, 38,826. Interior and the BIA dismissed those objections and promulgated the Final Rule. *Id*.

## II.    FACTS RELEVANT TO THE INTERESTS OF PLAINTIFFS

### A.    A.L.M.'s Adoption Proceedings

127.    A.L.M. was born in Arizona to M.M. and J.J., an unmarried couple. A.L.M. is an "Indian child" as that term is defined in the Final Rule because he is eligible for membership in an

Indian tribe, his biological mother is an enrolled member of the Navajo Nation, and his father is an enrolled member of the Cherokee Nation. *See* 25 C.F.R. § 23.2.

128.    A.L.M. has been living with Chad and Jennifer Brackeen for more than 16 months and, with the support of A.L.M.'s biological parents and his paternal grandmother, the Brackeens sought to become his adoptive parents. Because of the Final Rule and Section 1915 of ICWA, the Brackeens have faced great obstacles in their efforts to adopt a child they raised for more than half his life, and A.L.M. faces the possibility of separation from both his prospective adoptive and biological families.

129.    A few days after A.L.M.'s birth, his birth mother took A.L.M. to Fort Worth, Texas to live with A.L.M.'s paternal grandmother. In June 2016, when A.L.M. was ten months old, Child Protective Services ("CPS"), a division of the Texas DFPS, removed him from his grandmother and placed him in the foster care of the Brackeens. A.L.M. was identified as an "Indian child" within the meaning of ICWA, and as required by the Final Rule, 25 C.F.R. § 23.11, both the Cherokee Nation and the Navajo Nation were notified of A.L.M.'s placement with the Brackeens.

130.    Texas DFPS, the Cherokee Nation, and the Navajo Nation were unable to identify an ICWA-preferred foster placement for A.L.M., and he remained with the Brackeens.

131.    The Brackeens have raised A.L.M. for over 16 months and regard him as a member of their family.

132.    The parental rights of A.L.M.'s biological parents were voluntarily terminated on May 2, 2017, and he is free to be adopted under Texas law.

133.    In June 2017, a year after the Brackeens took custody of A.L.M., the Navajo Nation submitted a letter to the family court suggesting they had located a potential alternative placement for A.L.M. with non-relatives in New Mexico.

134.     On July 19, 2017, the Brackeens brought an original petition to adopt A.L.M. in the 323rd District Court, Tarrant County, Texas.

135.     In accordance with the requirements of the Final Rule, *see* 25 C.F.R. § 23.11, the Cherokee and Navajo Nations were notified of the adoption proceeding.

136.     Neither the Navajo Nation nor the prospective alternative placement located by the Navajo Nation intervened in the Texas adoption proceeding or otherwise formally sought to adopt A.L.M. The Brackeens are the only persons before the Texas family court seeking to adopt A.L.M.

137.     On August 1, 2017, the family court held a hearing regarding the Brackeens' petition for adoption.

138.     At the August 1, 2017 hearing, the Navajo Nation's social worker testified that the two tribes "came up with [an] agreement" among themselves in the hallway prior to the hearing to determine the designation of A.L.M.'s tribe. The tribes ultimately decided to designate the Navajo Nation as A.L.M.'s tribe, but this "determination of [A.L.M.'s] Tribe for purposes of ICWA and [the Final Rule] do[es] not constitute a determination for any other purpose." 25 C.F.R. § 23.109(c)(3).

139.     The Brackeens argued that ICWA's placement preferences did not apply in their adoption case because they were the only party before the family court formally seeking to adopt A.L.M., *see Adoptive Couple*, 133 S. Ct. at 2564, and that, in any event, good cause existed to depart from ICWA's preferences for placing A.L.M. with an Indian family because A.L.M.'s biological parents wanted him to be adopted by the Brackeens, and an expert in developmental psychology testified that A.L.M. will suffer severe emotional and psychological harm if he is removed from the Brackeens' care.

140.    Although ICWA does not define "good cause," the Final Rule requires the Brackeens—who were the only party to the proceeding seeking adoption—to "bear the burden of proving by clear and convincing evidence" that there was "good cause" to allow them, as a non-Indian couple, to adopt A.L.M. 25 C.F.R. § 23.132(b).

141.    To establish good cause, the Brackeens presented the testimony of A.L.M.'s biological parents, who each testified that they reviewed the placement options and preferred A.L.M.'s adoption by the Brackeens. *See* 25 C.F.R. § 23.132(c)(1). A.L.M.'s biological mother testified that A.L.M. "loves [the Brackeens]." A.L.M.'s biological father testified that the Brackeens are "the only parents [A.L.M.] knows." In addition, A.L.M.'s paternal grandmother also requested that A.L.M. remain with the Brackeens, testifying that they "have been the primaries in his life." A.L.M.'s court appointed guardian recommended that A.L.M. remain with the Brackeens. Other witnesses testified that taking A.L.M. from the Brackeens would also separate him from his biological family, with whom he currently has regular contact. Finally, the Brackeens presented an expert in psychology who concluded that the Brackeens and A.L.M. were strongly emotionally bonded, and that taking A.L.M. from his family would likely cause significant emotional and physiological harm that could last for many years. The expert further testified that A.L.M. is particularly at risk for severe emotional and psychological harm due to trauma he experienced in his infancy before he was placed with the Brackeens, and that he is "four to six times more likely" to experience that harm if he is removed from his home to live with strangers in New Mexico.

142.    Texas DFPS did not dispute that the Brackeens were fit parents to adopt A.L.M., or otherwise suggest any reason unrelated to ICWA why the Brackeens' petition to adopt A.L.M. should be denied. Texas DFPS maintained, however, that notwithstanding the fact that the Brackeens were the only parties that had petitioned to adopt A.L.M., ICWA's placement preferences

applied and could be overcome only upon a showing of "good cause." To rebut the Brackeens'

showing of "good cause," Texas DFPS pointed to the Final Rule's clear-and-convincing standard

of proof, arguing that the Brackeens did not satisfy the heightened showing required to justify a

departure from the placement preferences.

143.    On August 22, 2017, the family court entered an order denying the Brackeens'

adoption petition. The Brackeens' petition to adopt A.L.M. was denied solely because the family

court concluded that ICWA and the Final Rule applied to the Brackeens' petition and that the

Brackeens had failed to satisfy, by the Final Rule's clear and convincing burden of proof, that

"good cause" exists to depart from the Final Rule's and ICWA's "placement preferences." *See* 23

C.F.R. § 23.132; *see also* Order Denying Request for Adoption of Child, *In re A.L.M., a Child*,

No. 323-105593-17 (323rd Dist. Ct., Tarrant Cty., Texas Aug. 22, 2017).

144.    Although the court acknowledged that "Petitioners are the only party before the

Court seeking adoption," it concluded that "25 U.S.C. § 1915 preferences are applicable," and that

"preference shall be given to other members of the child's tribe." Order Denying Request for

Adoption of Child, *In the Interest of A.L.M.*, No. 323-105593-17 (323rd Distr. Ct., Tarrant County,

Tex. Aug. 22, 2017), ¶ 5. The Court held that the Brackeens "did not meet their burden under" the

Final Rule, 25 C.F.R. § 23.132 (which imposes the "clear and convincing evidence" burden on the

prospective adoptive parents), to "show good cause to depart from" ICWA's preferences. *Id.*

145.    Shortly after the family court denied the Brackeens' petition for adoption, Texas

DFPS, applying the placement preferences applicable to foster care and preadoptive placements,

*see* 25 C.F.R. § 23.131, stated its intention to immediately move A.L.M. to the Navajo Nation's

proposed placement in New Mexico.

146.    The Brackeens sought an emergency order staying any change in placement pending appeal. Texas appeared as *amicus curiae* in support of the Brackeens' stay request, arguing that ICWA violates the right of equal protection of the laws under the United States Constitution.

147.    On September 8, 2017, the family court entered a temporary order staying any change in placement pending the outcome of the Brackeens' appeal to the Texas Second District Court of Appeals, Fort Worth, Texas, holding that such an order was necessary and appropriate to protect A.L.M.'s safety and welfare during the pendency of the appeal. *See* Tex. Fam. Code § 109.001 ("[T]he court may make any order necessary to preserve and protect the safety and welfare of the child during the pendency of an appeal as the court may deem necessary and equitable.").

148.    In accordance with the Final Rule's provisions concerning preadoptive and foster care placements, Texas DFPS stated its intention to move A.L.M. to the Navajo Nation's proposed placement with non-relatives in New Mexico if the family court's ruling is affirmed.

149.    In anticipation of a favorable ruling on appeal, Texas DFPS proposed that, during the pendency of the appeal, it take A.L.M., without either of the Brackeens, to New Mexico for "transitional" overnight visits with the Navajo Nation's proposed alternative placement.

150.    During the pendency of the appeal, Texas DFPS informed counsel for the Brackeens that the Navajo couple previously identified as an alternative placement for A.L.M. was no longer an available placement, and that both the Navajo Nation and Cherokee Nation lacked viable adoptive placements for A.L.M. Based on these developments, the Brackeens, Texas DFPS, and the guardian ad litem entered into a settlement agreement recognizing that the Brackeens are now the only party seeking to adopt A.L.M., that Section 1915(a)'s placement preferences therefore do not apply, and that, even if they did apply, good cause exists to depart from them. Based on that

agreement, the Brackeens, Texas DFPS, and the guardian ad litem filed a joint unopposed motion to set aside the trial court's judgment and to remand to the trial court so that it could make a determination as to A.L.M.'s best interest.

151.    The Second Court of Appeals granted the parties' motion on December 7, 2017, setting aside the trial court's prior judgment and remanding to the trial court. *See In the Interest of A.M., A Child*, 02-17-00298-CV, 2017 WL 6047677, at *1 (Tex. App.—Fort Worth Dec. 7, 2017, no pet. h.).

152.    In January 2018, following the remand, the Brackeens successfully petitioned to adopt A.L.M. But under ICWA and the Final Rule, the Brackeens' adoption may be subject to collateral attack for two years.

153.    The Brackeens are directly and deeply aggrieved by the Final Rule and ICWA be- cause these provisions may subject their adoption of A.L.M. to collateral attack for up to two years—eighteen months more than Texas law would otherwise allow.

154.    The Brackeens also intend to provide foster care for, and possibly adopt, additional children in need. Because of their experience with the Final Rule and ICWA, however, the Brack- eens are reluctant to provide a foster home for other Indian children in the future. Because the Brackeens are not an Indian family under ICWA, they know that any future foster or adoption placement involving a child who may be an Indian child could subject them and the child to years of delay and litigation. ICWA and the Final Rule threaten to repeat the trials that A.L.M. and the Brackeens have already endured with any future foster or adoptive children.

155.    ICWA and the Final Rule therefore interfere with the Brackeens' intention and abil- ity to provide a home to additional children as well. This, in turn, damages Texas by limiting the supply of available, qualified homes necessary to provide support for children in need.

### B.    Baby O.'s Adoption Proceedings

156.    Baby O. was born in Nevada in March 2016. While pregnant with Baby O., Ms. Hernandez decided that she would be unable to provide the support that Baby O. would need to thrive and made the difficult decision to put Baby O. up for adoption at her birth.

157.    Nick and Heather Libretti are a married couple living in Sparks, Nevada. Mr. Libretti is a Marine Corps veteran and works as an auto mechanic. Mrs. Libretti is a marketing and public relations manager for a major antique car show. They are heavily involved in their community, particularly in work that serves at risk youth.

158.    Nick and Heather decided to become foster and adoptive parents several years ago and took in two young boys who needed a home. They have now adopted those children and provide them, and their older brother, with the love and support of a family.

159.    In 2016, the Librettis were overjoyed to have Baby O. come into their lives. Although Baby O. has significant medical needs, the Librettis were eager to welcome her into their family.

160.    Ms. Hernandez met the Librettis and agreed that they would provide a loving and nurturing home to Baby O. When Baby O. was born, the Librettis came to meet her in the hospital; Baby O. went home with the Librettis three days after her birth.

161.    Because of gestational difficulties, Baby O. suffers from a number of medical ailments that require extensive care and management. The Librettis have arranged and ensured that Baby O. receives all the treatment she needs to achieve full health. So far, this has required two surgeries and one extended hospital stay and frequent medical care. Baby O.'s medical needs are ongoing.

162.    Ms. Hernandez, along with Baby O.'s biological siblings, lives a mere twenty-minute drive from the Librettis and has remained part of Baby O.'s life. She and the Librettis visit

one another regularly so that Baby O., Ms. Hernandez, and Baby O.'s biological siblings are able to have a warm and loving relationship. She supports the Librettis' efforts to adopt Baby O. and hopes that they are able to finalize the adoption soon. The Librettis and Ms. Hernandez have agreed to an ongoing visitation agreement which will ensure that Ms. Hernandez remains a part of Baby O.'s life.

163.    Baby O.'s birth father, E.R.G., is descended from members of the Ysleta del sur Pueblo Tribe (also known as the Tigua or Tiwa Tribe), located in El Paso, Texas. At the time of Baby O.'s birth, E.R.G. was not a registered member of the Tribe. E.R.G. and Ms. Hernandez have never been married. They have two children in addition to Baby O. E.R.G. also supports the Librettis' effort to adopt Baby O.

164.    Baby O.'s biological paternal grandmother is a registered member of the Ysleta del sur Pueblo Tribe. The Tribe has intervened in the court proceedings regarding custody of Baby O. Contrary to the wishes of Baby O.'s parents, the Tribe seeks to remove Baby O. from the Librettis and send her into foster care on the reservation in west Texas. In its effort to justify Baby O.'s removal, the Tribe has repeatedly brought forward potential foster placements.

165.    Because of the Final Rule's "diligent search" requirements, the State cannot conduct its normal review of potential alternate placements before concluding that adoption by the Librettis is in the best interests of Baby O. Instead, the State is made an agent for the Tribe, and must conduct full reviews of any placement that the Tribe considers more socially or culturally suitable than allowing Baby O. to remain with the only family she has ever known.

166.    The diligent search requirement blocks the Librettis from seeking to adopt Baby O. until the State has completed an exhaustive review of any potential placement identified by the Ysleta del sur Pueblo Tribe. To date, in its efforts to prevent Baby O.'s adoption by the Librettis,

the Ysleta del sur Pueblo Tribe approximately forty potential placements requiring full home stud-

ies. Many of these potential placements withdrew before completing home studies. None now

seeks to adopt Baby O.

167.    Nevada has already conducted seven home studies of individuals designated by the

tribe and found them all not suitable to care for Baby O., particularly given her significant medical

needs. Most recently, the Tribe has nominated an additional twenty-nine purported foster place-

ments. Nevada child services is in the process of reviewing each.

168.    Only after the Librettis joined this action challenging the constitutionality of ICWA

and the validity of the Final Rule did the Tribe indicate its willingness to enter into settlement

negotiations. Those negotiations are ongoing and may result in an agreement allowing the Librettis

to adopt Baby O. Even if the Librettis' petition to adopt Baby O. is ultimately granted, however,

ICWA may subject the their adoption to collateral attack for up to two years.

169.    The Librettis intend to petition for adoption of Baby O. as soon as they are able to

do so. To date, the Tribe's involvement in the Nevada custody proceeding, made possible only

because of ICWA, has prevented the Librettis from petitioning to adopt. The Librettis are the only

people who have indicated an intent to formally adopt Baby O., and they are the only family she

has ever known.

170.    The Librettis intend to provide foster care for, and possibly adopt, additional chil-

dren in need. Because of their experience with the Final Rule and ICWA, however, the Librettis

are reluctant to provide a foster home for other Indian children in the future. Because the Librettis

are not an Indian family under ICWA, they know that any future foster or adoption placement

involving a child who may be an Indian child could subject them and the child to years of delay

and litigation. ICWA and the Final Rule threaten to repeat the trials that Baby O. and the Librettis have already endured with any future foster or adoptive children.

### C.      Child P.'s Adoption Proceedings

171.    Child P. was born in July 2011. She was placed in foster care in the summer of 2014 when her biological parents were arrested and charged with various drug related offenses. For her first two years in foster care, Child P. was bounced from one placement to another, staying with various relatives or foster parents, none of whom was able to provide her with a stable or permanent home.

172.    Minnesota also attempted to return Child P. to the care of her birth mother, but Child P. had to be returned to foster care after her birth mother relapsed. Finally, after Child P. had been in foster care for nearly two years, a Minnesota court terminated the parental rights of her birth parents. Later that month, Child P. joined the Clifford family.

173.    Jason and Danielle Clifford, Child P.'s foster and adoptive parents, have been married since 2007. Recognizing the significant need for foster families in their area, the Cliffords chose to become foster parents through the Hennepin County, Minnesota, adoption services, rather than pursuing an adoption internationally or through a private adoption agency. Since Child P. joined the Cliffords' family in July 2016, they have loved and cared for her, guiding her through her entrance into school and helping her through more than a year of child therapy in an attempt to heal the psychological wounds inflicted by the neglect and instability of her early life. The Cliffords love and care for Child P. as their own child. Child P. has made many friends, including through the Girl Scouts and the Cliffords' church, and has been warmly welcomed as a member of the Clifford family.

174.    Child P.'s maternal grandmother is a registered member of the White Earth Band of Ojibwe Tribe. When Child P. first entered state custody, her biological mother informed the

court that Child P. was not eligible for tribal membership. In the fall of 2014, several months after Child P. entered foster care, the White Earth Band wrote a letter to the Court confirming that Child P. was not eligible for membership in the tribe. Nevertheless, the Court sent notices, as required under ICWA, in the fall of 2014 and the spring of 2015 informing the White Earth Band that Child P. was in the custody of the state. Not until January 2017—some six months after Child P. was placed with the Cliffords—did the Tribe write to the court and insist, without explanation, that Child P. was eligible for membership.

175.     Most recently, in an unsupported assertion made in a brief, counsel for the White Earth Band announced that Child P. was now a member of the Tribe for purposes of ICWA. Considering itself bound by this pronouncement, the Minnesota state court has concluded that ICWA applies to all custody determinations regarding Child P.

176.     To date, the Cliffords are the only party to move to adopt Child P. Because the Tribe asserts that Child P. is an "Indian child," when the Cliffords moved to adopt Child P., the Minnesota court applied federal law in holding that ICWA's placement preferences apply to Child P. The court also declined to allow the Cliffords an evidentiary hearing on their motion, which would otherwise be guaranteed to them under state law, because ICWA contains no such provision. Because ICWA prefers placement with an "Indian family," Child P. was removed from the Cliffords' home in January 2018, and placed in the care of her maternal grandmother, who was previously determined by the State to be an unfit placement.

177.     The Cliffords wish to adopt Child P. to ensure that she has a permanent home and to make her a part of their family under the law, as she already is in practice. Child P.'s guardian ad litem supports their efforts to adopt and agrees that adoption by the Cliffords is in Child P.'s

best interest. But because of ICWA and the Final Rule, Child P. has now been separated from the Cliffords, who face heightened legal barriers to adopting Child P. purely because of her ancestry.

**D.    The Impact of ICWA and the Final Rule on State Plaintiffs**

178.    ICWA and the Final Rule harm State agencies charged with protecting child welfare from coast to coast by usurping lawful authority over the regulation of child custody proceedings and the management of child welfare services. It also jeopardizes millions of dollars in federal funding.

179.    Three federally recognized tribes exist in Texas: Ysleta del Sur Pueblo (also known as the Tigua or Tiwa) in El Paso, Texas; Kickapoo Tribe of Texas in Eagle Pass, Texas; and Alabama-Coushatta Tribe of Texas near Livingston, Texas. The Kickapoo and Alabama-Coushatta tribes have reservations in Texas.

180.    Four federally recognized tribes exist in Louisiana: Chitimacha Tribe in Charenton, Louisiana; Coushatta Tribe in Elton, Louisiana; Tunica-Biloxi Tribe in Marksville, Louisiana; and Jena Band of Choctaw Indians in Jena, Louisiana.

181.    One federally recognized tribe exists in Indiana: Pokagon Band of Potawatomi Indians. This Tribe maintains its official headquarters in Dowagic, Michigan, but some Pokagon members live in Northern Indiana.

182.    In 2010, the U.S. Census Bureau reported that the population of American Indian and Alaska Native persons living in Texas exceeded 315,000. *See* U.S. Census Bureau, *The American Indian and Alaska Native Population: 2010* at 7, Table 2, American Indian and Alaska Native Population for the United States, Regions, and States, and for Puerto Rico: 2000 and 2010 (Jan. 2012), *available at* https://www.census.gov/prod/cen2010/briefs/c2010br-10.pdf.

183.    In 2010, the U.S. Census Bureau reported that California and Oklahoma had the largest American Indian and Alaska Native populations, over 723,000 and 482,000, respectively.

*Id.* at 6–7. New Mexico had a population of over 219,000 American Indian and Alaska Native persons. *Id.* at 7.

184.     Given the three federally recognized tribes within Texas's borders, Texas's shared borders with Oklahoma and New Mexico, and the trend of Californians moving to Texas,[1] Texas maintains frequent and ongoing contact with Native Americans.

185.     Similarly, given the number of federally recognized tribes within Louisiana and Indiana's borders, and their shared borders with States that also host tribes, Louisiana and Indiana maintain frequent and ongoing contact with Native Americans.

186.     State Plaintiffs possess sovereign authority over family law issues within their borders. *Sosna*, 419 U.S. at 404.

187.     ICWA and the Final Rule place significant responsibilities and costs on State agencies and courts to carry out federal Executive Branch directives.

188.     Texas DFPS, Louisiana DCFS, and Indiana DCS each handle several Indian child cases every year.

189.     Texas DFPS, Louisiana DCFS, and Indiana DCS are authorized to file suits affecting the parent-child relationship, Tex. Fam. Code § 262.001; La. Child. Code art. 1004; Ind. Code § 31-34-9-1, and in some circumstances take possession of a child without a court order, *see, e.g.*, Tex. Fam. Code § 262.104. Moreover, when a child must be removed from their home, a Texas family court appoints Texas DFPS to be a "conservator" of the child, meaning Texas DFPS is legally responsible for the child's welfare. Tex. Fam. Code §§ 262.101, 262.113, 263.404. As of December 2017, there were thirty-nine children in the care of Texas DFPS who were verified to

---

[1]     Katey Psencik, "Everyone is moving to Texas, according to new report," *Austin American-Statesman*, Jan. 31, 2017, *available at* http://austin.blog.statesman.com/2017/01/05/everyone-is-moving-to-texas-according-to-new-report.

be enrolled or eligible for membership in a federal recognized tribe, and many of these children lived in Texas DFPS homes.

190.    ICWA and the Final Rule affect each and every child custody matter handled by Texas DFPS, Louisiana DCFS, and Indiana DCS and State Plaintiffs' courts because they must first determine if the child is an Indian child.

191.    Texas, Louisiana, and Indiana law requires their respective State agencies and courts to act in the best interest of the child in foster care, preadoptive, and adoptive proceedings.

192.    ICWA and the Final Rule replace State Plaintiffs' best-interest-of-the-child standard with one that mandates racial or ethnic preferences.

193.    The State Plaintiffs prohibit their agencies and courts from using racial preferences in foster care, preadoptive, and adoptive proceedings. Tex. Fam. Code §§ 162.015, 264.1085; La. Const. art. 1, § 3. Federal law also prohibits racial discrimination in adoption or foster care placements, but exempts child custody proceedings covered by ICWA. 42 U.S.C. § 1996b. Texas law exempts ICWA cases from these nondiscrimination rules, but the public policy of Texas is to prohibit racial or ethnic discrimination in foster care placements and adoptions. But for ICWA, the State Plaintiffs' courts would apply nondiscrimination laws to child custody proceedings.

194.    In an adoption proceeding, the State Plaintiffs' agencies and courts must give preference, in the absence of good cause to the contrary, to placement of an Indian child with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families. 25 U.S.C. § 1915(a).

195.    In a foster care or preadoptive proceeding, the State Plaintiffs' agencies and courts give preference, in the absence of good cause to the contrary, to placing the child with (1) a member of the child's extended family; (2) a foster home specified by the Indian tribe; (3) an Indian

foster home; or (4) an institution for children approved by the Indian tribe or operated by an Indian tribe. 25 U.S.C. § 1915(b).

196. ICWA requires the State Plaintiffs' agencies and courts to follow a resolution by the Indian child's tribe to alter the order of preferences related to the child's placement in any foster care or adoption proceeding, even if Texas and the Constitution do not recognize that tribe as an equally footed sovereign deserving full faith and credit. 25 U.S.C. § 1915(c).

197. ICWA and the Final Rule require the State Plaintiffs' child protective services to undertake additional responsibilities, inquiries, and costs in every child custody matter it handles.

198. For example, the Texas CPS Handbook contains Texas DFPS's policies and procedures for compliance with ICWA and the Final Rule. A true and correct copy of the relevant sections of the Texas CPS Handbook is attached as Exhibit 1 to the Complaint.

199. Section 1225 of the CPS Handbook states: "CPS policy requires workers in every abuse or neglect case to determine whether a child or the child's family has Native American ancestry or heritage. If Native American ancestry is claimed, CPS workers are required to follow specific procedure to ensure compliance with ICWA." Ex. 1, Texas DFPS, CPS Handbook § 1225, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_1200.asp#CPS_1225.

200. Section 5340 of the Texas CPS Handbook provides that "[i]f a DFPS lawsuit involves a Native American child, the Indian Child Welfare Act (ICWA) applies and the legal requirements change dramatically." Texas DFPS, CPS Handbook § 5340, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_5300.asp#CPS_5340.

201. Even though ICWA does not apply in every case, Texas CPS case workers must "*inquire* about Native American history in *every* case." *Id*. (emphasis in original).

202.     Sections 5840–5844 of the Texas CPS Handbook instruct Texas DFPS caseworkers on when and how to apply ICWA and the Final Rule to child custody matters.

203.     Section 5841 of the Texas CPS Handbook notes that "[f]ailure to comply with the ICWA can result in a final order being reversed on appeal." Texas DFPS, CPS Handbook § 5841, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_5800.asp#CPS_5840.

204.     Texas DFPS caseworkers must "routinely ask[] families whether they are Native American; document[] the families' responses; and consult[] with the attorney representing DFPS and the regional attorney, if the caseworker believes that a case may involve a Native American child." *Id.*

205.     Section 5844 of the CPS Handbook provides that if an Indian child "is taken into DFPS custody, almost every aspect of the social work and legal case is affected." Texas DFPS, CPS Handbook § 5844, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_pg_5800.asp#CPS_5840. If ICWA applies, the legal burden of proof for removal, obtaining any final order terminating parental rights, and restricting a parent's custody rights is higher; DFPS must serve the child's parent, tribe, Indian custodian, and the BIA with a specific notice regarding ICWA rights, DFPS and its caseworkers "must make active efforts to reunify the child and family"; the child must be placed according to ICWA statutory preferences; expert testimony on tribal child and family practices may be necessary; and a valid relinquishment of parental rights requires a parent to appear in court and a specific statutory procedure, just to name a few. *Id.*

206.     Texas DFPS caseworkers must fill out and submit Form 1706 for approval in any ICWA matter. A true and correct copy of Form 1706 is attached as Exhibit 2 to this Complaint. *See* Texas DFPS Form 1706, Indian Child Welfare Act Checklist, *available at* https://www.dfps.state.tx.us/Application/FORMS/showFile.aspx?Name=1706.doc.

207.    Texas DFPS Form 1706 requires CPS case workers to: (1) assess possible Indian child status during the initial interview of every child and family it encounters, and every time an additional family member is located; (2) contact Texas DFPS lawyers regarding possible ICWA cases and consult with them regularly throughout the case; (3) modify removal of custody affidavits to include ICWA information; (4) verify that any foster or adoptive placement follows ICWA's preferences unless the tribe alters those preferences or the court finds good cause not to alter them; (5) send membership query letters to each identified tribe in every Indian child case; (6) send notice of pending custody proceedings involving Indian children to each parent, any Indian custodian, each identified tribe, the Secretary of Interior, and the BIA area director; (7) send notice to the Secretary of Interior and the BIA area director if any parent, custodian, or tribe is unknown or cannot be located; (8) contact the tribe by telephone and fax if CPS receives no response to the formal notice; (9) file notices with proof of service in the relevant court; (10) make active efforts to preserve the Indian family by conferring with tribal social workers and document the services provided; and (11) consult with DFPS attorneys regarding ICWA requirements for in court procedures.

208.    Texas DFPS promulgated Appendices 1226-A and 1226-B of the CPS Handbook, which contain guidelines and checklists for CPS staff, to ensure Texas complies with ICWA and the Final Rule. *See* Ex. 1, Texas DFPS, CPS Handbook, Appendix 1226-A: Child-Placing Requirements of the Indian Child Welfare Act and Related Guidelines and Regulations, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_px_1226a.aspafd; Ex. 2, Texas DFPS, CPS Handbook, Appendix 1226-B: Checklist for Compliance with the Indian Child Welfare Act, *available at* https://www.dfps.state.tx.us/handbooks/CPS/Files/CPS_px_1226b.asp.

209.     Indiana DCS publishes a Child Welfare Manual that includes a section on ICWA compliance. A true and correct copy of the Indiana DCS Child Welfare Manual, Chapter 2, section 12 is attached as Exhibit 3 to the Complaint.

210.     Indiana DCS requires staff to use active efforts to determine if a child is an Indian child and sustain those efforts throughout its involvement with the child and family. Ex. 3.

211.     Indiana DCS requires staff to inquire about Indian child status prior to any initial removal from the parents; at any detention hearing; prior to any change in foster care placement; prior to any adoptive placement; at review hearings and at permanency hearings; and prior to the filing of any termination of parental rights petition. *Id.*

212.     Indiana DCS family case managers must engage the child and family during the initial contact, to assist in determining whether the child and/or family are of Indian heritage or if the child is eligible for membership in a tribe. They must document the child's tribal identity, complete a verification of tribal membership or eligibility, and continue to review the child and family's Indian status throughout the life of the case. A family case manager supervisor must ensure the family case manager asked each child and family member if he or she is a member of an Indian tribe or eligible for membership, ensure proper completion of the Indian status forms, and otherwise assist the family case manager to ensure adherence to ICWA. The Indiana DCS local office attorney must review the documentation of Indian status and serve notification of that information on BIA and the tribe. *Id.*

213.     Louisiana DCFS publishes Document No. 6-240, "Working with Native American Families," that includes information on how it must comply with ICWA. A true and correct copy of Document No. 6-240 is attached as Exhibit 4 to the Complaint.

214.   Louisiana DCFS must use "active efforts" to reunite an Indian child with his or her family or tribal community. "Active efforts constitute more than reasonable efforts as required by Title IV-E of the Social Security Act (42 USC 671(a)(15))." Ex. 4 at 1.

215.   Louisiana DCFS states that "active efforts" include:

- Engaging the Indian child, the Indian child's parents, the Indian child's extended family members, and the Indian child's custodian(s);

- Taking steps necessary to keep siblings together;

- Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;

- Identifying, notifying, and inviting representatives of the Indian child's tribe to participate;

- Conducting or causing to be conducted a diligent search for the Indian child's extended family members for assistance and possible placement;

- Taking into account the Indian child's tribe's prevailing social and cultural conditions and way of life, and requesting assistance of representatives designated by the Indian child's tribe with substantial knowledge of the prevailing social and cultural standards;

- Offering and employing all available and culturally appropriate family preservation strategies;

- Completing a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;

- Notifying and consulting with extended family members of the Indian child to provide family structure and support for the Indian child, to assure cultural connections, and to serve as placement resources for the Indian child;

- Making arrangements to provide family interaction in the most natural setting that can ensure the Indian child's safety during any necessary removal;

- Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or extended family in utilizing and accessing those services;

- Monitoring progress and participation in services;

- Providing consideration of alternative ways of addressing the needs of the Indian child's parents and extended family, if services do not exist or if existing services are not available;

- Supporting regular visits and tribal home visits of the Indian child during any period of removal, consistent with the need to ensure the safety of the child; and,

- Providing post-reunification services and monitoring.

*Id*. at 1-2.

216.    Louisiana's "active efforts" must be conducted while investigating whether the child is a member of a tribe, is eligible for membership in a tribe, or a biological parent of the child is or is not a member of a tribe. *Id*. at 2.

217.    Louisiana "[s]tate courts must ask if there is reason to believe the child subject to the child custody proceeding is an Indian child by asking each party to the case, including the child's attorney and Department representative, to certify on the record whether they have discovered or know of any information that suggests or indicates the child is an Indian child. If the court does not inquire of the child's Indian status, the FC case manager must ensure documentation is included in the report to the court of the child's Indian status and the responses of all parties asked." *Id*.

218.    Louisiana DCFS publishes Document No. 8-440, "Services to Native American Children-Indian Child Welfare Act Provisions." A true and correct copy of Document No. 8-440 is attached as Exhibit 5 to the Complaint.

219.    Document No. 8-440 states that ICWA "affects all placements of Indian children including changes or possible changes in placement of Indian children under DCFS authority." *Id*.

220.    Once Louisiana DCFS becomes involved with an Indian child it must maintain ongoing contact with the child's tribe because each tribe may elect to handle ICWA differently. *Id*.

221.    The foregoing requirements and responsibilities are just some of those imposed on the State Plaintiffs, and all States, by ICWA and the Final Rule.

222.    In voluntary child custody proceedings, if the child is an Indian child, State Plaintiffs' courts must ensure that the party seeking placement, often Texas DFPS, Louisiana DCFS, and Indiana DCS, has taken "all reasonable steps" to verify the child's status. 25 C.F.R. § 23.124.

223.    ICWA and the Final Rule require State Plaintiffs' courts to perform federal Executive Branch functions, such as gathering and distributing information for the federal government.

224.    ICWA and the Final Rule require state judges to ask each participant, on the record at the commencement of child custody proceedings, whether the person knows or has reason to know the child is an Indian child and to instruct the parties to inform the court of any such information that arises later. 25 C.F.R. § 23.107(a). If the state court believes the child is an Indian child, it must document and confirm that the relevant state agency (1) used due diligence to identify and work with all of the tribes that may be connected to the child and (2) conducted a diligent search to find suitable placements meeting the preference criteria for Indian families. *Id.* §§ 23.107(b), 23.132(c)(5).

225.    ICWA and the Final Rule require State Plaintiffs' agencies and courts to maintain indefinitely records of placements involving Indian children, and subject those records to inspection by the Secretary and the child's Indian tribe at any time. 25 U.S.C. §§ 1915(e), 1917; 25 C.F.R. §§ 23.140–41. This increases costs for State Plaintiffs' agencies and courts which have to maintain additional records not called for under state law and hire or assign additional employees to maintain these records indefinitely.

226.    ICWA and the Final Rule require State Plaintiffs' agencies and courts to provide various forms of notification to individuals and entities potentially impacted by a child custody

matter above and beyond what they are required to do under state law. This means State Plaintiffs' agencies and courts must spend additional money to comply with ICWA by hiring and training additional employees, and creating and publishing notifications, just to name a few things.

227.    ICWA and the Final Rule (1) require Texas DFPS, Louisiana DCFS, and Indiana DCS to notify an Indian custodian and a tribe of its absolute right to intervene in the proceedings of an Indian child bearing that tribe's heritage; (2) require Texas, Louisiana, and Indiana courts to grant the Indian custodian or tribe additional time to prepare for such proceedings; (3) require Texas DFPS, Louisiana DCFS, and Indiana DCS to satisfy the State courts of active efforts to provide remedial services and rehabilitative programs to keep the family together; and (4) require proof beyond a reasonable doubt that serious emotional or physical damage to the child will result if parental rights are not terminated. 25 U.S.C. §§ 1911–1912; 25 C.F.R. § 23.111–23.121. The State Plaintiffs' laws do not similarly provide for these rights and responsibilities, and permits the termination of parental rights based on clear and convincing evidence. *See, e.g.*, Tex. Fam. Code §§ 161.001(b), 161.206.

228.    For example, Texas and Louisiana laws require their state agencies to make reasonable efforts in child custody proceedings, but ICWA requires "active efforts." This substantially changes the cost and burden imposed on Texas DFPS and Louisiana DCFS. When referring a family or parent to services, reasonable efforts means providing a referral, but leaving the family to seek out assistance on their own, while the active efforts required by ICWA means arranging services and helping families engage in those services.

229.    State Plaintiffs' courts must notify an Indian child's biological parents, prior Indian custodian, and tribe if a final adoption decree is vacated. 25 C.F.R. § 23.139.

230.     State Plaintiffs' courts must affirmatively notify the Indian child once he or she reaches age eighteen of his or her tribal affiliation, increasing costs of maintaining records and resources to keep track of children for nearly 20 years of their lives in some cases. 25 C.F.R. § 23.138.

231.     ICWA section 1911(c) and the Final Rule change the rules of civil procedure for Texas state family courts, by dictating that an Indian child's custodian and the child's tribe must be granted mandatory intervention. Texas Rule of Civil Procedure 60 permits Texas courts to strike the intervention of a party upon a showing of sufficient cause by another party, but ICWA prevents application of this standard for child custody cases involving Indian children. In Louisiana, any person with a justiciable interest in an action may intervene. La. Code Civ. Proc. art. 1091. In Indiana, a person may intervene as of right or permissively, similar to the Federal Rules of Civil Procedure governing intervention. Ind. R. Tr. Proc. 24. ICWA, however, eliminates these require-ments and allows the Indian child's custodian and the child's tribe mandatory intervention.

232.     State Plaintiffs' agencies and courts must defer to the decisions of the child's Indian tribe when evaluating membership or eligibility for membership. 25 C.F.R. §§ 108–09.

233.     In a termination of parental rights proceedings, ICWA requires evidence beyond a reasonable doubt, and requires Texas DFPS, Louisiana DCFS, and Indiana DCS to hire expert witnesses at the State's expense. 25 U.S.C. § 1912(f). Texas, Louisiana, and Indiana laws require only clear and convincing evidence. Tex. Fam. Code §§ 161.001(b), 161.206; La. Child. Code art. 1035(A); Ind. Code § 31-37-14-2.

234.     ICWA and the Final Rule purport to override Texas law with respect to when a parent may voluntarily consent to relinquish parental rights. Texas law permits voluntary relin-quishment of parental rights 48 hours after birth of the child, Tex. Fam. Code § 161,103(a)(1),

Louisiana allows voluntary surrender of paternal rights prior to or after birth of the child and sur-

render of maternal rights five days after birth of the child, La. Child. Code art. 1130, and Indiana

permits voluntary termination of parental rights after birth of the child, Ind. Code § 31-35-1-6, but

ICWA and the Final Rule prohibit any consent until 10 days after birth, 25 U.S.C. § 1913(a); 25

C.F.R. § 23.125(e).

235.   ICWA purports to override Texas and Louisiana laws with respect to voluntary

relinquishment of parental rights. Texas law permits revocable and irrevocable voluntary relin-

quishment of parental rights. If the relinquishment is revocable, the revocation must be made be-

fore the eleventh day after the revocation affidavit is executed. Tex. Fam. Code § 161.103(b)(10).

Louisiana law prohibits a parent from annulling his or her surrender of parental rights 90 days after

its execution or after a decree of adoption has been entered, whichever is earlier. La. Child. Code

art. 1148. ICWA alters these state laws by permitting revocation of consent for foster care at any

time, 25 U.S.C. § 1913(b), and revocation of voluntary termination of parental rights any time

prior to entry of a final decree of termination, *id*. § 1913(c).

236.   ICWA significantly alters how long a final adoption decree may be challenged.

Under ICWA, the State Plaintiffs' courts must vacate a final decree of adoption involving an Indian

child and return the child to the parent if the parent of the child withdraws consent to the final

adoption decree on the grounds that the consent was obtained through fraud or duress. The parent

may withdraw consent based on fraud or duress for up to two years after the adoption. 25 U.S.C.

§ 1913(d); 25 C.F.R. § 23.136. This conflicts directly with Texas, Louisiana, and Indiana law,

which provide that an adoption order is subject to direct or collateral attack six months to one year

after the date the order was signed by the court. Tex. Fam. Code § 162.012(a) (up to six months);

*Goodson v. Castellanos*, 214 S.W.3d 741, 748–49 (Tex. App.—Austin 2007, pet. denied); La.

Child. Code art. 1263; Ind. Code § 31-19-14-2. It also betrays the Texas common law principle and Indiana statutory law that the best interest of the child is to reach a final child custody decision so that adoption to a stable home or return to the parents is not unduly delayed. *In re M.S.*, 115 S.W.3d at 548; Ind. Code § 31-19-14-2.

237.    ICWA permits the invalidation, by another court of competent jurisdiction, of a State court's final child custody order if a State agency or court did not comply with ICWA. 25 U.S.C. § 1914; 25 C.F.R. § 23.137.

238.    Thus, ICWA requires the State Plaintiffs' agencies and courts to undertake additional responsibilities, actions, and costs when caring for an Indian child, and provides Indian custodians and tribes additional procedural protections not expressly afforded other parties to the proceedings.

239.    For example, Texas, Louisiana, and Indiana must spend time and money on caseworkers searching for extended family members of the Indian child, contacting those persons, and consulting with them on the case.

240.    Texas, Louisiana, and Indiana also must hire expert witnesses, identified by the Indian child's tribe, to testify in the foster care and termination of parental rights proceedings.

241.    Texas, Louisiana, and Indiana also must spend money transporting Indian children to their parents or Indian custodian, and to their trial homes.

242.    The requirement that Texas, Louisiana, and Indiana maintain records for nearly 20 years in some child custody cases and provide various forms of notification to the federal government and potential ICWA parties, requires additional money and personnel dedicated to compliance. A good example of this is the Texas CPS Handbook, which dedicates several sections and

appendices to documenting and describing how Texas DFPS and Texas courts must comply with ICWA.

243.     If Texas, Louisiana, or Indiana fail to comply with ICWA, they would risk losing funding for child welfare services under Title IV-B and Title IV-E of the Social Security Act, which would threaten the elimination of many important social services.

244.     Failure to certify under 42 U.S.C. §§ 622 & 677 that Texas, Louisiana, or Indiana complies with ICWA allows Interior and HHS to withhold or discontinue Title IV-B and Title IV-E funding.

245.     If Texas, Louisiana, and Indiana fail to comply with ICWA, Defendants Zinke, Rice, Tahsuda, and Azar will determine whether these States may continue to receive Title IV-B and Title IV-E funding, which will jeopardize millions of dollars in grants for child welfare, foster care, and adoption services.

246.     If Texas, Louisiana, and Indiana failed or refused to follow ICWA and the Final Rule, Defendants would bring an action to enforce federal law, as Defendants do on a regular basis. *See, e.g., United States of America v. California*, Case No.: 2:18-cv-00490-JAM-KJN (E.D. Cal.) (pending); *Arizona v. United States*, 567 U.S. 387 (2012); *United States v. Texas*, 457 F.3d 472 (5th Cir. 2006).

## <u>CLAIMS ALLEGED BY ALL PLAINTIFFS</u>

### COUNT I
### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
**(Not in Accordance with Law – Equal Protection, Tenth Amendment, Article I)**

247.     Plaintiffs incorporate previous paragraphs as if fully restated here.

248.     Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the Final Rule complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action

made reviewable by statute and final agency action for which there is no other adequate remedy in a court," *id.* § 704.

249. The APA prohibits agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A). The Final Rule is not in accordance with law for a number of independent reasons.

250. The Final Rule violates the APA because the placement preference regime contained in the unit entitled "Dispositions," 25 C.F.R. § 23.129 *et seq.*, violates the individual plaintiffs' and citizens of State Plaintiffs' equal protection rights under the Fifth Amendment of the United States Constitution. *Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954). The Final Rule imposes a naked preference for "Indian families" over families of any other race; the Final Rule puts non-Indian families who wish to adopt an "Indian child" to the extraordinary burden of demonstrating good cause to depart from the placement preferences by clear and convincing evidence, while any Indian family would enjoy a presumption that the adoption is in the child's best interests. The Final Rule's classification of Indians and non-Indians, and its discrimination against non-Indians, is based on race and ancestry and violates the constitutional guarantee of equal protection.

251. The Final Rule further violates the APA because the placement preference regime contained in the unit entitled "Dispositions," 25 C.F.R. § 23.129 *et seq.*, unlawfully discriminates against "Indian children" (as defined by the Final Rule) in violation of the Constitution's guarantee of equal protection, by subjecting them to a heightened risk of a placement that is contrary to their best interests and based solely on their race and ancestry. Under State Plaintiffs' laws, a child's placement generally will be made in accordance with his or her best interests. But the Final Rule's placement preferences, its new restriction on evidence that can be considered as a part of an analysis of "good cause" for departing from those preferences, and the new regulation providing that good cause should be shown by clear and convincing evidence combine to substantially increase

the risk that an Indian child will be placed in accordance with the placement preferences even when that placement would be contrary to his best interests. This burden applies to Indian children solely by dint of their or their parents' membership in an Indian tribe—eligibility that often (as in this case) turns on blood quantum. The Final Rule thus discriminates against Indian children in State child custody proceedings in violation of equal protection principles under the Fifth Amendment.

252.    The Final Rule further violates the APA because the adoption and foster care and preadoptive placement of "Indian children"—the topics regulated by the unit of the Final Rule entitled "Dispositions," 25 C.F.R. § 23.129 *et seq*.,—are not permissible subjects of regulation under the Tenth Amendment. The Final Rule claims that federal regulation of the placement of Indian children is authorized by the Indian Commerce Clause. *See* 81 Fed. Reg. at 38,789; *see also* 25 U.S.C. § 1901(1). But children are not articles of commerce, nor can their placement be said to substantially affect commerce with Indian nations. *See Adoptive Couple*, 133 S. Ct. at 2566–70 (Thomas, J., concurring). The Final Rule therefore is not a valid exercise of federal authority and is unconstitutional.

253.    The Final Rule further violates the APA because the provisions concerning post-adoption collateral attacks, 25 C.F.R. §§ 23.136, 23.137, violate the Individual Plaintiffs', citizens of State Plaintiffs', and Indian children's equal protection rights under the Fifth Amendment of the United States Constitution. The Final Rule subjects the adoption of an "Indian child" to a period of collateral attack of not less than two years, overriding state laws that provide for shorter periods to attack a voluntary adoption, and thereby disadvantages Indian children and the families that adopt Indian children. This discrimination against Indian children and those that adopt them is based on race and ancestry and violates the constitutional guarantee of equal protection.

254.     The Final Rule further violates the APA because the Final Rule regulates the place-ment of Indian children not directly, but through State Plaintiffs' governments in violation of the Tenth Amendment. The Final Rule makes this plain when it purports to issue minimum federal standards for "placement of an Indian child *under State law*." 25 C.F.R. §§ 23.130(a), 23.131(a) (emphasis added). And it is not just the portion of State Plaintiffs' child custody regulatory regime administered by state courts that the Final Rule commandeers. The Final Rule also demands that State Plaintiffs' apply the placement preferences in foster care and preadoptive placements, which, in State Plaintiffs at least, are administered in part by State Plaintiffs' agencies. Even when Con-gress has power to regulate under one of its enumerated powers, the federal government cannot require a State agency or official to administer a federal regulatory program. *United States v. Printz*, 521 U.S. 898, 935 (1997) ("The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their polit-ical subdivisions, to administer or enforce a federal regulatory program."). The Final Rule thus violates the anti-commandeering principle under the Tenth Amendment and is unconstitutional.

255.     The Final Rule further violates the APA because the Final Rule delegates to Indian tribes the legislative and regulatory power to pass resolutions in each Indian child custody pro-ceeding that alter the placement preferences state courts must follow in violation of Article I of the Constitution. The Constitution provides that "[a]ll legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. 1, § 1. The Constitution authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its general powers. U.S. Const. art. 1, § 8. The Constitution bars Congress and the BIA from delegating to others the essential legislative and

administrative functions with which they are vested. The Final Rule thus violates the non-delega-

tion doctrine of Article I, Section 1 of the Constitution and is unconstitutional.

256.    The APA prohibits agency actions that are "arbitrary, capricious, [or] an abuse of

discretion." 5 U.S.C. § 706(2)(A). The Final Rule is arbitrary and capricious agency action for a

number of reasons, including that it is an unexplained and unsupported departure from the position

adopted in the 1979 Guidelines and held by the defendants for nearly forty years.

257.    The Final Rule further violates the APA because its provision that "[t]he party seek-

ing departure from the placement preferences should bear the burden of proving by clear and con-

vincing evidence that there is 'good cause' to depart from the placement preferences," 81 Fed.

Reg. at 38,874 (codified at 25 C.F.R. § 23.132(b)), is contrary to Section 1915 of ICWA and is

arbitrary and capricious.

258.    The Final Rule further violates the APA in that its limitation on the evidence that

may be considered in the analysis of "good cause," *see* 25 C.F.R. § 23.132(c)–(e), is contrary to

Section 1915 of ICWA and is arbitrary and capricious.

259.    The Brackeens are directly, personally, and substantially injured by ICWA's col-

lateral attack provisions, 25 U.S.C. §§ 1913(d), 1914, and the provisions of the Final Rule purport-

ing to implement those provisions, 25 C.F.R. §§ 23.136, 23.137, because they subject the Brackeen

family to a period of uncertainty and mental anguish substantially longer than otherwise would be

permitted under Texas law. The Brackeens are further aggrieved because the extraordinary burdens

imposed by Sections 1913–1915, and the portions of the Final Rule purporting to implement those

provisions, threaten to repeat the trials that A.L.M. and the Brackeens have already endured with

any future foster or adoptive children.

260.    The Librettis are directly, personally, and substantially injured by Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences, including the "diligent search" requirement, because they are causing delay, and perhaps denial, of their adoption of Baby O., and because they impose heightened standards and substantial burdens (both time and money) in connection with their efforts to adopt Baby O. Even if the Librettis' petition to adopt Baby O. is ultimately granted, ICWA and the Final Rule may subject the Librettis' adoption to collateral attack for up to two years. The Librettis are further aggrieved because the extraordinary burdens imposed by Sections 1913–1915, and the portions of the Final Rule purporting to implement those provisions, threaten to repeat the trials that Baby O. and the Librettis have already endured with any future foster or adoptive children.

261.    Ms. Hernandez is directly aggrieved by the Final Rule's application to Baby O. and by its imposition of heightened standards and substantial burdens (both time and money) in connection with her wishes to have her biological child adopted in a placement that best suits Baby O.'s interests and needs.

262.    The Cliffords are directly, personally, and substantially injured by ICWA's placement preferences and the provisions of the Final Rule purporting to implement those preferences, because they are causing delay, and perhaps denial, of their adoption of Child P., and they impose heightened standards and substantial burdens (both time and money) in connection with the Cliffords' efforts to adopt Child P.

263.    State Plaintiffs are directly aggrieved by the Final Rule's application to each and every child custody proceeding in their States, and, particularly, to those proceedings in which State Plaintiffs' agencies or courts discover that the child is an Indian child as defined by ICWA.

The Final Rule imposes a substantial burden on State Plaintiffs through the expenditure of resources and money in connection with their efforts to comply with the Final Rule for each child custody proceeding. And because of the Final Rule's burden, it necessarily limits prospective foster and adoptive parents so clearly needed to care for children, as now demonstrated by the Brackeens' reluctance to foster additional Indian children.

264.    Plaintiffs have no adequate remedy at law to redress the burdens now being imposed by Final Rule because claims arising under the APA cannot be litigated in State courts.

265.    This Court should declare the Final Rule invalid and set it aside.

## COUNT II
## VIOLATION OF ARTICLE I OF THE CONSTITUTION
### (Commerce Clause)

266.    Plaintiffs incorporate previous paragraphs as if fully restated here.

267.    The Commerce Clause of the United States Constitution provides: "The Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3.

268.    At the time the original Constitution was ratified, commerce consisted of selling, buying, and bartering, as well as transporting for these purposes. *See Adoptive Couple*, 133 S. Ct. at 2567 (Thomas, J., concurring).

269.    At the time the original Constitution was ratified, the Indian Commerce Clause was intended to include "trade with Indians." *See Adoptive Couple*, 133 S. Ct. at 2567 (Thomas, J., concurring).

270.    The Indian Commerce Clause provides Congress with the power to regulate commerce with Indian tribes, but not any Indian person. *See Adoptive Couple*, 133 S. Ct. at 2567 (Thomas, J., concurring).

271.    ICWA locates Congress's authority for the statute in the Indian Commerce Clause. *See* 25 U.S.C. § 1901(1).

272.    Children are not articles of commerce, nor can their placement be said to substantially affect commerce with Indian nations. *See Adoptive Couple*, 133 S. Ct. at 2566–70 (Thomas, J., concurring).

273.    No other enumerated power supports Congress's intrusion into this area of traditional state authority.

274.    ICWA Sections 1901–1923 and 1951–1952 are therefore unconstitutional under the Commerce Clause of Article I.

275.    The Brackeens are directly, personally, and substantially injured by ICWA's collateral attack provisions, 25 U.S.C. §§ 1913(d), 1914, and the provisions of the Final Rule purporting to implement those provisions, 25 C.F.R. §§ 23.136, 23.137, because they subject the Brackeen family to a period of uncertainty and mental anguish substantially longer than otherwise would be permitted under Texas law. The Brackeens are further aggrieved because the extraordinary burdens imposed by Sections 1913–1915, and the portions of the Final Rule purporting to implement those provisions, threaten to repeat the trials that A.L.M. and the Brackeens have already endured with any future foster or adoptive children.

276.    The Librettis are directly, personally, and substantially injured by Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences, including the "diligent search" requirement, because they are causing delay, and perhaps denial, of their adoption of Baby O., and because they impose heightened standards and substantial burdens (both time and money) in connection with their efforts to adopt Baby O. Even if the Librettis' petition to adopt Baby O. is ultimately granted, ICWA and the Final Rule may subject the

Librettis' adoption to collateral attack for up to two years. The Librettis are further aggrieved because the extraordinary burdens imposed by Sections 1913–1915, and the portions of the Final Rule purporting to implement those provisions, threaten to repeat the trials that Baby O. and the Librettis have already endured with any future foster or adoptive children.

277. Ms. Hernandez is directly aggrieved by the Final Rule's application of Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences to Baby O. because they are causing delay, and perhaps denial, of Ms. Hernandez's preferred placement of Baby O. for adoption by the Librettis, and because they impose heightened standards and substantial burdens (both time and money) in connection with the Librettis' efforts to adopt Baby O.

278. The Cliffords are directly aggrieved by the Final Rule's application of Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences to Child P. because they are causing delay, and perhaps denial, of their adoption of Child P., and they impose heightened standards and substantial burdens (both time and money) in connection with the Cliffords' efforts to adopt Child P.

279. The State Plaintiffs are directly aggrieved by ICWA Sections 1901–1923 and 1951–1952 because those provisions require State Plaintiffs' agencies and courts to carry out the policy objectives of the federal government and execute the federal government's regulatory framework for Indian child in child custody proceedings. State Plaintiffs must abide by ICWA in each and every child custody proceeding, and, particularly, to those proceedings in which State Plaintiffs' agencies and courts discover that the child is an Indian child as defined by ICWA. ICWA imposes a substantial burden on State Plaintiffs through the expenditure of resources and money in connection with its efforts to comply with ICWA for each child custody proceeding.

280.    Plaintiffs have no adequate remedy at law to redress the injuries they are suffering because of ICWA.

281.    Plaintiffs thus seek a declaration that Sections 1901–1923 and 1951–1952 of ICWA violate Article I of the United States Constitution and are unconstitutional and unenforceable, and an injunction barring the Defendants from implementing or administering that provision by regulation, guideline, or otherwise.

## COUNT III
## VIOLATION OF THE TENTH AMENDMENT
### (Domestic Relations & Anti-Commandeering )

282.    Plaintiffs incorporate previous paragraphs as if fully restated here.

283.    The Tenth Amendment to the United States Constitution provides: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

284.    ICWA Sections 1901–1923 and 1951–1952 are not permissible subjects of regulation under the Tenth Amendment.

285.    ICWA's provisions concerning the adoption and foster care and preadoptive placement of "Indian children" are not permissible subjects of regulation under the Tenth Amendment.

286.    Since the adoption of the Constitution, family law and domestic relations have been regarded as being within the virtually exclusive province of the States. *Sosna v. Iowa*, 419 U.S. 393, 404 (1975); *Ohio ex rel. Popovici v. Agler*, 280 U.S. 379, 383–84 (1930).

287.    Adoption proceedings are adjudicated exclusively in state family courts.

288.    Foster care and preadoptive placements also are administered exclusively by States; in Texas, Louisiana, and Indiana they are administered in the first instance by Texas DFPS, Louisiana DCFS, and Indiana DCS.

289.    ICWA locates Congress's authority for the statute in the Indian Commerce Clause. 25 U.S.C. § 1901(1). The Indian Commerce Clause grants Congress the authority "[t]o regulate commerce . . . with the Indian tribes." U.S. Const. art. I, § 8, cl. 3.

290.    Children are not articles of commerce, nor can their placement be said to substantially affect commerce with Indian nations. *See Adoptive Couple*, 133 S. Ct. at 2566–70 (Thomas, J., concurring).

291.    No other enumerated power supports Congress's intrusion into this area of traditional state authority.

292.    ICWA's provisions concerning the adoption and foster care and preadoptive placement of "Indian children" are unconstitutional under the Tenth Amendment because they regulate the placement of Indian children not directly, but through state governments. Even when Congress has power to regulate under one of its enumerated powers, the federal government cannot require a State agency or official to administer a federal regulatory program. *United States v. Printz*, 521 U.S. 898, 935 (1997) ("The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.").

293.    ICWA thus violates the anti-commandeering principle under the Tenth Amendment and is unconstitutional.

294.    ICWA impermissibly commands state governments to administer adoptions and foster care and preadoptive placements according to Congress's instructions. Here, ICWA commands the state family courts to apply ICWA's placement preferences under 25 U.S.C. § 1915(a) to the Individual Plaintiffs' petitions for adopting their children. And it further commands the State

Plaintiffs to make foster care or preadoptive placements in accordance with the placement preferences of 25 U.S.C. § 1915(b). ICWA impermissibly commandeers state governments and therefore is unconstitutional.

295.    ICWA Sections 1911, 1912, and 1913, and the Final Rule alter the content of State Plaintiffs' laws by requiring their courts to apply federal substantive rules of decision and federal procedural requirements in state law causes of action that result in state law judgments that form part of the corpus of state law.

296.    ICWA Section 1911 impermissibly alters State Plaintiffs' rules of procedure for foster care placement and termination of parental rights proceedings with federal rules of decision. ICWA grants an Indian custodian of a child and the child's tribe mandatory intervention at any point in the proceedings.

297.    ICWA Section 1912 and the Final Rule increase the standard for termination of parental rights for an Indian child to "evidence beyond a reasonable doubt" and demand expert witness testimony.

298.    ICWA Section 1913 and the Final Rule impermissibly command state governments and courts to change their laws and rules respecting when and how a parent of an Indian child or Indian custodian may give voluntary consent to foster care placement or termination of parental rights.

299.    ICWA Section 1913 also impermissibly commands state courts to allow for revocation of voluntary termination of parental rights any time prior to the final decree of termination.

300.    The Final Rule dictates what State Plaintiffs' agencies and courts must do in cases of emergency removal or placement of an Indian child.

301.    The Final Rule prohibits State Plaintiffs' agencies and courts from making a determination as to an Indian child's membership status with a tribe. State Plaintiffs must defer to the membership determination of the tribe.

302.    The Final Rule commands State Plaintiffs' courts to allow the invalidation of child custody proceeding final orders for up to two years, which is twelve to eighteen months beyond what is permitted under State Plaintiffs' laws. Tex. Fam. Code § 162.012; La. Child. Code art. 1263; Ind. Code § 31-19-14-2.

303.    ICWA requires State Plaintiffs' agencies and courts to undertake administrative actions of the federal government.

304.    ICWA Sections 1911 and 1912 and the Final Rule require state agencies and courts to notify potential intervenors about a proceeding, send copies of the notices to Defendants, and suspend proceedings for at least 10 days.

305.    The Final Rule commands state government agencies and state courts to inquire about Indian child status throughout child custody proceedings.

306.    ICWA Section 1912 and the Final Rule require Texas DFPS, Louisiana DCFS, and Indiana DCS to use "active efforts" to prevent the breakup of an Indian family.

307.    The Final Rule requires State Plaintiffs' courts to confirm that State Plaintiffs' agencies used "due diligence" to work with all of the tribes in which the child may be a member and conducted a "diligent search" for tribal placement of the child.

308.    ICWA Sections 1915, 1917, and 1951 and the Final Rule demand that State Plaintiffs' agencies and courts collect information and perform recordkeeping functions for the federal government for child custody proceedings involving Indian children.

309.    Social Security Act Sections 622(b)(9) and 677(b)(3)(G) commandeer States by requiring them to comply with all aspects of ICWA to receive federal funding.

310.    ICWA is unconstitutional under the Tenth Amendment for the additional reason that it violates the equal footing doctrine and the Full Faith and Credit Clause of the Constitution.

311.    The Constitution provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State." U.S. Const., art. IV, § 1. The "Full Faith and Credit Clause does not compel 'a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate.'" *Franchise Tax Bd. of Cal. v. Hyatt*, 538 U.S. 488, 494 (2003) (citations omitted).

312.    The Full Faith and Credit Clause extends only between States, not States and Indian tribes. *Wilson v. Marchington*, 127 F.3d 805 (9th Cir. 1997). "The equal footing clause has long been held to refer to political rights and to sovereignty. . . . The requirement of equal footing was designed not to wipe out those diversities but to create parity as respects political standing and sovereignty." *United States v. Texas*, 339 U.S. 707, 716 (1950) (internal citations and quotation marks omitted).

313.    ICWA demands that State Plaintiffs and other States defer to the resolutions of tribes altering the ICWA placement preferences for Indian children, even though those tribes are not on equal footing with the States and do not deserve full faith and credit under Article IV.

314.    The Final Rule requires State Plaintiffs' agencies and courts to transfer child custody matters to tribal courts when the Indian parent, custodian, or tribe requests it, even though those tribes are not on equal footing with the States and do not deserve full faith and credit under Article IV.

315.     ICWA is unconstitutional for the additional reason that it violates the Guarantee
Clause of Article IV, Section 4 of the Constitution, which guarantees to every State a republican
form of government. The Guarantee Clause provides that Congress many not interfere with states'
autonomy to such an extent that it prevents them from enjoying untrammeled self-government.
States are "endowed with all the functions essential to separate and independent existence." *Lane
Cty. v. Oregon*, 74 U.S. 71, 76 (1868). A separate and independent state judiciary is an indispen-
sable element of a republican form of government that Congress may not invade.

316.     State Plaintiffs' courts adjudicate family law and domestic relations cases, includ-
ing child custody proceedings. ICWA violates the Tenth Amendment by removing the guarantee
that State Plaintiffs' provide a republican form of government to its citizens, including an inde-
pendent judiciary that may develop its own substantive law within the areas of responsibility
granted it by the United States Constitution and State Plaintiffs' constitutions.

317.     The Brackeens are directly, personally, and substantially injured by ICWA's col-
lateral attack provisions, 25 U.S.C. §§ 1913(d), 1914, and the provisions of the Final Rule purport-
ing to implement those provisions, 25 C.F.R. §§ 23.136, 23.137, because they subject the Brackeen
family to a period of uncertainty and mental anguish substantially longer than otherwise would be
permitted under Texas law. The Brackeens are further aggrieved because the extraordinary burdens
imposed by Sections 1913–1915, and the portions of the Final Rule purporting to implement those
provisions, threaten to repeat the trials that A.L.M. and the Brackeens have already endured with
any future foster or adoptive children.

318.     The Librettis are directly, personally, and substantially injured by Section 1915's
placement preferences and the provisions of the Final Rule purporting to implement those prefer-
ences, including the "diligent search" requirement, because they are causing delay, and perhaps

denial, of their adoption of Baby O., and because they impose heightened standards and substantial burdens (both time and money) in connection with their efforts to adopt Baby O. Even if the Librettis' petition to adopt Baby O. is ultimately granted, ICWA and the Final Rule may subject the Librettis' adoption to collateral attack for up to two years. The Librettis are further aggrieved because the extraordinary burdens imposed by Sections 1913–1915, and the portions of the Final Rule purporting to implement those provisions, threaten to repeat the trials that Baby O. and the Librettis have already endured with any future foster or adoptive children.

319.    Ms. Hernandez is directly aggrieved by the Final Rule's application of Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences to Baby O. because they are causing delay, and perhaps denial, of Ms. Hernandez's preferred placement of Baby O. for adoption by the Librettis, and because they impose heightened standards and substantial burdens (both time and money) in connection with the Librettis' efforts to adopt Baby O.

320.    The Cliffords are directly, personally, and substantially injured by Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences to Child P. because they are causing delay, and perhaps denial, of their adoption of Child P., and they impose heightened standards and substantial burdens (both time and money) in connection with the Cliffords' efforts to adopt Child P.

321.    State Plaintiffs are directly aggrieved by ICWA's and the Final Rule's commandeering of State power because they require State Plaintiffs' agencies and courts to carry out the directives and policy objectives of the federal government and execute the federal government's regulatory framework for Indian child in child custody proceedings. State Plaintiffs must abide by ICWA in each and every child custody proceeding, and, particularly, to those proceedings in which

State Plaintiffs' agencies and courts discover that the child is an Indian child as defined by ICWA. ICWA imposes a substantial burden on State Plaintiffs through the expenditure of resources and money in connection with its efforts to comply with ICWA and the Final Rule for each child custody proceeding.

322.   Plaintiffs have no adequate remedy at law to redress the injuries they are suffering because of ICWA.

323.   Plaintiffs thus seek a declaration that Sections 1901–1923 and 1951–1952 of ICWA violate the Tenth Amendment and are unconstitutional and unenforceable, and an injunction barring the Defendants from implementing or administering that provision by regulation, guideline, or otherwise.

## COUNT IV
## VIOLATION OF THE FIFTH AMENDMENT
### (Equal Protection)

324.   Plaintiffs incorporate previous paragraphs as if fully restated here.

325.   The Due Process Clause of the Fifth Amendment mandates the equal treatment of people of all races without discrimination or preference. *Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954).

326.   ICWA defines an "Indian child" as an "unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4).

327.   ICWA classifies A.L.M. as an "Indian child."

328.   ICWA classifies many children in State Plaintiffs' custody and care as Indian children.

329.   The Brackeens, Librettis, and Cliffords are not "Indian families" within the meaning of ICWA.

330.   Many prospective foster parents and adoptive parents in Texas, Louisiana, and Indiana are not "Indian families" within the meaning of ICWA.

331.   ICWA's placement preferences applicable to an adoption or preadoptive placement of an "Indian child," 25 U.S.C. § 1915(a)–(b), impose a naked preference for "Indian families" over families of any other race and puts non-Indian families who wish to adopt an "Indian child" to the burden of demonstrating good cause to depart from the placement preferences, while any Indian family would enjoy a presumption that the adoption or preadoptive placement is in the child's best interests. ICWA's classification of Indians and non-Indians, and its discrimination against non-Indians, is based on race and ancestry and violates the constitutional guarantee of equal protection.

332.   The Brackeens are directly, personally, and substantially injured by ICWA's collateral attack provisions, 25 U.S.C. §§ 1913(d), 1914, and the provisions of the Final Rule purporting to implement those provisions, 25 C.F.R. §§ 23.136, 23.137, because they subject the Brackeen family to a period of uncertainty and mental anguish substantially longer than otherwise would be permitted under Texas law. The Brackeens are further aggrieved because the extraordinary burdens imposed by Sections 1913–1915, and the portions of the Final Rule purporting to implement those provisions, threaten to repeat the trials that A.L.M. and the Brackeens have already endured with any future foster or adoptive children.

333.   The Librettis are directly, personally, and substantially injured by Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences, including the "diligent search" requirement, because they are causing delay, and perhaps

denial, of their adoption of Baby O., and because they impose heightened standards and substantial burdens (both time and money) in connection with their efforts to adopt Baby O. Even if the Librettis' petition to adopt Baby O. is ultimately granted, ICWA and the Final Rule may subject the Librettis' adoption to collateral attack for up to two years. The Librettis are further aggrieved because the extraordinary burdens imposed by Sections 1913–1915, and the portions of the Final Rule purporting to implement those provisions, threaten to repeat the trials that Baby O. and the Librettis have already endured with any future foster or adoptive children.

334.    Ms. Hernandez is directly aggrieved ICWA's placement preferences and the provisions of the Final Rule purporting to implement those preferences to Baby O. because they are causing delay, and perhaps denial, of Ms. Hernandez's preferred placement of Baby O. for adoption by the Librettis, and because they impose heightened standards and substantial burdens (both time and money) in connection with the Librettis' efforts to adopt Baby O.

335.    The Cliffords are directly, personally, and substantially injured by ICWA's placement preferences and the provisions of the Final Rule purporting to implement those preferences to Child P. because they are causing delay, and perhaps denial, of their adoption of Child P., and they impose heightened standards and substantial burdens (both time and money) in connection with the Cliffords' efforts to adopt Child P.

336.    State Plaintiffs, on behalf of themselves, their residents, parents, and the children in their care, are directly aggrieved by ICWA's placement preferences because they require State Plaintiffs' agencies and courts to violate the Equal Protection Clause of the Fourteenth Amendment and state law, which prohibit racial preferences in child custody proceedings. ICWA requires State Plaintiffs to carry out the racially discriminatory policy objectives of the federal government and execute the federal government's discriminatory framework against potential foster and adoptive

parents who wish to care for Indian children. State Plaintiffs must abide by ICWA in each and every child custody proceeding, and, particularly, to those proceedings in which State Plaintiffs' agencies and courts discover that the child is an Indian child as defined by ICWA. ICWA imposes a substantial burden on State Plaintiffs through the expenditure of resources and money in connection with their efforts to comply with Section 1915(a) and Section 1915(b) for each child custody proceeding.

337. Plaintiffs have no adequate remedy at law to redress the injuries they are suffering because of ICWA.

338. Plaintiffs thus seek a declaration that Section 1915(a) and Section 1915(b) of ICWA violate principles of equal protection and are unconstitutional and unenforceable, and an injunction barring the Defendants from implementing or administering that provision by regulation, guideline, or otherwise.

## CLAIMS ALLEGED BY THE INDIVIDUAL PLAINTIFFS

### COUNT V
### VIOLATION OF ADMINISTRATIVE PROCEDURE ACT
#### (Not in Accordance with Law – Substantive Due Process)

339. Plaintiffs incorporate previous paragraphs as if fully restated here.

340. Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the Final Rule complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court," *id.* § 704.

341. The APA prohibits agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A).

342.     In addition to the reasons set forth in Count I of this Complaint, the Final Rule further violates the APA because the placement preference regime contained in the unit entitled "Dispositions," 25 C.F.R. § 23.129 *et seq*., violates the substantive due process rights of non-Indian prospective adoptive couples raising Indian children, and the rights of those Indian children, insofar as it permits—indeed, requires—the disruption of intimate familial relationships without a showing of an adequate state interest to do so. The intimate familial relationship between a prospective adoptive parent and a child is a substantial liberty interest under the Due Process Clause of the Fifth Amendment that can be vitiated only when necessary to vindicate an important governmental interest. The Final Rule articulates no adequate justification for vitiating an intimate familial relationship between a child and prospective adoptive parents in favor of placement with non-relatives who happen to be "Indian" within the meaning of ICWA, and there is none. The Final Rule thus violates the substantive due process rights under the Fifth Amendment of the prospective adoptive parents of an Indian child, and the rights of that Indian child.

343.     The Final Rule further violates the APA because the placement preference regime contained in the unit entitled "Dispositions," 25 C.F.R. § 23.129 *et seq*., violates the substantive due process rights of non-Indian prospective adoptive couples raising Indian children—and the rights of those Indian children—by excluding from the "good cause" analysis bonding and attachment resulting from their relationship if that relationship later is determined to be "in violation of ICWA." 25 C.F.R. § 23.132(e). The intimate familial relationship between a prospective adoptive parent and a child is a substantial liberty interest under the Due Process Clause of the Fifth Amendment that can be vitiated only when necessary to vindicate an important governmental interest. Ensuring that prospective adoptive couples are not "reward[ed]" by a state agency's or state court's error in failing to comply with ICWA's and the Final Rule's many requirements is not an interest

of the government sufficiently important to justify disrupting the familial bonds between a prospective adoptive couple and the child they are raising. Therefore, the Final Rule's categorical exclusion from consideration of an Indian child's bonding and attachment when it resulted from a placement later determined to be in violation of ICWA violates the substantive due process component of the Fifth Amendment.

344.    The Brackeens are directly, personally, and substantially injured by ICWA's collateral attack provisions, 25 U.S.C. §§ 1913(d), 1914, and the provisions of the Final Rule purporting to implement those provisions, 25 C.F.R. §§ 23.136, 23.137, because they subject the Brackeen family to a period of uncertainty and mental anguish substantially longer than otherwise would be permitted under Texas law. The Brackeens are further aggrieved because the extraordinary burdens imposed by Sections 1913–1915, and the portions of the Final Rule purporting to implement those provisions, threaten to repeat the trials that A.L.M. and the Brackeens have already endured with any future foster or adoptive children.

345.    The Librettis are directly, personally, and substantially injured by Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences, including the "diligent search" requirement, because they are causing delay, and perhaps denial, of their adoption of Baby O., and because they impose heightened standards and substantial burdens (both time and money) in connection with their efforts to adopt Baby O. Even if the Librettis' petition to adopt Baby O. is ultimately granted, ICWA and the Final Rule may subject the Librettis' adoption to collateral attack for up to two years. The Librettis are further aggrieved because the extraordinary burdens imposed by Sections 1913–1915, and the portions of the Final Rule purporting to implement those provisions, threaten to repeat the trials that Baby O. and the Librettis have already endured with any future foster or adoptive children.

346.    Ms. Hernandez is directly aggrieved by the Final Rule's application to Baby O. and by the imposition of substantial burdens (both time and money) in connection with the Librettis' efforts to adopt Baby O.

347.    The Cliffords are directly, personally, and substantially injured by ICWA's placement preferences and the provisions of the Final Rule purporting to implement those preferences to Child P. because they are causing delay, and perhaps denial, of their adoption of Child P., and they impose heightened standards and substantial burdens (both time and money) in connection with the Cliffords' efforts to adopt Child P.

348.    The plaintiffs have no adequate remedy at law to redress the burdens now being imposed by Final Rule because claims arising under the APA cannot be litigated in state court.

349.    This Court should declare the Final Rule invalid and set it aside.

**COUNT VI**
**VIOLATION OF THE FIFTH AMENDMENT**
**(Due Process—ICWA § 1915)**

350.    Plaintiffs incorporate previous paragraphs as if fully restated here.

351.    The United States has a deeply rooted tradition of honoring intimate family relationships. The Brackeens possess a fundamental right of liberty to intimate familial relationships.

352.    ICWA's placement preferences applicable to an adoption or preadoptive placement of an "Indian child," 25 U.S.C. § 1915(a)–(b), violate the Brackeens' substantive due process rights. The preferences permit the disruption of their intimate familial relationship with A.L.M. without a showing of an adequate state interest to do so.

353.    The Brackeens' intimate familial relationship with A.L.M. is a substantial liberty interest under the Due Process Clause of the Fifth Amendment that can be vitiated only when necessary to vindicate an important governmental interest.

354.     Placing A.L.M. with non-relatives who happen to be members of the Navajo Nation is not narrowly tailored to any important government interest.

355.     Unless the existence of an intimate familial relationship such as that which exists between the Brackeens and A.L.M. categorically constitutes "good cause" to depart from the placement preferences under Section 1915(a) and Section 1915(b), ICWA's placement preferences are unconstitutional under the Due Process Clause of the Fifth Amendment.

356.     The Brackeens are directly, personally, and substantially injured by ICWA's collateral attack provisions, 25 U.S.C. §§ 1913(d), 1914, and the provisions of the Final Rule purporting to implement those provisions, 25 C.F.R. §§ 23.136, 23.137, because they subject the Brackeen family to a period of uncertainty and mental anguish substantially longer than otherwise would be permitted under Texas law. The Brackeens are further aggrieved because the extraordinary burdens imposed by Sections 1913–1915, and the portions of the Final Rule purporting to implement those provisions, threaten to repeat the trials that A.L.M. and the Brackeens have already endured with any future foster or adoptive children.

357.     The Librettis' intimate familial relationship with Baby O. is a substantial liberty interest under the Due Process Clause of the Fifth Amendment that can be vitiated only when necessary to vindicate an important governmental interest.

358.     Ms. Hernandez's intimate parental relationship with Baby O. and her right to direct the upbringing of Baby O. is a substantial liberty protected by the Due Process Clause of the Fifth Amendment that can be vitiated only when necessary to vindicate an important governmental interest.

359.     Placing Baby O. with non-relatives who happen to be members of an Indian tribe is not narrowly tailored to any important government interest.

360.    Unless the existence of an intimate familial relationship such as that which exists between the Librettis and Baby O. categorically constitutes "good cause" to depart from the placement preferences under Section 1915(a) and Section 1915(b), ICWA's placement preferences are unconstitutional under the Due Process Clause of the Fifth Amendment.

361.    The Librettis and Ms. Hernandez are directly, personally, and substantially injured by Section 1915's placement preferences and the provisions of the Final Rule purporting to implement those preferences, including the "diligent search" requirement, because they are causing delay, and perhaps denial, of the Librettis' adoption of Baby O., and because they impose heightened standards and substantial burdens (both time and money) in connection with the Librettis' efforts to adopt Baby O. Even if the Librettis' petition to adopt Baby O. is ultimately granted, ICWA and the Final Rule may subject the Librettis' adoption to collateral attack for up to two years. The Librettis are further aggrieved because the extraordinary burdens imposed by Sections 1913–1915, and the portions of the Final Rule purporting to implement those provisions, threaten to repeat the trials that Baby O. and the Librettis have already endured with any future foster or adoptive children.

362.    The Cliffords' intimate familial relationship with Child P. is a substantial liberty interest under the Due Process Clause of the Fifth Amendment that can be vitiated only when necessary to vindicate an important governmental interest.

363.    Placing Child P. with non-relatives who happen to be members of an Indian tribe, or with relatives who would otherwise be unsuitable but are preferred to the Cliffords because of their race, is not narrowly tailored to any important government interest.

364.     Unless the existence of an intimate familial relationship such as that which exists between the Cliffords and Child P. categorically constitutes "good cause" to depart from the placement preferences under Section 1915(a) and Section 1915(b), ICWA's placement preferences are unconstitutional under the Due Process Clause of the Fifth Amendment.

365.     The Cliffords are directly, personally, and substantially injured by ICWA's placement preferences because they are causing delay, and perhaps denial, of their adoption of Child P. and they are requiring the Cliffords to expend substantial resources in an effort to demonstrate "good cause" to depart from them.

366.     The plaintiffs have no adequate remedy at law to redress the injuries they are suffering because of ICWA.

367.     The plaintiffs thus seek a declaration that Section 1915(a) and Section 1915(b) of ICWA violate principles of substantive due process and are unconstitutional and unenforceable, and an injunction barring the Defendants from implementing or administering those provisions by regulation, guideline, or otherwise.

### CLAIMS ALLEGED BY STATE PLAINTIFFS

**COUNT VII**
**VIOLATION OF ARTICLE I OF THE CONSTITUTION**
**(Non-Delegation Doctrine)**

368.     Plaintiffs incorporate previous paragraphs as if fully restated here.

369.     The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. Const. art. 1, § 1.

370.     The Constitution authorizes Congress "[t]o make all Laws which shall be necessary and proper for carrying into Execution" its general powers. U.S. Const. art. 1, § 8, cl. 18.

371.     The Constitution bars Congress from delegating to others the essential legislative functions with which it is vested.

372.     ICWA Section 1915(c) and the Final Rule Section 23.130(b) delegate to Indian tribes the legislative and regulatory power to pass resolutions in each Indian child custody proceeding that alter the placement preferences state courts must follow.

373.     The Final Rule prohibits State Plaintiffs' agencies and courts from making a determination as to an Indian child's membership status with a tribe. State Plaintiffs must defer to the membership determination of the tribe.

374.     State Plaintiffs are directly and substantially injured by the delegation of power over placement preferences because it violates the Constitution's separation of powers through abdication of Congress's legislative responsibility and requires State Plaintiffs to honor the legislation and regulation passed by tribes in each child custody matter, which can vary widely from one child to the next and one tribe to another.

375.     State Plaintiffs have no adequate remedy at law to redress the injuries they are suffering under ICWA.

376.     State Plaintiffs thus seek a declaration that ICWA Section 1915(c) and Final Rule Section 23.130(b) violate Article I, sections 1 and 8, and are unconstitutional and unenforceable, and an injunction barring the Defendants from implementing or administering those provisions by regulation, guideline, or otherwise.

<h2 style="text-align:center">PRAYER FOR RELIEF</h2>

Plaintiffs pray that this Court:

1.     Declare that the Final Rule violates the APA, hold it invalid, and set it aside;

2.      Issue a declaratory judgment that ICWA, 25 U.S.C. §§ 1901–1923, 1951–1952, is unconstitutional and unenforceable;

3.      Issue a declaratory judgment that Sections 1913(d), 1914, and 1915 of ICWA are unconstitutional and unenforceable;

4.      Issue a declaratory judgment that 42 U.S.C. §§ 622(b)(9) and 677(b)(3)(G) are unconstitutional and unenforceable.

5.      Issue an injunction prohibiting Defendants from implementing or administering 25 U.S.C. §§ 1901–1923, 1951–1952 by regulation, guidelines, or otherwise;

6.      Issue an injunction prohibiting Defendants from implementing or administering Sections 1913(d), 1914, 1915 of ICWA by regulation, guidelines, or otherwise;

7.      Issue an injunction prohibiting Defendants from implementing or administering 42 U.S.C. § 622(b)(9) and 677(b)(3)(G) by regulation, guidelines, or otherwise;

8.      Award Plaintiffs costs and reasonable attorneys' fees as appropriate; and

9.      Grant such further and other relief as this Court deems just and proper.

Respectfully submitted,


Dated: March 16, 2018

*/s/ Matthew D. McGill*

Matthew D. McGill (*pro hac vice*)
DC Bar No. 481430
Lochlan F. Shelfer (*pro hac vice*)
DC Bar No. 1029799
Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 887-3680
mmcgill@gibsondunn.com
lshelfer@gibsondunn.com


Rebekah Perry Ricketts
State Bar No. 24074883
Gibson, Dunn & Crutcher LLP
2100 McKinney Ave., Suite 1100
Dallas, TX 75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2976
rricketts@gibsondunn.com

*Attorneys for Individual Plaintiffs*

Mark Fiddler
FIDDLER LAW OFFICE, P.A.
6800 France Ave. So., Suite 190
Minneapolis, MN 55435
mark@fiddler-law.com
Telephone: (612) 822-4095
Facsimile: (612) 822-4096

*Attorney for Frank and Heather Libretti, and Jason and Danielle Clifford*

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

*/s/ David J. Hacker*

DAVID J. HACKER
Special Counsel for Civil Litigation
Texas Bar No. 24103323
david.hacker@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, Mail Code 009
Austin, TX 78711-2548
Telephone: (512) 936-1414

*Attorneys for State Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 16, 2018, I electronically filed the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties.

*/s/ David J. Hacker*
DAVID J. HACKER
Special Counsel for Civil Litigation
Texas Bar No. 24103323
david.hacker@oag.texas.gov

# EXHIBIT 1

TX 0001

- providing for legal representation of children (attorneys or guardian *ad litems*) in judicial proceedings

Recipients of CAPTA funds, including DFPS, are required to submit a state assurance plan every five years specifying their use, or intended use, of funds. Recipients must also submit notification to the federal government when there are substantive changes in state law and when there are significant changes to how CAPTA funds are being used.

For more information, see:

Child Abuse Prevention and Treatment Act

The Children's Bureau analysis CAPTA2003

## 1225 Indian Child Welfare Act

CPS February 2013

The Indian Child Welfare Act (ICWA) is a federal law aimed at keeping Native American children who are involved in child welfare cases with Native American families. The stated intent of the legislation is to protect the best interests of Native American children and to promote stability amongst Native American families.

ICWA sets federal requirements that apply to state child custody proceedings involving Native American children who are members of, or eligible for membership in, a federally recognized tribe. ICWA establishes standards for removing Native American children from their families and for placing them in foster and adoptive homes. It also allows for a child's tribe to intervene in the legal proceedings.

A child must meet the criteria of an "Indian child" as defined by federal law in order for ICWA to apply. However, CPS policy requires workers in every abuse or neglect case to determine whether a child or the child's family has Native American ancestry or heritage. If Native American ancestry is claimed, CPS workers are required to follow specific procedure to ensure compliance with ICWA.

See:

Indian Child Welfare Act

Federally Recognized Tribes

For information on CPS policy related to ICWA, see:

Form 1706    Checklist for Compliance with the Indian Child Welfare Act

For information about the ICWA and DFPS's responsibilities under it, see:

Appendix 1226-A: Child-Placing Requirements of the Indian Child Welfare Act and Related Guidelines and Regulations

**TX 0002**

Case 4:17-cv-00868-O   Document 35   Filed 03/22/18   Page 89 of 138   PageID 636

Appendix 1226-B: Checklist for Compliance with the Indian Child Welfare Act

# 1240 General Eligibility Criteria for Child Protective Services

CPS 96-8

*Law*

DFPS provides protective services to children as required by the Texas Family Code, Chapters 261 and 262, and the Human Resources Code. DFPS provides services to the families of children receiving protective services under Titles IV-A, IV-B, IV-E, and XX of the Social Security Act, the Intended Use Report, and Chapter 47 of the Human Resources Code.

*Texas Family Code Chapters 261, 262*

*Texas Human Resources Code Ch. 47*

*Management Policy*

To receive child protective services, the child or the child's family must be eligible at the time service is rendered.

The state plans contain the services offered by DFPS. Clients must meet the eligibility criteria for the specific service as detailed in the state plans.

*Law*

DFPS must not discriminate on the basis of race, color, national origin, sex, religion, or handicap in providing child protective services.

# 1241 Child Protective Services Priorities

CPS 96-8

*Management Policy*

DFPS is committed to providing at least minimally adequate protective services to all children who need them. Because of limited resources, however, DFPS must establish priorities for provision of services.

DFPS priorities for child protective services are based on the purposes and objectives of the program. (See Item 1110, Purpose and Objectives.) By establishing priorities, DFPS has provided statewide criteria for the types of situations and responsibilities DFPS staff respond to before others. The priorities also indicate which children DFPS is not required to serve and which responsibilities DFPS is not required to perform statewide.

Priorities are subject to change.

**TX 0003**

Case 4:17-cv-00868-O   Document 35   Filed 03/22/18   Page 90 of 138   PageID 637

If a child leaves the court's geographic jurisdiction, the caseworker must notify the court.

Notification is not required if there is no motivating reason, such as a judge expressing an interest in a particular case.

*DFPS Rules, 40 TAC §700.1107*

## 5332.4 Notifying the Court When Subsequent Removal

CPS December 2013

If DFPS finds it necessary to remove a child who has been returned to the parents and place the child in foster or substitute care, the caseworker must notify the court.

*DFPS Rules, 40 TAC §700.1107*

## 5332.5 Notifying the Court About a Designated Medical Consenter

CPS December 2013

If DFPS is authorized by the court to consent to the medical care of a child in DFPS conservatorship, the caseworker must provide the court with the name of the person designated by DFPS to consent to the child's medical care.

See 11118 Notifying the Court of the Designated Medical Consenter.

*Texas Family Code §266.004(c)*

# 5340 Indian Child Welfare Act (ICWA)

CPS December 2013

If a DFPS lawsuit involves a Native American child, the Indian Child Welfare Act (ICWA) applies and the legal requirements change dramatically.

The legal requirements related to ICWA are discussed primarily in 5840 The Indian Child Welfare Act (ICWA); however, while ICWA requirements do not apply in every case, it is critically important that the caseworker *inquire* about Native American history in *every* case.

The only way to determine whether a child may be a Native American child is to ask available parents, relatives, and children who are old enough to be interviewed whether there is any family history connected to a Native American tribe. The caseworker documents the responses by individual family members, whether a Native American history is reported or denied.

**TX 0004**

If there is any indication that a child may have a family member or ancestor affiliated with a tribe, the caseworker follows ICWA policies at 5840 The Indian Child Welfare Act (ICWA).

# 5350 Seeking Child Support for Children in Substitute Care

CPS December 2013

Even when DFPS has been appointed as temporary or permanent managing conservator of a child, the parents still have support obligations to their child. DFPS, therefore, has the legal authority and obligation to seek child support and medical support from the parents.

# 5351 Requesting Child Support From the Parents of Children in DFPS Conservatorship

## 5351.1 Requirements for Requesting a Court to Order Parents to Provide Support

CPS December 2013

In CPS cases involving a suit affecting but not terminating parental rights, DFPS *must* ask the court to order the parents to provide child support and health insurance.

If the court terminates parental rights, DFPS *may* request that the parents be ordered to provide support.

*Texas Family Code, §154.001*

Although it may appear that the parent is financially unable to provide support, the court is the entity that evaluates the parent's ability to pay. Even a small amount of support allows the parent to share the responsibility of providing for the child's care and ensures some level of parental involvement. The court may or may not order support as requested, but it is duty of DFPS to make the request.

The caseworker must inform the parents that DFPS will request that the parents pay child support and health insurance.

*DFPS Rules, 40 TAC §700.1108*

## 5351.2 DFPS's Right to Review Child Support Payments

CPS December 2013

DFPS is entitled to receive all child support paid for a child, as of the date that the child is placed in substitute care.

**TX 0005**

For more information about working with consular staff, see the [When a Child or Youth in CPS Conservatorship Travels Resource Guide](#)   .

# 5840 The Indian Child Welfare Act (ICWA)

## 5841 Purpose of ICWA

CPS December 2013

The Indian Child Welfare Act (ICWA) is a federal law that applies to any DFPS case involving an Indian child, as the term is defined by ICWA. See [25 U.S.C. §1901](#)   et seq.

Although the law refers to and applies only to an Indian child, as defined by the ICWA, *this policy uses the term Native American where the context allows, because it is accurate and is generally preferred for its recognition of Native American origins.*

The purpose of the ICWA is to preserve Native American tribal cultures (including Native Alaska tribal cultures), by giving legal rights to the children, parents, and tribes protected by this law.

Failure to comply with the ICWA can result in a final order being reversed on appeal.

To avoid having a final order reversed and a child's chance for a permanent home affected, the caseworker:

- routinely asks families whether they are Native American;
- documents the families' responses; and
- consults with the attorney representing DFPS and the regional attorney, if the caseworker believes that a case may involve a Native American child.

## 5842 Identifying a Native American Child

CPS December 2013

The law defines a Native American child as an unmarried person under age 18 who is either:

- a member of a Native American tribe; or
- eligible for membership in a Native American tribe and the biological child of a tribal member. See [25 U.S.C. §1903(4)](#)   .

To find out whether a child has Native American family history, the caseworker routinely asks:

- any child old enough to be interviewed;
- any parent of the child who is available to be interviewed; and

**TX 0006**

- any relatives who are available to be interviewed.

Because key facts about a child's family history may not be available when a case is first investigated, the caseworker routinely asks, throughout the case, about whether a child has Native American family history, especially when new family members are identified.

Whether family members deny or report tribal family history, the caseworker documents the information on:

- the removal affidavit; and
- any reports filed with the court.

For example:

> Information about the Child's Native American Status: Mother denies tribal family history; father reports that his great-grandfather may be Sioux. Paternal grandmother says that her husband's family was from the Cherokee tribe in Oklahoma.

If the caseworker obtains information indicating that there is a possible tribal heritage, the caseworker:

- completes Form 1705    Indian Child and Family Questionnaire;
- confers with the regional attorney and attorney representing DFPS as soon as possible; and
- refers to the following CPS policies:

  > 1225 Indian Child Welfare Act
  >
  > Appendix 1226-A: Child-Placing Requirements of the Indian Child Welfare Act and Related Guidelines and Regulations
  >
  > Appendix 1226-B: Checklist for Compliance With the Indian Child Welfare Act

As much information must be provided on Form 1705    as possible to determine whether a child is a member of a tribe or is eligible for membership in the tribe.


## 5843 Decision Regarding Native American Status

CPS December 2013

> There are more than 500 federally recognized Native American tribes in the U.S., and children from any one of these tribes may be living in Texas. Three federally recognized tribes have reservations in Texas: the Kickapoo, near Eagle Pass, the Alabama-Coushatta Tribe, near Livingston, and the Ysleta del Sur, also known as Tigua, near El Paso.

**TX 0007**

Each tribe has its own membership requirements and only the tribe can decide whether a child is a Native American child, as defined by the Indian Child Welfare Act (ICWA).

A child may be a Native American child, even if:

- the child's Native American relative is a distant one;
- the child's parent or grandparent was never enrolled as a tribal member;
- one or both parents are opposed to the tribe being involved;
- the child and family do not observe tribal traditions and practices; or
- the child is not enrolled in the tribe

If there is any indication that a child's family may have a tribal connection, the caseworker gives the relevant information to the tribe and ask that membership or eligibility be confirmed or denied.

## 5844 Legal Requirements If the ICWA Applies

CPS December 2013

If a Native American child, as defined by the Indian Child Welfare Act (ICWA), is taken into DFPS custody, almost every aspect of the social work and legal case is affected, including as follows:

- The legal burden of proof for removal is higher, as is the legal burden of proof for obtaining any final order terminating parental rights or restricting a parent's custody rights.
- DFPS must serve the child's parents, tribe, Native American caretakers, and the Bureau of Indian Affairs with a specific notice regarding ICWA rights.
- ICWA requires that the caseworker must make active efforts to reunify the child and family.
- The child must be placed according to ICWA statutory preferences.
- Expert testimony on tribal child and family practices may be necessary.
- A valid relinquishment of parental rights requires a parent to appear in court and a specific statutory procedure.

All of these requirements apply to both a Native American parent and a parent who is not Native American.

For a quick reference, see:

Form 1700    Indian Child Welfare Act Resource Guide

Form 1705    Indian Child and Family Questionnaire

Form 1706    Indian Child Welfare Act Checklist

**TX 0008**

Case 4:17-cv-00868-O   Document 35   Filed 03/22/18   Page 95 of 138   PageID 642

# Texas Department of Family and Protective Services

## Child Protective Services Handbook

| <<Previous Page | Next Page>> |
|---|---|

## Appendix 1226-A: Child-Placing Requirements of the Indian Child Welfare Act and Related Guidelines and Regulations

CPS 92-7

### I. Introduction

The Indian Child Welfare Act (ICWA) seeks to protect the best interests of eligible Indian children and to promote the stability and security of eligible Indian tribes and families. The ICWA establishes federal standards for the removal of eligible Indian children from their families and for placement of the children in foster or adoptive homes that reflect the unique values of Indian culture. The Act also provides for assistance to eligible Indian tribes to operate child and family service programs.

Three documents govern implementation of the ICWA:

1. **The Indian Child Welfare Act (ICWA) of 1978 (PL 95-608)**

   The ICWA has the force of law without reference to interpretations. However, the Department of the Interior's Bureau of Indian Affairs has interpreted portions of the ICWA in the two documents described below.

2. **Guidelines for State Courts: Indian Child-Custody Proceedings** (See the *Federal Register*, Volume 44, No. 228/Monday, November 29, 1979)

   The Bureau of Indian Affairs issued these guidelines to help courts interpret the portions of the ICWA that courts must implement. Under the ICWA, state courts and tribal courts are responsible for conducting most aspects of Indian child-custody proceedings. Each court must

**TX 0009**

establish rules and procedures for carrying out its responsibilities under the ICWA.

The Guidelines for State Courts do not have the force of law. They are intended to help state and tribal courts guarantee rights protected under the ICWA. Courts have the authority to disregard the guidelines when they consider them unnecessary to implementation of the ICWA.

### 3. Federal Regulations (25 CFR, Part 23)

These regulations govern the Bureau of Indian Affair's responsibilities under the ICWA.

The ICWA and the guidelines and regulations specified above apply to DFPS, other state agencies, and private child-placing agencies whenever they place eligible Indian children in protective placements covered under the ICWA.

## II. Definitions

The following definitions are derived from Section 4 of the ICWA, the Guidelines for State Courts, and the federal regulations specified above. The definitions have been rephrased to match state laws and other requirements governing DFPS services.

**A. Indian** — Any member of an Indian tribe.

*Note:* The ICWA and related guidelines and regulations do not include criteria for determining membership in specific Indian tribes. Each tribe is responsible for establishing membership criteria and determining who meets them. Information about tribal membership is available from the tribes themselves and from the Bureau of Indian Affairs. (For information about contacting the Bureau of Indian Affairs, see item K below.)

**B. Indian tribe** — Any Indian tribe, band, nation, or other organized group or community of Indians that is eligible for services provided to Indians by the Secretary of the Interior.

*Note:* The ICWA applies to the following tribes in Texas:

1. the Traditional Kickapoo Indians of Texas, who live on land near Eagle Pass in Region 09 (The tribe is part of the Kickapoo Tribe of Oklahoma.);

2. the Alabama-Coushatta Indian tribe and reservation near Livingston in Region 10; and

3. the Tigua Indian tribe and reservation near El Paso in Region 12.

The ICWA also applies to children who are members of federally recognized tribes when the children are in Texas, even though the tribe and reservation are not in Texas. The ICWA does not apply to children who are not members of federally recognized tribes.

**TX 0010**

**C.   Indian child** — Any person who fits the definition of a child under Chapter 11 of the Texas Family Code (TFC) and who

   1.   is a member of an Indian tribe; or

   2.   is both

      a.   eligible for membership in an Indian tribe, and

      b.   the biological child of a member of an Indian tribe.

*Note:* Part B.1. of the Guidelines for State Courts addresses the determination of eligibility as an Indian child.

**D.   Indian child's tribe** — Either

   1.   the tribe in which the child is

      a.   a member, or

      b.   eligible for membership; or

   2.   the tribe with which the child has the most significant contacts, if the child is a member of more than one tribe or is eligible for membership in more than one tribe.

*Note:* Part B.2. of the Guidelines for State Courts addresses the determination of an Indian child's tribe.

**E.   Indian parent** — Any Indian who fits the definition of a parent under TFC, Chapter 11, including a parent who has adopted a child under tribal law or custom.

**F.   Extended family member** — Either

   1.   a member of an Indian child's extended family as defined by tribal law or custom; or

   2.   in the absence of a tribal definition, an adult who is an Indian child's grandparent, aunt, uncle, brother, sister, brother-in-law, sister-in-law, niece, nephew, first or second cousin, or stepparent.

**G.   Indian custodian** — Any Indian

   1.   who has legal custody of an Indian child under tribal law or custom or under state law; or

   2.   to whom an Indian child's parent has temporarily transferred the child's physical care, custody, or control.

**H.   Child-custody proceeding** — Any of the following:

   1.   A suit affecting the parent-child relationship under TFC, Title II, or a judicial proceeding for an Indian status-offender under TFC, Title III, when the suit or proceeding involves a foster care placement, the termination of parental rights, a pre-adoptive placement, or an adoptive placement.

     This definition includes proceedings that involve any action in which

**TX 0011**

- an Indian child is removed from his parent or Indian custodian for any length of time, and
- the parent or custodian does not have the right to return of the child upon demand.

2. An affidavit of relinquishment of parental rights executed under TFC, §15.03, with respect to an Indian child.

3. The voluntary placement of an Indian child by the child's parents.

   *Note:* The term "child-custody proceeding" does **not** apply to

   - a divorce proceeding, parental separation, or similar action in which the child is placed in the managing conservatorship of one of the parents; or
   - a delinquency proceeding under TFC, Title III, caused by an action which would be a crime if committed by an adult.

   *Note:* Part B.3. of the Guidelines for State Courts provides criteria for determining whether a child-custody proceeding is covered by the ICWA.

**I.   Tribal court** — A court that

1. has jurisdiction over child-custody proceedings; and

2. is

   - a court of Indian offenses,
   - a court established and operated under the code or custom of an Indian tribe, or
   - any other administrative body of a tribe that has authority over child-custody proceedings.

**J.   State court** — Either

1. a district court that has jurisdiction over suits affecting the parent-child relationship, as defined in TFC, §11.01; or

2. a juvenile court that has jurisdiction over children in need of supervision (CHINS), as defined in TFC, §51.03.

**K.   Bureau of Indian Affairs** — The Bureau of Indian Affairs (BIA) is part of the Department of the Interior. There are 12 BIA offices in the United States. The office to contact for court proceedings involving Indians in Texas is located in Anadarko, Oklahoma.

Every BIA office offers the following services:

1. assistance in locating a child's tribe and his biological parents or Indian custodian to prevent involuntary removal when

   - the child is involved in involuntary state-court action, or
   - the child's adoption is terminated (see 25 CFR 23.11(f) and 23.93);

**TX 0012**

2.  arrangements for paying court-appointed attorney fees for indigent parents or Indian custodians when applicable requirements are met in involuntary state-court action (see 25 CFR 23.13);

3.  assistance to the court, the child-placing agency, or any other party in identifying qualified expert witnesses for involuntary state-court action (see 25 CFR 23.91); and

4.  assistance to the court, the child-placing agency, or any other party in identifying interpreters for an Indian child-custody proceeding (see 25 CFR 23.92).

The BIA's Division of Social Services in Washington, D.C., maintains a central file of all Indian adoptions.

**L.  Qualified expert witness** — An expert who

- can give competent testimony, and
- is qualified to specifically address the question whether continued custody by the parents or Indian custodian is likely to result in serious physical or emotional damage to the child. (See Part D.4. of the Guidelines for State Courts.)

## III. Services to the Indian Child and Family to Prevent Involuntary Removal

Under ICWA, §102(d), before seeking involuntary removal of a child, the child-placing agency must try to provide remedial services and rehabilitation programs designed to prevent the breakup of the child's family.

Under Part D.2 of the Guidelines for State Courts, the child-placing agency must demonstrate to the court that

A.  it has tried to provide remedial services and rehabilitation programs to prevent removal as specified above; and

B.  its efforts to do so

- took into account the prevailing social and cultural conditions and way of life of the Indian child's tribe; and
- involved and used the available resources of the extended family, the tribe, Indian social-service agencies, and Indian care givers.

## IV. Removal of the Indian Child

Under ICWA, §101(a), a child-placing agency may only seek state-court jurisdiction when the Indian child is not the ward of a tribal court.

### A.  Involuntary Removal of an Indian Child by a Court

If the suit is not transferred to an Indian court, ICWA, §102(e) and (f), prohibits the court from ordering involuntary foster-care

**TX 0013**

placement or termination of parental rights of an Indian child unless the proceedings include both

1.  the testimony of a qualified expert witness; and

2.  a determination that the parents' or Indian custodian's continued custody of the child is likely to result in serious emotional or physical damage to the child.

### B. Emergency Removal

Under ICWA, §112, Indian children may be protected by an emergency removal under TFC, Chapter 17.

Under Part B.7. of the Guidelines for State Courts, the petition for the emergency hearing under TFC, §§17.02 or 17.03, must be accompanied by an affidavit containing

1.  the name, age, and last known address of the Indian child;

2.  the names and addresses of the child's parents and Indian custodian, if any (If these persons are unknown, a detailed explanation must be given of the efforts made to locate them.);

3.  the facts necessary to determine the residence and domicile of the Indian child (If the residence and domicile is on an Indian reservation, the name of the reservation must be stated.);

4.  the tribal affiliation of the child and the child's parents or Indian custodian;

5.  a specific and detailed account of the circumstances that led to emergency removal of the child;

6.  if the child is believed to live on a reservation over which the tribe exercises exclusive jurisdiction in matters of child-custody, a statement of the efforts made to transfer the matter to the tribe's jurisdiction; and

7.  a statement of the actions taken to provide services to the parents or to the Indian custodian to permit the child to be safely returned to the parents' or the custodian's custody.

Under ICWA, §112, the child-placing agency must ensure that the emergency placement ends as soon as it is no longer necessary to prevent imminent physical harm or danger to the child. However, this requirement does not apply if a court orders or the parents consent to continued placement.

### C. Voluntary Placements (Temporary and Permanent)

Provisions for voluntary placements under the ICWA apply both to temporary and permanent voluntary placements made by child-placing agencies. Under ICWA, §103(a), the parents' or Indian custodian's consent to foster care placement or to termination of parental rights is not valid unless the following conditions are satisfied.

**TX 0014**

1.  The child's parents or Indian custodian cannot consent to the placement or to the termination of parental rights until at least 10 days after the child's birth. No child-placing agency, therefore, may place an Indian child in foster care based on the parent's or custodian's consent until 10 days after the child's birth.

2.  The parents' or Indian custodian's consent must be recorded before a district judge of a court of competent jurisdiction. The judge must certify in writing that

    a.  the terms and consequences of the consent were explained fully and in detail to the parent or Indian custodian; and

    b.  the parent or Indian custodian either

        - fully understood the explanation in English, or
        - fully understood it after it was interpreted or translated into a language the parent or custodian knows.

**Affidavit of relinquishment.** Under Part E.2 of the Guidelines for State courts, in addition to containing all of the information required in TFC, §15.03, an affidavit of relinquishment of parental rights must contain

1.  the name of the Indian child's tribe; and

2.  the identifying number or other indication of the child's membership in the tribe, if any.

**Withdrawal of consent.** Under ICWA, §103(b), a child's parent or Indian custodian has the right to withdraw consent to the child's foster-care placement at any time, except as noted below. If a parent or Indian custodian withdraws consent, the child-placing agency must return the child to the parent or Indian custodian immediately.

If a child-placing agency has managing conservatorship of a child or has validly evoked the provisions of TFC, Chapter 17, as a basis for the child's continued placement in foster care, the child's parent or Indian custodian cannot withdraw consent to the child's foster care placement.

Note: This citation (TFC Ch. 17) is out of date since the 1995 reorganization of the Texas Family Code. We can tell where some of these clauses went, but we couldn't find this one. Please request the correct citation from Legal staff. --H&RS

**Withdrawal of an affidavit of relinquishment.** Under ICWA, §103(c), an Indian parent may withdraw an affidavit of relinquishment of parental rights that designates a child-placing agency as managing conservator of the parent's child. The parent may withdraw the affidavit of relinquishment for any reason and at any time before the court's decree of termination. This provision may take precedence over Section 15.03 (d), Texas Family Code, which states that an affidavit of relinquishment designating DFPS as the child's managing conservator is irrevocable.

**TX 0015**

If an Indian parent withdraws an affidavit of relinquishment as specified above, the child-placing agency must return the child to the parent unless the child-placing agency obtains court-ordered managing conservatorship or validly evokes the provisions of TFC, Chapter 17, as a basis for the child's continued placement in foster care.

## V. Choosing Placements for Indian Children

### A.   Preferred Placement Settings

**Foster care placements.** Under ICWA, §105(b), the child-placing agency must apply the following criteria when placing Indian children in foster care.

1.  The placement must meet all the special needs of the child that the child-placing agency has identified.

2.   The placement setting must be

    a.   reasonably close to the child's home, and

    b.   the least restrictive and most family-like setting available.

3.   The following foster-care placement settings are preferred in the order listed unless there is good cause to the contrary (For definition of the term "good cause to the contrary," see item C below.):

    a.   a member of the child's extended family;

    b.   a foster home licensed, approved, or specified by the Indian child's tribe;

    c.   an Indian foster home licensed by DFPS or certified by a non-Indian, licensed, child-placing agency;

    d.   a child-caring institution approved by an Indian tribe or operated by an Indian organization which has a program to meet the Indian child's need.

**Adoptive placements.** Under ICWA, §106(b), the following adoptive placement settings are preferred for Indian children in the order listed unless there is good cause to the contrary:

1.   a member of the child's extended family,

2.   another member of the Indian child's tribe,

3.   another Indian family.

**Additional considerations.** Under ICWA, §105(d), the child-placing agency determines what foster-care or adoptive placement is most appropriate for a particular Indian child based on the prevailing social and cultural standards of the Indian community in which the child's parents or extended family reside or with which they maintain social and cultural ties.

**TX 0016**

Under ICWA, §106(b), subsequent foster care and adoptive placements are made according to provisions of the ICWA unless the child is returned to the person from whom he was removed.

## B. Good Cause to Modify Preferences

Under ICWA, §105(c), the following conditions constitute good causes to change the order or types of preference specified in item A above:

1.  The Indian child's tribe establishes a different order of preference by resolution. The tribe's order of preference must be followed subject to one condition: In a foster care placement, the tribe's preferred placement setting must be the least restrictive setting available that meets the child's particular needs.

2.  The Indian child or his parent has a different, but appropriate preference. The child-placing agency must take the child's and the parent's preferences into consideration.

    *Note:* When a parent requests anonymity in a voluntary placement, the child-placing agency must apply the preferences specified above in a way that meets the parent's need for anonymity.

## C. Good Cause to the Contrary

Under Part F.3(a) of the Guidelines for State Courts, good cause to the contrary is based on

1.  the request of the biological parents or the older child (The guidelines do not specify the meaning of "older."),

2.  the extraordinary physical or emotional needs of the child as established by testimony of a qualified expert witness, or

3.  the unavailability of a suitable placement setting after the child-placing agency has searched for one that meets the preference criteria.

Under Part F.3(b) of the Guidelines for State Courts, the burden of establishing good cause to the contrary rests on the party that requests an exception to the order or types of preferences specified above.

## D. Documentation of Consideration Given to Placement Choice

Under ICWA, §105(e), the child-placing agency must document each fostercare or adoptive placement of an Indian child, and the efforts made to comply with the order and types of preference specified above. The childplacing agency must provide a record of these efforts to the Secretary of the Interior or to the Indian child's tribe on request.

## VI. Agreements between Child-Placing Agencies and Indian Tribes

**TX 0017**

Under ICWA, §109, a child-placing agency may enter into agreements with an Indian tribe regarding the care and custody of Indian children and regarding the agency's and the tribe's respective jurisdictions in child-custody proceedings. Agreements about jurisdiction may include provisions for

A.   the orderly transfer of jurisdiction on a case-by-case basis; and

B.   concurrent jurisdiction of both the child-placing agency and the tribe.

Either party may revoke such an agreement upon 180 days written notice to the other party. The revocation cannot affect any action or proceeding over which a court has assumed jurisdiction, unless the agreement provides otherwise.

## VII. Observing the Rights of Adult Indian Adoptees

### A. State Court

Under ICWA, §107, if a court with jurisdiction receives a request from an Indian adoptee who is 18 or older, the court must inform the adoptee about:

1.   the adoptee's tribal affiliation, if any;

2.   the identity of the adoptee's biological parents; and

3.   any other information necessary to protect the rights pertaining to the adoptee's tribal relationship.

If the court does not reveal the identity of the adoptee's biological parents, the adoptee may obtain help from the Bureau of Indian Affairs to secure the necessary information for enrollment of the adoptee in a tribe.

> When presented with a valid court order, [DFPS's] Special Services Division provides information necessary for the adoptee's enrollment in a tribe, subject to the requirements regarding the charge and receipt of reasonable fees for determining and sending information specified in TFC, §11.17 (c).

### B. Bureau of Indian Affairs (BIA)

Under ICWA, §301(b), and 25 CFR 23.81(b), the BIA must give the foster or adoptive parent or the tribe of an Indian adoptee who is 18 or older and eligible under the ICWA all information needed to enroll the adoptee in a tribe or to determine the adoptee's rights and benefits associated with tribal membership. If the adoptee's biological parent has filed an affidavit of confidentiality with the court and the affidavit has been forwarded to the Bureau of Indian Affairs, the BIA will not reveal the parent's name.

**TX 0018**

Case 4:17-cv-00868-O   Document 35   Filed 03/22/18   Page 105 of 138   PageID 652

**<<Previous Page**                                        **Next Page>>**

**TX 0019**

Case 4:17-cv-00868-O   Document 35   Filed 03/22/18   Page 106 of 138   PageID 653

# Texas Department of Family and Protective Services

## Child Protective Services Handbook

| **<<Previous Page** | **Next Page>>** |
| --- | --- |

## Appendix 1226-B: Checklist for Compliance with the Indian Child Welfare Act

CPS 92-7

To ensure compliance with the Indian Child Welfare Act (ICWA) in any court action regarding an Indian Child, staff may refer to the following checklist.

*Note:* To determine whether a court action falls under the ICWA, see Appendix 1226A, Child-Placing Requirements of the Indian Child Welfare Act and Related Guidelines and Regulations.

1.  Does the petition for custody include the following elements?

    - the child's name, age, and address;
    - the parents' names and addresses;
    - a record of the diligent search for each missing parent, if any;
    - information needed to determine the child's residence (including the name and location of the reservation, if applicable);
    - the child's and the parents' tribal affiliation(s);
    - a record of the efforts made to transfer the proceeding to a tribal court;
    - the facts leading to the child's removal from his home; and
    - a specification of the reasonable efforts made to provide remedial and rehabilitative services to the parent(s) in order to prevent removal.

2.  Has the court served notice of the suit on the parents and the Indian tribe? The notice must include

    - the child's name;

**TX 0020**

- the child's date of birth;
- the child's place of birth;
- the names of the child's parents, the dates and places of their births, and the mother's maiden name;
- a copy of the petition;
- the name of the petitioner and his attorney;
- a notice of the right to intervene;
- a notice of the right to appointed counsel;
- a notice of the right to request 20 additional days to answer or prepare for the suit;
- a notice of the right to transfer the suit to tribal court;
- the number or name, the mailing address, and the phone number of the court;
- a notice of the potential consequences to the parents' rights; and
- a notice of the confidential nature of the proceeding.

3.   Have staff verified the child's status with the tribe? If the tribe is unknown, have staff sent notice of the suit by registered mail with return receipt requested to the following address?

   Anadarko Area Director,
   Bureau of Indian Affairs,
   P.O. Box 368,
   Anadarko, Oklahoma 73005

4.   Have all notices of the suit and all responses (if any) from the parents, the tribe, or the Bureau of Indian Affairs been filed with the court?

5.   Have the parents hired an attorney? If not, has one been appointed for them?

6.   Have staff made a diligent effort to find a suitable placement according to the orders of preference specified in Appendix 1226A?

7   If the orders of preference specified in Appendix 1226A have not been followed, has good cause to the contrary been shown as specified in the same appendix?

8.   Have staff kept a written record of the placement decision in order to document their efforts to observe the orders of preference specified in Appendix I/1226A?

9.   Have staff ensured that the Indian child is enrolled in his tribe before referring him for adoption?

| <<Previous Page | Next Page>> |
|---|---|

TX 0021

# EXHIBIT 2

TX 0022

# INDIAN CHILD WELFARE ACT CHECKLIST

**EVERY CHILD AND FAMILY**

❑   Assess possible Indian child status during initial investigation.

❑   Update information on possible Indian child status as additional family members are located and at regular intervals.

**REASON TO BELIEVE OR CONFIRMED INDIAN CHILD STATUS**

❑   Contact agency lawyer regarding possible ICWA case and consult regularly throughout case.

❑   If Indian child status known prior to removal, insert  required ICWA information in affidavit.

❑   Verify any foster or adoptive placement follows statutory preferences unless tribe alters preferences or court finds good cause not to.

❑   *Optional*: Send membership query letter to each identified tribe.

❑   Send *Notice of Pending Custody Proceeding Involving Indian Child* to:
   - each identified parent (Indian or non-Indian);
   - any Indian custodian;
   - each identified tribe;
   - Secretary of Interior; and
   - Bureau of Indian Affairs (Area Director).

❑   If any parent, custodian or tribe is unknown or can't be located send
   *Notice: Parent, Custodian or Tribe of Child Cannot be Identified or Located* to:
   - the Secretary of Interior; and
   - Bureau of Indian Affairs (Area Director).

❑   If there is no response to the formal notice from the tribe, follow up by telephone/fax.

❑   File notice(s) with proof of service with the court.

❑   Make active efforts to preserve Indian family.  Confer with tribal social workers and use ICWA Resources Guide to identify appropriate services. Document services provided.

❑   If relinquishment is anticipated consult agency attorney regarding ICWA requirements for in court procedure.

Date: _____

Worker:_____

Supervisor: _____

Form 1706
**TX 0023**

# EXHIBIT 3

TX 0024

| | INDIANA DEPARTMENT OF CHILD SERVICES CHILD WELFARE MANUAL | |
|---|---|---|
| **INDIANA** DEPARTMENT OF **CHILD** SERVICES | **Chapter 2:** Administration of Child Welfare | **Effective Date:** December 1, 2016 |
| | **Section 12:** Indian Child Welfare Act (ICWA) | **Version:** 6 |

## POLICY [REVISED]

The Indiana Department of Child Services (DCS) shall take measures to ensure that any child who is a member of a federally recognized Indian tribe is afforded all rights under the Indian Child Welfare Act (ICWA).

DCS will begin utilizing **active efforts**[1] immediately upon learning of the possible removal, formal or informal involvement with an Indian child.  DCS will make ongoing efforts to determine if a child is a member of an Indian tribe or eligible for membership in an Indian tribe.  Active efforts will continue throughout DCS involvement with the child(ren) and family.  DCS will comply with all rules, regulations, and laws governing ICWA and make an active effort to not only identify those children and families subject to the Act, but apply active efforts when developing interventions, providing service, engaging communication and all aspects of DCS involvement.

DCS will notify the child's parents, Indian custodian, and Indian tribe, whenever there is an action pending regarding parental rights involving a child who is, or is believed to be, a member or eligible for membership in an Indian tribe.  DCS will also send a copy of the notice to the appropriate Area Director of the Bureau of Indian Affairs (BIA) and to the United States (U.S.) Secretary of Interior.  If DCS is unable to identify or locate the parent, Indian custodian, or the Indian tribe, DCS will send the ICWA notification to the appropriate Area Director of the BIA for assistance and the U.S. Secretary of Interior. See www.bia.gov for further information.

DCS will provide notification of each and every court proceeding to the child's parents, Indian custodian, and Indian tribe.  All notices will be sent by certified mail, return receipt requested, and DCS will not make a foster care placement or hold a Termination of Parental Rights (TPR) proceeding until at least **10 days** after receipt of notice by the parent, Indian custodian, and the tribe or the U.S. Secretary of Interior.  The parent, Indian custodian and the tribe may, upon request, be granted up to **20 additional days** to prepare for the proceeding.

If there is imminent risk of physical harm, DCS may detain an Indian child in order to prevent imminent physical damage or harm to the child but must provide the notifications addressed

---

[1] '**Active efforts**' are intended primarily to maintain and reunite an Indian child with his or her family or tribal community and constitute more than reasonable efforts as required by Title IV-E of the Social Security Act (42 U.S.C. 671(a)(15)).  **Active efforts** are:  affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family.  **Active efforts** must be documented in detail in the child's record.  **Active efforts** Quick Reference Sheet can be located at http://www.bia.gov/cs/groups/xois/documents/document/idc2-041405.pdf

above.  This emergency removal only exists if the child is in imminent danger, and is not to be applied when the situation is only in need of services for improvement (e.g., the family has little to no food in their home, which could be remedied by actively taking them to the food pantry). Once the emergency no longer exists and the child is no longer at risk of imminent physical harm, the child must be returned home.  This temporary custody timeframe without a hearing shall only last 30 days.  The emergency removal process does not authorize DCS to remove a child from a reservation where a tribe exercises exclusive jurisdiction.

Preference for placement of an Indian child must be given in the following order to:
1. A member of the child's extended family;
2. A foster home licensed, approved, or specified by the Indian child's tribe;
3. An Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
4. An institution for children approved by an Indian tribe or operated by an Indian organization, which has a program suitable to meet the Indian child's needs.

   **[NEW] Note**: Foster care placement may not be ordered in proceedings involving an ICWA child in the absence of a determination, supported by clear and convincing evidence, **(including testimony of qualified expert witnesses)** that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

DCS will follow established procedures for the transfer of responsibility for the placement and care of a child to a Tribal Title IV-E agency or Indian Tribe with a Title IV-E agreement. See Tool 2.A Procedure for Transfer of a Child to a Tribe or Tribal Agency.

Applicability of ICWA depends upon whether the proceedings in question (Child in Need of Services [CHINS], Detention, TPR, etc.) involve an "Indian child" within the definition utilized in 25 U.S.C. §1903(4).  To promote early identification of ICWA applicability and to ensure compliance with ICWA requirements, DCS shall make ongoing efforts to determine whether ICWA procedures may apply to the case by inquiring whether there is a reason to believe the child is an Indian child:
1. Prior to any initial removal from the parents;
2. At any detention hearing;
3. Prior to any change in foster care placement;
4. Prior to any adoptive placement;
5. At review hearings and at permanency hearings; and
6. Prior to the filing of any TPR petition.

In the event that a tribe does not formally intervene in a DCS case, DCS is still subject to the provisions of ICWA.  The tribe has the right to intervene at any time during the course of DCS involvement.

**[REVISED]**  Code Reference
1. 25 U.S.C. §1903(4): Indian Child Welfare Definitions
2. 25 U.S.C. §1911: Indian tribe jurisdiction over Indian child proceedings
3. 25 U.S.C. § 1912 (e): Pending Court Proceedings
4. 25 U.S.C. §1913: Parental rights; voluntary termination

5. 25 U.S.C. §1915: Placement of Indian children
6. 25 U.S.C. §1916: Return of custody
7. 25 U.S.C. §1922: Emergency removal or placement of child; termination; appropriate action
8. 25 C.F.R. §23.2:  Definitions
9. 25 C.F.R. §23.11:  Notice
10. 25 C.F.R. §23:  ICWA Proceedings (Final Rule)

---

**PROCEDURE [REVISED]**

---

The Family Case Manager (FCM) will:
1. Engage the child (if age appropriate) and family, during the initial contact, to assist in determining if the child and/or family are of Indian heritage or if the child is eligible for membership in an Indian tribe;
2. Engage the family to obtain information regarding the tribe if the parent or Indian custodian indicates he or she is a member of an Indian tribe or the child is eligible for membership, and complete the Indian Status Identification Form and genogram if the child is involved in any current legal actions;
3. **[NEW]** Document the tribal identity of the child in Management Gateway for Indiana's Kids (MaGIK), by selecting the Indian Tribe(s) from the list;
4. **[NEW]** Complete the required verification of  tribal membership or eligibility by selecting the type of verification, uploading a copy of the verification and providing the date of verification in MaGIK. If the family does not have verification, select pending verification;
5. Provide the Indian Status Identification Form and genogram to the FCM Supervisor for review and forward to the DCS Local Office Attorney before proceeding with the steps below;
6. **[REVISED]** Document or correct the tribal identity of the child in MaGIK, after tribe confirmation, if verification was pending or the tribal confirmation is different from what was originally reported and complete date of verification;
7. Make a Permanency and Practice Support (PPS) referral in KidTraks to the International and Cultural Affairs (ICA) liaison for state tracking purposes and to assist with any ICWA related questions or concerns; and
8. Continue to review the Indian Status Identification Form with the family throughout the life of the case.

   **Note:** If it is determined the Indian parent or Indian custodian is a member of an Indian tribe and/or the child is eligible for membership, the FCM will complete and/or update a PPS referral in KidTraks for the ICA liaison to reflect membership.

The FCM Supervisor will:
1. Ensure the FCM asks each child and family member if he or she is a member of an Indian tribe or eligible for membership;
2. Ensure the Indian Status Identification Form and genogram are completed prior to forwarding to the Local Office Attorney; and
3. Assist the FCM to ensure adherence to ICWA.

The DCS Local Office Attorney will:
1. Review the Indian Status Identification Form upon receipt to ensure it is complete;

2. Obtain the address for ICWA Designated Tribal Agents for Service of Notice at www.bia.gov/WhoWeAre/BIA/OIS/HumanServices/IndianChildWelfareAct/index.htm

3. Notify the Indian tribe immediately that there is a pending proceeding in Indiana involving an Indian child;

4. Complete and send the ICWA Notification (a template can be found on Quest) by certified mail, with return receipt requested, to the Indian child's parents or custodian and the tribe;

5. Send **copies** of the notification, via mail, to the Midwest Regional Director and the U.S. Secretary of the Interior;

U.S. Department of Interior
Bureau of Indian Affairs
Midwest Regional Director
ATTN: ICWA
Norman Pointe II Building
5600 W. American Blvd., Suite 500
Bloomington, MN 55437

U.S. Department of Interior
U.S. Secretary of Interior
Indian Services
1849 C Street, N.W., MS 4513-MIB
Washington DC, 20240

**Note:** If contact information cannot be found for the child's parent, Indian custodian, or Indian tribe, and there is reason to believe the child is an Indian child, the ICWA Notification must be sent certified mail, with return receipt requested, to the Midwest Regional Director of the Bureau of Indian Affairs. The BIA will not make a determination of tribal membership, but may be able to identify tribes for DCS to contact. The U.S. Secretary of the Interior has **15 days** after receipt to provide the required notice to the parent or Indian custodian and the tribe. Any hearings regarding placement, including prospective placement, may not be held until **10 days** after the latest receipt by the parent, custodian, tribe, Midwest Regional Director of the Bureau of Indian Affairs, and the U.S. Secretary of Interior.

6. Notify the FCM of the child's tribal eligibility following confirmation from the Indian tribe; and

7. Notify, in writing, all tribes which received notice of the child custody proceeding once an Indian tribe has been designated as the child's Indian tribe. File a copy of that document with the court and send to each party to the proceeding and each person or governmental agency that received notice of the proceeding. Notices should also be sent in voluntary proceedings.

---

**PRACTICE GUIDANCE**

---

The FCM should engage every child (if age appropriate) and/or family in a discussion to determine if the child and/or family are of Indian heritage or if the child is eligible for membership in an Indian tribe. The BIA provides guidelines for State Courts and Child Welfare Agencies when implementing ICWA. These guidelines are found in the Federal Register/Vol. 80, No. 37/ Wednesday, February 25, 2015/Notices, and the guidelines suggest that DCS should ask, in every child custody proceeding, "Is this child an Indian child?". Even if the child is not an enrolled member, DCS should also ask, "Is this child eligible for membership?". Whether or not a child is an Indian child, for purposes of ICWA, must be determined by the tribe of

membership and federal law, and is not an arbitrary label assigned at the discretion of the parent.  The tribe alone retains the responsibility to determine tribal membership.  An Indian child does not have to be enrolled to be considered a member.  See www.bia.gov for further information.

If any questions arise, contact the Midwest Regional Office for assistance:

U.S. Department of Interior
Bureau of Indian Affairs
Midwest Regional Office
Norman Pointe II Building
5600 W. American Blvd., Suite 500
Bloomington, MN 55437
Telephone: (612) 713-4400
              (612) 725-4500
Fax:        (612) 713-4401

Regional Director                          Regional Social Worker
Phone: (612) 725-4502                  Phone: (612) 725-4571
Fax: (612) 713-4401                       Fax: (612) 713-4439

### International and Cultural Affairs (ICA) Resources
ICA information is available on the Permanency and Practice Support Sharepoint.  This information includes several helpful documents and information regarding all services provided by ICA.  The Permanency and Practice Support SharePoint serves as a resource for FCMs and other DCS staff seeking information to help improve services to multicultural populations and families (e.g., immigrant; tribal; sensory-impaired; Lesbian, Gay, Bi-Sexual, Transgender, Questioning [LGBTQ];  and members of the military) by honoring the diversity of cultures and perspectives constituting the Indiana child welfare population.   An email inbox is available to obtain guidance from an ICA liaison (Internationalandculturalaffairs@dcs.in.gov).

FORMS [REVISED]

1. ICWA Notification – Legal document
2. Indian Status Identification Form
3. Notice to Relatives (SF55211)
4. Tool 2.A Procedure for Transfer of a Child to a Tribe or Tribal Agency

RELATED INFORMATION

### Indian Child Welfare Act (ICWA)
The Indian Child Welfare Act of 1978 was initially enacted by Congress to ensure that agencies meet the cultural needs of Indian children and to protect the continued existence and integrity of Indian tribes.  ICWA provides heightened protection for Indian families, and it gives the Indian child's parents or custodian and the tribe, the right to intervene or request transfer to their tribal court of any state proceedings involving an Indian child.

**Pokagon Band of Potawatomi Indians**

The Pokagon Band of Potawatomi Indians are a federally-recognized tribe. Six (6) northern counties in Indiana are home to some of the Pokagon members, although the Pokagon Band of Potawatomi Indians headquarters remains in Michigan.  If a case involving an Indian child, identifying as a member of the Pokagon Band of Potawatomi Indians, comes to the attention of DCS, contact the Pokagon Band at the address below to verify the child's eligibility for tribal membership:

> Pokagon Band of the Potawatomi Indians
> Social Services Director
> 58620 Sink Road
> Dowagiac, MI 49047
> Phone: (269) 462-4277
> Fax: (269) 782-4295
> Mark.Pompey@pokagonband-nsn.gov

**Indian Tribe Membership and Eligibility**

If the child is a member of a tribe or eligible for membership in a tribe, the family, the Indian custodian, and the tribe have rights under ICWA.  These rights apply to any child protection action, adoption, guardianship, TPR, runaway, or truancy matter regarding the involvement and/or placement of an Indian child (e.g., foster care placements, prospective adoptive placements, adoptive placements, both voluntary and involuntary placements, transfers of placement, and placements due to failed adoptions).  Below are definitions that apply to cases involving a child who is a member of a tribe or eligible for membership in a tribe:

1. "Foster care placement" is any action removing a child from his or her parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, although parental rights have not been terminated**;**
2. "Termination of parental rights"  is any action resulting in the termination of the parent-child relationship;
3. "Preadoptive placement" is the temporary placement of an Indian child in a foster home or institution after TPR, but prior to or in lieu of adoptive placement;
4. "Adoptive placement" is the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption;
5. "Indian Child" is any unmarried person who is under age 18 and is either:
   a. A member of an Indian tribe; or
   b. Eligible for membership in an Indian tribe and the biological child of a member of an Indian tribe.

6. "Indian Tribe" is any Indian tribe, band, nation, or other organized group or community of Indians recognized as eligible for the services provided to Indians by the Secretary because of their status as Indians, including any Alaska Native village as defined in 43U.S.C. 1602 (c).  In the case of an Indian child who is a member or eligible for membership in more than one tribe, the Indian tribe with which the Indian child has more significant contacts will be designated as the child's tribe. See ICWA Guidelines 2015 for further information.

**ICWA Protection for Parents and Indian Custodians**

ICWA provides several protections for parents or Indian custodians of an Indian child.  These protections include the right to revoke voluntary consents to placements and  adoptions at any time prior to a decree of voluntary termination or adoption, whichever occurs later.  If a consent is withdrawn, the Indian child shall, with court approval, be immediately returned to the parent or Indian custodian.  After a final Decree of Adoption is entered, based on a voluntary consent, the parent may petition the court to vacate the adoption decree based on fraud or duress.  Upon a finding that consent was obtained through fraud or duress, the court shall vacate the adoption decree and return the child to the parent.  However, no adoption in effect for at least two (2) years may be challenged on this basis.  A consent given prior to or within 10 days after the birth of the Indian child is not valid.

If a final Decree of Adoption is ever vacated, set aside, or the adoptive parents voluntarily consent to termination of their parental rights, the Indian child shall be returned to the biological parent or prior Indian custodian unless the court determines returning the child is not in the best interests of the child.

# EXHIBIT 4

TX 0032

| | |
|---|---|
| **Agency Name** | Office of Community Services (OCS) |
| **Chapter No./Name** | 6. Foster Care |
| **Part No./Name** | 2.  Working With the Child's Family |
| **Section No./Name** | Working With the Child's Family |
| **Document No./Name** | 6-240 Working with Native American Families |
| **Effective Date** | May 1, 2015 |

## I.        STATEMENT OF POLICY

It is the policy of the Department of Children and Family Services to follow Indian Child Welfare Act (ICWA) legislation. *** * ICWA seeks to "protect the best interests of Indian children and to promote the stability and security of Indian tribes and families" (25 U.S.C. 1902).  ICWA applies to all children where the Department or state courts have reason to believe the child is an Indian child of a federally recognized tribe.  The Department and state courts must treat the child as an Indian child, unless and until it is determined the child is not a member or is not eligible for membership in an Indian tribe.  The tribe alone is responsible for determining tribal membership. **

DCFS is the state's designated Title IV-E agency.  DCFS is required to negotiate with federally recognized Indian tribes that request to develop an agreement with the state to administer all or part of the Title IV-E program on behalf of Indian children who are under authority of the tribe.

Procedures for the transfer and care responsibility of a child from a state to a tribal court are outlined below.  All transfer procedures developed for a tribe are to be established and maintained in consultation with that tribe.  This applies to federally recognized tribes throughout the United States, not just within the State of Louisiana.

## II.       PROCEDURES

* ICWA guidelines require a minimum of "active efforts" to reunite an Indian child with his or her family or tribal community.  Active efforts constitute more than reasonable efforts as required by Title IV-E of the Social Security Act (42 USC 671(a)(15)).  ASFA's exceptions to reunification and LA Ch. Code Art 672.1 do not apply to ICWA proceedings.  Active efforts include the following:

- Engaging the Indian child, the Indian child's parents, the Indian child's extended family members, and the Indian child's custodian(s);
- Taking steps necessary to keep siblings together;
- Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;
- Identifying, notifying, and inviting representatives of the Indian child's tribe to participate;
- Conducting or causing to be conducted a diligent search for the Indian child's extended family members for assistance and possible placement;
- Taking into account the Indian child's tribe's prevailing social and cultural conditions and way of life, and requesting assistance of representatives designated by the Indian child's tribe with substantial knowledge of the prevailing social and cultural standards;
- Offering and employing all available and culturally appropriate family preservation strategies;
- Completing a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;

**TX 0033**

| | |
|---|---|
| **Agency Name** | Office of Community Services (OCS) |
| **Chapter No./Name** | 6. Foster Care |
| **Part No./Name** | 2. Working With the Child's Family |
| **Section No./Name** | Working With the Child's Family |
| **Document No./Name** | 6-240 Working with Native American Families |
| **Effective Date** | May 1, 2015 |

- Notifying and consulting with extended family members of the Indian child to provide family structure and support for the Indian child, to assure cultural connections, and to serve as placement resources for the Indian child;
- Making arrangements to provide family interaction in the most natural setting that can ensure the Indian child's safety during any necessary removal;
- Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or extended family in utilizing and accessing those services;
- Monitoring progress and participation in services;
- Providing consideration of alternative ways of addressing the needs of the Indian child's parents and extended family, if services do not exist or if existing services are not available;
- Supporting regular visits and tribal home visits of the Indian child during any period of removal, consistent with the need to ensure the safety of the child; and,
- Providing post-reunification services and monitoring.

Active efforts must be conducted while investigating whether the child is a member of a tribe, is eligible for membership in a tribe, or whether a biological parent of the child is or is not a member of a tribe. FC case managers shall ask parents, children, other relatives, and collaterals if a child in Department custody is an Indian child. If it is believed a biological parent or a child in foster care is potentially a member of a federally recognized tribe, then the parent, child, and foster caretaker shall be provided with the DCFS CW Form ICWA-1, Rights under ICWA.

State courts must ask if there is reason to believe the child subject to the child custody proceeding is an Indian child by asking each party to the case, including the child's attorney and Department representative, to certify on the record whether they have discovered or know of any information that suggests or indicates the child is an Indian child. If the court does not inquire of the child's Indian status, the FC case manager must ensure documentation is included in the report to the court of the child's Indian status and the responses of all parties asked.

In any foster care placement involving an Indian child, the placement preferences of ICWA and the individual tribe apply. In any foster care placement of an Indian child, the child must be placed in the least restrictive setting that most approximates a family, allows his or her special needs to be met, and is in reasonable proximity to his or her home, extended family, and/or siblings. Preference must be given to placement of the child in the following order:

- A member of the Indian child's extended family;
- A foster home, licensed, approved, or specified by the Indian child's tribe, whether on or off a reservation;
- An Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

**TX 0034**

| | |
|---|---|
| **Agency Name** | Office of Community Services (OCS) |
| **Chapter No./Name** | 6. Foster Care |
| **Part No./Name** | 2.  Working With the Child's Family |
| **Section No./Name** | Working With the Child's Family |
| **Document No./Name** | 6-240 Working with Native American Families |
| **Effective Date** | May 1, 2015 |

● An institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the child's needs.

If the Department determines any of the preferences cannot be met, the Department must demonstrate through clear and convincing evidence that a diligent search has been conducted to seek out and identify placement options that would satisfy the placement preferences and why the preferences could not be met.  Any placement of an Indian child in foster care must be willing to support the child's connections to the tribe and participate in tribal events.

If parental rights are terminated for any reason and an Indian child is freed for adoption, the foster caretaker must be informed that adoption by the caretaker can only proceed with the agreement of the tribe.  The FC case manager shall inform the foster caretaker of this fact at placement of the child. **

**A.    PROCEDURES WHEN CHILD IS IDENTIFIED AS NATIVE AMERICAN AND IDENTITY AND/OR LOCATION OF TRIBE AND/OR PARENTS IS KNOWN**

In any involuntary proceeding in a state court where the court or * Department knows or has reason to know that an Indian child from or eligible for membership in a federally recognized tribe is involved, and where the identity and location of the child's Indian parents or custodians or tribe is known, the Department shall directly notify the Indian parents, Indian custodians, and the child's tribe by certified mail with return receipt requested, of the pending proceedings and of their right of intervention.  Personal service or other types of notification may be in addition to, but not in lieu of, notice by certified mail with return receipt requested. ** Notice shall include requisite information from the ICWA legislation, which is as follows:

(1)    Name of the Indian child, the child's birthdate and birthplace;
(2)    Name of Indian tribe(s) in which the child is enrolled or may be eligible for enrollment;
(3)    All names known, and current and former addresses of the Indian child's biological mother,  biological father, maternal and paternal grandparents and great grandparents or Indian custodians, including maiden, married and former names or aliases; birthdates; places of birth and death; tribal enrollment numbers, and/or other identifying information;
(4)    A copy of the petition, complaint or other document by which the proceeding was initiated;
(5)    A statement of the absolute right of the biological Indian parents, the child's Indian custodians and the child's tribe to intervene in the proceedings * at any time;
(6)    A statement indicating ** if the Indian parent(s) or Indian custodian(s) is (are) unable to afford counsel, and where a state court determines indigence, counsel will be appointed to represent the Indian parent or Indian custodian where authorized by state law;

**TX 0035**

| | | |
|---|---|---|
| **Agency Name** | Office of Community Services (OCS) | |
| **Chapter No./Name** | 6. Foster Care | |
| **Part No./Name** | 2.  Working With the Child's Family | |
| **Section No./Name** | Working With the Child's Family | |
| **Document No./Name** | 6-240 Working with Native American Families | |
| **Effective Date** | May 1, 2015 | |

(7)   A statement of the right of the Indian parent, Indian custodians and the child's tribe to be granted, upon request, up to 20 additional days to prepare for the proceedings;

(8)   The location, mailing address, and telephone number of the court and all parties notified pursuant to this section;

(9)   A statement of the right of the Indian parents, Indian custodians, and the child's tribe to  petition the court for transfer of the proceedings to the child's tribal court pursuant to 25 U.S.C. 1911, absent objection by either parent, provided that such transfer shall be subject to declination by the tribal court of said tribe;

(10)  A statement of the potential legal consequences of the proceedings on the future custodial and parental rights of the Indian parents or Indian custodians; * and **

(11)  A statement that, since child custody proceedings are conducted on a confidential basis, all parties notified shall keep confidential the information contained in the notice concerning the particular proceeding.  The notices shall not be handled by anyone not needing the information contained in the notices in order to exercise the tribe's rights under ICWA.

Copies of these notices to the tribes shall be sent to the United States Secretary of the Interior and the appropriate federal Area Director.

- o   The current United States Secretary of the Interior may be identified and contacted at: http://www.doi.gov/public/contact-us.cfm; Mailing Address – Department of the Interior, 1849 C Street N.W., Washington DC 20240; Phone – (202) 208-3100.
- o   For Louisiana, the federal * Regional Director would be Eastern Region Director, Bureau of Indian Affairs, 545 Marriott Drive, Suite 700, Nashville, TN 37214.
- o   Additional contact information for other states is located in Foster Care Policy, Appendix A, ICWA. **

## B.   PROCEDURES WHEN CHILD IS IDENTIFIED AS NATIVE AMERICAN BUT IDENTITY OR LOCATION OF TRIBE AND PARENTS IS UNKNOWN

If the identity or location of the Indian parents, Indian custodians, or the child's tribe cannot be determined, notice of the pendency of any involuntary child custody proceeding involving an Indian child in a state court shall be sent by certified mail with return receipt requested to the appropriate federal * Regional ** Director (see contact information above).

Notice to the appropriate federal * Regional ** Director may be sent by certified mail with return receipt requested or by personal service and shall include the following information, if known:

(1)   The same information noted above in Section A, Parts 1-11; and,

(2)   A request for the United States Secretary of the Interior or designee to make reasonable documented efforts to locate and notify the child's tribe and the child's Indian parents or Indian custodians within 15 days, after receipt of the notice from

| | |
|---|---|
| **Agency Name** | Office of Community Services (OCS) |
| **Chapter No./Name** | 6. Foster Care |
| **Part No./Name** | 2.  Working With the Child's Family |
| **Section No./Name** | Working With the Child's Family |
| **Document No./Name** | 6-240 Working with Native American Families |
| **Effective Date** | May 1, 2015 |

the persons initiating the proceedings, to notify the child's tribe and Indian parents or Indian custodians and send a copy of the notice to state court.

## C.   TRANSFER OF NATIVE AMERICAN CHILD TO FEDERALLY RECOGNIZED TRIBAL AGENCY

1. Contact the designated tribal agent for service of legal notices within the tribe to which the child is a member or eligible for membership by phone and by certified mail.  To determine the status of a tribe as *** federally recognized and obtain contact information for the tribe, go to http://www.usa.gov/Government/Tribal-Sites/C.shtml.  Refer to the Federal register at: https://www.federalregister.gov/articles/2012/08/01/2012-18594/indian-child-welfare-act-designated-tribal-agents-for-service-of-notice to determine the designated tribal agent for service of legal notices.  The contact with the designated tribal agent for service of legal notices within the tribe should be initiated within 24 hours of the child entering foster care and/or the * Department becoming aware of a child's membership or eligibility for membership in a federally recognized tribe.  The decision to transfer custody or court transfer procedures between the state and tribal court may occur at any stage of the proceeding and at ** discretion of the tribe.  When a federally recognized tribe is notified *** an Indian child is in DCFS custody, the tribe may request the case be transferred to a tribal court.  If the parent or Indian custodian requests transfer of the case to a tribal court, the DCFS case manager:

- Confers with the Regional * BGC Attorney; and
- Asks the parents whether either will oppose transfer of the case and reports this information to the state court responsible for the child welfare ** case.

   - If the next hearing in the case is coming up within the next 10 working days, report to the court through the attorney representing the * Department ** and through testimony during the hearing;
   - If the next hearing in the case is more than 10 working days, but within the next 30 days, report to the court through the court report and by bringing the issue to the attention of the attorney representing the * Department ** as well as being prepared to provide information through testimony during the hearing;
   - If the next hearing in the case is not due for more than 30 days, submit a special report to the court within 5 working days of acquiring knowledge of the child's membership in or eligibility for membership in a federally recognized tribe, and bring the issue to the attention of the attorney representing the * Department ** as well as being prepared to provide information through testimony during the hearing.

If a case is transferred by state court at the request of the family, tribe, or * Department, ** the tribal court has the authority to accept or decline transfer.  These details should be worked out with the tribe prior to pursuing transfer of the case with the state court to ensure expeditious, successful case transfer.

**TX 0037**

| | | |
|---|---|---|
| **Agency Name** | Office of Community Services (OCS) | |
| **Chapter No./Name** | 6. Foster Care | |
| **Part No./Name** | 2.  Working With the Child's Family | |
| **Section No./Name** | Working With the Child's Family | |
| **Document No./Name** | 6-240 Working with Native American Families | |
| **Effective Date** | May 1, 2015 | |

2. DCFS will notify IV-E eligibility worker via FAST III as soon as child's tribal membership/eligibility is identified.  Tribal membership/eligibility shall not impact the child's eligibility for receipt of services or payments under Title IV-E, Title XIX, or other federal funds.

3. DCFS must determine Title IV-E eligibility at time of transfer of custody if eligibility has not already been determined.

4. At transfer of custody and in accordance with the regulations guiding these funding streams, DCFS will provide all essential documentation and information to the tribal agency for the child to continue Title IV-E and Title XIX eligibility, including, but not limited to:

- All judicial determinations to the effect continuation in the home from which the child was removed would be contrary to the welfare of the child and reasonable efforts described in section 471(a)(15) of the Act have been made (instanter order, affidavit in support of instanter order, and any other subsequent court orders);
- Other documentation the state agency has related to the child's Title IV-E eligibility under sections 472 and 473 of the Act (FAST I, FAST V, birth certificate, social security card);
- Information and documentation available to the * Department regarding the child's eligibility or potential eligibility for other federal ** benefits (SSI-1);
- The case plan developed pursuant to section 475(1) of the Act, including health and education records of the child pursuant to section 475(1)(C) of the Act (Case Plan and Assessment of Family Functioning in FATS); and
- Information and documentation of the child's placement settings (Form 001 B Foster Care Record Face Sheet), including a copy of the most recent provider's certification document or approval (TIPS/LARE 357A, initial certification letter, re-certification approval letter).

In order for the child to remain Title IV-E eligible under tribal authority, the tribe must have a IV-E agreement or place with a state Title IV-E agency or must be a tribe operating as a IV-E agency.  If the child *** is eligible for IV-E funding, the DCFS case manager coordinates with the eligibility worker and the tribal case manager to ensure coverage continues during the transition.  If the child *** is not IV-E eligible, or the tribe does not have a IV-E agreement or is not operating as a IV-E agency, the DCFS case manager coordinates with the tribal case manager to continue any other benefits for which the child *** may be eligible.

In all cases, the DCFS case manager continues to provide services to the child and family until the tribe confirms in writing that the case has been accepted by the tribal court.  At that time, the DCFS case can be dismissed.

## D.   CONTINUED WORK WITH NATIVE AMERICAN FAMILIES

When a Native American tribe declines to accept jurisdiction of a child welfare case, the

| | | |
|---|---|---|
| **Agency Name** | Office of Community Services (OCS) | |
| **Chapter No./Name** | 6. Foster Care | |
| **Part No./Name** | 2.  Working With the Child's Family | |
| **Section No./Name** | Working With the Child's Family | |
| **Document No./Name** | 6-240 Working with Native American Families | |
| **Effective Date** | May 1, 2015 | |

\* Department completes case planning with the family (6-800 Case Planning Process).  The tribal agent is notified of all \*\* risk and safety assessments, staffings, case planning meetings, court hearings, placements, and runaway episodes.  The tribal agency is invited to and encouraged to provide input into all case planning meetings, including updates or revisions to the case plan.  A copy of the case plan is provided to the tribe when they are involved with a family.  Approval by the tribe is sought on every placement change decision.

If a tribal agency is not present during a staffing, case planning meeting, or court hearing, the \* Department documents efforts to involve the tribe and the response of the tribe to those efforts.  Afterward, the Department informs the tribe of decisions made during the events, including case closure (6-630 Closure of the Foster Care Case).  When a case with tribal involvement is closed, documentation that the tribe was notified of the case closure is made in the closing narrative and case notes. \*\*

\* When an Indian child's child welfare court proceedings remain in State court, either the attorney for the Department or the child shall address the child's ICWA status during every child custody proceeding.

In the event a child is eligible for membership in a tribe, but is not yet a member, the Department should take the steps necessary to obtain membership for the child in the tribe. \*\*

## III.  FORMS AND INSTRUCTIONS

FAST I Form
FAST III Form
FAST V Form
FC Assessment of Family Functioning (AFF) – in the Family Assessment Tracking System (FATS)
FC Case Plan – in the Family Assessment Tracking System (FATS)
CW Form 001 B, Foster Care Record Face Sheet
\* CW Form ICWA-1, Rights under ICWA \*\*
SSI-1, SSI screening form
Court documents
TIPS/LARE 357A
Initial Certification Letter
Re-Certification Approval Letter

## IV.  REFERENCES

DCFS CW Policy Chapter 6, Appendix A \* ICWA \*\*
DCFS CW Policy 6-630 Closure of the Foster Care Case
DCFS CW Policy 6-800 Case Planning Process
\* LA Children's Code Article 672.1 \*\*
Social Security Act, Section 471(a) (15)

| | |
|---|---|
| **Agency Name** | Office of Community Services (OCS) |
| **Chapter No./Name** | 6. Foster Care |
| **Part No./Name** | 2.  Working With the Child's Family |
| **Section No./Name** | Working With the Child's Family |
| **Document No./Name** | 6-240 Working with Native American Families |
| **Effective Date** | May 1, 2015 |

Social Security Act, Section 472
Social Security Act, Section 473
Social Security Act, Section 475(1)
Social Security Act, Section 475(1) (C)
ICWA legislation
* 25 U.S.C. 1902 **
25 U.S.C. 1911

TX 0040

# EXHIBIT 5

TX 0041

| Agency Name | Office of Community Services (OCS) |
|---|---|
| Chapter No./Name | 8. Adoption |
| Part No./Name | 4. Adoptive Placement Process |
| Section No./Name | Adoptive Placement Process |
| Document No./Name | 8-440 Services to Native American Children-Indian Child Welfare Act Provisions |
| Effective Date | November 15, 2014 |

## I.    STATEMENT OF POLICY

Native American children in the child welfare system are protected by the federal Indian Child Welfare Act (ICWA) of 1978 (PL-95-608), as well as the 1994 Indian Self Determination Act (ISDA).  Passage of the ISDA further strengthened the individual rights of Indian tribes including allowing them to choose how they wish to implement the provisions of ICWA.  These Acts supercede Louisiana state law when they are invoked in proceedings involving an Indian child.  The ICWA affects all placements of Indian children including changes or possible changes in placement of Indian children under * DCFS ** authority.  Furthermore, the individual laws of a particular tribe, when established in writing, supercede the requirements of ICWA when such tribal provisions are more stringent.

## II.    PROCEDURES

Once * DCFS ** becomes involved with an Indian child, it will be necessary to maintain on-going contact with the child's tribe throughout the * Department's ** involvement with the case as each tribe may elect to handle ICWA differently.  Because such cases occur relatively infrequently and the provisions of ICWA are not widely known, any case involving adoption of an Indian child shall be referred to the Foster Care Unit in State Office before the placement process is initiated.

The State Office Foster Care Unit shall be notified via a memorandum from the * Child Welfare Manager ** when a Native American child is placed in * DCFS ** custody.  In cases where parents choose to voluntarily surrender a child for placement in * DCFS ** custody, the assigned * DCFS ** worker shall complete a * DCFS CW ** Form 65 prior to placement of the child in temporary foster care in order to ensure that all pertinent regulations are applied. (For foster care placement of an Indian child, the worker uses an amended version of the * DCFS CW ** Form 65; See Section * F. ** below).

The ICWA requirements for Indian foster children are contained in * Child Welfare Policy ** Chapter 6 Foster Care manual policy, Appendix A. *** The policy which follows is specific to Indian children available for adoption and in either pre-adoptive placement or adoptive placement.  Refer to Appendix A *** for additional ICWA requirements as all children available for adoption who are in state custody are *** foster children until they are released by the court.  Since ICWA does not cover all adoption procedures, where it is silent, the Louisiana Children's Code shall be followed. (Refer to * Chapter 6, ** Section 6-1400 *** for information concerning requirements for surrenders according to the Louisiana Children's Code).  The ICWA takes precedence where it conflicts with Louisiana law.  The Children's Code applies when it affords a higher standard of protection of the rights of the parents or Indian custodian ***.

**TX 0042**

| | | |
|---|---|---|
| **LOUISIANA DSS** Department of Social Services | **Agency Name** | Office of Community Services (OCS) |
| | **Chapter No./Name** | 8. Adoption |
| | **Part No./Name** | 4. Adoptive Placement Process |
| | **Section No./Name** | Adoptive Placement Process |
| | **Document No./Name** | 8-440 Services to Native American Children-Indian Child Welfare Act Provisions |
| | **Effective Date** | November 15, 2014 |

## <mark>* A. **</mark> DEFINITIONS

The following definitions should be used as the criteria for helping to identify children to whom the ICWA statute applies:

INDIAN means any person who is a member of an Indian tribe, or who is an Alaskan Native and a member of a Regional Corporation as defined in USC section 1606 of Title 43. The tribe will determine who meets its membership definitions.

INDIAN CHILD means any unmarried person who is under age eighteen and is either a member of an Indian tribe or is eligible for membership in an Indian tribe and is the biological child of a member.

Guidance in determining a child's eligibility for tribal membership may be sought from the Bureau of Indian Affairs (BIA) Eastern Area Director whose address and phone listing are provided on the following page.

Native American is used interchangeably with Indian within this policy.

The following is a listing of definitions of ICWA terms pertaining to pre-adoptive and adoptive placement procedures:

Adoptive Placement: the permanent placement of an Indian child for adoption, including any action which results in a final decree of adoption. Such action includes voluntary relinquishment of a parent's rights.

Pre-adoptive Placement: the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement.

This definition includes, but is not limited to the following:

Placement in a foster home prior to the selection of an adoptive family;

Placement in a foster home which is to become the adoptive home when the child is legally made available for adoption; and,

Any other foster home placement for a child who is legally available for adoption including children in Alternative Permanent Living Arrangements.

Termination of Parental Rights: any action resulting in the termination of the parent-child relationship. This includes surrenders (voluntary termination of parental rights) and involuntary termination of parental rights hearings.

**TX 0043**

| | | |
|---|---|---|
| **Agency Name** | Office of Community Services (OCS) | |
| **Chapter No./Name** | 8. Adoption | |
| **Part No./Name** | 4. Adoptive Placement Process | |
| **Section No./Name** | Adoptive Placement Process | |
| **Document No./Name** | 8-440 Services to Native American Children-Indian Child Welfare Act Provisions | |
| **Effective Date** | November 15, 2014 | |

Extended Family Member shall be defined by the law or custom of the child's Indian tribe or, in the absence of such law or custom, shall be a person who has reached the age of eighteen (18), and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent.  The tribe will determine who meets the extended family definition.

The extended family member has rights under the ICWA in the Order of Placement Preference provisions of the Act (See Section * F. **. below).  Informal placement with an extended member of the family is often recognized by the ICWA as placement with an Indian custodian. Documentation shall be made on the * FATS ** of all contacts with the extended family members.

Indian Custodian is any Indian person who has legal custody of an Indian child under tribal law or custom or under State law or to whom temporary physical care, custody, or control has been transferred by the parent of such child.

If the parental rights to the child were previously terminated and the Indian Custodian was given legal guardianship in writing by state, tribal or Federal laws, the Indian Custodian can relinquish that right.  If the biological parent(s)' rights were never terminated, the Indian Custodian does not have the right to terminate the parents' rights.

The Indian custodian also cannot withdraw the parent's consent.  The rights of the biological parents and the Indian Custodian are separate, not one and the same.

Refer to Chapter 6, Appendix A for a complete listing of terms defined by the ICWA.

NOTE: The BUREAU OF INDIAN AFFAIRS which oversees Native American legislation and issues for Louisiana may be reached at the following address:

> Franklin Keel, Regional Director
> Eastern Regional Office
> Bureau of Indian Affairs
> 545 Marriott Dr.  Suite 700
> Nashville, TN 37214
> PHONE: (615) 564-6500

A nationwide address listing of Area Directors is given in Chapter 6. Appendix A. Part 23-ICWA, Sec. 2311.

## * B. ** TRIBES MAINTAINING RESIDENCE IN LOUISIANA

Refer to Appendix A of Chapter 6 for an address and representative listing of the four federally recognized tribes in Louisiana and for the six additional tribes residing in Louisiana which have been officially recognized by the State.  The ICWA provisions apply only to the federally recognized tribes, however the Indian child that is not officially covered by the ICWA should

| | | |
|---|---|---|
| **Agency Name** | Office of Community Services (OCS) | |
| **Chapter No./Name** | 8. Adoption | |
| **Part No./Name** | 4. Adoptive Placement Process | |
| **Section No./Name** | Adoptive Placement Process | |
| **Document No./Name** | 8-440 Services to Native American Children-Indian Child Welfare Act Provisions | |
| **Effective Date** | November 15, 2014 | |

also be able to participate in his culture of origin in the case planning and review process. Efforts shall be made and documented that the ICWA is followed for all Indian children.

The ICWA provisions including the Order of Placement Preference (Refer to Section * G. ** below) must also be followed when an Indian child is a member of, or is eligible for membership in, a tribe located in another state.

## * C. ** JURISDICTION-TRANSFER TO TRIBAL COURT

Refer to Appendix A of Chapter 6, Section 1911, ICWA, Subchapter I. for information concerning the right of the parent or Indian custodian or tribe to request transfer to a tribal court for a foster care placement or termination of parental rights hearing.

Transfer from juvenile court to tribal court is normally not necessary for preadoptive and adoptive placements, as it is presumed that the parental rights have already been terminated. It would be prudent however, to check with the tribe as to its tribal law.

## * D. ** RIGHT TO LEGAL INTERVENTION

The ICWA permits tribal court, parental or custodial intervention at any point in a state court child custody proceeding, including pre-adoptive and adoptive placement proceedings. Intervention, after the child is available for adoption, is primarily to enforce the Order of Placement Preference and to be involved if the child is moved Parents or Indian custodians whose parental rights have been terminated continue to have the right to notice of a hearing even after the child is available for adoption.

ICWA does not require notification to tribes in voluntary placement proceedings; however, some tribes have their own laws governing voluntary placements which require notification. Since individual tribal laws supercede those of ICWA, particularly where they are more stringent, it is prudent to find out from the tribe what provisions it may have for voluntary proceedings.  The tribe always has jurisdiction in a voluntary proceeding if the parent(s) live on the reservation.

## * E. ** SURRENDER PROCEEDINGS

Refer to Chapter 6. Appendix A, Sec. 1913 (a) and (b) of Subchapter I for additional information concerning voluntary proceedings and the ICWA.

1.   **\* DCFS CW ** Form 65 - Agreement between the Department and the Parent or Guardian requesting Foster Care for the Child.**

If * DCFS CW ** Form 65 is used for voluntary foster care placement of an Indian child prior to a surrender so that the counseling sessions required by the Children's Code may be accomplished, the form shall be altered to read that "the child will be returned to the care of the person making this agreement upon request."

**TX 0045**

| | | |
|---|---|---|
| **Agency Name** | Office of Community Services (OCS) | |
| **Chapter No./Name** | 8. Adoption | |
| **Part No./Name** | 4. Adoptive Placement Process | |
| **Section No./Name** | Adoptive Placement Process | |
| **Document No./Name** | 8-440 Services to Native American Children-Indian Child Welfare Act Provisions | |
| **Effective Date** | November 15, 2014 | |

Although the Indian child does not technically come under the ICWA during the time he is in state custody under * DCFS CW ** Form 65,* the assigned worker shall follow the ICWA guidelines and procedures for adoption.

*NOTE:  The child does not technically come under ICWA until: a) the time of the surrender of parental rights OR, b) the time that the Agency determines that the child's safety prohibits his being returned to the parent or custodian.

## 2.      Indian Resolution - Order of Placement Preference

Prior to the surrender, the assigned worker shall immediately check with the tribe to see if the tribe has established by resolution an Order of Placement Preference different from the Order of Placement Preference mandated by ICWA (See Section * G. ** below).  The assigned worker shall call the tribal representative to find out which placement preference to follow. If the tribe has established a different Order of Placement Preference, the placement shall follow the revised order as long as the placement is in the least restrictive setting appropriate to the particular needs of the child.   For the address and telephone listing of all federal and state recognized tribes in Louisiana, refer to Appendix A of Chapter 6 or, contact the Foster Care Unit in State Office.   The address and phone listing of all federally recognized Indian tribes in the United States and their tribal representatives may be accessed through the National Archives and Records Administration, Office of the Federal Register.

## 3.      Specific Surrender Requirements

The assigned worker shall request a hearing in juvenile court to execute the surrender.

Any surrender given prior to, or within ten days after the birth of the Indian child, shall not be valid.

The surrender must be in writing and recorded* before a judge in a court of competent jurisdiction (not a municipal court or a Justice of the Peace), preferably in chambers.

"Recorded" means that the worker is to arrange for the hearing to be either taped or recorded by a court reporter.

Execution of the surrender need not be in open court when confidentiality is requested or indicated.

The judge shall sign a certificate stating that the terms and consequences of the consent were fully explained in detail and were fully understood by the parent or Indian custodian and that either the parent or Indian custodian fully understood the explanation in English, or that it was interpreted into a language that the parent or Indian custodian understood.  This certificate may be in the form of a minute entry or court order as long as the above information is

**TX 0046**

| | Agency Name | Office of Community Services (OCS) |
|---|---|---|
| **LOUISIANA DSS** Department of Social Services | **Chapter No./Name** | 8. Adoption |
| | **Part No./Name** | 4. Adoptive Placement Process |
| | **Section No./Name** | Adoptive Placement Process |
| | **Document No./Name** | 8-440 Services to Native American Children-Indian Child Welfare Act Provisions |
| | **Effective Date** | November 15, 2014 |

contained within the body of the document, and the judge signs and dates it.  It is not necessary to have this certificate witnessed.  The certificate shall be attached to the surrender.

The Secretary of the Interior or his/her designee is responsible for identifying language interpreters when such assistance is requested by the parent or Indian custodian or the court. Further information in this regard is contained in Chapter 6. Appendix A, ICWA- Part 23, Sec. 23.82.

### 4.        Contents of Surrender

The assigned worker shall add to or adjust the * DCFS CW ** Voluntary Act of Surrender Form 445 (445-A) as follows to reflect an Indian surrender:

The name and birth date of the Indian child (the child shall be no less than ten days old);

The name of the Indian tribe and enrollment number, if any, of the child/parent;

The name and address of the consenting parent or Indian custodian;

The name and address of the * DCFS ** assigned worker who arranged for the child to come into * DCFS ** custody and,

The names and addresses of the prospective/current foster/adoptive parents, if known.

### 5.        Withdrawal of Consent (Surrender)

Withdrawal of consent by the surrendering parent may occur either one of two ways:

- ● Prior to issuance of a final decree of adoption, or

- ● Withdrawal due to fraud or duress.

### a.  Withdrawal Prior To Final Decree of Adoption

After the surrender has been executed the parent or Indian custodian may withdraw    consent either verbally or in writing anytime prior to the issuance of an adoption decree.   If the withdrawal is verbal, the assigned worker shall ask the parent or Indian Custodian to complete a written withdrawal which the worker shall file with the court in which the surrender was filed.  If the parent or Indian Custodian does not wish to complete the written document, the worker shall prepare a court report reporting the parent's or Indian Custodian's verbal withdrawal of consent.  If consent to a voluntary surrender is withdrawn, no reason need be stated, no evidence produced, and no hearing conducted.

**TX 0047**

| | |
|---|---|
| **Agency Name** | Office of Community Services (OCS) |
| **Chapter No./Name** | 8. Adoption |
| **Part No./Name** | 4. Adoptive Placement Process |
| **Section No./Name** | Adoptive Placement Process |
| **Document No./Name** | 8-440 Services to Native American Children-Indian Child Welfare Act Provisions |
| **Effective Date** | November 15, 2014 |

Withdrawal of the surrender does not guarantee the parent or Indian custodian the right to have the child returned.  A petition may be filed by OCS in juvenile court for an involuntary proceeding to prevent the return of the child if the child would be in imminent danger of harm if returned to the parent or Indian custodian. Refer to Chapter 6. Appendix A, Subchapter I of ICWA, Sections 12, 13, and 15.

If a petition is not filed, the child shall be returned as soon as practicable to the parent or Indian custodian.

**b.  Withdrawal Due to Fraud or Duress**

If a final decree of adoption of an Indian child has been entered, the parent may withdraw consent by petitioning the juvenile court to vacate the decree on grounds that the voluntary consent was obtained through fraud or duress. Withdrawal of consent by the parent or Indian custodian may occur at any time up to two years after the adoption is finalized if fraud was involved in the original consent to give up parental rights.  No adoption decree of an Indian child that has been in effect for two years may be invalidated.

If the child was made available for adoption through an involuntary termination of parental rights proceeding, no consent was involved, therefore, the parent or Indian Custodian has no right of withdrawal.

**\* F. \*\* PLACEMENT REQUIREMENTS:**

The ICWA states that any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which:

Most approximates a family and in which his special needs, if any, may be met; and,

The child shall be placed within reasonable proximity to his home, taking into account any special needs of the child.

ICWA further states that a preference shall be given, in the absence of good cause to the contrary, to a placement with:

- A member of the Indian child's extended family;

- A foster home licensed, approved, or specified by the Indian child's tribe;

- An Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

- An institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

**TX 0048**

| | |
|---|---|
| **Agency Name** | Office of Community Services (OCS) |
| **Chapter No./Name** | 8. Adoption |
| **Part No./Name** | 4. Adoptive Placement Process |
| **Section No./Name** | Adoptive Placement Process |
| **Document No./Name** | 8-440 Services to Native American Children-Indian Child Welfare Act Provisions |
| **Effective Date** | November 15, 2014 |

## \* G. \*\* ORDER OF PLACEMENT PREFERENCE IN ADOPTIVE PLACEMENTS

In any adoptive placement of an Indian child, a preference shall be given, in the absence of good cause to the contrary, to a placement with:

1. A member of the child's extended family;

2. Other members of the Indian child's tribe; or

3. Other Indian families.

The above placements shall be prioritized in the above order. The preference of the Indian child or parent must be considered.

## \* H. \*\* STANDARDS FOR ADOPTIVE PLACEMENT

Standards to determine whether or not a Native American family is suitable for adoptive placement must be the prevailing social or cultural standards of the parent or extended family's Native American community or the community with which they maintain social and cultural ties. The assigned worker is responsible for exploring all extended family members to determine their interest in adopting the child, or that none are found suitable for adoptive placement. Documentation of these efforts is required by ICWA.  Refer to section \* K. \*\* below for adoption record requirements.

For the procedures to follow if the Indian tribe has established a different Order of Placement Preference by resolution, refer to section \* E. \*\* above.

## \* I. \*\* ANONYMITY REQUESTED BY SURRENDERING PARENT (ICWA, SUBPART G., SECTION 23.71)

The Indian parent has the right to sign an affidavit before the court expressing the desire for anonymity from both the tribe and extended family.  The affidavit for request for anonymity shall be filed with the court of jurisdiction.  Procedures as prescribed in Section 23.71 (a)(2) of ICWA shall also be followed any time the Indian parent(s) have requested their identity remain confidential.  When the Indian parent does not sign an affidavit requesting anonymity, the placement preferences, including extended family members, must be followed.

## \* J. \*\* CHANGE OF PLACEMENT

If an Indian child in a preadoptive placement is to be moved from one placement setting to another, the Order of Placement Preference for foster care and preadoptive placements delineated in \* F. \*\* above, must be followed unless the child is returned to the parent or Indian custodian from whose custody the child was originally removed.

**TX 0049**

| | | |
|---|---|---|
| | **Agency Name** | Office of Community Services (OCS) |
| | **Chapter No./Name** | 8. Adoption |
| | **Part No./Name** | 4. Adoptive Placement Process |
| | **Section No./Name** | Adoptive Placement Process |
| | **Document No./Name** | 8-440 Services to Native American Children-Indian Child Welfare Act Provisions |
| | **Effective Date** | November 15, 2014 |

If the foster family moves with the Indian child to a different residence, this does not have any effect on the placement preference; however, the Indian parent should be notified if the move is to another state.

If an Indian child's final decree of adoption is later vacated or set aside or the adoptive parents voluntarily surrender their parental rights, a biological parent or prior Indian custodian may petition for a return of custody.  If the child is surrendered to * DCFS, ** the assigned worker shall send notice of the dissolution to the parent and/or Indian Custodian and the tribe, by Registered Mail, Return Receipt Requested, to the last known address of the parent and/or Indian custodian and the tribe.  The parent and Indian custodian shall be told of their right to petition for a return of custody.

The notification to the parent shall include a statement that the petition for return of custody will be granted unless it is established by a court of law that return of custody is not in the best interest of the child.  In the event that custody is not returned to the parent or prior to such return of custody, any subsequent placements shall follow the Order of Placement Preference for Adoption as outlined in section * G. ** of this policy.

In instances where there was a TPR hearing to make the child available for adoption, and the child's adoption later dissolves, * DCFS ** should notify the parent and/or Indian Custodian of their right to petition the court for a return of custody.

## * K.  DCFS ** REQUIREMENTS FOR ADOPTION RECORDS

The Department of * Children and Family Services, Child Welfare ** is required to maintain records of Indian child adoptive placements.  These records must show that efforts were made to follow the Order of Placement Preference in Adoption placements.  These records must be available at any time (within seven days) upon the request of the Secretary of the Interior, or the Indian child's tribe.

Records maintained shall contain at a minimum, * DCFS CW ** Form 65, the petition, surrender and all substantive orders entered in the proceeding and the complete record of the adoptive placement determination.  Also to be included are:

- A letter from the child's tribe showing the parent's and child's membership status;

- Applicable tribal enrollment number, if available;

- The results of direct inquiry of each of these family members regarding their interest in adopting the child;

- Copies of the home studies on all extended family members who have been studied as possible placement resources; and

**TX 0050**

| | | |
|---|---|---|
| **Agency Name** | Office of Community Services (OCS) | |
| **Chapter No./Name** | 8. Adoption | |
| **Part No./Name** | 4. Adoptive Placement Process | |
| **Section No./Name** | Adoptive Placement Process | |
| **Document No./Name** | 8-440 Services to Native American Children-Indian Child Welfare Act Provisions | |
| **Effective Date** | November 15, 2014 | |

- All correspondence by mail and a summary of other contact with the tribe regarding the child.

Where the adoptive placement does not meet the preference priorities, the efforts to find a suitable placement within those priorities shall be documented in the summary.  It shall also be shown that the placement chosen is in the least restrictive setting possible, and meets the child's special needs.

## * L. ** RECORDKEEPING AND INFORMATION AVAILABILITY

### 1.       Final Decree of Adoption

Within 30 days of a final decree or adoptive order for any Indian child a copy of the decree or order must be sent by the state court to the Secretary of the Interior.  In addition, if the biological parent(s) has by affidavit requested their identity remain confidential, a copy of the affidavit must also be provided to the Secretary or his/her designee.  Refer to Chapter 6. Appendix A, ICWA, Sec. 23.71 for complete information.

### 2.       Information Requests From Adopted Indian Adults, Adoptive/Foster Parents of An Indian Child, or an Indian Tribe Concerning Tribal Enrollment Requirements, Tribal Affiliation or Membership Rights

Requests for information from adopted Indian adults over age 18, adoptive or foster parents of an Indian child, or an Indian tribe which pertain to tribal enrollment or determination of rights or benefits associated with tribal membership, are to be referred to the Division of Social Services of the Bureau of Indian Affairs.  The Division of Social Services address along with complete information is found in Chapter 6. Appendix A, ICWA, Sec. 2371.

### 3.       Assistance in Locating Biological Parents of Indian Child After Termination of Parental Rights

The Agency shall refer the adopted Indian adult age eighteen (18) or older who is seeking information pertaining to his or her biological parents, to the Area Director designated in Sec. 23.11 (c) of ICWA shown in Chapter 6. Appendix A.

## * M. ** NEGOTIATION WITH INDIAN TRIBES

In accordance with the Title IV-E Social Security Act, as amended by Public Law 110-351, Fostering Connections to Success and Increasing Adoptions Act of 2008, Section 471(a)(32), the State negotiates in good faith with any Indian tribe, tribal organization or tribal consortium in the state that requests to develop an agreement with the state to administer all or part of the program on behalf of Indian children who are under the authority of the tribe, organization, or consortium, including foster care maintenance payments on behalf of children who are placed in  state or tribally licensed foster family homes, adoption assistance payments and, if the state has elected to provide such payments, kinship guardianship assistance payments under

**TX 0051**

| | |
|---|---|
| **Agency Name** | Office of Community Services (OCS) |
| **Chapter No./Name** | 8. Adoption |
| **Part No./Name** | 4. Adoptive Placement Process |
| **Section No./Name** | Adoptive Placement Process |
| **Document No./Name** | 8-440 Services to Native American Children-Indian Child Welfare Act Provisions |
| **Effective Date** | November 15, 2014 |

section 473 (d) and tribal access to resources for administration, training and data collection under Title IV- E.

## III.   FORMS AND INSTRUCTIONS

\* DCFS CW Form 65
DCFS CW Form 445
DCFS CW Form 445-A

## IV.   REFERENCES

Indian Child Welfare Act (ICWA) of 1978 (PL-95-608)
1994 Indian Self Determination Act (ISDA)
Fostering Connections to Success and Increasing Adoptions Act of 2008, Section 471(a)(32)
Louisiana Children's Code \*\*

**TX 0052**