## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

CHAD EVERET BRACKEEN, et al.,

    and

STATE OF TEXAS,
STATE OF LOUISIANA, and
STATE OF INDIANA,

        Plaintiffs,

      v.

RYAN ZINKE, in his official capacity as
Secretary of the United States Depart-
ment of the Interior, et al.,

        Defendants,

CHEROKEE NATION, et al.,

        Intervenor-Defendants.

Case No. 4:17-cv-00868-O

## STATE PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS'
## MOTIONS TO DISMISS AND MEMORANDUM IN SUPPORT OF MOTION
## FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. v

INTRODUCTION ............................................................................ 1

STATEMENT OF FACTS ................................................................. 3

    A.    States are responsible for child custody matters. ................... 3

    B.    Congress invades State powers with ICWA. .......................... 4

        1.    ICWA's racial preferences. ............................................ 4

        2.    ICWA's insertion of federal substantive law into state family codes. ........................................................... 4

        3.    ICWA's record-keeping and notification requirements. ................. 5

    C.    The BIA invades State powers with the Final Rule. ............................ 6

        1.    The Final Rule's racial preferences. ................................. 6

        2.    The Final Rule's mandates for state courts. ......................... 7

        3.    The Final Rule's mandates for both state agencies and courts. ............................................................... 9

    D.    The federal government enforces ICWA through invalidation of State child custody proceedings and Social Security Act funding ........ 11

STANDARD OF REVIEW .............................................................. 12

ARGUMENT ................................................................................ 12

I.    State Plaintiffs Have Standing to Challenge ICWA. ....................... 12

    A.    State Plaintiffs have standing to challenge federal laws that injure their sovereign power over domestic relations. ........................... 13

    B.    State Plaintiffs have standing under *Lujan*. ......................... 16

        1.    State Plaintiffs are suffering injuries in fact because they are "objects" of ICWA and the Final Rule. .......................... 16

        2.    Defendants are causing State Plaintiffs' injuries, which declaratory and injunctive relief will redress. ...................... 20

    C.    State Plaintiffs have *parens patriae* standing. ..................... 23

    D.    State Plaintiffs' claims against HHS, Secretary Azar, and the United States are ripe. ................................................. 25

    E.    The APA claim waives Defendants' immunity for all of State Plaintiffs' claims. ................................................... 26

II.  State Plaintiffs May Challenge the Final Rule.................................................. 27

    A.  State Plaintiffs have standing under the APA...................................... 27

    B.  State Plaintiffs may challenge the Final Rule under the APA, regardless of whether they commented on the proposed rule. ............. 29

        1.  The APA does not require parties to raise all objection during the notice and comment period for proposed rules. ........... 29

        2.  Commenters on the Final Rule raised the constitutional issues in State Plaintiffs' complaint. ............................................. 32

III.  *Younger* Abstention Is Inapplicable to State Plaintiffs' Claims. .................... 35

IV.  ICWA and the Final Rule Violate the Tenth Amendment (Count III). .......... 37

    A.  States Have Exclusive Power Over Domestic Relations. ..................... 37

    B.  The federal government may not commandeer state officials to implement federal policy.......................................................................... 39

    C.  ICWA requires state officials to enforce ICWA................................... 41

V.  ICWA Violates Article I of the Constitution (Counts II & VII)...................... 45

    A.  ICWA violates the non-delegation doctrine......................................... 46

        1.  The Constitution does not permit Congress to delegate its legislative authority. ........................................................................ 46

        2.  ICWA delegates to the tribes substantive legislative decisions on racial placement and adoption preferences. .............. 47

    B.  ICWA violates the Commerce Clause..................................................... 49

        1.  The Commerce Clause regulates economic activity. ...................... 49

        2.  Children are not "commerce." ........................................................ 50

        3.  Congress may regulate Indian tribes, not children........................ 52

VI.  ICWA and the Final Rule Violate Equal Protection (Count IV). ................... 52

    A.  ICWA and the Final Rule's adoption preference for an Indian family over a Non-Indian family is race-based discrimination. ........... 53

        1.  Adoptive *Couple v. Baby Girl* indicates ICWA and the Final Rule violate Equal Protection. ......................................................... 54

        2.  ICWA and the Final Rule's focus on ancestry creates race-based classifications. ...................................................................... 54

        3.  ICWA and the Final Rule lack any relevant to tribal self-government. ........................................................................................ 55

4.   Statutory language confirms ICWA and the Final Rule's race-based classifications. ................................................. 56

B.   ICWA and the Final Rule's Adoption and Foster Care Preferences Do Not Survive Strict Scrutiny. ....................................... 57

VII.   The Final Rule Violates the APA (Count I). .................................................... 58

CONCLUSION............................................................................................................. 59

# TABLE OF AUTHORITIES

**Cases**          **Page(s)**

*A.L.A. Schechter Poultry Corp. v. United States,*
295 U.S. 495 (1935) ............................................................ 47

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995) ............................................................ 53

*Adoptive Couple v. Baby Girl,*
570 U.S. 637 (2013) ......................................................*passim*

*Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.,*
429 F.3d 1136 (D.C. Cir. 2005)............................................ 32

*Alfred L. Snapp & Son, Inc. v. Puerto Rico,*
458 U.S. 592 (1982) ............................................................ 23

*Ankenbrandt v. Richards,*
504 U.S. 689 (1992) ............................................................ 38

*Appalachian Power Co. v. EPA,*
251 F.3d 1026 (D.C. Cir. 2001)............................................ 33

*Ark Initiative v. Tidwell,*
64 F. Supp. 3d 81 (D.D.C. 2014), *aff'd*, 816 F.3d 119 (D.C. Cir. 2016) ................ 33

*Armstrong v. Exceptional Child Ctr., Inc.,*
135 S. Ct. 1378 (2015) ........................................................ 29

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
627 F.3d 547 (5th Cir. 2010) ............................................... 12

*Atkinson Trading Co., Inc. v. Shirley,*
532 U.S. 645 (2001) ............................................................ 48

*Avocados Plus Inc. v. Veneman,*
370 F.3d 1243 (D.C. Cir. 2004)............................................ 32

*Bass v. USDA,*
211 F.3d 959 (5th Cir. 2000) ............................................... 31

*BCCA Appeal Grp. v. EPA,*
355 F.3d 817 (5th Cir. 2003) ......................................... 30, 31

*Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*,
    492 U.S. 408 (1989) ............................................................................ 56

*In re Burrus*,
    136 U.S. 586 (1890) ............................................................................ 38

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ............................................................................ 12

*Chamber of Commerce v. Hugler*,
    231 F. Supp. 3d 152 (N.D. Tex. 2017) ............................................. 32

*Cincinnati, W. & Z.R. Co. v. Comm'rs of Clinton Cty.*,
    1 Ohio St. 77 (1852) .......................................................................... 46

*City of Arlington, Tex. v. FCC*,
    569 U.S. 290 (2013) ............................................................................ 58

*City of Seabrook v. EPA*,
    659 F.2d 1349 (5th Cir. 1981) ..................................................... 29, 30

*Congleton v. Holy Cross Child Placement Agency, Inc.*,
    919 F.2d 1077 (5th Cir. 1990) ........................................................... 38

*Contender Farms, LLP v. USDA*,
    779 F.3d 258 (5th Cir. 2015) ............................................................. 17

*Va. ex rel. Cuccinelli v. Sebelius*,
    656 F.3d 253 (4th Cir. 2011) ............................................................. 13

*Del. Tribal Bus. Comm. v. Weeks*,
    430 U.S. 73 (1977) .............................................................................. 45

*Dep't of Transp. v. Ass'n of Am. Railroads*,
    135 S. Ct. 1225 (2015) ....................................................................... 47

*Doe v. United States*,
    853 F.3d 792 (5th Cir. 2017) ............................................................. 27

*Field v. Clark*,
    143 U.S. 649 (1892) ............................................................................ 46

*Fleming Companies, Inc. v. USDA*,
    322 F. Supp. 2d 744 (E.D. Tex. 2004) ............................................. 31

*Franciscan All., Inc. v. Burwell,*
 227 F. Supp. 3d 660 (N.D. Tex. 2016) ............................................................*passim*

*Fund for Animals, Inc. v. Norton,*
 322 F.3d 728 (D.C. Cir. 2003) ............................................................... 20

*Georgia v. Tenn. Copper Co.,*
 206 U.S. 230 (1907) .................................................................... 13

*Green v. City of Tuscon,*
 255 F.3d 1086 (9th Cir. 2001) ...................................................... 36, 37

*Halter v. Nebraska,*
 205 U.S. 34 (1907) ...................................................................... 23

*I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton Tri Indus.,*
 727 F.2d 1204 (D.C. Cir. 1984) ................................................... 33

*I.L. v. Alabama,*
 739 F.3d 1273 (11th Cir. 2014) .................................................... 20

*Iowa League of Cities v. EPA,*
 711 F.3d 844 (8th Cir. 2013) ........................................................ 25

*Larson v. Domestic & Foreign Commerce Corp.,*
 337 U.S. 682 (1949) .................................................................... 27

*Larson v. Valente,*
 456 U.S. 228 (1982) .................................................................... 22

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
 134 S. Ct. 1377 (2014) ................................................................ 25

*Loving v. United States,*
 517 U.S. 748 (1996) .................................................................... 46

*Loving v. Virginia,*
 388 U.S. 1 (1967) ....................................................................... 55

*Lujan v. Def. of Wildlife,*
 504 U.S. 555 (1992) .................................................... 12, 16, 17, 20

*Massachusetts v. EPA,*
 549 U.S. 497 (2007) .................................................................*passim*

*Massachusetts v. Mellon,*
    262 U.S. 447 (1923) ............................................................... 24

*Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Patchak,*
    567 U.S. 209 (2012) ............................................................... 27

*Mathews v. Eldridge,*
    424 U.S. 319 (1976) ............................................................... 30

*Merchants Fast Motor Lines, Inc. v. ICC,*
    528 F.2d 1042 (5th Cir. 1976) .............................................. 30

*Morton v. Mancari,*
    417 U.S. 535 (1974) .................................................. 54, 55, 56

*Myron v. Martin,*
    670 F.2d 49 (5th Cir. 1982) .................................................. 31

*Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.,*
    522 U.S. 479 (1998) ............................................................... 28

*Nat. Res. Def. Council v. EPA,*
    755 F.3d 1010 (D.C. Cir. 2014) ........................................... 33

*Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville,*
    508 U.S. 656 (1993) ............................................................... 53

*New York v. United States,*
    505 U.S. 144 (1992) .......................................................*passim*

*Nken v. Holder,*
    556 U.S. 418 (2009) ............................................................... 22

*Ohio Bureau of Emp't Servs. v. Hodory,*
    431 U.S. 471 (1977) ............................................................... 37

*Palmore v. Sidoti,*
    466 U.S. 429 (1984) ............................................................... 53

*Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1,*
    551 U.S. 701 (2007) .................................................. 52, 53, 57

*Penrod Drilling Corp. v. Williams,*
    868 S.W.2d 294 (Tex. 1993)................................................. 22

*Pratt v. Harris Cty.,*
   822 F.3d 174 (5th Cir. 2016) ............................................................................ 12

*Printz v. United States,*
   521 U.S. 989 (1997) ..............................................................................*passim*

*Printz v. United States,*
   854 F. Supp. 1503 (D. Mont. 1994), *aff'd on standing, rev'd & dismissed
   on other grounds*, 66 F.3d 1025 (9th Cir. 1995), *rev'd*, 521 U.S. 898
   (1997) ............................................................................................................ 14

*Rice v. Cayetano,*
   528 U.S. 495 (2000) ...................................................................... 55, 56

*Robinson v. Stovall,*
   646 F.2d 1087 (5th Cir. 1981) ........................................................ 37

*Rumsfeld v. FAIR,*
   547 U.S. 47 (2006) ........................................................................ 16

*Saint Francis Coll. v. Al-Khazraji,*
   481 U.S. 604 (1987) ...................................................................... 55

*Seminole Tribe of Fla. v. Florida,*
   517 U.S. 44 (1996) ........................................................................ 48

*Sierra Club v. EPA,*
   353 F.3d 976 (D.C. Cir. 2004) ...................................................... 33

*Sims v. Apfel,*
   530 U.S. 103 (2000) ...................................................................... 30

*Sosna v. Iowa,*
   419 U.S. 393 (1975) .............................................................. 1, 16, 38

*Spokeo, Inc. v. Robins,*
   136 S. Ct. 1540 (2016) .................................................................. 17

*Sprint Communications, Inc. v. Jacobs,*
   134 S. Ct. 584, 588 (2013) ............................................................ 35

*Susan B. Anthony List v. Driehaus,*
   134 S. Ct. 2334 (2014) ............................................................ 12, 25

*Sw. Bell Tel. Co. v. Pub. Util. Comm'n of Tex.,*
   208 F.3d 475 (5th Cir. 2000) ........................................................ 31

*Tex. Office of Pub. Util. Counsel v. FCC,*
   183 F.3d 393 (5th Cir.1999) .............................................................. 13

*Texas Oil & Gas Ass'n v. EPA,*
   161 F.3d 923 (5th Cir. 1998) ............................................................ 30

*Texas v. Richards,*
   301 S.W.2d 597 (Tex. 1957).............................................................. 23

*Texas v. United States,*
   --- F. Supp. 3d ---, No. 15-cv-151-O, 2018 WL 1478250 (N.D. Tex. Mar.
   5, 2018).......................................................................................... 47

*Texas v. United States,*
   201 F. Supp. 3d 810 (N.D. Tex. 2016)................................. 17, 18, 20, 21

*Texas v. United States,*
   497 F.3d 491 (5th Cir. 2007) ............................................ 17, 25, 26, 58

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court,* 136 S.
   Ct. 2271 (2016)..................................................................*passim*

*Town of Lockport, N.Y. v. Citizens for Cmty. Action,*
   430 U.S. 259 (1977) ......................................................................... 36

*U.S. Term Limits, Inc. v. Thornton,*
   514 U.S. 779 (1995) ......................................................................... 24

*United States v. Composite State Bd. of Med. Exam'rs,*
   656 F.2d 131 (5th Cir. 1981) ............................................................ 37

*United States v. L.A. Tucker Truck Lines, Inc.,*
   344 U.S. 33 (1952) ........................................................................... 30

*United States v. Lara,*
   541 U.S. 193 (2004) ........................................................................... 1

*United States v. Lopez,*
   514 U.S. 549 (1995) ...............................................................*passim*

*United States v. Morrison,*
   529 U.S. 598 (2000) ......................................................................... 49

*Washington v. Confederated Tribes of Colville Indian Reservation,*
   447 U.S. 134 (1980) ......................................................................... 48

*Washington v. Davis,*
    426 U.S. 229 (1976) ................................................................. 52, 53, 57

*White Mountain Apache Tribe v. Arizona,*
    649 F.2d 1274 (9th Cir. 1981) ............................................................ 48

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) ..................................................................... 20

*Younger v. Harris,*
    401 U.S. 37 (1971) ...................................................................... 35

## Constitutional Provisions

U.S. Const. amend. V ............................................................................... 52

U.S. Const. amend. X ............................................................................... 37

U.S. Const. art. I, § 1 ............................................................................. 46

U.S. Const. art. I, § 8 .......................................................................*passim*

La. Const. art. 1, § 3 .............................................................................. 44

## Statutes

5 U.S.C. § 702 ................................................................................... 26, 27

5 U.S.C. § 706 ................................................................................... 27, 58

25 U.S.C. § 1901 ............................................................................ 49, 51, 58

25 U.S.C. § 1902 ..................................................................................... 4

25 U.S.C. § 1903 ................................................................................ 52, 55

25 U.S.C. § 1911 .............................................................................. 5, 42, 44

25 U.S.C. § 1912 ........................................................................... 4, 5, 42, 44

25 U.S.C. § 1913 ................................................................................. 5, 44

25 U.S.C. § 1914 ................................................................................... 11

25 U.S.C. § 1915 .............................................................................*passim*

25 U.S.C. § 1951 ................................................................................ 6, 42

42 U.S.C. § 622 .................................................................................................... 12

42 U.S.C. § 671 .................................................................................................... 56

42 U.S.C. § 677 .................................................................................................... 12

42 U.S.C. § 1996b ......................................................................................... 56, 57

42 U.S.C. § 7607 .................................................................................................. 31

Ind. Code § 31-19-11-1 ...................................................................................... 43

Ind. Code § 31-19-14-2 ...................................................................................... 44

Ind. Code § 31-35-1-6 ........................................................................................ 44

Ind. Code § 31-37-14-2 ...................................................................................... 44

Indian Child Welfare Act, 25 U.S.C. §§ 1901–1963 ........................................ 4

La Child. Code art. 1035(A) ............................................................................... 44

La. Child. Code art. 1130 ................................................................................... 44

La. Child. Code art. 1255 ................................................................................... 43

La. Child. Code art. 1263 ................................................................................... 44

La. Code Civ. Proc. art. 1091 ............................................................................ 44

Navajo Nation Code tit. 1, § 701 ....................................................................... 55

Tex. Fam. Code § 153.002 ................................................................................. 43

Tex. Fam. Code § 161.001 ................................................................................. 44

Tex. Fam. Code § 161.103 ................................................................................. 44

Tex. Fam. Code § 161.206 ................................................................................. 44

Tex. Fam. Code § 162.012 ................................................................................. 44

Tex. Fam. Code § 162.015 ........................................................................... 44, 56

Tex. Fam. Code § 264.1085 ............................................................................... 44

## Regulations

25 C.F.R. § 23.2 ....................................................................................................... 7, 43, 59

25 C.F.R. § 23.11 ............................................................................................................ 5, 42

25 C.F.R. § 23.81 ................................................................................................................... 5

25 C.F.R. § 23.101 ................................................................................................................. 6

25 C.F.R. § 23.103 ............................................................................................................... 11

25 C.F.R. § 23.107 ........................................................................................................... 7, 59

25 C.F.R. § 23.107 ................................................................................................................. 7

25 C.F.R. § 23.108 ................................................................................................................. 7

25 C.F.R. § 23.108-.110 ...................................................................................................... 59

25 C.F.R. § 23.109 ................................................................................................................. 7

25 C.F.R. § 23.110 ................................................................................................................. 8

25 C.F.R. § 23.111 ........................................................................................................... 9, 43

25 C.F.R. §§ 23.111-.121 ................................................................................................... 44

25 C.F.R. § 23.112 ................................................................................................................. 9

25 C.F.R. § 23.113 ................................................................................................................. 7

25 C.F.R. § 23.114 ................................................................................................................. 8

25 C.F.R. § 23.114-19 ......................................................................................................... 59

25 C.F.R. § 23.120 ........................................................................................................... 7, 43

25 C.F.R. § 23.121 ........................................................................................................... 8, 59

25 C.F.R. § 23.122 ........................................................................................................... 8, 59

25 C.F.R. § 23.124 ................................................................................................................. 8

25 C.F.R. § 23.124-28 ......................................................................................................... 59

25 C.F.R. § 23.125 ........................................................................................................... 8, 44

25 C.F.R. §§ 23.130–131 ........................................................................... 6, 59

25 C.F.R. § 23.132 ................................................................................... *passim*

25 C.F.R. § 23.136 .................................................................................... 8, 44

25 C.F.R. § 23.138 ................................................................................ 9, 42, 45

25 C.F.R. § 23.139 .................................................................................... 8, 42

25 C.F.R. § 23.140 ................................................................................ 9, 43, 45

25 C.F.R. § 23.141 .................................................................................. 10, 43

25 C.F.R. § 83.11 ........................................................................................ 55

45 C.F.R. § 1355.34 ..................................................................................... 12

45 C.F.R. § 1355.36 ..................................................................................... 12

"Guidelines for State Courts; Indian Child Custody Proceedings," 44 Fed.
    Reg. 67,584 (Nov. 26, 1979) .................................................................. 6, 10

*Indian Child Welfare Act Proceedings*, 81 Fed. Reg. 38,778 (June 14, 2016)
    (codified at 25 C.F.R. pt. 23) ...................................................................... 6

## Rules

Fed. R. Civ. P. 56 ...................................................................................... 12

Ind. R. Tr. Proc. 24 .................................................................................... 44

Tex. R. Civ. Proc. 60 .................................................................................. 44

## Other Authorities

1 S. Johnson, *A Dictionary of the English Language* 361 (4th rev. ed. 1773)
    (reprint 1978) ........................................................................................ 49

32 Journals of the Continental Congress 1774-1789, Report of Committee
    on Indian Affairs (Feb. 20, 1787) .............................................................. 50

81 Fed. Reg. 38,788–89 ............................................................................... 33

81 Fed. Reg. 38,794, 38,826 ......................................................................... 34

81 Fed. Reg. at 38,802 ................................................................................ 11

81 Fed. Reg. at 38,838 ............................................................................ 10

81 Fed. Reg. at 38,839 ............................................................................ 10

81 Fed. Reg. 38,863–64 ............................................................................ 19

Cindy Bench & Mary Beck, Dep't of Interior Teleconference on Proposed
    Rule (May 12, 2015), https://www.regulations.gov/document?D=BIA-
    2015-0001-1882; .............................................................................. 34

Robert G. Natelson, *The Original Understanding of the Indian Commerce
    Clause*, 85 Denver U. L. Rev. 201 (2007) ............................................ 50

The Federalist No. 27 (A. Hamilton) ...................................................... 39

The Federalist No. 39 (J. Madison) ........................................................ 37

The Federalist No. 45 (J. Madison) ........................................................ 38

The Federalist No. 46 (J. Madison) .......................................................... 1

## Comment Letters

Barbara E. Katz, Comment Letter on Proposed Rule at 2 (May 15, 2015),
    https://www.regulations.gov/document?D=BIA-2015-0001-1547; ........ 34

Change.org Petition Opposing Proposed Rule (May 19, 2015),
    https://www.regulations.gov/document?D=BIA-2015-0001-1869; ........ 34

Devin D. Vinson, Adoption Choices of Texas, Comment Letter on Proposed
    Rule at 6, 9, 11, 14, 34, 35 (May 8, 2015),
    https://www.regulations.gov/document?D=BIA-2015-0001-1571; ........ 34

Elizabeth Morris, Comment Letter on Proposed Rule at 8 (May 11, 2015),
    https://www.regulations.gov/document?D=BIA-2015-0001-0794;
    Change.org ...................................................................................... 34

JaRae Thompson, Comment Letter on Proposed Rule at 2 (June 7, 2015),
    https://www.regulations.gov/document?D=BIA-2015-0001-1217 ........ 34

John Chally, Comment Letter on Proposed Rule at 2, 5 (Apr. 22, 2015),
    https://www.regulations.gov/document?D=BIA-2015-0001-1858; ........ 34

Johnston Moore, Comment Letter on Proposed Rule on Regulations for
    State Courts and Agencies in Indian Child Custody Proceedings
    (hereinafter "Proposed Rule") at 13 (May 19, 2015),
    https://www.regulations.gov/document?D=BIA-2015-0001-1476; ........ 33

Larry S. Jenkins, Comment Letter on Proposed Rule at 2 (May 19, 2015),
    https://www.regulations.gov/document?D=BIA-2015-0001-0533;....................... 34

Neal Sherry, Comment Letter on Proposed Rule at 2 (May 13, 2015),
    https://www.regulations.gov/document?D=BIA-2015-0001-1546;....................... 34

Philip McCarthy, Comment Letter on Proposed Rule at 2 (Apr. 15, 2015),
    https://www.regulations.gov/document?D=BIA-2015-0001-0072;....................... 33

Sherriann H. Hicks, Comment Letter on Proposed Rule at 2 (May 19,
    2015), https://www.regulations.gov/document?D=BIA-2015-0001-1386;............. 34

Stephen Konig, Comment Letter on Proposed Rule at 1 (May 19, 2015),
    https://www.regulations.gov/document?D=BIA-2015-0001-1194;....................... 34

Traci F. Lee, Assistant Cty. Counsel, Cty. of Sacramento, Cal., Comment
    Letter on Proposed Rule at 7, 8 (May 19, 2015),
    https://www.regulations.gov/document?D=BIA-2015-0001-1420;....................... 34

# INTRODUCTION

This case concerns the balance of federal and state power, and places children with Native American heritage at the mercy of that struggle. While the Constitution vests Congress with power over commerce with Indian tribes, *United States v. Lara*, 541 U.S. 193, 200 (2004), it vests States with "exclusive" power over domestic relations, *Sosna v. Iowa*, 419 U.S. 393, 404 (1975). The Founders did not intend for these powers to conflict, but to balance one another. The Federalist No. 46 (J. Madison); *see United States v. Lopez*, 514 U.S. 549, 552 (1995) ("a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front").

The Indian Child Welfare Act ("ICWA") upsets this balance of power, and tips the scales unconstitutionally toward the federal government. Congress enacted ICWA with the noble purposes of keeping Indian families together and preventing the dilution of native people groups. But Congress's righteous intent does not make ICWA constitutional. ICWA commandeers State agencies and courts to carry out a federal program, requiring them to apply federal procedural and substantive rules within State family law codes. It mandates racial preferences that favor Indian foster and adoptive parents (of any tribe) over the best interests of children, whatever the racial characteristics of the potential parents. A recent regulation from the U.S. Department of Interior ("Interior") and its Bureau of Indian Affairs ("BIA")—the Final Rule—further enforces these unconstitutional requirements on States.

The States of Texas, Louisiana, and Indiana ("State Plaintiffs") challenge the constitutionality of ICWA and the Final Rule under the Tenth Amendment (anti-commandeering), Article I (Commerce Clause and non-delegation doctrine), the Fifth Amendment (equal protection), and the Administrative Procedure Act ("APA"). Seven

individual plaintiffs ("Individual Plaintiffs") join these claims (except the non-delega-tion claim) and raise an additional cause of action under the Fifth Amendment (due process). Plaintiffs bring these claims against the United States, Interior, the U.S. Department of Health and Human Services ("HHS"), the Secretaries of Interior and HHS, the BIA, the Director of the BIA, and the Assistant Secretary for Indian Affairs. The Cherokee Nation, Oneida Nation, Quinault Indian Nation, and Morongo Band of Mission Indians ("Tribes") intervened as defendants.

The federal defendants move to dismiss Plaintiffs' Second Amended Com-plaint. They question State Plaintiffs' standing, assert the Court should abstain from hearing this case, and argue that failure to comment on the Final Rule disables the States' ability to challenge it. The Tribes move separately to dismiss, but adopt the federal defendants' argument. All of defendants' reasons to dismiss lack merit.

States deserve "special solicitude" under Article III, and here the State Plain-tiffs possess standing not only under *Massachusetts v. EPA*, but also *Lujan*, *parens patriae*, and the APA. Because State Plaintiffs are "objects" of ICWA and the Final Rule, and the federal defendants are the cause of their injuries, a favorable ruling from the Court will redress those injuries. There is no basis for the Court to abstain from this case under *Younger v. Harris* because State Plaintiffs do not ask the Court to interfere with a particular state court proceeding, rule on any state law, or seek an injunction against any state official. Finally, the APA does not require a State to com-ment on a proposed rule as a condition of later challenging that rule in court. Thus, the Court should deny Defendants' motion to dismiss.

State Plaintiffs and the Individual Plaintiffs independently cross-move for summary judgment. This case seeks to restore the balance of power over Indian af-fairs and domestic relations by "ascertaining the constitutional line between federal and state power." *New York v. United States*, 505 U.S. 144, 155 (1992). The claims

involve pure questions of law. ICWA and the Final Rule violate the Tenth Amendment because they commandeer States to follow, perform, and pay for a federal program aimed—virtuously—toward protecting Indian children. They violate Article I because Congress unconstitutionally delegated congressional power to tribes to change the racial placement preferences within the law and lacked Commerce Clause power to enact the law. ICWA and the Final Rule violate the Equal Protection Clause of the Fifth Amendment because they command racial preferences for placing Indian child with Indian families, tribes, or organizations, based on tribal membership decisions. And, finally, the Final Rule violates the APA because it is not in accordance with law under each of these constitutional provisions, and is arbitrary, capricious, and an abuse of discretion. Thus, the Court should grant summary judgment in State Plaintiffs' favor, declare ICWA and the Final Rule unconstitutional, and enjoin Defendants from enforcing them.

## STATEMENT OF FACTS

### A.    States are responsible for child custody matters.

Like all States, Texas, Louisiana, and Indiana possess sovereign authority over the domestic relations of individuals domiciled within their borders. 2d Am. Compl. ¶¶ 23–25, 40. They are the guardians of the health, welfare, safety, and property of their citizens. *Id*. ¶ 26. In particular, State Plaintiffs care for and protect many children within their custody through foster care, preadoption, and adoption services, *id*., and ensure child welfare by focusing on the best interest of the child, *id*. ¶ 42.

The Texas Department of Family and Protective Services ("Texas DFPS"), the Louisiana Department of Children and Family Services ("Louisiana DCFS"), and the Indiana Department of Child Services ("Indiana DCS") are State Plaintiffs' agencies responsible for child welfare. *Id*. ¶¶ 23–25. In addition, state courts within these States possess jurisdiction over child custody proceedings. *Id*.

## B.   Congress invades State powers with ICWA.

In 1978, Congress passed the Indian Child Welfare Act, 25 U.S.C. §§ 1901–1963, based on concerns about the dissolution of Indians families. *Id.* ¶¶ 8, 45. ICWA establishes minimum federal standards for the removal of Indian children from their families and the placement of those children in foster or adoptive homes. *Id.* ¶ 46 (citing 25 U.S.C. § 1902).

### 1.   ICWA's racial preferences.

ICWA's pivotal section requires racial preferences in foster care and adoption proceedings involving Indian children. *Id.* ¶ 47 (citing 25 U.S.C. § 1915). In the absence of "good cause to the contrary," State Plaintiffs' agencies and courts must prefer an adoption placement of an Indian child with (1) a member of the child's extended family, (2) other members of the Indian child's tribe, or (3) other Indian families. *Id.* ¶ 48 (citing 25 U.S.C. § 1915(a)). For foster care placements, State Plaintiffs must prefer (1) a member of the child's extended family, (2) a foster home specified by the Indian child's tribe, (3) an Indian foster home approved by an authorized non-Indian licensing authority, or (4) an institution for children approved or operated by an Indian tribe. *Id.* ¶ 49 (citing 25 U.S.C. § 1915(b)). If the child's Indian tribe chooses to reorder these placement preferences, ICWA requires State Plaintiffs' agencies and courts to defer to those decisions. *Id.* ¶ 50 (citing 25 U.S.C. § 1915(c)).

### 2.   ICWA's insertion of federal substantive law into state family codes.

ICWA requires state agencies and court to apply federal substantive rules of decision and procedure in state family law causes of action that affect state law judgments. States must:

- Use "active efforts" to prevent the breakup of the Indian family, *id.* ¶ 53–54 (citing 25 U.S.C. § 1912);

- Require "evidence beyond a reasonable doubt," supported by expert witness testimony, to terminate parental rights for an Indian child, *id.* ¶ 58 (citing 25 U.S.C. § 1912; 25 C.F.R. § 23.81);

- Transfer foster care and termination of parental rights proceedings involving an Indian child to tribal courts, even when the child is not living on the reservation, *id.* ¶ 56 (citing 25 U.S.C. § 1911);

- Allow a parent or Indian custodian to withdraw consent to foster care placement at any time, *id.* ¶ 59 (citing 25 U.S.C. § 1913);

- Allow a parent or Indian custodian to withdraw consent to voluntary termination of parental rights for any reason at any time prior to entry of a final decree of termination or adoption, *id.*;

- Permit a parent of an Indian child to contest a final adoption decree for up to two years after the final judgment, *id.* ¶¶ 60, 66 (citing 25 U.S.C. § 1913); and

- Grant mandatory intervention to an Indian custodian and the child's tribe at any point in a child custody proceeding, *id.* ¶ 57 (citing 25 U.S.C. § 1911).

### 3.   ICWA's record-keeping and notification requirements.

ICWA requires States to issue certain notices and keep particular records:

- Notify the Indian child's parents, Indian custodian, and the tribe, and Secretary Zinke and the BIA of child custody proceedings involving an Indian child, and wait 10 days after they receive notice before the proceedings may continue, *id.* ¶51–52 (citing 25 U.S.C. §§ 1911, 1912 and 25 C.F.R. § 23.11);

- Maintain records demonstrating ICWA compliance and make those records available for inspection at any time by Secretary Zinke or the child's Indian tribe, *id.* ¶ 61–62 (citing 25 U.S.C. § 1915); and

- Provide Secretary Zinke with a copy of final adoption decrees, and the name and tribal affiliation of the child, the names of the biological parents, the names of the adoptive parents, and the identity of any agency having files or information relating to the adoption, *id*. ¶ 64 (citing 25 U.S.C. § 1951).

As a result of ICWA, when Texas DFPS, Louisiana DCFS, and Indiana DCS encounter an Indian child in a child custody proceeding, almost every aspect of the matter is affected. *Id*. ¶¶ 23–25.

## C.     The BIA invades State powers with the Final Rule.

After ICWA's enactment, the BIA promulgated "Guidelines for State Courts; Indian Child Custody Proceedings" (the "1979 Guidelines") that were intended to assist the implementation of ICWA, but were "not intended to have binding legislative effect." *Id*. ¶ 82 (citing 44 Fed. Reg. 67,584, 67,584 (Nov. 26, 1979)). The 1979 Guidelines specified that the "good cause" standard—which governed the race-based placement preferences—was designed to give State courts flexibility to depart from those preferences. *Id*.

In June 2016, the BIA promulgated *Indian Child Welfare Act Proceedings*, 81 Fed. Reg. 38,778 (June 14, 2016) (the "Final Rule") (codified at 25 C.F.R. pt. 23), which purports to "clarify the minimum Federal standards governing implementation of the Indian Child Welfare Act" and to ensure that the Act "is applied in all States consistent with the Act's express language." *Id*. ¶ 85 (citing 25 C.F.R. § 23.101).

### 1.     The Final Rule's racial preferences.

Like ICWA, the Final Rule imposes racial preferences on child custody proceedings involving Indian children. State courts must follow the race-based placement preferences in all child custody decisions, unless the Indian child's tribe establishes by resolution a different order, *id*. ¶ 106–12 (citing 25 C.F.R. §§ 23.130–.131), or unless the State has "good cause," *id*. ¶ 115 (citing 25 C.F.R. § 23.132).

### 2.   The Final Rule's mandates for state courts.

The Final Rule also requires State courts to do the following:

- Ask each participant, on the court record, in a child custody proceeding whether the child at issue is an Indian child, and instruct parties to inform the court if they receive new information, *id.* ¶ 89 (citing 25 C.F.R. § 23.107(a));

- Request "a report, declaration, or testimony included in the record," that the state agency or other party used due diligence to identify and work with all of the tribes of which there is reason to know the child may be a member (or eligible for membership), *id.* ¶ 90 (citing 25 C.F.R. § 23.107(b));

- Ensure that the State agency used "active efforts" to prevent the breakup of the Indian family, and defines in detail what "active efforts" includes, *id.* ¶¶ 93–95 (citing 25 C.F.R. §§ 23.120, 23.2);

- Confirm that the state agency conducted a "diligent search" to find suitable placements meeting the preference criteria, *id.* ¶ 90 (citing 25 C.F.R. § 23.132(c)(5));

- Change how they handle emergency removal or placement of an Indian child, including when to hold a hearing, how to notify the Indian child's custodians, how to make a court record of the proceedings, what evidence must be provided to the court, and when to end the proceeding, *id.* ¶ 92 (citing 25 C.F.R. § 23.113);

- Defer to the judgment of the Indian tribe of which it is believed the child is a member (or eligible for membership) to determine if he is or is eligible for membership, *id.* ¶ 97 (citing 25 C.F.R. § 23.108(a));

- Defer to the tribes' agreement on which tribe the child belongs to when he or she is a member of more than one tribe, *id.* ¶ 98 (citing 25 C.F.R. § 23.109(b)–(c));

- Dismiss a child custody proceeding when the Indian child's residence or domicile is on a reservation where the tribe exercises exclusive jurisdiction over child custody proceedings, *id.* ¶ 99 (citing 25 C.F.R. § 23.110(a));

- End child custody proceedings if any party or the court has reason to believe that the Indian child was improperly removed from the custody of his parent or Indian custodian, *id.* ¶ 100 (citing 25 C.F.R. § 23.114);

- Order foster care placement of an Indian child only when there is clear and convincing evidence, including expert testimony, demonstrating serious emotional or physical danger to the child in the parent's or Indian custodian's custody, *id.* ¶ 102 (citing 25 C.F.R. § 23.121(a));

- Maintain parental rights for an Indian child, unless there is evidence beyond a reasonable doubt, including expert testimony designated by the tribe, that the child is in serious emotional or physical danger, *id.* ¶103 (citing 25 C.F.R. §§ 23.121–122);

- Require participants in voluntary child custody proceedings to state on the record whether the child is an Indian child, or whether they have reason to believe the child is an Indian child, *id.* ¶ 104 (citing 25 C.F.R. § 23.124(a));

- Change the standards of consent and the timing of consent for termination of parental rights, foster care, preadoptive, and adoptive proceedings, *id.* ¶ 105 (citing 25 C.F.R. § 23.125);

- Vacate adoption decrees for up to two years, if the parents of the Indian child seek vacatur, *id.* ¶ 120 (citing 25 C.F.R. § 23.136);

- Notify the child's biological parent or prior Indian custodian and the child's tribe if the adoption decree is vacated or the adoptive parent consents to termination of parental rights, *id.* ¶ 122 (citing 25 C.F.R. § 23.139);

- Inform a child once he or she reaches age 18 of his or her tribal affiliation, *id*. ¶ 123 (citing 25 C.F.R. § 23.138);

- Send a copy of a final adoption decree or an order in a voluntary or involuntary Indian child placement to the BIA within 30 days along with biographical information about the child, the biological parents, the adoptive parents, the state agency possessing information about the child, and information about tribal membership of the child, *id*. ¶ 124 (citing 25 C.F.R. § 23.140).

### 3. The Final Rule's mandates for both state agencies and courts.

The Final Rule requires State agencies and courts to do the following:

- Provide specific notice to an Indian tribe, the child's parents, and the child's Indian custodian concerning an involuntary foster care placement or termination of parental rights proceeding involving an Indian child, *id*. ¶ 91 (citing C.F.R. § 23.111).

- Delay foster care placement or termination of parental rights court proceedings in until at least 10 days after receipt of the notice by the parent or Indian custodian and by the tribe or Secretary of the Interior and grant them additional time to prepare for the hearing, *id*. ¶ 91 (citing 25 C.F.R. § 23.112);

- Perform a "diligent search" to find suitable placements meeting the preference criteria, *id*. ¶ 113 (citing 25 C.F.R. § 23.132(c)(5));

- Ignore the availability of a preferred placement according to generally applicable standards under state law (*i.e.*, best interest of the child), and instead adhere to prevailing social and cultural standards of the Indian community in which the Indian child's parent or extended family resides or with

which the Indian child's parent or extended family members maintain so-
cial and cultural ties, *id.*;

- Maintain a record of every voluntary or involuntary foster care, prea-
doptive, and adoptive placement of an Indian child and make the record
available within 14 days of a request by an Indian child's Tribe or Secretary
Zinke, *id.* ¶ 125 (citing 25 C.F.R. § 23.141).

The Final Rule makes two important changes in the application of ICWA.
First, prior to the Final Rule, most State courts applied the "good cause" standard
based on the child's best interests, including any bonds of attachment the child
formed with caregivers. *See id.* ¶ 83 (citing cases from Texas, Indiana, Arizona,
Alaska, Colorado, Iowa, Missouri, Nebraska, Oklahoma, and Washington). The Final
Rule requires that "[t]he party urging that the ICWA preferences not be followed
bears the burden of proving by clear and convincing evidence the existence of good
cause" to deviate from such a placement. *Id.* ¶ 116 (citing 81 Fed. Reg. at 38,838; 25
C.F.R. § 23.132(b)). This is contrary to the idea—previously embraced by the BIA—
that the "good cause" standard was designed to provide state courts with flexibility
in determining the disposition of a placement proceeding involving an Indian child."
*Id.* ¶ 118 (citing 44 Fed. Reg. 67,584, 67,584 (Nov. 26, 1979)). Thus, the Final Rule
sets forth five factors courts may use to make a determination of good cause to deviate
from the placement preferences, and makes clear that a court may not depart from
the preferences based on the ordinary bonding or attachment that results from time
spent in a non-preferred placement. *Id.* (citing 81 Fed. Reg. at 38,839; 25 C.F.R. §
23.132(c)–(e)).

Second, some State courts previously applied the "existing Indian family doc-
trine," which limited ICWA's application to circumstances in which the child has
some significant political or cultural connection to the tribe. *See id.* ¶ 84 (citing cases

from Indiana, Louisiana, Alabama, California, Kentucky, Missouri, Nevada, South Dakota, and Tennessee). The Final Rule expressly repudiates the Existing Indian Family doctrine. *Id.* ¶ 117 (citing 81 Fed. Reg. at 38,802; 25 C.F.R. § 23.103(c)). Now, all Indian children, no matter their connection to a tribe, are subject to ICWA and the Final Rule.

> **D.     The federal government enforces ICWA through invalidation of State child custody proceedings and Social Security Act funding.**

The federal government ensures state compliance with ICWA in two ways. First, States must report to Secretary Zinke and the BIA all child custody proceedings that involve Indian children, which allows Secretary Zinke and the BIA to monitor ICWA cases in state courts, and notify relevant tribes of ICWA non-compliance. Any Indian child subject to foster care placement or termination of parental rights and adoption, any parent or Indian custodian from whose custody an Indian child was removed, and the Indian child's tribe may challenge state proceedings in a court of competent jurisdiction and seek to have the State declared out of compliance with ICWA. *Id.* ¶¶ 65, 67 (citing 25 U.S.C. § 1914), 119.

Second, Congress ensures ICWA compliance through the provision of federal funding. According to the Social Security Act Amendments of 1994, States that receive Social Security Act Title IV-B funding must develop a plan and file annual reports with Secretary Azar and HHS detailing their compliance with ICWA. *Id.* ¶ 68. States may use Title IV-B funds for child welfare services, including foster and adoption services. *Id.* ¶ 69. Secretary Azar and HHS "shall [ ] reduce" a State's Title IV-B funding "[i]f the Secretary determines that a State has failed comply with subparagraph (a)," which mandates development of a plan to comply with ICWA. *Id.* ¶ 70. Congress also amended Title IV-E of the Social Security Act to require that States certify ICWA compliance to receive foster care and adoption services funding. *Id.* ¶

72. HHS determines whether a State complies with Titles IV-B and IV-E plan requirements, which include "compliance" with ICWA. *Id.* ¶¶ 73–74 (citing 45 C.F.R. § 1355.34). Secretary Azar and HHS may withhold Title IV-B and IV-E funding for States that fail to comply with and implement ICWA in their child custody proceedings. *Id.* ¶¶ 75 (citing 45 C.F.R. § 1355.36), 79 (citing 42 U.S.C. §§ 622, 677). In fiscal year 2018, Texas received approximately $410 million in Title IV-B and IV-E funding and Louisiana received approximately $64 million. *Id.* ¶¶ 76–77. In fiscal year 2014, Indiana received approximately $189 million in funding from these sources. *Id.* ¶ 78.

## STANDARD OF REVIEW

When evaluating a motion to dismiss, the court construes the complaint in favor of the plaintiff and accepts as true all well-pleaded allegations concerning standing. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010).

Summary judgment is appropriate when there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see Pratt v. Harris Cty.*, 822 F.3d 174, 180 (5th Cir. 2016) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ARGUMENT

### I.    State Plaintiffs Have Standing to Challenge ICWA.

A party has standing under Article III when it establishes a "personal stake in the outcome of the controversy." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014). This includes when it is "an object of the action (or forgone action) at issue." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 561 (1992). When a child in State Plaintiffs' care is an Indian child, ICWA and the Final Rule change every aspect of the legal proceedings and alter the burdens of proof, court procedure, record-keeping and

reporting requirements, and the finality of the child custody proceedings. These concrete injuries give the States standing under principles applicable to any litigant. But the Supreme Court also has said that States are not ordinary litigants; indeed, they deserve "special solicitude" in standing analysis, and that is the appropriate place to start this analysis.

### A.   State Plaintiffs have standing to challenge federal laws that injure their sovereign power over domestic relations.

State Plaintiffs bring this action in their capacities as sovereigns being pressured to relinquish control over powers reserved to them by the Constitution, to reevaluate their own laws, and to incur substantial costs in the process. Federal courts owe States "special solicitude" in the standing analysis when they sue for injuries sustained in their "'capacit[ies] [as] *quasi*-sovereign[s].'" *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007) (second quote quoting *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907)). In those capacities "'the State[s] ha[ve] an interest independent of and behind the titles of [their] citizens.'" *Id.* (quoting *Georgia*, 206 U.S. at 237).

States are not ordinary litigants. They "have a sovereign interest in 'the power to create and enforce a legal code.'" *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016) (quoting *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 449 (5th Cir.1999)). Thus, States have standing to challenge federal action based on "(1) federal assertions of authority to regulate matters they believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law, at least where 'the state statute at issue regulate[s] behavior or provide[s] for the administration of a state program' and does not 'simply purport [ ] to immunize [state] citizens from federal law.'" *Id.* (quoting *Va. ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269–70 (4th Cir. 2011)). "Those intrusions are analogous to pressure to change state law." *Id.*

In *New York v. United States*, 505 U.S. 144 (1992), there was no question that New York had standing to challenge the Low-Level Radioactive Waste Policy Act under the Tenth Amendment, because it conscripted the State to regulate according to Congress's demands or "take title" to and possession of radioactive waste. Likewise, in *Printz v. United States*, 521 U.S. 989 (1997), there was little question that the chief law enforcement officers of two counties had standing to challenge the Brady Handgun Violence Prevention Act under the Tenth Amendment because it commandeered them to conduct background checks, forcing them to reallocate resources and preventing them from performing other duties prescribed by state law. *See Printz v. United States*, 854 F. Supp. 1503, 1507–09 (D. Mont. 1994) (concluding the sheriff had standing to sue), *aff'd on standing, rev'd & dismissed on other grounds*, 66 F.3d 1025 (9th Cir. 1995), *rev'd*, 521 U.S. 898 (1997). The substantial pressure to comply with these federal intrusions into state sovereignty gave the State and its officers standing to sue the United States.

In Texas's challenge to the federal Deferred Action for Parents of Americans ("DAPA") program, the Fifth Circuit applied *Massachusetts* and held that Texas, Louisiana, Indiana, and twenty-three additional States had standing as sovereigns to challenge the Executive Branch program that gave lawfully present status to certain aliens. *Texas*, 809 F.3d at 153–54. The court found DAPA affected the States' quasi-sovereign interests by "imposing substantial pressure" on them to change their laws, including the issuance of driver's licenses to DAPA recipients. *Id*. at 153. Recognizing that "states have a sovereign interest in the power to create and enforce a legal code," the court held states have standing based on "federal assertions of authority to regulate matters they believe they control," preemption of state law, and "federal interference with the enforcement of state law." *Id*. These quasi-sovereign interests are impacted more directly in this case.

Beyond the "substantial pressure" felt by the States in the DAPA litigation, ICWA and the Final Rule mandate that State Plaintiffs change every aspect of their foster care and adoption proceedings when an Indian child is involved. 2d Am. Compl. ¶¶ 23–25. ICWA demands that States racially discriminate against potential foster care and adoptive parents by giving preference to Indian couples and tribes. *Id.* ¶¶ 47–49, 193. By imposing racial preferences, ICWA commandeers state power and forces them to defer to tribes if those tribes choose to reorder those racial preferences in violation of Article I's non-delegation doctrine. *Id.* ¶ 50. ICWA commands States to provide notifications to the parents, Indian custodians, tribes, Secretary Zinke, and the BIA any time a child custody proceeding involves an Indian child. *Id.* ¶¶ 51–52. States must maintain records of these proceedings and provide Secretary Zinke with specific information when a state court finalizes an adoption. *Id.* ¶¶ 61–62, 64. Beyond these notice and record-keeping requirements, ICWA forces states to apply different substantive family laws. Among other things, state agencies must use "active efforts" to prevent family breakup, *id.* ¶¶53–54; state courts must demand evidence beyond a reasonable doubt to terminate parental rights of an Indian child, *id.* ¶¶ 58–59, and change consent requirements for relinquishing parental rights, *id.*

The Final Rule imposes similar mandates on States, *see, e.g.*, *id.* ¶¶ 89, 91–95, 125, including the racial preferences, *id.* ¶ 106–12, 115, and goes further than the statute in some respects. For example, State agencies must perform a "diligent search" to find suitable placements for an Indian child that meet ICWA's preference criteria. *Id.* ¶ 90. State agencies and courts must defer to tribal judgments on an Indian child's membership in a tribe and domicile on a reservation. *Id.* ¶¶ 97–99. And State agencies may order foster care placement only when there is "clear and convincing evidence." *Id.* ¶ 102.

These requirements not only inflict "substantial pressure" on States, they fundamentally rewrite State law and commandeer State power over domestic relations. In violation of the Equal Protection Clause, ICWA and the Final Rule require States to discriminate based on race in foster care and adoption proceedings involving Indian children. In violation of the Tenth Amendment and Commerce Clause, ICWA and the Final Rule require States to change substantive and procedural laws affecting child custody, and to report compliance to the BIA and HHS. In violation of the non-delegation doctrine of Article I, ICWA and the Final Rule command States to defer to tribal judgments on racial preferences and child domicile. These are federal assertions of authority to regulate matters they believe they control, and federal interference with the enforcement of state law, as the Constitution confers the power of regulating domestic relations on the States. *Sosna*, 419 U.S. at 404. Thus, because States deserve "special solicitude" in standing analysis, and ICWA and the Final Rule inflict substantial pressure on the States, they have standing.

### B.   State Plaintiffs have standing under *Lujan*.

State Plaintiffs also satisfy the standing requirements applicable to any plaintiff. Under *Lujan,* a plaintiff satisfies the constitutional standing requirements of Article III by demonstrating "an injury in fact," caused by the defendant's conduct, and redressable by the court. *Lujan*, 504 U.S. at 560–61. The presence of "one party with standing is sufficient to satisfy Article III's case-or-controversy requirement" for all parties. *Texas*, 809 F.3d at 151 (quoting *Rumsfeld v. FAIR*, 547 U.S. 47, 52 n.2 (2006)). Here, State Plaintiffs satisfy each of *Lujan*'s factors.

#### 1.   State Plaintiffs are suffering injuries in fact because they are "objects" of ICWA and the Final Rule.

To establish an injury in fact, State Plaintiffs must show that they suffered "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Franciscan All., Inc. v. Burwell*,

227 F. Supp. 3d 660, 678 (N.D. Tex. 2016) (O'Connor, J.) (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)). A "particularized" injury is one that "'affects the plaintiff in a personal and individual way.'" *Id.* (quoting *Spokeo*, 136 S. Ct. at 1548). Importantly, when a plaintiff can establish that it is an "object" of the government action being challenged, "there is ordinarily little question that the action or inaction has caused [the plaintiff] injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62; *Texas v. United States*, 201 F. Supp. 3d 810, 822 (N.D. Tex. 2016) (O'Connor, J.). "Whether someone is in fact an object of a regulation is a flexible inquiry rooted in common sense." *Contender Farms, LLP v. USDA*, 779 F.3d 258, 265 (5th Cir. 2015); *Texas*, 201 F. Supp. 3d at 822.

In Texas's challenge to procedures adopted by the Secretary of the Department of Interior under the Indian Gaming Regulatory Act, the Secretary questioned Texas's standing to sue, and Texas argued that it had standing because the Secretary's procedures circumvented that act's procedural safeguards and exceeded the Secretary's regulatory authority. *Texas v. United States*, 497 F.3d 491, 496 (5th Cir. 2007). The Fifth Circuit held Texas "alleged a sufficient injury for standing purposes" because it was "being subjected to an administrative process" under the procedures and Texas "challenge[d] the Secretary's authority to undertake this process." *Id.* at 497. "The alleged injury [was] not hypothetical because the Secretarial Procedures ha[d] already been applied to Texas." *Id.* Texas's only alternative to abiding by the allegedly invalid regulations was to forfeit its opportunity to comment on the gaming regulations, "a forced choice that is itself sufficient to support standing." *Id.*

Similarly, this Court found standing when Texas, Louisiana, eleven additional States, and several public school districts challenged guidelines issued by the U.S. Departments of Education and Justice, forcing schools to permit students to use the bathrooms, locker rooms, and showers regardless of the student's biological sex, or

risk losing Title IX funding. *Texas*, 201 F. Supp. 3d at 816. The Court held that the plaintiffs suffered an injury in fact because they were an "object" of the guidelines, which directed "Plaintiffs to alter their policies concerning students' access" to intimate areas, "forc[ed] Plaintiffs to consider ways to build or reconstruct restrooms, and how to accommodate students who may seek to use private single person facilities." *Id.* at 822. "That the Guidelines spur this added regulatory compliance analysis satisfies the injury in fact requirement." *Id.*

Like the two *Texas* cases above, State Plaintiffs are "objects" of ICWA and the Final Rule. States must comply with ICWA and the Final Rule's racial preferences. 2d Am. Compl. ¶¶ 193–95. These racial preferences cause State Plaintiffs to violate the equal protection rights of their citizens, at the behest of the federal government. By causing States to violate the Constitution, ICWA and the Final Rule inflict a direct, cognizable injury on State Plaintiffs. ICWA and the Final Rule also commandeer State power in violation of Article I and the Tenth Amendment. States must alter the substance of their state laws: changing the "good cause" standard for departure from ICWA, *id.* ¶ 116; eliminate the existing family doctrine, *id.* ¶ 117; require proof beyond a reasonable doubt, instead of clear and convincing evidence, before terminating parental rights, *id.* ¶¶ 227, 233; and change rules on consent to terminate parental rights, *id.* ¶¶ 234–35. They must change their child custody procedures: use "active efforts" to find tribal placements, *id.* ¶ 94–95, 227–28; hire expert witnesses at state expense, *id.* ¶ 233; and allow tribes procedural rights to challenge adoption decrees at any time, *id.* ¶ 236. They must maintain records indefinitely and report specific information to the Secretary, BIA, and tribes. *Id.* ¶¶ 51–52, 61–62, 64, 91, 122–25. If States fail in any of these respects, the final order in a child custody proceeding can be reversed on appeal. *Id.* ¶ 203. And all of these burdens impose increases costs on

the States by necessitating additional staff, training, resources, handbooks, and employee time devoted to compliance.

The impact of ICWA and the Final Rule is palpable for State Plaintiffs' agencies. The handbook for Texas Child Protective Services, a division of Texas DFPS, states that when an Indian child "is taken into DFPS custody, *almost every aspect* of the social work and legal case is affected." 2d Am. Compl. ¶ 205 (emphasis added). Texas DFPS must "routinely ask[ ] families whether they are Native American," document their answers, and consult with DFPS legal counsel if they are. *Id*. ¶ 204. Texas DFPS even created a special form caseworks must fill out if a child is an Indian child. *Id*. ¶¶ 206–07. This obligation to ask about ICWA exists throughout the case. *Id*. ¶ 207. And Texas, Louisiana, and Indiana create, update, and publish state-wide handbooks with sections devoted to ICWA compliance. *Id*. ¶¶198–208 (Texas handbooks), 209–12 (Indiana handbooks), 213–220 (Louisiana handbooks).

State Plaintiffs also suffer concrete financial injuries from the tasks necessary for compliance with ICWA, including hiring expert witnesses, selected by the tribe, to testify in child custody proceedings. *Id*. ¶ 227. They must spend state employee time and money on caseworkers searching for, contacting, and consulting with extended family members of a child to determine if a parent or relative has Indian heritage. They also face increased record-keeping and notification costs.[1] *Id*. ¶¶ 225–26. These injuries do not even begin to account for the many employees the States have hired to comply with ICWA, and the trainings State agency employees, judges, and court staff attend to learn how to comply.

---

[1] When issuing the Final Rule, the BIA acknowledged that there is a financial burden on the States to comply with the notification requirements, both in terms of simple postage and state employee hours. 81 Fed. Reg. 38,863–64.

If States fail to comply with ICWA and the Final Rule, they risk losing millions of dollars in child-welfare funding provided under Titles IV-B and IV-E of the Social Security Act.[2] 2d Am. Compl. ¶ 79. The potential loss of future funding is a direct injury cognizable by States. *See Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992) (differentiating between a loss of general revenue and a direct financial injury); *I.L. v. Alabama*, 739 F.3d 1273, 1279 (11th Cir. 2014) (holding impediments to government funding arising from racially discriminatory laws can constitute particularized and concrete injury for purposes of standing); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 733 (D.C. Cir. 2003) (holding country of Mongolia had standing based on threatened loss of income).

ICWA and the Final Rule "are clearly designed to target [State] Plaintiffs' conduct" in a way that causes a direct injury. *Texas*, 201 F. Supp. 3d at 822. Thus, State Plaintiffs are not only the "object" of ICWA and the Final Rule, being directly conscripted to perform federal Executive Branch functions, but also suffer concrete and particularized injuries as a result of these laws. These injuries are sufficient to establish standing.

### 2. Defendants are causing State Plaintiffs' injuries, which declaratory and injunctive relief will redress.

When a party is an "object" of governmental action, "there is ordinarily little question" that the action "has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62. For example, in *Franciscan Alliance*, several States, including Texas and Louisiana, "easily established" the causation and redressability requirements because the federal regulation at issue, which caused them to redefine "sex" as "gender identity" in healthcare provisions, made them "the subject of the challenged government action." 227 F. Supp. 3d

---

[2] Defendants question the credibility of this threat, but fail to explain what HHS and Secretary Azar would do if a State refused to comply with ICWA. Certainly, these defendants would not sit idle. They would remove the State's funding during the next compliance reporting period.

at 679. The same is true here. State Plaintiffs are objects of the challenged govern-
ment action: ICWA and the Final Rule require the States to change "every aspect" of
their child custody proceedings when Indian children are involved. 2d Am. Compl. ¶
205. A declaratory judgment and injunction will absolve State Plaintiffs' from the
requirements of ICWA and the Final Rule.

     In a novel argument, the federal defendants argue that they cannot enforce
ICWA and the Final Rule—a law and regulation they passed and administer. Thus,
they claim they are not the cause of State Plaintiffs' injuries, and the Court cannot
provide redress. Defs.' Br. 19–23. This is wrong for three reasons. First, the federal
government raised, and this Court rejected, a similar argument concerning enforcea-
bility in multistate litigation over Executive regulations directing schools to let chil-
dren use bathrooms, locker rooms, and other intimate areas regardless of their bio-
logical sex. *Texas*, 201 F. Supp. 3d at 820. There, the federal government argued that
state plaintiffs had not "identified any enforcement action to which they are or about
to be subject." *Id*. But whether an enforcement action exists is a question of injury,
not causation. When a federal law or regulation directs a state to alter its policies on
a topic reserved to the States, it is the cause of the injury.

     Second, Defendants Interior, BIA, Zinke, Rice, and Tahsuda enforce ICWA by
threatening the stability of foster care placements and adoption decrees, and man-
dating compliance to receive federal funding. ICWA and the Final Rule require State
agencies and courts to notify Secretary Zinke and the BIA when they confront a child
custody matter involving an Indian child, report the final disposition of the matter,
and maintain records on the matter for inspection by Secretary Zinke and the BIA.
2d Am. Compl. ¶¶ 51–52, 61–62, 64. Failure to follow any aspect of the law or Final
Rule is grounds for the child, the child's parents, custodian, or tribe to seek the inval-
idation of a final adoption decree. *Id*. ¶¶ 60, 66. Beyond these threats to children and

the stability of families, Defendant HHS and Secretary Azar can remove hundreds of millions of dollars of federal child welfare funding under the Social Security Act if States do not annually certify ICWA compliance. *Id.* ¶¶ 68–70.

Third, Defendants' position—that they allegedly lack enforcement power—only highlights how ICWA commandeers State power by obligating States to conform their child-custody proceedings to a mandate that the federal government now claims it has no authority to enforce. *See infra* Part IV. Either States must follow ICWA and it commandeers their power; or they need not follow it and are free to operate under their normal family codes. Defendants cannot have it both ways.

Because State Plaintiffs are objects of ICWA and the Final Rule, a declaratory judgment and injunction from the Court will redress their injuries. *See Larson v. Valente*, 456 U.S. 228, 244, n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury"). A declaratory judgment will absolve State Plaintiffs' agencies and courts from the requirement to comply with ICWA. And an injunction against Secretaries Zinke and Azar and Defendants Rice and Tahsude—telling them "what to do or not to do"—will redress State Plaintiffs' injuries. *Nken v. Holder*, 556 U.S. 418, 428 (2009).

There is no merit to Defendants' argument that a declaratory judgment or injunction will have no binding effect on state courts—that those courts will continue to blindly apply ICWA despite it being declared unconstitutional. To be sure, while the Constitution requires Texas state courts to follow only higher Texas courts and the United States Supreme Court, they "may certainly draw upon the precedents of the Fifth Circuit, or any other federal or state court, in determining the appropriate federal rule of decision." *Penrod Drilling Corp. v. Williams*, 868 S.W.2d 294, 296 (Tex.

1993). Thus, State Plaintiffs' satisfy Article III's standing requirements. They are suffering injuries, caused by Defendants, which the Court can redress.

### C.    State Plaintiffs have *parens patriae* standing.

In addition to their standing under *Massachusetts* and *Lujan*, State Plaintiffs have *parens patriae* standing. States may "litigate as *parens patriae* to protect quasi-sovereign interests—*i.e.*, public or governmental interests that concern the state as a whole." *Massachusetts*, 549 U.S. at 520 n.17 (citing R. Fallon, et al., Hart & Wechsler's The Federal Courts and the Federal System 290 (5th ed. 2003)). States may act to protect the health, welfare, and safety of their citizens. *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982), because they have "a quasi-sovereign interest in the health and well-being—both physical and economic—of [their] residents in general."[3] *Id.* A "helpful indication" of *parens patriae* standing "is whether the injury is one the State, if it could, would likely attempt to address through its sovereign law-making powers," *id.*, and when the State alleges an "injury to a sufficiently substantial segment of its population," *id.* Thus, in *Snapp*, Puerto Rico had standing to protect its residents from labor-market discrimination. *Id.* at 608–09.

Here, State Plaintiffs assert standing as *parens patriae* to protect the health and safety of children in their care, and the constitutional rights of potential adoptive and foster parents. Before ICWA and the Final Rule, State Plaintiffs developed and implemented child custody laws that persist to this day. They did so under their "sovereign lawmaking powers" to protect the health and safety of children. *Alfred L. Snapp & Son*, 458 U.S. at 607. Now, under ICWA and the Final Rule, State Plaintiffs

---

[3] *See Halter v. Nebraska*, 205 U.S. 34, 40–41 (1907) ("[A] state possesses all legislative power consistent with a republican form of government; therefore each state, when not thus restrained, and so far as this court is concerned, may, by legislation, provide not only for the health, morals, and safety of its people, but for the common good, as involved in the well-being, peace, happiness, and prosperity of the people."); *see also Texas v. Richards*, 301 S.W.2d 597, 602 (Tex. 1957) ("As a general rule the [police] power is commensurate with, but does not exceed, the duty to provide for the real needs of the people in their health, safety, comfort and convenience . . . .").

must violate the equal protection rights of Indian children and potential foster parents and adoptive couples based on their race. Doing so causes State Plaintiffs to violate the equal protection guarantees in the Constitution, which gives them *parens patriae* standing.

Contrary to Defendants' position, Defs.' Br. 18, the Supreme Court in *Massachusetts v. Mellon*, 262 U.S. 447 (1923), did not foreclose States' *parens patriae* standing to sue the federal government over an unconstitutional statute. There, Congress passed the Maternity Act, which provided optional funding to States to reduce maternal and infant mortality. *Id.* at 479. The optional nature of the law caused the Court to conclude that the Tenth Amendment questions raised by Massachusetts were "political, and not judicial in character." *Id.* at 483. *Mellon* itself disavowed the broad reading Defendants give it, because the Court had been "called upon to adjudicate, not rights of person or property, not rights of dominion over physical domain, [and] *not quasi-sovereign rights actually invaded or threatened.*" *Id.* at 484–85 (emphasis added); *Massachusetts*, 549 U.S. at 520 n.17.

Every citizen has "'two political capacities, one state and one federal, each protected from incursion by the other.'" *Printz*, 521 U.S. at 920 (quoting *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring)). The Court never has held that States cannot sue the federal government in their *parens patriae* capacity. In fact, *Mellon* expressly acknowledged that the States would, in some instances, have standing "to protect [their] citizens against . . . *enforcement of unconstitutional acts of Congress.*" *Mellon*, 262 U.S. at 485 (emphasis added). More recently, in *Massachusetts*, the Court held that Massachusetts had a quasi-sovereign interest to assert on its *citizens'* behalf, 549 U.S. at 518; and the dissent agreed that, in proper circumstances, a State "might assert a quasi-sovereign right as *parens patriae*" to protect its citizens, *id.* at 539. Because State Plaintiffs maintain custody and care of

children through their state child welfare agencies, and they must protect the equal protection rights of those children and their potential parents, they possess *parens patriae* standing to challenge ICWA.

### D. State Plaintiffs' claims against HHS, Secretary Azar, and the United States are ripe.

State Plaintiffs are suffering ripe injuries caused by Defendants Azar and HHS. First, as established above, State Plaintiffs are injured by the Social Security Act's requirement that they certify compliance with ICWA as a condition of receiving federal child welfare funding. *See supra* Part II.B.1 & 2.

Second, Defendants' ripeness arguments collide with the Supreme Court's "unflagging" doctrine that when a party establishes Article III standing, its claims are ripe. *See Susan B. Anthony List*, 134 S. Ct. at 2347 (stating that when a party establishes Article III injury, "'a federal court's obligation to hear and decide' [the] case[ ] within its jurisdiction 'is virtually unflagging'" (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014))). The rationale of the ripeness doctrine is to prevent the courts "from entangling themselves in abstract disagreements," *Texas*, 497 F.3d at 498, which is not present here. Because ripeness "is peculiarly a question of timing," a party seeking review must show both "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Iowa League of Cities v. EPA*, 711 F.3d 844, 867 (8th Cir. 2013); *accord Texas*, 497 F.3d at 498. "The fitness and hardship prongs must be balanced, and a case is generally ripe if any remaining questions are purely legal ones." *Texas*, 497 F.3d at 498 (citations and quotation marks omitted).

State Plaintiffs' claims against ICWA and the certification requirements in the Social Security Act are pure legal questions. The issues are fit for judicial review because they involve the constitutional balance of power between the federal govern-

ment and States over child custody proceedings involving Indian children. May Defendants impose ICWA on State Plaintiffs and require compliance to receive child welfare funding, or not? Defendants discussion of how much funding is at stake and what State Plaintiffs would lose if they failed to comply with ICWA are strawmen arguments intended to distract from the undeniable reality that the Social Security Act and HHS regulations demand compliance with ICWA as a condition of continued federal funding to States. Additional fact-finding is unnecessary to resolve the legal question. If ICWA is unconstitutional, then the Court should absolve State Plaintiffs from the compliance mandates of Titles IV-B and IV-E of the Social Security Act.

State Plaintiffs also suffer hardships worthy of judicial review now. As Defendants' acknowledge, "'the harmful creation of legal rights or obligations'" and "'being forced to modify one's behavior'" suffice to fulfill this requirement. Defs.' Br. 30 (quoting *Texas*, 497 F.3d at 499). Titles IV-B and IV-E require State Plaintiffs to modify their laws and behavior in accordance with ICWA. Thus, State Plaintiffs' claims against HHS and Secretary Azar are ripe.

### E.    The APA claim waives Defendants' immunity for all of State Plaintiffs' claims.

The APA waives sovereign immunity for HHS, the United States, and the other defendants in this action for both the claims brought under the APA and those brought under the Constitution. When a person suffers a "legal wrong" or is "adversely affected" by agency action, he "is entitled to judicial review thereof." 5 U.S.C. § 702. Courts "shall not" dismiss claims in federal court "seeking relief other than money damages," stating that "an agency or an officer or employee thereof acted or failed to act" in accordance with the Constitution. *Id*. And the "United States may be named as a defendant in any such action, and a judgment or decree may be entered

against the United States." *Id.* To waive sovereign immunity, the Fifth Circuit requires a plaintiff to identify "agency action" that "adversely affected" him. *Doe v. United States*, 853 F.3d 792, 799 (5th Cir. 2017).

Here, Interior and the BIA's Final Rule is "agency action" that "adversely affects" State Plaintiffs' power over child custody. HHS's mandatory "compliance" with ICWA is "agency action" that "adversely affects" State Plaintiffs' ability to continue to receive child welfare funding. 2d Am. Compl. ¶¶ 68, 70. These agency actions waive the United States and HHS's sovereign immunity. *Doe*, 853 F.3d at 799–800. Additionally, because State Plaintiffs allege that the statute conferring power on the federal officials and agencies—ICWA—is unconstitutional and that the United States has exceeded its constitutional limitations in enacting that legislature, sovereign immunity does not shield Defendants from suit. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690 (1949).

## II.  State Plaintiffs May Challenge the Final Rule.

The APA provides that a "person suffering a legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The "reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* § 706. The court shall "hold unlawful and set aside" agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). The APA does not include a requirement that parties exhaust their administrative remedies or raise all arguments before the agency prior to challenging a rule. Here, State Plaintiffs have standing to challenge the Final Rule.

### A.  State Plaintiffs have standing under the APA.

When enacting the APA, Congress intended "to make agency action presumptively reviewable." *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v.*

*Patchak*, 567 U.S. 209, 225 (2012). To demonstrate standing under the APA, State Plaintiffs "must satisfy not only Article III's standing requirements," *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 488 (1998), but also demonstrate prudential standing under the APA, which requires showing that the interests sought to be protected are "arguably within the zone of interests to be protected or regulated by the statute" in question, *id.* (quotation marks and citation omitted). To satisfy the prudential standing inquiry, it is not necessary for a court to ask "whether there has been a congressional intent to benefit the would-be plaintiff." *Id.* at 488–89.

State Plaintiffs satisfy Article III standing for their APA claim. They also satisfy prudential standing. As government entities required to make widespread and expensive changes to their child custody systems, State Plaintiffs' interests fall squarely within the zone of interests regulated by the Final Rule. *See Franciscan*, 227 F. Supp. 3d at 680 (concluding States had standing to pursue APA challenge to rule that required them to change how the provide healthcare services based on sex). Thus, they have standing to pursue their APA claims.

Defendants contend that State Plaintiffs injuries under the Final Rule are not redressable because even if the Court declares the Final Rule invalid and enjoins Defendants from enforcing it, ICWA's requirements will still apply. Defs.' Br. 23–24. "When a litigant is vested with a procedural right," as a State is under the Declaratory Judgment Act and APA, "that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Texas*, 809 F.3d at 150–51 (quoting *Massachusetts*, 549 U.S. at 518). A declaratory judgment that the Final Rule is unlawful and an injunction against its enforcement will absolve State Plaintiffs from complying with its mandates that go beyond ICWA itself. Moreover, State Plaintiffs seek the

invalidation of most portions of ICWA, so their efforts also to declare the Final Rule unlawful and enjoin it are not in vain.

### B.    State Plaintiffs may challenge the Final Rule under the APA, regardless of whether they commented on the proposed rule.

Defendants attempt to import a waiver doctrine into the APA that does not exist when parties challenge the constitutionality of a promulgated rule.[4] In doing so, they place an impossible burden on "everyone who wishes to protect himself from arbitrary agency action not only to become a faithful reader" of the "rulemaking published each day in the Federal Register, but a psychic [ability] to predict the possible changes that could be made in the proposal when the rule is finally promulgated." *City of Seabrook v. EPA*, 659 F.2d 1349, 1360–61 (5th Cir. 1981). State Plaintiffs constitutional challenge to the Final Rule may proceed.[5] Neither the text of the APA, nor Fifth Circuit precedent require a party aggrieved by an agency rule to comment first on the proposed rule or risk waiving a later legal challenge to that rule.

### 1.    The APA does not require parties to raise all objection during the notice and comment period for proposed rules.

In the Fifth Circuit, a party may challenge an agency rule even if they failed to do so during the notice and comment period. In *City of Seabrook v. EPA*, the City asked the court to set aside EPA action approving Texas's plan to comply with the Clean Air Act. 659 F.2d at 1351. The Fifth Circuit held that "courts should not generally hold a petitioner estopped from objecting to an agency rule because his specific

---

[4] Defendants also improperly raise waiver in a Rule 12(b)(1) motion questioning subject matter jurisdiction. Those issues should be raised in a Rule 12(b)(6) motion.

[5] State Plaintiffs challenge the Final Rule under the APA and the Constitution. *See* 2d Am. Compl. ¶¶ 247–65 (Count I—challenging Final Rule under APA); ¶¶ 282–323 (Count III—challenging Final Rule under Tenth Amendment); ¶¶ 324–38 (Count IV—challenging Final Rule under equal protection); ¶¶ 368–76 (Count VII—challenging Final Rule under Article I). State Plaintiffs' constitutional claims do not depend on their APA claims because federal courts, even without a statutory cause of action, may enjoin federal officials from "unconstitutional actions." *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015) ("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.").

objection was not made during the 'notice and comment' period." *Id*. at 1360. The court noted that the APA does not require anyone who wishes to protect himself from arbitrary agency action "to become a faithful reader" of the Federal Register, and such a rule is one the "court will impose on no one." *Id*. at 1361.

In rejecting the EPA's argument that the City waived any objection not raised during notice and comment, the court distinguished *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952)—a case relied on by Defendants—and *Merchants Fast Motor Lines, Inc. v. ICC*, 528 F.2d 1042 (5th Cir. 1976), because each case involved a challenge to Interstate Commerce Commission action by a party who participated in an evidentiary hearing, with findings made on the record, and who had an opportunity to appeal the hearing officer's decision to the Commission itself. *City of Seabrook*, 659 F.2d at 1360 n.17. Later Fifth Circuit panels that have questioned *City of Seabrook* have relied erroneously on *L.A. Tucker Truck Lines* for the same reasons that they involved adjudicatory proceedings. *See, e.g.*, *BCCA Appeal Grp. v. EPA*, 355 F.3d 817, 828–29 (5th Cir. 2003) (relied on by Defendants); *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 n.7 (5th Cir. 1998).

When deciding whether issue exhaustion or waiver should apply to a particular agency action, the Supreme Court evaluates "the degree to which the analogy to normal adversarial litigation applies in a particular administrative proceeding." *Sims v. Apfel*, 530 U.S. 103, 109 (2000). "Where the parties are expected to develop the issues in an adversarial administrative proceeding, it seems to us that the rationale for requiring issue exhaustion is at its greatest." *Id*. at 110 (describing *L.A. Tucker Truck Lines* as an adversarial proceeding). "Where, by contrast, an administrative proceeding is not adversarial, we think the reasons for a court to require issue exhaustion are much weaker." *Id*. In fact, the requirement of issue exhaustion should be at its weakest when constitutional rights are at stake, as here. *Cf. Mathews v. Eldridge*,

424 U.S. 319, 329 n.10 (1976) ("failure to have raised [a] constitutional claim" does "not" bar asserting such a claim in court).

*BCCA*, which Defendants rely on, is inapposite for two reasons. First, the Fifth Circuit applied waiver in that case in the context of an EPA rulemaking, where exhaustion is statutorily required. *See* 42 U.S.C. § 7607(d)(7)(B) ("Only an objection to a rule . . . which was raise . . . during the period for public comment . . . may be raised ruing judicial review."). Second, the Fifth Circuit relied on cases dealing with administrative proceedings applicable to a particular matter, not general rulemaking. *See BCCA*, 355 F.3d at 828 (citing *Bass v. USDA*, 211 F.3d 959, 961 (5th Cir. 2000) (judicial review of extensive administrative proceeding involving the appraisal of a farm); *Sw. Bell Tel. Co. v. Pub. Util. Comm'n of Tex.*, 208 F.3d 475, 487 (5th Cir. 2000) (appeal from administrative hearing between interconnecting telephone companies); *Myron v. Martin*, 670 F.2d 49, 50, 51 (5th Cir. 1982) (review of order of Commodity Futures Trading Commission denying review of administrative law judge ruling)).

The upshot of this precedent is that when waiver or exhaustion of remedies is not statutorily required (as in APA actions), a party need not first comment on a rule to challenge it later in court. And when parties raise challenges to agency rulemaking, *City of Seabrook* controls because the APA does not require everyone to become a faithful reader of the Federal Register and commenter on proposed rules. *See, e.g.*, *Fleming Companies, Inc. v. USDA*, 322 F. Supp. 2d 744, 754 (E.D. Tex. 2004) (applying *City of Seabrook* and allowing a company's challenge to a USDA potato rule: "Fleming's failure to object during the notice and comment period neither deprives Fleming of its right to challenge the USDA's new rule nor robs this court of jurisdiction to adjudge that challenge.").

The Court's ruling in *Chamber of Commerce v. Hugler*, 231 F. Supp. 3d 152, 202–04 (N.D. Tex. 2017) (Lynn, C.J.), which Defendants cite for their waiver principle, failed to cite or consider *City of Seabrook*. *Hugler* involved a challenge to a Department of Labor rule that changed the fiduciary responsibilities of financial professionals. The Court rejected one party's First Amendment challenge to the DOL rule because the Court claimed the party did not first raise the objection in a comment to the proposed rule. This holding is wrong and distinguishable from this case for two reasons. First, *Hugler* erroneously relies on cases espousing waiver based on failure to raise arguments during agency adjudicatory proceedings. *Id.* at 203. Second, *Hugler* fails to mention *City of Seabrook* and acknowledge the difference between raising arguments during an adjudicatory proceedings and agency rulemaking. *Id.* at 202–03. City of Seabrook controls here—the APA does not require litigants to first raise issues during notice and comment.

### 2.   Commenters on the Final Rule raised the constitutional issues in State Plaintiffs' complaint.

Defendants also assert that the commenters on the proposed rule did not raise "most of the objections" in Count One of the Complaint. Defs.' Br. 39. In fact, many of the comments about the proposed rule raised the constitutional infirmities pleaded in the Second Amended Complaint. In the District of Columbia Circuit, like the Fifth Circuit, the "waiver doctrine does not represent an ironclad rule." *Advocates for Highway & Auto Safety v. Fed. Motor Carrier Safety Admin.*, 429 F.3d 1136, 1148 (D.C. Cir. 2005). "[A]s a general matter, a party's presentation of issues during a rulemaking proceeding is not a *jurisdictional* prerequisite to judicial review." *Id.* (emphasis in original); *see also Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1248 (D.C. Cir. 2004) (Courts "presume exhaustion is non-jurisdictional unless 'Congress states in clear, unequivocal terms that the judiciary is barred from hearing an action until the

administrative agency has come to a decision.'") (quoting *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton Tri Indus.*, 727 F.2d 1204, 1208 (D.C. Cir. 1984)).

While the DC Circuit has said it is "black-letter administrative law that absent special circumstances, a party must initially present its comments to the agency during the rulemaking in order for the court to consider the issue," *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001) (citation and quotation marks omitted), courts "frequently make[ ] exceptions to this rule, permitting plaintiffs who did not participate in rulemaking processes to file challenges if, for example, other commenters raised the same concerns," *Ark Initiative v. Tidwell*, 64 F. Supp. 3d 81, 94 (D.D.C. 2014), *aff'd*, 816 F.3d 119 (D.C. Cir. 2016) (permitting organization to challenge rule even though it did not comment on it because a number of other commenters raised the same concerns alleged in the complaint). When the "agency knew or should have known about the specific concerns, then the plaintiff need not have personally raised them during the comment period." *Id.*; *see, e.g., Nat. Res. Def. Council v. EPA*, 755 F.3d 1010, 1022–23 (D.C. Cir. 2014) (permitting challenge to EPA rule even though party did not comment, because other commenters raised the same issues); *Sierra Club v. EPA*, 353 F.3d 976, 982 (D.C. Cir. 2004) (same).

Several commenters raised the same constitutional issues presented in Plaintiffs' complaint. At least two commenters argued the Final Rule violated the Tenth Amendment.[6] Defendants even mentioned and dismissed these comments in the Final Rule in a section labeled "Tenth Amendment and Federalism." 81 Fed. Reg.

---

[6] Johnston Moore, Comment Letter on Proposed Rule on Regulations for State Courts and Agencies in Indian Child Custody Proceedings (hereinafter "Proposed Rule") at 13 (May 19, 2015), https://www.regulations.gov/document?D=BIA-2015-0001-1476; Philip McCarthy, Comment Letter on Proposed Rule at 2 (Apr. 15, 2015), https://www.regulations.gov/document?D=BIA-2015-0001-0072;

38,788–89. At least fourteen commenters argued the Final Rule violated equal protection,[7] including one of the counsel for the Individual Plaintiffs.[8] Again, Defendants mentioned and dismissed the equal protection concerns in the Final Rule. 81 Fed. Reg. 38,794, 38,826.

Any contention by Defendants that they lacked notice of the Final Rule's constitutional infirmities is at best naïve and at worst a misrepresentation of the notice and comment process. There is no requirement that State Plaintiffs had to submit formal comments about the constitutional defects in the Final Rule, and even if there were, other commenters raised the same concerns, given Defendants sufficient notice. Nor is the fact that Texas DFPS submitted a late comment on the Final Rule dispositive of Texas ability to challenge the Final Rule as unconstitutional. There are hundreds of Texas state agencies, counties, and local governments. The fact that one expressed a comment does not divest the State from its ability to challenge the Final Rule. In fact, in *New York v. United States*, the deputy commissioner of the New York Energy Offices testified in favor of the Low-Level Waste Legislation, and Senator

---

[7] McCarty, *supra* note 6 at 3–6; Devin D. Vinson, Adoption Choices of Texas, Comment Letter on Proposed Rule at 6, 9, 11, 14, 34, 35 (May 8, 2015), https://www.regulations.gov/document?D=BIA-2015-0001-1571; Cindy Bench (p. 81) & Mary Beck (p. 91), Dep't of Interior Teleconference on Proposed Rule (May 12, 2015), https://www.regulations.gov/document?D=BIA-2015-0001-1882; Traci F. Lee, Assistant Cty. Counsel, Cty. of Sacramento, Cal., Comment Letter on Proposed Rule at 7, 8 (May 19, 2015), https://www.regulations.gov/document?D=BIA-2015-0001-1420; Elizabeth Morris, Comment Letter on Proposed Rule at 8 (May 11, 2015), https://www.regulations.gov/document?D=BIA-2015-0001-0794; Change.org Petition Opposing Proposed Rule (May 19, 2015), https://www.regulations.gov/document?D=BIA-2015-0001-1869; Larry S. Jenkins, Comment Letter on Proposed Rule at 2 (May 19, 2015), https://www.regulations.gov/document?D=BIA-2015-0001-0533; John Chally, Comment Letter on Proposed Rule at 2, 5 (Apr. 22, 2015), https://www.regulations.gov/document?D=BIA-2015-0001-1858; Barbara E. Katz, Comment Letter on Proposed Rule at 2 (May 15, 2015), https://www.regulations.gov/document?D=BIA-2015-0001-1547; Sherriann H. Hicks, Comment Letter on Proposed Rule at 2 (May 19, 2015), https://www.regulations.gov/document?D=BIA-2015-0001-1386; Stephen Konig, Comment Letter on Proposed Rule at 1 (May 19, 2015), https://www.regulations.gov/document?D=BIA-2015-0001-1194; Neal Sherry, Comment Letter on Proposed Rule at 2 (May 13, 2015), https://www.regulations.gov/document?D=BIA-2015-0001-1546; JaRae Thompson, Comment Letter on Proposed Rule at 2 (June 7, 2015), https://www.regulations.gov/document?D=BIA-2015-0001-1217.

[8] Vinson, *supra* note 7 at 2.

---

Moynihan of New York spoke in favor of it on the Senate floor. 505 U.S. at 181. This did not waive New York's ability to later—successfully—challenge the law as unconstitutional under the Tenth Amendment. Moreover, here, Texas DFPS *must* speak favorably about the Final Rule, lest it jeopardize the funding it receives from HHS. Thus, the Court should reject Defendants' argument that the State Plaintiffs waived their ability to challenge the Final Rule.

## III.   *Younger* Abstention Is Inapplicable to State Plaintiffs' Claims.

The Supreme Court, in *Sprint Communications, Inc. v. Jacobs*, recently said, "In the main, federal courts are obliged to decided cases within the scope of federal jurisdiction. Abstention is not in order simply because a pending state-court proceeding involves the same subject matter." 134 S. Ct. 584, 588 (2013). The circumstances under which federal courts should abstain under the *Younger v. Harris*, 401 U.S. 37 (1971), doctrine are exceptional. *Sprint Commc'ns*, 134 S. Ct. at 588. When a federal court has jurisdiction, it has an unflagging obligation to hear and decide the case in front of it. *Id.* at 591.

"Our Federalism" as the *Younger* doctrine is known, counsels federal courts against hearing constitutional challenges to state action when there is an on-going state-court proceeding. *Younger*, 401 U.S. at 44. A main purpose behind this doctrine is that federal courts, out of a comity for the states, should allow state courts should have an opportunity to reach their own judgments.

*Younger* abstention is inapplicable to this case. State Plaintiffs came, by their own volition, to federal court requesting a ruling on the constitutionality of a federal law and its implementing regulations. Nowhere in the State Plaintiffs' complaint do they ask for a ruling on any state law or seek an injunction against any state official—the core areas of concern in *Younger*.

The *Younger* abstention doctrine applies only when the relief sought in federal court "would interfere in some manner with the state court litigation." *Green v. City of Tuscon*, 255 F.3d 1086, 1094 (9th Cir. 2001). Thus, *Younger* generally applies when the federal plaintiff is facing an enforcement action in state court. *Id*. *Younger* does not generally apply when the federal court decision may influence the result in state court. *Id*. And that interference must be direct; a "conflicting federal court decision on a point of law does not 'interfere' with an ongoing state proceeding for *Younger* purposes." *Id*. at 1096.

State Plaintiffs ask the Court to declare various portions of ICWA and the Final Rule unconstitutional and unenforceable, and issue an injunction against Defendants, who are all federal officials and agencies. None of this requested relief would directly interfere with any state proceeding. No state law would be struck down, and no state officials or agencies would be enjoined.

Additionally, even if this Court found ICWA unconstitutional, and a state court then agreed with that ruling, such a decision would not be outcome determinative. In place of applying ICWA, the state courts would revert to applying their normal state family laws. Because a decision in this case would not interfere with state proceedings, the Court should not ignore its unflagging obligation to decides case for which it has jurisdiction.

But there is another reason that the Court should not abstain under *Younger*: the *Younger* doctrine does not apply to non-parties in the state court proceeding. *Green*, 255 F.3d at 1099–00. Specifically looking at Indiana and Louisiana, Defendants point to no current state-court proceeding that involves either state as a party, or even any proceeding that involves an Indiana child in those states. And the mere prospect of a future lawsuit on the same issue does not require a federal court to abandon its jurisdiction. *Town of Lockport, N.Y. v. Citizens for Cmty. Action*, 430 U.S.

259, 264 n.8 (1977). Federal courts should abstain under *Younger* when the federal plaintiff is a non-party in the state proceeding only when the federal plaintiff's interest is "so intertwined with those of the state court party." *Green*, 255 F.3d at 1100. Texas, Indiana, and Louisiana are each individual sovereign states. None of them can be said to have interests that are intertwined with those of the Individual Plaintiffs. And "neither a mere 'common interest in the outcome of federal litigation nor a common effort in pressing it requires abstention as to all plaintiffs.'" *United States v. Composite State Bd. of Med. Exam'rs*, 656 F.2d 131, 137 (5th Cir. 1981) (quoting *Robinson v. Stovall*, 646 F.2d 1087, 1091 (5th Cir. 1981)).

Finally, "[i]f the State voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court force the case back into the State's own system." *Ohio Bureau of Emp't Servs. v. Hodory*, 431 U.S. 471, 480 (1977). Here, the States voluntarily chose to litigate these claims in a federal forum. There can be no question that they have submitted themselves to this federal forum. Thus, comity does not demand any abstention under *Younger* as to the State Plaintiffs.

## IV.   ICWA and the Final Rule Violate the Tenth Amendment (Count III).

### A.   States Have Exclusive Power Over Domestic Relations.

The Constitution established a system of "dual sovereignty." *Printz*, 521 U.S. at 918 (citation and quotation marks omitted). When the States joined the Union, they "surrendered many of their powers to the new Federal Government," but "they retained 'a residuary and inviolable sovereignty.'" *Id.* at 918–19 (quoting Federalist No. 39 (J. Madison)). The residual sovereignty of the States is evident from the Constitution's conferral of specific, enumerated, and limited powers to Congress, U.S. Const. art. I, § 8, and reservation of all other powers to the States, or the people, U.S. Const. amend. X. "'The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments

are numerous and indefinite.'" *Lopez*, 514 U.S. at 552 (quoting Federalist No. 45 (J. Madison)).

Nowhere is the division of dual sovereignty starker than in the powers conferred to the Congress and States over Indian tribes and domestic relations. On the one hand, Article I gives Congress the power to regulate commerce with the Indian tribes. U.S. Const. art. I, § 8, cl. 3. On the other hand, domestic relations, including adoption, foster care, and parental rights, have "long been regarded as a virtually exclusive province of the States." *Sosna*, 419 U.S. at 404.

Indeed, an inviolable doctrine exists that places all matters of family, marriage, parental rights, and child custody in the sole hands of the States. "The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United States." *In re Burrus*, 136 U.S. 586, 593–94 (1890). The Constitution keeps domestic relations issues in state control because Congress possesses no enumerated powers over domestic relations. "[C]ustody and guardianship by the parent of his child does not arise under the constitution, laws, or treaties of the United States, and is not dependent on them." *Id.* at 596. Domestic relations—including child custody—is a concern of the States.

Nowhere in this more evident than in the "domestic relations exception" to diversity jurisdiction in federal courts. This exception, which functions like an abstention doctrine, "divests the federal courts of power to issue divorce, alimony, and child custody decrees." *Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992). While federal courts may hear many state-law causes of action in diversity cases, the domestic relations exception requires parties to litigate these issues in state courts alone. *See Congleton v. Holy Cross Child Placement Agency, Inc.*, 919 F.2d 1077, 1079 (5th Cir.

1990) (concluding the dispute was "so intertwined with parental rights and the custodial status of the child" that the domestic relations exception applied to remove federal jurisdiction).

When Congress lacks power over an area because it is reserved to the States by the Tenth Amendment, it may request, but not command State action. Since the "early Congresses" there was an "assumption" rooted in the text of the Constitution that Congress may request States' assistance, but not command it. *See Printz*, 521 U.S. at 909 (discussing law recommending, but not commanding, that States hold federal prisoners in state jails at federal expense). The Federalist Papers confirm this point: Congress cannot impose "responsibilities *without the consent of the States*." *Id.* at 910–11; *see also id.* at 911 ("'Thus, the legislatures, courts, and magistrates, of the respective members will be incorporated into the operations of the national government *as far as its just and constitutional authority extends*.'" (quoting Federalist No. 27 (A. Hamilton)).

### B. The federal government may not commandeer state officials to implement federal policy.

The Framers, in designing our constitutional system, "explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." *New York*, 505 U.S. at 166. Our federal system "does not protect the sovereignty of States for the benefit of the States or state governments as abstract political entities, or even for the benefit of the public officials governing the States. To the contrary, the Constitution divides authority between federal and state governments for the protection of individuals." *Id.* at 181. Under that system, the federal government cannot direct or commandeer States to implement federal laws or regulations. In *New York*, 505 U.S. 144, and *Printz*, 521 U.S. 898, the Supreme Court articulated the authority for and the scope of this rule, known as the anti-commandeering principle.

ICWA and the Final Rule unconstitutionally commandeer State power over domestic relations and equal protection.

Congress may not compel States to do as it wishes. In *New York*, the Supreme Court considered whether Congress had the ability to compel States to provide for the disposal of radioactive waste generated within their borders. 505 U.S. at 149. Faced with the issue of how to deal with radioactive waste, Congress passed the Low-Level Radioactive Waste Policy Act. *Id*. at 150. Included within the Act were three provisions that encouraged States to comply with their obligation to provide for the disposal of this waste. The State of New York challenged the law and argued that the three provisions unconstitutionally commandeered the State by directing it to regulate radioactive waste. *Id*. at 160. The Supreme Court said that "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *Id*. at 162. And after consideration, the Supreme Court held that third challenged provision under the Act violated this constitutional understanding.

That provision gave the States two options: to regulate according to Congress's direction or to take title to and possession of the radioactive waste generated within their borders. *Id*. at 174–75. The Court held that, because Congress could not enact either option as a freestanding requirement, Congress could not offer the States a choice between two unconstitutionally coercive options. *Id*. at 176. Because this is what the challenged act had done, the Court held that it was unconstitutional. *See id*. at 188 ("The Federal Government may not compel the States to enact or administer a federal regulatory program.").

Just five years after the Court decided *New York*, the Court encountered a Tenth Amendment anti-commandeering challenge to the Brady Handgun Violence

Prevention Act in *Printz*. The Act required state officers, among other things, to conduct background checks on prospective handgun purchasers. *Printz*, 521 U.S. at 902. The Court described the Brady Act as requiring state law enforcement officers to "participate . . . in the administration of a federally enacted regulatory scheme." *Id.* at 904. The Court held that such a requirement violated the Constitution's anti-commandeering principles, even when the obligation on state officials was to perform only discrete, ministerial tasks as specified by Congress. *Id.* at 929–30. Such an arrangement is problematic, the Court said, because it allows Congress to take credit for solving problems while passing on the financial obligations of implementing the policy onto the States. *Id.* The Court also noted that obligations on State officials can create problems, even when those obligations impose no financial burdens on the States. *Id.* By administering the federal program, the State officials are "put in the position of taking the blame for its burdensomeness and for its defects." *Id.*

In the majority opinion's conclusion, Justice Scalia succinctly summarized the anti-commandeering principle's core tenets:

> We held in *New York* that Congress cannot compel the States to enact or enforce a federal regulatory program. Today we hold that Congress cannot circumvent that prohibition by conscripting the State's officers directly. The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program. It matters not whether policymaking is involved, and no case-by-case weighing of the burdens or benefits is necessary; such commands are fundamentally incompatible with our constitutional system of dual sovereignty.

*Id.* at 935.

### C.   ICWA requires state officials to enforce ICWA.

ICWA and the Final Rule commandeer State Plaintiffs' to act in ways that they might not otherwise act, and to do so in the area of domestic, family law, a traditional

concern of State governments. "It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority." *Id.* at 928.

ICWA requires, for example, that States:

- Notify the parents, Indian custodian, the child's tribe, Secretary Zinke, and the BIA of child custody proceedings involving an Indian child, and wait 10 days after they receive notice before the proceedings may continue, 25 U.S.C. §§ 1911, 1912 and 25 C.F.R. § 23.11; States' MSJ App. 16, 31, 372, 394, 397–99;

- Transfer foster care placement and termination of parental rights proceedings involving an Indian child to tribal courts, even when the child is not living on the reservation, 25 U.S.C. § 1911;

- Maintain records demonstrating ICWA compliance and make those records available for inspection at any time by Secretary Zinke or the child's Indian tribe, 25 U.S.C. § 1915; States' MSJ App. 15, 28–29, 31; and

- Provide Secretary Zinke with a copy of final adoption decrees, and the name and tribal affiliation of the child, the names of the biological parents, the names of the adoptive parents, and the identity of any agency having files or information relating to the adoption, 25 U.S.C. § 1951; States' MSJ App. 16.

In addition, the Final Rule requires State courts to do the following.

- Notify the child's biological parent or prior Indian custodian and the child's tribe if the adoption decree is vacated or the adoptive parent consents to termination of parental rights, 25 C.F.R. § 23.139;

- Inform a child once he or she reaches age 18 of his or her tribal affiliation, 25 C.F.R. § 23.138;

- Send a copy of a final adoption decree or an order in a voluntary or involuntary Indian child placement to the BIA within 30 days along with biographical information about the child, the biological parents, the adoptive parents, the state agency possessing information about the child, and information about tribal membership of the child, citing 25 C.F.R. § 23.140.

The Final Rule also purports to command States to do the following.

- Provide specific notice to an Indian tribe, the child's parents, and the child's Indian custodian concerning an involuntary foster care placement or termination of parental rights proceeding involving an Indian child, 25 C.F.R. § 23.111; States' MSJ App. 16, 31;

- Ensure that the State agency used "active efforts" to prevent the breakup of the Indian family, and defines in detail what "active efforts" includes, 25 C.F.R. §§ 23.120, 23.2; States' MSJ App. 16, 31, 370, 396;

- Perform a "diligent search" to find suitable placements meeting the preference criteria, 25 C.F.R. § 23.132(c)(5);

- Maintain a record of every voluntary or involuntary foster care, preadoptive, and adoptive placement of an Indian child and make the record available within 14 days of a request by an Indian child's Tribe or Secretary Zinke, 25 C.F.R. § 23.141; States' MSJ App. 26, 388.

ICWA and the Final Rule change State Plaintiffs' obligations under their family laws when considering cases with Indian children, to wit:

| Issue Under State Law | State Law | ICWA and Final Rule |
|---|---|---|
| What is the guiding principle for awarding foster care or adoptive rights? | Best interest of the child.<br><br>Tex. Fam. Code § 153.002; La. Child. Code art. 1255; Ind. Code § 31-19-11-1. | Racial preferences.<br><br>25 U.S.C. § 1915(a); States' MSJ App. 24, 386, 395. |

| Issue Under State Law | State Law | ICWA and Final Rule |
|---|---|---|
| May State agencies or courts discriminate based on race in foster care or adoption proceedings? | No.<br><br>Tex. Fam. Code §§ 162.015, 264.1085; La. Const. art. 1, § 3. | Yes.<br><br>25 U.S.C. § 1915(a)–(b). |
| What is the burden of proof for terminating parental rights? | Clear and convincing evidence<br><br>Tex. Fam. Code § 161.001(b), .206; La Child. Code art. 1035(A); Ind. Code § 31-37-14-2. | Proof beyond a reasonable doubt.<br><br>25 U.S.C. § 1912; 25 C.F.R. §§ 23.111-.121. |
| What efforts must State agencies use in child custody proceedings? | "Reasonable efforts"<br><br>2d Am. Compl. ¶ 228. | "Active efforts"<br><br>25 U.S.C. § 1912(d). |
| When may a party intervene in a State court lawsuit? | Upon showing sufficient cause, Tex. R. Civ. Proc. 60 & Ind. R. Tr. Proc. 24, or a justiciable interest, La. Code Civ. Proc. art. 1091. | Mandatory intervention as of right for Indian child's custodian and tribe.<br><br>25 U.S.C. § 1911(c). |
| When may a parent voluntarily relinquish parental rights? | 48 hours after birth of the child, Tex. Fam. Code § 161.103(a)(1); prior to or after birth, La. Child. Code art. 1130; anytime after birth, Ind. Code § 31-35-1-6. | 10 days after birth.<br><br>25 U.S.C. § 1913(a); 25 C.F.R. § 23.125(e). |
| How long may a final adoption decree be challenged? | 6 months to one year.<br><br>Tex. Fam. Code § 162.012(a); La. Child. Code art. 1263; Ind. Code § 31-19-14-2. | Two years.<br><br>25 U.S.C. § 1913(d); 25 C.F.R. § 23.136. |

These requirements impermissibly commandeer State officials. They impose affirmative duties and obligations on State officers for which the States will bear the costs of enforcement. The requirements imposed by ICWA and the Final Rule are substantially similar to those in *Printz* and should face the same result—a declaration that they are unconstitutional and an injunction against their enforcement.

Even the obligations imposed on the State courts violate the anti-commandeering principle. Although *Printz* did not foreclose totally the ability of Congress to create obligations for State courts, any obligations on State courts must be related to the judicial power. 521 U.S. at 907. For example, the requirements for State courts to inform a child once he or she reaches age 18 of his or her tribal affiliation, 25 C.F.R. § 23.138, or send a copy of a final adoption decree or an order in a voluntary or involuntary Indian child placement to the BIA within 30 days along with biographical information about the child, the biological parents, the adoptive parents, the state agency possessing information about the child, and information about tribal membership of the child, *id.* § 23.140. These actions are ministerial in nature and are not related to a court's judicial power. Notifying a child once he or she reaches the age of 18 is wholly unrelated to any case or controversy presently before the court. And that child's adoption proceedings may have ended over a decade ago. Accordingly, these tasks are not areas of traditional judicial power, and thus, the federal government may not order State courts to carry them out. ICWA and the Final Rule unconstitutionally commandeer State power.

## V.     ICWA Violates Article I of the Constitution (Counts II & VII).

"The power of Congress over Indian affairs may be of a plenary nature; but it is not absolute." *Del. Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 84 (1977) (citation omitted). Congress's power to legislate must be rooted in an Article I power, and Congress may not delegate those powers. Here, ICWA violates both principles because

Congress delegated to the tribes power to reorder the racial placement preferences for foster care and adoption, and rooted its power to enact ICWA in the Commerce Clause even though children and child custody matters are not commerce.

### A.    ICWA violates the non-delegation doctrine.

The Constitution prohibits Congress from delegating its legislative authority. This is especially true when Congress attempts to delegate to a non-executive branch agency. ICWA and the Final Rule delegate to Indian tribes the ability to modify and arrange the order of adoptive and foster parent preferences that a State court must follow in child-placement proceedings. This ability to reorder preferences (from a list originally ordered by Congress) is a delegation of legislative authority to a governing body that most State citizens have no ability to be represented in. This is impermissible and violates the non-delegation doctrine of the Constitution.

### 1.    The Constitution does not permit Congress to delegate its legislative authority.

Although the non-delegation doctrine is invoked infrequently, the doctrine is not dead. "The fundamental precept of the delegation doctrine is that the lawmaking function belongs to Congress, U.S. Const., art. I, § 1, and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996) (citing *Field v. Clark*, 143 U.S. 649, 692 (1892)).

> "The true distinction . . . is between the delegation of power to make the law, which necessarily involves a discretion as to what it shall be, and conferring authority or discretion as to its execution, to be exercised under and in pursuance of the law. The first cannot be done; to the latter no valid objection can be made."

*Field*, 143 U.S. at 693–94 (quoting *Cincinnati, W. & Z.R. Co. v. Comm'rs of Clinton Cty.*, 1 Ohio St. 77, 88–89 (1852)). Indeed, "[t]he intelligible-principle rule seeks to enforce the understanding that Congress may not delegate the power to make laws and so may delegate no more than the authority to make policies and rules that implement its statutes." *Loving*, 517 U.S. at 771 (citing *Field*, 143 U.S. at 693–94).

As shown by this Court in *Texas v. United States*, --- F. Supp. 3d ---, No. 15-cv-151-O, 2018 WL 1478250 (N.D. Tex. Mar. 5, 2018) (O'Connor, J.), the Constitution still vests "Congress alone with the unalienable power to make prospective and generally applicable rules of conduct." *Id.* at *18. "The Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). "Our Constitution, by careful design, prescribes a process for making law, and within that process there are many accountability checkpoints." *Dep't of Transp. v. Ass'n of Am. Railroads*, 135 S. Ct. 1225, 1237, (2015) (Alito, J. concurring). When these checkpoints are bypassed, the Constitution's protections are dismantled. *See id.* Thus, legislative delegation to a private entity or another sovereign does not even provide a "fig leaf of constitutional justification." *Id.*

2. **ICWA delegates to the tribes substantive legislative decisions on racial placement and adoption preferences.**

When Congress passed, and later amended, ICWA it set out a list of three race-based options for adoption placements and four race-based options for foster-care placements. *See* 25 U.S.C. § 1915. State courts must attempt to place Indian children within the options provided and with a preference for the highest listed option. Thus, where a court may ultimately place a child depends on Congress's choices in its ranking of preference options. But Congress did not set these racial preferences in stone. It also allowed Indian tribes to establish a different order of preference, by adopting their own resolutions, which State courts would then be bound to follow. *See* 25 U.S.C. § 1915(c) ("if the Indian child's tribe shall establish a different order of preference by resolution, the agency or court effecting the placement shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child").

This is a clear example of Congress unconstitutionally delegating its legislative authority. Congress, by legislative action, established orders of racial preference for Indian child adoptions and foster-care placements. Congress then provided, however, that an Indian tribe may change Congress's legislation. The tribes are thereby able to create a *new law* that State courts *must* honor and follow—at least according to the federal government. For example, the Alabama-Coushatta-Tribe of Texas has established different preferences than the ones set out by Congress. *See* States' App. 918 ("The Alabama-Coushatta-Tribe of Texas advised that their placement preferences differed from those in Appendix 1226-A. Their placement preferences are on file with DFPS.").

Congress may delegate authority to an Indian tribe to regulate the conduct on tribal lands and reservations or of non-Indians on non-Indian land that is within a reservation. *Atkinson Trading Co., Inc. v. Shirley*, 532 U.S. 645, 650–51 (2001). But it may not delegate power to the tribes to amend a congressional enactment that applies throughout the United States. Nor may it delegate to tribes the power to overcome state sovereign immunity. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996). And, for the same reason, tribal enactments do not necessarily preempt state law by virtue of congressional sanction. *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 156 (1980); *White Mountain Apache Tribe v. Arizona*, 649 F.2d 1274, 1281 (9th Cir. 1981).

Although the tribes are not private entities, a delegation to the tribes raises many of the same problems as seen in delegations to private entities. The tribal governments are unaccountable to the vast majority of the citizens of the State Plaintiffs. When Congress enacts law according to its delegated powers, it cannot transfer its legislative authority to a different entity. By delegating to the tribes, Congress allows

the tribes to make decisions different from those of the people's duly elected repre-
sentatives in Congress when they enacted ICWA. ICWA commands States to follow
those tribal decisions. In this way, tribal resolutions stand in the place of ICWA's
default standards, which Congress passed appropriately through bicameralism and
presentment. This violate the non-delegation doctrine as much as any delegation to
a private entity. And the Court should grant the State Plaintiffs' motion for summary
judgment on this court.

### B.   ICWA violates the Commerce Clause.

Under the Commerce Clause, Congress may regulate three categories of activ-
ity: the use of channels of interstate commerce; the instrumentalities of interstate
commerce, or persons or things in interstate commerce; and activities that substan-
tially affect interstate commerce. *United States v. Morrison*, 529 U.S. 598, 608–09
(2000). But there is a limit to this power. Congress may not use this power to enact
laws regulating "family law (including marriage, divorce, and child custody)." *Lopez*,
514 U.S. at 564. With ICWA, Congress exceeded its Commerce Clause power because
children are not commerce and ICWA regulates relationships with Indian people, not
tribes as a whole.

### 1.   The Commerce Clause regulates economic activity.

Congress premised its authority to enact ICWA on the Commerce Clause. 25
U.S.C. § 1901(1). Article I, section 8 of the Constitution provides that "Congress shall
have Power . . . To regulate Commerce with foreign Nations, and among the several
States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. The meaning of com-
merce is the same whenever Congress acts with respect to foreign nations, the States,
and Indian tribes.

At the time of the founding, "commerce" consisted of "selling, buying, and bar-
tering, as well as transporting for these purposes." *Adoptive Couple v. Baby Girl*, 570
U.S. 637, 659 (2013) (Thomas, J., concurring) (citing 1 S. Johnson, *A Dictionary of the*

*English Language* 361 (4th rev. ed. 1773) (reprint 1978) (defining commerce as "Intercourse; exchange of one thing for another; interchange of any thing; trade; traffick")). "'[W]hen Federalists and Anti–Federalists discussed the Commerce Clause during the ratification period, they often used trade (in its selling/bartering sense) and commerce interchangeably.'" *Id.* (quoting *Lopez*, 514 U.S. at 586 (Thomas, J., concurring)). The Founders did not define "commerce" to include economic activity like "manufacturing", "let alone noneconomic activity such as adoption of children." *Id.*

"Commerce," as it related to Indian tribes at the founding, meant "trade with Indians." *Id.* (citing Natelson, *The Original Understanding of the Indian Commerce Clause*, 85 Denver U. L. Rev. 201, 215–16 & n.97 (2007), and Report of Committee on Indian Affairs (Feb. 20, 1787), in 32 Journals of the Continental Congress 1774–1789, pp. 66, 68 (R. Hill ed. 1936)). "And regulation of Indian commerce generally referred to legal structures governing 'the conduct of the merchants engaged in the Indian trade, the nature of the goods they sold, the prices charged, and similar matters.'" *Id.* at 660 (quoting Natelson 216, & n.99).

Furthermore, the Commerce Clause limits Congress's power to regulation of commerce "with the Indian *tribes.*" U.S. Const. art. I, § 8, cl. 3 (emphasis added). This does not vest Congress with power to regulate commerce with "all Indian persons" any more than the Clause gives Congress power to regulate commerce with all foreign nationals in the United States. *Adoptive Couple*, 570 U.S. at 660. The plain language of the text confirms that Congress does not have "plenary" power over Indian tribes, but only the power to "regulate commercial interactions" with Indian tribes. *Id.*

### 2.     Children are not "commerce."

Termination of parental rights, awarding foster care, or approving of adoption petitions is not "commerce" under any sense of the word. Indeed, if adoption or foster

care of children is commerce, then the federal government has power to regulate domestic relations, an idea that flies in the face of the domestic relations doctrine and the States' Tenth Amendment power over such matters.

The Supreme Court's ruling in *Lopez*, 514 U.S. 549, is instructive. There the Court held that the Gun-Free School Zones Act, which made it a federal crime to knowingly possess a firearm near a school zone, exceeded Congress's Commerce Clause power. The Court determined that the law had "nothing to do with 'commerce'" or economic activity, however broadly those terms were defined. *Id*. at 561. Nor was the law connected to any sort of commercial transaction. *Id*. The federal government argued that possession of a firearm in a school zone "may result in violent crime and that violent crime can be expected to affect the functioning of the national economy" because violent crime causes financial costs on society, reduces the willingness of people to travel, and threatens the learning environment. *Id*. at 563–64. All of these things, the government contended, will result in a less productive society. *Id*. at 564. The Court rejected these justifications as too attenuated to be justified under the Commerce Clause. *Id*. at 563–64. Under the government's theory, "Congress could regulate any activity that it found was related to the economic productivity of individual citizens: family law (including marriage, divorce, and child custody)." *Id*. at 564.

ICWA exceeds Congress's Commerce Clause power in precisely the same way. Congress enacted ICWA based on concerns about "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Adoptive Couple*, 570 U.S. at 642 (citation omitted). Congress asserted that States failed to recognize the correct the problem. 25 U.S.C. § 1901(5). But these concerns, as noble as they were at the time, are not connected to commerce. In *Lopez*, the Court

expressly repudiated the attenuated causal links between gun violence and a productive society. It also rejected the idea that economic activity could justify federal regulation of child custody. *Lopez*, 514 U.S. at 564. The same is true here. Foster care and adoption decisions are child custody matters with little impact on economic activity.

### 3.   Congress may regulate Indian tribes, not children.

The Commerce Clause also specifies that Congress may regulate economic activity with "Indian tribes." U.S. Const. art. I, § 8, cl. 3. But ICWA does not regulate Indian tribes qua tribes. It regulates children who may or may not have any connection to a tribe. In fact, ICWA does not require a child to be a member of a tribe to qualify as an Indian child under the law. It defines "Indian child" to mean "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is *eligible for membership* in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4) (emphasis added). In other words, there are likely many child custody proceedings involving Indian children but without tribal involvement because none of the parties know they have Indian heritage or consider themselves Native American. And, yet, ICWA would apply to these cases. *Cf. Adoptive Couple*, 570 U.S. at 641 (holding ICWA does not apply to child who was 1.2% Cherokee). Thus, because adoption and foster care proceedings do not involve "commerce" with "Indian tribes," there is no basis for Congress to assert authority over these areas that belong to State power.

## VI.   ICWA and the Final Rule Violate Equal Protection (Count IV).

The Equal Protection Clause of the Fifth Amendment prohibits the federal government from making race-based classifications absent satisfaction of the strict-scrutiny standard. U.S. Const., amend. V; *Washington v. Davis*, 426 U.S. 229, 239 (1976). The Equal Protection Clause of the Fourteenth Amendment prohibits state governments from making similar race-based classifications. *Parents Involved in Cmty.*

*Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007). The standard under either amendment requires proof that the racial classification is narrowly tailored to achieve a compelling state interest. *Parents Involved*, 551 U.S. at 720; *Davis*, 426 U.S. at 248.

The United States Supreme Court has held that the Equal Protection Clause prohibits States from making child-custody decisions on the basis of racial prejudice. *Palmore v. Sidoti*, 466 U.S. 429, 433–34 (1984); *see also id.* at 433 ("The goal of granting custody based on the best interests of the child is indisputably a substantial governmental interest for purposes of the Equal Protection Clause."). "[W]henever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229–30 (1995). In other words, an individual's equal-protection rights are violated when they are unable "to compete on an equal footing" with others. *Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993) (stating also that the injury is "the denial of equal treatment").

ICWA causes non-Indian couples who desire to adopt or foster an Indian child, and Indian children not domiciled on the reservation to surrender their right to equal protection of law. When Texas citizens seek to adopt children with Indian heritage, they are not on "equal footing" with Indian families, solely because they are not members of an Indian tribe. Indeed, because of a child's status as an Indian child, the State's entire adoption and foster care system is displaced in favor of federally imposed preferences that do not place an Indian child's best interests first. Such race-based decisions are subject to strict-scrutiny analysis.

### A.    ICWA and the Final Rule's adoption preference for an Indian family over a Non-Indian family is race-based discrimination.

In the past, the Supreme Court has avoided the application of strict scrutiny to laws that distinguish between Indians and non-Indians when the classification is

"political," that is, focused on tribal membership. *See, e.g., Morton v. Mancari*, 417 U.S. 535, 553–54 & n.24 (1974). But the Court has never indicated that all classifications based on Indian status will avoid strict scrutiny and the adoption and foster care preferences in ICWA and the Final Rule are a race-based classification to which strict scrutiny applies for four primary reasons: (1) the Court indicated in *Adoptive Couple*, 133 S. Ct. 2552, that ICWA posed equal-protection concerns; (2) ICWA and the Final Rule's focus on ancestry indicates a race-based preference; (3) the adoption preferences in ICWA and the Final Rule do not concern Indian self-government; and (4) the language of ICWA and the Final Rule and at least one other federal statute indicate that the adoption preferences are race-based.

### 1.   Adoptive *Couple v. Baby Girl* indicates ICWA and the Final Rule violate Equal Protection.

In 2013, the Supreme Court decided *Adoptive Couple v. Baby Girl*, in which a non-Indian couple sought to adopt an Indian child. *Id*. at 2558. The child's Indian father, who had abandoned the birth mother and provided no support for the child, sought to use ICWA to prevent the adoption and obtain custody of the child for himself. *Id*. at 2558–59.

Although the Court resolved the suit on statutory grounds, it indicated that interpreting ICWA to prioritize an individual's Indian ancestry over a child's best interests "would put certain vulnerable children at a great disadvantage solely because an ancestor—even a remote one—was an Indian." *Id*. at 2565. The Court went on to state that "[s]uch an interpretation would raise equal protection concerns . . . ." *Id*. A majority of the Court has thus questioned the constitutionality of ICWA's differential treatment of Indian children and families.

### 2.   ICWA and the Final Rule's focus on ancestry creates race-based classifications.

ICWA and the Final Rule's singular focus on ancestry is also significant as the Court has "consistently repudiated '(d)istinctions between citizens solely because of

their ancestry' as being 'odious to a free people whose institutions are founded upon the doctrine of equality.'" *Loving v. Virginia*, 388 U.S. 1, 11 (1967). Discrimination based on "ancestry or ethnic characteristics" is, in fact, race discrimination. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 613 (1987); *see also Rice v. Cayetano*, 528 U.S. 495, 514 (2000) ("Ancestry can be a proxy for race.").

It is not enough to note that ICWA and the Final Rule do not apply to "Indians" as a whole, but rather only to those who are members of Indian tribes or eligible for such membership. *See* 25 U.S.C. § 1903(3), (4). "Simply because a class defined by ancestry does not include all members of the race does not suffice to make the classification race neutral." *Rice*, 528 U.S. at 516–17. Instead, the Court must consider its purpose and effect. *Id.* at 517. Here, for example, membership in the Navajo tribe is determined by the amount of Navajo blood an individual has. Navajo Nation Code tit. 1, § 701; *see also* 25 C.F.R. § 83.11(e) (requiring descent from a historical Indian tribe in order to be a federally recognized tribe). Thus, the focus on a child's ancestors betrays the fact that ICWA and the Final Rule create race-based classifications.

### 3. ICWA and the Final Rule lack any relevant to tribal self-government.

ICWA and the Final Rule likewise cannot be rescued by the traditional justification for treating Indians differently in other contexts, namely that such disparate treatment is vital to tribal sovereignty and self-government in some instances. That is because the Supreme Court has never held that all Indian-based classifications are political. Instead, the Court typically considers the extent to which the classification pertains to the Indians' ability to self-govern. *See Mancari*, 417 U.S. at 555. Thus, for example, the Court held that an Indian-employment preference at the Bureau of Indian Affairs need only be "rationally designed to further Indian self-government." *Id.* But the Supreme Court in *Mancari* expressly noted that the Indian preference at issue there "d[id] not cover any other Government agency or activity" and recognized

that "obviously more difficult question[s]" could arise in different circumstances. *Id.* at 554. Similarly, when discussing Indian classifications in *Rice*, the Court noted that "[t]he retained tribal authority relates to self-governance." 528 U.S. at 518; *see also Brendale v. Confederated Tribes & Bands of Yakima Indian Nation*, 492 U.S. 408, 425 (1989) (plurality opinion) (stating that "an Indian tribe generally retains sovereignty by way of tribal self-government and control over other aspects of its internal affairs").

Unlike other Indian-specific laws, the adoption preferences in ICWA and the Final Rule do not serve a political function of allowing tribes to govern themselves. Rather, they bind state courts and state agencies to federally imposed adoption and foster care preferences. The facts of this case demonstrate as much: the removal of Angel from his home, the termination of his parents' rights, and the placement of Angel with the Brackeens for foster care did not come about because of the efforts of any Indian tribe to control its own affairs. While Indian tribes may have an interest in the placement of Indian children for adoption, imposing ICWA and the Final Rule on state courts and state agencies does not further tribes' interest in self-governance.

### 4. Statutory language confirms ICWA and the Final Rule's race-based classifications.

Finally, other federal law implicitly recognizes that ICWA makes racial classifications. In 42 U.S.C. § 1996b(1), Congress decreed that adoption and foster-care placements may not be delayed or denied "on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved."[9] Congress then stated that the statute should not be construed to affect the application of ICWA. *Id.* § 1996b(3). This statutory exemption belies any claim that ICWA and the Final Rule do not create unconstitutional classifications that discriminate based on race. After

---

[9] Texas law contains a similar provision, Tex. Fam. Code § 162.015, as required in order to receive certain federal funds, 42 U.S.C. § 671(a)(18)(B).

all, such an exemption from discrimination on the basis of race, color, or national origin would be unnecessary if ICWA and the Final Rule were merely political classification.

Moreover, ICWA and the Final Rule's third adoption preference for any Indian family (regardless of tribe) over a non-Indian family also demonstrates that the line being drawn in § 1915(a) is one based on race, not political affiliation. If the goal was to allow tribes to govern themselves, then only the tribes to which the child belonged would receive a preference. Instead, Congress has created a preference for any Indian family, regardless of their connection to the Indian child or the child's tribe.

The Individual Plaintiffs, like many would-be adoptive and foster-care couples in Texas, Louisiana, and Indiana, have been denied relief solely because they are not Indian, and the rights of the children they wish to adopt or foster have been altered because of their statuses as Indian children. Such classifications are race-based, not political. Thus, strict scrutiny applies.

### B.   ICWA and the Final Rule's Adoption and Foster Care Preferences Do Not Survive Strict Scrutiny.

Because ICWA's adoption preferences create race-based classifications, they must be subject to analysis under the strict-scrutiny standard. *Parents Involved*, 551 U.S. at 720; *Davis*, 426 U.S. at 248. But there is no compelling interest that would support preferring one adoptive or foster-care family over another based solely on their status as Indians. Indeed, Congress already declared the exact opposite policy: that adoptions shall not be delayed or denied on the basis of race. 42 U.S.C. § 1996b(1).

Further, as emphasized by the majority in *Adoptive Couple*, Congress passed ICWA, in part, because it was concerned with "an alarmingly high percentage of Indian families [that were] broken up by the removal, often unwarranted, of their chil-

dren from them by nontribal public and private agencies." 25 U.S.C. § 1901(4); *Adoptive Couple*, 133 S. Ct. at 2562–63. But that interest is not furthered when the Indian family has already been broken up by their own choice through separation, divorce, or termination of parental rights, among other things. When a state lawfully, and pursuant to its established family law, terminates parental rights, and none of the other relatives are willing or able to adopt the child, the States, pursuant to their established family laws, should be able to decide the best interest of the child. The only question that remains in these situations is whether it is appropriate to choose the Indian child's new family on the basis of their race. There is no compelling reason to do so. And even if there was, ICWA and the Final Rule's adoption preferences are not narrowly tailored but rather broadly conclude that placement with an Indian family will, absent good cause, be preferable to placement with a non-Indian family. ICWA and the Final Rule's adoption preferences cannot survive a strict-scrutiny analysis, and thus are unconstitutional.

## VII. The Final Rule Violates the APA (Count I).

Under the APA, courts must "hold unlawful and set aside" agency actions that are "not in accordance with the law," or "arbitrary, capricious, and an abuse of discretion." 5 U.S.C. § 706(2). For "the authority of administrative agencies is constrained by the language of the statute they administer," *Texas*, 497 F.3d at 500–01 (citing *Massachusetts*, 549 U.S. 497); *Franciscan All.*, 227 F. Supp. 3d at 685, and the Constitution. "No matter how it is framed, the question a court faces when confronted with an agency's interpretation of a statute it administers is always, simply, *whether the agency has stayed within the bounds of its statutory authority*." *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 297 (2013) (emphasis in original); *Franciscan All.*, 227 F. Supp. 3d at 685.

As explained above, the Final Rule violates the APA because it violates the Constitution. First, the Final Rule violates the anti-commandeering doctrine of the Tenth Amendment by inserting federal substantive and procedural law into state family law and causes of action, 25 C.F.R. §§ 23.108–.110, .114–19, .124–28, changing burdens of proof, *id.* § 23.121–22, increasing agency burdens to "active efforts," *id.* § 23.2, and "diligent searches," *id.* § 23.132, requiring State agencies and courts to spend additional money on record-keeping and notifications to tribes and Interior, *id.* § 23.107, .111–12, .132, and mandating racial preferences in violation of State public policy, *id.* ¶¶ 106–112. Second, the Final Rule violates the Equal Protection Clause of the Fifth Amendment by imposing racial preferences on who may foster or adopt Indian children. 25 C.F.R. §§ 23.130–.131. This causes States to violate the equal protection rights of their citizens in child custody proceedings involving Indian children. Third, the Final Rule violates Article I because children are not "commerce" under the Commerce Clause, and Congress, Interior, and the BIA may not delegate legislative or rulemaking power to tribes to reorder the racial placement preferences. Finally, State Plaintiffs adopt and incorporate by reference the Individual Plaintiffs argument that the Final Rule is "arbitrary, capricious, and an abuse of discretion." *See* Individual Pls.' Br. Part II.C. For these reasons, the Court should declare the Final Rule not in accordance with law and arbitrary, capricious, and an abuse of discretion, and enjoin its enforcement.

## CONCLUSION

This case involves the federal government's intrusion into State sovereign power over domestic relations. State Plaintiffs possess standing to challenge ICWA and the Final Rule, their claims are ripe, and defendants possess no immunity. There is no reason for the Court abstain, and no waiver of their challenge to the Final Rule. ICWA and the Final Rule violate the Fifth and Tenth Amendments and Article I of

the Constitution, and the APA. Thus, State Plaintiffs respectfully request that the Court deny the federal government's and Tribes' motions to dismiss, grant summary judgment in State Plaintiffs' favor, declare ICWA unconstitutional and the Final Rule unlawful, and enjoin Defendants from enforcing ICWA and the Final Rule.

Respectfully submitted this 26th day of April, 2018.

JEFF LANDRY
Attorney General of Louisiana

CURTIS HILL
Attorney General of Indiana

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

*/s/ David J. Hacker*
DAVID J. HACKER
Special Counsel for Civil Litigation
Texas Bar No. 24103323
david.hacker@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
(512) 936-1414

*Attorneys for State Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2018, I electronically filed the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties.

*/s/ David J. Hacker*
DAVID J. HACKER