# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

CHAD EVERET BRACKEEN,
JENNIFER KAY BRACKEEN, FRANK NICH-
OLAS LIBRETTI, HEATHER LYNN LI-
BRETTI, ALTAGRACIA SOCORRO HER-
NANDEZ, JASON CLIFFORD, and DANIELLE
CLIFFORD,

     and

STATE OF TEXAS,
STATE OF LOUISIANA, and
STATE OF INDIANA,

        *Plaintiffs*,

     v.

UNITED STATES OF AMERICA; RYAN
ZINKE, in his official capacity as Secretary of the
United States Department of the Interior;
BRYAN RICE, in his official capacity as Direc-
tor of the Bureau of Indian Affairs; JOHN
TAHSUDA III, in his official capacity as Acting
Assistant Secretary for Indian Affairs; the BU-
REAU OF INDIAN AFFAIRS; the UNITED
STATES DEPARTMENT OF THE INTERIOR;
ALEX AZAR, in his official capacity as Secre-
tary of the United States Department of Health
and Human Services; and the UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN
SERVICES,

        *Defendants*,

CHEROKEE NATION, et al.,

        *Intervenor-Defendants*.

Civil Action No. 4:17-cv-868-O

**ORAL ARGUMENT REQUESTED**

## BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF INDIVIDUAL PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

BACKGROUND ...................................................................................................4

    I.    Statutory and Regulatory Framework ...................................................... 4

        A.    The Indian Child Welfare Act.................................................... 4

        B.    The 1979 Guidelines ................................................................ 6

        C.    The 2016 Final Rule................................................................. 7

    II.    Factual Background .................................................................................. 9

        A.    Child P.'s Adoption Proceedings............................................. 9

        B.    Baby O.'s Adoption Proceedings........................................... 12

        C.    A.L.M.'s Adoption Proceedings ............................................ 14

    III.    Procedural History ................................................................................. 16

LEGAL STANDARD ........................................................................................17

ARGUMENT.....................................................................................................18

    I.    Defendants' Motion to Dismiss Individual Plaintiffs' Claims for Lack of Subject-Matter Jurisdiction Should Be Denied ................................. 18

        A.    There Is a Live Controversy As To Each of Individual Plaintiffs' Claims ................................................................... 18

            1.    Individual Plaintiffs Are Being Injured By ICWA and the Final Rule.............................................................. 18

            2.    Individual Plaintiffs' Injuries Are Traceable to Regulations Promulgated by Defendants and to Federal Requirements Imposed by ICWA ................................. 25

            3.    A Judgment That Vacates the Final Rule and Declares ICWA Unconstitutional Will Redress Individual Plaintiffs' Injuries Caused By Federal Law................................. 30

**TABLE OF CONTENTS** *(continued)*

Page

B. The United States Has Waived Sovereign Immunity As To All of Individual Plaintiffs' Claims ................................................................. 35

C. There Is No Basis for This Court to Abstain Under *Younger* ................... 36

D. The States of Nevada and Minnesota Are Not Necessary and Indispensable Parties ................................................................................... 40

II. Individual Plaintiffs Are Entitled to Summary Judgment On Each of Their Claims for Relief ......................................................................................... 41

A. ICWA's Adoptive Placement Preferences and Collateral Attack Provisions Discriminate on the Basis of Race in Violation of Equal Protection ......................................................................................... 41

1. Any Law That "Fenc[es] Out Whole Classes" of Persons from "State Affairs" Is Plainly a "Racial Classification" ............. 42

2. ICWA's Adoptive Placement Preferences and Collateral-Attack Provisions Are Unconstitutional "Racial Classifications" ............................................................... 44

B. ICWA's Adoptive Placement Preferences and Collateral Attack Provisions Violate the Due Process Clause ................................................. 49

1. ICWA and the Final Rule Violate the Brackeens' Due Process Rights as Parents of A.L.M. ............................................... 50

2. ICWA and the Final Rule Violate Ms. Hernandez's Due Process Rights as the Biological Mother of Baby O. .................... 52

3. ICWA and the Final Rule Violate the Librettis' and Cliffords' Due Process Rights as Prospective Adoptive and Foster Parents of Baby O. and Child P. ................................. 53

C. The Final Rule—Including the BIA's Newfound Interpretation of Its Statutory Authority, the "Clear and Convincing" Burden of Proof, and the Diligent Search Requirement—Is Arbitrary and Capricious and Contrary to Law ......................................................... 55

1. The BIA Lacks Statutory Authority To Supervise Thousands of State Courts And Regulate the Custody Status of Countless Children Nationwide ....................................... 56

2. The Final Rule's "Clear and Convincing" Evidence Standard Conflicts with the Statutory "Good Cause" Requirement ................................................................................. 60

**TABLE OF CONTENTS** *(continued)*

                                                                          **Page**

3.    Even If ICWA Were Ambiguous, No *Chevron*
      Deference Is Warranted .............................................................. 63

D.    ICWA and the Final Rule Are Unconstitutional Because the
      Adoption of "Indian Children" Is Not a Permissible Subject of
      Federal Regulation ................................................................... 66

E.    The Final Rule Unconstitutionally Commandeers State
      Agencies and Courts ................................................................. 68

PRAYER FOR RELIEF ............................................................................. 70

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACRA Turf Club, LLC v. Zanzuccki,*
 748 F.3d 127 (3d Cir. 2014) ................................................................37

*Adarand Constructors, Inc. v. Pena,*
 515 U.S. 200 (1995) ................................................................... 43, 49

*In re Adoption of Baby Girl B.,*
 67 P.3d 359 (Okla. Civ. App. 2003) .........................................................7

*Adoptive Couple v. Baby Girl,*
 570 U.S. 495 (2013) .........................................................................3

*Adoptive Couple v. Baby Girl,*
 570 U.S. 637 (2013) ................................................................. *passim*

*Air Evac EMS, Inc. v. Texas,*
 851 F.3d 507 (5th Cir. 2017) ..........................................................30, 33

*Allstate Ins. Co. v. Abbott,*
 495 F.3d 151 (5th Cir. 2007) .....................................................28, 30, 33

*In the Interest of A.M., A Child,*
 02-17-00298-CV, 2017 WL 6047677
 (Tex. App.—Fort Worth Dec. 7, 2017, no pet. h.) ..........................................16

*Already, LLC v. Nike, Inc.,*
 568 U.S. 85 (2013) .........................................................................22

*Anibowei v. Sessions,*
 No. 3:16-CV-3495-D, 2018 WL 1477242 (N.D. Tex. Mar. 27, 2018) ...........................36

*Assoc. of Am. R.R. v. Dep't of Transp.,*
 38 F.3d 582 (D.C. Cir. 1994) ...............................................................19

*Bennett v. Spear,*
 520 U.S. 154 (1997) ....................................................................26, 28

*Bermudez v. U.S. Dep't of Agr.,*
 490 F.2d 718 (D.C. Cir. 1973) .............................................................40

*BLC(K) v. WWC,*
 568 S.W.2d 602 (Mo. Ct. App. 1976) .......................................................60

iv

**TABLE OF AUTHORITIES** *(continued)*

**Page(s)**

*Bolling v. Sharpe*,
   347 U.S. 497 (1954)..................................................................................41

*Bond v. United States*,
   564 U.S. 211 (2011)..................................................................................68

*Bowen v. Georgetown Univ. Hosp.*,
   488 U.S. 204 (1988)..................................................................................68

*Bowen v. Gilliard*,
   483 U.S. 587 (1987)..................................................................................50

*In re Bridget R.*,
   49 Cal. Rptr. 2d 507 (Cal. Ct. App. 1996)..................................7, 47, 49

*Brown v. Bd. of Educ.*,
   347 U.S. 483 (1954)..................................................................................42

*Ex Parte Burrus*,
   136 U.S. 586 (1890)..................................................................................58

*Campaign for S. Equal. v. Miss. Dep't of Human Servs.*,
   175 F. Supp. 3d 691 (S.D. Miss. 2016)..................................................25

*Catanach v. Thomson*,
   --- F. App'x ---, 2017 WL 5615849 (10th Cir. Nov. 20, 2017)..............39

*Chafin v. Chafin*,
   568 U.S. 165 (2013)..................................................................................22

*Chamber of Commerce v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996)................................................................35

*Chamber of Commerce v. U.S. Dep't of Labor*,
   885 F.3d 360 (5th Cir. 2018) ...........................................................*passim*

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)..................................................................................55

*City of Arlington v. FCC*,
   569 U.S. 290 (2013)..................................................................................56

*Claflin v. Houseman*,
   93 U.S. 130 (1876)....................................................................................69

*Clapper v. Amnesty Int'l*,
   568 U.S. 398 (2013)..................................................................................24

**TABLE OF AUTHORITIES** *(continued)*

**Page(s)**

*Contender Farms, LLP v. USDA*,
  779 F.3d 258 (5th Cir. 2015) ................................................................ *passim*

*Cook v. Harding*,
  879 F.3d 1035 (9th Cir. 2018) ........................................................................38

*Covenant Media of S.C., LLC v. City of N. Charleston*,
  493 F.3d 421 (4th Cir. 2007) .........................................................................24

*In re Matter of Welfare of D.L.*,
  486 N.W.2d 375 (Minn. 1992).......................................................................60

*Doe v. Piper*,
  165 F. Supp. 3d 789 (D. Minn. 2016)............................................................38

*Drummond v. Fulton Cty. Dep't of Family & Children's Servs.*,
  563 F.2d 1200 (5th Cir. 1977) (en banc) ......................................................54

*Duarte ex rel. Duarte v. City of Lewisville*,
  759 F.3d 514 (5th Cir. 2014) ................................................................ *passim*

*In re E.R.*,
  385 S.W.3d 552 (Tex. 2012)...........................................................................23

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Constr. Trades Council*,
  485 U.S. 568 (1988)........................................................................................58

*Elwell v. Byers*,
  699 F.3d 1208 (10th Cir. 2012) .....................................................................54

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016)........................................................................55, 56, 63

*FEC v. Akins*,
  524 U.S. 11 (1998)..........................................................................................30

*Fisher v. District Court of Sixteenth Judicial Dist. of Mont.*,
  424 U.S. 382 (1976) (per curiam)..................................................................45

*Gen. Elec. Co. v. Gilbert*,
  429 U.S. 125 (1976)........................................................................................59

*Gonzales v. Oregon*,
  546 U.S. 243 (2006)........................................................................................59

*Google, Inc. v. Hood*,
  822 F.3d 212 (5th Cir. 2016) ...................................................................37, 39

**TABLE OF AUTHORITIES** *(continued)*

**Page(s)**

*Grogan v. Garner,*
    498 U.S. 279 (1991) .................................................................................62

*Hodorowski v. Ray,*
    844 F.2d 1210 (5th Cir. 1988) ...............................................................50

*Home Builders Ass'n of Miss., Inc. v. City of Madison,*
    143 F.3d 1006 (5th Cir. 1998) ...............................................................17

*Hubbard v. U.S. EPA Adm'r,*
    809 F.2d 1 (D.C. Cir. 1986) ...................................................................36

*K.P. v. LeBlanc,*
    627 F.3d 115 (5th Cir. 2010) .....................................................26, 29, 33

*Knox v. Serv. Emps. Int'l Union,*
    567 U.S. 298 (2012) ..........................................................................22, 23

*Larson v. Domestic & Foreign Exchange Corp.,*
    337 U.S. 682 (1949) ..........................................................................35, 36

*Larson v. Valente,*
    456 U.S. 228 (1982) ..........................................................................30, 31

*Lee v. Verizon Commc'ns, Inc.,*
    837 F.3d 523 (5th Cir. 2016) ..................................................................17

*Legacy Cmty. Health Servs., Inc. v. Smith,*
    881 F.3d 358 (5th Cir. 2018) ............................................................26, 28

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    134 S. Ct. 1377 (2014) ............................................................................36

*Lindh v. Murphy,*
    521 U.S. 320 (1997) .................................................................................62

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) ...................................................................18, 25, 30

*McAllen Grace Brethren Church v. Salazar,*
    764 F.3d 465 (5th Cir. 2014) ..................................................................18

*McRae v. Lamb,*
    233 S.W.2d 193 (Tex. Ct. App.—San Antonio 1950) ...........................61

**TABLE OF AUTHORITIES** *(continued)*

**Page(s)**

*Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*,
501 U.S. 252 (1991) ..........................................................................................26

*Michigan v. EPA*,
268 F.3d 1075 (D.C. Cir. 2001) ........................................................................68

*Middlesex County Ethics Committee v. Garden State Bar Association*,
457 U.S. 423 (1982) ..........................................................................................39

*Miss. Band of Choctaw Indians v. Holyfield*,
490 U.S. 30 (1989) ...................................................................................4, 5, 23

*Mistretta v. United States*,
488 U.S. 361 (1989) ..........................................................................................59

*Moore v. Bryant*,
853 F.3d 245 (5th Cir. 2017) ............................................................................22

*Moore v. Sims*,
442 U.S. 415 (1979) ..........................................................................................38

*Morrow v. Winslow*,
94 F.3d 1386 (10th Cir. 1996) ..........................................................................39

*Morton v. Mancari*,
417 U.S. 535 (1974) .......................................................................3, 42, 43, 48

*Mother & Father v. Cassidy*,
338 F.3d 704 (7th Cir. 2003) ............................................................................69

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
145 F.3d 1399 (D.C. Cir. 1998) ........................................................................31

*Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*,
508 U.S. 656 (1993) .............................................................................21, 25, 30

*New York v. United States*,
505 U.S. 144 (1992) ..........................................................................................69

*Oglala Sioux Tribe v. Van Hunnik*,
993 F. Supp. 2d 1017 (D.S.D. 2014) ................................................................38

*Okpalobi v. Foster*,
244 F.3d 405 (5th Cir. 2001) (en banc) ......................................................27, 32

**TABLE OF AUTHORITIES** *(continued)*

**Page(s)**

*Palmore v. Sidoti*,
    466 U.S. 429 (1984)................................................................................42, 51, 53

*Porter v. Califano*,
    592 F.2d 770 (5th Cir. 1979) ...............................................................................36

*Printz v. United States*,
    521 U.S. 898 (1997)...........................................................................................68, 69

*Rice v. Cayetano*,
    528 U.S. 495 (2000)........................................................................................ *passim*

*Rivera v. Marcus*,
    696 F.2d 1016 (2d Cir. 1982)..............................................................................54

*Romero v. United States*,
    784 F.2d 1322 (5th Cir. 1986) ............................................................................40

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
    547 U.S. 47 (2006)..........................................................................................18, 22

*In re Santos Y.*,
    112 Cal. Rptr. 2d 692 (Cal. Ct. App. 2001) ..........................................................7

*Santosky v. Kramer*,
    455 U.S. 745 (1982)..............................................................................................52

*Sierra Club v. Glickman*,
    156 F.3d 606 (5th Cir. 1998) ...............................................................................29

*Sirva Relocation, LLC v. Richie*,
    794 F.3d 185 (1st Cir. 2015)................................................................................37

*Skidmore v. Swift & Co.*,
    323 U.S. 134 (1944)..............................................................................................60

*Smith v. Org. of Foster Families for Equal. & Reform*,
    431 U.S. 816 (1977)..................................................................................50, 51, 53, 54

*Sosna v. Iowa*,
    419 U.S. 393 (1975)........................................................................................58, 67

*Sprint Commc'ns, Inc. v. Jacobs*,
    571 U.S. 69 (2013)............................................................................36, 37, 38, 39

*Stewart v. Nevarez*,
    No. 4:17-CV-00501-O-BP, 2018 WL 507153 (N.D. Tex. Jan. 23, 2018)..............................38

**TABLE OF AUTHORITIES** *(continued)*

**Page(s)**

*Testa v. Katt*,
    330 U.S. 386 (1947) ..................................................................................69

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ....................................................................60

*Time Warner Cable, Inc. v. Hudson*,
    667 F.3d 630 (5th Cir. 2012) ......................................................21, 24, 30

*Tinsley v. McKay*,
    156 F. Supp. 3d 1024 (D. Ariz. 2015) ....................................................38

*Troxel v. Glanville*,
    530 U.S. 57 (2000) ........................................................................3, 50, 52

*Trudeau v. FTC*,
    456 F.3d 178 (D.C. Cir. 2006) ................................................................35

*Union Neighbors United v. Jewell*,
    831 F.3d 564 (D.C. Cir. 2016) ................................................................55

*United States v. Antelope*,
    430 U.S. 641 (1977) ................................................................................42

*United States v. Morrison*,
    529 U.S. 598 (2000) ................................................................................68

*Utah v. Evans*,
    536 U.S. 452 (2002) ..........................................................................30, 32

*Vill. of Barrington v. Surface Transp. Bd.*,
    636 F.3d 650 (D.C. Cir. 2011) ................................................................60

*Warth v. Seldin*,
    422 U.S. 490 (1975) ................................................................................25

*Washington v. Glucksberg*,
    521 U.S. 702 (1997) ................................................................................50

*Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*,
    443 U.S. 658 (1979) ................................................................................42

*Watt v. Alaska*,
    451 U.S. 259 (1981) ................................................................................59

*Williams v. Babbitt*,
    115 F.3d 657 (9th Cir. 1997) ............................................................43, 44

**TABLE OF AUTHORITIES** *(continued)*

**Page(s)**

*Younger v. Harris,*
  401 U.S. 327 (1971)............................................................36

**Constitutional Provisions**

U.S. Const. amend. V............................................................41, 65

U.S. Const. amend. X............................................................68

U.S. Const. art. I, § 8, cl. 3......................................................66

**Federal Statutes**

5 U.S.C. § 702........................................................17, 28, 31, 35

5 U.S.C. § 706..........................................................17, 31, 41

25 U.S.C. § 1902..........................................................5, 21

25 U.S.C. § 1903..........................................................5, 47

25 U.S.C. § 1911..........................................................49

25 U.S.C. § 1912..........................................................5, 62

25 U.S.C. § 1913........................................................*passim*

25 U.S.C. § 1914..................................................6, 21, 23, 49

25 U.S.C. § 1915........................................................*passim*

25 U.S.C. § 1922..........................................................49

25 U.S.C. § 1952..........................................................58

28 U.S.C. § 530D..........................................................32

28 U.S.C. § 1657..........................................................17

42 U.S.C. § 1996b..........................................................46

Blood Quantum Requirement Determined By Tribe,
  Pub. L. No. 112-157, 126 Stat. 1213 (2012)............................47, 53

**State Statutes**

Minn. Stat. Ann. § 259.57......................................................34, 45

**TABLE OF AUTHORITIES** *(continued)*

**Page(s)**

Minn. Stat. Ann. § 260 ............................................................................................41

Nev. Rev. Stat. § 127.040 .......................................................................................52

Nev. Rev. Stat. § 127.053 .......................................................................................52

Tex. Fam. Code § 105.005 ......................................................................................65

Tex. Fam. Code § 162.012 .............................................................................1, 23, 49

Tex. Fam. Code § 162.015 ......................................................................................46

Tex. Fam. Code § 162.016 ......................................................................................45

Tex. Fam. Code § 162.017 ......................................................................................50

**Tribal Constitutions and Statutes**

Cherokee Nation Const. art. IV, § 1 .......................................................................47

Navajo Nation Code § 701 ......................................................................................47

White Earth Band of Ojibwe Const. ch. 2, art. 1 ...................................................47

**Regulations**

25 C.F.R. § 23.107 ..................................................................................................69

25 C.F.R. § 23.129 ..................................................................................................65

25 C.F.R. § 23.130 ....................................................................................................8

25 C.F.R. § 23.131 ....................................................................................................8

25 C.F.R. § 23.132 ............................................................................................. passim

25 C.F.R. § 23.136 ..................................................................................................23

*Guidelines for State Courts; Indian Child Custody Proceedings,*
     44 Fed. Reg. 67,584 (Nov. 26, 1979)............................................................ passim

*Indian Entities Recognized and Eligible To Receive Servs. From the United States
     Bureau of Indian Affairs,*
     81 Fed. Reg. 5019 (Jan. 29, 2016) .........................................................................48

*Indian Child Welfare Act Proceedings,*
     81 Fed. Reg. 38,778 (June 14, 2016) ........................................................... passim

**TABLE OF AUTHORITIES** *(continued)*

**Page(s)**

## Rules

Fed. R. Civ. P. 19 ................................................................................................41

Fed. R. Civ. P. 56 ................................................................................................17

Fed. R. Civ. P. 57 ................................................................................................17

52 Minn. Stat. Ann. Adoption P. Rule 41.04 .........................................................65

## Other Authorities

Br. for United States,
   *Adoptive Couple v. Baby Girl*, 570 U.S. 367 (2013). ...........................................61

Matthew Fletcher,
   *The Supreme Court and Federal Indian Policy*, 85 Neb. L. Rev. 121 (2006)........................66

Robert Natelson,
   *The Original Understanding of the Indian Commerce Clause*, 85 Denver U.L.
   Rev. 201 (2007) .................................................................................................67

S. Rep. No. 95-597,
   95th Cong., 1st Sess. (1977) ..........................................................................6, 61

Stern & Gressman,
   *Supreme Court Practice* (10th ed. 2013) .............................................................32

## INTRODUCTION

Plaintiffs Jason and Danielle Clifford, Frank and Heather Libretti, Altagracia Hernandez, and Chad and Jennifer Brackeen (together, "Individual Plaintiffs") brought this lawsuit because the Indian Child Welfare Act of 1978, 25 U.S.C. §§ 1901–63 ("ICWA"), and the legislative regulation that Defendants promulgated to implement that statute, *Indian Child Welfare Act Proceedings*, 81 Fed. Reg. 38,778 (June 14, 2016) (codified at 25 C.F.R. pt. 23) ("Final Rule"), are severely and irreparably injuring Individual Plaintiffs' families.  Under the authority of ICWA and the Final Rule, the Cliffords' foster daughter, Child P., was forcibly removed from their family.  Because of ICWA and the Final Rule, the Librettis' efforts to adopt Baby O.—a plan supported by Baby O.'s biological mother, Ms. Hernandez—has been stalled for months as the State of Nevada, following the Final Rule's mandate, evaluates dozens of proposed alternative tribal placements.  And even though the Brackeens (after they filed this lawsuit) were permitted to adopt A.L.M., ICWA still casts a pall over their family by the exposing their adoption to a two-year period of collateral attack—18 months longer than Texas law otherwise would allow.  25 U.S.C. § 1913(d); Tex. Fam. Code § 162.012(a).

I.       Individual Plaintiffs are suffering these injuries because ICWA and the Final Rule designate Child P., Baby O., and A.L.M. as "Indian child[ren]" and compel states to erect extraordinary obstacles to the adoption of such children by non-Indian families like the Cliffords, the Librettis, and the Brackeens.

Seemingly reluctant to defend the constitutionality of ICWA and the legality of the Final Rule, the federal Defendants, now joined by several Indian tribes, contend that Plaintiffs lack Article III standing to bring this lawsuit.  That argument is devoid of merit.  Individual Plaintiffs are directly regulated by ICWA and the Final Rule, and the resulting injuries are both cognizable and obvious:  Child P. was ripped from the Cliffords' arms; the Librettis' efforts to adopt Baby O., as

Ms. Hernandez wishes, have been interminably delayed; and the Brackeens are forced to live under a two-year cloud of uncertainty imposed by federal law.

Lacking any serious argument that Individual Plaintiffs have not suffered an injury in fact, the federal government tries to shift the blame for these injuries, arguing that Individual Plaintiffs' injuries are not legally traceable to Defendants because it is the States—not the federal government—that ICWA and the Final Rule compel to administer the challenged federal requirements. This too-clever argument is a frank concession that the federal government is unconstitutionally commandeering the States—but it does nothing to undermine Individual Plaintiffs' Article III standing. The United States imposes ICWA's requirements, and the other federal Defendants indisputably promulgated the Final Rule. The Individual Plaintiffs' injuries flow from ICWA's and the Final Rule's federal requirements and are obviously "traceable" to their federal *authors*. And a judgment vacating the Final Rule and declaring ICWA unconstitutional would obviously ameliorate the injuries imposed by those federal laws. The federal Defendants' remaining arguments for dismissal—a grab-bag of arguments regarding sovereign immunity, *Younger* abstention, and failure to join necessary and indispensable parties—are similarly insubstantial. The motions to dismiss should be denied in their entirety.

II.     Because this case turns on questions of law, this Court should proceed to decide Plaintiffs' motions for summary judgment and grant summary judgment to Plaintiffs on each of their claims for relief.

The fundamental and fatal flaw shared by ICWA and the Final Rule is that they classify children and families on the basis of race in violation of the Constitution's guarantee of equal protection. The Supreme Court has already suggested as much when it observed that ICWA's

placement preferences "raise[d] equal protection concerns," because they place "vulnerable children at a great disadvantage solely because an ancestor . . . was an Indian." *Adoptive Couple v. Baby Girl*, 570 U.S. 495, 656 (2013). The federal government will contend that ICWA's classifications based on membership in an Indian tribe are "political rather than racial in nature." *Morton v. Mancari*, 417 U.S. 535, 553–54 n.24 (1974). But if that were true, ICWA's placement preferences would not have raised any "equal protection concerns." *Adoptive Couple*, 570 U.S. at 656. In fact, nearly 20 years ago, the Supreme Court held that the "limited exception of *Mancari*" does not apply across the board, and that such a classification, when not tied directly to "the internal affair[s] of a quasi sovereign," is just a "proxy for race." *Rice v. Cayetano*, 528 U.S. 495, 519, 520–21 (2000). Adoption proceedings in state courts—even those involving "Indian children"— obviously are not "internal affair[s]" of any Indian tribe, much less all of them. ICWA's classifications based on "Indian" status therefore are, like the classification in *Rice*, a "proxy for race," and cannot survive.

But even if ICWA's classifications of "Indian" persons were "political"—and they are not—that would not remotely justify ICWA's intrusion into Individual Plaintiffs' intimate familial relationships, which are sheltered by the Due Process Clause. Take Ms. Hernandez: She is Baby O's biological mother and, as such, has an unquestioned right to direct Baby O.'s upbringing. *See Troxel v. Glanville*, 530 U.S. 57, 66-67 (2000) (plurality op.). Yet because ICWA classifies Baby O. as an "Indian child," Ms. Hernandez's wish to have the Librettis adopt Baby O. is being interminably delayed. Such governmental impositions on the rights of parents, of course, can be sustained when justified by a compelling governmental interest. But the bare interest in keeping "Indians" with "Indians" cannot possibly be characterized as compelling.

There are more and deeper constitutional problems with ICWA.  ICWA's and the Final Rule's manifold commands to state agencies and state courts are transparent violations of the anti-commandeering doctrine of the Tenth Amendment.  And most fundamentally of all, there is no constitutional source of congressional authority for ICWA's regulation of adoption proceedings in state court.  The claim of power under the Indian Commerce Clause founders on the high and plain truth that children are not chattels in commerce.

Even apart from ICWA's many constitutional flaws, the Final Rule violates the Administrative Procedure Act in numerous ways, any one of which compels vacatur of the Rule.  It exceeds the authoring agency's authority under ICWA; it is contrary to ICWA, the statute it purports to clarify; and its unexplained change in its interpretation of ICWA is paradigmatic arbitrary and capricious agency action.

Individual Plaintiffs—and many families like them across the country—are being traumatized for no reason other than the vulnerable child they each welcomed into their family is classified by ICWA and the Final Rule as an "Indian child."  That classification subjects these families to a legal regime that callously demotes non-Indian families to the bottom of a hierarchy of placement preferences and subordinates the Indian child's best interests to a policy goal of keeping "Indian children" with "Indians."  That policy aim is incompatible with our Constitution.  This Court should declare ICWA unconstitutional and vacate the Final Rule.

## BACKGROUND

### I.      Statutory and Regulatory Framework

#### A.      The Indian Child Welfare Act

In the mid-1970s, there was rising concern over "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes."  *Miss. Band of Choctaw Indians*

*v. Holyfield*, 490 U.S. 30, 32 (1989).   "Congress found that 'an alarmingly high percentage of Indian families [were being] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies.'"   *Adoptive Couple*, 570 U.S. at 642.   In response, Congress enacted the Indian Child Welfare Act of 1978 ("ICWA" or the "Act"), 25 U.S.C. §§ 1901–1963, to safeguard "the rights of the Indian community and tribe in retaining its children in its society" by "establishing a Federal policy that, where possible, an Indian child should remain in the Indian community."   *Holyfield*, 490 U.S. at 37.

ICWA establishes "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes."   25 U.S.C. § 1902. The Act defines "Indian" to mean "any person who is a member of an Indian tribe."   25 U.S.C. § 1903(3).   An "Indian child" is defined as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe."   *Id.* § 1903(4).

If a state court determines that a child in a custody proceeding is an Indian child, ICWA supersedes state family law with a set of federal standards.   Before an Indian child can be placed into foster care or adopted, ICWA requires the state court to notify the tribe(s) in which the child is enrolled or may be eligible for membership.   25 U.S.C. § 1912(a).

When an Indian child becomes eligible for adoption, § 1915(a) of the Act mandates a hierarchy of preferences for the child's adoptive placement:

> In any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a placement with (1) a member of the child's extended family; (2) other members of the child's tribe; or (3) other Indian families.

*Id.* § 1915(a).   A similar set of preferences applies in the foster care or pre-adoptive placement of an Indian child.   *Id.* § 1915(b).

5

The Act does not define the term "good cause" or otherwise specify the circumstances sufficient to warrant departure from § 1915(a)'s placement preferences.  Nor does it specify a standard of proof to establish "good cause."  This flexibility was part of ICWA's design:  According to the Senate Report, ICWA's "good cause" standard was "designed to provide State courts with a degree of flexibility in determining the disposition of a placement proceeding involving an Indian child."  S. Rep. No. 95-597, 95th Cong., 1st Sess. at 17 (1977).

ICWA also displaces state laws governing collateral attack on final adoptions, permitting the biological parent of an Indian child to withdraw consent to the adoption on grounds of fraud or duress for up to two years after the final adoption order.  25 U.S.C. § 1913(d).  And it allows the child's parent, Indian custodian, or tribe to petition a court to invalidate "any action for foster care placement or termination of parental rights" on the basis that the order violated ICWA, without any statute of limitations whatsoever.  25 U.S.C. § 1914.

## B.      The 1979 Guidelines

In 1979—the year after ICWA was enacted—the Bureau of Indian Affairs ("BIA"), a federal agency within the Department of the Interior, promulgated "Guidelines for State Courts; Indian Child Custody Proceedings" (the "1979 Guidelines").  The 1979 Guidelines were intended to assist the implementation of ICWA, but were "not intended to have binding legislative effect." 44 Fed. Reg. 67,584, 67,584 (Nov. 26, 1979).

The BIA explained that it was issuing non-binding guidelines, rather than regulations having the force of law, because Congress did not "intend[] this Department to exercise supervisory control over state or tribal courts or to legislate for them with respect to Indian child custody matters," and "the Department has an obligation not to assert authority that it concludes it does not have."  *Id.*  The Guidelines further noted that "[a]ssignment of supervisory authority over the courts to an administrative agency is a measure so at odds with concepts of both federalism and separation

6

of powers that it should not be imputed to Congress in the absence of an express declaration of Congressional intent to that effect." *Id.* The BIA therefore concluded that the "[p]rimary responsibility" for interpreting ICWA "rests with the courts that decide Indian child custody cases." *Id.*

The 1979 Guidelines emphasized that the "good cause" necessary to depart from ICWA's placement preferences "was designed to provide state courts with flexibility in determining the disposition of a placement proceeding." *Id.* (citing S. Rep. No. 95-597, 95th Cong., 1st Sess. 17 (1977)).

As state courts applied ICWA in the ensuing decades, most courts held that the "good cause" exception to ICWA's placement preferences requires consideration of the child's best interests, including any bond or attachment formed with the child's current caregivers. *See, e.g.*, *In re Adoption of Baby Girl B.*, 67 P.3d 359, 370–75 (Okla. Civ. App. 2003) (collecting cases).

Other state courts, applying the "Existing Indian Family doctrine," limited ICWA's application to circumstances where the child has some significant political or cultural connection to the tribe. *See, e.g.*, *In re Santos Y.*, 112 Cal. Rptr. 2d 692, 715–23 (Cal. Ct. App. 2001) (ICWA's "overriding concern . . . was the maintenance of the family and tribal relationships existing in Indian homes"). The Existing Indian Family doctrine is premised at least in part on the significant equal protection concerns that arise if ICWA is applied to children based solely on the child's ancestry. *See In re Bridget R.*, 49 Cal. Rptr. 2d 507, 527–29 (Cal. Ct. App. 1996).

### C.    The 2016 Final Rule

In June 2016, almost four decades after ICWA's passage, the BIA promulgated *Indian Child Welfare Act Proceedings*, 81 Fed. Reg. 38,778 (June 14, 2016) (the "Final Rule") (codified at 25 C.F.R. pt. 23). The Final Rule purports to "improve ICWA implementation" by dictating myriad "requirements for State courts in ensuring implementation of ICWA in Indian child-welfare proceedings." *Id.*

The Final Rule notes at its outset that the Department "no longer agrees with statements it made in 1979 suggesting that it lacks the authority to issue binding regulations." 81 Fed. Reg. at 38,786. Although the BIA had previously determined that regulations were "not necessary to carry out the Act," 44 Fed. Reg. at 67,584, it now promulgated the Final Rule as a "legislative rule" that purports to have the "force of law" and "set[s] binding standards for Indian child-custody proceedings in State courts." 81 Fed. Reg. at 38,782, 38,785.

The Final Rule laid out a parallel set of adoptive placement preferences, providing that "[i]n any adoptive placement of an Indian child under State law," unless the child's Tribe has established a different order of preference, "preference must be given in descending order . . . to placement of the child with: (1) A member of the Indian child's extended family; (2) Other members of the Indian child's Tribe; or (3) Other Indian families." 25 C.F.R. § 23.130. The Rule established a similar set of preferences for foster care and preadoptive placements. *Id.* § 23.131.

The Final Rule then proceeded to constrain state courts in their ability to find "good cause" to depart from the placement preferences. Although the 1979 Guidelines had long touted the "flexibility" of the "good cause" standard as a virtue, 44 Fed. Reg. at 67,584, the BIA now announced that "Congress intended the good cause exception to be narrow and limited in scope." 81 Fed. Reg. at 38,839. The Final Rule therefore provides that "[a] court's determination of good cause to depart from the placement preferences . . . should be based on" one or more of five specified criteria, including the "request of one or both of the Indian child's parents" and the "extraordinary physical, mental, or emotional needs of the Indian child." 25 C.F.R. § 23.132(c). The Rule also announced for the first time that "[t]he party seeking departure from the placement preferences should bear the burden of proving *by clear and convincing evidence* that there is 'good cause' to

depart from the placement preferences." 25 C.F.R. § 23.132(b) (emphasis added). The BIA acknowledged that "this burden of proof standard is not articulated in section 1915." *Id.* at 38,843.

The Final Rule further demands that the state undertake "a diligent search . . . to find suitable placements meeting the preference criteria," 25 C.F.R. § 23.132(c)(5). It also prohibits courts from assessing the availability of a preferred placement according to generally applicable standards under state law; instead, courts must adhere to "the prevailing social and cultural standards of the Indian community in which the Indian child's parent or extended family resides or with which the Indian child's parent or extended family members maintain social and cultural ties." *Id.*

The Final Rule also expressly repudiates the Existing Indian Family doctrine. *Id.* at 38,802. It forbids state courts that are evaluating the application of ICWA from "consider[ing] factors such as the participation of the parents or Indian child in Tribal cultural, social, religious, or political activities, the relationship between the Indian child and his or her parents, whether the parent ever had custody of the child, or the Indian child's blood quantum." *Id.* at 38,868.

## II.     Factual Background

### A.     Child P.'s Adoption Proceedings

Child P. was born in July 2011 in Minnesota. App. 2. She was placed in foster care in the summer of 2014 when her biological parents were arrested and charged with various drug-related offenses. *Id.* For two years, Child P. was moved from one placement to another, staying with various relatives or foster parents, none of whom was able to provide her with a stable or permanent home. During that period, state officials also attempted to return Child P. to the care of her birth mother, but Child P. had to be returned to foster care after her birth mother relapsed. App. 3. In July 2016, after Child P. had been in foster care for a total of nearly two years, a Minnesota court terminated the parental rights of her birth parents. App. 8–34. Later that month, Child P. joined the Clifford family. App. 3.

Jason and Danielle Clifford, Child P.'s foster and prospective adoptive parents, live in Minnesota.  Recognizing the significant need for foster families in their area, the Cliffords chose to become foster parents through Hennepin County adoption services.  App. 2.  When Child P. first joined the Cliffords' family, she had difficulty forming emotional connections with others and was emotionally withdrawn.  App. 3.  The Cliffords have loved and cared for her, guiding her through her entrance into school and supporting her through more than a year of therapy in an effort to help her overcome the psychological wounds inflicted by the neglect and instability of her early life.  *Id.*  The Cliffords love and care for Child P. as their own child, and Child P. has thrived in their care.

Child P.'s maternal grandmother is a registered member of the White Earth Band of Ojibwe Tribe.  App. 4.  When Child P. first entered state custody, her biological mother informed the court that Child P. was not eligible for tribal membership.  In the fall of 2014, several months after Child P. entered foster care, the White Earth Band wrote a letter to the court confirming that Child P. was not eligible for membership in the tribe.  App. 36.  Not until January 2017—some six months after Child P. was placed with the Cliffords—did the Tribe write to the court and insist, without explanation, that Child P. was in fact eligible for membership.  Most recently, in an unsupported assertion made in a brief, counsel for the White Earth Band announced that Child P. is now a member of the Tribe for purposes of ICWA.  App. 4.  Considering itself bound by this pronouncement, the Minnesota state court has concluded that ICWA applies to all custody determinations regarding Child P.  App. 46.

In the fall of 2017, after Child P. had been living with them for more than a year, the Cliffords moved for leave to petition to adopt Child P., with the support of Child P.'s guardian ad litem, who argued that adoption by the Cliffords would be in Child P.'s best interests.  But the

County, which up to this point had supported the Cliffords' intention to adopt Child P., abruptly reversed course and insisted that ICWA compelled them to take Child P. from the Cliffords and place her in foster care.  App. 38.  The state court declined to rule on their motion and instead ordered the County to remove Child P. from the Cliffords—the only stable home she has ever known—and formally place her for adoption under the placement preferences laid out in ICWA. App. 46.

The County moved quickly to carry out the court's order.  The Cliffords were instructed to bring Child P. to the County Health Services building, where the Cliffords and their parents—who had been Child P.'s parents and grandparents for a year and a half—were given less than 20 minutes to say goodbye.  App. 5.  In the midst of those 20 minutes, County officials returned to move the grieving family to another room in the building.  Child P. wept the entire time.  App. 6.

Child P. was then placed in the foster custody of R.B., her maternal grandmother.  *Id.* Shortly after Child P. was placed in her care, R.B.—who had previously been denied a state foster care license, App. 4—informed the Cliffords that Child P. was depressed and unhappy following the transfer, and that R.B. was not certain she could care for Child P.  *Id.*  But before the Cliffords were able to negotiate a return, the County instructed R.B. not to communicate with the Cliffords and not to allow Child P. to contact them.  *Id.*  Child P. remains in the care of R.B., who has not filed a petition to adopt Child P.  *Id.*

The Cliffords wish to adopt Child P., whom they loved and raised as their own for a year and a half.  App. 2.  Child P.'s guardian ad litem supports these efforts and agrees that adoption by the Cliffords is in Child P.'s best interest.  App. 5.  Both state courts to address the removal have agreed that Child P.'s best interests, which must govern adoptive placements under Minnesota law, are irrelevant because of ICWA's mandated preferences.  App. 53.  Instead of being

allowed to adopt Child P., the Cliffords have endured an abrupt, traumatic—and potentially per-manent—separation from Child P.

**B.    Baby O.'s Adoption Proceedings**

Baby O. was born in Nevada in March 2016 to Plaintiff Altagracia Hernandez and E.R.G., an unmarried couple.  App. 72.  While pregnant with Baby O., Ms. Hernandez decided that she would not be able to provide the support that Baby O. would need to thrive and made the difficult decision to put Baby O. up for adoption at her birth.  App. 72.

Plaintiffs Nick and Heather Libretti are a married couple living in Sparks, Nevada. App. 66.  They are heavily involved in their community, particularly in work that serves at-risk youth.  *Id.*  The Librettis decided to become foster and adoptive parents several years ago, and took in two young boys who needed a home.  *Id.*  They have now adopted those children and provide them, and their older brother, with the love and support of a family.  *Id.*

When Baby O. was born, the Librettis came to meet Baby O. in the hospital.  App. 67. Baby O. went home with the Librettis three days after her birth, and has remained with them for more than two years.  *Id.*  As a result of gestational difficulties, Baby O. has significant, ongoing medical needs that require extensive care and management.  App. 67.  The Librettis have ensured that Baby O. receives all the treatment she needs to achieve full health.  *Id.*  So far, this has required two surgeries, an extended hospital stay, and frequent medical care.  *Id.*

Ms. Hernandez and Baby O.'s biological siblings live 20 minutes away from the Librettis and have remained part of Baby O.'s life.  App. 73.  Ms. Hernandez and the Librettis visit one another regularly so that Baby O., Ms. Hernandez, and Baby O.'s biological siblings are able to have a close relationship.  *Id.*  The Librettis and Ms. Hernandez have agreed to an ongoing visita-tion arrangement to ensure that Ms. Hernandez remains a part of Baby O.'s life.  App. 74.  Ms. Hernandez supports the Libretti' efforts to adopt Baby O.  *Id.*

Baby O.'s biological father, E.R.G., is descended from members of the Ysleta del sur Pueblo Tribe, located in El Paso, Texas.  At the time of Baby O.'s birth, E.R.G. was not a registered member of the Tribe, App. 73, but E.R.G.'s mother is a registered member of the Ysleta del sur Pueblo Tribe.  App. 69.  The Tribe has intervened in the court proceedings regarding custody of Baby O.  Contrary to the wishes of Ms. Hernandez, the County removed Baby O. from the Librettis and placed her with a different foster family when Baby O. was only three months old.  App. 68–69.  Baby O. failed to thrive in her new placement.  *Id*.  After two weeks of heated negotiations, the County agreed to return Baby O. to the Librettis, where she has remained.  *Id.*

In its effort to justify Baby O.'s removal, the Tribe repeatedly brought forward potential foster placements.  App. 69.  Because of the Final Rule's "diligent search" requirements, Nevada cannot simply conduct its normal review of potential alternate placements before concluding that adoption by the Librettis is in Baby O.'s best interests.  Instead, the State must conduct full reviews of any placement that the Tribe deems more culturally suitable than allowing Baby O. to remain with the only family she has ever known.  The Librettis cannot petition to adopt Baby O. until this "diligent search" is complete.  In its efforts to prevent Baby O.'s adoption by the Librettis, the Ysleta del sur Pueblo Tribe has identified more than 40 placements.  *Id.*  Nevada conducted several home studies of individuals designated by the Tribe, but each potential placement either withdrew from consideration or was found unsuitable in light of Baby O.'s substantial medical needs.  *Id.*

After the Librettis joined this lawsuit, the Ysleta del sur Pueblo Tribe entered into discussions to allow the Librettis' adoption to move forward.  App. 69.  The Librettis, eager to resolve this dispute and finalize their adoption of Baby O., have agreed with the Tribe to a settlement that would permit the Librettis to petition for adoption.  App. 70.

### C.       A.L.M.'s Adoption Proceedings

A.L.M. was born in Arizona in August 2015.  App. 60.  A.L.M. is an "Indian child" for purposes of ICWA because he is eligible for membership in an Indian tribe.  App. 78.  His biological mother is an enrolled member of the Navajo Nation and his father is an enrolled member of the Cherokee Nation.  App. 60.

A.L.M. is now the adoptive child of Chad and Jennifer Brackeen, and has lived with them for more than 18 months.  *Id.*  The Brackeens adopted A.L.M. with the support of A.L.M.'s biological parents and his paternal grandmother.  App. 62.  Although A.L.M.'s adoption is now final under state law, ICWA extends the period of time to challenge an adoption, exposing A.L.M. to the risk of physical and geographical separation from both his adoptive and biological families.

In June 2016, when A.L.M. was ten months old, Child Protective Services ("CPS"), a division of the Texas Department of Family Protective Services ("DFPS"), removed him from his grandmother's care and placed him in the foster care of the Brackeens.  App. 61.  Texas DFPS, the Cherokee Nation, and the Navajo Nation were unable to identify an ICWA-preferred foster placement for A.L.M., and he remained with the Brackeens.  After the parental rights of A.L.M.'s biological parents were voluntarily terminated in May 2017, he became free to be adopted under Texas law.  In June 2017—a year after the Brackeens took custody of A.L.M.—the Navajo Nation submitted a letter to the court suggesting that they had located a potential alternative placement for A.L.M. with non-relatives in New Mexico.  App. 62.

The Brackeens brought an original petition to adopt A.L.M., with the support of A.L.M.'s guardian ad litem, and the Cherokee and Navajo Nations were notified of the adoption proceeding.  Because neither the Navajo Nation nor the prospective alternative placement located by the Navajo

intervened in the proceeding or otherwise formally sought to adopt A.L.M., the Brackeens were the only persons before the court seeking to adopt A.L.M.[1]  App. 78–79, 84.

At A.L.M.'s first adoption hearing, the Brackeens sought to establish "good cause" to depart from ICWA's placement preferences by presenting the testimony of A.L.M.'s biological parents, who each testified that they reviewed the placement options and preferred A.L.M.'s adoption by the Brackeens.  App. 62.  A.L.M.'s biological mother testified that A.L.M. loves the Brackeens, and A.L.M.'s biological father testified that the Brackeens are the only parents A.L.M. knows.  *Id.* The Brackeens also presented an expert in psychology who concluded that the Brackeens and A.L.M. were strongly emotionally bonded, and that taking A.L.M. from his family would likely cause significant emotional and psychological harm that could have a lasting detrimental impact on his life.  *Id.*  Nonetheless, the court denied the Brackeens' adoption petition, concluding that they had failed to demonstrate by "clear and convincing" evidence that "good cause" existed to depart from ICWA's placement preferences.  App. 78, 84 (finding that the Brackeens "did not meet their burden under 25 C.F.R. § 23.132").

Shortly after the court denied the Brackeens' adoption petition, Texas DFPS stated its intention to immediately move A.L.M. to the Navajo Nation's proposed placement in New Mexico. App. 63.  The Brackeens were able to obtain an emergency order from the trial court, staying any change in placement pending appeal.  *Id.*  During the pendency of the appeal, Texas DFPS informed counsel for the Brackeens that the Navajo couple previously identified as an alternative

---

[1]  At A.L.M.'s first adoption hearing, the Navajo Nation's social worker testified that the two tribes "came up with [an] agreement" among themselves in the hallway prior to the hearing to determine the designation of A.L.M.'s tribe.  App. 62.  The tribes ultimately decided to designate the Navajo Nation as A.L.M.'s tribe.  *Id.*

placement for A.L.M. was no longer an available placement, and that both the Navajo Nation and Cherokee Nation lacked viable adoptive placements for A.L.M.  *Id.*

Shortly after the filing of this lawsuit, based on these developments, the Brackeens, Texas DFPS, and the guardian ad litem entered into a settlement agreement recognizing that the Brackeens are now the only party seeking to adopt A.L.M., that § 1915(a)'s placement preferences therefore do not apply, and that, even if they did apply, good cause exists to depart from them.  App. 63, 88.  The Brackeens, Texas DFPS, and the guardian ad litem filed a joint unopposed motion to set aside the trial court's judgment.  *In the Interest of A.M., A Child*, 02-17-00298-CV, 2017 WL 6047677, at *1 (Tex. App.—Fort Worth Dec. 7, 2017, no pet. h.).  In December 2017, Texas's Second Court of Appeals granted the parties' motion, setting aside the trial court's prior judgment and remanding to the trial court.  *Id.*  On remand, the Brackeens adopted A.L.M.  App. 64.

The Brackeens also intend to provide foster care for, and possibly adopt, additional children in need.  Because the Brackeens are not an Indian family under ICWA, they know that any future foster or adoption placement involving a child who may be an Indian child could subject them and the child to years of delay and litigation.  App. 64.

## III.  Procedural History

In October 2017, the Brackeens and the State of Texas filed this lawsuit, seeking declaratory and injunctive relief against ICWA and the Final Rule.  ECF No. 1.  In December 2017, Plaintiffs filed a First Amended Complaint that added as Plaintiffs the States of Louisiana and Indiana, as well as the Cliffords, Librettis, and Ms. Hernandez.  ECF No. 22.  Plaintiffs filed a Second Amended Complaint in March 2018.  ECF No. 35.

Defendants renewed their motion to dismiss on April 5, 2018.  ECF No. 54.  On March 26, federally recognized Indian Tribes joined the lawsuit as intervenor defendants.  ECF Nos. 41, 45. The Tribes adopted Defendants' motion to dismiss.  ECF No. 58.

## LEGAL STANDARD

"A motion under 12(b)(1) should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle him to relief." *Home Builders Ass'n of Miss., Inc. v. City of Madison*, 143 F.3d 1006, 1009 (5th Cir. 1998).  "Where, as here, the movant mounts a 'facial attack' on jurisdiction based only on the allegations in the complaint, the court simply considers 'the sufficiency of the allegations in the complaint because they are presumed to be true.'" *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 533 (5th Cir. 2016).

Summary judgment is warranted when "there is no genuine dispute as to any material fact" and the movant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  This Court has authority to grant summary judgment on an expedited basis in order to make a clear declaration of the rights of the parties.  Fed. R. Civ. P. 56(a), 57; 28 U.S.C. § 1657(a).

Under the Administrative Procedure Act (APA), this Court "shall . . . hold unlawful and set aside agency action" that [is] "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory . . . authority." 5 U.S.C. § 706(2)(A)–(C).  "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." *Id*. § 702.  A court reviewing an agency action "shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." *Id.* § 706.

17

# ARGUMENT

## I.     Defendants' Motion to Dismiss Individual Plaintiffs' Claims for Lack of Subject-Matter Jurisdiction Should Be Denied

### A.     There Is a Live Controversy As To Each of Individual Plaintiffs' Claims

It is well established that plaintiffs have Article III standing where (1) they "have suffered an injury in fact," (2) that injury is "fairly trace[able] to the challenged action of the defendant," and (3) it is "likely" that "the injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). And it is equally well settled that "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006); *see McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014) ("It is well settled that once we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit."). Thus, as long as any one of the Individual or State Plaintiffs has Article III standing to bring a claim, that resolves the standing inquiry as to that claim.

Here, Defendants make no serious effort to contest State Plaintiffs' standing to bring their challenges under the Tenth Amendment and the APA. And their attempts to challenge Individual Plaintiffs' standing fall flat: "[T]here is ordinarily little question" that standing is satisfied where, as here, the plaintiff "is himself [the] object" of the challenged government action. *Lujan*, 504 U.S. at 561. The Cliffords, Librettis, Brackeens, and Ms. Hernandez all readily satisfy this test.

### 1.     Individual Plaintiffs Are Being Injured By ICWA and the Final Rule

#### i.     Individual Plaintiffs Are "Objects of the Regulation" At Issue and Face Increased Regulatory Burdens

Individuals presumptively have standing to challenge regulations that govern them personally. *See Contender Farms, LLP v. USDA*, 779 F.3d 258, 264 (5th Cir. 2015) ("If a plaintiff is an

object of a regulation 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'"); *see id.* at 266 ("An increased regulatory burden typically satisfies the injury in fact requirement.").

The question "[w]hether someone is in fact an object of a regulation is a flexible inquiry rooted in common sense." *Id.* at 265. In *Association of American Railroads v. Department of Transportation*, 38 F.3d 582 (D.C. Cir. 1994), for example, challengers to a regulation argued that a new rule required them to comply with two sets of regulations enforced by two agencies instead of one. *Id.* at 585. The court concluded that standing was satisfied because "the railroads allege that they are materially harmed by the additional regulatory burden imposed upon them as the result of a federal agency's unlawful adoption of a rule." *Id.* at 586.

Here, Individual Plaintiffs are plainly subject to ICWA and the Final Rule, which govern their adoption efforts because they are seeking to adopt or place for adoption (or, in the case of the Brackeens, have adopted) an "Indian child." Because of ICWA and the Final Rule, Individual Plaintiffs are relegated to the bottom tier in the hierarchy of adoptive placement preferences for Indian children—behind other "member[s] of the child's extended family," "other members of the Indian child's tribe," or any "*other Indian families.*" 25 U.S.C. § 1915(a) (emphasis added). Departure from those placement preferences requires a showing of "good cause," *id.*, and the Final Rule further provides that "[t]he party seeking departure from the placement preferences" must show "good cause" by "clear and convincing evidence." 25 C.F.R. § 23.132(b).

Because of ICWA and the Final Rule, Plaintiff Hernandez's intent to have Baby O. adopted by the Librettis has been delayed for months, and the Librettis have been threatened with separation from Baby O., while the State of Nevada has worked to evaluate the *more than 40* alternative placements identified by the Tribe. *See id.* § 23.132(c)(5). The impact on the Cliffords is even

more stark:  They have been forcibly separated from Child P. because ICWA and the Final Rule classify Child P. as an "Indian child" subject to ICWA's placement preferences.  And even though the Brackeens have finally adopted A.L.M., ICWA and the Final Rule still expose their adoption to collateral attack for up to two years, while the underlying termination of parental rights remains open to attack indefinitely.  *See* 25 U.S.C. §§ 1913(d), 1914.

Under any "common sense" view of these facts, Individual Plaintiffs are plainly the "object[s] of [the] regulation[s]" at issue and subjected to an "increased regulatory burden."  *Contender Farms, LLP*, 779 F.3d at 264.  Indeed, the challenged regulations "interfere[] with the[ir] lives" in one of the most "concrete and personal way[s]" imaginable, *Duarte ex rel. Duarte v. City of Lewisville*, 759 F.3d 514, 519 (5th Cir. 2014)—by dictating whether and when they are permitted to become or remain parents to the children they love and care for as their own.

Courts routinely recognize—in circumstances far less compelling—that individuals who are directly affected by government regulations have constitutional standing to challenge them.  In *Duarte*, for example, a registered sex offender, his wife, and his child challenged an ordinance that restricted the man from residing in certain parts of the municipality.  759 F.3d at 518.  The City argued that the man lacked standing to sue because he had not yet violated the ordinance, and that the man's wife and child lacked standing to sue because they were not directly regulated by the ordinance.  *Id.* at 518–19.  The Fifth Circuit reversed the district court's dismissal for lack of standing, holding that *all three* had standing because the challenged regulation "interfere[d] with the Duartes' lives in a concrete and personal way." *Id.*

So too here.  ICWA's preference scheme plainly "targets participants" in state adoption proceedings involving Indian children.  *Contender Farms, LLP*, 779 F.3d at 265.  There is thus "no reason to depart from the ordinary rule that [Individual Plaintiffs], as objects of the Regulation,

may challenge it." *Id.* at 266.   And because Individual Plaintiffs are subjected to "increased reg-ulatory burden[s]" under ICWA and the Final Rule, the injury-in-fact requirement is plainly satis-fied. *Id.*

> ii.     **Individual Plaintiffs Suffer Discriminatory Treatment on the Basis of Race**

Individual Plaintiffs are also injured by ICWA and the Final Rule for a second, independent reason:  Individual Plaintiffs are subject to the ICWA's discriminatory preference scheme because of their race and the race of their adoptive or prospective adoptive children.

"The 'injury in fact' in an equal protection case" is "the denial of equal treatment resulting from the imposition of [a] barrier, not the ultimate inability to obtain [a] benefit." *Ne. Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville*, 508 U.S. 656, 666 (1993).  "Discriminatory treatment at the hands of the government" is "recognizable for standing irrespective of whether the plaintiff will sustain an actual or more palpable injury as a result of the unequal treatment under law or regulation."  *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 636 (5th Cir. 2012).

Here, ICWA and the Final Rule impose a set of federal standards for the adoption of "In-dian children" that differ from the state-law standards applicable to non-Indian children.  *See* 25 U.S.C. § 1902.  Those federal standards, which are applicable only to "Indian children," indisput-ably prefer adoptive placements with "Indian families" over non-Indian families.  *Id.* § 1915(a). Even after adoption of an "Indian child" is granted, ICWA supplants state law to provide a two-year period for collateral attacks on the adoption.  *Id.* § 1913(d).  And an Indian parent, custodian, or tribe may petition for any foster-care placement or termination-of-parental-rights order to be invalidated at any time in the future.  *Id.* § 1914.  Where government action "positions similar parties unequally before the law," as ICWA and the Final Rule certainly do, "no further showing of suffering based on that unequal positioning is required for purposes of standing." *Time Warner*

*Cable*, 667 F.3d at 636; *see also Moore v. Bryant*, 853 F.3d 245, 250 (5th Cir. 2017) ("the gravamen of an equal protection claim is differential governmental treatment").

### iii.  Defendants' Remaining Arguments Specific to the Brackeens and Librettis Are Insubstantial

Defendants argue that the Brackeens' claims are moot and that the Librettis' claims are unripe.  But as noted above, "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement."  *Rumsfeld*, 547 U.S. at 53 n.2.  So if either the Cliffords or Ms. Hernandez have standing—and Defendants do not deny that they each have suffered an injury in fact—Article III's case-or-controversy requirement is satisfied, and this Court need not address the remaining plaintiff-specific arguments.  If the Court reaches those arguments, they should be rejected.

***The Brackeens Are Injured by ICWA and the Final Rule and Their Claims Are Not Moot.***  Defendants argue that, because the Brackeens' adoption of A.L.M. has been finalized, the Brackeens are no longer injured and their claims are now moot.  Not so.

A suit becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013).  The Supreme Court has repeatedly held that a case "becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party."  *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (quoting *Knox v. Serv. Emps. Int'l Union*, 567 U.S. 298, 307 (2012)).  "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot."  *Knox*, 567 U.S. at 307–08.

ICWA's two-year collateral attack period, 25 U.S.C. § 1913(d), means that the Brackeens continue to have an interest in the outcome of this litigation—specifically, an interest in not being exposed to a period of collateral attack 18 months longer than Texas law allows.  Under generally

22

applicable Texas law, "the validity of an adoption order is not subject to attack after six months after the date the order was signed." Tex. Fam. Code § 162.012.[2] But under § 1913 of ICWA, because A.L.M. is an "Indian child," the Brackeens' adoption is exposed to collateral attack for two years. 25 U.S.C. § 1913(d) ("After the entry of a final decree of adoption of an Indian child in any State court, the parent may withdraw consent thereto" on grounds of "fraud or duress" for up to "two years"). The Brackeens have a "concrete"—indeed, an acute—interest in avoiding that extended collateral attack period. *See Knox*, 567 U.S. at 307.[3]

Defendants suggest that the Brackeens' adoption will not be exposed to collateral attack under ICWA, asserting that § 1913(d) "only permits vacatur of a voluntary adoption (i.e., from biological parents whose rights were not under threat of termination by the state)." Defs.' Br. 11. But the government cites no authority for this litigation position, nor does that purported limitation appear in the Final Rule. *See* 25 C.F.R. § 23.136. But if the government's litigation position is correct, that would mean only that either A.L.M.'s biological parents or his Tribe could seek to invalidate the termination of parental rights—under § 1914—a provision which contains no time limitation at all. 25 U.S.C. § 1914; *see Holyfield*, 490 U.S. at 53–54 (vacating decree of adoption in a § 1914 challenge).

---

[2] Defendants mischaracterize *In re E.R.*, 385 S.W.3d 552 (Tex. 2012), as allowing collateral attacks on adoption decrees without limitation. But *In re E.R.* holds only that, when a parent lacks notice of a proceeding resulting in the termination of her parental rights, she has been deprived of due process and must be provided an opportunity to challenge the termination. 385 S.W.3d at 562. The court did not hold that "there was no statute of limitations" in any case involving an untimely challenge for fraud or duress. Defs.' Br. 14.

[3] Defendants also suggest that the Brackeens lacked an injury at the time the initial complaint was filed in October 2017, incorrectly asserting that "the Brackeens' adoption of A.L.M. was all but inevitable." Defs.' Br. 10. But the fact that the Navajo Nation withdrew their proposed placement for A.L.M. did nothing to prevent "other Indian families" from coming forward to claim the benefit of § 1915(a)'s placement preferences prior to A.L.M.'s final adoption in January 2018.

23

Defendants argue that it is improbable that A.L.M.'s adoption ever will be attacked under § 1913 and § 1914, and that therefore their injury is not "certainly impending." *Clapper v. Amnesty Int'l*, 568 U.S. 398, 415 (2013).  But that argument misapprehends the nature of the injury.  The Brackeens' injury arises from the fact that ICWA imposes a unique disability on their adoption—an extended period of collateral attack—because they adopted an Indian child.  The unequal treatment that federal law imposes on the Brackeens' adoption is not just "impending"—it is engraved in the statute and its limitation to decrees involving an "Indian child."  That unequal treatment is sufficient to establish an injury-in-fact, "irrespective of whether the plaintiff will sustain an actual or more palpable injury as a result of the unequal treatment under law or regulation."  *Time Warner Cable*, 667 F.3d at 636.

**The Librettis Are Injured By ICWA and the Final Rule.**  After claiming that the Brackeens are too *late* in the adoption process to seek relief, Defendants next claim that the Librettis are too *early*.  According to Defendants, because "Baby O. has not been removed from [the Librettis'] care," they have suffered no injury.  Defs.' Br. 15.

ICWA and the Final Rule are materially delaying Baby O.'s adoption.  Baby O. has now been awaiting adoption for over two years and counting—which, as Defendants concede, is *already* longer than "nearly a third" of adoptive children in Nevada have to wait before being adopted.  Defs.' Br. 15 n.11.  Because of ICWA's "diligent search" requirement, the Librettis have been stuck in ICWA purgatory for months as the State wades through *more than 40* proposed alternative placements put forward by the Tribe.  That delay itself is a cognizable harm.  *See Covenant Media of S.C., LLC v. City of N. Charleston*, 493 F.3d 421, 428 (4th Cir. 2007) ("[T]he injury of not having an application processed timely is distinct from the injury of ultimate denial

of that application."); *Warth v. Seldin*, 422 U.S. 490, 516 (1975) (finding lack of standing because plaintiffs never alleged that the challenged governmental action "delayed or thwarted" plaintiffs).

The Article III case here is all the more clear because the delay results from unequal treatment—specifically, the "diligent search" requirements that ICWA and the Final Rule impose only on efforts to adopt "Indian child[ren]."  25 C.F.R. § 23.132(c)(5).  That "denial of equal treatment resulting from the imposition of the barrier" is itself an "injury in fact," even if the Librettis ultimately are able to "obtain the benefit" of adopting Baby O.  *Ne. Fla.*, 508 U.S. at 666.

Finally, because the Librettis have "concrete plans" to adopt Baby O., *Duarte*, 759 F.3d at 518, they can challenge the other discriminatory "barrier[s]" that ICWA and the Final Rule impose on their adoption plan, including § 1915's placement preferences, *Ne. Fla.*, 508 U.S. at 666.  That ICWA and the Final Rule compel the Librettis to shoulder the "good cause" burden—which applies because they are non-Indians who seek to adopt an Indian child—is itself a constitutional injury.  Other courts in this Circuit have held that plaintiffs who have "taken steps sufficient to show they desire adoption" may challenge constitutionally suspect legal barriers to adoption even before they have been precluded from adopting.  *See, e.g.*, *Campaign for S. Equal. v. Miss. Dep't of Human Servs.*, 175 F. Supp. 3d 691, 700 (S.D. Miss. 2016) (adoptive parents may challenge state laws prohibiting adoption by same-sex couples).

### 2.   Individual Plaintiffs' Injuries Are Traceable to Regulations Promulgated by Defendants and to Federal Requirements Imposed by ICWA

Individual Plaintiffs also readily satisfy *Lujan*'s second prong, because their injuries are "fairly traceable to the defendant[s'] allegedly unlawful conduct" of administering an unconstitutional federal statute and promulgating an unlawful regulation.  504 U.S. at 590.  Indeed, both "[c]ausation and redressability . . . flow naturally from the injury."  *Contender Farms, LLP*, 779 F.3d at 266.

i.   **Defendants' Actions Significantly Contribute to Individual Plaintiffs' Injuries**

Article III's traceability requirement is satisfied so long as the defendant's actions "significantly contributed to the Plaintiffs' alleged injuries." *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010). Importantly, "[t]racing an injury is not the same as seeking its proximate cause." *Id.* Traceability is satisfied even when the injury is "produced by [the Defendants'] determinative or coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997).

So, for example, an injury is fairly traceable to a governmental agency where that agency's powers or policies influence decisions made by third parties. *See, e.g.*, *Bennett*, 520 U.S. at 168–71 (opinion by the Fish and Wildlife Service that would have a "powerful coercive effect" on an agency's action to harm the plaintiffs fairly caused their injury); *Metro. Washington Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 265 (1991) (injury was "fairly traceable" to the veto powers of Metropolitan Washington Airports Authority's Board of Review because "knowledge that the master plan was subject to the veto power undoubtedly influenced MWAA's Board of Directors when it drew up the plan"); *Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 368 (5th Cir. 2018) (injury was "fairly traceable" where evidence indicated that Texas Human Health and Human Services Commission's policy "impacted" the relevant "decision").

The traceability question here is whether ICWA and the Final Rule "significantly contribute" to Individual Plaintiffs' injuries. The answer to that question is glaringly obvious: The existence and application of ICWA's and the Final Rule's discriminatory requirements is part and parcel of Individual Plaintiffs' injuries. ICWA's placement preferences and the Final Rule's "good cause" requirements "significantly contributed" to Child P.'s removal from the Cliffords. App. 52–54. ICWA's placement preferences and the Final Rule's "diligent search" requirement

26

is "significantly contribut[ing]" to the extraordinary delay being imposed on the Librettis (and on Ms. Hernandez) as they seek to adopt Baby O. The Final Rule's requirement that "good cause" be shown by "clear and convincing" evidence certainly "significantly contribute[s]" to the Librettis' injury of being compelled to surmount that burden whenever the diligent search for an alternative placement is complete and Baby O.'s adoption proceedings begin. App. 69. ICWA's two-year collateral attack provision "significantly contributes" to the Brackeens' injury by subjecting their adoption of A.L.M. to an extended period of collateral attack, and by exposing the underlying termination of parental rights to invalidation for an indefinite period. In short: Article III's traceability requirement is readily satisfied because Individual Plaintiffs' injuries are caused by the provisions of federal law that they are challenging in this action.

Defendants nevertheless argue that even if Plaintiffs' injuries are traceable to *federal law*, they are not traceable to *the federal government* because "ICWA specifies no enforcement role for Defendants, and neither Interior or HHS or any of their respective officers have enforced or are threatening to enforce ICWA." Defs.' Br. 19–20. Instead, Defendants claim that Plaintiffs' injuries "flow from the implementation of ICWA by state courts, not from any actions by Defendants." *Id.* at 19. That is both wrong and irrelevant.

It is wrong because Defendants promulgated the Final Rule, claiming for themselves the authority to "set *binding standards* for Indian child-custody proceedings in State courts" that purport to have the "force of law." 81 Fed. Reg. at 38,782, 38,785 (emphasis added). Defendants here thus are quite unlike the defendants in *Okpalobi v. Foster*, 244 F.3d 405 (5th Cir. 2001) (en banc), who lacked "any duty or ability to do *anything*" relating to the challenged statute. *Id.*; *cf.* Defs.' Br. 20.

And it is irrelevant because the Fifth Circuit has since made clear that "*Okpalobi* does not control" in a "case brought against a state officer in his official capacity" where "[the state] waived its Eleventh Amendment immunity," *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 159 (5th Cir. 2007), because at that point "the [government] is the real party in interest." Where "the [government] itself is a party, causation and redressability are easily satisfied"; the presence of the government as the "real party in interest" means that "the connection between the state officer named in the suit and the enforcement of [the statute] is *irrelevant* to our standing analysis." *Id.* (emphasis added). And so it is, here. Indeed, the United States is not only "the real party in interest" here; it is a *defendant*, and lawfully so pursuant to Congress's waiver of sovereign immunity in claims for nonmonetary relief. *See* 5 U.S.C. § 702; *see infra* at 35.

Moreover, wholly apart from *Allstate*'s rule that where the government is a real party in interest, a plaintiff need not show that the named defendant enforces the statute, Individual Plaintiffs' injuries are traceable to Defendants because the federal laws Defendants have laid down—ICWA and the Final Rule—most certainly "impact[]" the adoptive placement decisions made by state agencies and state courts. *See Legacy Cmty. Health Servs., Inc.*, 881 F.3d at 368. Indeed, that is their very point—to alter the courses and outcomes of adoption matters involving "Indian children." Having discovered and exercised authority to "set *binding standards* for Indian child-custody proceedings in State courts," 81 Fed. Reg. at 38,782, 38,785 (emphasis added), which require those state courts to apply ICWA's placement preferences and "good cause" requirement, Defendants cannot possibly deny having "coercive effect" on those state courts. *Bennett*, 520 U.S.

at 169; *see* Defs.' Br. 2 (recognizing States' "obligation to follow federal law").  And that "coercive effect" amply satisfies Article III's traceability requirement.[4]

### ii.     Defendants' Remaining Traceability Arguments Are Meritless

Contrary to Defendants' assertions, all of the Individual Plaintiffs readily satisfy the traceability element.

***The Brackeens' Injury Is Traceable to ICWA and the Final Rule.***  Defendants claim that the Brackeens' injury is not traceable to ICWA because the "proximate cause" of any vacatur of their adoption "would be purported fraud or duress, not the statute."  Defs.' Br. 13.  But of course, "[t]racing an injury is *not the same* as seeking its proximate cause."  *K.P.*, 627 F.3d at 123 (emphasis added).  And the fact that Texas law also permits collateral attack on an adoption obtained by fraud or duress is irrelevant.  As explained above, what matters here is that Texas law authorizes collateral attack for a period of six months, while ICWA extends that period to *two years*, during which time the Brackeens must live under a different legal regime solely because they adopted an Indian child.  That special disability is clearly caused by and traceable to ICWA.

***The Librettis' Injury Is Traceable to ICWA and the Final Rule.***  Defendants further contend that the Librettis' injury is not traceable to ICWA because of the possibility that a "state court *may find* that good cause to deviate from ICWA's adoptive preferences exists."  Defs.' Br. 15–16 (emphasis added).  But the possibility that a state court may choose to depart from ICWA's placement preferences cannot defeat the Librettis' standing to bring a constitutional challenge to the placement preference regime.  Indeed, the ultimate outcome of the Librettis' adoption petition is

---

[4]  Even if ICWA and the Final Rule were not "coercive"—and they are—the traceability requirement would still be satisfied.  The Fifth Circuit has expressly rejected the proposition that "causation can be proven only if the governmental agency has coercive control over th[e] third parties."  *Sierra Club v. Glickman*, 156 F.3d 606, 614 (5th Cir. 1998).

beside the point, because their "injury in fact" is "the denial of equal treatment resulting from the imposition of [a] barrier." *Ne. Fla.*, 508 U.S. at 666. That "[d]iscriminatory treatment at the hands of the government" is "recognizable for standing irrespective of whether" the Librettis ultimately experience "more palpable injury as a result of the unequal treatment." *Time Warner Cable, Inc.*, 667 F.3d at 636.

### 3.   A Judgment That Vacates the Final Rule and Declares ICWA Unconstitutional Will Redress Individual Plaintiffs' Injuries Caused By Federal Law

Finally, Individual Plaintiffs readily satisfy the redressability requirement because "it is likely . . . that the[ir] injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560.

### i.   The Requested Relief Would Relieve "Discrete Injur[ies]" Individual Plaintiffs Suffer Because of ICWA and the Final Rule

"[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982); *see also Air Evac EMS, Inc. v. Texas*, 851 F.3d 507, 514 (5th Cir. 2017) (same). In other words, redressability is satisfied where "the practical consequence" of the ruling "would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002); *see also FEC v. Akins*, 524 U.S. 11, 25 (1998) (vacatur of FCC order "can 'redress' respondents'" injury, "even though the FEC might reach the same result exercising its discretionary powers lawfully").

Even where third party actors or causes "play a role" in the ultimate outcome, redressability is satisfied provided that "a judgment in [plaintiffs'] favor would at least make it easier for them" to achieve the desired result. *Duarte*, 759 F.3d at 521; *see also Allstate Ins. Co.*, 495 F.3d at 159 n.19 (citing *Franklin v. Massachusetts*, 505 U.S. 788, 790–91 (1992)) (redressability satisfied

"where actors who [a]re not parties to the lawsuit could be expected to amend their conduct in response to a court's declaration").

An order vacating the Final Rule would plainly "relieve a discrete injury" to Individual Plaintiffs by eliminating the Rule's myriad requirements. *See Larson*, 456 U.S. at 243 n.15.  Such an order would invalidate the Final Rule, rendering it a legal nullity—even in state court. *See Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) ("[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."); *see also AFL-CIO v. Chao*, 496 F. Supp. 2d 76, 92 (D.D.C. 2007) ("[V]acatur takes the rule off the books").  Defendants thus have no substantial basis to dispute redressability with respect to Individual Plaintiffs' challenge to the Final Rule.[5]

Defendants claim, however, that a further declaration from this Court that ICWA is unconstitutional would not redress Individual Plaintiffs' injuries flowing from the statute because "a declaratory judgment addressing the constitutionality of ICWA would not bind state courts."  Once again, Defendants are wrong.

If this Court declares ICWA unconstitutional, that is not the end of the line.  Instead, one of two things must happen.  The far more likely scenario is that Defendants will appeal, and, if this Court's judgment is affirmed by the Fifth Circuit, then appeal to the Supreme Court.  And if the Supreme Court grants certiorari—as it almost invariably does when an Act of Congress has been

---

[5] To the extent that Defendants argue that Individual Plaintiffs should have brought their challenge to the Final Rule "in the context of state-court proceedings in which they seek to adopt children," Defs.' Br. 23, that contention is foreclosed by the text of the APA.  Only in federal court is "[a] person suffering legal wrong because of agency action . . . entitled to judicial review thereof."  5 U.S.C. § 702.  And only a federal court can "hold unlawful and set aside agency action . . . found to be arbitrary, capricious . . . or otherwise not in accordance with law."  5 U.S.C. § 706(2).

declared unconstitutional, *see* Stern & Gressman, *Supreme Court Practice* 264 (10th ed. 2013)—then its judgment as to ICWA's constitutionality most certainly will be binding on state courts, as even Defendants recognize. *See* Defs.' Br. 22. The less likely scenario is that Defendants acquiesce to this Court's judgment that ICWA is unconstitutional. *See* 28 U.S.C. § 530D(a)(1)(B)(ii).

Defendants hypothesize that, in the latter scenario, States and Indian Tribes will continue to invoke ICWA, and that state courts will be bound to follow its provisions regardless of this Court's judgment of ICWA's unconstitutionality (and the Executive Branch's acquiescence in it). *See* Defs.' Br. 22. But Defendants cannot seriously dispute that, at least in Texas, Nevada, and Minnesota, where there are no decisions of the state supreme courts affirming ICWA's constitutionality, this Court's judgment would "at least make it easier" for Individual Plaintiffs to persuade those state courts of ICWA's unconstitutionality. *Duarte*, 759 F.3d at 521. Indeed, if a state court of last resort continued to apply ICWA in spite of this Court's judgment and the Executive's acquiescence, there would be a strong case for review by the Supreme Court, resulting in a judgment that applies to state courts nationwide. Because a favorable declaration of ICWA's constitutionality from this Court undeniably would have the "practical consequence" of increasing "the likelihood that the plaintiff would obtain relief," *Evans*, 536 U.S. at 464, Article III's redressability requirement is satisfied.

*Okpalobi*, the only case cited by Defendants that even mentions redressability, is not to the contrary.[6] As explained above, *Okpalobi* involved state officials without "any duty or ability to do *anything*" related to the enforcement of the challenged statute. 244 F.3d at 427. Here, by contrast, Defendants are the *authors* of the challenged federal regulation, issued pursuant to the

---

[6] The other cases Defendants cite in support of this argument involve the *Supremacy Clause*, which is not at issue here. Defs.' Br. 22.

challenged federal statute. *Okpalobi* does not apply where the defendant "has definitive responsi-bilities related to the application" of the challenged statute. *K.P.*, 627 F.3d at 123 (redressability satisfied even though defendant "is far from the sole participant in the application of the challenged statute"); *see also Air Evac EMS, Inc.*, 851 F.3d at 515 (declining to apply *Okpalobi*); *Allstate Ins. Co.*, 495 F.3d at 159 ("*Okpalobi* does not control this case.").

The notion that, because the federal government has engineered a statute that must be en-forced by state agencies and state courts, no party has standing to challenge the constitutionality of the federal statute in federal court is an unsupported and insupportable perversion of Article III's case-and-controversy requirement, and one this Court should soundly reject. If the fact that a "state court owes obedience to only . . . the Supreme Court," Defs.' Br. 23, were enough to defeat redressability, *no* federal plaintiff could challenge a federal statute that provides state courts con-current jurisdiction, thus eviscerating federal question jurisdiction. That cannot be the law. Where a federal statute is causing constitutional injury, a federal court's declaration that the statute is unconstitutional provides a measure of relief—even if misguided third parties might continue to try to enforce the stricken federal statute in state court.

### ii.   Defendants' Remaining Redressability Arguments Are Without Merit

Defendants' redressability arguments as to the Brackeens and Librettis are warmed-over versions of their traceability arguments, and therefore fail for substantially the reasons stated above. *See supra* at 25–29. Defendants' remaining redressability arguments, which focus on the Cliffords, also fail.

***The Cliffords' Injuries Are Redressable.*** Defendants contend that the Cliffords' injuries cannot be redressed in this lawsuit because Minnesota state law compelled Child P.'s removal regardless of ICWA and the Final Rule. *See* Defs.' Br. 16–17. That argument is refuted by the

recent decision of the Minnesota Court of Appeals, which made clear that "the regulations associated with ICWA *required the district court* to treat the child as an Indian child," making "any adoptive or preadoptive placement of" Child P. "subject to the placement preferences recited in ICWA." App. 52 (emphasis added). The Final Rule further imposed on the Cliffords the burden to "establish[ by] clear and convincing evidence . . . the good cause that is necessary to deviate from the preadoptive preferences." App. 53. And the court "exercis[ed] judicial power" pursuant to *ICWA's* definition of "Indian child," not pursuant to any Minnesota state statute. App 55 (emphasis added). In other words: The Cliffords' injuries were caused by federal, not state, law.

Defendants are also wrong that Minnesota has a "preference for placements with relatives" that would independently require Child P. to be placed with her biological grandmother. Defs.' Br. 16. Instead, Minnesota courts need only "consider" placement with a child's "relatives" or "important friend[s]," and only to the extent that it is "consistent with the child's best interests," and so long as it does not "delay[ ] or den[y]" a placement "based on race, color, or national origin of the adoptive parent or the child." Minn. Stat. § 259.57(c). That is a far cry from the Final Rule's mandate that the Cliffords provide "clear and convincing evidence of the good cause that is necessary to deviate from [ICWA's] preferences," App. 53, which apply precisely *because* of the "race, color, or national origin of the adoptive parent [and] the child," Minn. Stat. § 259.57(c)(2).

Finally, to the extent Minnesota state law repeats any of ICWA's unconstitutional provisions, Defs.' Br. 16–17, Defendants themselves agree that "a decision on the constitutionality of

ICWA could have ramifications for" that state law as well, Defs.' Br. 37, and thus would at the very least "make it easier" for the Cliffords to adopt Child P., *Duarte*, 759 F.3d at 521.[7]

### B.    The United States Has Waived Sovereign Immunity As To All of Individual Plaintiffs' Claims

Defendants assert in passing that Individual Plaintiffs cannot sue the United States because there is no waiver of sovereign immunity.  *See* Defs.' Br. 31.  In fact, the United States has waived its sovereign immunity to Individual Plaintiffs' claims in two separate ways.

*First*, § 702 of the APA waives the sovereign immunity of the United States for any action "seeking relief other than money damages" and "stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority." 5 U.S.C. § 702.  Section 702 further provides that "[t]he United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States."  *Id.* This waiver "applies to any suit whether under the APA or not."  *Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (collecting cases); *see also Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006) ("There is nothing in the language of the second sentence of § 702 that restricts its waiver to suits brought under the APA.").  Individual Plaintiffs' claims clearly implicate an agency action—the issuance of the Final Rule—and therefore fall within the scope of the § 702 waiver.

*Second*, suits against federal officers seeking equitable relief for a constitutional violation are also not barred by sovereign immunity.  Under *Larson v. Domestic & Foreign Exchange Corp.*, 337 U.S. 682, 689–91 (1949), suits for prospective relief are permitted when the statute from which

---

[7]  Additionally, Individual Plaintiffs have live, justiciable claims against the Department of Health and Human Services and Secretary Azar, as explained in Part I.D of State Plaintiffs' Brief.

the relevant government officials derive their authority is itself unconstitutional.  This is a "constitutional exception to the doctrine of sovereign immunity," *id*. at 696, which affords individuals the "right to sue directly under the [C]onstitution to enjoin . . . federal officials from violating [their] constitutional rights." *Porter v. Califano*, 592 F.2d 770, 781 (5th Cir. 1979); *see also Anibowei v. Sessions*, No. 3:16-CV-3495-D, 2018 WL 1477242, at *2 (N.D. Tex. Mar. 27, 2018) (same).  Thus, federal courts always have the inherent power to grant equitable relief against the federal government for constitutional violations.  *See, e.g.*, *Hubbard v. U.S. EPA Adm'r*, 809 F.2d 1, 11 (D.C. Cir. 1986) ("[F]ederal courts have jurisdiction to grant equitable relief to remedy agency violations of constitutional rights.  [There is a] presumed availability of federal equitable relief against threatened invasions of constitutional interests.").  That waiver is more than sufficient to encompass Individual Plaintiffs' claims.

## C.    There Is No Basis for This Court to Abstain Under *Younger*

Defendants next urge this Court to decline to exercise jurisdiction based on *Younger v. Harris*, 401 U.S. 37 (1971).  But Defendants' argument relies on outdated authority, all but ignoring the Supreme Court's most recent decision, in *Sprint Communications, Inc. v. Jacobs*, 571 U.S. 69 (2013), on the limited applicability of *Younger*.  As *Sprint* makes clear, *Younger* abstention does not apply here.

"[A] federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014); *see also Sprint*, 571 U.S. at 77 ("Federal courts, it was early and famously said, have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.").  In *Younger v. Harris*, the Supreme Court recognized a "far-from-novel exception to this general rule," holding that federal courts should decline to enjoin a pending state criminal prosecution absent a showing that the charges had been brought in bad faith or with an intent to harass. *Sprint*,

571 U.S. at 77.  That holding was later extended to bar interference with certain state civil proceedings.  *See id.* at 77–78 (collecting cases).

In 2013, the Supreme Court's *Sprint* decision "revisited the *Younger* doctrine, clarified its operation, and narrowed its scope."  *Sirva Relocation, LLC v. Richie*, 794 F.3d 185, 189 (1st Cir. 2015); *see also ACRA Turf Club, LLC v. Zanzuccki*, 748 F.3d 127, 129 (3d Cir. 2014) (*Sprint* "clarifies and reminds courts of the boundaries of the *Younger* abstention doctrine").  *Sprint* made clear that *Younger* abstention "applies only to three 'exceptional' categories" of state proceedings":  (1) "criminal prosecutions"; (2) "certain civil enforcement proceedings akin to criminal prosecutions"; and (3) "'civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions.'"  *Google, Inc. v. Hood*, 822 F.3d 212, 222 (5th Cir. 2016) (quoting *Sprint*, 571 U.S. at 72, 78).  The Supreme Court "ha[s] not applied *Younger* outside these three 'exceptional' categories," and has expressly held "that they define *Younger*'s scope."  *Sprint*, 571 U.S. at 78.

Adoption and custody proceedings are not, of course, criminal prosecutions (category 1).  Nor do Defendants claim that such proceedings implicate "the state courts' ability to perform their judicial functions" (category 3).  Instead, Defendants try to shoehorn adoption and custody proceedings into *Sprint* category 2:  "civil enforcement proceedings akin to criminal prosecutions." 571 U.S. at 72; *see* Defs.' Br. 32.  But adoption and custody proceedings bear no resemblance to the proceedings that satisfy *Sprint*'s second category—"enforcement action[s] before civil rights commission[s]," "bar disciplinary proceedings," and "state-instituted public nuisance proceeding[s]."  *Google, Inc.*, 822 F.3d at 222–23 n.5 (collecting cases).  Each of these civil enforcement actions are "akin to criminal prosecutions" because they are "characteristically initiated to sanction the federal plaintiff . . . for some wrongful act."  *Sprint*, 571 U.S. at 279.

37

Post-*Sprint*, federal courts have routinely rejected attempts to invoke *Younger* in adoption and custody proceedings.  In *Doe v. Piper*, 165 F. Supp. 3d 789 (D. Minn. 2016), for example, the court expressly held that "Baby Doe's state court adoption proceeding was undeniably not a criminal prosecution, civil enforcement proceeding 'akin to a criminal prosecution,' nor a civil proceeding involving the enforcement of a state court judgment."  *Id.* at 806.  Similarly, in *Tinsley v. McKay*, 156 F. Supp. 3d 1024 (D. Ariz. 2015), the court held that ongoing state juvenile court proceedings "do not qualify as quasi-criminal [enforcement actions] for purposes of *Younger*."  *Id.* at 1034; *see also Oglala Sioux Tribe v. Van Hunnik*, 993 F. Supp. 2d 1017 (D.S.D. 2014) (*Younger* did not apply to proceedings related to the removal of Indian children from their homes).  As the Ninth Circuit explained, "federal courts cannot ignore *Sprint*'s strict limitations on *Younger* abstention simply because states have an undeniable interest in family law."  *Cook v. Harding*, 879 F.3d 1035, 1040 (9th Cir. 2018).  Indeed, "the law of domestic relations often has constitutional dimensions properly resolved by federal courts."  *Id.* (citing *Loving v. Virginia*, 388 U.S. 1 (1967)).[8]

Defendants rely on *Moore v. Sims*, 442 U.S. 415 (1979), as an example of a quasi-criminal civil enforcement action.  *See* Defs.' Br. 32.  But as *Sprint* explained, *Moore* involved a "state-initiated proceeding to gain custody of children allegedly abused by their parents."  571 U.S. at 79.  Because the proceedings in *Moore* were "in aid of and closely related to criminal statutes," 442 U.S. at 423, they were considered quasi-criminal for purposes of *Younger*.  Here, by contrast,

---

[8]   Defendants cite *Stewart v. Nevarez*, No. 4:17-CV-00501-O-BP, 2018 WL 507153, at *2 (N.D. Tex. Jan. 23, 2018), an unpublished order in which this Court, accepting a magistrate judge's Report and Recommendation, applied *Younger* in the context of state-court proceedings involving child custody and child support.  But Stewart was a *pro se* litigant, and neither party in that case briefed the application of *Sprint* to the *Younger* abstention analysis.

the state proceedings to which Individual Plaintiffs are parties are garden-variety adoption or cus-tody proceedings.   None of the Individual Plaintiffs has done anything wrong, and none of these proceedings were "initiated to sanction the federal plaintiff . . . for some wrongful act."   *Sprint*, 571 U.S. at 79.

Because none of the three "exceptional" circumstances identified in *Sprint* is at issue here, this Court need not consider the additional abstention factors laid out in *Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423 (1982).   Defendants say that *Middlesex* constitutes an independent and sufficient test for when *Younger* applies.   *See* Defs.' Br. 33 (claim-ing that "*Younger* instructs a federal court to abstain . . . if three [*Middlesex*] factors are present").   That is wrong.   *Sprint* made clear that the *Middlesex* factors are "not dispositive; they [a]re, instead, *additional* factors appropriately considered by the federal court before invoking *Younger*."   571 U.S. at 81; *see also Google, Inc.*, 822 F.3d at 222 ("*If* state proceedings fit into one of these cate-gories, a court appropriately consider[s]" the *Middlesex* factors "before invoking *Younger*") (em-phasis added).   Indeed, *Sprint* expressly rejected a contention identical to Defendants' as "irrecon-cilable with our dominant instruction that, even in the presence of parallel state proceedings, ab-stention from the exercise of federal jurisdiction is the exception, not the rule."   571 U.S. at 81–82.[9]

---

[9]   Defendants also cite *Morrow v. Winslow*, 94 F.3d 1386 (10th Cir. 1996), but the court in that case—which pre-dates *Sprint* by more than 15 years—assumed that *Younger* applies to any civil proceedings "when important state interests are involved."   *Id.* at 1393 (quoting *Middle-sex*, 457 U.S. at 432).   As noted above, that holding cannot be squared with *Sprint*'s holding that the *Middlesex* factors are "*additional* factors."   571 U.S. at 81; *see also Catanach v. Thom-son*, --- F. App'x ---, 2017 WL 5615849, at *2 n.2 (10th Cir. Nov. 20, 2017) (rejecting absten-tion argument because it "relied" on "cases" that "pre-date the Supreme Court's decision in *Sprint*," which "significantly limited the reach of *Younger*").

No Plaintiff is asking for a ruling on any state law or seeking an injunction against any state official.  Nor are there any pending civil enforcement actions against any of the Plaintiffs. Under controlling Supreme Court precedent, there is no basis for this Court to abstain.

**D.     The States of Nevada and Minnesota Are Not Necessary and Indispensable Parties**

Defendants further assert that the Cliffords' and Librettis' claims should be dismissed because the States of Nevada and Minnesota are necessary and indispensable parties to this litigation. Defs.' Br. 36–37.  But that argument hinges on the mistaken premise that Plaintiffs are asking this Court to "prevent" those states' "courts from applying either ICWA or the Final Rule to" particular proceedings through an order from this Court that would "bind" those States. Defs.' Br. 36.  Plaintiffs request no such thing.  As the Second Amended Complaint makes clear, Plaintiffs simply ask this Court to declare that a *federal* regulation and a *federal* statute are unconstitutional and otherwise invalid, and to enjoin the *federal* government from implementing or administering them.  As demonstrated above, *see supra* at 30–34, such an order would redress Individual Plaintiffs' injury.

Contrary to Defendants' argument (at 37), states are not "necessary and indispensable" to any litigation where a declaration that a federal statute is constitutional might have implications for a separate state statute.  As the Fifth Circuit has held, a state is not an indispensable party when the suit "is directed primarily at the constitutionality of a federal statute," and not at state statutes or rules.  *Romero v. United States*, 784 F.2d 1322, 1325 (5th Cir. 1986) (brackets omitted) (citing *Bermudez v. U.S. Dep't of Agr.*, 490 F.2d 718, 724 (D.C. Cir. 1973)).  Where, as here, "plaintiffs seek to adjudicate their rights vis-a-vis the federal government and request re[s]cission of federal policy," and "[t]he interests of the States [are] protected as no liability [i]s imposed on them," the states are not necessary and indispensable parties.  *Bermudez*, 490 F.2d at 724.

Finally, even if Nevada and Minnesota were indispensable parties to this challenge to a federal statute and implementing regulations—and they are not—the Rule 19(b) factors weigh against dismissal. Specifically, the relief the Cliffords and Librettis seek causes no "prejudice" to Minnesota and Nevada. Fed. R. Civ. P. 19(b)(1). The only prejudice Defendants claim on behalf of Nevada is its generalized "interest in the welfare of children." Def's Br. 37. But if that interest were sufficient to establish "prejudice," then *every* state would have to be joined for this litigation to proceed.

For similar reasons, Defendants' claim of prejudice on behalf of Minnesota—that a judgment here could have "ramifications" for the enforceability of the Minnesota Indian Family Preservation Act, Minn. Stat. §§ 260.751–260.835—cannot be sustained. If that were sufficient to establish prejudice requiring dismissal, then Minnesota—along with every other State that has a similar "mini-ICWA" on the books—would have to be joined to every federal action challenging ICWA's constitutionality. Rule 19 does not invite—much less require—such an absurd result.

*   *   *

For all the foregoing reasons, Defendants' motion to dismiss should be denied. For the reasons that follow, Individual Plaintiffs are entitled to summary judgment.

## II. Individual Plaintiffs Are Entitled to Summary Judgment On Each of Their Claims for Relief

### A. ICWA's Adoptive Placement Preferences and Collateral Attack Provisions Discriminate on the Basis of Race in Violation of Equal Protection

Section 1915(a)'s placement preferences impose a race-based classification, and the collateral-attack provisions in § 1913(d) and § 1914 impose race-based disabilities, all in violation of Individual Plaintiffs' equal protection rights under the Fifth Amendment. *Bolling v. Sharpe*, 347 U.S. 497, 498–99 (1954). The Final Rule's parallel provisions are therefore "contrary to constitutional right" and must be vacated. 5 U.S.C. § 706(2)(B).

### 1.   Any Law That "Fenc[es] Out Whole Classes" of Persons from "State Affairs" Is Plainly a "Racial Classification"

The Constitution's guarantee of equal protection protects both adults and children from differential treatment based on race or ancestry. *See Brown v. Bd. of Educ.*, 347 U.S. 483 (1954). Accordingly, state courts may not use racial considerations to make child custody determinations. *See Palmore v. Sidoti*, 466 U.S. 429, 433–34 (1984) (invalidating child custody decision that was impermissibly based on "racial classification").

The Supreme Court has approved differential treatment for Indian tribes in limited circumstances arising out of Congress's "treaty obligations and its responsibilities to the Indian tribes" as quasi-sovereign entities. *Rice v. Cayetano*, 528 U.S. 495, 519 (2000). It is permissible, for example, for the United States to grant preferential fishing rights to an Indian tribe by treaty, *Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 673 n.20 (1979), or to confer exclusive jurisdiction to tribal courts over crimes committed by enrolled Indians on reservations, *United States v. Antelope*, 430 U.S. 641, 645–47 (1977). But these concessions are tightly linked to Indian land, tribal sovereignty, and self-government.

The outer boundaries of permissible legislation in this sphere were set by *Morton v. Mancari*, 417 U.S. 535 (1974), a case the Supreme Court later described as a "limited exception." *Rice*, 528 U.S. at 520. *Mancari* upheld a hiring preference for enrolled members of federally recognized Indian tribes at the Bureau of Indian Affairs, the agency that governs the "lives and activities" of tribal members "in a unique fashion." 417 U.S. at 554. Because the hiring preferences were limited to the individuals employed by the BIA, which governs Indian tribes, the Court found that the BIA preference for tribal members "further[ed] Indian self-government," and concluded that the preferences were "political rather than racial in nature." *Id.* at 553–54 & n.24. The Court was "careful to note," however, that its holding was "confined" to the authority of the BIA,

an agency it described as "*sui generis.*"  *Rice*, 528 U.S. at 520.  It would be an "obviously more difficult question," the Court emphasized, if Congress were to extend that preference to other government agencies or establish "a blanket exemption for Indians from all civil service examinations."  417 U.S. at 554.

In *Rice*, the Court confirmed the limits on *Mancari*, making clear that Indian or tribal classifications that are untethered from "the internal affair[s] of a quasi sovereign" are an impermissible "proxy for race."  *Rice*, 528 U.S. at 520.[10]  *Rice* involved a challenge to Hawaii's scheme for electing the trustees of its Office of Hawaiian Affairs, which administers programs for the benefit of "Hawaiians," defined as descendants of native persons inhabiting the Hawaiian Islands.  *Id.* at 499.  Hawaii's constitution limited the right to vote for the trustees to these native "Hawaiians."  *Id.*  When this voting scheme was challenged as race-based, the state invoked *Mancari*, arguing that "native Hawaiians have a status like that of Indians in organized tribes," and that the trustee positions afforded native Hawaiians "a measure of self-governance."  *Id.* at 518–20.

The Supreme Court struck down the Hawaii statute, holding that "[i]t does not follow from *Mancari*" that a State could have a "voting scheme that limits the electorate for its public officials to a class of tribal Indians, to the exclusion of all non-Indian citizens."  *Id.* at 520.  In declining to "extend the limited exception of *Mancari*" to this "new and larger dimension," the Supreme Court explained that because the trustee elections are "affairs of the State," not "the internal affair[s] of

---

[10]   Even before *Rice*, the Supreme Court had dramatically curtailed the use of racial preferences—and therefore the scope of *Mancari*—in *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995).  In his *Adarand* dissent, Justice Stevens specifically cited *Mancari* and noted that the majority's emphasis on "consistency" would require the application of strict scrutiny to "the special preferences that the National Government has provided to Native Americans."  *Id.* at 244 (Stevens, J., dissenting); *see also Williams v. Babbitt*, 115 F.3d 657, 664–65 (9th Cir. 1997) ("If Justice Stevens is right about the logical implications of *Adarand*, *Mancari*'s days are numbered.").

a quasi sovereign," *Mancari* did not apply. *Id.* at 520–22. "To extend *Mancari*" in this way, the Court concluded, "would be to permit a State, by racial classification, to fence out whole classes of its citizens from decisionmaking in critical state affairs." *Rice*, 528 U.S. at 522.

*Rice* thus confirms that a classification of federally-recognized Indian tribes (or their members) is generally a "racial classification," and that *Mancari*'s "limited exception" to this rule applies only when the classification is closely tethered to Congress's "treaty obligations and its responsibilities to the Indian tribes" as quasi-sovereign entities. *Id.* at 519; *see also Williams*, 115 F.3d at 665 (*Mancari* applies only to "statutes that affect uniquely Indian interests," such as "preferences or disabilities directly promoting Indian interests in self-government"). Under *Rice* and its progeny, a law that favors tribal members by "fenc[ing] out whole classes" of persons from "state affairs" is unquestionably a "racial classification" that is subject to strict scrutiny. *Id.* at 522.

### 2. ICWA's Adoptive Placement Preferences and Collateral-Attack Provisions Are Unconstitutional "Racial Classifications"

Section 1915(a) does not regulate tribal land or property, nor does it otherwise touch on tribal self-government. Instead—like the race-based statute struck down in *Rice*—§ 1915(a)'s placement preferences operate to "fence out" non-Indians from the quintessentially "state affair[]" of state-court adoption proceedings. And the collateral-attack provisions in §§ 1913(d) and 1914 impose unique disabilities on the adoptions of "Indian child[ren]" by exposing them to an extended period of risk and uncertainty. Because these provisions do not fit into Mancari's "limited exception," they are "racial classification[s]" subject to strict scrutiny. *Rice*, 528 U.S. at 520, 522.

The Cliffords have now been separated from Child P.—perhaps forever—because ICWA deems Child P. an "Indian child," and the Cliffords are not an "Indian famil[y]." The Librettis have been forced to delay their efforts to adopt Baby O. as the State conducts dozens of tribal home studies, because ICWA treats Baby O. as an "Indian child," and the Librettis are not an "Indian

famil[y]." And the Brackeens' adoption of A.L.M. remains subject to an extended two-year collateral attack period because ICWA deems A.L.M. an "Indian child," and the Brackeens are not an "Indian famil[y]." If Child P., Baby O., and A.L.M. were not "Indian child[ren]," the relevant state courts would simply analyze whether their adoption is in "the best interest of the child" under generally applicable state law.[11] But because they are "Indian child[ren]" in the eyes of the law, and their adoptive families are not, ICWA's preference for tribal or "other Indian families" controls the path of their lives.

Child-custody proceedings administered by state agencies and adjudicated by state courts—even those involving "Indian children"—are plainly "state affair[s]" and not "the internal affair[s] of a quasi sovereign." *Rice*, 528 U.S. at 522. Quite unlike a law that governs the adoption of Indian children *on tribal lands, see Fisher v. District Court of Sixteenth Judicial Dist. of Mont.*, 424 U.S. 382, 390–91 (1976) (per curiam), a law that governs the adoption of "Indian child[ren]" in *state courts* nationwide has no impact on how the tribe governs itself. Sections 1913(d), 1914, and 1915(a) thus are not restricted to Indian tribes as quasi sovereigns, or otherwise limited to tribal self-government, as in the "unique" circumstance of *Mancari*. Under *Rice*, that is sufficient to conclude that ICWA's regulation of "Indian children" in the "state affair" of state-court adoption proceedings is a "racial classification."

Indeed, the Supreme Court has already strongly suggested that it regards ICWA's placement preferences as racial (not political) in nature. In *Adoptive Couple*, the Court observed that applying § 1915(a)'s placement preferences in that case would "raise equal protection concerns," because it "would put certain vulnerable children at a great disadvantage solely because an ancestor—even a remote one—was an Indian." 570 U.S. at 655–56. The Court further warned that, if

---

[11] *See* Tex. Fam. Code § 162.016(b); Nev. Rev. Stat. § 127.150(1); Minn. Stat. Ann. § 259.57(1).

a tribal member could "play [the] ICWA trump card at the eleventh hour to override the mother's decision and the child's best interests," "many prospective adoptive parents would surely pause before adopting any child who might possibly qualify as an Indian under the ICWA." *Id.* at 656. If ICWA's classifications were merely political, the result anticipated by the Court would not "raise equal protection concerns." *Id.* The application of § 1915(a)'s placement preferences raises equal protection concerns only because those preferences are based on race.

Both Congress and the Texas Legislature have evidently recognized the race-based nature of ICWA's classifications by carving out ICWA from generally applicable prohibitions on race-based discrimination. For example, the Multi-Ethnic Placement Act of 1994 prohibits any "person or government that is involved in adoption or foster care placements" from "delay[ing] or deny[ing] the placement of a child for adoption or into foster care, on the basis of the race, color, or national origin of the adoptive or foster parent, or the child, involved." 42 U.S.C. § 1996b(1)(B). But the statute then provides that "[t]his subsection *shall not be construed to affect* the application of [ICWA]." 42 U.S.C. § 1996b(3) (emphasis added).

Similarly, the Texas Family Code generally prohibits courts from "discriminat[ing] on the basis of race or ethnicity of the child or the prospective adoptive parents" in "determining the best interest of the child." Tex. Fam. Code § 162.015(a). But once again, ICWA is specifically exempted from that general prohibition. *Id.* at § 162.015(b) ("This section does not apply to a person, entity, tribe, organization, or child custody proceeding subject to [ICWA]."). That ICWA requires an express carve-out to avoid a conflict with laws prohibiting racial discrimination in adoptions further confirms that its classifications are based on race.

Two additional features of § 1915(a)'s placement preference regime provide still further confirmation that ICWA's classification is racial, not political.

*First*, the "Indian children" subject to § 1915(a)'s placement preferences include not only children who are "member[s] of an Indian tribe," but also any child who is "eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903(4). So § 1915(a) reaches beyond persons who are members of a federally-recognized tribe—the only classification *Mancari* upheld—and sweeps in those who are merely eligible for membership.

For Child P., Baby O., and A.L.M.—and most (if not all) other Indian children—that eligibility is based solely on blood relationship with a tribal ancestor. The vast majority of federally recognized Indian tribes—including the Tribes at issue in this litigation—have only blood quantum or lineage requirements as prerequisites for membership. The Navajo Nation "automatically" enrolls any child of an enrolled member provided the child is "at least one-fourth degree Navajo blood." Navajo Nation Code § 701. Membership in the Ysleta del sur Pueblo Tribe, the White Earth Band, and the Cherokee Nation is also based on racial ancestry. *See* Pub. L. No. 112-157, 126 Stat. 1213 (2012) (recognizing as a tribal member "any person of Tigua Ysleta del sur Pueblo Indian blood enrolled by the Tribe"); White Earth Band of Ojibwe Const. ch. 2, art. 1 ("Citizens of the White Earth Nation shall be descendants of Anishinaabeg families and related by linear descent to enrolled members of the White Earth Reservation and Nation."); Cherokee Nation Const. art. IV, § 1 ("All citizens of the Cherokee Nation must be original enrollees or descendants of original enrollees").

Thus, "children who are related by blood to . . . a tribe may be claimed by the tribe, and . . . made subject to the provisions of ICWA, solely on the basis of their biological heritage." *In re Bridget R.*, 49 Cal. Rptr. 2d at 527. This danger is illustrated in grotesque relief in the case of A.L.M., where the Navajo and Cherokee Tribes haggled over which Tribe would claim him—in

the hallway immediately prior to the adoption hearing—before finally settling on the Navajo. App. 62. And in the case of Child P., both the biological mother and the White Earth Band represented to the court in the fall of 2014 that Child P. was *not* eligible for membership in the tribe. Not until January 2017—six months after Child P. was placed with the Cliffords—did the White Earth Band write to the court and insist, without explanation, that Child P. was in fact eligible for membership.

Like the race-based election statute struck down in *Rice*, § 1915(a) requires differential treatment based on an "ancestral" classification with an "explicit tie to race." 528 U.S. at 516–17. "Ancestral tracing of this sort . . . employs the same mechanisms, and causes the same injuries, as laws or statutes that use race by name," *id.* at 517, and is every bit as "odious to a free people whose institutions are founded upon the doctrine of equality." *Rice*, 528 U.S. at 517 (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)).

*Second*, § 1915(a)'s placement preferences extend beyond members of the Indian child's tribe to "other Indian families" of *other* tribes. 25 U.S.C. § 1915(a). That provision—which accords preference to *any* "Indian famil[y]" from *any* one of 566 federally-recognized tribes—eviscerates any argument that § 1915(a)'s placement preferences are based on political affiliation with the Indian child's or his parents' tribe. *See Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs*, 81 Fed. Reg. 5,019, 5,019 (Jan. 29, 2016). The Indian child has no political affiliation with these other tribes, yet § 1915(a) mandates that they be preferred over a non-Indian placement. The clear import is that any "Indian famil[y]" will do. That demonstrates beyond any doubt that § 1915(a) constitutes a "preference [that] is . . . directed towards a 'racial' group consisting of 'Indians.'" *Mancari*, 417 U.S. at 553 n.24.

48

In sum, § 1915(a) imposes special preferences—or, more to the point, special disabilities—on a class that is defined solely by ancestry as a "proxy for race." That is no mere political classification—it is a racial classification subject to strict scrutiny, which it cannot survive. *See* *Adarand*, 515 U.S. at 227 ("all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny").[12]

For the same reasons, the collateral attack provisions in §§ 1913(d) and 1914 cast a shadow over the Brackeens' family solely on the basis of race. Because A.L.M. is an "Indian child," and the Brackeens are not an "Indian family," their adoption is subject to a two-year period of collateral attack—18 months longer than Texas law would otherwise allow. 25 U.S.C. § 1913(d); Tex. Fam. Code § 162.012(a). And the underlying termination of parental rights remains open to attack for an indefinite period of time. 25 U.S.C. § 1914. These provisions, too, violate equal protection.

### B.  ICWA's Adoptive Placement Preferences and Collateral Attack Provisions Violate the Due Process Clause

Even if ICWA's "Indian" classifications were political rather than race-based, those preferences would still violate the Due Process Clause here, because they disrupt Individual Plaintiffs' intimate familial relationships based solely on the arbitrary fact of tribal membership (or eligibility for membership).[13]

---

[12]  Of course, holding that § 1915(a)'s classifications are impermissibly based on race would not itself render unconstitutional ICWA's other protections, including the provisions according the tribe exclusive jurisdiction over custodial proceedings involving an Indian child who resides or is domiciled on a reservation, 25 U.S.C. § 1911(a), or emergency removal authority for "an Indian child who is a resident of or is domiciled on a reservation, but temporarily located off the reservation, *id.* § 1922—at least where there is an "existing Indian family" involved. *See, e.g.*, *In re Bridget R.*, 49 Cal. Rptr. 2d at 520–22.

[13]  If this Court should agree with Plaintiffs that ICWA imposes *racial* rather than political classifications, Plaintiffs' due-process arguments would apply with only greater force, because race is the paradigmatic arbitrary basis for governmental action. "[D]istinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Adarand*, 515 U.S. at 214.

The Supreme Court has "long recognized that freedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment." *Bowen v. Gilliard*, 483 U.S. 587, 611–12 (1987).  Parents therefore have a "fundamental right" under the Due Process Clause "to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66–67 (2000) (plurality) (collecting cases).

The "most essential and basic aspect" of this protection is "the right of the family to remain together without the coercive interference of the awesome power of the state." *Hodorowski v. Ray*, 844 F.2d 1210, 1216 (5th Cir. 1988).  That right also includes a parent's ability to make decisions about the visitation and custody of her child.  *Troxel*, 530 U.S. at 66–67.  In particular circumstances, a liberty interest may also attach to a foster relationship, because "biological relationships are not the exclusive determination of the existence of a family." *Smith v. Org. of Foster Families for Equal. & Reform*, 431 U.S. 816, 843 (1977) ("*OFFER*"); *see also id.* at 844 ("No one would seriously dispute that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship.").

A fundamental liberty interest in maintaining intimate familial relationships can be vitiated only when necessary to vindicate an important governmental interest.  *See, e.g.*, *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (Due Process Clause "forbids the government to infringe . . . 'fundamental' liberty interests . . . unless the infringement is narrowly tailored to serve a compelling state interest.") (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)).

### 1.   ICWA and the Final Rule Violate the Brackeens' Due Process Rights as Parents of A.L.M.

As discussed above, *see supra* at 16, the Brackeens' adoption of A.L.M. is now final, making them his parents "for all purposes" in the eyes of the law.  Tex. Fam. Code § 162.017 ("An order of adoption creates the parent-child relationship between the adoptive parent and the child

for all purposes"); *see also OFFER*, 431 U.S. at 844 n.51 ("Adoption . . . is recognized as the legal equivalent of biological parenthood). Nonetheless, ICWA continues to impose special disabilities on their family by exposing A.L.M.'s adoption to collateral attack for a two-year period.

The best interests of a child are a substantial governmental interest that can justify the interference with important familial relationships. *See Palmore*, 466 U.S. at 433 ("The State . . . has a duty of the highest order to protect the interests of minor children, particularly those of tender years. . . . The goal of granting custody based on the best interests of the child is indisputably a substantial government interest.").

The reason A.L.M.'s adoption is subject to a two-year collateral attack period is not because of his best interests (which were never seriously in dispute), but because he is eligible for enrollment in the Navajo Nation and is therefore deemed an "Indian child." ICWA therefore subordinates the Brackeens' liberty interests—and A.L.M.'s best interests—to the arbitrary happenstance of A.L.M.'s eligibility for membership in the Navajo Nation, which in turn results from the fact that he was born to a mother enrolled in the Navajo Nation and has at least 25% Navajo blood quantum. But for these accidents of his birth, A.L.M. would not be "Indian child," and ICWA's collateral attack provision would not apply.[14]

The government has no legitimate interest in placing a child with a tribe that "automatically enrolls" him as a member based solely on his parentage and blood quantum—much less an interest

---

[14]   Indeed, because Indian tribes have exclusive control over their own membership criteria, if a tribe's right to custody over all children who are members supervenes the liberty interests of prospective adoptive couples and foster parents raising those children, then a tribe could—simply by altering its membership criteria—position itself to claim virtually any child in a foster care or preadoptive placement, regardless of parentage, by providing for the "automatic enrollment" of that child as a member of the tribe. In practice, it is the tribes' reliance on blood quantum as the principal criterion for membership that limits their "automatic enrollment" practice.

so substantial that it could justify vitiating the intimate familial relationship between the Brackeens and their son.  Subjecting the Brackeens' family to ICWA's collateral attack provisions based on A.L.M.'s "automatic[] enrollment" in the Navajo Nation is wholly arbitrary and violates the Brackeens' rights under the Due Process Clause.

### 2. ICWA and the Final Rule Violate Ms. Hernandez's Due Process Rights as the Biological Mother of Baby O.

ICWA also violates Ms. Hernandez's Due Process Clause rights by subordinating her desires regarding the adoptive placement of Baby O., her biological child, to the arbitrary fact that Baby O. is eligible for enrollment in the Ysleta del sur Pueblo Tribe.

"[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*, 530 U.S. at 65.  That liberty interest "does not evaporate simply because [a biological parent] . . . ha[s] lost temporary custody of their child to the State." *Santosky v. Kramer*, 455 U.S. 745, 753 (1982).  In deference to that fundamental right, state law affords biological parents the ability to select or influence the adoptive placement of their children.  *See, e.g.*, Nev. Rev. Stat. § 127.040 (requiring a biological parent's consent to an adoption provided the parent's parental rights have not been terminated); Nev. Rev. Stat. § 127.053 (biological parent's consent to adoption must specifically identify adoptive parents to be valid).

In this case, Ms. Hernandez actively prefers the Librettis as Baby O.'s adoptive family.  Ms. Hernandez fully supports the Librettis' efforts to adopt Baby O., and the Librettis regularly visit Ms. Hernandez and Baby O.'s biological siblings, who live 25 minutes away, so that they can remain part of Baby O.'s life.  App. 73–74.  Nonetheless, because Baby O.'s paternal grandmother is a registered member of the Ysleta del sur Pueblo Tribe, the Tribe intervened in the court proceedings and—contrary to the wishes of both Ms. Hernandez and Baby O.'s biological father—

sought to remove Baby O. from the Librettis and send her into foster care hundreds of miles away on the Tribe's reservation in west Texas.

The reason Baby O.'s adoption has been delayed for months is not because of her "best interests." *Palmore*, 466 U.S. at 433. Indeed, Baby O. has significant, ongoing medical needs, and the Librettis have ensured that she receives the extensive treatment she needs to achieve full health; by contrast, several of the proposed alternative placements have either withdrawn or been found unsuitable in light of Baby O.'s medical needs. Nonetheless, because Baby O.'s father is a "person of Tigua Ysleta del sur Pueblo Indian blood enrolled by the Tribe," *see* Pub. L. No. 112-157, 126 Stat. 1213 (2012), she is an "Indian child" for purposes of ICWA. Baby. O's adoption has therefore been held in limbo as the State of Nevada, seeking to apply ICWA's "diligent search" requirement, has tried to evaluate *more than 40* alternative placements put forward by the Tribe.

ICWA therefore subordinates Ms. Hernandez's liberty interests in directing the adoptive placement of her biological child to the arbitrary fact that Baby O. is eligible for membership in the Tribe. The government has no compelling interest in negating Ms. Hernandez's own choice of adoptive family for her child based solely on Baby O.'s parentage and blood quantum. Applying ICWA's "diligent search" requirement to Baby O.'s adoption is therefore wholly arbitrary and violates Ms. Hernandez's rights under the Due Process Clause.

> **3.  ICWA and the Final Rule Violate the Librettis' and Cliffords' Due Process Rights as Prospective Adoptive and Foster Parents of Baby O. and Child P.**

Finally, ICWA also violates the Due Process Clause rights of the Librettis and the Cliffords as prospective adoptive and foster parents to Baby O. and Child P.

As noted above, "biological relationships are not the exclusive determination of the existence of a family." *OFFER*, 431 U.S. at 843. Particularly where "a child has been placed in foster care as an infant, has never known his natural parents, and has remained continuously for several

years in the care of the same foster parents, it is natural that the foster family should hold the same place in the emotional life of the foster child, and fulfill the same socializing functions, as a natural family." *Id.* at 844.   Accordingly, "individuals may acquire a liberty interest against arbitrary governmental interference in the family-like associations into which they have freely entered, even in the absence of biological connection," as long as those interests do not interfere with the interests of another with superior rights. *Id.* at 846.

The relative liberty interests of foster parents must be determined "on a case by case basis." *Drummond v. Fulton Cty. Dep't of Family & Children's Servs.*, 563 F.2d 1200, 1207 (5th Cir. 1977) (en banc).   In *Elwell v. Byers*, for example, the court confronted facts very different from the "ordinary, temporary foster arrangement."   699 F.3d 1208, 1217 (10th Cir. 2012).   There, the plaintiffs had been the child's foster parents for more than a year (since the child was three months old), the child's biological parents had relinquished their rights, and the foster parents "were on the verge of adopting him." *Id.* at 1211, 1217.   On these facts, the court reasoned that the foster parents "fall closer to the status of adoptive parents than in the ordinary, temporary foster arrangement," and concluded they held a protected liberty interest. *Id.*; *see also Rivera v. Marcus*, 696 F.2d 1016, 1024–25 (2d Cir. 1982) (similar).

The facts here are even more compelling:   Baby O. came home from the hospital with the Librettis and has resided with them for more than two years.   Child P.—after bouncing between foster placements for years—finally found a home and began to thrive with the Cliffords, where she resided for more than 18 months before her recent and traumatic separation.   In these circumstances, the Librettis' and Cliffords' liberty interests in maintaining their parent-child relationships

54

with Baby O. and Child P. are at their apex.  The government has no substantial interest in disrupt-ing those relationships simply because Baby O. and Child P. are eligible for tribal membership due to the accidents of their parentage and blood quantum.

### C.     The Final Rule—Including the BIA's Newfound Interpretation of Its Statutory Authority, the "Clear and Convincing" Burden of Proof, and the Diligent Search Requirement—Is Arbitrary and Capricious and Contrary to Law

Separate and apart from the foregoing constitutional infirmities, the Final Rule—including its "clear and convincing" burden of proof and diligent search requirement—also violates the APA because it contravenes ICWA and exacerbates the underlying constitutional harms.

"In the usual course, when an agency is authorized by Congress to issue regulations and promulgates a regulation interpreting a statute it enforces," courts apply "the two-step analysis set forth in *Chevron*" to determine whether deference to the agency's interpretation is appropriate. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2124 (2016).  At *Chevron* step one, the court must determine whether Congress has "directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).  If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43.  If not, then the question at *Chevron* step two is "whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.  A court may uphold the regulation only if it is both "reasonable" and "not arbitrary, capricious, contrary to law or in excess of statutory authority" under the APA. *Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 379–80 (5th Cir. 2018) (citing 5 U.S.C. § 706).

A critical "premise of *Chevron*," however, is that "Congress [has] grant[ed] an agency the authority to administer a statute by issuing regulations with the force of law," and that "the agency will use that authority to resolve ambiguities in the statutory scheme." *Encino*, 136 S. Ct. at 2125 (citing *United States v. Mead Corp.*, 533 U.S. 218, 229–30 (2001)); *see also Union Neighbors*

*United v. Jewell,* 831 F.3d 564, 579 (D.C. Cir. 2016) ("*Chevron* deference [is] appropriate only where Congress has 'delegated authority to the agency generally to make rules carrying the force of law, and . . . the agency interpretation claiming deference was promulgated in the exercise of that authority.'").

The agency is also not entitled to *Chevron* deference where its rule is "procedurally defective." *Encino*, 136 S. Ct. at 2125. "One of the basic procedural requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions," including the reasons for any "changes [in] its existing position." *Id.* When an agency "discover[s]" a regulatory authority that it had disclaimed for "forty years," that reversal "alone gives [courts] reason to withhold approval or at least deference for the Rule." *Chamber of Commerce*, 885 F.3d at 380–81.

1.    **The BIA Lacks Statutory Authority To Supervise Thousands of State Courts And Regulate the Custody Status of Countless Children Nationwide**

It is settled law that, for the *Chevron* framework to apply at all, "the agency must have received congressional authority to determine the particular matter at issue in the particular manner adopted." *City of Arlington v. FCC*, 569 U.S. 290, 306 (2013); *see also Chamber of Commerce*, 885 F.3d at 369 ("A regulator's authority is constrained by the authority that Congress delegated it by statute.").

But for *37 years* after ICWA's enactment, the Department expressly recognized that "Congress did not "intend[] this Department to exercise supervisory control over state or tribal courts or to legislate for them with respect to Indian child custody matters." 44 Fed. Reg. 67,584, 67,584 (Nov. 26, 1979). The Department therefore *rejected* a recommendation that it publish binding "regulations," concluding that "the Department has an obligation *not to assert authority that it concludes it does not have*." *Id.* (emphasis added). The Department further noted that "[p]rimary responsibility for interpreting" ICWA "rests with the courts that decide Indian child custody

cases." *Id.* As an example, the Department stated that "[t]he legislative history of the Act states explicitly that the use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." *Id.*

The 1979 Guidelines further bolstered the Department's rationale for declining to issue binding regulations by pointing to the constitutional harms that would otherwise follow: "For Congress to assign to an administrative agency such supervisory control over courts would be an extraordinary step," "vest[ing] this Department with . . . extraordinary power." *Id.* The Department warned that "[a]ssignment of supervisory authority over the courts to an administrative agency is a measure *so at odds with concepts of both federalism and separation of powers* that it should not be imputed to Congress in the absence of an express declaration of Congressional intent to that effect." *Id.* (emphasis added).

In 2016, the Department flip-flopped on both the extent of its statutory authority and the scope of the "good cause" requirement. As explained above, *see supra* at 8, the Department announced that it "no longer agrees . . . that it lacks the authority to issue binding regulations," and therefore promulgated the Final Rule as a "legislative rule" that "set[s] binding standards for Indian child-custody proceedings in State courts." 81 Fed. Reg. at 38,782, 38,785–86. It then proceeded to constrain state courts in their ability to find "good cause" to depart from the placement preferences. Claiming that "Congress intended the good-cause exception to be narrow and limited in scope," 81 Fed. Reg. at 38,839, the Final Rule specified criteria for a good cause determination, and announced for the first time that "[t]he party seeking departure from the placement preferences should bear the burden of proving *by clear and convincing evidence* that there is 'good cause' to depart from the placement preferences." 25 C.F.R. § 23.132(b), (c) (emphasis added). It also

imposed a requirement on state courts to confirm that "a diligent search" has been undertaken to locate ICWA-preferred placements.  25 C.F.R. § 23.132(c)(5).

The Department got it right the first time around.  ICWA's plain text directs the BIA only to make rules necessary "to carry out" ICWA.  25 U.S.C. § 1952.  The 1979 Guidelines properly interpreted that statutory mandate as limited to those discrete "portions" of ICWA that "expressly delegate to the Secretary of the Interior responsibility for interpreting statutory language."  44 Fed. Reg. at 67,584.[15]  The Final Rule turned that mandate on its head, instead claiming for the Department the "extraordinary power[s]" of "supervisory control over courts."  *Id.*

In doing so, the Final Rule realized all of the constitutional harms the Department had warned against nearly 40 years before.  Interpreting ICWA to "assign[] supervisory authority over the courts to an administrative agency" is fundamentally "at odds" with "federalism."  *Id.*; *see Sosna v. Iowa*, 419 U.S. 393, 404 (1975) ("domestic relations" is "an area that has long been regarded as a virtually exclusive province of the States"); *Ex Parte Burrus*, 136 U.S. 586, 593–94 (1890) ("The whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the states, and not to the laws of the United states.").  The canon of constitutional avoidance thus precludes *Chevron* deference here, because "courts will not . . . lightly assume that Congress intended to infringe constitutionally protected liberties or usurp power constitutionally forbidden it."  *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Constr. Trades Council*, 485 U.S. 568, 574–75 (1988).

---

[15]  For example, "under 25 U.S.C. 1918, the Secretary is directed to determine whether a plan for reassumption of jurisdiction is 'feasible' as that term is used in the statute."  44 Fed. Reg. at 67,584.  None of the provisions identified in the 1979 Guidelines as "areas where primary responsibility for implementing portions of [ICWA] rest[s] with this Department" are at issue in this suit.  *Id.*

Delegating to a federal agency broad rulemaking authority over the state-court system is also fundamentally "at odds" with the "separation of powers." 44 Fed. Reg. at 67,584. Indeed, the Final Rule goes much further than the facts of *Mistretta v. United States*, 488 U.S. 361 (1989). Unlike the judges on the Sentencing Commission—who had ample experience in criminal law, and would themselves carry the Sentencing Guidelines into effect, *id.* at 404—the BIA has neither expertise nor experience in administering family law.  Congress could not and did not set loose the BIA to legislate as a "junior varsity Congress" in—of all things—the field of child custody matters involving countless children nationwide.  *Id.* at 427 (Scalia, J., dissenting).

Moreover, "that it took [the BIA] forty years to 'discover' its novel interpretation further highlights the [Final] Rule's unreasonableness." *Chamber of Commerce*, 885 F.3d at 380 (quoting *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2444 (2014)).  The BIA's "turnaround from its previous regulation that upheld the common law understanding of ['good cause'] alone" is a suf-ficient reason "to withhold approval or at least deference for the [Final Rule]." *Id.* at 380–81; *see also Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 142 (1976) (overturning an agency guideline that was "not a contemporaneous interpretation of Title VII," and "flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the governing statute"); *Watt v. Alaska*, 451 U.S. 259, 272–73 (1981) ("[P]ersuasive weight" is due to an agency's contempora-neous construction of applicable law and subsequent consistent interpretation, but a "current inter-pretation, being in conflict with its initial position, is entitled to considerably less deference.").

In sum, the Final Rule is "arbitrary and capricious" and "contrary to law" because the BIA lacks statutory authority to supervise state courts.  At a minimum, because the agency lacks "con-siderable experience and expertise . . . acquired over time," *Chevron* deference does not apply. *Gonzales v. Oregon*, 546 U.S. 243, 256 (2006).  In fact, because the Department lacks expertise in

supervising state courts—as well as in adoption, child welfare, and child custody proceedings—the Final Rule is not even due *Skidmore* (or "persuasive") deference. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944); *see Texas v. EPA*, 829 F.3d 405, 432–33 (5th Cir. 2016) ("[T]he level of deference owed to an agency's conclusions is substantially diminished when the subject matter in question lies beyond the agency's expertise.").

### 2.    The Final Rule's "Clear and Convincing" Evidence Standard Conflicts with the Statutory "Good Cause" Requirement

Even under the *Chevron* framework, the Department is not entitled to deference because the statutory term "good cause" had an established meaning when ICWA was enacted, and that meaning "unambiguously forecloses" the Final Rule's "clear and convincing" standard. *See Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 659 (D.C. Cir. 2011).

It is a "settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Chamber of Commerce*, 885 F.3d at 369–70 (quoting *United States v. Castleman*, 134 S. Ct. 1405, 1410 (2014)). "Indeed, it is the general rule that a common-law term of art should be given its established common-law meaning, except where that meaning does not fit." *Id.* at 370.

Here, the statutory term "good cause" had an existing common-law meaning in the context of child custody and family law when ICWA incorporated that term into § 1915(a)'s placement preferences in 1978. Historically, the "good cause" standard has been interpreted as an invitation to state family courts to exercise their discretion. *See, e.g.*, *BLC(K) v. WWC*, 568 S.W.2d 602, 605 (Mo. Ct. App. 1976) ("good cause" standard is "obviously . . . applied with discretion to prevent a manifest injustice or to avoid a threatened one"); *In re Matter of Welfare of D.L.*, 486 N.W.2d 375, 380 (Minn. 1992) ("The terms 'best interests,' 'good cause to the contrary' and 'detriment' do not lend themselves to standardized definitions. The best interests of potential adoptees will

vary from case to case, and the trial court retains broad discretion because of its opportunity to observe the parties and hear the witnesses."); *McRae v. Lamb*, 233 S.W.2d 193, 196 (Tex. Ct. App.—San Antonio 1950) (applying "good cause" standard for withdrawal of consent to adoption).

As ICWA's legislative history confirms, Congress selected the term "good cause" in order "to provide State courts with a degree of flexibility in determining the disposition of a placement proceeding involving an Indian Child." S. Rep. No. 95-597, at 17 (1977). And in the 1979 Guidelines, the BIA itself recognized that "the use of the term 'good cause' was designed to provide state courts with flexibility." 44 Fed. Reg. at 67,584. Indeed, as recently as 2013, the United States described the "good cause" standard in § 1915(a) as a "safety-valve for deviating from the preferences." Br. for United States 14 n.2, *Adoptive Couple v. Baby Girl*, 570 U.S. 637.

Nonetheless, the Final Rule purports to impose on state courts a fixed definition of "good cause," prescribing a set of five specified criteria on which the good-cause determination "should be based." 25 C.F.R. § 23.132(c). The Final Rule further *prohibits* state courts from considering "ordinary bonding or attachment"—both traditional good-cause factors—where such attachment "flowed from time spent in a non-preferred placement that was made in violation of ICWA." *Id.* § 23.132(e). These requirements directly conflict with the statutory discretion accorded to state courts by ICWA itself.

More troubling still, the Final Rule requires that "[t]he party seeking departure from the placement preferences should bear the burden of proving by *clear and convincing evidence* that there is 'good cause' to depart from the placement preferences." 25 C.F.R. § 23.132(b) (emphasis added). As the Department acknowledged, "this burden of proof standard is not articulated in section 1915." 81 Fed. Reg. at 38843. Congress did not require a heightened evidentiary showing

for good cause—or any evidentiary standard at all.  *See* 25 U.S.C. § 1915(a), (b).  This "silence is inconsistent with the view that Congress intended to require a special, heightened standard of proof."  *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

By contrast, Congress *did* provide for heightened burdens of proof elsewhere in the statute. *See*, *e.g.*, 25 U.S.C. § 1912(e) ("No foster care placement may be ordered . . . in the absence of a determination [of damage to the child], supported by clear and convincing evidence."); *id.* at § 1912(f) ("No termination of parental rights may be ordered . . . in the absence of a determination [of damage to the child], supported by evidence beyond a reasonable doubt.").  And "[w]here Congress includes particular language in one section of a statute but omits it in another, it is presumed that Congress acts intentionally and purposely."  *Chamber of Commerce*, 885 F.3d at 373 (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)) (brackets and ellipsis omitted).

The fact that all of the relevant provisions of ICWA were enacted at the same time strengthens the force of the presumption that the absence of an evidentiary standard from § 1915 was deliberate.  *See Lindh v. Murphy*, 521 U.S. 320, 330–31 (1997).  If Congress wished to impose a "clear and convincing" standard for the "good cause" exception in Section 1915, it could have and surely would have said so, particularly given its careful attention to the standard of proof required in other provisions of ICWA.

Thus, there is simply no ambiguity suggesting that ICWA gives the BIA the power to alter that burden by imposing a "clear and convincing evidence" requirement on non-Indian families seeking to adopt Indian children.  Congress's exclusion of the heightened burden in ICWA's "good cause" exception must be construed as intentional, and the default civil standard—preponderance of the evidence—must apply.  *See Grogan*, 498 U.S. at 286.  The Final Rule's heightened burden made all the difference to the lower court in the Brackeens' case.  App. 78–79, 84 (finding that the

Brackeens failed to show "good cause" because they "did not meet their burden under 25 C.F.R. § 23.132"). That Rule is contrary to law and should be invalidated.

### 3. Even If ICWA Were Ambiguous, No *Chevron* Deference Is Warranted

Even if the term "good cause" were ambiguous, the Final Rule is still "arbitrary and capricious," "unlawful," and "receives no *Chevron* deference" because it is "an unexplained inconsistency in agency position," *Encino Motorcars*, 136 S. Ct. at 2126, and because it exacerbates the grave constitutional harms raised by ICWA itself.

#### i. The Department Failed To Provide a Reasoned Explanation For Its Changed Positions

The BIA provides no reasoned explanation for its about-face in the Final Rule, which claimed the authority to "set binding standards for Indian child-custody proceedings in State courts." 81 Fed. Reg. at 38,785. The Final Rule simply opines that "37 years of real-world ICWA application" have "underscored the need for this regulation." 81 Fed. Reg. at 38,786–87. But such *ipse dixit* statements have no bearing on why Defendants changed position as to their *authority* to exercise regulatory control over state courts and state adoption agencies.

The BIA also provides no reasoned basis for its change in position with respect to the meaning of the "good cause" exception to the placement preferences. The Final Rule baldly states that "to the extent that the Department [in 1979] believed that providing any regulatory guidance on the meaning of terms such as 'good cause' improperly intrudes on a State court's flexibility to address particular factual scenarios, that interpretation was incorrect." *Id.* at 38,788. But Defendants never explain *why* their prior interpretation was incorrect, let alone justify their new position. The only explanation the Department offered was that state courts "weigh[] a variety of different factors" when analyzing whether "good cause" exists, and that [t]his "lack of uniformity in the

interpretation of ICWA by State courts" purportedly "undermine[s] the statute's underlying purposes." 81 Fed. Reg. at 38,782, 38,787. But this thin justification makes no attempt to grapple with the Department's prior interpretation—that, under the plain meaning of § 1915, state courts *should* have the flexibility to interpret "good cause" in particular circumstances.

Defendants also fail to adequately explain why they adopted the "clear and convincing" evidence standard to demonstrate "good cause" under § 1915(a). The Final Rule simply states that the 1979 Guidelines "gave excessive weight to a single statement in the legislative history" that had said that "use of the term 'good cause' was designed to provide State courts with flexibility." 81 Fed. Reg. at 38,788 (citing S. Rep. No. 95-597, at 17 (1978)). But that piece of legislative history was just an "example" of Congress's statutory design, which accorded "[p]rimary responsibility for interpreting" ICWA's provisions concerning child placement "rests with the courts that decide Indian child custody cases." 44 Fed. Reg. at 67,584. Tellingly, Defendants point to nothing in the legislative history that supports their new, contrary interpretation. To the extent they rely on other statutory provisions legislating a heightened evidentiary burden, that explanation is facially frivolous—and indeed, cuts the other way—for the reasons explained above. Nor did the BIA provide any justification for imposing the duty on state courts to confirm that a "diligent search" was undertaken, 23 C.F.R. § 23.132(c)(5), other than a vague reference to ICWA's statement that the preferences "shall be given." 81 Fed. Reg. at 38,839 (citing 25 U.S.C. § 1915(a)).

Defendants have thus failed to satisfy their burden of explanation, rendering the Final Rule invalid.

64

ii.   The "Clear and Convincing" Evidence Standard and Diligent Search Requirement Are Also Unreasonable and Contrary to Law

The Final Rule's "clear and convincing evidence" standard and "diligent search" requirements are further unreasonable under *Chevron*, and arbitrary and capricious under the APA, because they exacerbate the grave constitutional harms raised by ICWA itself.

As explained above, *see supra* at 41–49, the Final Rule's placement preference regime, 25 C.F.R. § 23.129 *et seq.*, discriminates against "Indian children" in violation of the Constitution's guarantee of equal protection, by subjecting them to a heightened risk of a placement that is contrary to their best interests and based solely on their race and ancestry.  The Final Rule further compounds this constitutional defect by putting non-Indian families who wish to adopt an "Indian child" to the extraordinary burden of demonstrating "clear and convincing evidence" that good cause exists to depart from the placement.  The Final Rule thus discriminates against Indian children and non-Indian families in State child custody proceedings in violation of equal protection principles under the Fifth Amendment.

Interpreting ICWA's good cause standard to minimize (or even eliminate) consideration of the child's best interests is both unconstitutional and perverse.  In the typical voluntary adoption case, the court considers the best interests of the child under a preponderance-of-the-evidence standard.  *See, e.g.*, Tex. Fam. Code § 105.005; 52 Minn. Stat. Ann. Adoption Procedure Rule 41.04.  But the Final Rule's clear-and-convincing evidence standard imposes yet another disability on "Indian children" and their families.

All agree that these children have formed a familial bond with the Individual Plaintiffs.  Baby O. has never known a family other than the Librettis; A.L.M. has lived with the Brackeens since he was ten months old; and, until she was abruptly removed, Child P. enjoyed stability for the first time in her life as part of the Clifford family.  Those familial bonds have constitutional

significance both to the Individual Plaintiffs and their children.  But the Final Rule subordinates the familial bonds between parent and child—and even the children's best interests themselves—to the arbitrary happenstance of race.  That violates the Due Process Clause.

The same constitutional defects infect the Final Rule's requirement that state courts confirm that "a diligent search" has been undertaken to locate ICWA-preferred placements.  25 C.F.R. § 23.132(c)(5).  The BIA justified this new requirement not by discussing any changed circumstances, but rather based on ICWA's use of "shall" in the phrase "a preference shall be given" to Indian families in § 1915(a), and on the requirement in § 1915(e) that States keep records of their efforts to comply with ICWA.  81 Fed. Reg. at 38,839.  The BIA lacked the authority to issue these mandates directed at state courts, unreasonably reversed position without sufficient justification, and heightened the constitutional harms that ICWA already presents.

### D.   ICWA and the Final Rule Are Unconstitutional Because the Adoption of "Indian Children" Is Not a Permissible Subject of Federal Regulation

There is yet another reason why ICWA and the Final Rule are unconstitutional:  Neither the Indian Commerce Clause nor any other grant of authority gives Congress plenary power over all individuals who happen to be eligible for membership in an Indian tribe.  For the same reason, Defendants lacked the power to promulgate the Final Rule pursuant to a void statute.

The Indian Commerce Clause gives Congress the authority "[t]o regulate commerce . . . with the Indian tribes," U.S. Const. art. I, § 8, cl. 3, and is the only plausible constitutional font of congressional authority to regulate Indian affairs.  *See* Matthew Fletcher, *The Supreme Court and Federal Indian Policy*, 85 Neb. L. Rev. 121, 137 (2006) ("As a matter of federal constitutional law, the Indian Commerce Clause grants Congress the only explicit constitutional authority to deal with Indian tribes").

The Indian Commerce Clause is subject to two limitations.  First, it limits Congress's authority under that Clause to regulating interstate "Commerce."  "At the time the original Constitution was ratified, 'commerce' consisted of selling, buying, and bartering, as well as transporting for these purposes." *Adoptive Couple*, 570 U.S. at 659 (Thomas, J., concurring) (citations omitted). The Supreme Court has interpreted this power to include authority over "chattels," "instrumentalities," and activities with a "substantial relation" to interstate commerce.  *See* Robert Natelson, *The Original Understanding of the Indian Commerce Clause*, 85 Denver U. L. Rev. 201, 210, 215 (2007) ("The Indian Commerce Clause was adopted to grant Congress power to regulate Indian trade between people under state or federal jurisdiction and the tribes, whether or not under state or federal jurisdiction.  Within its sphere, the Clause provides Congress with authority to override state laws.  It d[oes] not otherwise abolish or alter the pre-existing state commercial and police power.").  Second, Congress may regulate Commerce "with the Indian *tribes*," but "the Clause does not give Congress the power to regulate commerce with all Indian *persons* any more than the Foreign Commerce Clause gives Congress the power to regulate commerce with all foreign nationals traveling within the United States."  *Id.*

ICWA regulates state-court child custody proceedings—not interstate commerce.  And its provisions do not regulate Indian tribes as tribes, but instead apply to any "Indian child[ren]," defined solely by eligibility for tribal membership.  *See supra* at 5, 42–44.  "Because adoption proceedings . . . involve neither 'commerce' nor 'Indian tribes,' there is simply no constitutional basis for Congress' assertion of authority over such proceedings."  *Adoptive Couple*, 570 U.S. at 666 (Thomas, J., concurring).  ICWA thus exceeds Congress's enumerated powers by regulating the adoption proceedings of all "Indian children," domestic relations that have long been regarded as the virtually exclusive province of the States.  *Sosna*, 419 U.S. at 404.

67

Moreover, a federal agency "has no constitutional or common law existence or authority," *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001); its power "to promulgate legislative regulations is limited to the authority delegated by Congress," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988).   An unconstitutional statute cannot provide the basis for legitimate agency action.   And Congress, in turn, lacks the power to enact legislation exceeding the powers specifically enumerated in the Constitution.   U.S. Const. amend. X; *see, e.g.*, *United States v. Morrison*, 529 U.S. 598, 618–19 (2000).   Thus, Defendants lacked the power to promulgate the Final Rule pursuant to an unconstitutional statute.

For these reasons, and those articulated in Part VI of the State Plaintiffs' Brief, ICWA is unconstitutional because it exceeds Congress's enumerated powers, and the Final Rule, which was promulgated pursuant to an invalid statute, is therefore void.

### E.     The Final Rule Unconstitutionally Commandeers State Agencies and Courts

The Final Rule is also unconstitutional because the federal government may not commandeer state resources to achieve federal policy objectives.[16]

"The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers . . . to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997).   Here, the Final Rule violates the Tenth Amendment by impermissibly commandeering state courts and state agencies to perform executive functions.   First, the Final Rule imposes an affirmative and onerous requirement to conduct a "diligent search" to seek out and solicit alternative, competing "preferred" placements for an Indian child.   25 C.F.R. § 23.132(c)(5).   Second, the Final Rule commandeers state courts by

---

[16]   Plaintiffs have standing to complain of the Rule's "contravention of constitutional principles of federalism" because it is an injury to our system of federalism that directly affects their ability to effect A.L.M.'s adoption.   *See Bond v. United States*, 564 U.S. 211, 222–23 (2011).

mandating that they "ask each participant . . . whether the participant knows or has reason to know that the child is an Indian child." *Id.* § 23.107(a). "If there is reason to know the child is an Indian child," the Final Rule requires state courts to "[c]onfirm, by way of a report, declaration, or testimony included in the record that the agency . . . used due diligence to identify and work with all of the Tribes of which there is reason to know the child may be a member (or eligible for membership)." *Id.* § 23.107(b).

None of these requirements is a mere application of the Supremacy Clause, which allows Congress to pass laws actionable in state courts. *Cf. Testa v. Katt*, 330 U.S. 386 (1947); *Claflin v. Houseman*, 93 U.S. 130 (1876). Cases like *Testa* and *Claflin* "all involve congressional regulation of individuals, not congressional requirements that States regulate." *New York v. United States*, 505 U.S. 144, 178 (1992). The Final Rule imposes obligations on courts and state agencies not only to apply the substantive law of ICWA but to become the investigative and executive actors carrying out federal policy.

Although *New York* stated in dicta that Congress may direct state judges to enforce federal law, 505 U.S. at 178, it does not follow that the federal government may force state judges into service as *executive* agents. The outcome in *Printz* would have been the same if the challenged provision of the Brady Act directed state-court judges, instead of state law enforcement officers, to perform background checks on handgun purchasers. "[T]he Federal Government may not compel the States to implement, by . . . executive *action*, federal regulatory programs." 521 U.S. at 925 (emphasis added). It is the nature of the command, not of the state official impressed into service, that is of constitutional significance. *Cf. Mother & Father v. Cassidy*, 338 F.3d 704, 711 (7th Cir. 2003) ("[A]n order by the federal court directing the state court to assess the conduct of

both parties in litigation that did not even occur before it would raise serious constitutional questions under the Supreme Court's anti-commandeering decisions.").

For these reasons, and those articulated in Part V of the State Plaintiffs' Brief, the Final Rule unconstitutionally commandeers state courts, converting them into arms of the federal executive branch, and is therefore void.

### PRAYER FOR RELIEF

For these reasons, Plaintiffs hereby request that the Court enter summary judgment on all of Plaintiffs' claims, enter a declaratory judgment that ICWA and the Final Rule are unconstitutional and unenforceable, set aside the Final Rule, and enjoin the Defendants from implementing, administering, or enforcing ICWA or the Final Rule in any way.

Dated:  April 26, 2018

Respectfully submitted,

/s/ Matthew D. McGill

Mark Fiddler
FIDDLER LAW OFFICE, P.A.
6800 France Ave. So., Suite 190
Minneapolis, MN 55435
mark@fiddler-law.com
Telephone: (612) 822-4095
Facsimile: (612) 822-4096

*Attorney for Frank and Heather Libretti,*
*and Jason and Danielle Clifford*

Matthew D. McGill (*pro hac vice*)
Lochlan F. Shelfer (*pro hac vice*)
David W. Casazza
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 887-3680
mmcgill@gibsondunn.com
lshelfer@gibsondunn.com
dcasazza@gibsondunn.com

Rebekah Perry Ricketts
Texas Bar No. 24074883
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Ave., Suite 1100
Dallas, TX  75201
Telephone: (214) 698-3100
Facsimile: (214) 571-2976
rricketts@gibsondunn.com

*Attorneys for Individual Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that, on April 26, 2018, I filed the foregoing document using the Court's ECF system.  Service on all counsel of record for all parties was accomplished electronically using the Court's CM/ECF system.

*/s/ Matthew D. McGill*

Matthew D. McGill (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 887-3680
mmcgill@gibsondunn.com
