# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |
|---|---|
| CHAD EVERET BRACKEEN, et al., | |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, et al., | Civil Action No. 4:17-cv-868-O |
| Defendants, | |
| CHEROKEE NATION, et al., | |
| Intervenor-Defendants. | |

**DECLARATION OF DANIELLE EMILY CLIFFORD**

I, Danielle Clifford, hereby declare that the following is true and correct, to the best of my knowledge.

1.      My husband Jason and I were the foster parents and seek to be the adoptive parents of Child P.

2.      My husband and I have been married for ten years.  In order to help the children in our community, we became foster parents through Hennepin County adoption services rather than trying to adopt through a private agency or international adoption.  Child P. is our only child. Neither my husband nor I am eligible for membership in a federally recognized Indian Tribe.

3.      We became the foster parents to Child P. in July 2016.  Before she came into our home, Child P. had a difficult life.  She was born in July 2011 and entered foster care at three years of age in the summer of 2014 when her biological parents were arrested on various drug charges.

4.      During her first two years in foster care, Child P. moved from one placement to another, staying with a variety of related and unrelated foster parents. None of these placements provided Child P. with stability.

5.      Minnesota family services attempted to reunify Child P. with her birth mother once her birth mother left state custody.  The family court determined, however, that Child P.'s biological parents could not provide her with a safe and stable home and returned Child P. into the foster care system.  In July 2016, the court involuntarily terminated the parental rights of Child P.'s biological parents.  That court order is attached as Attachment 1.

6.      When Child P. came into our home she was a sad and troubled little girl.  She had difficulty forming emotional connection with other people and was withdrawn.  We arranged for extended child therapy for Child P. and slowly introduced her into our community.  Child P.'s therapist has said that she has suffered extensive psychological harm and due to the instability of her childhood is an emotionally vulnerable child.  Because of the frequent instability in her life—removal from her birth parents, her foster placements, a brief time back with her mother, and her entry into our family—Child P. is overcome with fear that she will never be allowed to maintain a lasting attachment with the people around her.

7.      When Child P. first came to live with us in July 2016 she was very quiet and subdued with us.  As we, together with her therapist, learned how to provide the type of emotional environment that Child P. needs, she began to open up with us.  She began to share her emotions with us, and, because she felt safe in our family, was able for the first time to express and begin to deal with the grief and fear that her constant relocations have caused.  We have been dedicated to

2

working with her therapist to ensure that we are able to give Child P. the best emotional environment for her.  Her therapist was very pleased with the progress Child P. was making while she was in our care.

8.      Child P. made many friends while part of our family through both the Girl Scouts and our local church.  She has been warmly welcomed into our family.  We have also taken significant efforts to ensure that Child P. was not cut off from her biological family's cultural heritage.  We have taken Child P. to a number of pow wows held in our area, as well as an American Indian dance production, a Native American Family Day at the Minnesota Historical Society and to several Native American Family Involvement Days at her school.

9.      Child P.'s maternal grandmother, R.B., is an enrolled member of the White Earth Band of Ojibwe Indians.  Because of a prior conviction, Minnesota officials revoked R.B.'s foster license.  County officials contacted the Tribe when Child P. first entered foster care.  In 2015, more than a year before Child P. was placed with us, the Tribe wrote to inform the state court that Child P. was not eligible for membership.  The Tribe's letter is attached as Attachment 2.

10.      In January 2017, the Tribe intervened in Child P.'s state court custody proceeding and changed its position, suggesting Child P. was eligible for membership.  In a brief filed later in 2017, the White Earth Band informed the Court that Child P. was now a member of the Tribe for purposes of ICWA and that Child P. must be placed in accordance with ICWA's preferences.

11.      Prior to the Tribe's assertion, County officials supported our efforts to adopt Child P. and advised against any contact with R.B.  But, since the Tribe declared its involvement and because of the Tribe's authority under ICWA, County officials have deferred to the Tribe on decisions regarding the appropriate placement for Child P.  Assistant County Attorney Nancy Jones

explained the County's abrupt change of position in a letter to the family court.  That letter is attached as Attachment 3.

12.     We asked the Minnesota court to transfer Child P.'s foster placement with us to a pre-adoptive placement with us to allow us to petition to adopt Child P.  Child P.'s guardian ad litem supported our request and indicated that Child P. should be adopted by us and should not be sent to live with members of the Tribe.  Instead, at the Tribe's insistence, the court ordered County family services to immediately remove Child P. from our home so that she could be placed for adoption elsewhere.  The Court held that ICWA's placement preferences would apply to Child P. and that, because Child P.'s case would be governed by the ICWA regime, we were not entitled to the evidentiary hearing that we could have had under state law.  The state court's order is attached as Attachment 4.

13.     After the Minnesota District Court ordered Child P. removed from our home, we asked the Court of Appeals to block the removal.  The Court of Appeals denied our emergency motions and declined to reverse the actions the District Court had taken under ICWA.  The Court of Appeals' order is attached as Attachment 5.

14.     The County moved immediately to remove Child P. from our home.  County officials instructed us not to discuss her impending departure with Child P. and not to discuss Child P.'s removal with Child P.'s therapist during her next counseling session.  County officials then told us to bring Child P. to the County Health Services building and gave us and our parents, Child P.'s grandparents for the past year and a half, twenty minutes to say goodbye.  The County official returned to the room after a mere five minutes to inform us that the room we were in had been reserved.  He then relocated us to a different, smaller space in the building.  He told us we would have only a further five minutes with Child P. and that this was just a courtesy on his part.

Throughout this conversation, Child P., who had been withdrawn when first told she was being taken from us, was crying uncontrollably.

15. After Child P. was transferred to R.B.'s custody, R.B. indicated that she was very upset about Child P.'s depression following the transfer and indicated that she was concerned she had made a mistake. R.B. was unsure that Child P. would thrive in her care and expressed that she was considering returning Child P. to our home if Child P. remained unhappy. Before we were able to negotiate a return, the County instructed R.B. not to contact us and not to allow Child P. to contact us.

16. We have since learned that Child P. is experiencing serious emotional harm from the dislocation of losing the home and family she has known for nearly two years. Child P. does not understand why she cannot see us and has regressed to the emotionally withdrawn state that she was in before she first entered our home.

17. R.B. has not filed a petition for adoption. Child P. remains in limbo and remains separated from the only stable home she has known.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: April 26 2018

_____
Danielle Clifford

5

# ATTACHMENT 1

27-JV-15-483
7/7/2016 10:03:06 AM
Judicial District Court
Hennepin County, MN

STATE OF MINNESOTA

COUNTY OF HENNEPIN

*In the Matter of the Welfare of the Child of:*

█████████ B███ , Respondent mother
Respondent father

DISTRICT COURT - JUVENILE COURT

FOURTH JUDICIAL DISTRICT

**FINDINGS OF FACT,
CONCLUSIONS OF LAW AND
ORDER FOR TERMINATION OF
PARENTAL RIGHTS**

FAM ID No. 349034
JC Case No. 27-JV-15-483
HSPHD Case No. 370774916

Child: P█████████ born July 9, 2011

The above-entitled matter came on for trial on May 26, 2016, before the Honorable Lyonel Norris, Judge of the District Court, Juvenile Division.

## APPEARANCES

Kacy Wothe, Assistant Hennepin County Attorney, appeared for the Department.
Jolene (Jodi) Castillo, Social Worker, Hennepin County Human Services and Public Health Department (Department).
Elizabeth Scott, Assistant Hennepin County Public Defender, appeared for the mother.
█████ B█████ , Mother/custodial parent
Lee Kratch, Attorney at Law, appeared for the father.
█████████ Father.
Eric Rehm, Attorney at Law, appeared for Guardian ad Litem ("GAL" herein).
Barbara Reis, Guardian ad Litem.

Based upon the sworn testimony adduced and exhibits received, stipulation of the parties, arguments of counsel, and the files, records, and proceedings herein, the Court finds by clear and convincing evidence that:

## FINDINGS OF FACT

### Parents

1.0   Respondent mother, █████ B█████ , born September 10, 1990, is the birth mother of P█████ ████████ born July 09, 2011.

1.1   Respondent mother was not married when the child was conceived and/or when the child was born and is the sole custodian under Minn. Stat. § 257.541, subd. 1.

2.0   █████████ born 03/01/1989, is considered adjudicated as the father of P█████ ████ because he and mother were over the age of eighteen when they signed a Recognition of

Parentage form which was filed with the Minnesota Department of Health, Division of Vital Statistics.

2.1 There is no one who has registered with the Father's Adoption Registry for the child ████ ██████ ████ as established by the certified statement of the Department of Health dated October 1, 2014, now filed with the Court. Ex. 6.

## Service on Parents

3.0 The parties were served with the Petition on this matter as follows:

3.1 Respondent mother was served with the Petition on this matter by personal service on March 26, 2015.

3.2 The non-custodial father was served with the Petition on this matter by publication, following the filing of an affidavit of diligent efforts, on or around May 19, 2015.

## ICWA Not Applicable

4.0 The child is not eligible for membership in any Indian Tribe and the Indian Child Welfare Act does not apply.

## Procedural History

5.0 The child has been in foster care placement during the following time period(s):

5.1 ██ ████ entered court ordered foster care on August 12, 2014. She was on a trial home visit with Respondent mother from on or around December 17, 2015 through January 27, 2016. On January 27, 2016, she re-entered foster care.

5.2 The child is now in placement in a non-relative shelter home.

5.3 The Department made an individualized determination of the needs of the child and the current placement is appropriate and meets the needs of the child, in accordance with Minn. Stat. § 260C.193, subd. 3.

5.4 The requirement of Minn. Stat. § 260C.215, subd. 1, has been satisfied, in that special efforts were made to recruit a foster family from among the child's relatives.

6.0 Child in Need of Protection or Services (CHIPS) Proceedings:

6.1 On August 11, 2014, a petition was filed in the Hennepin County District Court, Juvenile Division, alleging that the above-named child of Respondent mother was in need of protection or services.

6.2 On September 19, 2014 the child was adjudicated in need of protection or services, based upon the following:

6.2.1 Respondent mother admitted that she had issues with chemical dependency which negatively impacted her ability to properly parent her child.

6.3 Respondent mother was ordered to comply with and successfully complete her case plan.

6.4 Respondent father was offered a case plan that he agreed to and was approved by this Court.

6.5 Disposition of the CHIPS proceeding was a transfer of legal custody of the child to the Hennepin County Human Services and Public Health Department for placement in

2

     foster care.

6.6    A permanency review hearing was held and continued foster care placement was ordered. A petition for termination of parental rights was filed on January 30, 2015.

6.7    The initial admit deny had to be continued so the parents could be served with the permanency petition.

6.8    The permanency trial was initially scheduled on July 31, 2015. At a pre-trial hearing on July 7, 2015. Respondent mother made a motion for a continuance of the trial. Respondent father and the GAL joined in the motion. The Department objected. The Court granted the continuance motion.

6.9    The permanency trial was rescheduled for October 21, 2015. Due to Respondent mother's progress in treatment, the Department agreed to a continuance of the trial. Review hearings were conducted during the trial home visit. When the trial home visit was terminated, the Department requested a trial date. The soonest date the Court and parties were available was May 26, 2016.

## Trial

7.0    Trial on this matter took place on May 26, 2016.

7.1    Respondent father made a motion for a continuance. The Department and GAL objected. The motion was denied due to the permanency deadlines. Further, the Court found a continuance was not in the child's best interests.

7.2    At trial, the Department sought the permanency disposition of termination of parental rights. Respondent parents requested more to engage in their case plans to work toward reunification.

7.3    Respondent mother entered into an agreement with the Department and GAL to conduct the trial as it related to her parental rights via stipulated evidence. After being duly sworn, she waived her right to subpoena witnesses and testify on her own behalf. She agreed to have the judge make a decision about her parental rights based upon the exhibits listed below. Respondent mother, the Department, and GAL all also agreed that the three parties would submit a written statement to the Court summarizing their respective positions regarding her parental rights, and that the Court could make findings of fact and legal conclusions based upon these statements, also. The Department and GAL filed their statements with the Court on June 1, 2016. At the time of submitting this order, Respondent mother has not submitted her statement.

7.4    Respondent father did not enter into this agreement, and the matter regarding his parental rights proceeded to trial.

8.0    At the trial, the following witnesses testified:

8.1    <span style="background:black">      </span>    Respondent father

    This Court finds that Respondent father was largely forthcoming on the stand. He appeared emotional and honest. However, Respondent father is aware of what is at stake. As such, he has a motivation to present himself in a favorable light. This Court, therefore, does not accord great weight his testimony concerning the impact of controlled substances on him. The Court finds that Respondent father rarely helped

27th Judicial District Court
7/7/2016 10:03:06 AM
Hennepin County, MN

himself. Respondent father blamed his case plan failures on the behaviors of others.
The record, however, reflects that Respondent father knew what his case plan was, who
his social workers were, and what he needed to do. While the Department has an
obligation to make reasonable efforts toward reunification, Respondent father impaired
the Department's ability to do so by failing to maintain communication with social
workers and by failing to accept responsibility for his own conduct. Finally, this Court
does not find Respondent father's testimony about his plan to stop using controlled
substances credible. Respondent father has had since August of 2014 to demonstrate to
this Court that will prioritize P̸ over his drug use, but on multiple occasions
Respondent father failed to do so. Based upon this pattern of conduct, this Court does
not find it credible that Respondent father will cease now.

8.2 Jodi Castillo, Child Protection Social Worker ("CPSW" herein)

This Court finds Ms. Castillo's testimony to be credible. Ms. Castillo holds a Master's
degree in social work. She participates in ongoing training. She has engaged in multiple
other relevant professions. She has read the Department's entire file on the family,
including the SSIS notes of the previous social worker. She maintains her own case
notes on the family. She has reviewed all of the exhibits. She regularly communicated
with services providers on the case. Her testimony was internally consistent and
consistent with the testimony of Ms. Reis and Ms. Rofles and the exhibits in evidence.
Where her testimony conflicted with Respondent father, this Court gives her testimony
more credibility and weight. This Court also finds her statement filed on June 1, 2016
regarding Respondent mother to be credible.

8.3 Elizabeth Rolfes, Chemical Dependency Counselor

This Court finds Ms. Rolfes's testimony to be credible. She has been a drug and alcohol
counsel for two years. She has a four year degree and is licensed as a drug and alcohol
counselor. She takes continuing education courses. She has taken educational courses
on how different substances impact the brain. Her testimony was internally consistent
and consistent with the exhibits from RCCS (Exs. 71-73).

8.4 Barbara Reis, Guardian ad Litem

This Court finds Ms. Reis's testimony to be credible and therefore it will be afforded
significant weight. Ms. Reis has been a GAL for fifteen years. She participated in a
forty hour training course and participates in ongoing trainings. She has been assigned
to this case since September 3, 2014. She has read all of the reports and exhibits and
regularly spoke with the social workers, child, and foster/shelter parents. Her testimony
was internally consistent and consistent with the testimony of other witnesses and
exhibits admitted into evidence.

27-JV-15-483
Filed in Ninth Judicial District Court
7/7/2016 10:03:06 AM
Hennepin County, MN

9.0    At the trial, the following exhibits were received into evidence by stipulation of the parties without objection:

| EXHIBIT | DATE | DESCRIPTION |
|---|---|---|
| 1 | 08/12/2014 | Hennepin County Juvenile Court- Order for Protective Care and Out-of-Home Placement- 27-JV-14-5202 |
| 2 | 09/26/2014 | Hennepin County Juvenile Court- Order for CHIPS Adjudication and Foster Care Placement- 27-JV-14-5202 |
| 3 | 02/23/2015 | Hennepin County Juvenile Court- Permanency Hearing Findings and Order-27-JV-14-5202/27-JV-15-483 |
| 5 | | State of Minnesota Certificate of Birth- ▮▮▮▮ |
| 6 | 10/01/2014 | Minnesota Department of Health- Fathers' Adoption Registry- ▮▮▮▮ |
| 7 | 04/01/2015 | Minnesota Department of Human Services Out-of-Home Placement Plan- ▮▮▮▮ |
| 8 | 09/25/2014 | Park Avenue Center- Rule 25 Assessment- ▮▮▮▮ |
| 9 | 11/04/2014 | Mental Health Center-Diagnostic Assessment |
| 10 | 11/13/2014 | Familywise In-Home Termination Report |
| 11 | 12/01/2014 | Familywise Cancellation Letter – ▮▮▮▮ |
| 12 | 06/17/2014 | Hennepin County District Court Register of Actions 27-CR-14-17212 |
| 13 | 07/07/2014 | Hennepin County District Court Register of Actions 27-CR-14-19165 |
| 14 | 07/22/2014 | Ramsey County District Court Register of Actions 62-CR-14-5485 |
| 15 | 08/08/2014 | Hennepin County District Court Register of Actions 27-CR-14-23181 |
| 16 | 09/24/2014 | Hennepin County District Court Sentencing Order 27-CR-14-23181 |
| 17 | 08/11/2014 | Hennepin County District Court Register of Actions- Theft- 27-CR-14-23364 |
| 18 | 08/19/2014 | Anoka County District Court- Register of Actions- Trespassing- 27-CR-14-5258 |
| 19 | 08/20/2014 | Hennepin County District Court-Register of Actions- Theft-27-CR-14-24507 |
| 20 | 10/07/2014 | Hennepin County District Court Register of Actions- Theft- 27-CR-14-29344 |
| 21 | 10/22/2014 | Hennepin County District Court Register of Actions- Theft-27-CR-14-31109 |
| 22 | 10/24/2014 | Hennepin County District Court-Register of Actions- Possession of Drug Paraphernalia- 27-CR-14-31489 |
| 23 | 10/27/2014 | Hennepin County District Court-Register pf Actions- Possession of Theft of Burglary 27-CR-14-31717 |
| 24 | 10/28/2014 | Hennepin County District Court Register of Actions- DWI-27-CR-14-31833 |
| 25 | 05/04/2015 | Hennepin County District Court Petition to Enter Guilty Plea- DWI-27-CR-14-31833 |
| 26 | 09/29/2014 | Hennepin County District Court-Register of Actions- Theft- 27-CR-14-28623 |
| 27 | 11/04/2014 | Hennepin County District Court- Register of Actions- Drug |

| | | Possession- 27-CR-14-32523 |
|---|---|---|
| 28 | 05/05/2015 | Hennepin County District Court- Warrant of Commitment- 27-CR-14-32523 |
| 29 | 05/05/2014 | Hennepin County District Court- Sentencing Order 27-CR-14-32523 |
| 30 | 11/07/2014 | Hennepin County District Court- Register of Actions- 27-CR-14-32922 |
| 31 | 01/09/2015 | Anoka County District Court- Register of Actions-02-CR-15-145 |
| 32 | 06/17/2015 | Anoka County District Court-Warrant of Commitment- 02-CR-15-145 |
| 33 | 02/12/2015 | Anoka County District Court- Register of Actions- 02-CR-15-874 |
| 34 | 12/01/2014 | Familywise Discontinuation Letter regarding ████ █ |
| 35 | 01/02/2015 | Park Avenue Center Rule 25/31 Combined Assessment |
| 36 | 02/13/2015 | Park Avenue Center Discharge Letter |
| 37 | 05/24/2012 | Hennepin County District Court Register of Actions 27-CR-12-16172 |
| 38 | 05/25/2012 | Hennepin County District Court Petition to Enter Plea of Guilty 27-CR-12-16172 |
| 39 | 05/31/2012 | Hennepin County District Court Criminal Domestic Abuse No Contact Order 27-CR-12-16172 |
| 40 | 05/31/2012 | Hennepin County District Court Sentencing Order 27-CR-12-16172 |
| 41 | 12/31/2013 | Hennepin County District Court Register of Actions 27-CR-13-42476 |
| 42 | 01/17/2014 | Hennepin County District Court Petition to Enter Plea of Guilty 27-CR-13-33359 |
| 43 | 01/24/2014 | Hennepin County District Court Sentencing Order 27-CR-13-42476 |
| 44 | 10/27/2014 | Hennepin County District Court Amended Order and Warrant of Commitment 27-CR-13-42476 |
| 46 | 08/08/2014 | Hennepin County District Court Register of Actions 27-CR-14-23174 |
| 47 | 09/18/2014 | Hennepin County District Court Sentencing Order 27-CR-14-23174 |
| 48 | 09/18/2014 | Hennepin County District Court Order and Warrant of Commitment 27-CR-14-23174 |
| 49 | 10/27/2014 | Hennepin County District Court Amended Order and Warrant of Commitment 27-CR-14-23174 |
| 51 | 06/25/2015 | Hennepin County District Court- Register of Actions- Domestic Assault-27-CR-15-17138 |
| 52 | 06/25/2015 | Hennepin County District Court- Petition to Enter Guilty Plea- 27-CR-15-17138 |
| 53 | 06/26/2015 | Hennepin County District Court- Sentencing Order- 27-CR-15-17138 |
| 54 | 07/31/2015 | Hennepin County Juvenile Court-Permanency Progress Review Hearing Findings and Order- 27-JV-15-483 |
| 55 | 12/28/2015 | Hennepin County Juvenile Court Order from Pre-Trial-27-JV-15-483 |
| 56 | 02/03/2016 | Hennepin County Juvenile Court-Findings and Order -27-JV-15-483 |
| 57 | 02/17/2016 | Hennepin County Juvenile Court-Order-27-JV-15-483 |
| 58 | 02/24/2016 | Hennepin County Juvenile Court-Order-27-JV-15-483 |
| 59 | 03/04/2016 | Hennepin County Juvenile Court-Pre-Trial and Intermediate Disposition Order- 27-JV-15-483 |
| 60 | 09/26/2014 | HCMC Positive Toxicology Results |

| 61 | 01/15/2016 | MillennumUDT Report |
|----|------------|---------------------|
| 62 | 04/21/2016 | MillennumUDT Report |
| 63 | 01/24/2016 | MillennumUDT Report |
| 64 | 02/28/2016 | MillennumUDT Report |
| 65 | 03/11/2016 | Wayside House, Inc. Treatment Report/ Progress Report |
| 67 | 05/21/2015 | Certified Ashland County Circuit Court- Possession of Narcotics- Judgment of Conviction- 2014CF000228 |
| 68 | 08/12/2014 | HCMC Positive Toxicology Results |
| 69 | 08/26/2014 | Hennepin County Adult Field Services- Positive Toxicology Results |
| 70 | 01/19/2016 | Rule 25 Assessment and Placement Summary |
| 71 | 02/03/2016 | RCCS Chemical Dependency Comprehensive Assessment Summary |
| 72 | 03/07/2016 | RCCS Behavior Contract |
| 73 | 03/08/2016 | RCCS Chemical Dependency Discharge Summary |
| 74 | 09/09/2014 | Hennepin County District Court- Order Revoking Conditional Release and Ordering Issue of Bench Warrant-27-CR-14-23174 |
| 75 | 07/10/2015 | Certified Copy Hennepin County District Court- Register of Actions- 3rd Degree Drug Sale- 27-CR-15-18681 |
| 76 | 07/10/2015 | Certified Copy Hennepin County District Court- Complaint- 3rd Degree Drug Sale- 27-CR-15-18681 |
| 77 | 08/20/2015 | Certified Copy Hennepin County District Court- Petition to Enter Plea of Guilty- 3rd Degree Drug Sale- 27-CR-15-18681 |
| 78 | 08/26/2015 | Certified Copy Hennepin County District Court- Sentencing Order- 3rd Degree Drug Sale- 27-CR-15-18681 |
| 79 | 12/21/2015 | Certified Copy Hennepin County District Court-Warrant- 3rd Degree Drug Sale- 27-CR-15-18681 |
| 80 | 01/15/2016 | Certified Copy Hennepin County District Court- In-Custody Rule 25 Referral- 3rd Degree Drug Sale- 27-CR-15-18681 |
| 81 | 03/09/2016 | Certified Copy Hennepin County District Court- Warrant- 3rd Degree Drug Sale- 27-CR-15-18681 |
| 82 |  | P    PHOTO |
| 83 |  | P    PHOTO |
| 84 | 04/21/2016 | Restoration Counseling & Community Services – Chemical Dependency Comprehensive Assessment Summary for B |

10.0　The Court took Judicial Notice of the following Court Orders/documents/facts over Respondent father's objection:

Ex. 4　Hennepin County Juvenile Court Request for Order in 27-JV-15-481 (filed on March 3, 2015).

11.0　The Court heard argument on the following evidentiary issues:

11.1　The Department offered exhibits 45, 50 and 66, which were certified copies of Minneapolis Police Department reports involving the parents. The Department offered

7

the records as self-authenticating under Minn. R. Evid. 902(4). Respondent parents objected, arguing relevance, hearsay, and cumulative. The district court declined to accept the exhibits as cumulative.

## Conditions that Led to Out of Home Placement

12.0 On August 7, 2014, the Department received a report of neglect of F█ due to Respondent parents having drugs and drug paraphernalia accessible to F█ Ex. 7 at 2. Respondent mother admitted that the child was in a car with someone who was using heroin and that a methamphetamine pipe was also found in the car. Ex. 8 at 2. Respondent father admitted that he and Respondent mother were in a car with P█ and drug paraphernalia. Testimony of Mr. █████ He admitted Respondent mother was "trippin'", meaning under the influence of controlled substances. *Id.* He admitted this was not a safe environment for F█ *Id.* Both parents were arrested and transported to the Hennepin County Jail. Ex. 7 at 2. Respondent parents were both convicted of possessing drug paraphernalia in a public place. Exs. 15, 46.

13.0 Both parents have a significant history of controlled substance use. Respondent mother used marijuana since age 13, opiates since age 21, methamphetamine since approximately March of 2014, and heroin since approximately June of 2014. Ex. 8 at 2. Around the time that P█ entered foster care, Respondent mother admitting to using one half to one gram of methamphetamine daily and one quarter gram of heroin daily. *Id.* Respondent father used marijuana since age 13, cocaine since age 21 and opiates since age 23. Ex. 35 at 3.

14.0 Respondent parents also had substantial involvement in criminal activity. Prior to or around the time F█ entered foster care, Respondent mother had involvement in multiple theft offenses and a third degree possession of controlled substances offense. Exs. 12-20, 24-25, 27-31. Respondent father had a previous conviction for domestic assault where Respondent mother was the victim. Ex. 37-40. He committed another domestic assault against a different victim in December of 2013 (for which he was convicted in July of 2015). Ex. 41-44.

15.0 The Department was concerned that if the parents fail to engage in chemical health services and continue to use methamphetamines and other non-prescribed medications, they would not be able to take care of F█ and her safety would be negatively impacted. Ex. 2 at 11. The Department wanted the parents to engage in services, remain sober, and keep drugs away from P█ to enable to the parents to make safe parenting decision for the child. Ex. 2 at 3.

## Respondent Mother's Court Ordered Case Plan

16.0 The Department developed the following case plan for Respondent mother that was approved by this Court: (1) Complete a Rule 25 Chemical Health Assessment ("Rule 25" herein) and follow recommendations; (2) document sobriety through the submission of random urinalysis ("UA" herein) – failure to submit to timely urinalysis or submitting a tampered sample shall result in a test presumed positive for the presence of alcohol or controlled substances; (3) complete a mental health assessment and follow recommendations; (4) participate in in-home parenting education; (5) comply with criminal court orders and address outstanding warrants; (6) obtain suitably safe and stable housing; (7) maintain contact with the Department and GAL.

8

27-JV-15-493 Judicial District Court
7/7/2016 10:03:06 AM
Hennepin County, MN

Respondent mother was also permitted supervised visitation. Ex. 2, Ex. 7.

17.0 The case plan was offered voluntarily since August 12, 2014. Ex. 1. The first CPSW, Ms. Muenzer-Doy, conducted a family team conference meeting with Ms. B▓▓▓▓ and other family members to discuss the case plan purpose and expectations with Ms. B▓▓▓▓. Statement of Jodi Castillo. The case plan was court ordered as of September 19, 2014. Ex. 2.

18.0 Respondent mother failed to address her issues with chemical dependency and failed to remain law abiding.

18.1 Ms. Muenzer-Doy referred Respondent mother for a Rule 25 Assessment. Respondent mother completed her first assessment on September 25, 2014. She admitted significant controlled substance usage, including methamphetamines, opiates, cocaine, and heroin. Respondent mother admitted to stealing to obtain money for drugs, increased depression, lowered self-esteem, and increased anger related to chemical use. She had been homeless for almost four months. Respondent mother admitted to daily cravings, and using to manage her cravings. She continued to use controlled substances despite child protection involvement. She admitted that in a typical day, all she did was get high, sleep, and eat, and that all of her associates also use. Respondent mother was diagnosed with severe opioid use disorder and stimulant related disorder (amphetamine). Ms. Muenzer-Doy provided collateral information to the assessor. The assessor recommended that Respondent mother complete Wayside Inpatient Treatment Program. Ex. 8.

18.2 One month later, Respondent mother still was not in treatment (she was on a waiting list at Wayside) and admitted to using heroin and methamphetamine. Ex. 9 at 6.

18.3 Ms. Muenzer-Doy placed Respondent mother on a UA color code to verify sobriety on or around August 14, 2014. Respondent mother did not comply with submitting UAs to verify sobriety in the fall of 2014. Statement of Jodi Castillo.

18.4 On or around November 7, 2014, Respondent mother was arrested for possession of narcotics and drug paraphernalia in Ashland County, Wisconsin. Ex. 67. Police officers found drug paraphernalia in her hotel room. The paraphernalia tested positive for heroin. Respondent mother admitted that the items belonged to her and she is a "user." *Id.* She remained in custody in various jails until June 2, 2015. Statement of Jodi Castillo. One of the primary jails Respondent mother was at was Ashland County, WI. Ms. Muenzer-Doy inquired if services could occur there, and learned that was not possible. *Id.*

18.5 During this time, Respondent mother had over a dozen open criminal cases. On May 4, 2015, she was convicted of misdemeanor theft, Ex. 21, misdemeanor DWI, Ex. 24, third degree drug possession and false information to a peace officer, Ex. 27. Various other theft and possession charges were dismissed. Exs. 17, 19, 20, 22, 23, 26, 30. On May 14, 2015, she was convicted of felony possession of narcotic drugs. Ex. 67. On June 17, 2015, she was convicted of felony introducing contraband-weapon into a jail. Ex. 31.

18.6 As a result of the criminal offenses, Ms. B▓▓▓▓ has been on probation and will remain on probation until June 17, 2018. Among other conditions, her probation requires her to document sobriety and complete chemical dependency treatment. When a parent's probation officer is requesting the same services that the Department is, the

9

27-JV-15-483
Judicial District Court
7/7/2016 10:03:06 AM
Hennepin County, MN

Department will commonly coordinate with probation to make sure services are not duplicated. Under these circumstances, it is reasonable for probation to make the referrals after communicating with the CPSW so the parent has only one person telling her where to complete services to avoid confusion. This communication occurred in this case. Exs. 27, 31, 67; Statement of Jodi Castillo.

18.7 If Respondent mother violates her probation, she may have to serve 18 months in prison. Ex. 32. Thus, this Court finds that Respondent mother's probation provides a significant incentive for her to maintain sobriety and successfully complete treatment.

18.8 Ms. Muenzer-Doy coordinated with probation and Respondent mother entered chemical health inpatient treatment at Wayside on approximately June 11, 2015. The program included 90 days of inpatient and 20 weeks of outpatient aftercare programming. Ms. Muenzer-Doy spoke with Respondent mother's counselor at Wayside, who reported Respondent mother did well in programing there. Wayside also offered mental health services to Respondent mother. Respondent mother completed the inpatient portion of programming on September 3, 2015. Respondent mother was participating in outpatient programming, was attending AA/NA meetings, and had obtained a sponsor. Respondent mother also received a parenting educator through Wayside. Statement of Ms. Castillo.

18.9 Ms. Muenzer-Doy retired from the Department in September 2015. The case was transferred to Michelle Woodard on approximately August 26, 2015. Ms. Castillo was assigned on October 26, 2015. Ms. Woodard communicated with Wayside. During the time period that Ms. Woodard was assigned to the case, the child was placed in foster care on the White Earth Reservation. Ms. Woodard assisted Respondent mother with scheduling three visits by providing financial assistance for travel and lodging. *Id.*

18.10 Respondent mother obtained sober housing by the winter of 2015. The Department provided her with financial assistance to obtain this housing. *Id.*

18.11 Respondent mother had positive UAs on January 12, January 16, and January 21, 2016 for various substances including morphine, amphetamine, methamphetamine, oxycodone, and noroxycodone. Exs. 61-63. The child was on a trial home visit at this time. As a result of the UAs, the trial home visit was terminated, Respondent mother lost her housing, and she was in jail February 2 through February 9, 2016. Statement of Jodi Castillo.

18.12 When Respondent mother was released from jail, she was allowed to re-enter treatment at Wayside on an inpatient basis. Ms. Castillo coordinated with Respondent mother's probation officer and treatment counselor. Inpatient treatment was supposed to last 30 days. That time was extended due to another positive UA on February 26, 2016. *Id.*; Ex. 64-65.

18.13 On March 11, 2016, Respondent mother successfully completed her inpatient portion of the treatment at Wayside and was transferred to non-residential programming. That programming included weekly individual counseling sessions, twice weekly issues groups, and case management services. Wayside also recommended that Respondent

10

27-JV-15-483
Filed in Fourth Judicial District Court
7/7/2016 10:03:06 AM
Hennepin County, MN

mother obtain a sponsor, participate in twice weekly self-help groups in the community, weekly individual therapy, expand her sober support network, remain in safe housing conducive to recovery, comply with probation and comply with child protection. Ex. 65.

18.14 Respondent mother was subsequently discharged from Wayside for continued substance use and not being honest regarding her use. Respondent mother was taken into custody for probation violations and was released for treatment on April 20, 2016 at Restoration Counseling and Community Services ("RCCS"). Ms. Castillo coordinated with probation regarding setting up this treatment. RCCS's primary program typically lasts around 6 months, and there are expectations for ongoing aftercare after completion of primary treatment. Statement of Jodi Castillo.

18.15 Ms. Castillo regularly spoke with Respondent mother's treatment counselor at RCCS. Respondent mother admitted to marijuana use on May 15, 2016. She was also asked to leave RCCS's housing program around that time due to drug paraphernalia being found in the room that she shared with others (she denied the paraphernalia was hers, but per policy, she was asked to leave). *Id.*

18.16 RCCS approved Respondent to re-enter the housing program, but she failed to do so. Probation then asked her to submit a UA on or around May 25, 2016. Respondent mother initially declined, but then when she did submit a UA, she was observed to be tampering with it. A warrant was issued for her arrest, and she was taken into custody on May 25, 2016. *Id.*

18.17 Respondent mother's longest period of sobriety during this case was from June of 2015 through January of 2016. Ex. 84.

18.18 This Court accords significant weight to the evidence regarding Respondent mother's chemical health. While Respondent mother's case plan also included services to address mental health and parenting issues, services this Court agrees were necessary for her to safely parent P▇▇ the primary concern was Respondent mother's sobriety. The record reflects that her use had an impact upon her ability to remain law abiding, to make thoughtful decisions, and to have stability in her own life (let alone the life of her child). Respondent mother had periods of success, but she failed to demonstrate that she could sustain sobriety in an unstructured and unmonitored environment for any length of time. The record shows that her use was and is ongoing and persistent, and that it causes Respondent mother to make poor and unsafe decisions. Her ongoing use presents an ongoing safety risk for a child. The child could be exposed to drug paraphernalia, poor parenting due to Respondent mother being under the influence, and criminal activity.

19.0 Respondent mother failed to adequately address her mental health.

19.1 Ms. Muenzer-Doy referred Respondent mother for a diagnostic assessment, which she completed on October 22, 2014. Respondent mother admitted to feeling down, depressed, or hopeless more than half the days. The assessor diagnosed her with "opiate dependence, methamphetamine abuse or dependence, adjustment disorder with depression vs. substance induced mood disorder vs. depressive disorder." The assessor noted it was difficult to assess Respondent mother's mental health needs while she was

actively using. The assessor recommend that Respondent mother participate in inpatient chemical dependency program and that she undergo further assessment for her mental health once she has begun a period of sobriety. Ex. 9.

19.2    When Respondent mother entered Wayside in June of 2015, Wayside also offered her mental health services. Statement of Jodi Castillo.

19.3    In March of 2016, Respondent mother obtained a new therapist and was on medications for anxiety and depression. Ex. 65.

20.0    Respondent mother failed to adequately address her parenting issues.

20.1    Ms. Muenzer-Doy referred Respondent mother for in home parenting services at Familywise on August 15, 2014. The educator tried to contact Ms. B▓▓▓▓ since October 3, 2014. She made twice weekly phone calls and left voicemails when she was able. They finally scheduled a meeting on October 22, 2014, which Respondent mother cancelled. Respondent mother was terminated from Familywise services due to lack of contact. Ex. 10.

20.2    Respondent mother was assigned a second parenting educator through her Wayside treatment program. Ms. Castillo coordinated with Wayside to transition the parenting service to being "in-home" when the trial home visit started in December of 2015. During the trial home visit, the Ms. Castillo still observed concerns about Respondent mother's parenting abilities. For example, Respondent mother often appeared overwhelmed with work, treatment, and parenting her child. Ms. Castillo helped arrange for day care for the child. Ms. Castillo discussed these concerns with Respondent mother and asked the parenting educator to work on goals regarding structure and routine with Ms. B▓▓▓▓. Despite these conversations and education, Ms. Castillo did not observe any noticeable changes in Respondent mother's parenting. Statement of Jodi Castillo.

21.0    Respondent mother does not have safe and stable housing. She lost her sober housing due to a relapse. At the time of trial, she was currently incarcerated. Statement of Jodi Castillo.

22.0    Visitation

22.1    Ms. Muenzer-Doy arranged for Respondent mother to have supervised visits at Familywise in the fall of 2014. On December 1, 2014, Familywise terminated Ms. B▓▓▓▓'s visits due to having three cancellations for the months of November. Ex. 11.

22.2    Between November of 2014 and June of 2015, Respondent mother was incarcerated in various jails. The Department agreed the foster parent could transport the child for visits if the child wanted them. Ex. 56.

22.3    When Respondent mother entered treatment at Wayside in June of 2015, the Department made arrangements for Respondent mother to have visits at the facility. The child was subsequently moved to a foster home near the White Earth Reservation. The Department assisted Respondent mother with financial and lodging assistance so should could attend three visits during this time. Statement of Jodi Castillo.

22.4    After the trial home visit terminated, Ms. Castillo coordinated with Wayside for Respondent mother to have supervised visits at Wayside. *Id.*

12

27-JV-15-483
Judicial District Court
7/7/2016 10:03:06 AM
Hennepin County, MN

**Respondent Father's Court Approved Case Plan**

23.0 The Department developed the following case plan for Respondent father that was approved by this Court: (1) Complete a Rule 25 and follow recommendations; (2) Document sobriety through random UAs; (3) Complete a Mental Health Assessment and follow recommendations; (4) Participate in in-home parenting educations; (5) Cooperate with probation; (6) obtain suitably safe and stable housing; (7) maintain contact with the Department and GAL. Ex. 2, Ex. 7. Respondent father was invited to the family team conference in August 2014 where the case plans were developed. Respondent father admitted that Ms. Muenzer-Doy explained his full case plan to him in the beginning of the case. Testimony of Ms. Castillo and Mr. █

24.0 Respondent father failed to address his issues with chemical dependency and failed to remain law abiding.

    24.1 At the time P█ entered out of home placement, Respondent father was on probation. Some of the conditions of his probation included that he complete a Rule 25 and follow recommendations and maintain and document sobriety through UAs. Because these services matched the services the Department was requesting, Ms. Muenzer-Doy and Ms. Castillo coordinated with probation for the services to be arranged. The CPSWs would communicate with probation about the client's progress and their recommendations for treatment needs. The probation officer would then make the actual for the parent to complete the assessment. The CPSW would provide collateral information. *Id.*

        24.1.1 This Court finds that the Department acted reasonably under the circumstances by allowing the probation officer to take the lead in referring Respondent father for chemical health services. Respondent father was ordered through criminal court to complete chemical health services, so the probation officer was making the referral. It would have been duplicative, confusing, and unnecessary for the CPSW to then make a separate referral for the exact same assessment.

    24.2 Respondent father initially told Ms. Muenzer-Doy that he was not willing to cooperate with his case plan. He stated that he did not need to because Respondent mother would do her case plan to reunify with P█ He did not work his case plan because he had "other things going on." Testimony of Ms. Castillo and Mr. █

        24.2.1 This Court finds Mr. █ explanation of why he initially did not engage in a case plan credible. The record shows that Ms. █ did, in fact, have other things going on; he was using controlled substances during this time. The Court finds that Mr. █ never prioritized reunification with P█ over his own use and personal life.

    24.3 Respondent father had the following UAs in the fall and winter of 2014: August 20, 2014 positive for cocaine, opiates and marijuana; September 2, 2014 positive for cocaine and opiates; November 15, 2014 positive for opiates; November 21, 2014 positive for marijuana and opiates; and December 4, 2014 positive for marijuana, opiates and alcohol. Ex. 35.

    24.4 Respondent father completed his first Rule 25 on December 29, 2014. He admitted to previous use of opiates, cocaine, and marijuana. He reported he suffers from daily cravings. He admitted to neglecting his physical health and hygiene when he uses. *Id.* He admitted that most of his associates use drugs and he did not have any leisure

13

Filed in District Court
7/7/2016 10:03:06 AM
Hennepin County, MN

activities except looking for drugs. The assessor recommended that Respondent father attend the HCMC Addiction Medicine Program for methadone and that he attend MICD programming at Park Avenue. Ex. 35.

24.5 Respondent father started the Park Avenue MICD program on February 5, 2015. The program offered services including intensive group therapy, individual counseling, aftercare planning, and a family and friends group. Eight days later, on February 13, 2015, Respondent father was unsuccessfully discharged from Park Avenue due to multiple reports of Respondent father selling heroin to his peers. Respondent father became aggressive when asked to leave, and police were contacted. Ex. 36.

    24.5.1 Respondent father denied these claims. This court does not find his testimony on that point credible. He has motivation to lie. Further, on or around April 23, 2015, Respondent father was arrested and admitted that he sells a couple of grams of heroin every day. Ex. 76.

24.6 Respondent father's whereabouts were largely unknown after this discharge until he reentered treatment. He did not stay in communication with Ms. Muenzer-Doy. He spent some time in jail. The record shows that Respondent father was not proactive about reaching out to the Department or probation to request help getting back into treatment. Testimony of Mr. ████ and Ms. Castillo, Ex. 81.

24.7 Respondent father was arrested around April 23, 2015 for selling heroin. Ex. 76. On January 29, 2016, he was convicted of Felony Third Degree Sale of Narcotics. Ex. 75. He is on probation until August 24, 2018. *Id.*

24.8 Respondent father started his second stint in treatment in September of 2015 at RS Eden. He was unsuccessfully discharged in November of 2015. Testimony of Mr. ████

24.9 When Ms. Castillo was assigned to the case, she met with Mr. ████ in December of 2015 to exchange contact information and to go over his case plan again. She also made contact with his probation officer to discuss services going forward. Testimony of Ms. Castillo.

24.10 Respondent father completed another Rule 25 on January 19, 2016. He was in jail at the time. He admitted to using one half gram of heroin daily and marijuana twice per week. He admitted his last use of heroin was January 12, 2016. The assessor noted Respondent father has difficulty with impulse control and, while he did not have a formal diagnosis, he would benefit from a mental health evaluation. The assessor recommended RCCS Intensive Outpatient Treatment with Lodging. Ex. 70. Respondent father was diagnosed with severe cannabis use disorder and severe opioid use disorder. Ex. 71.

    24.10.1 This Court does not find Respondent father's testimony about how controlled substances impact him to be credible. Respondent father denied that substances like cocaine, heroin, and marijuana impact him. This Court does not find it reasonable that a person would use illegal substances if the substance had no impact. Further, this Court does give credibility to Ms. Rolfes' testimony about how these substances typically impact a user. Ms. Rolfes is an educated chemical health counselor who has undergone training specific to controlled substances. She has no motivation to testify falsely, whereas Respondent father does. Respondent father's testimony is further found not credible because he admitted that use of controlled substances led to an overdose in March of 2016, so clearly, the substances have some impact on him.

14

Filed in Fourth Judicial District Court
7/7/2016 10:03:06 AM
Hennepin County, MN

24.11 Respondent father started treatment at RCCS on February 1, 2016. Respondent father admitted that his motivation for treatment was that he did not want to die. The services providers noted he appeared externally motivated by probation. He also lacked coping skills. Ex. 71. Ms. Castillo regularly communicated with his counselors at RCCS. She also arranged for visits when the facility allowed them. Testimony of Ms. Castillo.

24.12 On March 7, 2016, Respondent father was placed on a behavior contract at RCCS. He was kicked out of sober supportive housing. Ex. 72. On March 8, 2016, Respondent father was unsuccessfully discharged from RCCS. He was discharged at staff's request due to his behaviors. Ex. 73.

24.13 During his time at RCCS, Respondent father never accepted responsibility for the role his conduct had in P███ entering foster care. He also never accepted current responsibility for his using behaviors. Acceptance of responsibility is a critical factor in the recovery and treatment process, but Respondent father never got there. Someone cannot change if he or she does not admit his or her issues. Respondent father's treatment counselors also never saw any changes in his behaviors. Testimony of Ms. Rolfes.

24.14 On or around March 25, 2016, Respondent father overdosed on controlled substances and was arrested. He has remained in custody since that date. His expected discharge date is August 5, 2016. He is participating in the Telesis chemical health program at the Workhouse. Testimony of Mr. ███.

24.15 Respondent father admitted that at the time of trial, he still has issues with chemical dependency and needs treatment. Testimony of Mr. ███.

24.16 Respondent father has failed to establish and maintain sobriety. The Court is not convinced that Respondent father has either the desire or ability to be sober now or in the reasonably foreseeable future. Respondent father has been unsuccessful in treatment on three occasions. He frequently either denies his issues or allows his behaviors to interfere with his progress. Respondent father did not take treatment seriously. He never accepted responsibility for his use or the impact of that use upon his life or the life of P███ He also had external motivators for treatment. The Court is not convinced that Respondent father attempted to be sober for his daughter, but did so because of probation. In the nearly two years that this case been open, Respondent father has never demonstrated an ability to maintain sobriety in an unstructured or unmonitored environment. As a result, P███ would be at risk of being exposed to controlled substances, drug paraphernalia, criminal activity, and general neglect if placed in Respondent father's care.

24.17 Although addressing his chemical health was only one part of Respondent father's case plan, this Court gives this part of his case plan the greatest weight in evaluating his ability to parent P███ Respondent father's controlled substance use impacted his housing, his judgment, his probation, and basically every aspect of his life. Thus, long term sobriety, relapse prevention planning, and a sober support network are critical to Respondent father's ability to parent independent of other issues.

25.0 Respondent father failed to adequately address his mental health and parenting issues
    25.1 The Department wanted Respondent father to complete a mental health assessment to determine if there were any underlying diagnoses which required further services.
    25.2 Ms. Muenzer-Doy did not make a referral for Respondent father to complete a mental

16

27-JV-15-483
Judicial District Court
7/7/2016 10:03:06 AM
Hennepin County, MN

health assessment in the Fall of 2014. Respondent father was still using controlled substances and said he was not going to work a case plan. The Department thought it was important that Respondent father have a period of sobriety before trying to address any mental health issues. Testimony of Ms. Castillo.

    25.2.1 The Court finds that the Department acted reasonably under these circumstances. Notably, Respondent mother's initial diagnostic assessment also noted that sobriety was important before mental health issues could be addressed. Further the record is clear that Respondent father was actively using during this time and had indicated he was not going to do his case plan (so a referral would have been moot, anyway).

25.3    Respondent father could have participated in mental health services at Park Avenue, but he was discharged due to his own behaviors after only eight days. Ex. 36.

25.4    Respondent father was also offered mental health services while he was at RCCS. Exs. 71-73.

25.5    Respondent father has five other children. None of those children are in his care or custody. The department wanted Respondent father to participate in parenting education to address his parenting skills and basic knowledge of child development. Testimony of Ms. Castillo and Mr. ▮▮▮▮

    25.5.1 Respondent father testified to having regular contact with his five other children. However, he struggled to testify to their names and birthdates. He testified that he saw many of them daily "off and on", but he also denied that he ever used around his children. This is inconsistent with his Rule 25 assessments in which he admitted to daily drug use. Respondent father was thus either lying about how often he sees his children or about whether or not he has ever used controlled substances around them.

25.6    Ms. Muenzer-Doy made a referral for a parenting educator for Respondent father in August of 2014. Respondent father never followed through with this service. Testimony of Ms. Castillo.

25.7    Ms. Castillo made a second referral for a parenting educator in March of 2016 at Familywise and she communicated this referral to Respondent father. Because Respondent father was subsequently discharged from treatment, he never followed through with this referral, either. *Id.*

25.8    After March of 2016, Respondent father was incarcerated, so Ms. Castillo was unable to refer him for further mental health or parenting services. *Id.*

25.9    The Department is concerned that Respondent father still cannot effectively parent P▮▮ He does not understand the full spectrum of what is required to parent a child. He has not demonstrated the ability to provide the structure for P▮▮ that she needs. *Id.*

26.0    Respondent father does not have safe and stable housing. In the time Ms. Castillo was on the case, Respondent father had various residencies including RS Eden, RCCS, a family member's home, and the jail. Other times his whereabouts were unknown. Testimony of Ms. Castillo.

27.0    Respondent father's visitation with the child was sporadic, at best. When he did visit, he was appropriate with the child. The child was happy to see him. However, in November of 2014 he was discharged from visits at Familywise due to too many missed visits. Then his whereabouts were largely unknown from March of 2015 through September of 2015. By the time he entered

17

Filed in District Court
7/7/2016 10:03:06 AM
Hennepin County, MN

treatment at RS Eden, P▮▮ was in a placement far away at White Earth. Respondent father regularly visited P▮▮ when he was in treatment at RCCS, but then he was discharged. He has not visited the child since March of 2016 due to his incarceration. It would not be in the child's best interests to visit her father in a locked facility. Testimony of Ms. Castillo, Exs. 4, 34.

## Reasonable Efforts

28.0    Reasonable efforts were made by the Department to prevent foster care placement and to return the child to the parents:

    28.1    The Department exercised due diligence to prevent foster care placement and to offer services that were timely, available, relevant and culturally appropriate for the child and family, to remedy the circumstances requiring the foster care placement and permit reunification.

    28.2    These services provided a meaningful opportunity to address the issues relevant to the foster care placement. In total, the Department offered: coordination with probation for Rule 25s and chemical health treatment; coordination with chemical health treatment centers for mental health services; a diagnostic assessment for the mother; multiple referrals for parenting education; supervised visitation; foster care placement; financial assistance; daycare assistance; and case management services. For both parents, the case plan focused upon treating their chemical dependency and included ancillary services including mental health and parenting services. Due to the Court's grant of a continuance in July of 2015, both parents were given ten additional months to obtain sobriety and demonstrate that they could maintain that sobriety for a prolonged period of time. Sobriety was critical for either parent to successfully provide day to day care for P▮▮ Thus, the Department services provided a meaningful opportunity to obtain sobriety. This is true even considering the Department coordinated with probation. The reasonableness of efforts consider the circumstances presented. In this case, the circumstances included that both parents had involvement in criminal activity which led to probation. It would have been duplicative, confusing, and therefore unreasonable under the circumstances for the Department to making referrals for assessments and services different than or in addition to those made by probation. It was reasonable for the Department to communicate with probation and allow probation to make referrals.

    28.3    The parents have not corrected the conditions that led to the out-of-home placement. At the time of trial, both parents failed to treat their chemical health. Respondent mother used controlled substances in the month of trial and she tampered with a UA days before trial which led to her arrest. Respondent father had three failed treatment attempts, had an overdose on March 25, 2016, and then was incarcerated. Thus, at the time of trial, the conditions of drug use and failing to remain law abiding were still present.

29.0    Reasonable efforts were made by the Department to finalize a permanency plan for the child:

    29.1    Reunification with the parent from whom the child was removed was not possible and will not be possible for the reasonably foreseeable future. Respondent mother has had since August 12, 2014 to show that she can be sober and maintain that sobriety. Despite multiple services and support networks, by the time of trial on May 26, 2016, almost two years later, she is in the exact same place as she was when this case started.

18

27-JV-15-493
Filed in Fourth Judicial District Court
7/7/2016 10:03:06 AM
Hennepin County, MN

Respondent mother demonstrated periods of success, but this Court's primary concern is that, even with criminal and juvenile court monitoring her, Respondent mother was unable to maintain this success. Based upon her conduct since August 12, 2014 and based upon her current status, this Court is confident that Respondent mother will not be able to safely parent P███ now or in the reasonably foreseeable future.

29.2 Permanency with the non-custodial parent was not possible. Respondent father also failed to demonstrate that he could obtain and maintain sobriety. He was offered chemical dependency treatment on three separate occasions, but was unsuccessfully discharged each time. After his third discharge, he used so much that he overdosed and was arrested. Despite nearly two years of services, he also is in the same place he was when this case started. He even admitted at trial that, after his discharge date on August 5, 2016, he *still* would not be in a position to provide day to day care of P███ Given P███ young age and significant time in out of home placement, she cannot wait any longer for her father to establish sobriety.

29.3 The Department conducted a diligent search for relatives who could be willing to be a permanency resource for the child. P███ was placed with two separate relatives during the course of this case. She is currently in a non-relative shelter home. The Department has identified a potential non-relative permanency resource.

## **Statutory Grounds Analysis**

### I. **Failure of Reasonable Efforts**

Minn. Stat. § 260C.301, subd. 1(b)(5) provides that parental rights may be terminated if the district court finds "that following the child's placement out of home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the child's placement." It is presumed that reasonable efforts have failed upon a showing that:

> (i) a child has resided out of the parental home under court order for a cumulative period of 12 months within the preceding 22 months. In the case of a child under age eight at the time the petition was filed alleging the child to be in need of protection or services, the presumption arises when the child has resided out of the parental home under court order for six months unless the parent has maintained regular contact with the child and the parent is complying with the out-of-home placement plan; (ii) the court has approved the out-of-home placement plan required under section 260C.212 and filed with the court under section 260C.178; (iii) conditions leading to the out-of-home placement have not been corrected. It is presumed that conditions leading to a child's out-of-home placement have not been corrected upon a showing that the parent or parents have not substantially complied with the court's orders and a reasonable case plan; and (iv) reasonable efforts have been made by the social services agency to rehabilitate the parent and reunite the family. Id.

It is also presumed that reasonable efforts have failed under this clause upon a showing that:

> (A) the parent has been diagnosed as chemically dependent by a professional certified to make the diagnosis; (B) the parent has been required by a case plan to participate

19

in a chemical dependency treatment program; (C) the treatment programs offered to the parent were culturally, linguistically, and clinically appropriate; (D) the parent has either failed two or more times to successfully complete a treatment program or has refused at two or more separate meetings with a caseworker to participate in a treatment program; and (E) the parent continues to abuse chemicals.

Minn. Stat. § 260C.301, subd. 1(b)(5)(A)-(D). A parent may comply with a case plan but nevertheless fail to correct conditions which led to out of home placement. *In re Welfare of Child of J.K.T.*, 814 N.W.2d 76, 89 (Minn. Ct. App. 2012). "The critical issue is not whether the parent formally complied with the case plan, but rather whether the parent is presently able to assume the responsibilities of caring for the child." *Id.*

Both presumptions have been proven by clear and convincing evidence for both parents. Analyzing the latter presumption, first, both parents were diagnosed as chemically dependent. Respondent mother was diagnosed with severe opioid use disorder and stimulant related disorder. Respondent father was diagnosed with severe cannabis use disorder and opioid use disorder. Second, both parents were required by their case plans to participate in chemical dependency treatment. Notably, both parents were also required to comply with probation, and both of their probation conditions required chemical dependency treatment. Third, both parents were offered multiple opportunities for treatment. Wayside, RCCS, RS Eden, and Park Avenue were culturally, linguistically and clinically appropriate. Fourth, both parents have failed two or more times to successfully complete treatment. Respondent mother was unsuccessfully discharged from Wayside, and while she entered RCCS, she relapsed and then was arrested. Respondent father was unsuccessfully discharged from three separate treatment programs – Park Avenue, RS Eden, and RCCS. Finally, the parents continue to abuse chemicals. Respondent mother admitted to a relapse on May 15, 2016 and was observed tampering with a UA the day before trial. Respondent father overdosed on March 25, 2016.

Analyzing the former presumption, first P▮▮ has been in out of home placement since August 12, 2014. Second, the out of home placement plan was approved. Third, the conditions leading to the out-of-home placement have not been corrected. Both parents failed to abide by this Court's orders and a reasonable case plan. Regarding Respondent mother, she was given since August of 2014 to demonstrate that she could be sober and provide safe, adequate parenting for P▮▮ Respondent mother did not even start treatment until June of 2015, almost ten months after P▮▮ entered foster care. For the first ten months of this case, Respondent mother prioritized her drug use and her criminal activity. Respondent mother then had a period of demonstrated sobriety, but even during that time, there were ongoing concerns for her ability to provide structure and routine for the child. Respondent mother ultimately relapsed in January of 2016, and has had multiple instances of relapse and arrest since January. At the time of trial, she was still using and incarcerated. Regarding Respondent father, he also balked his child protection case plan, initially saying he was not going to do it. When he did go to treatment, his conduct was not motivated by reunifying with his child, but by probation. Further, he had multiple failed treatment attempts. At the time of trial, he had recently overdosed and was also incarcerated.

Fourth, the Department made reasonable efforts to rehabilitate the parents and reunite the family. Considering the circumstances that led to out of home placement, it was appropriate and relevant for the Department to prioritize chemical health services in the case plans before addressing

20

17-JV-15-493
Filed in Fourth Judicial District Court
7/7/2016 10:03:06 AM
Hennepin County, MN

mental health and parenting issues. Additionally, it was realistic under the circumstances and adequate for the Department to coordinate with probation and allow probation to take the lead on making referrals for Rule 25s. Had the Department also made separate referrals, services would have been unnecessarily duplicated and the parents would likely have been confused. The service were available and accessible. Each parent was provided multiple opportunities to complete treatment. The parents hindered these opportunities by failing to communicate (at times), engaging in criminal activity, and relapsing. The services were consistent and timely. Since August of 2014, the parents have in total been offered five different chemical health treatment opportunities, multiple Rule 25s, coordination with probation services, multiple referrals for parenting education, the opportunity for mental health services through chemical health treatment, financial assistance, daycare assistance, supervised visits, and case management services.

Finally, even without the presumptions, this Court concludes that this statutory ground was proven by clear and convincing evidence. Six hundred and fifty-five days after P████ entered foster care, neither parent is presently able to assume the responsibility of providing day to day care for her. Both parents are currently incarcerated and both are in need of further chemical health treatment and mental health and parenting services. Respondent father admitted that, even after he is released from jail, he would not be able to take P████ with him. P████ cannot and should not wait any longer for her parents to do what they need to do. P████ deserves a decision about her future.

## II.   Neglected and in Foster Care

Parental rights may be terminated if a "child is neglected and in foster care." Minn. Stat. § 260C.301, subd. 1(b)(8). This means that (1) the child is in court ordered foster care; (2) the child's "parents' circumstances, condition, or conduct are that the child cannot be returned to them"; and (3) the "parents, despite the availability of needed rehabilitative services, have failed to make reasonable efforts to adjust their circumstances, condition or conduct, or have failed to meet reasonable expectations with regard to visiting the child." Minn. Stat. § 260C.007, subd. 24.

Factors to consider in determining if a child is neglected and in foster care include: (1) how long the child has been in foster care; (2) the parent's efforts to change the circumstances that necessitated removal; (3) whether the parent visited the child within the three months preceding the filing of the petition; (4) the maintenance of regular contact or communication with the agency or person temporarily responsible for the child; (5) the appropriateness and adequacy of services offered to facilitate a reunion; (6) whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child within the foreseeable future; and (7) the nature and reasonableness of the efforts made by the social services agency to rehabilitate and reunite the family. Minn. Stat. § 260C.163, subd. 9.

The Department has proven by clear and convincing evidence that P████ is neglected and in foster care. Analyzing the definition, first, P████ has been in court ordered foster care since August 12, 2014. Second, the parents' circumstances, condition and conduct are such that P████ cannot be returned to them. Both parents are currently incarcerated. They have demonstrated a pattern of criminal activity throughout this case which has prevented them from consistently working a case plan and visiting their daughter. Both parents need further chemical health treatment and need to demonstrate an ability to

21

27-JV-15-493
Filed in Ninth Judicial District Court
7/7/2016 10:03:06 AM
Hennepin County, MN

maintain sobriety for a prolonged period of time in an unstructured environment. Their conduct since this case started demonstrates neither can do so.

Third, despite the availability of needed rehabilitative services, the parents have failed to make reasonable efforts to adjust their circumstances, condition, or conduct. Respondent father initially said he would not work a case plan. When he did engage in services, he was motivated by probation, not by the possibility of reunification. He consistently failed to acknowledge his use and failed to accept responsibility for his role in the child's out of home placement. He was given three attempts to complete treatment, and failed each time due to his own behaviors. Respondent mother did not meaningfully start to work her case plan until ten months after the child entered foster care. She had a period of success, but she could not maintain that success. In the five months leading up to trial, knowing what was on the line, she continued to use controlled substances, which led to her arrest, to period of incarceration, and to discharges from treatment. The services were set up for both parents to succeed, but they failed to take advantage of what was offered to them.

Analyzing the factors, the child has spent 655 days in foster care placement. This is over thirty percent of her young life. Second, as discussed above, the parents made minimal and inconsistent efforts to change the circumstances that necessitated removal. Third, specifically regarding Respondent father, his visits were always inconsistent. He has not seen the child since March. Fourth, both parents were inconsistent with their communication with the Department. Respondent mother's communication admittedly improved since June of 2015, but this Court cannot ignore the first ten months of this case. Fifth, the Department's services were appropriate and adequate. They were specifically targeted at addressing chemical health issues. Further, the coordination with probation was realistic under these circumstances to avoid duplication and confusion.

Sixth, additional services would not likely bring about lasting parental change enabling a safe return of P█ within foreseeable future. The evidence proves that, in 655 days, both parents have failed to achieve prolonged sobriety. They both have had very recent relapses and both continue to fail to remain law abiding. They are in the exact same position as when this case came in. Due to their histories, their conduct during this case, and their current circumstances, this Court is confident that the child cannot safely be returned in the foreseeable future. Finally, for the reasons discussed above, the Department made reasonable efforts to rehabilitate and reunite the family.

## III.    Neglect of Parental Duties

The district court may terminate parental rights if the record contains clear and convincing evidence

> that the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon that parent by the parent and child relationship, including but not limited to providing the child with necessary food, clothing, shelter, education, and other care and control necessary for the child's physical, mental, or emotional health and development, if the parent is physically and financially able, and either reasonable efforts by the social services agency have failed to correct the conditions that formed the basis of the petition.

22

App. 29

Minn. Stat. §260C.301, subd. 1(b)(2). This ground requires a dual showing: first, that the parent has substantially, continuously, or repeatedly refused or neglected to comply with the duties of the parent and child relationship; and second that reasonable efforts by the agency failed to correct the conditions that formed the basis of the petition. *Id.*

The Department has proven by clear and convincing evidence that the parents have substantially, continuously, repeatedly refused or neglected to comply with the duties imposed by the parent and child relationship. For the reasons stated above, the reasonable efforts by the Department failed to correct the conditions that formed the basis of the petition.

This case opened because the parents failed to ensure that P███ was in a safe environment. She was found in a car with her parents with drugs and drug paraphernalia while Respondent mother was under the influence. This is not a safe environment for a young child, and the parents directly exposed her to that. Throughout the course of this case, except for the brief period of time that P███ was on a trial home visit with her mother, neither parent has provided her with the necessary food, clothing, shelter, education or other care and control necessary for her wellbeing. The parents would have been able to do so had they consistently engaged in the services offered by the Department. However, both parents demonstrated patterns of drug use and criminal activity. Even when P███ was on a trial home visit with her mother, Respondent mother was unable to provide structure and routine for the child. Respondent mother then relapsed while the child was in her care. The parents have a duty to achieve sobriety so they could safely parent their child, so their judgment would not be impaired, and so that P███ would not be exposed to controlled substances, to paraphernalia, to criminal activity, and to poor parenting decisions. The case plans offered to both parents would have enabled them to accomplish this duty. However, both parents significantly failed to successfully complete their case plans. Both parents failed their parenting duties.

### Best Interests

30.0   It is in the best interests of the child, P███ ███ ███ that parental rights be terminated for the following reasons:

30.1   The parents will not be able to care for the child for the reasonably foreseeable future for the reasons stated above.

30.2   Balancing interest, both parents have verbalized an interest in maintaining the parent and child relationship. This Court is aware that both parents love P███ very much, and she loves them. However, love is not the issue before the Court. Both parents were given the gift of more time when this Court granted a continuance in July of 2015. Both parents were aware that they needed to obtain and maintain sobriety to reunify with P███ However, instead of using the additional time to demonstrate their ability to maintain sobriety, both parents were unsuccessfully discharged from chemical health treatment, relapsed, and ultimately taken into custody. Thus, both parents' conduct does not match their verbal desire to reunify with their child. As a result, this court gives little weight to the parent's interest in maintaining the parent and child relationship.

30.3   Next analyzing P███'s interest, P███ is very bonded to her parents. Having their rights terminated will be emotionally difficult for P███ P███ has an emotional interest in maintaining the parent and child relationship.

30.4   Finally, balancing P███'s competing interests, this Court assigns the greatest weight to

23

her need for stability in her daily routine, for a stable home environment, and for safe, sober caregivers who can raise her through the age of majority. A stable home environment is essential for P███'s sense of belonging and well-being. P███ is currently in a stable and sober shelter environment, and she is thriving there. She needs a nurturing, caring, stable caregiver who can provide her with structure and boundaries, but challenge her and foster her development at the same time. Neither parent has demonstrated that they have the ability to provide her this level of care on a consistent basis. Testimony of Ms. Castillo and Ms. Reis.

30.5    Termination of parental rights will free P███ to be adopted into a home that can provide her the stability, nurturing, structure, and safety that she needs and deserves.

## CONCLUSIONS OF LAW

1.0    There is clear and convincing evidence that parental rights should be terminated under Minn. Stat. § 260C.301, subd. 1(b)(2), as the parents have substantially, continuously, or repeatedly refused or neglected to comply with the duties imposed upon by the parent and child relationship.

2.0    There is clear and convincing evidence that parental rights should be terminated under Minn. Stat. § 260C.301, subd. 1(b)(5), as following the child's placement out of the home, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the placement.

3.0    There is clear and convincing evidence that parental rights should be terminated under Minn. Stat. § 260C.301, subd. 1(b)(8), as the child is neglected and in foster care.

4.0    There is clear and convincing evidence that it is in the best interests of the child that any and all parental rights be terminated.

## ORDER

**IT IS HEREBY ORDERED:**

1.0    Any and all parental rights of ███████ B███████, as mother, and of ███████ as father, to P██████ born July 9, 2011, are terminated and the Minnesota Commissioner of Human Services is appointed guardian of said child.

2.0    The Hennepin County Human Services and Public Health Department may disclose private or confidential data, as defined in the Data Practices Act, to relatives of the child for the purpose of locating a suitable adoptive home.

3.0    The appointment of the Guardian ad Litem shall continue until an adoption decree is entered.

4.0    The Hennepin County Human Services and Public Health Department shall use the total income and resources attributable to the child, including, but not limited to, social security benefits, supplemental security income, and child support, to reimburse the cost of the child's

care, examination or treatment.

5.0   A hearing will be held every 90 days to review the progress of the Hennepin County Human Services and Public Health Department toward adoptive placement of the child.

6.0   Form 11.4 is incorporated herein as necessary, and as required by and consistent with Minn.R.Juv.Prot.Pro 8.04, subd. 5.

BY THE COURT:

Dated:  6 July 16

Lyonel Norris
Judge of District Court
Juvenile Division

25

27-JV-15-483
Judicial District Court
7/7/2016 10:03:06 AM
Hennepin County, MN

## NOTICE TO PERSON WHOSE PARENTAL RIGHTS ARE TERMINATED AND WHOSE CHILD IS SUBSEQUENTLY ADOPTED

### This Notice is given to you pursuant to
### Minn. Stat. §259.89 and §260C.318, subd. 4:

As the parent named on the birth certificate of a child (or children) to whom parental rights are terminated, you have the following rights if that child (or children) is/are subsequently adopted:

(1)     The right to file at any time with the Minnesota Registrar of Vital Statistics a Consent to Disclosure (as defined in Minn. Stat. §144.212, subd. 11) of all information appearing on the child's original birth certificate if the child requests such information after becoming nineteen (19) years old.

OR

(2)     The right to file at any time with the Minnesota Registrar of Vital Statistics an Affidavit of Non-Disclosure stating that the information on the child's original birth certificate shall not be disclosed to the child.

(3)     If you and the other parent named on the birth certificate (if any) both file a "Consent to Disclosure", or, do not file an "Affidavit of Non-Disclosure", the child may be given the information on the original birth certificate if the child requests such information after becoming nineteen (19) years old.

(4)     If either you or the other parent named on the birth certificate (if any) files an "Affidavit of Non-Disclosure" no information on the original certificate can be disclosed to the requested child unless:

(a)     The "Affidavit(s) of Non-Disclosure" are revoked.

OR

(b)     The parent(s) who filed an "Affidavit of Non-Disclosure" dies and the Juvenile Court upon a petition by the child determines that disclosure of the information would be of greater benefit than non-disclosure.

(5)     A parent may, at any time, revoke a "Consent for Disclosure" or an "Affidavit of Non-Disclosure" by filing the revocation with the Minnesota Registrar of Vital Statistics.

7/7/2016 10:03:06 A
Hennepin County, N

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT - JUVENILE DIVISION

FOURTH JUDICIAL DISTRICT

*In the Matter of the Welfare of the Child of:*

**ORDER TERMINATING PARENTAL
RIGHTS AND APPOINTING GUARDIAN**

█    B█    , Respondent mother
            Respondent father

FAM ID No.  349034
JC Case No.  27-JV-15-483

Child:  P█            born July 9, 2011

A Petition having been filed, notice given, a hearing duly held and Findings of Fact having been made as to the termination of parental rights of the above-named child,

**IT IS ORDERED,** that any and all parental rights of            B█        , as mother, and of                        as father, to P█            born July 9, 2011, are terminated and the Minnesota Commissioner of Human Services is appointed guardian of said child.

**IT IS FURTHER ORDERED,** that the Commissioner and her designated agent shall have the authority to make major decisions affecting the child, including, but not limited to, giving consent to medical, surgical, mental or chemical health treatment, and educational services.

BY THE COURT:

Dated: 7 July 16

Lyonel Norris
Judge of District Court
Juvenile Division

# ATTACHMENT 2

Filed in Fourth Judicial District Court
4/24/2015 2:03:00 AM
Hennepin County Juvenile, MN
Hennepin County, MN



# White Earth Reservation Tribal Council

## INDIAN CHILD WELFARE
P.O. Box 358
White Earth, MN 56591
(218) 983-4647 • Fax (218) 983-3712

April 23, 2015

Kacy L. Wothe, Assistant Hennepin County Attorney
525 Portland Avenue South, #1210
Minneapolis, MN 55415

Re:  P▮▮▮ – DOB: 07/▮▮/11
     ▮▮▮B▮▮▮ – DOB: ▮▮▮ – Mother
     ▮▮▮▮▮▮– ▮▮▮ – Father

Dear Ms. Wothe:

Upon your request, the Indian Child Welfare Office conducted an enrollment check. Based upon information provided the results of that check indicate that the above named child is <u>Not Eligible for Membership under ICWA with the White Earth Band of Chippewa.</u> Therefore this office will not intervene in this case. If you have any further questions regarding this information please do not hesitate to call.

Sincerely,

Jeri Jasken
Director of Indian Child Welfare
JJcb


cc:     file

# ATTACHMENT 3

OFFICE OF THE HENNEPIN COUNTY ATTORNEY

MICHAEL O. FREEMAN   COUNTY ATTORNEY

October 6, 2017

Referee Angela Willms
Juvenile Justice Center
590 Park Avenue
Minneapolis, MN 55415-1573

> RE:   In the Matter of Child in the Custody of
>       The Commissioner of Human Services
>       Child: P█████ dob 07/09/2011
>       **FAM No. 349034**          **Case No. 27-JV-15-483**

Dear Referee Willms:

The Department is filing its Memorandum of Law in opposing the Motion of R████ B█████ for intervention as of right. The Department continues its opposition to permissive intervention by any person.

Specifically, on behalf of the Department, I would like to respond to the inference that the Department continued to support the foster parents to adopt after the Tribe determined the child to be an Indian child under the I.C.W.A. Prior to that determination, the Department was supporting the foster parents to adopt, as documented in its Report to Court submitted for the January 4, 2017 review hearing. The Department filed its Notice of Intent to Not Object to Intervention by the Tribe on January 9, 2017, as it was not contesting the determination of eligibility for membership. From that date forward the Department has been prepared to defer to the Tribe on the suitability of any prospective adoptive home consistent with Minn. Stat. §260C.215, subd. 6(b), and I would submit that I did not proffer anything to the contrary at the hearing on February 14, 2017, at which intervention was argued. That the Department may withdraw its support from the foster parents was acknowledged by the Court in #6 of the Conclusions of Law on Page 3 of the Order Regarding Motions to Intervene filed February 27, 2017, which also concluded that the foster parents have an alternative legal avenue to contest that adoption which does not require them to be parties. On behalf of the Department, I would submit that the posture of the case as per the foster parents has not changed since the Court denied their motion to intervene in February to-date.

Sincerely,

Nancy K. Jones
Assistant County Attorney
Telephone: (612)348-8371
FAX: (612) 348-9247

NKJ:
cc:   Eric Rehm, attorney for GAL
      Rebecca McConkey-Greene, Attorney for Tribe
      Mark Fiddler, Attorney for Foster Parents
      HSPHD CSW – Joseph Thompson
      HSPHD ARW – Hannah Epstein

# ATTACHMENT 4

Filed in Fourth Judicial District Court
1/23/2018 7:46 AM
Hennepin County, MN
27-JV-15-483

STATE OF MINNESOTA

COUNTY OF HENNEPIN

DISTRICT COURT
FOURTH JUDICIAL DISTRICT
JUVENILE COURT DIVISION

*In the Matter of the Welfare of the Child of*:

**The Commissioner of Human Services**

Child: P█████ (d.o.b. 07/09/2011)

**FINDINGS AND ORDER
REGARDING MOTIONS FOR
ADOPTIVE PLACEMENT**

Case Number: 27-JV-15-483
Family Number: 349034

The above-entitled matter came before the Honorable Angela Willms, Referee of District Court, Juvenile Division, on January 16, 2018 at the Hennepin County Juvenile Justice Center in Minneapolis, Minnesota.  CMR recorded the proceedings.

### PARTIES AND PARTICIPANTS

Nancy Jones, Assistant Hennepin County Attorney, appeared on behalf of the Hennepin County Human Services and Public Health Department ("Department"), which was represented by Hannah Epstein, Adoption Resource Worker, and Joseph Thompson, Child Services Worker, who were present.

Eric Rehm, Attorney at Law, appeared on behalf of Barbara Reis, Guardian ad Litem, who was present.

Rebecca McConkey-Greene, Attorney at Law, appeared on behalf of the White Earth Band of Chippewa ("White Earth"), which was represented by Lee Goodman, Social Worker, who was present.

Mark Fiddler, Attorney at Law, appeared on behalf of Danielle and Jason Clifford, Foster Parents, who were present.

Ronald Walters, Attorney at Law, appeared on behalf of R███ B██████, Maternal Grandmother, who was present.

Upon all the records and proceedings herein, the Court makes the following:

### FINDINGS OF FACT

1.  The parties and participants last appeared on December 4, 2017 for a post-permanency review hearing.  The Court's December 5, 2017 Order from that hearing required the parties and participants to comply with certain filing deadlines regarding any motions for adoptive placement.  On December 14, 2017, Mr. Walters filed a letter indicating that his client, R███ B██████, would not file a motion for adoptive placement because the Department and White Earth currently support her as the child's adoptive placement.  In

this letter, Mr. Walters indicated: "My client, of course, continues in her desire to adopt P███" (R. Walters Letter, filed 12/14/17, p. 1).

2.   The same day, the Cliffords filed a motion for adoptive placement pursuant to Minnesota Statutes §260C.607, subdivision 6, asking the Court for an evidentiary hearing on the issue of whether the Department is unreasonable for failing to place the child with them for adoption. On December 27, 2017, Mr. Rehm submitted a letter on behalf of the Guardian ad Litem, supporting the Cliffords' motion and opposing adoptive placement with Ms. B██████.

3.   On December 29, 2017, the Department filed a memorandum opposing the Cliffords' motion. The Department argues it was reasonable not to place the child with the Cliffords for adoption because Minnesota and federal law require the Department to place the child according to Indian Child Welfare Act ("ICWA") and Minnesota Indian Family Preservation Act ("MIFPA") preferences, which the Cliffords do not satisfy. The Department also filed a motion requesting court authorization to immediately place the child with Ms. B█████ and to enter into an adoptive placement agreement with her.

4.   The same day, White Earth filed a response opposing the Cliffords' motion and supporting the Department's motion for immediate placement with Ms. B█████.

5.   Mr. Walters filed a memorandum on December 29, 2017 supporting the child's placement with his client and arguing that the Cliffords are legally unable to adopt the child due to the ICWA placement preferences and the Cliffords' inability to obtain a Qualified Expert Witness from White Earth to support their adoption of the child. On January 5, 2018, the Cliffords filed a reply memorandum arguing that the child cannot legally be placed with Ms. B█████ for adoption because she does not have an approved adoption home study.

6.   On January 8, 2018, Mr. Walters re-filed his December 29, 2017 memorandum in order to serve the Cliffords, who were inadvertently excluded from his initial service of the document. On January 9, 2018, the Cliffords responded to Mr. Walters's memorandum. The Cliffords' January 9, 2018 memorandum was filed in violation of the Court's December 5, 2017 Order but will nevertheless be considered under the circumstances. [1]

7.   On January 16, 2018, the parties and participants appeared on the Cliffords' motion for adoptive placement.

## CONCLUSIONS OF LAW

1.   Minnesota Statutes §260C.607 permits foster parents to file a motion for adoptive placement as long as those foster parents have an approved adoption home study and have resided in Minnesota for at least six months prior to filing the motion. Minn. Stat. §260C.607, subd. 6(1) (2017). There is no dispute that Danielle and Jason Clifford are

---

[1] "Any motions or responses filed outside of the aforementioned timelines will be dismissed or excluded from consideration by the Court." (Order, filed 12/5/17, p. 3, ¶ 9).

foster parents within the meaning of the statute, that they have an approved adoption home study, and that they resided in Minnesota for at least six months before filing their motion.

2.    The issue before the Court is whether the Cliffords' motion and supporting documents make a prima facie showing that the Department has been unreasonable in failing to place the child with the Cliffords for adoption. See Id.  If the Cliffords meet this burden, they are entitled to an evidentiary hearing where they must prove by a preponderance of the evidence that the Department was unreasonable in failing to make the requested adoptive placement. Minn. Stat. Id. at subd. 6(d).  However, if the Cliffords fail to make a prima facie showing, they are not entitled to an evidentiary hearing, and Minnesota law requires the Court to dismiss their motion. Id. at subd. 6(c).

3.    When determining whether the movant has made a prima facie showing, "the district court must accept facts in [the movant's] supporting documents as true, disregard contrary allegations, and consider the non-moving party's supporting documents only to the extent that they explain or provide context." In the Matter of the Welfare of the Children of L.L.P., A.J.H., and J.M.L., 836 N.W. 2d 563, 570 (Minn. Ct. App. 2013).

4.    The district court shall not weigh the movant's allegations against the agency's conduct and the history of the proceedings. Id.  However, conclusory allegations do not support a prima facie showing. Id. at 571.  Minnesota Statutes Section 260C.607 is a relatively new statute, so there is almost no case law to guide the Court regarding what constitutes a prima facie showing in these cases.  Additionally, the child in this case is an Indian child subject to the ICWA and the MIFPA. (See Order, filed 10/23/17, p. 11, ¶ 42).  The Court is not aware of any case law regarding a §260C.607 motion for the adoptive placement of an Indian child and believes this may be an issue of first impression.

5.    The Department, White Earth, and R███ B██████ argue that the Department was reasonable in not placing the child with the Cliffords for adoption because the §1915(a) ICWA placement preferences apply to this child, the Cliffords cannot meet them, and the Cliffords cannot prove by clear and convincing evidence that there is good cause to deviate from the preferences.  In response, the Cliffords argue that the §1915(a) placement preferences do not apply to this child, pursuant to the U.S. Supreme Court's rationale in Adoptive Couple v. Baby Girl. 133 S. Ct. 2552 (U.S.S.C. 2013).  The Cliffords argue that the Department has been unreasonable in deferring its placement decision to White Earth instead of making an individualized determination of the child's best interests as required by Minnesota Statutes §260C.212, subdivision 2.  The Cliffords argue that even if the §1915(a) placement preferences apply, they have made a prima facie showing that there is good cause to deviate from the preferences and should therefore receive an evidentiary hearing to further prove good cause by clear and convincing evidence.[2]

---

[2] The letter filed and oral arguments made by Mr. Rehm on behalf of the Guardian ad Litem, while clearly supportive of the child's placement with the Cliffords, did not address the legal issues before the Court and are therefore given little weight in this decision.

6. Thus, as argued by the parties and participants to this case, central to the Court's determination of whether the Cliffords have made a prima facie showing under §260C.607 is the issue of whether the §1915(a) ICWA placement preferences apply to this child.

7. However, the §1915(a) placement preferences only apply to the *adoptive* placement of an Indian child, and this child has not yet been placed for adoption. See 25 U.S.C. §1915(a). The ICWA defines adoptive placement as, "the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption." 25 U.S.C. §1903(1)(iv). Under Minnesota law, "[t]he child shall be considered placed for adoption when the adopting parent, the agency, and the commissioner have fully executed an adoption placement agreement on the form prescribed by the commissioner." §260C.613, subd. 1(a). No adoption placement agreement has been executed for this child. For these reasons, the issue of whether the §1915(a) placement preferences apply to this child (and by extension, whether the Cliffords have made a prima facie showing of unreasonableness) is not yet ripe for the Court's consideration.[3]

8. Normally under these circumstances, the Court would dismiss the Cliffords' motion without prejudice. However, the Court believes doing so in this case would only lead to the re-litigation of the same issues when the Department places the child for adoption. To avoid further delaying this child's permanency, the Court finds that it is in her best interests for the Court to defer ruling on the Cliffords' motion until the Department has placed the child for adoption and the Cliffords' motion becomes justiciable.

9. The Department says it has not placed the child for adoption as it desires, with Ms. B▉▉▉▉, out of deference to the Court. While the Court understands this deference given the litigious nature of these proceedings, there is no legal basis for it. The law is clear: "The responsible social services agency has exclusive authority to make an adoptive placement of a child under the guardianship of the commissioner." Id. The Court may only compel the Department to make a different adoptive placement upon granting a §260C.607 motion for adoptive placement. See Minn. Stat. §260C.607, subd. 5(a), 6(e) (2017).

10. Since the Court has not granted the only §260C.607 motion before it, the Department retains exclusive authority to place this child for adoption, and the Department need not ask the Court's permission to do so.[4] Until the Department places the child for adoption, the child remains in a preadoptive placement. The ICWA defines preadoptive placement as, "the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement." 25 U.S.C. §1903(1)(iii); see also Minn. Stat. §260.755, subd. 3(c) (2017); Minn. Tribal/State

---

[3] "[I]ssues that exist only hypothetically in the future are not justiciable." Power Line Task Force, Inc. v. Northern States Power Co., 2004 WL 2659837, *2 (Minn. Ct. App. 2004) (citing State v. Murphy, 545 N.W.2d 909, 917 (Minn. 1996).

[4] Accordingly, the Court will not rule on the Department's motion for adoptive placement because the Court has no authority under the circumstances to place this child for adoption.

Agreement, p. 9, ¶ 31).  Preadoptive placements have their own placement preferences under the ICWA.  Section 1915(b) requires:

> Any child accepted for foster care or preadoptive placement shall be placed in the least restrictive setting which most approximates a family and in which [her] special needs, if any, may be met. The child shall also be placed within reasonable proximity to his or her home, taking into account any special needs of the child. In any foster care or preadoptive placement, a preference shall be given, in the absence of good cause to the contrary, to a placement with--
>> **(i)** a member of the Indian child's extended family;
>> **(ii)** a foster home licensed, approved, or specified by the Indian child's tribe;
>> **(iii)** an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or
>> **(iv)** an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.
>
> 25 U.S.C. §1915(b).

11. The Court may deviate from these preferences upon a tribal resolution specifying a different order of preferences or for good cause shown. See Id. §1915(a), (b), (c).  As far as the Court is aware, White Earth does not have a tribal resolution specifying a different order of preferences; therefore, the Court may only depart from the ICWA placement preferences in this case upon good cause shown.  Under federal law:

> A court's determination of good cause to depart from the placement preferences must be made on the record or in writing and should be based on one or more of the following considerations:
>> (1) The request of one or both of the Indian child's parents, if they attest that they have reviewed the placement options, if any, that comply with the order of preference;
>> (2) The request of the child, if the child is of sufficient age and capacity to understand the decision that is being made;
>> (3) The presence of a sibling attachment that can be maintained only through a particular placement;
>> (4) The extraordinary physical, mental, or emotional needs of the Indian child, such as specialized treatment services that may be unavailable in the community where families who meet the placement preferences live;
>> (5) The unavailability of a suitable placement after a determination by the court that a diligent search was conducted to find suitable placements meeting the preference criteria, but none has been located. For purposes of this analysis, the standards for determining whether a placement is unavailable must conform to the prevailing social and cultural standards of the Indian community in which the Indian child's parent or extended family resides or with which the Indian child's parent or extended family members maintain social and cultural ties.

App. 44

25 C.F.R. §23.132(c) (Effective 12/12/16).  "The party seeking departure from the placement preferences should bear the burden of proving by clear and convincing evidence that there is 'good cause' to depart from the placement preferences." 25 C.F.R. §23.132(b).

12. Minnesota law also permits departure from the §1915 placement preferences but has established slightly different requirements for good cause:

(b) The court may place a child outside the order of placement preferences only if the court determines there is good cause based on:
(1) the reasonable request of the Indian child's parents, if one or both parents attest that they have reviewed the placement options that comply with the order of placement preferences;
(2) the reasonable request of the Indian child if the child is able to understand and comprehend the decision that is being made;
(3) the testimony of a qualified expert designated by the child's tribe and, if necessary, testimony from an expert witness who meets qualifications of subdivision 6, paragraph (d), clause (2), that supports placement outside the order of placement preferences due to extraordinary physical or emotional needs of the child that require highly specialized services; or
(4) the testimony by the local social services agency that a diligent search has been conducted that did not locate any available, suitable families for the child that meet the placement preference criteria.

(c) Testimony of the child's bonding or attachment to a foster family alone, without the existence of at least one of the factors in paragraph (b), shall not be considered good cause to keep an Indian child in a lower preference or nonpreference placement.

(d) A party who proposes that the required order of placement preferences not be followed bears the burden of establishing by clear and convincing evidence that good cause exists to modify the order of placement preferences.

Minn. Stat. §260.771, subd. 7(b) (2017).

13. These laws are clear that the Court may only deviate from the ICWA placement preferences upon a showing of good cause by clear and convincing evidence.  Although the Cliffords have arguably alleged facts that suggest there may be good cause to deviate from the §1915(a) preferences, they have not established good cause by clear and convincing evidence under either the federal or the Minnesota law.  In the context of their motion for adoptive placement, the Cliffords argued that their current filings should prompt another hearing on the issue of good cause.  While a prima facie showing is required to obtain an evidentiary hearing under §260C.607, the Court is not aware of any legal authority requiring the same two-step review under the §1915(b) preferences.  Both Minnesota and federal law require a showing of good cause by clear and convincing evidence in order to depart from the §1915(b) placement preferences, and the Cliffords have not made that showing here.

Page **6** of **8**

Filed in Fourth Judicial District Court
1/23/2018 7:46 AM
Hennepin County, MN

14. This Court has previously held that this child is an Indian Child as defined by the ICWA (order, filed 2/27/17, p. 4, ¶ 3), that she is an enrolled member in a federally recognized Indian tribe (id.; see also order, filed 10/23/17, p. 11, ¶ 42), and that the ICWA and the MIFPA apply to her. (See Id.).  Accordingly, the §1915(b) preadoptive placement preferences apply to her.  The Cliffords do not dispute that they do not meet these preferences, and without a finding of good cause to deviate, the Department is bound by them.  There is no dispute that Ms. B█████ meets the first placement preference as an extended member of the child's family.  The record is clear that Ms. B█████ has an approved adoption home study. (See N. Jones Oral Argument, 1/16/18).  Despite Ms. B█████'s lack of a foster care license, the Department confirms there are no legal barriers to the child's placement with Ms. B█████. (Id.)  Ms. B█████ is willing to have the child placed with her for adoption, and the Department and White Earth believe such placement is in the child's best interests. (See N. Jones Oral Argument, 1/16/18; R. McConkey-Greene Oral Argument, 1/16/18).  The Court notes that the Guardian ad Litem does not support the child's placement with Ms. B█████, but the Court is not aware of any legal authority requiring the Department to follow the Guardian ad Litem's placement recommendation instead of its own.  Under the current posture of this case, the Department retains the exclusive authority to place the child for adoption, and there appear to be no legal barriers restricting their ability to do so.

15. The Department asserted that the child would have been placed with Ms. B█████ immediately had it not been for these proceedings and that it is ready to sign an adoption placement agreement with her.  The Court is tasked with ensuring that the Department makes reasonable efforts (or in this case, *active* efforts) toward finalizing the adoption of this child. See Minn. Stat. §260C.607, subd. 1(a); see also Minn. Stat. §260.762, subd. 3. The Court is also required to make sure that these efforts are "appropriate to the stage of the case." Id. at 4(a)(1).  It is with this authority that the Court orders the Department to act expeditiously in its adoptive placement of this child so that the resolution of the Cliffords' motion, and more importantly, the child's permanency, are not further delayed.

### IT IS HEREBY ORDERED

1. The Court reserves its ruling on Danielle and Jason Clifford's motion for adoptive placement until the Department has placed this child for adoption.

2. The Hennepin County Human Services and Public Health Department shall immediately place this child for adoption pursuant to the mandates of Minnesota and federal law.

3. The Department shall notify the parties and participants by court notification when the child has been placed for adoption, at which point, the Court will rule on whether the Cliffords have made a prima facie showing warranting an evidentiary hearing under §260C.607.

Filed in Fourth Judicial District Court
1/23/2018 7:46 AM
Hennepin County, MN

4.  The parties shall appear for a review hearing on **Tuesday, February 13, 2018 at 11:00 a.m.**

BY THE COURT:

January 22, 2018

_____

Angela Willms
Referee of District Court
Juvenile Court Division

_____

Judge of District Court
Juvenile Court Division

# ATTACHMENT 5



April 20, 2018

**OFFICE OF
APPELLATE COURTS**

**STATE OF MINNESOTA**

**IN COURT OF APPEALS**

In re J. C. and D. C., Petitioners

**ORDER**

In the Matter of the Welfare of the Child of:
The Commissioner of Human Services

#A18-0393

Considered and decided by Larkin, Presiding Judge; Bjorkman, Judge; and Hooten, Judge.

**BASED ON THE FILE, RECORD, AND PROCEEDINGS, AND FOR THE FOLLOWING REASONS:**

The child who is the subject of this matter was born in 2011 and was initially placed in foster care in 2014. Parental rights to the child were terminated in July 2016. That month, the child was placed with the foster parents who are now bringing the issue of the child's placement before this court. Initially, the district court did not treat the child as an Indian child under the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901-63 (2012), based on representations to the district court by the White Earth Band of Chippewa. In January 2017, however, the tribe asserted for the first time that the child is an Indian child. In February 2017, the district court ruled that the child is an Indian child. Later, the tribe indicated support for placing the child with her maternal grandmother, and foster parents moved for an adoptive placement of the child in their home and a hearing on their motion.

By order filed on January 23, 2018, and amended on February 5, 2018, the district court noted that the prerequisites for an adoptive placement were not yet satisfied and that litigation regarding an adoptive placement would be premature.   Pending adoption proceedings, the district court allowed the child to be placed with her maternal grandmother pursuant to preferences in ICWA § 1915(b) for preadoptive placements.  The district court reserved foster parents' motion for an adoptive placement, and directed the Hennepin County Human Services and Public Health Department (the county) to "immediately" place the child for adoption pursuant to state and federal law.  The child was placed with her maternal grandmother on January 26, 2018.  On March 9, 2018 foster parents petitioned this court for a writ of prohibition and a writ of mandamus, challenging various rulings made by the district court.   Foster parents also moved this court to stay the child's placement with her maternal grandmother.  On March 13, 2018, foster parents filed an amended petition.

A writ of prohibition can be issued only if (1) an inferior court is about to exercise judicial or quasi-judicial power; (2) the exercise of that power is unauthorized by law; and (3) the exercise of that power will result in injury for which there is no adequate remedy. *Leslie v. Emerson (In re Leslie)*, 889 N.W.2d 13, 14 (Minn. 2017); *see Underdahl v. Comm'r of Pub. Safety (In re Comm'r of Pub. Safety)*, 735 N.W.2d 706, 710 (Minn. 2007) (addressing prohibition).  While prohibition may issue "to prevent an abuse of discretion where there is no other adequate remedy at law," *Wasmund v. Nunamaker*, 277 Minn. 52, 55,

2

151 N.W.2d 577, 579 (1967), "[a] writ [of prohibition] is a preventative, not a corrective, measure." *State v. Deal*, 740 N.W.2d 755, 769 (Minn. 2007).

Foster parents argue that the district court exceeded its authority by allowing the child to be placed with her maternal grandmother before ruling on foster parents' motion for an adoptive placement in their home. Because the child was placed with her maternal grandmother more than a month before foster parents sought relief in this court, foster parents' petition, contrary to *Deal*, seeks to correct rather than prevent the placement with her maternal grandmother. Because the challenged exercise of judicial power is not prospective, a writ of prohibition is improper. *See id.*

Moreover, the child's placement with her maternal grandmother is not unauthorized by law. "Minnesota courts have frequently looked to the guidelines published by the Bureau of Indian Affairs in construing ICWA provisions." *In re Best Interests of M.R.P.-C.*, 794 N.W.2d 373, 378 (Minn. App. 2011); *see* Bureau of Indian Affairs (BIA) *Guidelines for Implementing the Indian Child Welfare Act* (2016), https://www.bia.gov/sites/bia.gov/files/assets/bia/ois/pdf/idc2-056831.pdf (Guidelines). And the Guidelines contemplate that a non-ICWA placement of a child can be reopened and supplanted by an ICWA-based placement if, after the placement, it is determined either that the child is an Indian child or that the district court has reason to believe the child is an Indian child. *See* Guidelines at 11 (stating that a failure to timely identify whether ICWA applies to a child "can generate unnecessary delays, as the court and the parties may need to redo certain processes or findings under the correct standard"), 12 (stating that "it makes sense to place a

3

child that the court has reason to know is an Indian child in a placement that complies with ICWA's placement preferences from the start of a proceeding, rather than having to consider a change [in] a placement later in the proceeding once the court confirms that the child actually is an Indian child").

Once the tribe informed the district court that it had changed its position regarding the child's status as an Indian child, the district court, at a minimum, had reason to know the child was an Indian child. Therefore, the regulations associated with ICWA required the district court to treat the child as an Indian child. 25 C.F.R. § 23.107(b)(2) (2017); *see* 25 C.F.R. § 23.107(c) (2017) (identifying when a court has reason to know a child is an Indian child). Thus, "any" adoptive or preadoptive placement of this child was subject to the placement preferences recited in ICWA, unless the tribe set different preferences. *See* 25 U.S.C. § 1915(a) (adoptive placement preferences), (b) (preadoptive placement preferences), (c) (tribal preferences). Because the district court was not presented with any tribe-specific placement preferences, the ICWA preferences were the relevant preferences. Further, an adoption placement agreement is a prerequisite for an adoptive placement. *See* Minn. Stat. § 260C.613, subd. 1(a) (2016) (stating that "[t]he child shall be considered placed for adoption when the adopting parent, the agency, and the commissioner have fully executed an adoption placement agreement on the form prescribed by the commissioner"). No adoption placement agreement has been executed in this case, however. Therefore, ICWA's preadoptive placement preferences were more relevant to the child's current placement with her maternal grandmother than ICWA's adoptive placement preferences.

4

Foster parents' focus on the *adoptive* placement preferences of section 1915(a) is misplaced because, absent an adoptive placement, it is premature to address foster parents' arguments about the applicability of the adoptive placement preferences and whether to deviate from those preferences. Foster parents' reliance on *Adoptive Couple v. Baby Girl*, is similarly misplaced because that case addresses the adoptive placement preferences of ICWA § 1915(a), rather than the preadoptive preferences of section 1915(b), which are more applicable here. 570 U.S. 637, 654-56, 133 S. Ct. 2552, 2564-65 (2013).

Under ICWA, absent good cause to the contrary, in "any" preadoptive placement, preference "shall be given" to a placement with "a member of the Indian child's extended family[.]" 25 U.S.C. § 1915(b)(i). Grandmother is a member of the child's extended family, and foster parents are not. The district court acknowledged that foster parents "arguably alleged facts that suggest there may be good cause to deviate from the [adoptive] preferences," but noted that they had not established clear and convincing evidence of the good cause that is necessary to deviate from the preadoptive preferences. We, like the district court, are sensitive to legitimate concerns about the best interests of this child, who was removed from her foster parents' home after approximately 18 months even though they are willing to adopt her. By themselves, however, a child's best interests are an inadequate basis to deviate from ICWA's preferences. *See In re Custody of S.E.G.*, 521 N.W.2d 357, 362 (Minn. 1994) (stating that "good cause [to deviate from ICWA's adoptive placement preferences] cannot be based simply on a determination that placement outside the preferences would be in the child's best interests"). Because we cannot conclude that

5

the district court's allowance of the child's preadoptive placement with her maternal grandmother was unauthorized by law, a writ of prohibition is inappropriate.

Nor can we say that foster parents have shown an injury for which there is no adequate remedy. Foster parents do not clearly identify exactly which of their legal rights the district court allegedly prejudiced. Regardless, the district court ordered that the child be placed for adoption "immediately." When the prerequisites for that placement are satisfied and the placement is made, foster parents will have the opportunity to litigate the propriety of any refusal to make that adoptive placement in their home. Minn. Stat. § 260C.607, subd. 6 (2016). And because the applicability of ICWA's adoptive placement preferences will depend, in part, on whether the child is an Indian child, that litigation may address any challenge foster parents may have to the form of the tribe's submissions to support its assertion that this child is an Indian child. Moreover, to the extent foster parents believe that the county is not complying with the district court's directive to "immediately" place the child for adoption, foster parents can seek relief in district court. Because foster parents have an adequate legal remedy, a writ of prohibition is not appropriate.

To support their request for a writ of prohibition, foster parents also argue that the definition of "Indian child" in the Minnesota Indian Family Preservation Act (MIFPA) includes, but is broader than and hence preempted by, ICWA's definition of "Indian child." Alternatively, foster parents argue that applying MIFPA based on its definition of "Indian child" will result in a violation of the Equal Protection Clause of the U.S. Constitution. Based

6

on these arguments, foster parents seek a writ of prohibition ruling the relevant portions of MIFPA unconstitutional.

In its February 5, 2018 order, the district court noted that it had previously ruled the child to be an Indian child "as defined by [ICWA]." Because the district court used ICWA's definition of "Indian child" rather than MIFPA's definition, the district court is not about to exercise judicial power pursuant to MIFPA's definition. Thus, a writ of prohibition ruling MIFPA unconstitutional is not available.

Foster parents seek a writ of prohibition to preclude application of MIFPA until the child is ruled to be an Indian child under ICWA based on competent documentary evidence. Because this record shows that the district court, at a minimum, has reason to know that this child is an Indian child, the district court is required to treat the child as an Indian child until it is shown that she is not. 25 C.F.R. § 23.107(b)(2). Therefore, the district court's treatment of this child as an Indian child does not show that it is about to exercise unauthorized judicial power. As a result, this argument does not merit the extraordinary remedy of a writ of prohibition.

Foster parents seek a writ of mandamus to compel the district court to address their motion seeking an adoptive placement of the child in their home. A writ of mandamus is "an extraordinary legal remedy," *State v. Pero*, 590 N.W.2d 319, 323 (Minn. 1999), the issuance of which is discretionary with the court, *State v. Hart*, 723 N.W.2d 254, 260 (Minn. 2006). Generally, a writ of mandamus will issue only to compel the performance of a duty with respect to which a district court has no discretion, and a writ of mandamus will not issue in

7

any case where there is an adequate remedy in the ordinary course of law. *In re D.F. ex rel K.D.F.*, 828 N.W.2d 138, 140-41 (Minn. App. 2013). Because an adoption placement agreement has not been executed in this case, an adoptive placement of this child cannot be made at present. *See* Minn. Stat. § 260C.613, subd. 1(a). Therefore, granting a writ of mandamus to compel the district court to address foster parents' motion would compel the district court to deny or dismiss that motion. In these circumstances, foster parents are not prejudiced by the district court's reservation of their motion, and their argument is not a basis for a writ of mandamus. *See* Minn. R. Civ. P. 61 (requiring harmless error to be ignored).

Citing *Clark v. Clark*, 543 N.W.2d 685 (Minn. App. 1996) and other authorities dealing with stays pending appeal, foster parents challenge the district court's denial of their request to stay the child's preadoptive placement with her maternal grandmother pending the district court's ruling on their motion for an adoptive placement of the child. Because the current posture of this case involves a petition for extraordinary writs but not an actual appeal, we question the propriety of foster parents' motion to this court for a stay. We will, however, address the point.

Generally, a district court's decision regarding a stay pending appeal will not be altered by an appellate court absent an abuse of discretion. *State by Clark v. Robnan, Inc.*, 259 Minn. 88, 90, 107 N.W.2d 51, 53 (1960); *DRJ, Inc. v. City of St. Paul*, 741 N.W.2d 141, 144 (Minn. App. 2007). Custody decisions generally take effect on the date specified by the district court. *Petersen v. Petersen*, 296 Minn. 147, 149, 206 N.W.2d 658, 659-60 (1973); *see* Minn. R. Civ. App. P. 108.01-.02 (addressing stays pending appeal, generally).

8

An exception to *Petersen*'s general rule regarding the effective date of custody decisions may be invoked if (1) the custody determination will result in major changes in the child's living arrangements, and (2) there are no exigent circumstances requiring an immediate change in the child's placement. *See Clark*, 543 N.W.2d at 687.

Foster parents' motion does not address *Petersen*'s general rule, and this case is factually distinguishable from *Clark*. *Clark* involved a change in the custody of a 12-year old child requiring that child, four days after the district court's order, to move from "stable, but unsatisfactory living circumstances" in Minnesota with mother to the island of Sardinia with father, despite father's lack of an established home on Sardinia, and his inability to tell the district court whether the child would attend school on Sardinia or 150 miles away, in Italy. *See id.* at 686-87. Here, unlike *Clark*, there is no uncertainty about where the child will live and where she will go to school. Further, the child's placement and progress toward adoption is subject to statutorily-required periodic review by the district court. Minn. Stat. § 260C.607, subd. 1 (2016). Thus, whatever changes occur in this child's life due to the transfer, those changes will be much less dramatic than those in *Clark*, and much more amenable to monitoring, and prompt alteration if necessary, by the district court. Further, the exigent circumstances prong of *Clark* is also unsatisfied: Under ICWA and the Guidelines, this child currently must be treated as an Indian child subject to the preadoptive placement preferences, and the district court found foster parents did not refute those preferences. Foster parents have not shown that the district court abused its discretion by denying their motion for a stay.

9

**IT IS HEREBY ORDERED:**

1.    The petition for prohibition is denied.

2.    The petition for mandamus is denied.

3.    The motion to stay the transfer of the child pending resolution of petitioners'

motion for and adoptive placement of the child, is denied.

**Dated:**  April 20, 2018

BY THE COURT

Michelle A. Larkin
Presiding Judge

10

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| CHAD EVERET BRACKEEN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES OF AMERICA, et al., <br><br> Defendants, <br><br> CHEROKEE NATION, et al., <br><br> Intervenor-Defendants. | Civil Action No. 4:17-cv-868-O |

**DECLARATION OF JENNIFER KAY BRACKEEN**

I, Jennifer Kay Brackeen, hereby declare that the following is true and correct, to the best of my knowledge.

1.      My husband Chad and I are the adoptive parents of A.L.M., a two-year-old boy who has lived with us since June 2016, when he was ten months old.

2.      My husband and I have been married for twelve years and, in addition to A.L.M., we are the parents of two biological children who are nine and six.  Neither my husband nor I am descended from a member of an Indian Tribe or eligible for membership in a federally recognized Tribe.

3.      A.L.M. was born to an unmarried couple in New Mexico in the fall of 2015. A.L.M.'s mother is an enrolled member of the Navajo Nation and his father is an enrolled member of the Cherokee Nation.  A.L.M.'s mother left the Navajo reservation when she was 24 years old and established her residence outside the reservation.  Seven years later, while pregnant with A.L.M., she returned to the reservation and gave birth to A.L.M.

4.      Two days after A.L.M.'s birth, his birth mother relocated to Texas and took A.L.M. with her to live with A.L.M.'s paternal grandmother.  Neither A.L.M. nor his biological parents were domiciled on a reservation during his life nor, excepting the day he was born and the next day, did they live on the reservation.

5.      A.L.M. was removed from his grandmother's home by the Texas Department of Family and Protective Services in June 2016, when he was ten months old.  Because A.L.M's parents are enrolled members of recognized tribes, Texas DFPS notified both Tribes that A.L.M. was being placed in foster care.  Neither Tribe offered a foster placement to A.L.M. and he was placed with my husband and me.

6.      In May 2017, after we had cared for A.L.M. for nearly a year, his biological parents agreed that we should be able to adopt A.L.M. and voluntarily terminated their parental rights to allow us to petition for his adoption.  A.L.M.'s biological parents have remained in Texas and reside near our home.  A.L.M. has been able to remain in contact with his paternal grandparents, who were his primary caregivers for the first ten months of his life.  My husband and I have taken A.L.M. to visit his grandparents in Stillwater, Oklahoma, where they recently moved, and have visited the Cherokee Heritage Center with him.  We have also kept A.L.M. in touch with his paternal biological cousins, who live nearby in Fort Worth, and we intend to continue fostering A.L.M.'s relationships with his biological cousins and paternal grandparents.

7.      After A.L.M.'s biological parents voluntarily terminated their parental rights and indicated their support for our adoption, the Navajo Nation wrote to the family court overseeing the proceedings to suggest A.L.M. should be removed from our home and relocated to live with members of the Tribe to whom he was not related in New Mexico.  This removal would have

2

separated A.L.M. from the only home he knew, where he had lived for more than half of his life, and would also have removed him from contact with his biological family.

8.     In July 2017, after we became eligible to seek to adopt A.L.M., my husband and I filed a petition to adopt him.  A.L.M.'s biological parents and his paternal grandmother supported our petition.  Once again, the court notified the Cherokee and Navajo Nations of the proceedings. Neither the alleged foster family identified by the Navajo Nation nor the Navajo Nation sought to participate in the Texas court proceeding or sought to adopt A.L.M.

9.     On August 1, 2017, the Texas family court held a hearing regarding our petition to adopt A.L.M.  A.L.M.'s biological father testified at the hearing that my husband and I are the only parents A.L.M. knows and that he supported our adoption.  A.L.M.'s biological mother testified that A.L.M. loves us and should be adopted by us.  A.L.M.'s paternal grandmother also testified that A.L.M. loves us and should be adopted by us.  A.L.M.'s guardian ad litem recommended that A.L.M. remain with us.

10.     We also offered testimony at the hearing from a child psychologist, who is an attachment expert and who testified that A.L.M. had grown attached to us and would be psychologically injured by removal from our home.

11.     On the day of the hearing on our adoption petition, representatives of the Cherokee and Navajo Nations appeared and, as the Navajo Nation's social worker later testified, reached an agreement in the hallway outside the hearing room that A.L.M. would become a member of the Navajo Nation because only the Navajo had identified a potential foster placement.

12.     Texas DFPS did not contest that we were appropriate adoptive parents for A.L.M. Instead, Texas DFPS argued that we had not shown good cause to depart from ICWA's preferences and that we had not satisfied the clear-and-convincing evidence standard.

3

13.     The Texas court denied our petition to adopt A.L.M. and, although acknowledging that we were the only party seeking to adopt A.L.M., held that ICWA's placement preferences governed the proceedings.  The court held that we had not met our burden under ICWA and the related regulations to show good cause to depart from the adoptive preferences.  We immediately appealed.

14.     After the court ruled against our adoption petition, Texas DFPS stated that they intended to remove A.L.M. from our home immediately and place him in foster care on the reservation in New Mexico.  We sought an emergency order from the Texas appellate court blocking Texas DFPS from removing A.L.M. before our appeal was considered.  After we made this filing, Texas DFPS informed us, via text message, that A.L.M. would be removed from our custody three days later at 6:30 am.  Before Texas DFPS could remove A.L.M., the Texas appellate court granted our emergency petition for a stay pending our appeal.

15.     We filed this lawsuit while our appeal was pending before the Texas appellate court.  Texas DFPS then informed us that the Navajo couple previously identified as a potential foster placement for A.L.M. was no longer a viable placement and that no other placements were available for A.L.M.  Based on these developments, Texas DFPS, A.L.M.'s guardian ad litem, and my husband and I entered into a settlement agreement.  The settlement specified that, because we were the only individuals seeking to adopt A.L.M., ICWA's placement preferences did not apply.  The settlement also specified that, even if the preferences did apply, we had demonstrated good cause to depart from them.

16.     Based on the settlement agreement, the appellate court sent the case back to the trial court and we were able to successfully petition for adoption of A.L.M.  Our adoption of A.L.M. was finalized on January 8, 2018.

17.     Prior to our experience with A.L.M., my husband and I intended to foster and adopt other children in the future.  But we are reluctant to place ourselves or our potential future foster and adoptive children in a position where we will be unexpectedly separated from them because they are not of the same race as us.  The Tribes' efforts to force A.L.M.'s removal from our home more than a year after we had taken him in caused serious emotional and psychological harm to both A.L.M. and us.  Had the Tribes been successful in removing him, the harm would likely have been much more severe.  While we hope to provide a loving and supportive home to other children in need in the future, we do not wish to relive the experience of racial discrimination that we and A.L.M. suffered.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on:  April 25, 2018

_____
Jennifer Kay Brackeen

# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

|  |  |
|---|---|
| CHAD EVERET BRACKEEN, et al., | |
| Plaintiffs, | |
| v. | |
| UNITED STATES OF AMERICA, et al., | Civil Action No. 4:17-cv-868-O |
| Defendants, | |
| CHEROKEE NATION, et al., | |
| Intervenor-Defendants. | |

## DECLARATION OF HEATHER LYNN LIBRETTI

I, Heather Lynn Libretti, hereby declare that the following is true and correct, to the best of my knowledge.

1.      I live in Sparks, Nevada, with my husband Nick. Nick is a veteran and currently employed as an auto-mechanic. I am a marketing and public relations manager for the largest nostalgic and classic car festival in the world.

2.      My husband and I are active in service to our community. In 2009 we became foster-to-adopt parents, and in 2012 finalized our adoption of, two young boys. Their older brother, who was 19 at the time, joined our family in 2014 and has become a third son to us. Our sons live with us and, along with their brother, are a central part of our family.

3.      Neither Nick nor I am of Indian descent, nor are we eligible for membership in any federally recognized Indian Tribe.

4.     Baby O. was born in Nevada in March 2016.  Before Baby O.'s birth, her birth mother, Gracie Hernandez, determined that she would not be able to care for Baby O. and decided to put her up for adoption.  She informed Renown Regional Medical Center of her decision. The Medical Center connected Gracie with Washoe County Human Services Agency, which arranged to place Baby O. for adoption.

5.     We were overjoyed to bring Baby O. into our home.  We first met Baby O. in the hospital two days after her birth.  We were able to take her home with us on the third day after her birth.

6.     Because of complications during her mother's pregnancy, Baby O. has serious medical needs.  She has already required two surgeries and has another scheduled for later this summer.  She has also had one extended hospital stay in the two years since her birth.  Her needs continue to be ongoing.  We have arranged all of her treatments with providers including her pediatrician, two pulmonary specialists, an ear, nose and throat specialist, an allergist, a gastrologist, and a neurologist in addition to a psychiatrist to assist with her anxiety and behavioral disorders and three therapists (occupational, developmental, and speech) to assist with her delays. These providers are all here in Nevada.  We have played an active and intricate role in managing her complex care throughout her life.

7.     Baby O.'s biological father, E.R.G., has not played a part in her life.  Through his attorney, he has indicated that he supports Gracie's decision to place Baby O. for adoption and that he supports our adoption of Baby O.

8.     We began the process necessary for us to adopt Baby O. shortly after her birth more than two years ago.  We are listed with the County as foster-to-adopt parents, which means

2

that the County would place a child with us only if we would be able to adopt and provide a permanent home for the child.

9.      One month after Baby O. was born, we were contacted by the County and learned that E.R.G. wanted a paternity test to prove that he was not Baby O.'s biological father. The test showed that he was Baby O.'s father.

10.     On May 16, 2016, County officials came to our home and told us that Baby O. could no longer stay with us. They took her from her family and placed her in foster care. Later that month, Baby O.'s pediatrician observed that there was a decline in her progress during her time in foster care.

11.     On June 1, 2016, after extensive negotiations with County and city officials, the County agreed to return Baby O. to our home. At this point, Baby O. was just over three months old and had been taken from her home for more than two weeks.

12.     On June 16, 2016, County officials brought E.R.G. to meet Baby O. This one visit is the only contact Baby O. has ever had with her biological father.

13.     The following day, Gracie, Baby O.'s biological mother, contacted us to assure us that she wanted us to adopt Baby O. and to offer her support in any way she could help. We have remained in touch with Gracie since then. Gracie lives in Reno, Nevada, approximately a twenty-minute drive from our home in Sparks. Baby O.'s biological siblings live with Gracie. Beginning in the fall of 2017, we have brought Baby O. to visit with Gracie and with her biological siblings on many occasions. Baby O. has also met Gracie's family members, including Baby O.'s biological aunts and uncles. Gracie and Baby O.'s biological siblings remain an important part of Baby O.'s life. We have entered into a voluntary post-adoption agreement plan with Gracie that will allow Baby O. to remain in contact with her biological family.

3

14.     After Baby O. was returned to us, we learned that the Ysleta del sur Pueblo Tribe, of which E.R.G.'s mother is a registered member, has intervened in these proceedings to block our adoption of Baby O. The Tribe has asserted that E.R.G. is a member of the Tribe and, without our consent or the consent of Baby O.'s biological mother, the Tribe claims to have registered Baby O. as a member of the Tribe. The Tribe has sought to remove Baby O. from our care in order to transport her to the reservation in Texas.

15.     The Tribe also asserted its rights under ICWA to require Washoe County Human Services Agency officials to make an exhaustive search of Tribal members before contemplating placing Baby O. for adoption with us. The Tribe submitted more than forty members as potential placements and insisted that the County's Human Services Agency mail out fostering connection letters and complete home studies with each responsive potential placement. Nevada officials completed nearly ten home studies, but most of the potential placements withdrew from consideration or were determined to be unfit placements. None of the Tribe's identified individuals sought to adopt Baby O. and none seeks foster custody over Baby O. Nick and I are the only people seeking to adopt Baby O.

16.     After we joined this lawsuit and began to challenge the constitutionality of ICWA, the Ysleta del sur Pueblo Tribe agreed to enter into discussions to settle Baby O.'s adoption. Because of the Tribe's ability to delay and possibly derail the adoption proceeding under ICWA, we are eager to enter into a settlement that would allow us to adopt Baby O. As part of the settlement agreement that we negotiated with the Tribe, the Tribe has agreed not to contest our adoption of Baby O. We have agreed to continue to educate Baby O. about her father's cultural heritage and we have agreed to make visits to the Tribe's Reservation every three years during her childhood. These visits will be a financial burden on my husband and me.

4

17.     Once the Court has reviewed our agreement with the Tribe, we anticipate that we will be able to move forward with adopting Baby O. As soon as we are able, we will formally petition for Baby O.'s adoption.

18.     In addition to the anguish these delays have caused us, the threat to our adoption of Baby O. has also emotionally impacted our other children. Because of our experience with Baby O.'s adoption, our sons now fear that they could also be unexpectedly taken away from us. These disruptions and delays, including Baby O.'s removal from our home, have destabilized and distressed our entire family.

19.     My husband and I intend to provide foster care for, and possibly adopt, other children in the future. Prior to taking in Baby O., we have adopted two sons and lovingly accepted our sons' biological older brother into our family. Providing a home and a loving family to children in need has been one of the great joys of our lives together. But our experience with Baby O.'s adoption gives us great concern. We are concerned that we will encounter the same discriminatory experience with a future adoptive child that we have encountered with Baby O. Prior to our experience with Baby O., my husband and I intended to foster and adopt other children in the future. But we are reluctant to place ourselves or our potential future foster and adoptive children in a position where we will be unexpectedly separated from them because they are not of the same race as us.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: April 25, 2018

Heather Lynn Libretti

5

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

CHAD EVERET BRACKEEN, et al.,

        Plaintiffs,

v.

UNITED STATES OF AMERICA, et al.,

        Defendants,

CHEROKEE NATION, et al.,

        Intervenor-Defendants.

Civil Action No. 4:17-cv-868-O

## DECLARATION OF ALTAGRACIA SOCORRO HERNANDEZ

I, Altagracia Socorro Hernandez, hereby declare that the following is true and correct, to the best of my knowledge.

1.     I live in Reno, Nevada, with my children. I live near the Libretti family and am in frequent contact with the Librettis and with Baby O.

2.     Baby O. is my biological daughter. She was born in Nevada in March 2016.

3.     For more than a decade, I was in a relationship with E.R.G., Baby O.'s biological father. We have never been married.

4.     While I was pregnant with Baby O., I decided that I would not be able provide for her as I would have liked. When I delivered Baby O., I decided to place her for adoption. I spoke with the county's Social Services, and decided to surrender Baby O. for adoption placement.

5. Several months after Baby O. was born, I learned that E.R.G., Baby O.'s biological father, had been in contact with Social Services to contest my designation of him as Baby O.'s father. After he was determined to be Baby O.'s father, I learned that the Ysleta del Sur Pueblo Tribe planned to contest the adoption. To my knowledge, E.R.G. was not a member of the Tribe during our relationship or when Baby O. was born and has never lived on the reservation nor has he ever been to Texas. But E.R.G.'s mother is a member of the Tribe.

6. When the Tribe became involved, I learned that Social Services had removed Baby O. from the Librettis' home and planned to place Baby O. in a different home. When I learned that the Tribe intended to oppose Baby O.'s adoption, I connected with the Librettis to tell them that I would support them in any way that I could. I saw that Baby O. had found a home with the Librettis and that having the Librettis adopt Baby O. would be in her best interests.

7. Because I live in Reno, about twenty minutes from the Librettis, Baby O. has been able to visit with me and with her biological siblings. Baby O.'s biological siblings and I remain an important part of Baby O.'s life. The Librettis have agreed to a post-adoption plan that will ensure that Baby O. stays in touch with her biological family.

8. Baby O.'s biological father, E.R.G., has not played a part in her life. He did not support me during my pregnancy and has never played a role in Baby O.'s care. E.R.G. has made contact with me in person and left a voicemail on my phone indicating his support for the Librettis to proceed with the adoption of Baby O. Through his attorney, he has also indicated that he supports my decision to place Baby O. for adoption and that he supports the Librettis' adoption of Baby O.

9.     Baby O. has significant medical needs.  The Librettis have ensured that these needs are met and have worked with all of Baby O.'s doctors and therapists to ensure she is constantly provided with the care that she needs.  I do not believe that Baby O. would receive a similar level of care if she were sent to live with a foster family on the reservation in Texas.  Out of concern for Baby O.'s medical and emotional needs, I strongly oppose any effort to relocate her away from the Librettis or out of Nevada to a strange place to live with people she has never met and who have no experience with the level of care that she requires.

10.    When the Librettis petition to adopt Baby O., I will fully support their efforts.  The Librettis have loved Baby O. as their own daughter and have lovingly welcomed her into their family.  I believe being adopted by the Librettis is in Baby O.'s best interests.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: April 25, 2018

Altagracia Socorro Hernandez

# EXHIBIT 5

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| CHAD EVERET BRACKEEN, et al.,<br><br>      Plaintiffs,<br><br>  v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>      Defendants,<br><br>CHEROKEE NATION, et al.,<br><br>      Intervenor-Defendants. | Civil Action No. 4:17-cv-868-O |

**DECLARATION OF REBEKAH PERRY RICKETTS**

I, Rebekah Perry Ricketts, hereby declare as follows:

1.     I am an associate with the law firm of Gibson, Dunn & Crutcher, LLP, and am counsel to the Individual Plaintiffs. I am a member in good standing of the Bar of this Court.

2.     Attached hereto are true and accurate copies of the following materials which are relevant to the issues in this motion.

| Attachment | Description |
|---|---|
| 1 | Order Denying Request for Managing Conservatorship, *In the Interest of A.L.M.*, No. 323-105593-17 (323rd Dist. Ct., Tarrant Cty. Texas Aug. 1, 2017) |
| 2 | Order Denying Request For Adoption, *In the Interest of A.L.M.*, No. 323-105593-17 (323rd Dist. Ct., Tarrant Cty. Texas Aug. 22, 2017) |
| 3 | *In the Interest of A.L.M.*, Settlement Agreement (Nov. 13, 2017) |

Executed on: April 26, 2018

                                        */s/ Rebekah Ricketts*
                                        Rebekah Ricketts

# ATTACHMENT 1

*NO. 323-103401-16*

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *IN THE DISTRICT COURT* |
| | § | |
| A▇▇▇ L▇ M▇▇▇▇▇, | § | *323RD JUDICIAL DISTRICT* |
| | § | |
| *CHILD* | § | *TARRANT COUNTY, TEXAS* |

### ORDER DENYING REQUEST FOR MANAGING CONSERVATORSHIP

On August 1, 2017, this matter came to be heard.

**1.  Appearances**

Petitioners, by CHAD EVERET BRACKEEN and JENNIFER KAY BRACKEEN, appeared in person and through their attorney of record, KELLYE HUGHES.

Respondent, TEXAS DEPARTMENT OF FAMILY & PROTECTIVE SERVICES (TDFPS) appeared in person through their representative KENDRA KINGSBERRY and through their attorney of record, CINDY WILLIAMS, ASSISTANT CRIMINAL DISTRICT ATTORNEY FOR TARRANT COUNTY, TEXAS.

The Attorney/Guardian Ad Litem for the child, JOHN ECK appeared in person.

Intervenor, the CHEROKEE NATION appeared through their representative, KRISTY CRADDOCK.

**2.  Jurisdiction**

This court is the court of continuing jurisdiction and has jurisdiction to hear this matter.

**3.  Record**

A record was made by the official court reporter for the 323rd Judicial District Court.

**4.  Child Before the Court**

The child before the court is:

A▇▇▇ L▇ M▇▇▇▇▇, a male child born on August▇ 2015.

**5.  Findings**

The Court finds that the child the subject of this litigation is free for adoption as parental rights have been terminated. The court further finds that 25 USC §1915 (a) is applicable and that Petitioners did not meet their burden under 25 CFR § 23.132 in that Petitioners did not



show good cause to depart from the Indian Child Welfare Act Preferences.

**6.   Controlling Tribe**

The Court finds and so orders that pursuant to 25 CFR § 23.109, the controlling tribe before the court shall be the Navajo Nation.

**7.   Order**

IT IS THEREFORE ORDERED that the requested relief by Petitioners is hereby denied.

SIGNED this _____22_____ day of _____august_____, 2016.


JUDGE PRESIDING

APPROVED AS TO FORM ONLY:


KELLYE HUGHES
State Bar No. 00792864
3615-C W. Pioneer Parkway
Pantego, Texas 76013
PH: (817) 465-4664
FAX: (817) 549-8953
Kellye.Hughes@yahoo.com

Attorney for Intervenors


CINDY WILLIAMS
State Bar No. 00798584
Asst. Criminal District Attorney
2700 Ben Avenue
Ft. Worth, Texas 76103
PH: (817) 255-8734
Cindy.Williams@dfps.state.tx.us

Attorney for Petitioner


JOHN ECK
State Bar No. 0092480
933 W. Weatherford
Ft. Worth, Texas 76102
PH: (817) 336-7577
FAX: (817) 336-7583
eckjt@flash.net

Attorney/Guardian Ad Litem


KRISTY CRADDOCK, Representative
CHEROKEE NATION


A CERTIFIED COPY
ATTEST: 8.22.17
THOMAS A. WILDER
DISTRICT CLERK
TARRANT COUNTY, TEXAS
BY: Kelly Csizmazia
DEPUTY
Kelly Csizmazia
PAGE 2

show good cause to depart from the Indian Child Welfare Act Preferences.

**6.    Controlling Tribe**

The Court finds and so orders that pursuant to 25 CFR § 23.109, the controlling tribe before the court shall be the Navajo Nation.

**7.    Order**

IT IS THEREFORE ORDERED that the requested relief by Petitioners is hereby denied.

SIGNED this _____ day of _____, 2016.

<br>

JUDGE PRESIDING

APPROVED AS TO FORM ONLY:

JOHN ECK
State Bar No. 0092480
933 W. Weatherford
Ft. Worth, Texas 76102
PH: (817) 336-7577
FAX: (817) 336-7583
eckit@flash.net

**KELLYE HUGHES**
State Bar No. 00792864
3615-C W. Pioneer Parkway
Pantego, Texas 76013
PH: (817) 465-4664
FAX: (817) 549-8953
Kellye.Hughes@yahoo.com

Attorney/Guardian Ad Litem

Attorney for Intervenors

**CINDY WILLIAMS**
State Bar No. 00798584
Asst. Criminal District Attorney
2700 Ben Avenue
Ft. Worth, Texas 76103
PH: (817) 255-8734
Cindy.Williams@dfps.state.tx.us

**KRISTY CRADDOCK**, Representative
**CHEROKEE NATION**

Attorney for Petitioner



App. 80

show good cause to depart from the Indian Child Welfare Act Preferences.

## 6. Controlling Tribe

The Court finds and so orders that pursuant to 25 CFR § 23.109, the controlling tribe before the court shall be the Navajo Nation.

## 7. Order

IT IS THEREFORE ORDERED that the requested relief by Petitioners is hereby denied.

SIGNED this _____ day of _____, 2016.

_____
JUDGE PRESIDING

APPROVED AS TO FORM ONLY:

JOHN ECK
State Bar No. 0092480
933 W. Weatherford
Ft. Worth, Texas 76102
PH: (817) 336-7577
FAX: (817) 336-7583
eckjt@flash.net

_____
KELLYE HUGHES
State Bar No. 00792864
3615-C W. Pioneer Parkway
Pantego, Texas 76013
PH: (817) 465-4664
FAX: (817) 549-8953
Kellye.Hughes@yahoo.com

Attorney for Intervenors

Attorney/Guardian Ad Litem

_____
CINDY WILLIAMS
State Bar No. 00798584
Asst. Criminal District Attorney
2700 Ben Avenue
Ft. Worth, Texas 76103
PH: (817) 255-8734
Cindy.Williams@dfps.state.tx.us

KRISTY CRADDOCK, Representative
CHEROKEE NATION Crawford

Attorney for Petitioner

App. 81

# ATTACHMENT 2

**NO. 323-105593-17**

| IN THE INTEREST OF | § | IN THE DISTRICT COURT |
|---|---|---|
| A███ L█ M███████, | § | 323RD JUDICIAL DISTRICT |
| | § | |
| CHILD | § | TARRANT COUNTY, TEXAS |

### ORDER DENYING REQUEST FOR ADOPTION OF CHILD

On August 21, 2017, this matter came to be heard.

**1. Appearances**

Petitioners, CHAD EVERET BRACKEEN and JENNIFER KAY BRACKEEN, appeared in person and through their attorney of record, KELLYE HUGHES.

Respondent, TEXAS DEPARTMENT OF FAMILY & PROTECTIVE SERVICES (TDFPS) appeared in person through their representative KENDRA KINGSBERRY and through their attorney of record, CINDY WILLIAMS, ASSISTANT CRIMINAL DISTRICT ATTORNEY FOR TARRANT COUNTY, TEXAS.

The Attorney/Guardian Ad Litem for the child, JOHN ECK appeared in person.

**2. Jurisdiction**

This court is the court of continuing jurisdiction and has jurisdiction to hear this matter.

**3. Record**

A record was made by the official court reporter for the 323rd Judicial District Court.

**4. Child Before the Court**

The child before the court is:

A███ L█ M███████, a male child born on August█ 2015.

**5. Findings**

The Court finds that Petitioners filed as exhibits the documents necessary in an adoption proceeding including their home-study, criminal history report, and DFPS report. The court finds that the subject child has been in the continuous possession of Petitioners for a period of more than six months. The Court finds that the child the subject of this litigation is free for adoption as

ORDER DENYING ADOPTION



parental rights have been terminated.

The Court finds that TDFPS had good cause to not consent to the adoption of the child by Petitioners because the Court finds that 25 USC § 1915(a) preferences are applicable. The Court finds that, even though Petitioners are the only party before the Court seeking adoption, that preference shall be given to other members of the child's tribe and that members of the child's tribe came to court and testified asking for placement of the child.

The court further finds that since 25 USC §1915 (a) applied, Petitioners did not meet their burden under 25 CFR § 23.132 in that Petitioners did not show good cause to depart from the Indian Child Welfare Act Preferences.

The court further rejects the argument of Petitioners that TDFPS withheld consent to adopt the child without good cause under Texas Family Code § 162.010.

**6.     Controlling Tribe**

The Court finds and so orders that per 25 CFR § 23.109, the controlling tribe before the court shall be the Navajo Nation.

**7.     Order**

IT IS THEREFORE ORDERED that the adoption of the child by Petitioners is hereby denied.

SIGNED this ____22____ day of ____august____, 2017.

JUDGE PRESIDING

A CERTIFIED COPY
ATTEST: _8 22 17_
THOMAS A. WILDER
DISTRICT CLERK
TARRANT COUNTY, TEXAS
BY: _____
DEPUTY

Kelly Csizmazia

ORDER DENYING ADOPTION                                                                          PAGE 2

App. 84

APPROVED AS TO FORM ONLY:

KELLYE HUGHES
State Bar No. 00792864
3615-C W. Pioneer Parkway
Pantego, Texas 76013
PH: (817) 465-4664
FAX: (817) 549-8953
Kellye.Hughes@yahoo.com
Attorney for Intervenors

CINDY WILLIAMS
State Bar No. 00798584
Asst. Criminal District Attorney
2700 Ben Avenue
Ft. Worth, Texas 76103
PH: (817) 255-8734
Cindy.Williams@dfps.state.tx.us
Attorney for Petitioner


JOHN ECK
State Bar No. 0092480
933 W. Weatherford
Ft. Worth, Texas 76102
PH: (817) 336-7577
FAX: (817) 336-7583
eckjt@flash.net
Attorney/Guardian Ad Litem

APPROVED AS TO FORM ONLY:

Page 3

**KELLYE HUGHES**
State Bar No. 00792864
3615-C W. Pioneer Parkway
Pantego, Texas 76013
PH: (817) 465-4664
FAX: (817) 549-8953
Kellye.Hughes@yahoo.com
Attorney for Intervenors

**CINDY WILLIAMS**
State Bar No. 00798584
Asst. Criminal District Attorney
2700 Ben Avenue
Ft. Worth, Texas 76103
PH: (817) 255-8734
Cindy.Williams@dfps.state.tx.us
Attorney for Petitioner

**JOHN ECK**
State Bar No. 0092480
933 W. Weatherford
Ft. Worth, Texas 76102
PH: (817) 336-7577
FAX: (817) 336-7583
eckit@flash.net
Attorney/Guardian Ad Litem

App. 86

# ATTACHMENT 3

*In the Interest of A.L.M., a Child*

Nos. 323-105593-17 & 323-103401-16
(323rd District Court of Tarrant County, Texas)

Nos. 02-17-00298-CV & 02-17-00300-CV
(Court of Appeals for the Second Judicial District, Fort Worth, Texas)

### SETTLEMENT AGREEMENT

1.  This agreement is entered into by The Texas Department of Family and Protective Services ("DFPS"), through its attorney of record, Debra Windsor, Assistant Criminal District Attorney for Tarrant County, Texas; C▇ ▇ B▇ and J▇ K▇ B▇ ("the B▇s"), through their attorney of record, Rebekah Perry Ricketts; and the guardian ad litem for A▇ L▇ M▇ ("A.L.M."), John Eck (the "Guardian Ad Litem").

2.  DFPS, the B▇s, and the Guardian Ad Litem desire to achieve permanency for A.L.M. through adoption without undue delay.

3.  There has been a material change in circumstances since the trial court denied the B▇s' petitions to adopt A.L.M. and modify the managing conservatorship on August 22, 2017.

4.  The Navajo Nation and the Cherokee Nation have now advised DFPS that R▇ G▇ and T▇ H▇, who were previously identified as an alternative adoptive placement for A.L.M., are no longer an available adoptive home for A.L.M. The Navajo Nation and the Cherokee Nation have further advised DFPS that they do not have a viable adoptive placement for A.L.M.

5.  Accordingly, the B▇s are now the only party seeking to adopt A.L.M.

6.  DFPS, the B▇s, and the Guardian Ad Litem agree there is no alternative adoptive placement, and that the placement preferences set forth in 25 U.S.C. § 1915(a) are therefore inapplicable to A.L.M.

7.  DFPS, the B▇s, and the Guardian Ad Litem further agree that, even if the placement preferences set forth in 25 U.S.C. § 1915(a) were applicable, there is good cause to depart from those placement preferences.

8.  The B⬛⬛⬛s agree to promptly renew their petition to adopt A.L.M. in the trial court.

9.  DFPS consents to the B⬛⬛⬛s' adoption of A.L.M.

10. The B⬛⬛⬛s, DFPS, and the Guardian Ad Litem further agree that each party shall bear its own costs.

Signed and agreed to this 13th day of November, 2017.

/s/ *Debra Windsor*
Debra Windsor
State Bar No. 00788692
Assistant Criminal District Attorney
401 W. Belknap St.
Fort Worth, Texas 76196-0201
Tel.: 817-884-1687
Fax: 817-884-1672
*coaappellatealerts@tarrantcountytx.gov*

*Counsel for Texas Department of Family and Protective Services*

/s/ *John Eck*
John Eck
State Bar No. 00792480
933 W. Weatherford
Ft. Worth, Texas 76102
Tel.: 817-336-7577
Fax: 817-336-7583
*eckjt@flash.net*

*Guardian Ad Litem*

/s/ *Rebekah Perry Ricketts*
Rebekah Perry Ricketts
State Bar No. 24074883
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Ave., Suite 1100
Dallas, Texas 75201
Tel.: 214-698-3100
Fax: 214-571-2976
*rricketts@gibsondunn.com*


*Counsel for C⬛⬛ and J⬛⬛ B⬛⬛*

*In the Interest of A.L.M., a Child*

Nos. 323-105593-17 & 323-103401-16
(323rd District Court of Tarrant County, Texas)

Nos. 02-17-00298-CV & 02-17-00300-CV
(Court of Appeals for the Second Judicial District, Fort Worth, Texas)

### SETTLEMENT AGREEMENT

1. This agreement is entered into by The Texas Department of Family and Protective Services ("DFPS"), through its attorney of record, Debra Windsor, Assistant Criminal District Attorney for Tarrant County, Texas; Chad Everet Brackeen and Jennifer Kay Brackeen ("the Brackeens"), through their attorney of record, Rebekah Perry Ricketts; and the guardian ad litem for Angel Lee Mancinas ("A.L.M."), John Eck (the "Guardian Ad Litem").

2. DFPS, the Brackeens, and the Guardian Ad Litem desire to achieve permanency for A.L.M. through adoption without undue delay.

3. There has been a material change in circumstances since the trial court denied the Brackeens' petitions to adopt A.L.M. and modify the managing conservatorship on August 22, 2017.

4. The Navajo Nation and the Cherokee Nation have now advised DFPS that Renee Goldtooth and Teddy Halwood, who were previously identified as an alternative adoptive placement for A.L.M., are no longer an available adoptive home for A.L.M.  The Navajo Nation and the Cherokee Nation have further advised DFPS that they do not have a viable adoptive placement for A.L.M.

5. Accordingly, the Brackeens are now the only party seeking to adopt A.L.M.

6. DFPS, the Brackeens, and the Guardian Ad Litem agree there is no alternative adoptive placement, and that the placement preferences set forth in 25 U.S.C. § 1915(a) are therefore inapplicable to A.L.M.

7. DFPS, the Brackeens, and the Guardian Ad Litem further agree that, even if the placement preferences set forth in 25 U.S.C. § 1915(a) were applicable, there is good cause to depart from those placement preferences.

8.   The Brackeens agree to promptly renew their petition to adopt A.L.M. in the trial court.

9.   DFPS consents to the Brackeens' adoption of A.L.M.

10.  The Brackeens, DFPS, and the Guardian Ad Litem further agree that each party shall bear its own costs.

Signed and agreed to this 13th day of November, 2017.

/s/ Debra Windsor
Debra Windsor
State Bar No. 00788692
Assistant Criminal District Attorney
401 W. Belknap St.
Fort Worth, Texas 76196-0201
Tel.: 817-884-1687
Fax: 817-884-1672
*coaappellatealerts@tarrantcountytx.gov*

*Counsel for Texas Department of Family and Protective Services*

/s/ John Eck
John Eck
State Bar No. 00792480
933 W. Weatherford
Ft. Worth, Texas 76102
Tel.: 817-336-7577
Fax: 817-336-7583
*eckjt@flash.net*

*Guardian Ad Litem*

/s/ Rebekah Perry Ricketts
Rebekah Perry Ricketts
State Bar No. 24074883
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Ave., Suite 1100
Dallas, Texas 75201
Tel.: 214-698-3100
Fax: 214-571-2976
*rricketts@gibsondunn.com*

*Counsel for Chad and Jennifer Brackeen*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on April 26, 2018, I filed the foregoing document using the Court's ECF system.  Service on all counsel of record for all parties was accomplished electronically using the Court's CM/ECF system.

/s/ *Matthew D. McGill*
Matthew D. McGill
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036