**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| CHAD EVERET BRACKEEN, et al., | |
| and | |
| STATE OF TEXAS, STATE OF LOUISIANA, and STATE OF INDIANA, | |
| Plaintiffs, | |
| v. | Case No. 4:17-cv-00868-O |
| RYAN ZINKE, in his official capacity as Secretary of the United States Department of the Interior, et al., | |
| Defendants, | |
| CHEROKEE NATION, et al., | |
| Intervenor-Defendants. | |

**REPLY BRIEF IN SUPPORT OF**
**STATE PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ...................................................................................................... 1

ARGUMENT .............................................................................................................. 2

I.     ICWA Unconstitutionally Commandeers States by Requiring State Agencies to Carry Out a Federal Program and State Courts to Apply Substantive Federal Rules of Decision in State Law Causes of Action. ........... 2

II.    ICWA Unconstitutionally Delegates Congressional Power to Tribes. .............. 7

III.   Congress Lacked Article I Power to Enact ICWA. ........................................... 9

     A.     The Treaty Clause did not authorize Congress to enact ICWA. ............ 9

     B.     ICWA exceeds Congress's Commerce Clause power. ............................ 10

          1.    ICWA regulates States, which requires application of the Interstate Commerce Clause. ........................................................ 10

          2.    Congress's power over Indian tribes is "not absolute." .................. 14

          3.    The Court's Commerce Clause jurisprudence has retreated from describing Congress's power as "plenary." ........................... 17

          4.    "Preconstitutional" federal powers did not authorize Congress to enact ICWA. ................................................................ 17

IV.   ICWA Violates the Equal Protection Clause and the Administrative Procedure Act. ................................................................................................ 18

CONCLUSION ......................................................................................................... 19

# TABLE OF AUTHORITIES

**Cases**                                                                                                **Page(s)**

*Adoptive Couple v. Baby Girl,*
    570 U.S. 637 (2013) ................................................................................ 12

*Arizona Public Service Co. v. EPA,*
    211 F.3d 1280 (D.C. Cir. 2000)................................................................ 7

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ..................................................................................... 16

*Bugenig v. Hoopa Valley Tribe,*
    266 F.3d 1201 (9th Cir. 2001) ................................................................. 7

*Cherokee Nation v. Georgia,*
    30 U.S. 1 (1831) ............................................................... 8, 11, 14–15

*Cotton Petroleum Corp. v. New Mexico,*
    490 U.S. 163 (1989) ................................................................................ 12

*Del. Tribal Bus. Comm. v. Weeks,*
    430 U.S. 73 (1977) ................................................... 14, 15, 16, 17

*Dick v. United States,*
    208 U.S. 340 (1908) ................................................................................ 17

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ................................................................................ 12

*Haddock v. Haddock,*
    201 U.S. 562 (1906) ................................................................................ 13

*Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.,*
    452 U.S. 264 (1981) ................................................................................. 3

*J.W. Hampton, Jr. & Co. v. United States,*
    276 U.S. 394 (1928) ................................................................................. 8

*The Kansas Indians,*
    72 U.S. 737, 755 (1866) ......................................................................... 15

*Marbury v. Madison,*
    5 U.S. 137 (1803) ..................................................................................... 18

*McClanahan v. State Tax Comm'n of Ariz.,*
411 U.S. 164 (1973) ................................................................................ 9–10, 14

*Mistretta v. United States,*
488 U.S. 361 (1989) ............................................................................................ 8

*Montana v. United States,*
450 U.S. 544 (1981) ............................................................................................ 7

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
138 S. Ct. 1461 (2018) .......................................................................... 2, 3, 5, 6

*Nat'l Fed. of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) ......................................................................... 11, 12, 16, 18

*New York v. United States,*
505 U.S. 144 (1992) ............................................................................................ 4

*Palmore v. Sidoti,*
466 U.S. 429 (1984) ............................................................................................ 1

*Printz v. United States,*
521 U.S. 898 (1997) ..................................................................................... 3, 11

*Rice v. Rehner,*
463 U.S. 713 (1983) ............................................................................................ 7

*Sosna v. Iowa,*
419 U.S. 393 (1975) ............................................................................................ 6

*Strate v. A-1 Contractors,*
520 U.S. 438 (1997) ............................................................................................ 7

*Testa v. Katt,*
330 U.S. 386 (1947) ............................................................................................ 3

*Texas v. United States,*
No. 7:15-cv-00151, 2018 WL 1478250 (N.D. Tex. Mar. 5, 2018)............................ 8

*United States v. 43 Gallons of Whiskey,*
93 U.S. 188 (1876) ........................................................................................... 15

*United States v. Alcea Band of Tillamooks,*
329 U.S. 40 (1946) (plurality opinion) ............................................................... 14

*United States v. Creek Nation,*
295 U.S. 103 (1935) ......................................................................................... 16

*United States v. Holliday,*
    70 U.S. 407 (1865) ........................................................................... 17

*United States v. Kagama,*
    118 U.S. 375 (1886) ......................................................................... 15

*United States v. Lara,*
    541 U.S. 193 (2004) ..................................................................*passim*

*United States v. Lopez,*
    514 U.S. 549 (1995) ........................................................ 11, 13, 14, 15

*United States v. Mazurie,*
    419 U.S. 544 (1975) ........................................................................... 7

*United States v. Morrison,*
    529 U.S. 598 (2000) .............................................................. 14, 15, 18

*United States v. Windsor,*
    570 U.S. 744 (2013) ......................................................................... 13

*Whitman v. Am. Trucking Ass'ns,*
    531 U.S. 457 (2001) ........................................................................... 8

## Constitutional Provisions

U.S. Const. amend. X ........................................................................... 11

U.S. Const. art. I, § 8 .......................................................................... 18

U.S. Const. art. II, § 2 ........................................................................... 9

## Statutes

8 U.S.C. § 1186a .................................................................................. 13

25 U.S.C. § 71 ...................................................................................... 10

25 U.S.C. § 1901 .................................................................................. 18

25 U.S.C. § 1903 .......................................................................... 11, 17

25 U.S.C. § 1914 .................................................................................... 5

25 U.S.C. § 1915 .............................................................................. 7, 19

28 U.S.C. § 3702 .................................................................................... 5

28 U.S.C. § 3703 ........................................................................................... 5

42 U.S.C. § 1382c ......................................................................................... 13

Ind. Code § 31-10-2-1 .................................................................................... 1

La. Child. Code art. 101 ................................................................................. 1

Tex. Fam. Code § 153.001 .............................................................................. 1

## Other Authorities

Gregory Ablavsky, *Beyond the Indian Commerce Clause*, 124 Yale L. J. 1012, 1037 (2015) .......................................................................... 16

Helping Expedite and Advance Responsible Tribal Home Ownership Act, Pub. L. No. 112-151, § 2, 126 Stat. 1150–53 (2012) (codified at 25 U.S.C. § 415) .................................................................................................... 7

Report of Committee on Indian Affairs (Feb. 20, 1787) ............................ 12

The Federalist No. 42 (J. Madison) .............................................................. 12

## INTRODUCTION

"The State, of course, has a duty of the highest order to protect the interests of minor children, particularly those of tender years." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984). Texas, Louisiana, and Indiana, among their sister States, possess the duty and power to protect the welfare of children. *See* Tex. Fam. Code § 153.001(a) ("The public policy of [Texas] is to (1) assure that children will have frequent and continuing contact with parents who have shown the ability to act in the best interest of the child; [and] (2) provide a safe, stable, and nonviolent environment for the child."); La. Child. Code art. 101 (stating similar purposes); Ind. Code § 31-10-2-1 (stating similar purposes). The Federal Defendants and Tribes cannot escape the reality that the States regulate domestic affairs. The fact that Native Americans are involved does not vest the federal government with authority to invade State power.

Congress may have enacted the Indian Child Welfare Act and the Department of Interior may have issued the Final Rule with noble purposes—purportedly to act in the best interest of Indian children by keeping children with their families—but Congress and Interior abused their constitutionally enumerated powers in doing so, invaded the States' power over domestic relations of their citizens, and blindly, or willingly, imposed racial preferences that shock anyone of good sensibility. Whether ICWA and the Final Rule are good public policy or benchmarks for child custody proceedings is something left to the legislative decisions of the States, not the federal government. Congress may give Indian tribes power to adjudicate child custody matters occurring solely on tribal land, but ICWA and the Final Rule go much further.

ICWA and the Final Rule commandeer state power over domestic relations in violation of the Tenth Amendment to the Constitution by commanding state child welfare agencies to modify their regulations and actions to carry out a federal program, and by requiring state courts to regulate child custody proceedings based on state-law causes of action in a way dictated by the federal government. ICWA and

the Final Rule also require state agencies and courts to discriminate against potential foster care or adoptive parents based on their race in violation of the Constitution's guarantee of equal protection. Regardless of Congress's power to enact ICWA, the Court can and should strike down ICWA and the Final Rule on commandeering and equal protection grounds. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018) ("We have always understood that even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts.").

Aside from the invasion of state power and mandated racial discrimination, Congress also lacked the power under the Commerce Clause to enact ICWA, and the federal government exceeded its delegable authority by allowing Indian tribes to re-order the racial placement preferences in ICWA and the Final Rule. Finally, the Final Rule violates the Constitution's guarantee of equal protection and the Administrative Procedure Act in multiple ways as detailed in State Plaintiffs' opening brief and Individual Plaintiffs' briefs. The motions for summary judgment filed by State Plaintiffs and the Individual Plaintiffs should be granted.

## ARGUMENT

State Plaintiffs, the Federal Defendants, and the Tribes do not dispute the material facts relevant to final disposition of this matter. The only questions for the Court to resolve are whether ICWA and the Final Rule are lawful and constitutional. Accordingly, this case is ripe for summary judgment, and as explained below and in the Plaintiffs' briefs, it should be granted in favor of all Plaintiffs.

**I.  ICWA Unconstitutionally Commandeers States by Requiring State Agencies to Carry Out a Federal Program and State Courts to Apply Substantive Federal Rules of Decision in State Law Causes of Action.**

ICWA violates the anti-commandeering doctrine because it unconstitutionally regulates State agencies and courts responsible for child custody proceedings. The federal government may not commandeer state resources to carry out federal

programs. The Supreme Court's ruling in *Printz v. United States* makes this point clearly: "The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers . . . to administer or enforce a federal regulatory program." 521 U.S. 898, 935 (1997). And the Supreme Court, this term, reaffirmed this principle. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461 (2018). ICWA imposes affirmative duties on state officers, which unquestionably results in the expenditure of state funds. In fact, Defendants hardly explain why the duties on state agencies responsible for child custody does not violate anti-commandeering principles. And that ICWA's obligations are directed to state courts does nothing to change the nature of the commands, the effect of which is to turn state judicial officers into executive agents of the federal government. Our system of federalism allows States to implement a federal program, but it cannot require it. *See id.* at 1479 (discussing the appropriate balance of "cooperative federalism" in *Hodel v. Virginia Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264 (1981), where "States [were] not compelled to enforce the [federal] standards, to expend any state funds, or to participate in the federal regulatory program in any manner whatsoever"). ICWA requires the States to enforce a federal program and thus violates the Tenth Amendment's anti-commandeering principle.

The Federal Defendants and the Tribes completely ignore ICWA's massive impact on State agencies, which, at least in Texas, affects "every aspect" of the social work and legal cases. States' MSJ App.0016. Instead, they attempt to avoid the clear holdings of *New York, Printz,* and now *Murphy* by characterizing ICWA as a mandate to state courts to enforce a federal law. They argue that ICWA is a constitutional exercise of the federal government's authority to require State courts to adjudicate federal issues and follow federally mandated procedures. Indeed, the Supreme Court in *Testa v. Katt* held that a State court may not refuse to hear a federal claim when it would ordinarily hear similar state-law claims. 330 U.S. 386, 394 (1947). So, while

the federal government may grant state courts concurrent jurisdiction to hear federal claims from which state courts may not abstain, that is not what the federal government did by enacting ICWA.

In *New York v. United States*, the Supreme Court noted an important difference between the type of legislation in *Testa* (which the Court found to be a constitutional application of the Supremacy Clause) and the legislation in *New York* (which the Court found to violate the anti-commandeering doctrine). 505 U.S. 144, 178–79 (1992). In *Testa*, the law at issue was a direct regulation of individuals, with a grant of jurisdiction for state courts to enforce the statutorily created rights; but in *New York*, the law was a congressional requirement that the States regulate in certain way. And this, Congress cannot do. *See New York*, 505 U.S. at 178–79 ("Federal statutes enforceable in state courts do, in a sense, direct state judges to enforce them, but this sort of federal "direction" of state judges is mandated by the text of the Supremacy Clause. No comparable constitutional provision authorizes Congress to command state legislatures to legislate.").

ICWA's requirements on state courts are like those in *New York*, and not *Testa*. They do not directly regulate individuals but issue requirements to State courts about how to conduct certain child custody proceedings. The portions of ICWA that the State Plaintiffs complain of are not "[f]ederal statutes enforceable in state courts." *New York,* 505 U.S. at 178–79. ICWA's requirements are federal mandates that a State, including its agencies responsible for child welfare, regulate the state-law child custody proceedings of Indian children in a certain way.

This important distinction is made evident in the Supreme Court's recent decision in *Murphy v. National Collegiate Athletic Association*. In that case, various sports leagues sought to enjoin the State of New Jersey from giving effect to a state law that partially repealed its prohibition on sports gambling. The only thing standing in New Jersey's way from repealing its previous laws on sports gambling

was the Professional and Amateur Sports Protection Act ("PASPA"). *Murphy*, 138 S. Ct. at 1473. That act made it unlawful for a State to "sponsor, operate, advertise, promote, license, or authority by law or compact . . . a lottery, sweepstakes, or other betting, gambling, or wagering scheme based . . . on" sports. 28 U.S.C. § 3702(1). Importantly, PASPA did not directly regulate individuals by making sports gambling a federal crime. *Murphy*, 138 S. Ct. at 1470.

After New Jersey passed its partial repeal of its prior sports-gambling prohibitions, the sports leagues sued to enjoin New Jersey, arguing that its repeal violated PASPA. *Id.* at 1473. New Jersey argued that PASPA violated the anti-commandeering doctrine and was thus unconstitutional; the Court of Appeals held that it was not unconstitutional because it did not require New Jersey to take any affirmative action. The Supreme Court reversed. In holding PASPA unconstitutional, the Supreme Court noted that the law could in no way be "understood as a regulation of private actors." *Id.* at 1481. The law did not confer any rights on private actors, but neither did it impose any restrictions. *Id.* Thus, the only way to understand PASPA is as a direct command to the States, and the anti-commandeering doctrine does not allow that. *Id.*

PASPA is much like ICWA in this regard. ICWA does not regulate private individuals.[1] The only thing that ICWA does is "issue orders directly to the States." *Id.* at 1475. State agencies and courts must then conduct child custody cases—both before, during, and after litigation—for Indian children in a particular way "only because [they have] been commanded to do so by Congress." *Id.* at 1477. This imposes a financial burden on the States, and its blurs responsibility for ICWA's effects

---

[1] Although section 1914 of ICWA creates a cause of action in a "court of competent jurisdiction," the action is one "to invalidate" state action in violation of ICWA's commands to States in sections 1911, 1912, and 1913. 25 U.S.C. § 1914. PASPA similarly allowed private entities to sue in federal court to enjoin violations of PASPA's substantive commands to States, *see* 28 U.S.C. § 3703, but that did not change the Supreme Court's finding that it violated the anti-commandeering doctrine. In ICWA, as in PASPA, the private right of action exists to enforce the federal command to the States.

between the States and federal government, which the anti-commandeering doctrine seeks to prevent. *Id.* Thus, ICWA violates the anti-commandeering doctrine.

Contrary to Defendants' arguments, ICWA's commands to state courts is not just a command to enforce federal law as they would similar state laws. This is highlighted by the fact that ICWA does not even create federal jurisdiction of the child custody matters it regulates, as there is no federal jurisdiction over domestic relations cases. *Sosna v. Iowa*, 419 U.S. 393, 408–09 (1975). What ICWA does do is change the governing law in state-law causes of action, and the federal government may not do that.

That ICWA violates the anti-commandeering doctrine can easily be seen by reimagining the *Murphy* decision. In that case, the Supreme Court held that PASPA, which prohibited the States from repealing certain anti-gambling laws, violated the anti-commandeering doctrine. But what if instead, Congress had simply passed a law that required state courts, in any state-law nuisance actions against gambling establishments, to enjoin the state laws that legalized sports gambling? The effect would be the same as with PASPA: States would be effectively unable to repeal their prohibitions on gambling due to a federal statute. However, this new and imagined statute would not be an order to state executives or legislators, but to state courts. It would take a state-law cause of action (public nuisance) and change its rules of decision. Under Defendants' reasoning, this new law would be constitutional. But that cannot be the case.

But that is exactly what ICWA attempts to do. ICWA requires state courts to act in a particular way (in order to achieve the federal law's desired regulatory outcome) by regulating the States' child welfare agencies and child custody proceedings. If the federal government wants to achieve ICWA's goals, it must do so by directly regulating individuals by conferring rights or imposing restrictions on them. But Congress cannot do it by mandating federal standards in state-law causes

of action. The federal government may regulate individuals, but it cannot regulate how the States provide child-welfare services or conduct child custody proceedings. For these reasons, ICWA violates the Tenth Amendment's anti-commandeering doctrine.

## II.   ICWA Unconstitutionally Delegates Congressional Power to Tribes.

The tribes' ability to rearrange the order of ICWA's adoptive and foster care placement preferences, 25 U.S.C. § 1915(c), which state courts must then enforce, violates the nondelegation doctrine. The Tribes cite a number of cases where courts have recognized Congress's ability to delegate to the tribes. *See* Tribes' Br. at 37 n.29. To be sure, limitations on when Congress can delegate legislative power are less stringent in cases where "the delegated authority itself possesses independent authority over the subject matter." *United States v. Mazurie*, 419 U.S. 544, 557 (1975). And tribes do possess sovereign authority over their members and territory. *Id.* But none of the cases cited by the Tribes stand for the proposition that Congress may delegate to the tribes the ability to alter *state* law governing *state* child custody proceedings in *state* courts.[2]

If Congress wanted to delegate the ability to re-arrange the order of ICWA's placement preferences to another entity, it could have delegated that power to the individual States to set their own preference orders for their own child custody

---

[2]     The Tribes cite the following laws and cases, none of which authorize congressional delegation of power over States to tribes. The Helping Expedite and Advance Responsible Tribal Home Ownership Act, Pub. L. No. 112-151, § 2, 126 Stat. 1150–53 (2012) (codified at 25 U.S.C. § 415) involves leasing Indian lands; *United States v. Lara*, 541 U.S. 193 (2004) involved tribal criminal laws against assaulting a police officer on tribal lands; *Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997), states that " absent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of non-members exists only in limited circumstances" and says nothing about the ability to tribes to influence State court child custody proceedings; *Rice v. Rehner*, 463 U.S. 713 (1983), involved the tribes ability to regulate liquor sales on reservations; *Montana v. United States*, 450 U.S. 544 (1981), involved a tribes ability to regulate hunting and fishing on its land; *Mazurie*, 419 U.S. 544 dealt with a tribe's ability to regulate alcohol sales in Indian country; *Bugenig v. Hoopa Valley Tribe*, 266 F.3d 1201 (9th Cir. 2001), involved tribe's ability to regulate timber-harvesting within its lands; and *Arizona Public Service Co. v. EPA*, 211 F.3d 1280 (D.C. Cir. 2000), examined delegation to a tribe to regulate air quality on land within a reservation.

proceedings. But just as Congress could not delegate to Vermont, for example, the ability to change rules of decision in a Texas child custody proceeding, neither can Congress delegate that power to the tribes. This is especially true since tribes are "domestic dependent nations" to the United States and do not possess equal footing with either the federal government or the States. *Cherokee Nation v. Georgia*, 30 U.S. 1, 17 (1831).

In *Texas v. United States*, this Court recently found that Congress impermissibly delegated legislative authority to the Actuarial Standards Board, a private organization. *See* No. 7:15-cv-00151, 2018 WL 1478250, at *18–25 (N.D. Tex. Mar. 5, 2018). In finding an unconstitutional delegation of legislative power, the Court noted the important distinction between delegations to private entities and federal agencies. *See id.* at *19. The former delegation is impermissible, while the latter is not. The Court explained that sometimes Congress must "delegate a degree of policy judgment to an administrative agency constitutionally vested with executive power and tasked with executing the law." *Id.* (citing *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474–75 (2001)); *see also J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928) (stating delegation is of less concern when it is from Congress to the Executive).

Here, State Plaintiffs challenge ICWA's delegation to the tribes, which are self-evidently not a federal administrative agency. *See Mistretta v. United States*, 488 U.S. 361, 373 (1989) (discussing the standard in terms of delegating authority to "a public agency" capable of carrying out Congress's delegation). And while the Tribes correctly point that they are not private entities but sovereigns, this should not change the Court's analysis. The delegation is not being made to an executive agency answerable to the President and charged with enforcing the law, *see Whitman*, 531 U.S. at 474–75, and neither is the delegation one that simply allows the tribes to regulate their own internal affairs. This delegation is one that changes how State courts must

conduct state-court child custody proceedings. When a tribe reorders ICWA's preferences, it changes substantive state law in state child custody proceedings, not child custody proceedings in tribal courts. The tribe's preference order then directs how a state social worker must handle a child welfare case and how a state-court judge should rule in a given state-court child custody proceeding. This is far removed from Congress delegating to the Executive or the tribes in matters regulating tribal members or activity on tribal land and why the cases cited by the Tribes are inapposite. Here we have delegated power from Congress to other nations. For the same reasons as it explained in *Texas v. United States*, the Court should hold that ICWA also violates the non-delegation doctrine. Even if Congress can regulate the states' regulations of child custody proceedings—and it cannot—Congress cannot delegate to the tribes decisions on how those proceedings should be conducted.

## III.   Congress Lacked Article I Power to Enact ICWA.

Neither the Commerce Clause nor the Treaty Clause authorized Congress to regulate child custody proceedings, whether they have Native American ancestry or not. Of course, Congress alone does not possess the power to enter into treaties with Indian tribes; that is a shared power of the Executive and Congress, and is not at issue in this case. But Congress also lacks Commerce Clause power to enact ICWA. While Congress may have broad power over the tribes, ICWA does not regulate just tribes—it regulates States—so Congress must justify ICWA under the Interstate Commerce Clause, which it cannot do.

### A.   The Treaty Clause did not authorize Congress to enact ICWA.

As a preliminary matter, the Court must reject Defendants' assertion that the treaty power authorized Congress to enact ICWA. Congress does not possess a treaty power, other than to provide "Advice and Consent" by the Senate to treaties made by the Executive. U.S. Const. art. II, § 2; *see Lara*, 541 U.S. at 201 ("The treaty power does not literally authorize Congress to act legislatively. . . ."); *cf. McClanahan v.*

*State Tax Comm'n of Ariz.*, 411 U.S. 164, 172 n.7 (1973) (describing the source of federal authority over Indian matters to be rooted in "regulating commerce with Indian tribes" and "treaty making"). ICWA is not a treaty. And while Congress may enact laws based on Executive treaties, *Lara*, 541 U.S. at 201, ICWA lacks any connection to a particular treaty with a particular tribe. At one time in our nation's history, the federal government regulated its relations with Indian tribes by treaty. *Id*. But it has long since abandoned that practice in favor of legislative enactments. 25 U.S.C. § 71. Thus, the treaty power does not authorize ICWA.

**B.      ICWA exceeds Congress's Commerce Clause power.**

Without the treaty power, the only constitutional text available to support the enactment of ICWA is the Commerce Clause. Defendants contend the Clause gives the United States "plenary and exclusive" authority to regulate Indian affairs. Fed. Br. 24 (citing *Lara*, 541 U.S. at 200); Tribes' Br. 23–24 (same). Plaintiffs do not dispute that Congress has broad power over the regulation of tribal activity. But this power is not absolute and must yield to other protections in the Constitution, such as the Fifth Amendment. Moreover, ICWA does not regulate just tribes—it regulates States. As such, the only possible source of congressional power to enact ICWA's restrictions is the Interstate Commerce Clause, and Congress exceeded this power.

**1.      ICWA regulates States, which requires application of the Interstate Commerce Clause.**

Even assuming that the Commerce Clause empowers Congress to regulate child custody proceedings arising on tribal land, ICWA invades child welfare actions of state agencies and child custody proceedings in state courts, even when they have no connection to Indian children, and applies its restriction to child custody proceedings even when there is no tribal involvement. *See, e.g.*, States' MSJ App.0014 (requiring Texas Department of Family and Protective Services to routinely ask families in *any* child custody proceeding whether they are Native American.);

App.0016 (noting that if ICWA applies, it changes "every aspect" of the social work and legal case).

"[T]he question of congressional power under the Commerce Clause is necessarily one of degree." *United States v. Lopez*, 514 U.S. 549, 566 (1995) (citation and quotation marks omitted). As described above, the United States' power to regulate the tribes differs in an important degree from its power over the States, which the Supreme Court's jurisprudence on the Indian and Interstate Commerce Clauses reveals. *Compare Cherokee Nation*, 30 U.S. at 17 (describing the relationship between the tribes and the United States as that which resembles a ward to his guardian), *with Printz*, 521 U.S. at 919 (describing our system of "dual sovereignty" and stating states retain "a residuary and inviolable sovereignty"). While the United States may have broad power over the tribes, it possesses only enumerated powers over the States. U.S. Const. amend. X; *see Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 534 (2012) ("The Constitution's express conferral of some powers makes clear that it does not grant others.").

In regulating state agencies and courts, Congress must justify its actions under the Interstate Commerce Clause, not the Indian Commerce Clause. ICWA defines "Indian child" to include "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C. § 1903. Thus, ICWA applies to State actions involving children who are not members of an Indian tribe, but who could become members at some point in the future.

As stated in prior briefing, at the time of the founding, "commerce" meant buying and selling things and transporting them for such purposes. State Pls.' MSJ Br. 49–50, ECF No. 74. "The power to regulate commerce presupposes the existence of commercial activity to be regulated" and applies only to "activities" that "have a substantial effect on interstate commerce." *NFIB*, 567 U.S. at 549–50 (Opinion of

Roberts, C.J.); *see id.* at 647 (Joint Dissent of Scalia, Kennedy, Thomas, Alito, J.J.) ("Whatever the conceptual limits upon the Commerce Clause . . . [it] cannot be such as will enable the Federal Government to regulate all private conduct and to compel the States to function as administrators of federal programs."). Defendants quibble with Plaintiffs' citation to Justice Thomas's concurring opinion in *Adoptive Couple v. Baby Girl*, 570 U.S. 637 (2013), and a Denver University Law Review article. But both rely on founding-era sources that elucidate the Founders' understanding of what the Commerce Clause governs. *See, e.g.*, State Pls.' MSJ Br. 50 (citing Report of Committee on Indian Affairs (Feb. 20, 1787), in 32 Journals of the Continental Congress 1774–1789, pp. 66, 68 (R. Hill ed. 1936)). And, in any case, the Supreme Court recently defined "commerce" in *NFIB* to mean activities involving "commercial activity."

State Plaintiffs acknowledge that Supreme Court precedent discusses the "Commerce with . . . the Indian Tribes" and "Commerce . . . among the several States" as two different provisions: the Indian and Interstate Commerce Clauses. *See Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989). But State Plaintiffs submit, as a matter of constitutional interpretation, the use of "Commerce" should be interpreted consistently between the two provisions. *See District of Columbia v. Heller*, 554 U.S. 570, 576 (2008) ("[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning"). Thus, "commerce" means buying and selling things and transporting them for such purposes, both with respect to "the Indian Tribes" and "the several States." *See* The Federalist No. 42 (J. Madison) (limiting the Indian Commerce Clause "limited to the regulation of "trade with Indians, though not members of a state, yet residing within its legislative jurisdiction.").

Defendants cite no case indicating children are "commerce" subject to congressional regulation. Nor could they. Both an original and modern understanding

of commerce excludes the possibility that children, and child custody proceedings in particular, could constitute commerce. Indeed, the Supreme Court recently, repeatedly, and expressly rejected the federal government's overbroad understanding of the commerce power as enabling it to regulate domestic relations.

In *United States v. Windsor*, 570 U.S. 744, 766 (2013), the Court examined the federal Defense of Marriage Act. In striking down DOMA, the Court stated: "the states, at the time of the adoption of the Constitution, possessed full power over the subject of marriage and divorce . . . [and] the Constitution delegate[s] no authority to the Government of the United States on the subject of marriage and divorce." *Windsor*, 570 U.S. at 766–67 (quoting *Haddock v. Haddock*, 201 U.S. 562, 575 (1906)). Of course, Congress may enact laws that affect domestic relations as considered under federal laws. *See, e.g.*, 8 U.S.C. § 1186a(b)(1) (providing that marriages entered into for the purpose of procuring an alien's admission to the United States as an immigrant will not qualify the alien for that status); 42 U.S.C. § 1382c(d)(2) (stating that income-based criteria for Social Security benefits include common-law marriages, regardless of a particular State's view on these relationships). But when Congress acts in this way it is not regulating domestic relations per se, but regulating how it will carry out programs that depend on State laws defining domestic relations.

In *Lopez*, the Court's majority and dissenting opinions agreed that Congress may *not* regulate "marriage, divorce, and child custody." 514 U.S. at 564; *id.* at 624 (Breyer, J., dissenting). Justice Thomas concurred with these conclusions: "But it seems to me that the power to regulate 'commerce' can by no means encompass authority over mere gun possession, any more than it empowers the Federal Government to regulate marriage, littering, or cruelty to animals, throughout the 50 States. Our Constitution quite properly leaves such matters to the individual States."

*Id.* at 585; *see also United States v. Morrison*, 529 U.S. 598, 613 (2000) (concluding the same).

The nature of the relationship between the tribes and the federal government on the one hand, and the states and the federal government on the other hand, dictates that Congress must have enacted ICWA pursuant to the Interstate Commerce Clause, not the Indian Commerce Clause. The United States may have broad power over the tribes pursuant to the Indian Commerce Clause, but, here, ICWA does not regulate tribes. ICWA commands States to alter the practices of their child custody agencies and apply substantive federal rules in state law causes of action. These requirements of ICWA must be justified by the Interstate Commerce Clause because they regulate States, not tribes. And as articulated herein and in State Plaintiffs' earlier briefing, ICWA cannot survive scrutiny under the Interstate Commerce Clause.

### 2.     Congress's power over Indian tribes is "not absolute."

If the Court believes that ICWA is really a regulation of tribes, and not States, then the Indian Commerce Clause may apply. But even so, Congress still lacked the power to enact ICWA. "The power of Congress over Indian affairs may be of a plenary nature; *but it is not absolute.*" *Del. Tribal Bus. Comm. v. Weeks*, 430 U.S. 73, 84 (1977) (quoting *United States v. Alcea Band of Tillamooks*, 329 U.S. 40, 54 (1946) (plurality opinion)) (emphasis added). An examination of the terms "plenary" and "exclusive" in the Court's Indian law jurisprudence demonstrates that Congress acted well beyond its authority when it enacted ICWA.

When the Supreme Court uses the term "exclusive" to describe Congress's power over the tribes, *Lara*, 541 U.S. at 200, it means that only the federal government may regulate matters on Indian land and "state law could have no role to play within the reservation boundaries," *McClanahan*, 411 U.S. at 168. Indian tribes are "domestic dependent nations" to the United States. *Cherokee Nation*, 30

U.S. at 17. The internal management of the tribes and their lands are "governed exclusively by the government of the Union." *The Kansas Indians*, 72 U.S. 737, 755 (1866). Just as the States cannot regulate each other, the States cannot regulate the tribes. Although the Court has described congressional regulation of *commerce* with the tribes as "exclusive and absolute power," *United States v. 43 Gallons of Whiskey*, 93 U.S. 188, 194 (1876) (upholding a federal law prohibiting the sale of alcohol in Indian Territory), precedent shows that the power is "not absolute," *Weeks*, 430 U.S. at 84.

In *United States v. Kagama*, the Court reviewed the Major Crimes Act, which provided federal courts with jurisdiction over Native Americans charged with committing one of several crimes against Native Americans or other persons. 118 U.S. 375, 376 (1886). The Court declared that Congress did not have Indian Commerce Clause power to enact the law, which applied to activities wholly on reservation lands. *Id*. at 378. The Court said "it would be a very strained construction" of the Indian Commerce Clause to allow Congress to enact a law that regulated criminal activity on reservations "without any reference" to "any kind of commerce." *Id*. at 378–79.

The Court's holding in *Kagama* is consistent with recent Commerce Clause rulings in *Lopez* and *Morrison*, where the Court rejected the ability of Congress to regulate activity that possessed only a remote connection to interstate economic activity. *See Morrison*, 529 U.S. at 615 (holding Congress lacked power under Commerce Clause to enact the Violence Against Women Act because its connection to interstate commerce was too attenuated); *Lopez*, 514 U.S. at 564 (holding the same as to the Gun Free School Zones Act). Congressional power over the tribes is not unlimited, and the Court's jurisprudence under both the Indian and Interstate provisions of the Commerce Clause demonstrates this conclusion.

Even the Supreme Court's use of "plenary" to describe congressional power over the tribes does not authorize the type of power advanced by Defendants. When

the Court uses the term "plenary," it does so in reference to Congress's power "to legislate in respect to Indian tribes," *Lara*, 541 U.S. at 200. While the Tribes contend the dictionary defines "plenary" as "absolute," Tribes Br. 24, the Court does not agree. In *Weeks*, the Court stated: "The power of Congress over Indian affairs may be of a plenary nature; but it is not absolute." 430 U.S. at 84.

Even Professor Ablavsky, who submitted an *amicus* brief in this case supporting the Defendants' unlimited view of Congress's Indian Commerce Clause power, Professors' Br. 4–13, ECF No. 108, argues in other writings that a reading of the Indian Commerce Clause that grants Congress plenary authority is "implausible." *See* Gregory Ablavsky, *Beyond the Indian Commerce Clause*, 124 Yale L. J. 1012, 1037 (2015). Instead, he argues that federal power is justified by the "holistic view" of the Constitution taken by the Washington Administration. *Id*. at 10. But, as articulated below, even that view is not supported by the text of the Constitution. *See infra* Part III.B.4.

Finally, when the Supreme Court has acknowledged Congress's "plenary" power over a certain domain, the Court still noted that the Constitution's structural limitations and affirmative rights continue to apply to restrain that "plenary" power. This is consistent with the Court's jurisprudence outside of tribal matters. *See, e.g.*, *NFIB*, 567 U.S. at 535. For example, in *Buckley v. Valeo*, the Supreme Court acknowledged that "Congress has plenary authority" to regulate federal elections, but held that it is still subject to the Appointments Clause.  424 U.S. 1, 132 (1976). In *United States v. Creek Nation*, the Court examined the United States' power over the Creek Nation's land, which the Nation held in fee-simple title, and concluded the federal government's was "not absolute" because it was restrained by the Fifth Amendment's Takings Clause. 295 U.S. 103, 109–10 (1935). And in *Weeks*, the Court examined congressional power over the distribution of money awarded to Delaware Indians, and although the Court upheld the federal government's actions, it tested

those actions under the due process and equal protection clauses of the Fifth Amendment. 430 U.S. at 84. Thus, other provisions of the Constitution, including both the structure of the Constitution and its Bill of Rights, restrain Congress's power over the tribes.

### 3. The Court's Commerce Clause jurisprudence has retreated from describing Congress's power as "plenary."

Even if the Indian Commerce Clause, and not the Interstate Commerce Clause, imbued Congress with power to regulate beyond economic activity, the Indian Commerce Clause allows Congress to legislate with respect to "tribes." But ICWA applies to States and requires them to treat Indian children in a certain way. When the Court has permitted Congress to regulate individual Indians under the Indian Commerce Clause, it has done so in cases involving the regulation of "commerce" and economic activity between citizens of the United States and "individuals composing those tribes." *United States v. Holliday*, 70 U.S. 407, 417 (1865); *see also Dick v. United States*, 208 U.S. 340, 357 (1908) (stating the same). ICWA regulates States. *See supra* Part I. Even if the Court disagrees with State Plaintiffs' characterization of ICWA as solely regulating States and not individuals, ICWA regulates non-Indians who wish to adopt or foster a child whose family may have ancestral connection to an Indian tribe. And ICWA regulates children, even if they are not members and have no formal connection to a tribe, but are merely "eligible for membership" in a tribe. 25 U.S.C. § 1903(4). Congress's regulation beyond Indian tribes themselves violates the Commerce Clause.

### 4. "Preconstitutional" federal powers did not authorize Congress to enact ICWA.

Defendants and some *amici* supporting Defendants argue that the federal government possesses plenary power, by which they mean unlimited power, over the tribes *vis a vis* preconstitutional powers of any nation. *See* Fed. Defs.' Br. 25; Tribes Br. 22; Professors' Br. 6, ECF No. 108. In fact, ICWA references such an idea:

"through this [the Indian Commerce Clause] and other constitutional authority, Congress has plenary power over Indian affairs." 25 U.S.C. § 1901(1). While the Court has acknowledged Congress's power over the tribes to be rooted in preconstitutional powers, *Lara*, 541 U.S. at 201, those powers refer to the United States' power over "military and foreign policy," not "domestic or municipal law," *id*.

The Supreme Court rejected this notion of "preconstitutional" power in one of its oldest, and most notorious, cases. *See Marbury v. Madison*, 5 U.S. 137, 176 (1803) ("*The powers of the legislature are defined, and limited*; and that those limits may not be mistaken, or forgotten, the constitution is written.") (emphasis added). Congress acts pursuant to enumerated powers only, not those that may have existed before the Constitution's ratification. "[R]ather than granting general authority to perform all the conceivable functions of government, the Constitution lists, or enumerates, the Federal Government's powers. Congress may, for example, 'coin Money,' 'establish Post Offices,' and 'raise and support Armies.' [U.S. Const.] Art. I, § 8, cls. 5, 7, 12. The enumeration of powers is also a limitation of powers, because '[t]he enumeration presupposes something not enumerated.'" *NFIB*, 567 U.S. at 534; *see also Morrison*, 529 U.S. at 607 ("Every law enacted by Congress must be based on one or more of its powers enumerated in the Constitution."). Thus, because ICWA regulates domestic relations that were not part of the United States' preconstitutional powers, but were and remain part of the States' powers, it cannot be justified under this amorphous (and extra-constitutional) doctrine.

## IV.   ICWA Violates the Equal Protection Clause and the Administrative Procedure Act.

State Plaintiffs adopt by reference, as if fully set forth herein, the arguments of the Individual Plaintiffs concerning equal protection (Count IV) and the Administrative Procedure Act (Count I). But two points bear mentioning. Defendants contend that the State Plaintiffs cannot sue for violations of equal protection and that

they forfeited the right to challenge the Final Rule. *See* Fed. Defs.' Mot. to Dismiss Reply Br. 7–8, ECF No. 115. But as already explained in State Plaintiffs' first brief, they may bring claims on behalf of the children in their custody and control through their state child welfare agencies, and on behalf of their residents who are potential adoptive and foster parents. *See* State Pls.' MSJ Br. 23–25. Moreover, State Plaintiffs' first brief establishes that there can be no "waiver" of the ability to challenge a federal agency rule. Defendants' conflate waiver with issue exhaustion, and the case law demonstrates that State Plaintiffs are not estopped from challenging the Final Rule even though they either did not comment on it, or one of their subordinate agencies commented favorably. *Id.* at 29–35. Thus, the Court should grant summary judgment in favor of State Plaintiffs (and Individual Plaintiffs) on the equal protection and APA claims as well.

## CONCLUSION

State Plaintiffs respectfully request that the Court declare ICWA unconstitutional, declare the Final Rule unlawful, and enjoin their enforcement. ICWA sections 1901–1923 and 1951–1952 and the entire Final Rule unconstitutionally commandeer State power over domestic relations and are not authorized by Article I, and ICWA section 1915(c) and Final Rule section 23.130(b) delegate legislative authority to tribes. ICWA sections 1913—1915 and the Final Rule violate the equal protection protections of the Fifth Amendment. And the Final Rule violates the Administrative Procedure Act. If the Court enjoins ICWA, which it should, it should also enjoin the Federal Defendants from enforcing the portions of the Social Security Act—42 U.S.C. §§ 622(b)(9) and 677(b)(3)(G)—that require States to comply with ICWA as a condition of receiving federal child welfare funding.

Respectfully submitted this 8th day of June, 2018.

JEFF LANDRY
Attorney General of Louisiana

KEN PAXTON
Attorney General of Texas

CURTIS HILL
Attorney General of Indiana

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney General

JAMES E. DAVIS
Deputy Attorney General for Civil Litigation

*/s/ David J. Hacker*
DAVID J. HACKER
Special Counsel for Civil Litigation
Texas Bar No. 24103323
david.hacker@oag.texas.gov

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
(512) 936-1414

*Attorneys for State Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 8, 2018, I electronically filed the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties.

/s/ *David J. Hacker*
DAVID J. HACKER