**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| CHAD EVERET BRACKEEN, JENNIFER KAY BRACKEEN, FRANK NICHOLAS LIBRETTI, HEATHER LYNN LIBRETTI, ALTAGRACIA SOCORRO HERNANDEZ, JASON CLIFFORD, and DANIELLE CLIFFORD, | |
| and | |
| STATE OF TEXAS, STATE OF LOUISIANA, and STATE OF INDIANA, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 4:17-cv-868-O |
| UNITED STATES OF AMERICA; RYAN ZINKE, in his official capacity as Secretary of the United States Department of the Interior; BRYAN RICE, in his official capacity as Director of the Bureau of Indian Affairs; JOHN TAHSUDA III, in his official capacity as Acting Assistant Secretary for Indian Affairs; the BUREAU OF INDIAN AFFAIRS; the UNITED STATES DEPARTMENT OF THE INTERIOR; ALEX AZAR, in his official capacity as Secretary of the United States Department of Health and Human Services; and the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | |
| *Defendants*, | |
| CHEROKEE NATION, et al., | |
| *Intervenor-Defendants*. | |

**INDIVIDUAL PLAINTIFFS' REPLY IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

ARGUMENT ........................................................................................................................ 1

    I.     ICWA And The Final Rule Unconstitutionally Discriminate On The Basis Of
         Race ......................................................................................................................... 1

       A.   Classifications Singling Out Indians Are "Political" Only When Tightly
            Tethered To Indian Self-Government Or Tribal Land ................................................. 2

       B.   The Classifications Made By ICWA And The Final Rule Are Racial, Not
            Political ................................................................................................................... 4

       C.   ICWA's And The Final Rule's Classifications Violate Equal Protection At
            Least As Applied To Individual Plaintiffs ................................................................ 9

    II.    ICWA And The Final Rule Unconstitutionally Erode The Due-Process Rights
         Of Each Individual Plaintiff ..................................................................................... 11

    III.  ICWA And The Final Rule Violate The Anti-Commandeering Doctrine And
         The Tenth Amendment ............................................................................................ 15

    IV.  The Final Rule Independently Violates The APA ...................................................... 16

    V.   Defendants' Request For Discovery Should Be Denied .............................................. 24

CONCLUSION ..................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Adoptive Couple v. Baby Girl*,
  570 U.S. 637 (2013).................................................................................................6, 8

*Alabama-Coushatta Tribe of Texas v. United States*,
  757 F.3d 484 (5th Cir. 2014) ...................................................................................20

*Am. Family Life Assurance Co. of Columbus v. Biles*,
  714 F.3d 887 (5th Cir. 2013) ...................................................................................24

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988)..................................................................................................16

*In re Bridget R.*,
  49 Cal. Rptr. 2d 507 (Cal. Ct. App. 1996) ................................................................6

*Carcieri v. Salazar*,
  555 U.S. 379 (2009)..................................................................................................18

*Chamber of Commerce of U.S. v. U.S. Dep't of Labor*,
  885 F.3d 360 (5th Cir. 2018) .............................................................17, 18, 21, 22

*Cherokee Nation v. Nash*,
  267 F. Supp. 3d 86 (D.D.C. 2017)........................................................................6, 7

*Citizens United v. FEC*,
  558 U.S. 310 (2010)....................................................................................................9

*City of Arlington v. FCC*,
  569 U.S. 290 (2013)..................................................................................................17

*City of Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989)....................................................................................................9

*Drummond v. Fulton Cty. Dep't of Family & Children's Servs.*,
  563 F.2d 1200 (5th Cir. 1977) .................................................................................14

*Duro v. Reina*,
  495 U.S. 676 (1990)..................................................................................................10

*Encino Motorcars, LLC v. Navarro*,
  138 S. Ct. 1134 (2018)..............................................................................................18

# TABLE OF AUTHORITIES

*(Continued)* **Page(s)**

*Encino Motorcars, LLC v. Navarro*,
 136 S. Ct. 2117 (2016)..................................................................................................17, 18

*Fisher v. Dist. Court*,
 424 U.S. 382 (1976)..........................................................................................................4

*Grogan v. Garner*,
 498 U.S. 279 (1991)........................................................................................................20

*Hodorowski v. Ray*,
 844 F.2d 1210 (5th Cir. 1988) .......................................................................................11

*Int'l Shortstop, Inc. v. Rally's, Inc.*,
 939 F.2d 1257 (5th Cir. 1991) .......................................................................................24

*Kahawaiolaa v. Norton*,
 386 F.3d 1271 (9th Cir. 2004) .........................................................................................4

*KG Urban Enters., LLC v. Patrick*,
 693 F.3d 1 (1st Cir. 2012)................................................................................................2

*Lehr v. Robertson*,
 463 U.S. 248 (1983)...................................................................................................11, 13

*McRae v. Lamb*,
 233 S.W.2d 193 (Tex. Ct. App.—San Antonio 1950)...........................................................21

*Mexichem Fluor, Inc. v. EPA*,
 866 F.3d 451 (D.C. Cir. 2017)........................................................................................18

*Michael H. v. Gerald D.*,
 491 U.S. 110 (1989)........................................................................................................13

*Mistretta v. United States*,
 488 U.S. 361 (1989)...................................................................................................19, 20

*Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*,
 425 U.S. 463 (1976)..........................................................................................................4

*Morton v. Mancari*,
 417 U.S. 535 (1974)......................................................................................................2, 4

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983)..........................................................................................................23

# TABLE OF AUTHORITIES
### (*Continued*)

**Page(s)**

*Murphy v. NCAA*,
    138 S. Ct. 1461 (2018) ................................................................................................ 15, 16

*Nationwide Mut. Ins. Co. v. Darden*,
    503 U.S. 318 (1992) ............................................................................................................ 22

*Nielson v. Ketchum*,
    640 F.3d 1117 (10th Cir. 2011) ......................................................................................... 10

*Palmore v. Sidoti*,
    466 U.S. 429 (1984) ..................................................................................................... 1, 7, 9

*PharmFlex, Inc. v. Div. of Emp't Sec.*,
    964 S.W.2d 825 (Mo. Ct. App. 1997) ............................................................................... 21

*Pierce v. Soc'y of Sisters*,
    268 U.S. 510 (1925) ........................................................................................................... 12

*Plains Commerce Bank v. Long Family Land & Cattle Co.*,
    554 U.S. 316 (2008) ............................................................................................................. 7

*Printz v. United States*,
    521 U.S. 898 (1997) ........................................................................................................... 16

*Reno v. Flores*,
    507 U.S. 292 (1993) ..................................................................................................... 12, 14

*Rice v. Cayetano*,
    528 U.S. 495 (2000) ........................................................................................... 2, 3, 4, 5, 6, 7

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ............................................................................................................. 24

*In re Santos Y.*,
    92 Cal. App. 4th 1274 (2001) ............................................................................................ 11

*Smith v. Org. of Foster Families For Equal. & Reform*,
    431 U.S. 816 (1977) ........................................................................................................... 11

*Troxel v. Granville*,
    530 U.S. 57 (2000) ....................................................................................................... 11, 13

*United States v. Antelope*,
    430 U.S. 641 (1977) ......................................................................................................... 4, 7

## TABLE OF AUTHORITIES

*(Continued)*                                                                    **Page(s)**

*United States v. Castleman,*
    134 S. Ct. 1405 (2014) ...................................................................................21

*United States v. Chestman,*
    947 F.2d 551 (2d Cir. 1991) ..........................................................................22

*United States v. Lara,*
    541 U.S. 193 (2004) .......................................................................................15

*United States v. Lopez,*
    514 U.S. 549 (1995) .......................................................................................15

*United States v. Salerno,*
    481 U.S. 739 (1987) .........................................................................................9

*Washington v. Wash. State Commercial Passenger Fishing Vessel Ass'n,*
    443 U.S. 658 (1979) .........................................................................................4

*Williams v. Babbitt,*
    115 F.3d 657 (9th Cir. 1997) ...........................................................................4

*Yakima Valley Cablevision, Inc. v. FCC,*
    794 F.2d 737 (D.C. Cir. 1986) .......................................................................23

**Constitutional Provisions**

U.S. Const. amend. XIII ......................................................................................15

**Statutes**

5 U.S.C. § 702 ......................................................................................................20

5 U.S.C. § 706 ......................................................................................................16

25 U.S.C. § 1903(3) ...............................................................................................9

25 U.S.C. § 1912(e) .............................................................................................21

25 U.S.C. § 1912(f) ..............................................................................................21

25 U.S.C. § 1913 ....................................................................................................5

25 U.S.C. § 1913(d) ..........................................................................................5, 12

25 U.S.C. § 1914 ...............................................................................................5, 12

**TABLE OF AUTHORITIES**
(*Continued*)                                                                    **Page(s)**

25 U.S.C. § 1915................................................................................................9

25 U.S.C. § 1915(a) ...........................................................................................8

25 U.S.C. § 1918(b) ..........................................................................................19

25 U.S.C. § 1952..........................................................................17, 18, 19, 20, 22

Nev. Rev. Stat. § 127.150 ..................................................................................13

Hopi Enrollment Ordinance No. 33 § 11.1(B)(III) ..............................................10

**Rules**

Fed. R. Civ. P. 56(d) ....................................................................................24, 25

**Regulations**

25 C.F.R. § 23.108(b) ........................................................................................10

25 C.F.R. § 23.127 ..............................................................................................5

25 C.F.R. § 23.132(b) ...................................................................................20, 22

25 C.F.R. § 23.132(c)..........................................................................................16

Guidelines for State Courts; Indian Child Custody Proceedings,
     44 Fed. Reg. 67,584 (Nov. 26, 1979).....................................................17, 18, 19

Indian Child Welfare Act Proceedings,
     81 Fed. Reg. 38,778 (June 14, 2016) (codified at 25 C.F.R. pt. 23)...........17, 18, 20, 22, 23

**Other Authorities**

Brief of the United States as *Amicus Curiae*,
     *Rice v. Cayetano*,
     No. 98-818, 1999 WL 569475 (U.S. July 23, 1999).............................................3

Dan Diamond,
     *Trump Challenges Native Americans' Historical Standing*,
     Politico, Apr. 22, 2018, *available at*
     https://www.politico.com/story/2018/04/22/trump-native-americans-
     historical-standing-492794 ........................................................................3

**TABLE OF AUTHORITIES**
(*Continued*)                                                                                          **Page(s)**

Kirsty Gover,
  *Genealogy As Continuity: Explaining the Growing Tribal Preference for
  Descent Rules in Membership Governance in the United States*,
  33 Am. Indian L. Rev. 243 (2009)..........................................................................................5

H.R. Rep. 95-1386 (1978)..........................................................................................................10

Letter from Brian Neale, Dir., Ctr. for Medicaid & CHIP Servs., to Tribal
  Leaders,
  Re: Opportunities to Promote Work and Community Engagement Among
  Medicaid Beneficiaries (Jan. 17, 2018) ...................................................................................3

Solangel Maldonado,
  *Race, Culture, and Adoption: Lessons from* Mississippi Band of Choctaw
  Indians v. Holyfield,
  17 Colum. J. Gender & L. 1 (2008) ..........................................................................................6

S. Rep. No. 95-597 (1977)..........................................................................................................22

## INTRODUCTION

Defendants readily acknowledge that ICWA "reflect[s] Federal policy that . . . an Indian child should remain in the Indian community." U.S. Br. 5. There can be no doubt today that a policy providing that Caucasian children should be placed with Caucasian adults would violate the Constitution; that is the essential holding of *Palmore v. Sidoti*, 466 U.S. 429 (1984). ICWA's policy of keeping Indian children with Indians—well-intentioned though it may be—is no less unconstitutional. It impermissibly discriminates on the basis of race and it intrudes into intimate familial relationships sheltered by the Due Process Clause without adequate justification. For these reasons, and those advanced by the State Plaintiffs, ICWA and the Final Rule must fall.

But even if there were no challenge to ICWA's constitutionality here, the Final Rule still would present a triple-barreled violation of the APA. Congress did not authorize the Department of the Interior ("DOI") to issue regulations that micro-manage the conduct of state child-custody proceedings; the regulations DOI issued on "good cause" are contrary to ICWA and the Constitution; and the new requirements are inadequately explained. Plaintiffs' motion for summary judgment should be granted.

## ARGUMENT

### I.      ICWA And The Final Rule Unconstitutionally Discriminate On The Basis Of Race

ICWA and the Final Rule violate the Constitution's guarantee of equal protection by imposing racial classifications in child-custody determinations. Defendants argue that ICWA's and the Final Rule's classifications are based on membership in a federally recognized Indian tribe and thus are political classifications subject only to rational-basis review. U.S. Br. 8–31. But if all classifications based on tribal membership were subject to rational-basis review, a State would be free to bar tribal members from state employment or admission to state universities. That is not

the law.  A state employer could not escape liability for racial discrimination against Native Americans with the defense that its discrimination was confined to members of Indian tribes.  As the Supreme Court has recognized, classifications based on ancestry, though facially race-neutral, may be "prox[ies] for race"—and therefore subject to strict scrutiny.  *Rice v. Cayetano*, 528 U.S. 495, 514 (2000).  The tribal classifications that ICWA incorporates, which are based almost exclusively on lineal descent and blood quantum, are just such a proxy.  At minimum, ICWA's classifications take on a racial character when applied to children like Baby O., Child P., and A.L.M., who do not live on tribal land and have no substantial connections to a tribe.

### A.  Classifications Singling Out Indians Are "Political" Only When Tightly Tethered To Indian Self-Government Or Tribal Land

The government invokes *Morton v. Mancari*, 417 U.S. 535 (1974) to argue that all laws that draw classifications based on tribal membership "refer to a political, not a racial group."  U.S. Br. 9.  But as Individual Plaintiffs have already explained, *see* Ind. Pls.' Br. 42–44, *Mancari* itself does not reach nearly that far, and Defendants' strained reading of the case has been rejected by courts of appeals and the Supreme Court.

In upholding the BIA hiring preference for Indians, *Mancari* observed that the BIA is a "sui generis" agency with a unique role in the administration of Indian affairs.  417 U.S. at 554. The hiring preference thus operated "to give Indians a greater participation in their own self-government."  *Id.* at 541.  Because the hiring preference was connected to governance of Indian affairs, the Court regarded it as "political" rather than racial in nature.  *Id.* at 553–54 & n.24.  But at the same time, the Court warned that it would be an "obviously more difficult question" whether "a blanket exemption for Indians from all civil service examinations" would constitute "racial discrimination."  *Id.* at 554; *see KG Urban Enters., LLC v. Patrick*, 693 F.3d 1, 18–19 (1st Cir. 2012) (noting *Mancari*'s "rather pointed language that if the preference were applied to employment in

federal agencies not related to Indians," then "that might be viewed as race based discrimination").[1]

The Supreme Court addressed that "more difficult question" in *Rice*, holding that an ancestral classification limiting the franchise for a particular state office to Native Hawaiians could not be regarded as "political" under *Mancari* because it involved "critical state affairs."  528 U.S. at 520–22.  *Mancari*, *Rice* held, had carved out a "limited exception" to the rule forbidding racial discrimination where laws concern the "internal affair[s] of a quasi sovereign," but that "exception" could not be extended to the "new and larger dimension" of an "affair of the State of Hawaii." *Id.* at 520.[2]

Defendants argue that *Rice* is not controlling because it "did not concern a federally recognized Indian tribe," U.S. Br. 18–19, but that contradicts the United States' own argument in *Rice*. In *Rice*, the government argued that *Mancari* "squarely held that distinctions based on the United States' unique trust relationship with indigenous people should not be equated with distinctions based on race that are prohibited by the Constitution," and therefore was controlling even though Native Hawaiians were not a federally recognized Indian tribe.  U.S. Br. 14, *Rice v. Cayetano*, No. 98-818, 1999 WL 569475, (U.S. July 23, 1999) ("*Rice* U.S. Br.").  And to address that argu-

---

[1]  The federal government thus recently recognized that exemptions for tribal members from regulations applicable to the general population "could raise civil rights issues."  Letter from Brian Neale, Dir., Ctr. for Medicaid & CHIP Servs., to Tribal Leaders, Re: Opportunities to Promote Work and Community Engagement Among Medicaid Beneficiaries (Jan. 17, 2018); *see* Dan Diamond, *Trump Challenges Native Americans' Historical Standing*, Politico, Apr. 22, 2018, (the "administration contends that tribes are a race rather than separate governments, and exempting them from Medicaid work rules . . . would be illegal preferential treatment"), *available at* https://www.politico.com/story/2018/04/22/trump-native-americans-historical-standing-492794.

[2]  This reading of the majority opinion *Rice* is confirmed by Justice Breyer's separate opinion, which characterizes the "critical rationale" of the majority opinion as "hold[ing]" that because election to the board of a state agency "is not 'the internal affair of a quasi sovereign,' such as an Indian tribe," the statutory classification was impermissible racial discrimination.  528 U.S. at 524–25 (Breyer, J., concurring in result).

ment, *Rice* accepted *arguendo* the proposition that Native Hawaiians were equivalent to a federally-recognized tribe, and held that "[e]ven" if it "were . . . to" consider "native Hawaiians as tribes," the classification was impermissible.  528 U.S. at 519; *see also id.* at 524 (Breyer, J., concurring in result) (majority opinion "assumes without deciding that the State could 'treat Hawaiians or Native Hawaiians as tribes'").

The Ninth Circuit thus has "reject[ed] the notion that distinctions based on Indian or tribal status can never be racial classifications subject to strict scrutiny."  *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1279 (9th Cir. 2004).  "As *Rice* illustrates, an 'Indian tribe' may be classified as a 'racial group' in particular instances."  *Id.*  *Mancari* "shield[s] only those statutes that affect uniquely Indian interests," such as those "that give special treatment to Indians on Indian land," *Williams v. Babbitt*, 115 F.3d 657, 665 (9th Cir. 1997), or fulfill "treaty obligations and its responsibilities to the Indian tribes," *Rice*, 528 U.S. at 519, including through legislation that "further[s] the cause of Indian self-government," *Mancari*, 417 U.S. at 554.  It does not allow discrimination favoring (or disadvantaging) tribal Indians in an "affair of the State."  *Rice*, 528 U.S. at 520.[3]

### B.   The Classifications Made By ICWA And The Final Rule Are Racial, Not Political

The challenged provisions of ICWA and the Final Rule create a system of descent-based

---

[3]  The cases and legislation cited by Defendants fit comfortably within this framework.  Most concern legislation regulating activity on tribal lands.  Such regulation is obviously tethered to Indian self-governance.  *See, e.g.*, *United States v. Antelope*, 430 U.S. 641, 646 n.7 (1977) (upholding Major Crimes Act, addressing crimes committed on tribal lands by tribal members); *Moe v. Confederated Salish & Kootenai Tribes of the Flathead Reservation*, 425 U.S. 463, 480–81 (1976) (upholding exemption from a tax "sought to be applied to a reservation Indian conducting a cigarette business for the Tribe on reservation land"); *Fisher v. Dist. Court*, 424 U.S. 382, 389–90 (1976) (upholding tribal jurisdiction over adoption proceedings "arising on the Indian reservation").  And *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n* upheld legislation implementing treaties with Indian nations on the common-sense ground that "these treaties confer enforceable special benefits on signatory Indian tribes."  443 U.S. 658, 673 n.20 (1979); *see also Rice*, 528 U.S. at 519 (describing these cases).

preferences in foster, preadoptive, and adoptive placements for "Indian children" that divvies up families by race, and subjects non-Indian families to unique legal disabilities.  *See* 25 U.S.C. §§ 1913–1915; 25 C.F.R. §§ 23.127–132.  These preferences apply regardless of whether the child resides on Indian land and apply not only to tribal members but also to children who are merely *eligible*—by virtue of their parentage—to become members.  Like the ancestral classification in *Rice*, ICWA's classification is an obvious proxy for race.  And because the classification applies not just to Indian tribes' governance of their own affairs, but to a "critical state affair[ ]," *Rice*, 528 U.S. at 522, it cannot be regarded as a political classification under *Mancari*.[4]

1. ICWA's tribal classification is a transparent proxy for race.  "'[R]acial discrimination' is that which singles out identifiable classes of persons solely because of their ancestry or ethnic characteristics."  *Rice*, 528 U.S. at 515.  When legislation "singles out identifiable classes of persons" who are "culturally distinguishable" in order to "preserve th[e] commonality" of a community based on its "ancestry or ethnic characteristics," that is "a proxy for race."  *Id.* at 514–15.  As the United States argued in *Rice*, "[t]he [Supreme] Court has always understood members of traditional Indian communities to share the same or a similar race."  *Rice* U.S. Br. 14.

The racial nature of ICWA's tribal classification is confirmed by an examination of tribal membership criteria, which overwhelmingly are defined by "lineal descent" and "blood-quantum" rules.  Kirsty Gover, *Genealogy As Continuity: Explaining the Growing Tribal Preference for Descent Rules in Membership Governance in the United States*, 33 Am. Indian L. Rev. 243, 247

---

[4]  The government argues that Plaintiffs did not allege that Sections 1913(d) or 1914 were unconstitutional.  U.S. Br. 10–11.  Plaintiffs alleged in Count IV that they "are directly, personally, and substantially injured by ICWA's collateral attack provisions, 25 U.S.C. §§ 1913(d), 1914," SAC, ECF No. 35, at 74, ¶ 332; *see id.* at 74–75, ¶ 333; *id.* at 5, ¶ 11.  Indeed, as this Court has recognized, "Plaintiffs allege" that ICWA's "provisions providing for *vacatur* in the event of fraud and duress violate" equal protection.  Order Denying Navajo Nation's Motion to Intervene, ECF No. 139, at 2.

(2009).  "ICWA's definition of an 'Indian child,'" when placed "in the context of tribal rules that condition membership on the existence of tribal blood, . . . shows that biology, above all else, makes a person Indian under ICWA."  Solangel Maldonado, *Race, Culture, and Adoption: Lessons from* Mississippi Band of Choctaw Indians v. Holyfield, 17 Colum. J. Gender & L. 1, 26 (2008). As the California Court of Appeal explained, tribes "recognize[ ] as members all persons who are biologically descended from historic tribal members," and therefore "children who are related by blood to such a tribe may be claimed by the tribe, and thus made subject to the provisions of ICWA, solely on the basis of their biological heritage."  *In re Bridget R.*, 49 Cal. Rptr. 2d 507, 527 (Cal. Ct. App. 1996).  Indeed, if tribal membership criteria did *not* depend on lineal heritage and blood quantum, then the Supreme Court would not have warned that ICWA could "put certain vulnerable children at a great disadvantage solely because an ancestor—even a remote one—was an Indian." *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 655–56 (2013).

The government argues that ICWA's tribal classifications cannot be characterized as racial because "individuals of Native American heritage who lack membership in a federally recognized tribe do not qualify for the preference," whereas some individuals that are not ethnically Native American, such as "descendants of the Cherokee Nation's freed slaves" do qualify.  U.S. Br. 25, 16 n.13; *see* Intervs. Br. 19.  But *Rice* squarely "reject[ed] this line of argument," holding that "[s]imply because a class . . . does not include all members of the race does not suffice to make the classification race neutral."  528 U.S. at 514, 516–17.  "Ancestral tracing" of the type required by tribal lineal-heritage and blood-quantum requirements "employs the same mechanisms, and causes the same injuries, as laws or statutes that use race by name."  *Rice*, 528 U.S. at 517.[5]

---

[5]  Defendants' reliance on the example of the Cherokee Freedmen is highly ironic given that the Cherokee spent decades vigorously trying to *remove* the Freedmen's descendants from its membership rolls so that tribal membership would be limited to those "of Cherokee blood."  *Cherokee*

2.  ICWA's tribal classification cannot be re-characterized as "political" because it discriminates in "critical state affairs" rather than an area of tribal self-government.

The proceedings governing custody of vulnerable children within a State's jurisdiction undeniably is a critical state affair; indeed, it is a state interest "of the highest order." *Palmore*, 466 U.S. at 433.  And racial discrimination in child-custody proceedings has long been forbidden.  *Id.* at 434.  Under *Rice*, that should settle the matter; the "limited exception" of *Mancari* cannot be extended to permit racial discrimination in "critical state affairs." *Rice*, 528 U.S. at 520.[6]

*Mancari*'s inapplicability is confirmed by the fact that state-court proceedings quite obviously are not the "internal affair[s] of a quasi-sovereign" Indian tribe. *Rice*, 528 U.S. at 520.  State-court proceedings do not take place on Indian lands, so ICWA's rules for state courts cannot be justified as advancing Indian tribes' governance of their territory. *Cf. Antelope*, 430 U.S. at 646 n.7.  And ICWA governs children who may never have set foot on Indian lands, and may not be members of an Indian tribe at all, but are merely eligible for membership, so it cannot plausibly be claimed that ICWA governs only persons over whom tribal governments can assert jurisdiction. *See Plains Commerce Bank v. Long Family Land & Cattle Co.*, 554 U.S. 316, 330 (2008) ("[E]fforts by a tribe to regulate nonmembers, especially on non-Indian fee land, are presumptively invalid.").

Defendants nevertheless argue that ICWA "support[s] tribal status, self-government, and

---

*Nation v. Nash*, 267 F. Supp. 3d 86, 110 (D.D.C. 2017).  The Cherokee gave up this crusade for racial homogeneity only a few months ago, when a federal court upheld the Freedmen's descendants' right to Cherokee citizenship based on an 1866 treaty between the United States and the Cherokee Nation.  *Id.* at 90, 139.  The Freedman's example thus serves only to underscore the overwhelmingly racial nature of tribal membership.

[6]  None of the contrary state-court decisions that Intervenor-Defendants (at 16) and *amici* tribes (at 19 n.17) reference address *Rice*'s limitation on *Mancari*, and all predate the Supreme Court's explicit recognition in *Adoptive Couple* that ICWA raises equal-protection concerns.

culture" by preventing loss of a tribe's children. U.S. Br. 23. But ICWA's placement preferences reveal that justification to be pretextual. ICWA grants a placement preference not only to extended family and tribal members but also to "other Indian families," which is to say, *any* family of *any* of the *other* 572 federally recognized tribes. 25 U.S.C. § 1915(a)(3). This placement preference treats Indian tribes as fungible, "regardless of cultural, political, economic, or religious differences between" them. Maldonado, *supra*, at 25–26. But placing a Cherokee child with a Navajo family is not even rationally related to the "self-government" of either tribe. In that scenario, the Cherokee tribe has lost one of its members, and, because of blood-quantum requirements, the child likely cannot be a member of the tribe in which she has been placed. This third placement preference exposes the true aim of ICWA—which, as the government admits, is to route Indian children wherever possible to "Indian" families rather than "non-Indian" families. U.S. Br. 24. That is not a tribal preservation policy; it is a race preservation policy. And that is why the Supreme Court said in *Adoptive Couple* that applying ICWA in that case—in which a Cherokee birth father sought to reclaim custody of a girl who, by virtue of her parentage was eligible for membership in the Cherokee Nation—would raise "equal protection concerns." No such concerns would be raised if ICWA's tribal classification of the child had been merely "political" and subject only to rational basis review. 570 U.S. at 656.[7]

ICWA's classification of "Indian children" accordingly should be recognized as a proxy for race and subject to strict scrutiny. Defendants do not even attempt to sustain that burden, nor could they, as the Supreme Court has already held that "a racial classification" cannot justify child-

---

[7] Defendants dismiss the Supreme Court's recognition of "equal protection concerns" as "dicta," U.S. Br. 20, but those concerns informed the Court's statutory interpretation. *See Adoptive Couple*, 570 U.S. at 656 (explaining that the South Carolina Supreme Court's interpretation of Section 1915 "would raise" constitutional "concerns"). In any event, the Court would not have made the point—even in dicta—were it not true that ICWA seriously implicated equal-protection issues.

custody decisions.  *See Palmore*, 466 U.S. at 434; *cf.* U.S. Br. 25–27 (arguing that ICWA's pref-erences "pass[ ] rational basis review").  The provisions of ICWA governing child placements in state courts—Sections 1915, 1914, and 1913(d)—therefore should be struck down on their face.[8]

Nor is ICWA's discriminatory treatment limited to its definition of "Indian child."  ICWA also singles out the Individual Plaintiffs and imposes heightened burdens on them as foster and adoptive parents because of their lack of Indian ancestry.  Because the Individual Plaintiffs lack the necessary ancestry to qualify for membership in a tribe, they are permanently barred from obtaining ICWA's favored "Indian" family status.  *See* 25 U.S.C. §§ 1903(3), 1915.  The treatment of the Individual Plaintiffs demonstrates that ICWA's ancestry-based classification erects barriers built on immutable racial characteristics, not barriers built on voluntary association.

### C.    ICWA's And The Final Rule's Classifications Violate Equal Protection At Least As Applied To Individual Plaintiffs

The children that Individual Plaintiffs sought to adopt possess no substantial connection to an Indian tribe other than their lineal descent.  If the Court declines to strike down Sections 1913(d), 1914, and 1915 of ICWA on their face, it should rule that those provisions are unconsti-tutional at least as applied to the Individual Plaintiffs.[9]  If ICWA's constitutionality is grounded

---

[8]  Defendants invoke the "no set of circumstances" test for facial challenges to federal statutes. U.S. Br. 6–7 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).  But when a racial classification does not satisfy strict scrutiny, it indisputably is invalid on its face.  *See City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 509 (1989) (facially invalidating racial preference but acknowledging that the preference could have been granted to "identified victims" of past racial discrimination); *id.* at 526 (Scalia, J., concurring) (the Constitution permits remedial action for victims of past discrimination).

[9]  Defendants suggest Individual Plaintiffs did not raise as-applied challenges to ICWA's child placement provisions.  But "the distinction between facial and as-applied challenges" goes only "to the breadth of the remedy employed by the Court, not what must be pleaded in a com-plaint."  *Citizens United v. FEC*, 558 U.S. 310, 331 (2010).  In any event, the operative complaint does describe how ICWA unconstitutionally affects each Plaintiff.  *See* SAC, ECF No. 35, at 73–76.

on the theory that its child-placement provisions further tribal self-government by preserving tribal populations, that rationale cannot extend to Child P. and Baby O., who had never lived on tribal lands or had any other substantial connection to the tribe, or A.L.M, whose mother left the reservation two days after A.L.M.'s birth.  In each case, the tribes used ICWA and the Final Rule to determine eligibility for membership, based on the child's lineal descent from a non-custodial biological parent with the requisite blood quantum.  *See* 25 C.F.R. § 23.108(b).[10]

But when Congress debated ICWA, the Department of Justice recognized that it "may constitute racial discrimination" if the child's membership was based on a noncustodial Indian parent. H.R. Rep. 95-1386, at 39 (1978).  The Department of Justice "d[id] not think that the blood connection between the child and a biological but noncustodial parent is a sufficient basis" to apply ICWA, and therefore recommended tying a tribe's authority over adoptive proceedings under ICWA to whether "a parent who is a tribal member has legal custody of a child . . . eligible for membership at the time of a proceeding."  *Id.*  This, the Department argued, was because cases like "*Mancari*" and "*Antelope*" "suggest that, absent tribal membership, Congress's freedom to treat differently persons having Indian blood is diminished."  *Id.* at 37.

If the Court does not strike down ICWA's provisions governing child-placement proceedings on their face—and it should—it should follow the path of the California Court of Appeal, which has ruled that "any application of ICWA which is triggered by an Indian child's genetic

---

[10]  Intervenor-Defendant Cherokee Nation previously has employed the further "gamesmanship" of foisting "citizenship upon a nonconsenting person in order to invoke ICWA protections."  *Nielson v. Ketchum*, 640 F.3d 1117, 1124 (10th Cir. 2011).  The Tenth Circuit, however, drew the line at a tribe granting automatic citizenship to all newborns eligible for membership, holding that those provisional assertions of membership do not render children "Indian" under ICWA.  *Id.* at 1124; *see also Duro v. Reina*, 495 U.S. 676, 693–94 (1990) (tribal authority does not "exten[d]" to "those who have not given the consent of the governed that provides a fundamental basis for power within our constitutional system").  Other tribes prohibit minors from relinquishing membership without simultaneously enrolling in a different tribe, thereby ensuring that they remain within ICWA's regime.  *See, e.g.*, Hopi Enrollment Ordinance No. 33 § 11.1(B)(III).

10

heritage, without substantial social, cultural or political affiliations between the child's family and a tribal community, is an application based solely, or at least predominantly, upon race and is subject to strict scrutiny under the equal protection clause." *In re Santos Y.*, 92 Cal. App. 4th 1274, 1321 (2001). Because Baby O., Child P., and A.L.M. have only the most limited connections to Indian tribes, ICWA's child placement provisions should be held unconstitutional as applied to Individual Plaintiffs.

## II.      ICWA And The Final Rule Unconstitutionally Erode The Due-Process Rights Of Each Individual Plaintiff

ICWA and the Final Rule violate Individual Plaintiffs' due-process rights by interfering with their ability to retain custody and control over their children. Defendants argue that Plaintiffs—who are simply trying to maintain their families—seek to create "novel" rights. U.S. Br. 31. But "the interest of parents in the care, custody, and control of their children" is the "oldest of the fundamental" rights. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality). "[T]he relationship of love and duty in a recognized family unit is an interest in liberty entitled to constitutional protection." *Lehr v. Robertson*, 463 U.S. 248, 258 (1983).[11]

***The Brackeens.*** "[T]he right of the family to remain together without the coercive interference of the awesome power of the state" is the "most essential and basic aspect of familial privacy." *Hodorowski v. Ray*, 844 F.2d 1210, 1216 (5th Cir. 1988). Defendants contend, without citing any authority, that the Brackeens have no due-process right against attacks on their adoption of A.L.M.. But adoptive parents have the same due-process rights as biological parents, *Smith v. Org. of Foster Families For Equal. & Reform*, 431 U.S. 816, 844 & n.51 (1977)—including the fundamental right "to remain together without . . . coercive interference." *Hodorowski*, 844 F.2d

---

[11]  Defendants assert that these due-process challenges are facial only, U.S. Br. 6, but in fact they depend on individual circumstances and relationships, and so necessarily are as-applied claims.

11

at 1216.   The government may not infringe this liberty interest "at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Reno v. Flores*, 507 U.S. 292, 302 (1993).   Texas's collateral-attack provision might satisfy that stringent test because it is narrowly tailored to ensure that the biological parents' own fundamental rights in their relationships with their child are not wrongfully dissolved.   On the other hand, ICWA's provisions, which extend the collateral-attack period to two years, 25 U.S.C. § 1913(d), and which, according to the United States, can be invoked even by the child's *tribe*, U.S. Br. 32 (citing 25 U.S.C. § 1914), are not similarly narrowly tailored.   Defendants make no effort at all to show either why a two-year period is necessary, or how allowing a tribe to advance claims of fraud or duress when the biological parents themselves do not is somehow necessary (or even appropriate) to protect the parental rights from wrongful dissolution.   ICWA's collateral-attack provisions—which even now threaten to tear the Brackeen family apart—cannot be sustained.

**Ms. Hernandez.**   The government concedes, as it must, that Ms. Hernandez's "right to make decisions concerning the care, custody, and control of . . . her child is 'fundamental.'"   U.S. Br. 33; *see Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925).   Defendants claim, however, that a parent's fundamental right to make decisions "concerning the care [and] custody" of children does not encompass the right to "direct the adoption of [her] children."   U.S. Br. 33.   Again, Defendants cite no authority in support of that dubious argument.   And, indeed, it is difficult to imagine that if a single mother were terminally ill, she would not have the right to decide the best adoption placement for her children, subject to abridgment only when necessary to achieve a compelling governmental interest.   *Troxel* strongly suggests she would have that right.   In *Troxel*, the plurality held that because a mother has a "fundamental right to make decisions concerning the

care, custody, and control of her" children, the state may not compel her to give paternal grand-parents access to her child.   530 U.S. at 72 (plurality); *see also id.* at 78 (Souter, J., concurring in the judgment) ("The strength of a parent's interest in controlling a child's associates is as obvious as the influence of personal associations on the development of the child's social and moral char-acter.").   If a parent has the right to exclude persons from a child's upbringing, it follows that she has the right also to direct who shall be included in that upbringing.

To be sure, the right of a parent to select an adoptive placement is not unfettered.   It is bounded by the state's compelling interest in ensuring the health and safety of the child.[12]   *See* Nev. Rev. Stat. § 127.150 (requiring adoptive placement to be consistent with child's best interest). But the asserted interest in accruing children to tribal rolls, or the more general interest in keeping "Indian children" in the "Indian community" does not even remotely approach the "compelling" threshold.   Defendants themselves qualify it only as "important," and Defendants can make no serious argument that ICWA's placement preferences—applicable to all "Indian children"—are narrowly tailored to the stated problem of "removals of Indian children from their homes and their tribes."   ICWA's interference with Ms. Hernandez's adoption plan for her child thus violates her fundamental right to direct the upbringing of her child, Baby O.[13]

---

[12]   Defendants suggest that parental rights can be "erased completely" in view of "the competing interests of the child and the State."   U.S. Br. 34 n.33 (citing *Michael H. v. Gerald D.*, 491 U.S. 110 (1989), and *Lehr*, 463 U.S. 248).   *Michael H.* held no such thing.   It concluded only that legal and historical tradition did not support the right of a biological father to overturn the existing fun-damental rights of parents in an existing "unitary family." 491 U.S. at 123.   And *Lehr* similarly rejected the effort of a biological father who "ha[d] never had any significant custodial, personal, or financial relationship" with his child to upset the adoption of the child by her mother's husband. 463 U.S. at 262.

[13]   Defendants say that ICWA's placement preferences "account for a parent's preference" by allowing it to be a basis for a finding of "good cause" to depart from the preferences.   U.S. Br. 34 (citing 25 C.F.R. § 23.132).   But that turns Ms. Hernandez's fundamental right to direct the up-bringing of her child upside-down.   Because her right is a fundamental one, it is not up to Ms.

13

**The Librettis and the Cliffords.**   Defendants propose a bright-line rule that would deny foster parents any due process "right in their relationship with their foster children."  U.S. Br. 33 (citing *Drummond v. Fulton Cty. Dep't of Family & Children's Servs.*, 563 F.2d 1200, 1206–07 (5th Cir. 1977) (en banc)).  But the holding in *Drummond* was closely tied to the particular "context of" the case before it, and the court held that its "conclusion" did "does not necessarily control every 'foster family' situation."  563 F.2d at 1206–07.  Notably, *Drummond* involved a temporary foster placement not intended to result in adoption.  *Id.* at 1207.  The court thus directed that "[o]ther situations will have to be addressed on a case by case basis."  *Id*.

Here, the Librettis and Cliffords, unlike the *Drummond* foster parents, have long and mean-ingful familial relations with Baby O. and Child P.  Although the government suggests, U.S. Br. 33 n.32, that the placements with the Cliffords and Librettis were temporary, they fostered their chil-dren with the express intent of adopting, *see* App. 26 (identifying Cliffords as "potential non-relative permanency resource"); *id.* at 67–68 (Librettis sought to "provide a permanent home for the child").  Accordingly, these relationships ought to be recognized as having due-process rights subject to strict scrutiny.  And while there may be circumstances in which there is sufficient justi-fication to vitiate those relationships—including to advance the compelling state interests in main-taining biological families where not contrary to the child's best interests—it cannot possibly be maintained that ICWA's regime of placement preferences is narrowly tailored to the achievement of those interests.  Nor can it plausibly be argued that the interest the preferences do advance—keeping "Indian children" in the "Indian community"—is a compelling governmental interest.

---

Hernandez to justify her wish for her child to the government.  To the contrary, it is the government that must demonstrate a compelling basis to depart from her wishes.  *See Reno*, 507 U.S. at 302.

III.    **ICWA And The Final Rule Violate The Anti-Commandeering Doctrine And The Tenth Amendment**

Individual Plaintiffs adopt State Plaintiffs' arguments that ICWA and the Final Rule exceed Congress's enumerated powers and violate the anti-commandeering principle.

*First*, Congress has power to enact legislation pursuant only to the powers enumerated in the Constitution. "[A]ll other legislative power is reserved for the States, as the Tenth Amendment confirms." *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018). The Commerce Clause, which authorizes Congress "[t]o regulate Commerce with Foreign Nations, and among the several States, and with the Indian Tribes," permits regulation only of *commerce*. Children are not objects of commerce under the Constitution. *See United States v. Lopez*, 514 U.S. 549, 585 (1995) ("At the time the original Constitution was ratified, 'commerce' consisted of selling, buying, and bartering, as well as transporting for these purposes."); *see also* U.S. Const. amend. XIII.

Despite its textual limitation to "Commerce," Defendants assert that the Commerce Clause "provide[s] Congress with plenary power to legislate in the field of Indian affairs." U.S. Br. 35 (quoting *United States v. Lara*, 541 U.S. 193, 200 (2004)). But in *Lara*, the parties did not dispute that Congress had plenary authority over Indian affairs and so the Court accepted the proposition as given. *See* 541 U.S. at 218 (Thomas, J., concurring). In any event, power over "Indian affairs" must be understood as limited to *tribal matters*. The Supreme Court has never held that Congress has plenary power to issue any legislation whatsoever pertaining to Indians living outside a reservation, much less the power to regulate *the States'* regulation of Indians under state jurisdiction. Under the government's theory, Congress could require the States to apply different rules of evidence to Indian defendants in criminal cases; or regulate landlord-tenant relationships involving Indians. The possibilities are as endless as they are absurd. But whatever the limits of Congress's authority to regulate "Indian affairs," neither the Indian Commerce Clause nor any federal treaty

15

gives Congress authority to regulate state-court adoptions of children not living on tribal land.

*Second*, the Constitution "withhold[s] from Congress the power to issue orders directly to the States." *Murphy*, 138 S. Ct. at 1475. The anti-commandeering principle "promotes political accountability" by ensuring that "the responsibility for the benefits and burdens of the regulation is apparent." *Id.* at 1477. ICWA creates the very confusion that this principle prohibits by requiring state officials to become agents of the national government. The government contends that ICWA merely provides federal law "enforceable in state courts." U.S. Br. 41. But the Final Rule imposes numerous requirements on State agencies. *See, e.g.*, 25 C.F.R. § 23.132(c)(5) (diligent search requirement). And no authority supports Defendants' position that Congress can order State courts to implement federal requirements as part of a state-law cause of action. That *modifies* state law rather than preempting it.[14]

## IV.    The Final Rule Independently Violates The APA

As demonstrated above, ICWA is unconstitutional. The Final Rule purporting to implement that unconstitutional law therefore must be vacated as contrary to law. *See* 5 U.S.C. § 706. But even if the constitutionality of ICWA were not here at issue, the Final Rule still must be vacated because it (1) exceeds the scope of DOI's regulatory authority under ICWA; (2) reflects an impermissible construction of the statute; and (3) otherwise is arbitrary and capricious.

**A.** DOI does not have authority to promulgate substantive standards and procedural rules for child-custody proceedings in state courts, which is what the Final Rule does.

1. DOI and the BIA are creatures of statute and have only the regulatory "authority delegated by Congress." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). Although

---

[14]  Further, the Final Rule's "diligent search" requirements are contrary to ICWA because that statute nowhere indicates an intention to direct the operation of state child-service agencies—not surprisingly because to do so clearly violates the anti-commandeering principle. *See Printz v. United States*, 521 U.S. 898 (1997).

*Chevron* generally applies to "whether the [agency] possesse[s] statutory authority to adopt" the regulations at issue, *City of Arlington v. FCC*, 569 U.S. 290, 295 (2013), there is no *Chevron* deference when the agency takes "forty years to 'discover'" its sweeping regulatory authority, *Chamber of Commerce of U.S. v. U.S. Dep't of Labor*, 885 F.3d 360, 380 (5th Cir. 2018), or when the regulation is "procedurally defective," *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016) ("*Encino I*"). The Final Rule trips all of these wires.

Beginning in its first interpretation of ICWA and continuing through the next 37 years, the BIA disclaimed, on statutory and constitutional grounds, the very authority it now asserts. In 1979, the BIA recognized that, as a statutory matter, "[p]rimary responsibility for interpreting" much of ICWA "rests with courts that decide Indian child custody cases," and the BIA's interpretations of ICWA's substantive standards could not be "controlling." Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,584 (Nov. 26, 1979). "Assignment of super-visory authority over the courts to an administrative agency is a measure so at odds with concepts of both federalism and separation of powers that it should not be imputed to Congress in the ab-sence of an express declaration of Congressional intent to that effect." *Id*. The BIA therefore interpreted ICWA's "language" in Section 1952 as permitting the BIA "to promulgate regulations to carry out" only those "responsibilities Congress had assigned it under the Act." *Id*.

The Final Rule departs from this longstanding interpretation. DOI now believes it can issue "binding regulations" that prescribe substantive standards and procedures that state courts must follow. And while DOI spelled out why it thought such binding regulations were a good idea—principally to stamp out disuniformity in the States' administration of ICWA, *see* Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38,778, 38,785 (June 14, 2016) (codified at 25 C.F.R. pt. 23)—DOI said nothing to explain why its 1979 construction of the statute was incorrect. The

17

agency merely stated that it "no longer agrees . . . that it lacks the authority to issue binding regu-lations." *Id*. at 38,785–86.

Under *Chamber of Commerce*, DOI's newfound interpretation is not entitled to deference. When an agency's new interpretation of a statute "flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the governing statute," it is "entitled to considerably less deference." 885 F.3d at 381; *see also Carcieri v. Salazar*, 555 U.S. 379, 396 (2009) (Breyer, J., concurring) (no deference to current agency interpretation when the agency took the opposing party's interpretation at passage of the statute).

Moreover, the Rule is "procedurally defective" because DOI never grappled with its 1979 legal interpretation. *Encino I*, 136 S. Ct. at 2125. When an agency changes how it interprets a congressional statute, it must "explain its change in interpretation of" the law. *Mexichem Fluor, Inc. v. EPA*, 866 F.3d 451, 461 (D.C. Cir. 2017). In 1979, the BIA recognized that its prescription of binding standards for state courts would be "at odds with concepts of both federalism and sep-aration of powers," and that, accordingly, under ICWA, DOI "does not have" such "authority." 44 Fed. Reg. at 67,584. But in the Final Rule, DOI never attempts to reconcile its new interpretation with the "concepts of both federalism and separation of powers" that compelled the BIA's 1979 interpretation. Because DOI changed its interpretation of Section 1952 "without a sufficiently reasoned explanation," its new interpretation gets no deference. *Encino Motorcars, LLC v. Na-varro*, 138 S. Ct. 1134, 1139 (2018) ("*Encino II*").

2. This Court thus must "decide whether, without administrative deference" Section 1952 of ICWA provides DOI with authority to issue the Final Rule. *Encino II*, 138 S. Ct. at 1139. It does not. As the BIA recognized contemporaneously with ICWA's enactment, Congress did not "intend[ ] this Department to exercise supervisory control over state or tribal courts or to legislate

18

for them with respect to Indian child custody matters."  44 Fed. Reg. at 67,584.

Defendants characterize Section 1952, which directs the agency to "promulgate such rules and regulations as may be necessary to carry out the provisions of this chapter," as a "general grant" of rulemaking authority.  U.S. Br. 43–44; Intervs. Br. 40 & n.30.  But ICWA, in its peculiar statutory design, commands that the vast majority of its provisions be "carr[ied] out" not by DOI or the BIA or any other component of the federal government, but by state and tribal courts.  Indeed, ICWA gives DOI no child-placement duties to "carry out" at all.  As the BIA correctly concluded in 1979, regulations of child-custody proceedings in state and tribal courts are "not necessary to carry out the Act" and thus beyond the BIA's statutory authority.  44 Fed. Reg. at 67,584.  The BIA's regulatory authority under ICWA was delimited by the "responsibilities Congress has explicitly imposed on the Department." *Id.*

This is confirmed by the fact that, where Congress did impose a responsibility on DOI to administer some portion of ICWA, Congress expressly provided DOI with the corresponding power to interpret the relevant statutory language.  *See* 25 U.S.C. § 1918(b) (providing factors for DOI to consider in deciding whether a plan for reassumption of jurisdiction was "feasible" under Section 1918(a)).  And in that specific area where Congress expressly imposed administrative duties on DOI, DOI did, in fact, publish binding regulations.  *See* 25 C.F.R. pt. 23.

Finally, construing Section 1952 to authorize DOI to issue regulations respecting provisions it has no role in administering raises serious constitutional concerns.  Allowing an agency to create substantive rules that the agency does not enforce impermissibly establishes "a sort of junior-varsity Congress."  *Mistretta v. United States*, 488 U.S. 361, 427 (1989) (Scalia, J., dissenting).  The Supreme Court found no non-delegation problem in *Mistretta* only because the judges appointed to the Sentencing Commission there were well-versed in sentencing and would themselves

19

carry the Sentencing Guidelines into effect. *Id.* at 404.  DOI, on the other hand, has neither exper-tise nor experience nor any role in administering family law. *Mistretta* does not remotely suggest that Congress could delegate rulemaking authority to agencies that do not administer the relevant aspect of the statute, which is the power DOI claims here.

For all of these reasons, the best interpretation of Section 1952 and the scope of its regula-tory authority is the interpretation DOI originally provided:  It authorizes DOI to issue regulations with respect to the areas of the statute it administers; it does not allow DOI to regulate state courts' adjudications of child-custody proceedings.[15]

**B**.  Even if DOI had statutory authority to issue rules respecting child-custody proceedings in state courts—and it does not—the Final Rule still must be vacated because its limitations on what may constitute "good cause" to depart from ICWA's placement preferences and its height-ened burden of proof each reflect an impermissible interpretation of ICWA.

1. The Final Rule's determination that departures from ICWA's placement preferences must be proved by clear and convincing evidence, 25 C.F.R. § 23.132(b)—a standard that the Rule itself acknowledges "is not articulated in section 1915," 81 Fed. Reg. at 38,843—is not a permis-sible construction of the statute.

The default standard of proof in civil cases is preponderance of the evidence, and the Su-preme Court has held that congressional "silence" as to the burden of proof "is inconsistent with the view that Congress intended to require a special, heightened standard of proof." *Grogan v. Garner*, 498 U.S. 279, 286 (1991).  ICWA's acknowledged silence as to the burden of proof to

---

[15]  Because Plaintiffs' injuries result from the final action that the BIA and DOI took when they promulgated the Final Rule, the APA waives the United States' sovereign immunity. *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 489 (5th Cir. 2014) (Section 702's sov-ereign immunity waiver extends to "claims where a person 'suffer[s] a legal wrong because of agency action'" including "statutory or non-statutory cause[s] of action that arise[ ] completely apart from the general provisions of the APA") (quoting 5 U.S.C. § 702).

show "good cause" under Section 1915 therefore cannot be construed as presenting a range of options from which the agency (or state courts) may choose; it operates as a congressional command that the preponderance standard be applied. Defendants have no response to *Grogan*.

But there is more than "silence." Where Congress wanted a heightened burden, it expressly provided for it. *See* 25 U.S.C. § 1912(e), (f). Congress's inclusion of heightened burdens in Section 1912 but omission of a similar burden in Section 1915 must be presumed to be "intentional[ ]." *Chamber of Commerce*, 885 F.3d at 373. Defendants have no response to this point either. The Final Rule's clear-and-convincing standard is unambiguously foreclosed by the statute.[16]

2. The Final Rule's sharp restrictions on the evidence that can be considered in a "good cause" proceeding similarly should be rejected as contrary to the statute. *Chamber of Commerce* confirms that "Congress intends to incorporate the well-settled meaning of the common-law terms it uses." 885 F.3d at 370.[17]

As numerous cases hold, "'[g]ood cause' has a well-known meaning at common law." *PharmFlex, Inc. v. Div. of Emp't Sec.*, 964 S.W.2d 825, 830 (Mo. Ct. App. 1997). The term "eludes a precise definition, but refers to a remedial purpose and is to be applied with discretion to prevent a manifest injustice or to avoid a threatened one." *Id.*; *see McRae v. Lamb*, 233 S.W.2d 193, 196 (Tex. Ct. App.—San Antonio 1950) ("good cause" standard demands that "each case must be judged upon its particular facts in the light of equitable principles, and the chancellor must be satisfied that the best interests of the child" are served by the outcome). The BIA cannot deviate

---

[16] The Final Rule's clear-and-convincing evidence requirement and good-cause standards are also contrary to law because they violate the constitutional rights of Individual Plaintiffs and Indian children. *See* Ind. Pls.' Br. 65–66. Defendants do not respond to this argument.

[17] Contrary to Defendants' suggestion, U.S. Br. 47, this canon of statutory construction is not limited to ERISA. *See, e.g.*, *United States v. Castleman*, 134 S. Ct. 1405, 1410 (2014).

from this established common-law meaning of "good cause" unless ICWA "dictates" such a departure. *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992); *see Chamber of Commerce*, 885 F.3d at 369–70. But here, the legislative history indicates that the discretion inherent in the common-law meaning of "good cause" was integral to Congress's design. S. Rep. No. 95-597, at 17 (1977) ("good cause" standard meant "to provide State courts with a degree of flexibility in determining the disposition of a placement proceeding involving an Indian child").[18]

3. Defendants argue that the Final Rule's new restrictions on proof of good cause can be overlooked because those prescriptions are "not articulated as a mandate," but instead say only that state courts "should" follow the Final Rule's standards. U.S. Br. 49. This is utterly disingenuous. Nearly any state court (bound by oath to follow federal law) would understand the regulation—"[t]he party seeking departure from the placement preferences should bear the burden of proving by clear and convincing evidence that there is 'good cause' to depart from the placement preferences," 25 C.F.R. § 23.132(b)—only as a *requirement* to impose the clear-and-convincing standard. This is particularly so given that the Final Rule describes itself as "binding" and setting forth "the minimum requirements of ICWA." *See* 81 Fed. Reg. at 38,851. But even if the Final Rule's directives as to what state courts "should" do possibly could be understood as mere suggestions, whatever authority DOI has to "carry out" the statute (25 U.S.C. § 1952) surely does not include power to suggest to state courts that they act contrary to the statute. The Final Rule's restrictions on "good cause" are contrary to ICWA and the Final Rule therefore must be vacated.

---

[18] DOI claims the authority to define "good cause" in derogation of the common law, citing *United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991). But the statute at issue there "explicitly directs the SEC to 'define' fraudulent practices and to 'prescribe means reasonably designed to prevent" such practices, *id.* at 558, and thus demonstrates a clear intent to reach beyond established common-law meaning.

C.   The Final Rule's change in course with respect to good cause also is inadequately explained and therefore arbitrary and capricious.   When an agency changes its policy, it "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"   *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).   And under that standard, "[t]he failure of an agency to consider obvious alternatives has led uniformly to reversal."   *Yakima Valley Cablevision, Inc. v. FCC*, 794 F.2d 737, 746 n.36 (D.C. Cir. 1986).   Here, other than its unsupported assertion "that Congress intended good cause to be a limited exception," 81 Fed. Reg. at 38,839, DOI's only stated justification for its sharp limitations on proof of good cause was that "good cause is a frequently litigated area of ICWA, and this litigation can result in harmful delays in achieving permanency for children."   *Id.*   But that does not even begin to explain why the appropriate response to such delays is to make good cause *more* difficult to prove rather than *less* difficult, for instance, by clarifying that good cause can be established by a preponderance of the evidence.   After all, many "litigation delays" are attributable to the fact that litigants must present *more* evidence to surmount the clear-and-convincing standard of proof.

The agency's failure to consider and grapple with such an "obvious alternative" solution to the stated problem marks the Final Rule as arbitrary and capricious.   It also fairly indicates that the agency's real concern here was not "litigation delays" but litigation *outcomes*.   But Congress granted DOI no authority to thumb the ICWA scales in state courts.[19]

---

[19]   DOI's expressed desire for "uniformity" in state courts' interpretation of ICWA cannot justify its change in course with respect to good cause, because, on DOI's telling, it "decline[d] to establish a uniform standard" in this area.   81 Fed. Reg. at 38,843.

23

**V.     Defendants' Request For Discovery Should Be Denied**

In line with their earlier efforts to delay adjudication of Plaintiffs' claims, Defendants in-voke Rule 56(d) to argue that Plaintiffs' motion should be deferred to allow discovery on Plaintiffs' Article III standing.  U.S. Br. 7–8.  But Defendants "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts," but instead must show with spec-ificity how the discovery will "create a genuine dispute as to a material fact," *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991), and how it "will influence the outcome of the summary judgment motion," *Am. Family Life Assurance Co. of Columbus v. Biles*, 714 F.3d 887, 895 (5th Cir. 2013).  Defendants make no effort to sustain that burden.

Here, Individual Plaintiffs' standing is predicated on the undisputed fact that ICWA desig-nates A.L.M., Child P., and Baby O. as "Indian children," and thereby subjects Plaintiffs to ICWA's and the Final Rule's requirements.  The declarations of the Individual Plaintiffs and the attached exhibits are more than sufficient to establish that each of them is injured by ICWA and the Final Rule.  That is particularly true because Article III is satisfied by just "one party with standing" per claim, *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).  The Cliffords present a simple case:  ICWA and the Final Rule has hindered them from adopting Child P., thus clearly establishing their standing.  Defendants argue that they "cannot determine what grounds support the Cliffords' understanding that ICWA's placement preferences and the Final Rule apply to those proceedings."  ECF No. 123-1 at 12, 14–15.  But the decision of the court of appeals says plainly that the "district court allowed the child to be placed with her maternal grandmother pursuant to preferences in ICWA" and also held that the "regulations asso-ciated with ICWA required the district court to treat the child as an Indian child."  App. 50, 52.  The Cliffords are subject to a special legal disability because of their race and Child P.'s status as an "Indian child," and this itself is a cognizable injury sufficient to carry all of the Cliffords'—and

thus all Individual Plaintiffs'—claims for relief.

To the extent that the Court has any doubts about whether Plaintiffs' declarations and exhibits adequately support their Article III standing, Plaintiffs respectfully request that, rather than order discovery, the Court order an evidentiary hearing at which the Court can accept evidence and live testimony from Plaintiffs.  *See* Fed. R. Civ. P. 56(d)(3) (allowing "any other appropriate order").  Given the nature of Individual Plaintiffs' claims and the risk that Defendants will argue that some or all of them could be mooted by the passage of time, Individual Plaintiffs respectfully submit that such an accelerated procedure would be "appropriate" to the circumstances.

## CONCLUSION

The Individual Plaintiffs' motion for summary judgment should be granted.

Dated:  June 8, 2018

Respectfully submitted,

/s/ Matthew D. McGill

Mark Fiddler
FIDDLER LAW OFFICE, P.A.
6800 France Ave. So., Suite 190
Minneapolis, MN 55435
mark@fiddler-law.com
Telephone: (612) 822-4095
Facsimile: (612) 822-4096

*Attorney for Frank and Heather Libretti, and
Jason and Danielle Clifford*

Matthew D. McGill (*pro hac vice*)
Lochlan F. Shelfer (*pro hac vice*)
David W. Casazza
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 887-3680
mmcgill@gibsondunn.com
lshelfer@gibsondunn.com
dcasazza@gibsondunn.com

Scott K. Hvidt
State Bar No. 24097864
GIBSON, DUNN & CRUTCHER LLP
2100 McKinney Ave., Suite 1100
Dallas, TX 75201
(214) 698-3100
shvidt@gibsondunn.com

*Attorneys for Individual Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on June 8, 2018, I filed the foregoing document using the Court's ECF system. Service on all counsel of record for all parties was accomplished electronically using the Court's CM/ECF system.

*/s/ Matthew D. McGill*
Matthew D. McGill
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Ave. N.W.
Washington, D.C. 20036
