**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHAD BRACKEEN, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:17-cv-00868-O** |
| | § | |
| **RYAN ZINKE, et al.,** | § | |
| | § | |
| **Defendants,** | § | |
| | § | |
| | § | |
| **CHEROKEE NATION, et al.,** | § | |
| | § | |
| **Intervenors-Defendants.** | § | |

## ORDER

All of the Defendants have filed Motions to Dismiss (ECF Nos. 56, 58).[1] Defendants seek to dismiss Plaintiffs' claims due to lack of standing. Plaintiffs oppose these motions. For the following reasons, Defendants' motions are **DENIED**.

## I.    BACKGROUND

The following factual recitation is taken from Plaintiffs' First Amended Complaint (ECF No. 35) unless stated otherwise. Plaintiffs are composed of three states—Texas, Louisiana, and Indiana, (collectively the "State Plaintiffs"), and seven individual Plaintiffs—Chad Everett and Jennifer Kay Brackeen (the "Brackeens"), Nick and Heather Libretti (the "Librettis"), Altagracia Socorro Hernandez ("Ms. Hernandez"), and Jason and Danielle Clifford (the "Cliffords") (collectively the "Individual Plaintiffs"). Am. Compl. 8–10, ECF No. 35. Defendants are the

---

[1] The Tribal Defendants "rely on, and incorporate by reference as if fully set forth herein" Federal Defendants' motion to dismiss. *See* Tribal Defs.' Mot. Dismiss, ECF No. 58. This Order will refer to both motions collectively as Defendants' Motion to Dismiss. Federal Defendants were also the only Defendants to reply to Plaintiffs' Response.

United States of America; the United States Department of the Interior (the "Interior") and its Secretary Ryan Zinke ("Zinke") in his official capacity; the Bureau of Indian Affairs (the "BIA") and its Director Bryan Rice ("Rice") in his official capacity; BIA Principal Assistant Secretary for Indian Affairs John Tahsuda, III ("Tahsuda")[2] in his official capacity; the Department of Health and Human Services ("HHS") and its Secretary Alex M. Azar II ("Azar") (collectively, the "Federal Defendants"). *Id.* Shortly after this case was filed the Cherokee Nation, Oneida Nation, Quinalt Indian Nation, and Morengo Band of Mission Indians (collectively "Tribal Defendants") filed an unopposed motion to intervene, which the Court granted. *See* Trib. Defs.' Mot. Intervene, ECF No. 42; 28 March 2018 Order, ECF No. 45.

This case is about the constitutionality of the Indian Child Welfare Act (the "ICWA") and the accompanying regulations (codified at 25 C.F.R. pt. 23) known as the Indian Child Welfare Act Proceedings (the "Final Rule") as promulgated by the BIA, as well as certain provisions of the Social Security Act ("SSA") that predicate federal funding for portions of state child-welfare payments on compliance with the ICWA. Plaintiffs argue that the ICWA and the Final Rule implement a system that mandates racial and ethnic preferences, in direct violation of state and federal law. Am. Comp. ¶ 193, ECF No. 35 (citing TEX. FAM. CODE §§ 162.015, 264.1085; LA. CONST. ART. 1, § 3; 42 U.S.C. § 1996b). Plaintiffs ask that the Final Rule be declared invalid and set aside as a violation of substantive due process and as not in accordance with law (Counts One and Five). 5 U.S.C. § 705(2)(A); Am. Compl. ¶¶ 265, 349, ECF No. 35. Plaintiffs also ask that the

---

[2] Initially Plaintiffs sued Michael Black in his official capacity as Acting Assistant Secretary of Indian Affairs. *See* Orig. Compl. ¶ 17, ECF No. 1. On September 13, 2017, U.S. Secretary of the Interior Ryan Zinke appointed John Tahsuda III as the Department of Interior's Principal Assistant Secretary of Indian Affairs. Press Release, *Secretary Zinke Names John Tahsuda III the Principal Deputy Assistant Secretary for Indian Affairs*, DEP'T OF THE INT., (Sept. 13, 2017), https://www.doi.gov/pressreleases/secretary-zinke-names-john-tahsuda-iii-principal-deputy-assistant-secretary-indian. Accordingly, he is substituted as a Defendant.

ICWA, specifically §§ 1901–23 and 1951–52, be declared unconstitutional under Article One and the Tenth Amendment of the United States Constitution because the provisions violate the Commerce Clause, intrude into state domestic relations, and violate principles of anti-commandeering (Counts Two and Three). Am. Compl. ¶¶ 281, 323, ECF No. 35. Finally, Plaintiffs ask that the ICWA §§ 1915(a)–(b) be declared unconstitutional in violation of substantive due process and the Equal Protection Clause of the Fifth Amendment to the United States Constitution (Counts Four and Six). Am. Compl. ¶¶ 338, 367, ECF No. 35. The State Plaintiffs alone bring the final count, seeking a declaration that ICWA § 1915(c) and Final Rule § 23.130(b) violate the non-delegation doctrine (Count Seven). Am. Compl. ¶ 376, ECF No. 35. Defendants move to dismiss, challenging the standing of all Plaintiffs to bring their claims.

### A. The ICWA and SSA

Congress passed the ICWA in the mid-1970s due to rising concern over "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989). "Congress found that 'an alarmingly high percentage of Indian families [were being] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies.'" *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552, 2557 (2013) (quoting 25 U.S.C. § 1901(4)). Recognizing "that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children," Congress created a framework to govern the adoption of Indian children. *See* 25 U.S.C. §§ 1901–63. This framework establishes: (1) placement preferences; (2) good cause to depart from placement preferences; (3) standards and responsibilities for state courts and their agents; and (4) fiscal and procedural consequences if the ICWA is not followed. *See id.*

The ICWA itself established "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes." 25 U.S.C. § 1902. The ICWA mandates placement preferences in foster care, preadoptive, and adoptive proceedings involving Indian children. 25 U.S.C. § 1915. The ICWA requires that "in any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a place with: (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." 25 U.S.C. § 1915(a). Similar requirements are set for foster care or preadoptive placements. *Id.* § 1915(b). If the Indian child's tribal court should establish a different order of the preferences, the state court or agency "shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child." *Id.* § 1915(c).

Absent good cause, the state court shall transfer proceedings concerning an Indian child to the Indian child's tribal court. 25 U.S.C. § 1911(b). In any state court proceeding for the "foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding." 25 U.S.C. § 1911(c). The ICWA prohibits the termination of parental rights for an Indian child in the absence of "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f).

State agencies and courts must notify potential intervenors and the Director of the BIA of an Indian child matter. 25 U.S.C. § 1912. In any involuntary Indian child custody proceeding for foster care placement or termination of parental rights, the ICWA commands state agencies and courts to notify the parents or Indian custodian and the Indian child's tribe of the pending

proceedings and of their right to intervention. 25 U.S.C. § 1912(a). Copies of these notices must

be sent to the Secretary of the Interior and the BIA. The ICWA also grants the Indian custodian or

tribe up to twenty additional days to prepare for such proceedings. *Id.*

The ICWA imposes a ten-day waiting period on the termination of parental rights to an

Indian child. 25 U.S.C. § 1913(a). Before such parental rights are terminated "any parent or Indian

custodian may withdraw consent to a foster care placement under State law at any time." *Id.* §

1913(b). In any voluntary proceeding for termination of parental rights or adoptive placement of

an Indian child, the biological parents or the Indian tribe may withdraw consent for any reason

prior to the entry of a final decree, and the child shall be returned to its parents or guardians. *Id.* §

1913(c). Finally, the ICWA permits the parent of an Indian child to withdraw consent to a final

decree of adoption on the grounds that the consent was obtained through fraud or duress for up to

two years after the final decree. 25 U.S.C. § 1913(d); Am. Compl. ¶¶ 58–60, ECF No. 35.

The ICWA places recordkeeping duties on state agencies and courts to demonstrate states'

compliance with the statute. 25 U.S.C. § 1915(e); Am. Compl. ¶ 61, ECF No. 35. Additionally,

state courts entering final decrees must provide the Secretary of the Interior with a copy of the

decree or order, along with the name and tribal affiliation of the child, names of the biological

parents, names of the adoptive parents, and the identity of any agency having files or information

relating to the adoption. 25 U.S.C. § 1951.

If the state court or prospective guardians fail to comply with the ICWA, the final child

custody orders or placements may be overturned on appeal or by another court of competent

jurisdiction.[3] 25 U.S.C. § 1914. To ensure state agencies and courts comply with the ICWA's

---

[3] While "court of competent jurisdiction" is not defined in the ICWA or the Final Rule, state appellate courts and federal district courts have heard challenges to adoption proceedings under the ICWA. *See e.g.*, *Oglala Sioux Tribe v. Van Hunnik*, 993 F. Supp. 2d 1017, 1022 (D.S.D. 2014); *Doe v. Mann*, 285 F. Supp. 2d 1229, 1231 (N.D. Cal. 2003).

mandates, it enables any Indian child who is the subject of any action under the ICWA, any parent or Indian custodian from whose custody the child was removed, and the Indian child's tribe, to petition any court of competent jurisdiction to invalidate a state court's decision for failure to comply with the ICWA §§ 1911, 1912, and 1913. 25 U.S.C. § 1914. Section 1914 has also been applied to allow collateral attacks to adoptions after the close of the relevant window under state law. *See Id.*; Am. Compl. ¶ 67, ECF No. 35; *see e.g.*, *Belinda K. v. Baldovinos*, No. 10-cv-2507, 2012 WL 13571, at *4 (N.D. Cal. Jan. 4, 2012).

Congress has also tied child welfare funding to compliance with the ICWA. The SSA requires states who receive child welfare funding through Title IV-B, Part 1 of the SSA to file annual reports, including a description of their compliance with the ICWA. Am. Compl. ¶ 68, ECF No. 35; Pub. L. No. 103–432, § 204, 108 Stat. 4398 (1994); 42 U.S.C. § 622(a). Title IV-B funding is partially contingent on how well the states demonstrate they comply with the ICWA. Part 'b' requires that this plan must also "contain a description, developed after consultation with tribal organizations . . . in the State, of the specific measures taken by the State to comply with the [ICWA]." 42 U.S.C. § 622(b).

Congress expanded the requirement for States to comply with the ICWA to receive SSA funding in 1999 and 2008 when it amended Title IV-E to require States to certify ICWA compliance to receive foster care and adoption services funding. Foster Care Independence Act of 1999, Pub. L. No. 106–69, § 101, 113 Stat. 1822 (1999); Fostering Connections to Success and Increasing Adoptions Act of 2008, Pub. L. No. 110–351, § 301, 122 Stat. 3949 (2008).

Finally, HHS regulations state that the HHS Administration for Children and Families ("ACF") "will determine a title IV–E agency's substantial conformity with title IV–B and title IV–

E plan requirements" based on "criteria related to outcomes." 45 C.F.R. § 1355.34(a). Part 'b' of the same section includes compliance with the ICWA. 54 C.F.R. § 1355.34(b).

In fiscal year 2018, Congress allocated Texas approximately $410 million in federal funding for Title IV-B and Title IV-E programs, Louisiana received approximately $64 million, and Indiana received approximately $189 million. Am. Compl. ¶¶ 76–78, ECF No. 35. Plaintiffs argue that HHS and Secretary Azar administer funding under Title IV-B and Title IV-E and are vested with discretion to approve or deny a state's compliance with the requirements of 42 U.S.C. §§ 622, 677. Because of this, Plaintiffs claim that funding for Title IV-B and IV-E is dependent on compliance with the ICWA. Am. Compl. ¶ 80, ECF No. 35.

## B.     The Final Rule

In 1979, before passage of the Final Rule, BIA promulgated Guidelines for State Courts— the Indian Child Custody Proceedings (the "1979 Guidelines"). Am. Compl. ¶ 82, ECF No. 35. BIA intended these guidelines to assist in the implementation of the ICWA but they were "not intended to have binding legislative effect." 44 Fed. Reg. 67,584 (Nov. 26, 1979). The 1979 Guidelines left the "primary responsibility" for interpreting the ICWA "with the courts that decide Indian child custody cases." *Id.* It also emphasized that "the legislative history of the Act states explicitly that the use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." *Id.* As state courts applied the ICWA, some held that the 'good cause' exception to the ICWA placement preferences required a consideration of a child's best interest, including any bond or attachment the child formed. *See e.g.*, *In re Interest of Bird Head*, 331 N.W.2d 785, 791 (Neb. 1983); *In re Appeal in Maricopa Cnty*,. Juvenile Action No. A-25525, 667 P.2d 228, 234 (Ariz. Ct. App. 1983); see also Am. Compl. ¶ 83, ECF No. 35. Other state courts limited the ICWA's application to

situations where the child had some significant political or cultural connection to the tribe. Am. Compl. ¶ 84, ECF No. 35; *see, e.g.*, *In re Interest of S.A.M*, 703 S.W.2d 603, 608–09 (Mo. Ct. App. 1986); *Claymore v. Serr*, 405 N.W.2d 650, 653–54 (S.D. 1987); *In re Adoption of T.R.M.*, 525 N.E.2d 298, 303 (Ind. 1988); *Hampton v. J.A.L.*, 658 So. 2d 331, 335 (La. Ct. App. 1995).

In June of 2016, BIA promulgated the Final Rule, which purported to "clarify the minimum Federal standards governing implementation of the [ICWA]" and to ensure that the ICWA "is applied in all States consistent with the Act's express language." 25 C.F.R. § 23.101. The regulations declared that while BIA "initially hoped that binding regulations would not be necessary to carry out [the ICWA], a third of a century of experience has confirmed the need for more uniformity in the interpretation and application of this important Federal law." 81 Fed. Reg. at 38,782.

The main departure from the previous decades of practice under the ICWA was the Final Rule's definition of the 'good cause' exception to the preference placements. Am. Compl. ¶ 116, ECF No. 35. The Final Rule noted that "State courts . . . differ as to what constitutes 'good cause' for departing from ICWA's placement preferences." 81 Fed. Reg. at 38,782. In response, the Final Rule mandates that "[t]he party urging that ICWA preferences not be followed bears the burden of proving by clear and convincing evidence the existence of good cause" to deviate from such a placement. 81 Fed. Reg. at 38,838; *see also* 25 C.F.R. § 23.132(b).

The Final Rule provides that state courts "may not consider factors such as the participation of the parents or Indian child in Tribal cultural, social, religious, or political activities, the relationship between the Indian child and his or her parents, whether the parent ever had custody of the child, or the Indian child's blood quantum." 81 Fed. Reg. at 38,868 (codified at 25 C.F.R. § 23.103(c)).

Plaintiffs contrast the 1979 statutory text where "the use of the term 'good cause' was designed to provide state courts with flexibility" to the Final Rule, which now claims that "Congress intended the good cause exception to be narrow and limited in scope." *Compare* 44 Fed. Reg. 67,584 (Nov. 26, 1979), *with* 81 Fed. Reg. at 38,839. Accordingly, the Final Rule sets forth "five factors upon which courts may base a determination of good cause to deviate from the placement preferences," and further "makes clear that a court may not depart from the preferences based on the socioeconomic status of any placement relative to another placement or based on the ordinary bonding or attachment that results from time spent in a non-preferred placement that was made in violation of ICWA." 81 Fed. Reg. at 38,839; *see also* 25 C.F.R. § 23.132(c)–(e); Am. Compl. ¶ 118, ECF No. 35.

Beyond the narrowing of what state courts may consider in determining "good cause," the Final Rule places more responsibilities on the states to determine if the child is an Indian child. 25 C.F.R. § 23.107(a). These inquiries "should be on the record," and "State courts must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." *Id.*, § 23.107(b). Whenever a state court enters a final adoption decree or an order in an Indian child placement, the Final Rule requires the state court or agency to provide a copy of the decree or order to BIA. *Id.* § 23.140. The Final Rule requires states to "maintain a record of every voluntary or involuntary foster care, preadoptive, and adoptive placement of an Indian child and make the record available within 14 days of a request by an Indian child's Tribe or the Secretary [of the Interior].'" *Id.* § 23.141.

In an involuntary foster care or termination of parental rights proceeding, the Final Rule requires state courts to ensure and document that the state agency has used "active efforts" to prevent the breakup of the Indian family. *Id.* § 23.120. The Final Rule defines "active efforts" to

include "assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan." *Id.* § 23.2.

When determining if the child is an Indian child, only the Indian tribe of which it is believed the child is a member may determine whether the child is a member of the tribe or eligible for membership. *Id.* § 23.108(a). "The State court may not substitute its own determination regarding a child's membership in a Tribe, a child's eligibility for membership in a Tribe, or a parent's membership in a Tribe." *Id.* § 23.108(b). But when the child meets the definition of "Indian child" for more than one tribe, then the Final Rule instructs state agencies and courts to defer to "the Tribe in which the Indian child is already a member," or allow "the Tribes to determine which should be designated as the Indian child's Tribe." *Id.* § 23.109(b)–(c). Only when the tribes disagree about the child's membership may the state courts designate the tribe to which the child belongs, and the Final Rule provides criteria the courts must use in making that designation. *Id.* § 23.109(c)(2).

The Final Rule instructs state courts to dismiss a voluntary or involuntary child custody proceeding when the Indian child's residence or domicile is on a reservation where the tribe exercises exclusive jurisdiction over child custody proceedings. 25 C.F.R. § 23.110(a). The Final Rule requires state courts to terminate child custody proceedings if any party or the court has reason to believe that the Indian child was improperly removed from the custody of his parent or Indian custodian. 25 C.F.R. § 23.114.

### C.     The Pertinent Adoption Proceedings

#### 1.     The Brackeens and A.L.M.

The Brackeens wished to adopt A.L.M, who was born in Arizona to an unmarried couple, M.M. and J.J. Am. Compl. ¶ 127, ECF No. 35. A.L.M. is an Indian child under the Final Rule

because he is eligible for membership in two Indian tribes—his biological mother is an enrolled member of the Navajo Nation, and his biological father is an enrolled member of the Cherokee Nation. *Id.*; *see* 25 C.F.R. § 23.2. A few days after A.L.M. was born, his biological mother brought him to Fort Worth, Texas, to live with his paternal grandmother. When he was ten months old, Child Protective Services ("CPS"), a division of the Texas Department of Family and Protective Services ("DFPS"), removed A.L.M. from his grandmother and placed him in foster care with the Brackeens. *Id.* ¶ 129. Per the ICWA and the Final Rule, the Cherokee Nation and the Navajo Nation were notified of A.L.M.'s placement with the Brackeens. *Id.* The Court identified no ICWA-preferred foster placement for A.L.M., so he remained with the Brackeens. *Id.* A.L.M. lived with the Brackeens for more than sixteen months before—with the support of his biological parents and paternal grandmother—the Brackeens sought to adopt him. Am. Compl. ¶ 128, ECF No. 35.

On May 2, 2017, a Texas state court terminated the parental rights of A.L.M.'s biological parents, making him eligible for adoption under Texas law. *Id.* ¶ 132. In June 2017, a year after the Brackeens took custody of A.L.M., the Navajo nation notified the family court that it located a potential alternative placement for A.L.M. with non-relatives in New Mexico. *Id.* ¶ 133.

On July 29, 2017, the Brackeens filed an original petition in the 323rd District Court, Tarrant County, Texas seeking to adopt A.L.M. *Id.* ¶ 134. The Cherokee and Navajo Nations were notified of the adoption proceeding. *Id.* ¶ 135; *see* 25 C.F.R. § 23.11. No one intervened in the Texas adoption proceeding or otherwise formally sought to adopt A.L.M. Am. Compl. ¶ 135, ECF No. 35. On August 1, 2017, the family court held a hearing regarding the Brackeens' petition for adoption. *Id.* ¶ 137. At that hearing, the Navajo Nation's social worker testified that the two tribes "came up with [an] agreement" among themselves in the hallway prior to the hearing to determine the designation of A.L.M.'s tribe. *Id.* ¶ 138. According to that agreement, they decided to designate

the Navajo Nation as A.L.M.'s tribe, but this "determination of [A.L.M.'s] Tribe for purposes of ICWA and [the Final Rule] do[es] not constitute a determination for any other purpose." 25 C.F.R. § 23.109(c)(3).

Under the ICWA and the Final Rule placement preferences, absent good cause, an Indian child should be placed with an Indian relative, member of the child's tribe, or another Indian party. See 25 U.S.C. § 1915(a). The Brackeens argued in state court that the ICWA's placement preferences should not apply because they were the only party formally seeking to adopt A.L.M., and that good cause existed to depart from the preferences. The burden is on the party seeking adoption to prove "by clear and convincing evidence that there was 'good cause'" to allow them, a non-Indian couple, to adopt A.L.M. 25 C.F.R. § 23.132(b). The Brackeens submitted testimony by A.L.M.'s biological parents, his court appointed guardian, and an expert in psychology to show good cause. Am. Compl. ¶ 141, ECF No. 35. However, Texas DFPS pointed to the Final Rule's heightened evidentiary requirements and argued that the Brackeens did not satisfy the heightened requirements to justify a departure from the placement preferences. *Id.* ¶ 142.

The family court denied the Brackeens' adoption petition, citing the ICWA and the Final Rule, concluding that the Brackeens failed to satisfy the burden of proof necessary to depart from the placement preferences. *Id.* ¶ 143; *see* 23 C.F.R. § 23.132; Order Denying Request for Adoption of Child, *In re A.L.M., a Child*, No. 323-105593-17 (323rd Dist. Ct., Tarrant Cnty., Tex. Aug. 22, 2017). DFPS notified all parties of its intention to move A.L.M. to the Navajo Nation's proposed placement in New Mexico. Am. Compl. ¶ 145, ECF No. 35. The Brackeens sought and obtained an emergency order preventing any placement of A.L.M. *Id.* ¶ 146. DFPS then proposed to take A.L.M., without the Brackeens, on an overnight visit to the proposed New Mexico placement. *Id.* ¶ 147–49. But, before that occurred, the proposed New Mexico placement withdrew their offer to

adopt A.L.M., leaving the Brackeens the only party seeking to adopt A.L.M. *Id.* ¶ 150. The Brackeens and A.L.M's guardian ad litem then entered into a settlement agreement to that effect. *Id.* ¶ 150.

In January 2018, the Brackeens successfully petitioned to adopt A.L.M., but under the ICWA and the Final Rule, the Brackeens' adoption of A.L.M. is open to collateral attack for two years. *Id.* ¶ 152. Plaintiffs explain that the Brackeens intend to continue to provide foster care for, and possibly adopt, additional children in need, but they are reluctant, after this experience, to provide foster care for other Indian children in the future. *Id.*¶ 154. Plaintiffs argue that the ICWA and the Final Rule therefore interferes with the Brackeens' intention and ability to provide a home to additional children. *Id.* Additionally, Plaintiffs argue that this legal regime damages Texas by limiting the supply of available, qualified homes necessary to help foster-care children in general, and Indian children, in particular. *Id.*

### 2.    The Librettis and Baby O.

The Librettis are a married couple living in Sparks, Nevada. *Id.* ¶ 156. They sought to adopt Baby O. when she was born in March of 2016. Baby O.'s biological mother, Ms. Hernandez, felt that she would be unable to care for Baby O. and wished to place her for adoption at her birth. *Id.* ¶ 157. Baby O. has significant medical needs but the Librettis welcomed her into their family, along with other adopted children and a biological son. *Id.* ¶ 158. Ms. Hernandez has continued to be a part of Baby O.'s life and she and the Librettis visit each other regularly. *Id.* ¶ 162.

Baby O.'s biological father, E.R.G., is descended from members of the Ysleta del sur Pueblo Tribe ("Pueblo Tribe"), located in El Paso, Texas. *Id.* ¶ 163. At the time of Baby O.'s birth, E.R.G. was not a registered member of the Tribe. *Id.* Baby O.'s biological paternal grandmother is a registered member of the Pueblo Tribe. The Pueblo Tribe intervened in the Nevada custody

proceedings in an effort to remove Baby O. from the Librettis and send her to foster care on Pueblo

Tribe reservation in west Texas. *Id.* ¶ 164. To date, the Pueblo Tribe identified thirty-six potential

placements, each requiring Nevada to conduct full home studies as an agent of the Pueblo Tribe.

*Id.* ¶¶ 165–66. Given Baby O.'s significant medical needs, Nevada found the first seven home

studies designated by the tribe unsuitable. Currently, Nevada is in the process of reviewing the

additional twenty-nine proposed homes nominated by the Pueblo Tribe to take foster care of Baby

O. *Id.* ¶ 167.

Once the Librettis joined the challenge to the constitutionality of the ICWA and the Final

Rule, the Pueblo Tribe indicated its willingness to discuss settlement. *Id.* ¶ 168. While the

settlement negotiations may result in the Librettis adopting Baby O., Plaintiffs point out that any

settlement would still be subject to collateral attack under the ICWA for two years. *Id.* ¶ 168. The

Librettis intend to petition to adopt Baby O. as soon as they are able; they are the only people who

have indicated an intent to adopt her; and they are the only family she has known. *Id.* ¶ 169. Similar

to the Brackeens, the Librettis intend to provide foster care for and possibly adopt additional

children in need. *Id.* ¶ 170. Due to their experiences with the ICWA, the Librettis are "reluctant to

provide a foster home for other Indian children in the future." *Id.*

### 3.      The Cliffords and Child P.

The Cliffords live in Minnesota and seek to adopt Child P. *Id.* ¶ 173. Child P. was born in

July 2011 and placed in foster care in 2014 when her biological parents were arrested and charged

with various drug-related offenses. *Id.* ¶ 171. For two years, Child P. moved between various foster

parents and relatives without a stable or permanent home. *Id.* The State of Minnesota attempted to

return Child P. to her biological mother, but when her mother relapsed, the state returned Child P.

to foster care. *Id.* ¶ 172. Finally, Minnesota terminated the biological mother's parental rights and

placed her with the Cliffords in July 2016. *Id.* The Cliffords seek to adopt Child P. and "have continually worked to help her feel that she is a part of their family and community." *Id.* ¶ 173.

Child P.'s maternal grandmother is a registered member of the White Earth Band of Ojibwe Tribe (the "White Earth Band"). *Id.* ¶ 174. When Child P. first entered the state foster care system, her biological mother informed the state court that Child P. was not eligible for tribal membership. *Id.* In the fall of 2014, several months after Child P. entered foster care, the White Earth Band notified the court that Child P. was not eligible for membership. *Id.* Nevertheless, the state court sent notices to the White Earth Band that Child P. was in the custody of the state, as required by the ICWA. *Id.* Then, in January 2017, six months after Child P. was placed with the Cliffords, the White Earth Band wrote the court and insisted that Child P. was eligible for membership. *Id.* Most recently, the White Earth Band announced that Child P. was not only eligible but was now a member of the White Earth Band for the purposes of the ICWA. *Id.* ¶ 175. The Minnesota state court considered itself bound by this latest pronouncement and concluded that the ICWA must apply to all custody determinations concerning Child P. *Id.*

No other family has moved to adopt Child P. *Id.* ¶ 176. However, because the ICWA placement preferences apply, Minnesota removed Child P. from the Cliffords and placed her in the care of her maternal grandmother in January 2018. *Id.* ¶ 176. According to Plaintiffs, Child P.'s grandmother was previously denied a foster care license by the state. *Id.*

Child P.'s guardian ad litem supports the Cliffords' efforts to adopt her and agrees that this is in Child P's best interest. *Id.* ¶ 177. However, due to the application of the ICWA, the Cliffords and Child P. remain separated and the Cliffords face heightened legal barriers to adopt Child P. *Id.* Just like the other Individual Plaintiffs, if the Cliffords are successful in petitioning for adoption, that adoption may be attacked for two years under the ICWA. 25 U.S.C. § 1915(a).

### D.      State Plaintiffs

Texas, Louisiana, and Indiana bring this suit in their capacities as sovereign states. *Id.* ¶ 178. They claim that the ICWA and the Final Rule harm state agencies charged with protecting child welfare by usurping their lawful authority of the regulation of child custody proceedings and management of child welfare services. *Id.* Additionally, the ICWA and the Final Rule jeopardize millions of dollars in federal funding. *Id.* The State Plaintiffs have at least one Indian tribe living within their borders and have regular dealings with Indian child adoptions and the ICWA.[4] *Id.*

Plaintiffs argue that the ICWA and the Final Rule place significant responsibilities and costs on state agencies and courts to carry out federal Executive Branch directives. *Id.* ¶ 187. Texas DFPS, Louisiana Department of Child and Family Services ("DCFS"), and Indiana Department of Child Services ("DCS") each handle several Indian child cases every year. *Id.* ¶ 188.

The State Plaintiffs require their state agencies and courts to act in the best interest of the child in foster care, preadoptive, and adoptive proceedings. *Id.* ¶ 191. But the State Plaintiffs argue that the ICWA and Final Rule require these courts and agencies to apply the mandated placement preferences, regardless of the child's best interest, if the child at issue is an "Indian child." *Id*. ¶¶ 194–95. Additionally, the State Plaintiffs argue that the ICWA's requirement that state courts submit their authority to a mandate from the Indian child's tribe violates state sovereignty because

---

[4] Three federally recognized tribes live in Texas—Yselta del Sur Pueblo in El Paso, Texas; the Kickapoo Tribe in Eagle Pass, Texas; and the Alabama-Coushatta Tribe near Livingston, Texas. Both the Kickapoo Tribe and the Alabama-Coushatta Tribe have reservations in Texas. Am. Compl. ¶ 179, ECF No. 35. Four tribes exist in Louisiana—Chitimacha Tribe in Charenton, Louisiana; Coushatta Tribe in Elton, Louisiana; Tunica-Biloxi Tribe in Marksville, Louisiana; and Jena Band of Choctaw Indians in Jena, Louisiana. *Id.* ¶ 180. One federally recognized tribe exists in Indiana: Pokagon Band of Potawatomi Indians. *Id*. ¶ 181. For example, as of December 2017, there were thirty-nine children in the care of Texas DFPS who were verified to be enrolled or eligible for membership in a federally recognized tribe, many of them living in Texas DFPS homes. *Id.* ¶ 189.

the Indian tribe is not an equally-footed sovereign deserving full faith and credit. *Id.* ¶ 196; 25 U.S.C. § 1915(c).

In every child custody case, the ICWA and Final Rule requires the State Plaintiffs to undertake additional responsibilities, inquiries, and costs. *Id.* ¶ 197. As an example of how the ICWA and the Final Rule affects state procedures, the State Plaintiffs submit the Texas CPS Handbook (the "Texas Handbook"). The Texas Handbook contains Texas DFPS's policies and procedures for compliance with the ICWA and the Final Rule. *Id.* ¶ 198. First, these standards require that, in every case, CPS workers determine if the child or the child's family has Native American ancestry or heritage. *Id.* ¶ 199; Am. Compl., Ex. 1 (Texas Handbook) [hereinafter "Texas Handbook"] § 1225, ECF No. 35. The Texas Handbook instructs agencies how to ascertain if the ICWA and the Final Rule apply, how to comply with it, and warns that failure to comply could result in the final adoption order being overturned. Am. Compl. ¶¶ 200–204. The Texas Handbook also warns that if an Indian child is taken into DFPS custody, "almost every aspect of the social work and legal case is affected." Texas Handbook § 5844, ECF No. 35. If the ICWA applies, the legal burden of proof for removal, obtaining a final order terminating parental rights, and restricting a parent's custody rights is higher. *Id.* Texas DFPS must serve the child's parent, tribe, Indian custodian, and the BIA with a specific notice regarding the ICWA rights, and DFPS and its caseworkers "must make active efforts to reunify the child and biological Indian family." *Id.* Finally, the child must be placed according to the ICWA statutory preferences; expert testimony on tribal child and family practices may be necessary; and a valid relinquishment of parental rights requires a parent to appear in court and a specific statutory procedure is applied. *Id.*

Indiana and Louisiana have similar requirements in place to assure that their child welfare systems comply with the ICWA and Final Rule. *See* Am. Compl. ¶¶ 209–19. Louisiana DCFS

must maintain on-going contact with the Indian child's tribe because each tribe may elect to handle the ICWA differently. *Id.* ¶ 220. They are also required to ensure that the state agencies take "all reasonable steps" to verify the child's status. 25 C.F.R. § 23.124.

The ICWA and the Final Rule require state judges to ask each participant, on the record, at the commencement of child custody proceedings whether the person knows or has reason to know whether the child is an Indian child and directs the parties to inform the court of any such information that arises later. 25 C.F.R. § 23.107(a). If the state court believes the child is an Indian child, it must document and confirm that the relevant state agency: (1) used due diligence to identify and work with all of the tribes that may be connected to the child; and (2) conducted a diligent search to find suitable placements meeting the preference criteria for Indian families. *Id.* §§ 23.107(b), 23.132(c)(5). The ICWA and the Final Rule require the State Plaintiffs' agencies and courts to maintain indefinitely records of placements involving Indian children, and subject those records to inspection by the Director of BIA and the child's Indian tribe at any time. 25 U.S.C. §§ 1915(e), 1917; 25 C.F.R. §§ 23.140–41. This increases costs for State Plaintiffs' agencies and courts who have to maintain additional records not called for under state law and hire or assign additional employees to maintain these records indefinitely. Am. Compl. ¶ 225, ECF No. 35.

The statutes also affect the State Plaintiffs' rules of civil procedure. ICWA § 1911(c) and the Final Rule dictate that the Indian child's custodian and the child's tribe must be granted mandatory intervention. Texas Rule of Civil Procedure 60 permits Texas courts to strike the intervention of a party upon a showing of sufficient cause by another party, but the ICWA prevents the rule's application to child custody cases involving Indian children. Tex. R. Civ. Pro. 60. In Louisiana, any person with a justiciable interest in an action may intervene. La. Code Civ. Proc.

ART. 1091. In Indiana, a person may intervene as of right or permissively, similar to the Federal Rules of Civil Procedure. IND. R. TR. PROC. 24. The ICWA, however, eliminates these requirements and provides mandatory intervention for the Indian child's custodian and the child's tribe. Am. Compl. ¶ 231, ECF No. 35.

Finally, the ICWA and the Final Rule override the State Plaintiffs' laws with respect to voluntary consent to relinquish parental rights. *Id.* ¶ 234. Texas law permits voluntary relinquishment of parental rights 48 hours after the birth of the child; Louisiana allows surrender prior to or after birth of the child and surrender of maternal rights five days after the birth of the child; and Indiana permits voluntary termination of parental rights after birth of the child. TEX. FAM. CODE § 161,103(a)(1); LA. CHILD CODE ART. 1130; IND. CODE §31-35-1-6. The ICWA and Final Rule prohibit any consent until ten days after the birth. 25 U.S.C. § 1913(a); 25 C.F.R. § 23.125(e).

The ICWA and Final Rule also affect how long a final adoption decree is subject to challenge. Under the ICWA, state courts must vacate a final adoption decree involving an Indian child, and return the child to the biological parent, anytime within two years if the biological parent withdraws consent on the grounds that it was obtained through fraud or duress. 25 U.S.C. § 1913(d); 25 C.F.R. § 23.136. This directly conflicts with Texas, Louisiana, and Indiana law, which provide that an adoption decree is subject to direct or collateral attack for no more than one year. *See*, TEX. FAM. CODE § 162.012(a) (up to six months); *Goodson v. Castellanos*, 214 S.W.3d 741, 748–49 (Tex. App.—Austin 2007, pet. denied); LA. CHILD. CODE ART. 1263; IND. CODE § 31-19-14-2. It also contradicts the Texas common law principle, as well as Indiana statutory law, which hold that the best interest of the child is served by concluding child custody decisions so that these decisions are not unduly finalized. *In re M.S.*, 115 S.W.3d 534, 548 (Tex. 2003); IND. CODE § 31-

19

19-14-2. The ICWA however permits the invalidation, by any court of competent jurisdiction, of a state court's final child custody order if it fails to comply with the ICWA. 25 U.S.C. § 1914; 25 C.F.R. § 23.137.[5]

Finally, if states fail to comply with the ICWA, they risk losing funding for child welfare services under Title IV-B and Title IV-E of the SSA. Am. Compl. ¶ 243, ECF No. 35; 42 U.S.C. §§ 622, 677. Interior and HHS, and Defendants Zinke, Rice, Tahsuda, and Azar, determine if the State Plaintiffs complied with the statutory requirements, making them eligible for continued funding under Title IV-B and Title IV-E funding. Am. Compl. ¶¶ 244–46; 42 U.S.C. § 622(a); 42 U.S.C. § 677(e)(3).

## II.     LEGAL STANDARD

"Every party that comes before a federal court must establish that it has standing to pursue its claims." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013); *see also Barrett Computer Servs., Inc. v. PDA, Inc.*, 884 F.2d 214, 218 (5th Cir. 1989). Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy. "The doctrine developed in our case law to ensure that federal courts do not exceed their authority as it has been traditionally understood." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *Raines v. Byrd*, 521 U.S. 811, 820 (1997).

"The doctrine of standing asks 'whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.'" *Cibolo Waste*, 718 F.3d at 473 (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11 (2004)). Standing has both constitutional and prudential components. *See id.* (quoting *Elk Grove*, 542 U.S. at 11) (stating standing "contain[s] two strands: Article III standing . . . and prudential standing"). The Supreme Court has established

---

[5] *See* note 3, *supra.*

that the "irreducible constitutional minimum" of standing consists of three elements. *Spokeo*, 135 S. Ct. at 1547; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Lujan*, 504 U.S. at 560–61. But it is not necessary for all Plaintiffs to demonstrate standing; rather, "one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Texas v. United States*, 809 F.3d 134, 151 (5th Cir. 2015) (quoting *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

"Prudential standing requirements exist in addition to 'the immutable requirements of Article III,' . . . as an integral part of 'judicial self-government.'" *ACORN v. Fowler*, 178 F.3d 350, 362 (5th Cir. 1999) (quoting *Lujan*, 504 U.S. at 560). "The goal of this self-governance is to determine whether the plaintiff 'is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial power.'" *Id.* (quoting *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 546 n.8 (1986)). The Supreme Court has observed that prudential standing encompasses "at least three broad principles," including "the general prohibition on a litigant's raising another person's legal rights . . . ." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014); *Cibolo Waste, Inc.*, 718 F.3d at 474 (quoting *Elk Grove*, 542 U.S. at 12); *see also Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 290 (2008) (discussing cases where third-parties sought "to assert not their own legal rights, but the legal rights of others"); *Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 773 (2000) (noting "the assignee of a claim has standing to assert the injury in fact suffered by the assignor").

The question of standing implicates subject-matter jurisdiction; therefore, the motion to dismiss standards pursuant to Rule 12(b)(1) apply. *Villas at Parkside Partners v. City of Farmers*

*Branch*, 245 F.R.D. 551, 556 (N.D. Tex. 2007) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998)). A court determines subject-matter jurisdiction based on "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). A challenge to subject-matter jurisdiction can come in one of two ways—a facial attack or a factual attack. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). If the opposing party merely files a Rule 12(b)(1) motion, it is considered a facial attack, and the court takes all pleaded facts as true and looks at the sufficiency of the allegations in the pleadings. *Id.* A factual attack requires the moving party to submit additional evidence, through affidavits or testimony, and the non-moving party must then prove by a preponderance of the evidence that the court has jurisdiction. *Id.*

Article III confines the federal judicial power to "cases" and "controversies." U.S. CONST. art. III, § 2. The case or controversy requirement ensures that the federal judiciary respects "the proper—and properly limited—role of the courts in a democratic society." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (quotation marks omitted). "[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement [for each claim]." *Rumsfeld*, 547 U.S. at 53 n.2. As the parties invoking jurisdiction, Plaintiffs bear the burden of demonstrating that all of the requirements for standing are satisfied. *See Ramming*, 281 F.3d at 161.

Here, Defendants filed their motion to dismiss as a facial attack based on Plaintiffs' lack of standing. Defs.' Br. Supp. Mot. Dismiss [hereinafter "Defs.' Br. Dismiss"] 8, ECF No. 57. Therefore, when ruling on Defendants' motion to dismiss for lack of standing, the Court accepts "as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

### III.    ANALYSIS

Defendants move to dismiss Plaintiffs' complaint for failure to establish subject-matter jurisdiction. Defs.' Br. Dismiss 1, ECF No. 57. Defendants argue that: (1) neither the Individual nor the State Plaintiffs have standing to bring their claims; (2) the requested relief will not redress any alleged injury; (3) the claims against HHS are not ripe; (4) Minnesota and Nevada are necessary and indispensable parties under Rule 19; (5) the *Younger* abstention doctrine should apply; (6) and the State Plaintiffs waived their ability to challenge the Final Rule by not objecting to it during the notice and comment period. *Id.* at 1–2. The State and Individual Plaintiffs respond separately. *See* State Pls.' Comb. Resp., ECF No. 72; Indiv. Pls.' Comb. Resp., ECF No. 79. The Individual Plaintiffs respond that they are objects of the regulations at issue and have suffered an injury-in-fact due to the challenged provisions. Indiv. Pls.' Resp. Defs.' Mot. Dismiss Br. Supp. Mot. Summ. J. [hereinafter "Indiv. Pls.' Br. Resp."] 18, ECF No. 80. The State Plaintiffs respond that they have standing because the ICWA and the Final Rule pressures them "to relinquish control over powers reserved to them by the Constitution, to reevaluate their own laws, and to incur substantial costs in the process." State Pls.' Resp. Defs.' Mot. Dismiss Br. Supp. Mot. Summ. J. [hereinafter "State Pls.' Br. Resp."] 12, ECF No. 74. The Court will address standing for each of these challenges separately.

### B.    Individual Plaintiffs

#### 1.    Injury-in-Fact

The Individual Plaintiffs assert first, that they are "plainly subject to ICWA and the Final Rule, which govern their adoption efforts because they are seeking to adopt or place for adoption (or, in the case of the Brackeens, have adopted) an 'Indian child.'" Indiv. Pls.' Br. Resp. 19, ECF No. 80. Defendants argue that foster parents are not the object of either the ICWA or the Final

Rule, therefore neither regulation provides an injury-in-fact. Defs.' Reply Indiv. Pls.' Opp. [hereinafter "Defs.' Reply Indiv."] 1, ECF No. 116. Defendants also argue that the Brackeens' claims are moot because their adoption has been finalized. Defs.' Br. Dismiss 10, ECF No. 57.

Injury-in-fact must be both particularized and concrete, actual or imminent, not conjectural or hypothetical. *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). For an injury to be particularized, it "must affect the plaintiff in a personal and individual way." *Id.* Finally, the injury must actually exist. *Id.* Under *Lujan*, a type of a concrete and particularized injury generally exists if the "plaintiff is himself an object of the action (or forgone action) at issue. If he is, there is ordinarily little question that the action or inaction has caused him injury. . . ." *Lujan*, 504 U.S. at 561–62.

The Supreme Court has explained that a party is the object of a regulation if "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970). When the Fifth Circuit applied this concept, it held that if legislation targets a party, that party ordinarily has standing. *Duarte ex rel. Duarte v. City of Lewisville, Tex.*, 759 F.3d 514, 518 (5th Cir. 2014). Further, it held that "an increased regulatory burden typically satisfies the injury in fact requirement [of standing]." *Contender Farms, LLP v. USDA*, 779 F.3d 258, 264 (5th Cir. 2015). When determining if someone is an object of the regulation, the Fifth Circuit uses "a flexible inquiry rooted in common sense." *Id.* In *Duarte*, the court held that the daughter and wife of the sex offender had standing to object to the ordinance that restricted where sex offenders could live because they were held to be within the "zone-of-interest" for the ordinance. *Duarte*, 759 F.3d at 515; *see also Ass'n of Am. R.R.s v. Dep't of Trans.*,

38 F.3d 582 (D.C. Cir. 1994) (finding standing when the challengers of the regulation asserted they were harmed by two sets of regulations rather than one).

Applying the standards established in *Duarte* and *Contender Farms*, it is clear that the Individual Plaintiffs are objects of the ICWA and the Final Rule. The language of the Final Rule and the ICWA anticipates that there will be non-Indian parents seeking to adopt Indian children. *See* 25 C.F.R. § 23.130 (detailing the placement preferences for foster care or adoption, anticipating the possibility of non-Indian parents only if no preferred options were available). Individual Plaintiffs are burdened by the additional regulations and requirements as long as they are attempting to adopt an Indian child. *See Contender Farms, LLP*, 779 F.3d at 264; *cf, Lujan*, 504 U.S. at 561 (holding standing did not exist without concrete plans to be subject to the regulation).

The Individual Plaintiffs' attempts to adopt Indian children have been burdened, at the very least, by the ICWA and the Final Rule. *See Duarte*, 759 F.3d at 519 (finding standing for the wife and child of a man registered as a sex offender because the regulation interfered with their lives in "a concrete and personal way"). In this case, the Individual Plaintiffs attempted to adopt Indian children and, because they themselves were not Indian, faced heightened burdens to adoption. *See Contender Farms, LLP*, 779 F.3d at 264. The ICWA and the Final Rule target those adults seeking to adopt Indian children even if those adults are not members of an Indian tribe. *See* 25 U.S.C. §§ 1915(a)–(b); 25 C.F.R. § 23.130; *Duarte*, 759 F.3d at 519.

The Court finds the Individual Plaintiffs to be objects, therefore, it next examines whether the Individual Plaintiffs have alleged a concrete and particularized injury. First, the Brackeens'

adoption of A.L.M. is open to collateral attack for two years under the ICWA and the Final Rule.[6]

Indiv. Br. Resp. 37, ECF No. 80. Next, despite Baby O.'s biological mother supporting them, the

Librettis have faced additional regulatory burdens as they seek to adopt her because she is eligible

for membership in an Indian tribe.[7] *Id.* 38–39. And finally the Cliffords saw Child P. removed

from their home because of the ICWA placement preferences. *See supra* Part II.C. Even if the

Court only considered the injuries alleged by the Cliffords—that Child P. has been removed from

their home because of the ICWA and the Final Rule placement preferences—this would constitute

concrete and particularized injury. But, as stated above, the Librettis and Brackeens have also

stated injuries due to application of the ICWA and the Final Rule. This constitutes being the "object

of the regulation," which is a particularized and concrete injury that satisfies the injury-in-fact

requirements for standing. *Contender Farms, LLP*, 779 F.3d at 264.

        2.    <u>Traceability</u>

      The second prong of the standing analysis requires the alleged injury be "fairly traceable

to the defendant[s'] allegedly unlawful conduct." *Lujan*, 504 U.S. at 590. Tracing an injury is not

the same as seeking "proximate cause." *Bennett v. Spear*, 520 U.S. 154, 169 (1997). Instead, the

Fifth Circuit has held that traceability is satisfied if the defendant "significantly contributed to the

plaintiff's alleged injuries." *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010). The Supreme

Court held that while traceability is not satisfied when the injury results from actions by a third

party not before the court, this "does not exclude injury produced by determinative or coercive

---

[6] Defendants argue that the Brackeens' claims are moot because their adoption of A.L.M. has been finalized. Defs.' Br. Dismiss, 19, ECF No. 57. But the Brackeens also claim injury from the two-year time frame for collateral attack on their adoption that has not yet run.

[7] Defendants also argue that the Librettis are not injured by the ICWA or the Final Rule because Baby O. has not been taken away from them, nor have they faced an unusually long delay. Defs.' Br. Dismiss 24, ECF No. 57. But the Librettis have taken "concrete steps" to adopt Baby O. and additional barriers, due to the ICWA and the Final Rule, have delayed it. *Duarte*, 759 F.3d at 518.

effect upon the action of someone else." *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 265 (1991).

The Federal Defendants argue that traceability is not shown here because the Federal Defendants are not the cause of the Individual Plaintiffs' injuries. Defs.' Br. Dismiss 19, ECF No. 57. Instead, the Federal Defendants argue the alleged injury is caused by state courts that enforce the ICWA. *Id.* at 20. This argument ignores the fact that the injury complained of exists *because* of the ICWA and Final Rule. As explained below, the state courts only follow these requirements because the ICWA and the Final Rule require them. The ICWA and the Final Rule are therefore fairly traceable to the alleged injury because the pleading demonstrates the injury complained of results from the ICWA and the Final Rule. *See Legacy Cmty. Health Servs., Inc. v. Smith*, 881 F.3d 358, 368 (5th Cir. 2018). Federal Defendants also argue that the Individual Plaintiffs' alleged injuries are not traceable to the federal government because "ICWA specifies no enforcement role for Defendants, and neither Interior or HHS or any of their respective officers have enforced or are threatening to enforce ICWA." Defs.' Br. Dismiss 28–29, ECF No. 57. But the Final Rule, by its own terms, requires states to comply or face loss of funds by the Defendants.

Federal Defendants promulgated the Final Rule, setting "binding standards for Indian child-custody proceedings in State courts" that have the force of law. 81 Fed. Reg. at 38,782; *see* 25 C.F.R. § 23.132 (describing how a determination of good cause to depart from placement preferences is made). Accordingly, the traceability requirements are met.

3.   Redressability

The final requirement—redressability—requires a plaintiff to show "a 'favorable decision will relieve a discrete injury to himself,' but not necessarily 'that a favorable decision will relieve his *every* injury.'" *Air Evac EMS, Inc. v. Texas*, 851 F.3d 507, 514 (5th Cir. 2017) (quoting *Larson*

*v. Valente*, 456 U.S. 228, 243 n.15 (1982)). The Court must be able to structure relief to redress plaintiff's injury. The Individual Plaintiffs request the Final Rule be declared invalid and set aside; the ICWA and the related SSA provisions be declared unconstitutional; and Federal Defendants enjoined from enforcing the statutes. Defendants argue that this requested relief would not redress Plaintiffs' alleged injuries because "a declaratory judgment addressing the constitutionality of ICWA would not bind state courts." Defs.' Br. Dismiss 23, ECF No. 57.

The Court finds that the Individual Plaintiffs have satisfied the redressability requirement of constitutional standing. The redressability requirement is met if a judgment in plaintiffs' favor "would at least make it easier for them" to achieve their desired result. *Duarte*, 759 F.3d at 521. In this case, a declaration of the ICWA's unconstitutionality or the invalidity of the Final Rule would have the "practical consequence" of increasing "the likelihood that the plaintiff would obtain relief." *Evans*, 536 U.S. at 464. If the Federal Defendants are enjoined from applying the ICWA and the Final Rule, then the obligation to follow these statutory and regulatory frameworks will no longer be applied to the states. Nor would the placement preferences and the two-year collateral attack period be imposed. The Brackeens' injury, at the very least, would be redressed by a favorable decision, allowing their adoption of A.L.M. to be finalized after six months, as provided by Texas state law, rather than two years, as required by the ICWA and the Final Rule. *See* Part I.D. The redressability requirement for the Individual Plaintiffs is therefore met.

4.    Prudential Standing

Finally, a court should analyze prudential standing only "if the Article III standing requirements are met." *Wyoming v. U.S. Dep't of the Interior*, 674 F.3d 1220, 1231 (10th Cir. 2012). Because the Individual Plaintiffs alleged Article III standing, the Court now considers whether the prudential principles of standing require dismissal.

Prudential standing requires that the plaintiff generally "assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982). Federal courts must refrain from "adjudicating 'abstract questions of wide public significance,' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Id.* at 474–75. Finally, plaintiffs must fall within the "zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 475. If the three requirements of constitutional standing are met, and the party is championing his own rights, "the basic practical and prudential concerns underlying the standing doctrine are generally satisfied." *Duke Power Co. v. Carolina Evntl. Study Grp., Inc.*, 438 U.S. 59, 80–81 (1978). Because the Individual Plaintiffs are the "objects of the regulations" at issue, they are also within the zone of interests regulated by the statutes in question. *Valley Forge Christian Coll.*, 454 U.S. at 475.

For the above reasons, the Court finds that the Individual Plaintiffs have met the constitutional and prudential standing requirements to bring their claims. Accordingly, the Individual Plaintiffs have standing to bring Count Four (addressing the constitutionality of §§ 1915(a)–(b), Count Six (alleging §§ 1915(a)–(b) violate the equal protection clause of the Fifth Amendment), and parts of Counts One and Five (challenging the Final Rule as not in accordance with the law). The Individual Plaintiffs have alleged standing to challenge the parts of the Final Rule implementing the challenged portions of the ICWA.

## B.    State Plaintiffs

### 1.    Standing

Defendants also contend that the State Plaintiffs do not have standing to bring this suit in *parens patriae* and that they fail to allege a fiscal injury because they plead no facts demonstrating they have been financially harmed by the ICWA or the Final Rule. Defs.' Br. Dismiss 18, ECF No. 57. According to Defendants, the State Plaintiffs may not represent the interests of children within their custody or their resident parents who wish to foster or adopt a child. *Id.* While it is generally true that states may not represent their citizens against the federal government—that is not what is happening here. *See Massachusets v. Mellon*, 262 U.S. 447, 485–86 (1923). The State Plaintiffs assert that their standing is based primarily on a federal intrusion into a quasi-sovereign realm of state law, through the ICWA, the Final Rule, and the compliance requirements found in the SSA Title IV-B and IV-E. State Pls.' Br. Resp. 16, ECF No. 74. They also argue they have standing under *Lujan*, as they are "objects" of the ICWA and Final Rule. *Id.* at 20.

When analyzing if a state has standing to challenge a statute, a court must ask if the state is entitled to "special solicitude." *See Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). When a state sues for injuries sustained in its capacity as quasi-sovereign, the state has "an interest independent of and behind the titles of its citizens." *Id.* at 520 (quoting *George v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907). In *Massachusetts*, the Supreme Court identified two considerations that entitled the state to special solicitude. First, that the Clean Air Act created a procedural right to challenge the EPA's decision, and second, that the EPA's decision affected Massachusetts's quasi-sovereign interest in its territory. *Id.* at 520.

The Fifth Circuit applied the *Massachusetts* standard to Texas's right to challenge the Department of Homeland Services' ("DHS") implementation of the deferred action program for alien children ("DACA"), particularly the 2014 expansion to parents of the DACA recipients ("DAPA"). *Texas v. United States*, 809 F.3d 134, 152 (5th Cir. 2015) [hereinafter *Texas DHS*].

While DACA did not contain the same procedural rights as the EPA statute in *Massachusetts*, the Fifth Circuit found that the Administrative Procedures Act's (the "APA") general authorization for challenges to "final agency action" satisfied the first *Massachusetts* consideration. *Texas DHS*, 809 F.3d at 152. Second, the court also found that DAPA affected the states' quasi-sovereign interest by imposing substantial pressure on the state to change its laws. *Id.*

The same considerations apply in this case. First, as in *Texas DHS*, the State Plaintiffs are challenging the Final Rule as not in accordance with law under the APA. Second, it is well-established that domestic affairs fall within the traditional police powers of the individual states.[8] *Sosna v. Iowa*, 419 U.S. 393 (1975). Third, as DAPA pressured Texas to change their laws, the ICWA and the Final Rule pressures the State Plaintiffs to change their domestic relations laws as they relate to adoptions of Indian children. The ICWA and the Final Rule usurp state civil procedure rules by requiring different procedure framework for an Indian child adoption proceeding. *See supra*, Part II.D. Finally, the State Plaintiffs have standing to challenge federal assertions of authority to regulate matters they believe they control. *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999). Here, the State Plaintiffs have stated a sufficient injury-in-fact in Defendants' intrusion upon their interests as quasi-sovereigns to control the domestic affairs within their states. Am. Compl. ¶ 17, ECF No. 35.

The second injury-in-fact the State Plaintiffs claim is related to funding under Title IV-B and Title IV-E, which is contingent on complying with the ICWA. Am. Compl. ¶¶ 23–25, 53, 263,

---

[8] The Fifth Circuit has also found that "States have a sovereign interest in the 'power to create and enforce a legal code.'" *Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 449 (5th Cir. 1999) (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)). From that basis, the Fifth Circuit held that states may have standing based on: (1) federal assertions or authority to regulate matters the States believe they control, (2) federal preemption of state law, and (3) federal interference with the enforcement of state law, at least where the "state statute at issue regulate[s] behavior or provides for the administration of a state program and does not simply purport to immunize state citizens from federal law." *Id*. Those intrusions are analogous to pressure to change state law. *Id.*

ECF No. 35. Defendants argue that the State Plaintiffs have not alleged a fiscal injury because they have not "alleged any concrete fiscal impact to State funds, or that Federal Defendants either have withheld, or threatened to withhold." Defs.' Br. Dismiss 19, ECF No. 57. In *Texas v. United States* (2007), Defendants raised a similar argument. 497 F.3d 491, 496 (5th Cir. 2007) [hereinafter *Texas 2007*]. There Defendants claimed that Texas's challenge amounted to an alleged injury from the mere existence of the regulation because it had not yet been applied against the state. *Id.*

The regulations at issue in *Texas 2007* involved the approval of Class III gaming licenses involving Indian tribes and states that invoked sovereign immunity. *Id.* at 494. If a state invoked sovereign immunity and refused to bargain with the Indian tribes regarding proposed licensing regulation, then the Class III Gaming Procedures, 25 C.F.R. pt. 291 ("Secretarial Procedures"), would apply. *Id.* These procedures would allow the Department of the Interior to either approve the proposed plan by the Indian tribe without the state's input, or consider an alternative plan put forth by the state. *Id.* at 495. Texas challenged this regulation and argued it created an invalid administrative process. *Id.* at 496. The Fifth Circuit found that Texas had standing to challenge the regulation because Texas was forced to either participate in the allegedly invalid process or forfeit its only opportunity to object to the proposed gaming plan, "a forced choice that is itself sufficient to support standing." *Id.* at 497; *see Thomas v. Union Carbide Agr. Prod. Co.*, 473 U.S. 568, 582 (1985) (recognizing "the injury of being forced to choose between relinquishing [the benefit of an unlawful adjudicatory process] . . . or engaging in an unconstitutional adjudication").

This case calls for a similar result. Either the State Plaintiffs abide by the regimes enacted by the ICWA and the Final Rule, or they face forfeiture of their child welfare benefits. *See* 42 U.S.C. §§ 622, 677. Accordingly, the State Plaintiffs have alleged a sufficient injury-in-fact. The traceability and redressability requirements are satisfied as well. The injury the State Plaintiffs

claim are directly traceable to the application of the ICWA and the Final Rule to the domestic authority of the state. Texas has alleged sufficient facts to show that it has been forced to create alternate laws and requirements for its DFPS if an adoption proceeding involves an Indian child. For these reasons, the State Plaintiffs have standing to challenge the Final Rule as not in accordance with law under the APA (Count One); the ICWA, §§ 1901–23 and 1951–52 violates the Commerce Clause and the Tenth Amendment (Counts Two and Three), and §§ 1915(c) and § 23.130(b) of the Final Rule violate Article 1, §§ 1 and 8 of the Constitution (Count Seven).

### 2.   Ripeness

Defendants challenge the State Plaintiffs claims against HHS, Azar, and the United States (the "HHS Defendants") on the grounds that these claims are not ripe. Defs.' Br. Dismiss 28, ECF No. 57. Defendants argue that the State Plaintiffs are alleging merely a possible injury. State Plaintiffs respond that they are currently injured and have suffered hardship because of the ICWA and the Final Rule compliance requirements found under §§ 622 and 677 of the SSA. State Pls.' Br. Resp. 25, ECF No. 74. The statutes require such compliance or warn that the HHS Defendants will reduce child-welfare funding to the states. *Id.*; *see supra* Part II.B. For these reasons, the State Plaintiffs argue they have alleged both standing and ripeness. State Pls.' Br. Resp. 25, ECF No. 74.

The purpose of the ripeness doctrine is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and to protect the agencies from judicial interference until the administrative decision has been formalized and its effects felt in a concrete way by the challenging parties. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148–49 (1967). When evaluating if a case is ripe for review, the court must consider also (1) the fitness of the issues for judicial decision, and (2) the hardship to the

parties of withholding court consideration. *See id.* at 149. Fitness and hardship must be balanced and a "case is generally ripe if any remaining questions are purely legal ones." *Am. Forest & Paper Ass'n v. EPA*, 137 F.3d 291, 296 (5th Cir. 1998); *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 833 F.2d 583, 587 (5th Cir. 1987). "A challenge to administrative regulations is fit for review if (1) the questions presented are 'purely legal one[s],' (2) the challenged regulations constitute 'final agency action,' and (3) further factual development would not 'significantly advance [the court's] ability to deal with the legal issues presented.'" *Texas v. United States*, 497 F.3d 491, 498–99 (5th Cir.2007) (citing *Nat'l Park Hosp. Ass'n*, 538 U.S. at 812).

The Court finds that State Plaintiffs' case is ripe for review. Here, the question is a legal one—whether the ICWA and Final Rule compliance requirements under the SSA provisions are violations of constitutional principles of federalism. Additional facts would not help the Court make its decision. To be eligible to receive federal funding under Title IV-B and IV-E, the State Plaintiffs must submit a plan in conformity with the ICWA and the Final Rule. *See supra* Part II.B. The Fifth Circuit has held that the kinds of hardships considered in a ripeness analysis include— "the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being forced to modify one's behavior in order to avoid future adverse consequences." *Texas 2007*, 497 F.3d at 499 (internal quotation marks omitted). Similar to *Texas 2007*, either the State Plaintiffs must comply with the ICWA and the Final Rule or risk their funding under Title IV-B and IV-E. Defendants seem to imply that instead the State Plaintiffs should take a wait-and-see approach, suggesting that the State Plaintiffs violate the SSA requirements by not complying with the ICWA, and see if the federal government will enforce the statute. *See id.*; Defs.' Br. Dismiss 28, ECF No. 57.

Here, the ICWA and the Final Rule require additional regulations and obligations from the State Plaintiffs if they wish to continue to receive federal funding under Title IV-B and IV-E. This is the harm of "being forced to modify one's behavior in order to avoid future adverse consequences." *Id.* (quoting *Oh. Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998)). For these reasons, the claims the State Plaintiffs bring against the HHS Defendants are ripe for adjudication.

### C.     Sovereign Immunity

Defendants assert that the HHS Defendants and the United States should be dismissed because they have not waived sovereign immunity. Defs.' Br. Dismiss 31, ECF No. 57. All Plaintiffs respond that sovereign immunity has been waived for both the administrative and constitutional actions under the APA and Supreme Court precedent. State Pls.' Br. Resp. 27, ECF No. 74; Indiv. Pls.' Br. Resp. 35–36, ECF No. 80.

First, the APA allows for claims "seeking relief other than money damages" against the United States. 5 U.S.C. § 702. When a person suffers a "legal wrong" or is "adversely affected" by agency action," he is entitled to judicial review. *Id.* Here, all Plaintiffs challenged Interior and BIA's Final Rule, as well as the HHS Defendants SSA ICWA and Final Rule compliance requirements, as agency actions that adversely affects State Plaintiffs' domestic relation laws and subjects Individual Plaintiffs to an additional regulatory scheme. State Pls.' Br. Dismiss 26, ECF No. 74.

Second, all other claims come under a challenge to the constitutionality of the ICWA or SSA. The Supreme Court held that if the United States exceeds its constitutional limitations, sovereign immunity cannot shield it from suit. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690 (1949). Under *Larson*, suits for prospective relief are permitted when the statute

authorizing the challenged actions is itself beyond constitutional authority. *Id.*; *Anibowei v. Sessions*, No. 3:16-CV-3495-D, 2018 WL 1477242, at *2 (N.D. Tex. Mar. 27, 2018); RICHARD H. FALLON, JR. ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 895 (7th ed. 2015) ("Hart and Wechsler") ("[I]f the officer acted within the conferred statutory limits of the office, but his or her conduct allegedly offended a provision of the Constitution, then sovereign immunity will be lifted.") (internal quotation marks and citation omitted).

In this case, all Plaintiffs bring a valid APA challenge to the Final Rule under § 702 and a constitutional challenge to the ICWA, the Final Rule, and HHS's application of the challenged rule and statute through the SSA. For these reasons, sovereign immunity does not act as a bar to Plaintiffs claims in this case.

### D.     *Younger* Abstention

Defendants also argue that the Court should abstain from hearing this case under *Younger*. Defs.' Br. Dismiss 32, ECF No. 57. Since Plaintiffs seek declaratory and injunctive relief to preclude application of the ICWA and the Final Rule to ongoing state-court child-custody proceedings, Defendants argue this Court should abstain from exercising jurisdiction. *Id.* (citing *DeSpain v. Johnston*, 731 F.3d 1171, 1178 (5th Cir. 1984)). Plaintiffs respond that Defendants' argument is based on "outdated authority, all but ignoring the Supreme Court's most recent decision . . . on the limited application of *Younger*." Indiv. Pls.' Br. Resp. 36, ECF No. 80 (citing *Sprint Comms., Inc. v. Jacobs*, 571 U.S. 69 (2013)). In 2013, the Supreme Court decided *Sprint* and clarified the three categories of the *Younger* abstention doctrine. *Sprint*, 571 U.S. at 78. Specifically, the *Younger* exception applies to only "three 'exceptional' categories of state proceedings: ongoing criminal prosecutions, certain civil enforcement proceedings akin to

criminal prosecutions, and pending 'civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions." *Id*.

Since *Sprint*, courts have declined to invoke *Younger* in adoption proceedings unless the case involved "state-initiated proceedings." *Sprint*, 571 U.S. at 79. Defendants rely on *Moore v. Sims* as an example of *Younger* abstention in an adoption context. Defs.' Br. Dismiss 32, ECF No. 57. But in *Moore*, the proceedings were "in aid of and closely related to criminal statutes." *Id*. *Sprint* explained *Moore* as involving "a state-initiated proceeding to gain custody of children allegedly abused by their parents." *Sprint*, 571 U.S. at 79. Unlike *Moore*, there are no criminal statutes at issue in the state-court adoption proceedings in this case, nor are there state initiated proceedings at issue here. The cases Defendants rely on either pre-date the Supreme Court's decision in *Sprint*, or deal with distinguishable facts. *See Catanach v. Thomson*, 718 F. App'x 595, 598 n.2 (10th Cir. 2017) (clarifying the changes to the *Younger* doctrine found in *Sprint*). When the Fifth Circuit applied *Sprint*, it found that, while *Younger* has been expanded beyond the purely criminal context, abstention is not required in every context with parallel state-court proceedings. *Google, Inc. v. Hood*, 822 F.3d 212, 222 (5th Cir. 2016). If a case fits into one of the *Sprint* categories, then the three *Middlesex* factors are evaluated before invoking *Younger* abstention. *See Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982).

The first *Sprint* category does not apply here, as no party alleges there is an ongoing criminal prosecution. Neither does the third category, proceedings uniquely aiding the state court judicial function, apply. *See*, *Sprint*, 571 U.S. at 78 (referencing *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 4 (1987) as an example of the third *Sprint* category). Defendants attempt to place this case into the second category, claiming that because there is an ongoing state-court adoption proceeding, *Younger* must apply. Defs.' Br. Dismiss 33, ECF No. 57. Sprint describes the second

category as "akin to criminal prosecutions" because they are "characteristically initiated to sanction the federal plaintiff . . . for some wrongful act." *Sprint*, 571 U.S. at 279. The Fifth Circuit has applied the second category to an enforcement action before a civil rights commission, a bar disciplinary proceedings, and state-instituted public nuisance proceedings. *See Google, Inc.*, 822 F.3d at 222 (citing *Ohio Civil Rights Comm'n v. Dayton Christian Schs. Inc.*, 477 U.S. 619, 623 28 (1986); *Middlesex*, 457 U.S. at 432–35; *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 595–97 (1975)). None of these apply here. Accordingly, the *Younger* abstention doctrine does not apply in this case.

### E.      Failure to Join an Indispensable Party

Defendants also argue that Nevada and Minnesota are necessary parties to the Librettis' and Cliffords' claims and that they should be joined or the claims dismissed. Defs.' Br. Dismiss 45, ECF No. 57. If Plaintiffs obtain the relief they are seeking, Defendants argue, this Court's decision would necessarily bind the Nevada and Minnesota state courts and their executive agencies. *Id.* Plaintiffs respond that they are not asking to bind state courts; instead they seek "to declare that a federal regulation and a federal statute are unconstitutional and otherwise invalid, and to enjoin the federal government from implementing or administering them." Indiv. Pls.' Br. Resp. 54, ECF No. 80.

When a party is primarily challenging the constitutionality of a federal statute and not state statutes or rules, states are not an indispensable party. *Romero v. United States*, 784 F.2d 1322, 1325 (5th Cir. 1986). Since Plaintiffs seek to nullify a federal statute and regulation, Nevada and Minnesota are not indispensable parties. *Bermudez v. U.S. Dep't of Agric.*, 490 F.2d 718, 724 (D.C. Cir. 1973). Rather than binding the state courts to an affirmative action, a favorable decision for the Plaintiffs here would remove a federal mandate on the state courts. Therefore, Nevada and Minnesota are not necessary parties and this argument is overruled.

### F.      Waiver to Challenge the Final Rule

Defendants' final argument is that the State Plaintiffs "waived their APA arguments challenging the Final Rule in Count One by not presenting their objections to BIA during the notice and comment period." Defs.' Br. Dismiss 47, ECF No. 57. The State Plaintiffs respond that they have standing under statutory and Supreme Court precedent to challenge the Final Rule under the APA. State Pls.' Br. Resp. 43–4, ECF No. 74. They also argue that "neither the text of the APA, nor the Fifth Circuit precedent require a party aggrieved by an agency rule to comment first on the proposed rule or risk waiving a later legal challenge to that rule." *Id.* at 45.

In *City of Seabrook v. EPA*, defendants made a similar argument. 659 F.2d 1349, 1360–61 (5th Cir. 1981).[9] In that case, the Fifth Circuit declined to require anyone who wishes to challenge a regulation to first have commented on it during the administrative process. It distinguished *L.A. Tucker Truck Lines, Inc.* and *Merchants Fast Motor Lines, Inc.*, both of which found a party waived the right to initiate legal challenges to an agency decision, because the plaintiffs in both of these cases participated in the underlying administrative hearing and failed to appeal the decision. *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952); *Merchants Fast Motor Lines, Inc. v. ICC*, 528 F.2d 1042 (5th Cir. 1976); *City of Seabrook*, 659 F.2d at 1360 n.17. *City of Seabrook* concluded these cases did not apply because there had been no underlying adversarial proceeding. *Id.*

Defendants argue *City of Seabrook* does not control because more recent Fifth Circuit decisions have undermined it. Defs.' Br. Dismiss 47, ECF No. 57; *BCCA Appeal Group v. EPA*,

---

[9] "The rule urged by EPA would require everyone who wishes to protect himself from arbitrary agency action not only to become a faithful reader of the notices of proposed rulemaking published each day in the Federal Register, but a psychic ability to predict the possible changes that could be made in the proposal when the rule is finally promulgated. This is a fate this court will impose on no one." *City of Seabrook, Tex.*, 659 F.2d at 1360-61.

355 F.3d 817, 829 n.10 (5th Cir. 2003); *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 n.7 (5th

Cir. 1998). While there has been disagreement about the applicability of *City of Seabrook,* no

Supreme Court decision or Fifth Circuit en banc decision has overruled it. Therefore, *City of*

*Seabrook* remains binding law on district courts. Accordingly, Defendants' argument that *City of*

*Seabrook* does not control fails. *City of Seabrook*, 659 F.2d at 1349; *see also*, *Am. Forest & Paper*

*Ass'n v. EPA*, 137 F.3d 291, 295 (5th Cir. 1998) (citing *City of Seabrook*'s rule that failure to

comment does not preclude a challenge to the APA statute). At this time, it appears the Fifth Circuit

requires a party that participates in an administrative process to appeal an adverse ruling or waive

its right to later challenge the decision. But if a party has not participated in the agency process, a

subsequent challenge is not waived. *Compare L.A. Tucker Truck Lines, Inc.*, 344 U.S. at 35, *with*

*Fleming Companies, Inc. v. U.S. Dep't of Agric.*, 322 F. Supp. 2d 744, 754 (E.D. Tex. 2004).

Accordingly, the State Plaintiffs did not waive their right to challenge the Final Rule in this

case. *See City of Seabrook*, 659 F.2d at 1360–61.

## IV.    CONCLUSION

For the foregoing reasons, the Court finds that Federal Defendants' Motion to Dismiss

(ECF No. 56) and Tribal Defendants' Motion to Dismiss (ECF No. 58) should be and are hereby

**DENIED**.

**SO ORDERED** on this **24th day** of **July, 2018**.

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**