**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **CHAD BRACKEEN, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:17-cv-00868-O** |
| | § | |
| **RYAN ZINKE, et al.,** | § | |
| | § | |
| **Defendants,** | § | |
| | § | |
| **CHEROKEE NATION, et al.,** | § | |
| | § | |
| **Intervenors-Defendants.** | § | |

**ORDER**

This case arises because three children, in need of foster and adoptive placement, fortunately found loving adoptive parents who seek to provide for them. Because of certain provisions of a federal law, however, these three children have been threatened with removal from, in some cases, the only family they know, to be placed in another state with strangers. Indeed, their removals are opposed by the children's guardians or biological parent(s), and in one instance a child was removed and placed in the custody of a relative who had previously been declared unfit to serve as a foster parent. As a result, Plaintiffs seek to declare that federal law, known as the Indian Child Welfare Act (the "ICWA"), unconstitutional.

In this case, the State Plaintiffs have filed a Motion for Summary Judgment (ECF No. 72), on April 26, 2018, and the Individual Plaintiffs filed a Motion for Summary Judgment (ECF No. 79), on the same day. Plaintiffs seek judgment as a matter of law on all of their claims. The parties appeared at a hearing on these motions and presented oral arguments on August 1, 2018. *See* Hr'g Tr., ECF No. 163. For the following reasons, the Court finds Plaintiffs' motions for summary judgment should be and are hereby **GRANTED in part and DENIED in part.**

## I. BACKGROUND

First, the Court identifies the parties, next the legal backdrop of this dispute, and then the parties' claims, drawing in large part on those facts set out in the Order denying Defendants' motions to dismiss. *See* July 24, 2018 Order, ECF No. 155. Following these sections, this order will analyze the claims.

Plaintiffs are comprised of three states—Texas, Louisiana, and Indiana, (collectively, the "State Plaintiffs"), and seven individual Plaintiffs—Chad Everett and Jennifer Kay Brackeen (the "Brackeens"), Nick and Heather Libretti (the "Librettis"), Altagracia Socorro Hernandez ("Ms. Hernandez"), and Jason and Danielle Clifford (the "Cliffords") (collectively, the "Individual Plaintiffs") (together with the State Plaintiffs, "Plaintiffs"). State Pls.' Br. Supp. Mot. Summ. J. 1–2, ECF No. 74 [hereinafter "State Pls.' Br."]. Defendants are the United States of America; the United States Department of the Interior (the "Interior") and its Secretary Ryan Zinke ("Zinke") in his official capacity; the Bureau of Indian Affairs (the "BIA") and its Director Bryan Rice ("Rice") in his official capacity; the BIA Principal Assistant Secretary for Indian Affairs John Tahsuda III ("Tahsuda")[1] in his official capacity; the Department of Health and Human Services ("HHS") and its Secretary Alex M. Azar II ("Azar") (collectively the "Federal Defendants"). *Id.* Shortly after this case was filed, the Cherokee Nation, Oneida Nation, Quinalt Indian Nation, and Morengo Band of Mission Indians (collectively, the "Tribal Defendants") filed an unopposed

---

[1] Initially Plaintiffs sued Michael Black in his official capacity as Acting Assistant Secretary of Indian Affairs. *See* Orig. Compl. ¶ 17, ECF No. 1. On September 13, 2017, Secretary of the Interior Ryan Zinke appointed Tahsuda as the Department of Interior's Principal Assistant Secretary of Indian Affairs. *See* Press Release, *Secretary Zinke Names John Tahsuda III the Principal Deputy Assistant Secretary for Indian Affairs*, DEP'T OF THE INT., (Sept. 13, 2017), https://www.doi.gov/pressreleases/secretary-zinke-names-john-tahsuda-iii-principal-deputy-assistant-secretary-indian. Accordingly, Tahsuda has been substituted as a Defendant.

motion to intervene, which the Court granted. *See* Trib. Defs.' Mot. Intervene, ECF No. 42; Mar. 28, 2018 Order, ECF No. 45.

Plaintiffs seek to declare unconstitutional certain provisions of the ICWA and its accompanying regulations (codified at 25 C.F.R. part 23), known as the Indian Child Welfare Act Proceedings (the "Final Rule"), as well as certain provisions of the Social Security Act (the "SSA") that predicate federal funding for portions of state child-welfare payments on compliance with the ICWA. Plaintiffs argue that the ICWA and the Final Rule implement a system that mandates racial and ethnic preferences, in direct violation of state and federal law. Am. Comp. ¶ 193, ECF No. 35; 42 U.S.C. § 1996(b); TEX. FAM. CODE §§ 162.015, 264.1085; LA. CONST. art. 1, § 3. Plaintiffs ask that the Final Rule be declared invalid and set aside as a violation of substantive due process and as not in accordance with law (Counts One and Five). Am. Compl. ¶¶ 265, 349, ECF No. 35; 5 U.S.C. § 705(2)(A). Plaintiffs also ask that the ICWA, specifically sections 1901–23 and 1951–52, be declared unconstitutional under Article One and the Tenth Amendment of the United States Constitution because these provisions violate the Commerce Clause, intrude into state domestic relations, and violate the anti-commandeering principle (Counts Two and Three). Am. Compl. ¶¶ 281, 323, ECF No. 35. Finally, Plaintiffs ask that the ICWA sections 1915(a)–(b) be declared unconstitutional in violation of the equal protection guarantee of the Fifth Amendment to the United States Constitution and Individual Plaintiffs alone ask the same sections be declared unconstitutional in violation of substantive due process. (Counts Four and Six). *Id.* ¶¶ 338, 367. State Plaintiffs alone bring the final count, seeking a declaration that ICWA section 1915(c) and Final Rule section 23.130(b) violate the non-delegation doctrine (Count Seven). Am. Compl. ¶ 376, ECF No. 35.

**A. The ICWA and the SSA**

Congress passed the ICWA in 1978 in response to rising concerns over "abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989). "Congress found that 'an alarmingly high percentage of Indian families [were being] broken up by the removal, often unwarranted, of their children from them by nontribal public and private agencies.'" *Adoptive Couple v. Baby Girl*, 133 S. Ct. 2552, 2557 (2013) (quoting 25 U.S.C. § 1901(4)). Recognizing "that there is no resource that is more vital to the continued existence and integrity of Indian tribes than their children," Congress created a framework to govern the adoption of Indian children.[2] *See* 25 U.S.C. § 1901, *et seq*. This framework establishes: (1) placement preferences in adoptions of Indian children; (2) good cause to depart from those placement preferences; (3) standards and responsibilities for state courts and their agents; and (4) consequences flowing from noncompliance with the statutory requirements. *See id*.

The ICWA established "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes." 25 U.S.C. § 1902. The ICWA mandates placement preferences in foster care, preadoptive, and adoptive proceedings involving Indian children. *Id*. § 1915. It requires that "in any adoptive placement of an Indian child under State law, a preference shall be given, in the absence of good cause to the contrary, to a place with: (1) a member of the child's extended family; (2) other members of the

[2] *See also* Br. of *Amicus Curiae* 123 Federally Recognized Indian Tribes, *et al*. in Opposition to Plaintiffs' Motions for Summary Judgment 1, ECF No. 138. ("Congress enacted the Indian Child Welfares Act of 1978 ("ICWA" or "the Act"), 25 U.S.C. 1901 *et seq*., in response to a nationwide crisis—namely, the widespread and wholesale displacement of Indian children from their families by state child welfare agencies at rates far higher than those of non-Indian families.").

Indian child's tribe; or (3) other Indian families." *Id*. § 1915(a). Similar requirements are set for foster care or preadoptive placements. *Id.* § 1915(b). If the Indian child's tribal court should establish a different order of the preferences than that set by Congress, the state court or agency "shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child." *Id.* § 1915(c).

Absent good cause, the state court shall transfer proceedings concerning an Indian child to the Indian child's tribal court. 25 U.S.C. § 1911(b). In any state court proceeding for the "foster care placement of, or termination of parental rights to, an Indian child, the Indian custodian of the child and the Indian child's tribe shall have a right to intervene at any point in the proceeding." *Id*. § 1911(c). The ICWA prohibits the termination of parental rights for an Indian child in the absence of "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." *Id*. § 1912(f).

State agencies and courts must notify potential intervenors and the Director of the BIA of an Indian child matter. 25 U.S.C. § 1912. In any involuntary child custody proceeding, the ICWA commands state agencies and courts—when seeking foster care placement of or termination of parental rights to an Indian child—to notify the parents or Indian custodian and the Indian child's tribe of the pending proceedings and of their right to intervene. 25 U.S.C. § 1912(a). Copies of these notices must be sent to the Secretary of the Interior and the BIA. No foster care placement or termination of parental rights proceeding may be held until at least ten days after receipt of such a notice by the parent or Indian custodian and tribe or the Secretary of the Interior. *Id*. The ICWA also grants the Indian custodian or tribe up to twenty additional days to prepare for such proceedings. *Id.*

The ICWA dictates that an Indian parent or guardian may not give valid consent to termination of parental rights before ten days after the birth of the Indian child. 25 U.S.C. § 1913(a). Before parental rights are terminated "any parent or Indian custodian may withdraw consent to a foster care placement under State law at any time." *Id.* § 1913(b). In any voluntary proceeding for termination of parental rights or adoptive placement of an Indian child, the biological parents or the Indian tribe may withdraw consent for any reason prior to the entry of a final decree, and the child shall be returned. *Id.* § 1913(c). Finally, the ICWA permits the parent of an Indian child to withdraw consent to a final decree of adoption on the grounds that the consent was obtained through fraud or duress for up to two years after the final decree. *Id*. § 1913(d); Ind. Pls.' Br. Supp. Mot. Summ. J. 20, ECF No. 80 [hereinafter "Ind. Pls.' Br."].

The ICWA places recordkeeping duties on state agencies and courts, to demonstrate their compliance with the statute. 25 U.S.C. § 1915(e). Additionally, state courts entering final decrees must provide the Secretary of the Interior with a copy of the decree or order, along with the name and tribal affiliation of the child, names of the biological parents, names of the adoptive parents, and the identity of any agency having files or information relating to the adoption. *Id*. § 1951.

If the state court or prospective guardian fails to comply with the ICWA, the final child custody orders or placements may be overturned, whether on direct appeal or by another court of competent jurisdiction. 25 U.S.C. § 1914.[3] To ensure state agencies and courts comply with the ICWA's mandates, it enables any Indian child who is the subject of any action under the ICWA, any parent or Indian custodian from whose custody the child was removed, and the Indian child's tribe, to petition any court of competent jurisdiction to invalidate a state court's decision for failure

[3] While a "court of competent jurisdiction" is not defined in the ICWA or the Final Rule, state appellate courts and federal district courts have heard challenges to adoption proceedings under the ICWA. *See e.g.*, *Oglala Sioux Tribe v. Van Hunnik*, 993 F. Supp. 2d 1017, 1022 (D.S.D. 2014); *Doe v. Mann*, 285 F. Supp. 2d 1229, 1231 (N.D. Cal. 2003).

to comply with the ICWA sections 1911, 1912, and 1913. *Id*. Section 1914 has also been applied to allow collateral attacks of adoptions after the close of the relevant window under state law. *See id.*; Ind. Pls.' Br. 6, ECF No. 80; *see e.g., Belinda K. v. Baldovinos*, No. 10-cv-2507-LHK, 2012 WL 13571, at *4 (N.D. Cal. Jan. 4, 2012).

Congress has also tied child welfare funding to compliance with the ICWA. The SSA requires states who receive child welfare funding through Title IV-B, Part 1 of the SSA to file annual reports, including a description of their compliance with the ICWA. Social Security Amendments Act of 1994, Pub. L. No. 103-432, § 204, 108 Stat. 4398 (1994); 42 U.S.C. § 622(a). Title IV-B funding is partially contingent on how well the states demonstrate their compliance with the ICWA. Part 'b' requires that a state's plan must also "contain a description, developed after consultation with tribal organizations . . . in the State, of the specific measures taken by the State to comply with the [ICWA]." 42 U.S.C. § 622(b).

Congress expanded the requirement for states to comply with the ICWA to receive SSA funding in 1999 and 2008 when it amended Title IV-E to require states to certify ICWA compliance to receive foster care and adoption services funding. Foster Care Independence Act of 1999, Pub. L. No. 106-69, § 101, 113 Stat. 1822 (1999); Fostering Connections to Success and Increasing Adoptions Act of 2008, Pub. L. No. 110-351, § 301, 122 Stat. 3949 (2008). Finally, HHS regulations state that the HHS Administration for Children and Families ("ACF") "will determine a title IV–E agency's substantial conformity with title IV–B and title IV–E plan requirements" based on "criteria related to outcomes." 45 C.F.R. § 1355.34(a). Part 'b' of the same section includes compliance with the ICWA. *Id.* § 1355.34(b).

In fiscal year 2018, Congress allocated to Texas approximately $410 million in federal funding for Title IV-B and Title IV-E programs, Louisiana received approximately $64 million,

and Indiana received approximately $189 million. Am. Compl. ¶¶ 76–78, ECF No. 35. Plaintiffs argue that HHS and Secretary Azar have the authority to administer funding under Title IV-B and Title IV-E and are vested with discretion to approve or deny a state's compliance with the requirements of 42 U.S.C. §§ 622, 677. Therefore, Plaintiffs claim that funding under Title IV-B and IV-E is dependent on compliance with the ICWA. Am. Compl. ¶ 80, ECF No. 35.

**B. The 1979 Guidelines and Final Rule**

In 1979, before passage of the Final Rule, the BIA promulgated the Guidelines for State Courts—the Indian Child Custody Proceedings (the "1979 Guidelines"). 44 Fed. Reg. 67,584 (Nov. 26, 1979). The BIA intended these guidelines to assist in the implementation of the ICWA but they were "not intended to have binding legislative effect." *Id*. The 1979 Guidelines left the "primary responsibility" for interpreting the ICWA "with the courts that decide Indian child custody cases." *Id.* The 1979 Guidelines also emphasized that "the legislative history of the [ICWA] states explicitly that the use of the term 'good cause' was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." *Id.* As state courts applied the ICWA, some held that the 'good cause' exception to the ICWA placement preferences required a consideration of a child's best interest, including any bond or attachment the child formed. Ind. Pls.' Br. 7, ECF No. 80; *see e.g., In re Interest of Bird Head*, 331 N.W.2d 785, 791 (Neb. 1983); *In re Appeal in Maricopa Cnty*., Juvenile Action No. A-25525, 667 P.2d 228, 234 (Ariz. Ct. App. 1983). Other state courts limited the ICWA's application to situations where the child had some significant political or cultural connection to the tribe. Ind. Pls.' Br. 7, ECF No. 80; *see e.g*., *In re Interest of S.A.M*, 703 S.W.2d 603, 608–09 (Mo. Ct. App. 1986); *Claymore v. Serr*, 405 N.W.2d 650, 653–54 (S.D. 1987); *In re Adoption of T.R.M.*, 525 N.E.2d 298, 303 (Ind. 1988); *Hampton v. J.A.L.*, 658 So. 2d 331, 335 (La. Ct. App. 1995).

In June 2016, the BIA promulgated the Final Rule, which purported to "clarify the minimum Federal standards governing implementation of the [ICWA]" and to ensure that it "is applied in all States consistent with the Act's express language." 25 C.F.R. § 23.101. The regulations declared that while the BIA "initially hoped that binding regulations would not be necessary to carry out [the ICWA], a third of a century of experience has confirmed the need for more uniformity in the interpretation and application of this important Federal law." 81 Fed. Reg. 38,782 (June 14, 2016).

Plaintiffs contend the main departure from the previous decades of practice under the ICWA was the Final Rule's definition of the 'good cause' exception to the preference placements and the evidentiary standard required to show good cause. Am. Compl. ¶ 116, ECF No. 35; Ind. Pls.' Br. 60–63, ECF No. 80. The Final Rule noted that "State courts . . . differ as to what constitutes 'good cause' for departing from ICWA's placement preferences." 81 Fed. Reg. at 38,782. In response, the Final Rule mandates that "[t]he party urging that ICWA preferences not be followed bears the burden of proving by clear and convincing evidence the existence of good cause" to deviate from such a placement. 81 Fed. Reg. at 38,838; *see also* 25 C.F.R. § 23.132(b). The Final Rule further provides that state courts "may not consider factors such as the participation of the parents or Indian child in Tribal cultural, social, religious, or political activities, the relationship between the Indian child and his or her parents, whether the parent ever had custody of the child, or the Indian child's blood quantum." 81 Fed. Reg. at 38,868 (codified at 25 C.F.R. § 23.103(c)).

Plaintiffs contrast the text of the 1979 Guidelines where "the use of the term 'good cause' was designed to provide state courts with flexibility" with the Final Rule, which now claims that "Congress intended the good cause exception to be narrow and limited in scope." *Compare* 44

Fed. Reg. at 67,584 (Nov. 26, 1979), *with* 81 Fed. Reg. at 38,839 (June 14, 2016). Accordingly, the Final Rule sets forth "five factors upon which courts may base a determination of good cause to deviate from the placement preferences," and further "makes clear that a court may not depart from the preferences based on the socioeconomic status of any placement relative to another placement or based on the ordinary bonding or attachment that results from time spent in a non-preferred placement that was made in violation of ICWA." 81 Fed. Reg. at 38,839; *see also* 25 C.F.R. § 23.132(c)–(e); Ind. Pls.' Br. 7–9, ECF No. 80.

Beyond limiting what state courts may consider in determining "good cause," the Final Rule places more responsibilities on states to determine if the child is an Indian child. 25 C.F.R. § 23.107(a). These inquiries "should be on the record," and "state courts must instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child." *Id.*; 25 C.F.R. § 23.107(b). Whenever a state court enters a final adoption decree or an order in an Indian child placement, the Final Rule requires the state court or agency to provide a copy of the decree or order to the BIA. 25 C.F.R. § 23.140. The Final Rule also requires states to "maintain a record of every voluntary or involuntary foster care, preadoptive, and adoptive placement of an Indian child and make the record available within 14 days of a request by an Indian child's Tribe or the Secretary [of the Interior]." 25 C.F.R. § 23.141.

In an involuntary foster care or termination of parental rights proceeding, the Final Rule requires state courts to ensure and document that the state agency has used "active efforts" to prevent the breakup of the Indian family. 25 C.F.R. § 23.120. The Final Rule defines "active efforts" to include "assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan." 25 C.F.R. § 23.2.

When determining if the child is an Indian child, only the Indian tribe of which the child is believed to be a member may determine whether the child is a member of the tribe or eligible for membership. 25 C.F.R. § 23.108(a). "The State court may not substitute its own determination regarding a child's membership in a Tribe, a child's eligibility for membership in a Tribe, or a parent's membership in a Tribe." *Id.* § 23.108(b).

When an Indian child is a member or eligible for membership in only one tribe, that tribe must be designated by the state court as the Indian child's tribe. But when the child meets the definition of "Indian child" for more than one tribe, then the Final Rule instructs state agencies and courts to defer to "the Tribe in which the Indian child is already a member, unless otherwise agreed to by the Tribes," or allow "the Tribes to determine which should be designated as the Indian child's Tribe." 25 C.F.R. §§ 23.109(b)–(c). Only when the tribes disagree about the child's membership may state courts independently designate the tribe to which the child belongs, and the Final Rule provides criteria the courts must use in making that designation. *Id.* § 23.109(c)(2).

The Final Rule instructs state courts to dismiss a voluntary or involuntary child custody proceeding when the Indian child's residence or domicile is on a reservation where the tribe exercises exclusive jurisdiction over child custody proceedings. 25 C.F.R. § 23.110(a). The Final Rule requires state courts to terminate child custody proceedings if any party or the state court has reason to believe that the Indian child was improperly removed from the custody of his parent or Indian custodian. 25 C.F.R. § 23.114.

**C. The Adoption Proceedings**

1. The Brackeens and A.L.M.

The Brackeens wished to adopt A.L.M, who was born in Arizona to an unmarried couple, M.M. and J.J. Ind. Pls.' App. Supp. Mot. Summ. J. 60, ECF No. 81 [hereinafter "Ind. Pls.' App."].

A.L.M. is an Indian child under the ICWA and the Final Rule because he is eligible for membership in an Indian tribe—his biological mother is an enrolled member of the Navajo Nation and his biological father is an enrolled member of the Cherokee Nation. *Id.*; *see* 25 C.F.R. § 23.2. A few days after A.L.M. was born, his biological mother brought him to Texas to live with his paternal grandmother. Ind. Pls.' App. 61, ECF No. 81. When he was ten months old, Child Protective Services ("CPS"), a division of the Texas Department of Family and Protective Services ("DFPS"), removed A.L.M. from his grandmother and placed him in foster care with the Brackeens. *Id.* at 61. Pursuant to the ICWA and the Final Rule, 25 C.F.R. § 23.11, the Cherokee Nation and the Navajo Nation were notified of A.L.M.'s placement with the Brackeens. *Id* at 61–62. Because DFPS identified no ICWA-preferred foster placement for A.L.M., he remained with the Brackeens. *Id.* A.L.M. lived with the Brackeens for more than sixteen months before, with the support of his biological parents and paternal grandmother, the Brackeens sought to adopt him. *Id.*

In May 2017, a Texas state court terminated the parental rights of A.L.M.'s biological parents, making him eligible for adoption under Texas law. *Id.* at 61. Shortly thereafter, a year after the Brackeens took custody of A.L.M., the Navajo nation notified the state court that it had located a potential alternative placement for A.L.M. with non-relatives in New Mexico. *Id*. The Brackeens note that this placement would have moved A.L.M away from both his biological parents and the only home he has ever known. *Id*. at 61-62.

In July 2017, the Brackeens filed an original petition seeking to adopt A.L.M. *Id*. at 62. The Cherokee and Navajo Nations were notified of the adoption proceeding in accordance with the ICWA and the Final Rule. *Id.*; *see* 25 U.S.C. § 1912; *see* 25 C.F.R. § 23.11. No one intervened in the Texas adoption proceeding or otherwise formally sought to adopt A.L.M. *Id*. at 63. On August 1, 2017, a Texas family court held a hearing regarding the Brackeens' petition for adoption.

*Id.* at 62. The Navajo Nation was designated as A.L.M.'s tribe, but this "determination of [A.L.M.'s] Tribe for purposes of ICWA and [the Final Rule] [did] not constitute a determination for any other purpose." 25 C.F.R. § 23.109(c)(3).

Under the ICWA and the Final Rule placement preferences, absent good cause, an Indian child should be placed with a member of the child's extended family, a member of the child's Indian tribe, or another Indian family, in that order. *See* 25 U.S.C. § 1915(a). The Brackeens argued in state court that the ICWA's placement preferences should not apply because they were the only party formally seeking to adopt A.L.M., and that good cause existed to depart from the preferences. Ind. Pls.' App. 63, ECF No. 81. The Final Rule places the burden on the Brackeens, the party seeking adoption, to prove "by clear and convincing evidence that there was 'good cause'" to allow them, a non-Indian couple, to adopt A.L.M. 25 C.F.R. § 23.132(b). The Brackeens submitted testimony by A.L.M.'s biological parents, his court appointed guardian, and an expert in psychology to show good cause. Ind. Pls.' App. 62, ECF No. 81. However, Texas DFPS pointed to the Final Rule's heightened evidentiary requirements and argued that the Brackeens did not provide clear and convincing evidence of good cause to justify a departure from the placement preferences. *Id.* at 61–62.

In January 2018, the Brackeens successfully petitioned to adopt A.L.M., but under the ICWA and the Final Rule, the Brackeens' adoption of A.L.M. is open to collateral attack for two years. *Id*. at 64; *see* 25 U.S.C § 1914; Ind. Pls.' Br. at 6, ECF No. 80; *see e.g*., *Belinda K. v. Baldovinos*, No. 10-cv-2507-LHK, 2012 WL 13571, at *4 (N.D. Cal. Jan. 4, 2012). Plaintiffs explain that the Brackeens intend to continue to provide foster care for, and possibly adopt, additional children in need. Ind. Pls.' App. 64, ECF No. 81. But they are reluctant, after this experience, to provide foster care for other Indian children in the future. *Id.* Plaintiffs argue that

the ICWA and the Final Rule therefore interfere with the Brackeens' intention and ability to provide a home to additional children. Am. Compl. ¶ 154, ECF No. 35. Additionally, Plaintiffs argue that this legal regime harms Texas's interests by limiting the supply of available, qualified homes necessary to help foster-care children in general and Indian children in particular. *Id.*

2. The Librettis and Baby O.

The Librettis are a married couple living in Sparks, Nevada. *See* Ind. Pls.' App. 66, ECF No. 81. They sought to adopt Baby O. when she was born in March 2016. *Id*. at 67. Baby O.'s biological mother, Ms. Hernandez, felt that she would be unable to care for Baby O. and wished to place her for adoption at her birth. *Id.* at 72. Ms. Hernandez has continued to be a part of Baby O.'s life and she and the Librettis visit each other regularly. *Id.* at 73. Baby O.'s biological father, E.R.G., descends from members of the Ysleta del sur Pueblo Tribe (the "Pueblo Tribe"), located in El Paso, Texas. *Id.* at 69. At the time of Baby O.'s birth, E.R.G. was not a registered member of the Pueblo Tribe. *Id.* at 73.

The Pueblo Tribe intervened in the Nevada custody proceedings in an effort to remove Baby O. from the Librettis. *Id.* at 69. Once the Librettis joined the challenge to the constitutionality of the ICWA and the Final Rule, the Pueblo Tribe indicated its willingness to discuss settlement. *Id.* at 69. The Librettis have agreed to a settlement with the tribe that would permit them to petition for adoption of Baby O. *Id* at 70. But Plaintiffs point out that any settlement would still be subject to collateral attack under the ICWA for two years. Am. Compl. ¶ 168, ECF No. 35. The Librettis intend to petition to adopt Baby O. as soon as they are able and are the only people who have indicated an intent to adopt her. Ind. Pls.' App. at 69–70, ECF No. 81.

Similar to the Brackeens, the Librettis intend to provide foster care for and possibly adopt additional children in need. *Id.* at 70. Due to their experiences with the ICWA, the Librettis are "reluctant to provide a foster home for other Indian children in the future." *Id.*

3. <u>The Cliffords and Child P.</u>

The Cliffords live in Minnesota and seek to adopt Child P. *See* Ind. Pls.' App. 2, ECF No. 81. Child P.'s maternal grandmother is a registered member of the White Earth Band of Ojibwe Tribe (the "White Earth Band"). *Id.* at 4. Child P. is a member of the White Earth Band for the purposes of the ICWA only. *Id.* The Minnesota state court considered itself bound by the White Earth Band's pronouncement and concluded that the ICWA must apply to all custody determinations concerning Child P. *Id*. at 4. However, because the ICWA placement preferences apply, county officials removed Child P. from the Cliffords. *Id*. at 5–6. Child P. was placed in the care of her maternal grandmother—whose foster licensed had been revoked—in January 2018. *Id.* at 3–6.

Child P.'s guardian ad litem supports the Cliffords' efforts to adopt her and agrees that the adoption is in Child P's best interest. *Id.* at 5. However, due to the application of the ICWA, the Cliffords and Child P. remain separated and the Cliffords face heightened legal barriers to adopt Child P. *Id.* at 53*.* If the Cliffords are successful in petitioning for adoption, that adoption may be collaterally attacked for two years under the ICWA. 25 U.S.C. § 1915(a).

**D. State Plaintiffs**

Texas, Louisiana, and Indiana bring this suit in their capacities as sovereign states. *See* Am. Compl. ¶ 178, ECF No. 35. They claim that the ICWA and the Final Rule harm state agencies charged with protecting child welfare by usurping their lawful authority of the regulation of child custody proceedings and management of child welfare services. *Id.* Additionally, State Plaintiffs

contend the ICWA and the Final Rule jeopardize millions of dollars in federal funding. *Id.* State Plaintiffs each have at least one Indian tribe living within their borders and have regular dealings with Indian child adoptions and the ICWA.[4] *Id.*

Plaintiffs argue that the ICWA and the Final Rule place significant responsibilities and costs on state agencies and courts to carry out federal Executive Branch directives. *Id*. at ¶ 187. Texas DFPS, Louisiana Department of Child and Family Services ("DCFS"), and the Indiana Department of Child Services ("DCS") each handle Indian child cases. *See* State Pls.' App at 10, 370, 394, ECF No. 73.

The State Plaintiffs require their state agencies and courts to act in the best interest of the child in foster care, preadoptive, and adoptive proceedings. *See id*. at 37, 40, 44, 46, 64, 382. But the State Plaintiffs argue that the ICWA and Final Rule require these courts and agencies to apply the mandated placement preferences, regardless of the child's best interest, if the child at issue is an "Indian child." Am. Compl. ¶¶ 194–95, ECF No. 35. Additionally, State Plaintiffs argue that the ICWA's requirement that state courts submit to mandates from an Indian child's tribe violates state sovereignty because the Indian tribe is not an equal sovereign deserving full faith and credit. *Id.* ¶ 196; 25 U.S.C. § 1915(c).

In every child custody case, the ICWA and Final Rule require the State Plaintiffs to undertake additional responsibilities, inquiries, and costs. As an example of how the ICWA and

[4] Three federally recognized tribes reside in Texas—Yselta del Sur Pueblo in El Paso, Texas; the Kickapoo Tribe in Eagle Pass, Texas; and the Alabama-Coushatta Tribe near Livingston, Texas. Both the Kickapoo Tribe and the Alabama-Coushatta Tribe have reservations in Texas. *See* State Pls' App at 481, ECF No. 73. Four tribes reside in Louisiana—the Chitimacha Tribe in Charenton, Louisiana; Coushatta Tribe in Elton, Louisiana; the Tunica-Biloxi Tribe in Marksville, Louisiana; and the Jena Band of Choctaw Indians in Jena, Louisiana. Am. Compl. ¶ 180, ECF No. 35. One federally recognized tribe resides in Indiana—the Pokagon Band of Potawatomi Indians. *Id*. ¶ 181. For example, as of December 2017, there were thirty-nine children in the care of Texas DFPS who were verified to be enrolled or eligible for membership in a federally recognized tribe, many of them living in Texas DFPS homes. *Id*. ¶ 189.

the Final Rule affect state administrative and judicial procedures, State Plaintiffs submit the Texas CPS Handbook (the "Texas Handbook"). Ind. Pls.' App. 16 (Texas Handbook) § 1225, ECF No. 73 [hereinafter "Texas Handbook"]. The Texas Handbook contains Texas DFPS's policies and procedures for compliance with the ICWA and the Final Rule. *Id.* at 9–29. First, these standards require that, in every case, CPS workers determine if the child or child's family has Native American ancestry or heritage. *Id.* at 12. The Texas Handbook provides guidance on how to ascertain if the ICWA and the Final Rule apply, how to comply with it, and warns that failure to comply could result in the final adoption order being overturned. *Id*. at 9–29. The Texas Handbook also states that if an Indian child is taken into DFPS custody, "almost every aspect of the social work and legal case is affected." Texas Handbook § 5844. If the ICWA applies, the legal burden of proof for removal, obtaining a final order terminating parental rights, and restricting a parent's custody rights is higher. *Id.* Texas DFPS must serve the child's parent, tribe, Indian custodian, and the BIA with a specific notice regarding the ICWA rights, and DFPS and its caseworkers "must make active efforts to reunify the child and biological Indian family." *Id.* Finally, the child must be placed according to the ICWA statutory preferences; expert testimony on tribal child and family practices may be necessary; and a valid relinquishment of parental rights requires a parent to appear in court and a specific statutory procedure is applied. *Id.*

Indiana and Louisiana have similar requirements in place to assure that their child welfare systems comply with the ICWA and the Final Rule. *See id*. at 370–400. Louisiana DCFS must maintain ongoing contact with the Indian child's tribe because each tribe may elect to handle the ICWA differently. Am. Compl. ¶ 220, ECF No. 35. They are also required to ensure that the state agencies take "all reasonable steps" to verify the child's status. 25 C.F.R. § 23.124.

The ICWA and the Final Rule require state courts to ask each participant, on the record, at the commencement of child custody proceedings whether the person knows or has reason to know whether the child is an Indian child and directs the parties to inform the court of any such information that arises later. 25 C.F.R. § 23.107(a). If the state court believes the child is an Indian child, it must document and confirm that the relevant state agency (1) used due diligence to identify and work with all of the tribes that may be connected to the child and (2) conducted a diligent search to find suitable placements meeting the preference criteria for Indian families. *Id*. §§ 23.107(b), 23.132(c)(5). The ICWA and the Final Rule require the State Plaintiffs' agencies and courts to maintain indefinitely records of placements involving Indian children and subject those records to inspection by the Director of the BIA and the child's Indian tribe at any time. 25 U.S.C. §§ 1915(e), 1917; 25 C.F.R. §§ 23.140–41. State Plaintiffs claim this increases costs for the agencies and courts who have to maintain additional records not called for under state law and hire or assign additional employees to maintain these records indefinitely. Am. Compl. ¶ 225, ECF No. 35.

The statutes also affect the State Plaintiffs' rules of civil procedure. The ICWA section 1911(c) and the Final Rule dictate that the Indian child's custodian and the child's tribe must be granted mandatory intervention. Texas Rule of Civil Procedure 60 permits Texas courts to strike the intervention of a party upon a showing of sufficient cause by another party, but the ICWA imposes a different legal standard of intervention to child custody cases involving Indian children. TEX. R. CIV. P. 60; 25 U.S.C. § 1911(c) ("In any State court proceeding . . . the Indian child's tribe *shall have a right* to intervene at any point in the proceeding.") (emphasis added). In Louisiana, any person with a justiciable interest in an action may intervene. LA. CODE CIV. PROC. art. 1091. In Indiana, a person may intervene as of right or permissively, similar to the Federal Rules of Civil

Procedure. IND. R. TR. PROC. 24. The ICWA, however, eliminates these requirements and provides mandatory intervention for the Indian child's custodian and the child's tribe. 25 U.S.C. § 1911(c).

Finally, the ICWA and the Final Rule override the State Plaintiffs' laws with respect to voluntary consent to relinquish parental rights. *See* 25 U.S.C. § 1913(a); 25 C.F.R. § 23.125(e). Texas law permits voluntary relinquishment of parental rights forty-eight hours after the birth of the child; Louisiana allows surrender prior to or after birth of the child, and surrender of maternal rights five days after the birth of the child, and Indiana permits voluntary termination of parental rights after birth of the child. TEX. FAM. CODE § 161,103(a)(1); LA. CHILD CODE art. 1130; IND. CODE § 31-35-1-6. The ICWA and Final Rule prohibit any consent until ten days after the birth. 25 U.S.C. § 1913(a); 25 C.F.R. § 23.125(e).

The ICWA and the Final Rule also affect how long a final adoption decree is subject to challenge. Under the ICWA, state courts must vacate a final adoption decree involving an Indian child, and return the child to the biological parent, any time within two years if the parent withdraws consent on the grounds that it was obtained through fraud or duress. 25 U.S.C. § 1913(d); 25 C.F.R. § 23.136. This directly conflicts with Texas, Louisiana, and Indiana state law, which provide that an adoption decree is subject to direct or collateral attack for no more than one year. TEX. FAM. CODE § 162.012(a) (up to six months); *Goodson v. Castellanos*, 214 S.W.3d 741, 748–49 (Tex. App.—Austin 2007, pet. denied); LA. CHILD. CODE art. 1263 (up to six months); IND. CODE § 31-19-14-2 (up to six months after entry of adoption decree; or up to one year after adoptive parents obtain custody, whichever is later). It also contradicts the Texas common law principle, as well as Indiana statutory law, which hold that the best interest of the child is served by concluding child custody decisions so that these decisions are not unduly delayed. *In re M.S.*, 115 S.W.3d 534, 548 (Tex. 2003); IND. CODE § 31-19-14-2. The ICWA however permits the

invalidation, by any court of competent jurisdiction, of a state court's final child custody order if it fails to comply with the ICWA. 25 U.S.C. § 1914; 25 C.F.R. § 23.137.[5]

Finally, the State Plaintiffs contend if they fail to comply with the ICWA, they risk losing funding for child welfare services under Title IV-B and Title IV-E of the SSA. Am. Compl. ¶ 243, ECF No. 35; 42 U.S.C. §§ 622, 677. Defendants Zinke, Rice, Tahsuda, and Azar, and their respective federal departments, determine if the State Plaintiffs are in compliance with the ICWA's statutory requirements, and in turn, whether they are eligible for continued funding under Title IV-B and Title IV-E funding.

Plaintiffs moved for summary judgment on all counts, arguing there is no dispute of material fact and only questions of law remain. *See* ECF Nos. 72, 79. The motions are ripe for review.

## II. LEGAL STANDARD

The Court may grant summary judgment where the pleadings and evidence show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The movant must inform the Court of the basis of its motion and demonstrate from the record that no genuine dispute as to any material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When reviewing the evidence on a motion for summary judgment, the Court must decide all reasonable doubts and inferences in the light most favorable to the non-movant. *See Walker v.*

[5] *See supra* note 3.

*Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255. If there appears to be some support for disputed allegations, such that "reasonable minds could differ as to the import of the evidence," the Court must deny the motion. *Id.* at 250.[6]

## III. ANALYSIS

Plaintiffs move for summary judgment, claiming that the ICWA and the Final Rule violate: (1) the equal protection requirements of the Fifth Amendment; (2) the Due Process Clause of the Fifth Amendment; (3) the Tenth Amendment; and (4) the proper scope of the Indian Commerce Clause. Plaintiffs also argue that: (1) the Final Rule violates the Administrative Procedure Act (the "APA"); and (2) the ICWA violates Article I of the Constitution.[7] *See generally* Ind. Pls.' Br., ECF No. 80; State Pls.' Br., ECF No. 74.

### A. Fifth Amendment Equal Protection Claim

Plaintiffs claim that sections 1915(a)–(b), section 1913(d), and section 1914 of the ICWA as well as sections 23.129–132 of the Final Rule violate the Fifth Amendment's guarantee of equal protection under the laws. The parties primarily disagree about whether sections 1915(a)–(b) of the ICWA rely on racial classifications requiring strict scrutiny review. Ind. Pls.' Br. 41, ECF No. 80; Fed. Defs.' Br. Supp. Resp. Obj. Ind. Mot. Summ. J. 14, ECF No. 123 [hereinafter "Fed. Defs.' Resp. Ind."]. Plaintiffs argue the ICWA provides special rules in child placement proceedings

---

[6] The Federal Defendants disputed facts relating to Individual Plaintiffs' standing in this case. *See* Fed. Defs.' Br. Resp, ECF No. 124-1. But the dispute over standing was resolved in the July 24, 2018 Order, ECF No. 156. Neither the Federal nor Tribal Defendants have disputed facts in the record relating to the claims to be resolved by summary judgment. *See* Tribal Defs.' Br. Supp. Resp. Mot. Summ. J. 2 n.1, ECF No. 118. ("[Individual] Plaintiffs rely on none of the other facts in their brief and declarations to support their legal arguments, and none is relevant to the issues currently before the court.").

[7] Individual Plaintiffs alone argue the Fifth Amendment due process claim. *See generally* Ind. Pls.' Br.; State Pls.' Br.; Ind. Pls.' Reply; State Pls.' Reply. State Plaintiffs alone argue the Article I non-delegation claim. *Id*.

depending on the race of the child, which is permissible only if the race-based distinctions survive strict scrutiny. Ind. Pls.' Br. 42–44. ECF No. 80; State Pls.' Br. 57, ECF No. 74. The Federal Defendants and Tribal Defendants (collectively, "Defendants") disagree, contending the ICWA distinguishes children based on political categories, which requires only a rational basis. Fed. Defs.' Resp. Ind. 11, ECF No. 123; Trib. Defs.' Resp. 16, ECF No. 118. Resolution of this issue will direct the level of scrutiny to be applied to Plaintiffs' challenge of the ICWA and Final Rule.

1. Appropriate Level of Review

Unlike the Fourteenth Amendment, the text of the Fifth Amendment does not contain an equal protection clause. But courts "employ the same test to evaluate alleged equal protection violations under the Fifth Amendment as under the Fourteenth Amendment." *Richard v. Hinson*, 70 F.3d 415, 417 (5th Cir. 1995) (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217, (1995)). This means that to survive strict scrutiny, "federal racial classifications, like those of a State, must serve a compelling governmental interest, and must be narrowly tailored to further that interest." *Id.* at 202; *see also Fisher v. Univ. of Tex. at Austin*, 758 F.3d 633, 664 (5th Cir. 2014). On the other hand, when a federal statute governing Indians relies on political classifications, the legislation is permissible if singling out Indians for "particular and special treatment" is "tied rationally to the fulfillment of Congress' unique obligation toward the Indians." *Morton v. Mancari*, 417 U.S. 535, 554–55 (1974). This requirement mirrors typical rational basis review which requires only that the government show a statute is rationally related to a legitimate government interest. *See F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993).

The parties rely on precedent developed by the Supreme Court's (and various circuits') review of statutes focused on American Indians and other native peoples. *See Mancari*, 417 U.S. 535; *see Rice v. Cayetano*, 528 U.S. 495 (2000). The Supreme Court's decisions in *Rice* and

*Mancari* explain the differences between classifications based on race and those based on tribal membership. *See id*. Plaintiffs argue that *Rice* controls because the ICWA, like the statute in *Rice*, utilizes ancestry as a proxy for a racial classification. Ind. Pls.' Br. 42–44, ECF No. 80; State Pls.' Reply 18, ECF 142. Defendants counter that *Mancari* and other decisions going back hundreds of years support their contention that the ICWA's Indian classification is based on political characteristics. Fed. Defs.' Resp. Ind. 11, ECF No. 123; Trib. Defs.' Resp. 16, ECF No. 118.

*a. Ancestry as Racial Classification*

Plaintiffs argue that the placement preferences in sections 1915(a)–(b) of the ICWA, as well as the collateral-attack provisions in section 1913(d) and section 1914, include race-based classifications like those in *Rice*, which must survive strict scrutiny review. Ind. Pls.' Br. 41, ECF No. 80; State Pls.' Br. 54–57, ECF No. 74. In *Rice*, the Supreme Court overturned a Hawaiian statute restricting voter eligibility to only "native Hawaiians" and those with "Hawaiian" ancestry for positions at a state agency. *Rice*, 528 U.S. at 519. By declaring this restriction an unlawful racial preference, the Supreme Court found that "ancestry can be a proxy for race" and noted that "racial discrimination is that which singles out 'identifiable classes of persons . . . solely because of their ancestry or ethnic characteristics.'" *Id.* at 515 (citation omitted). The Supreme Court held that Hawaii had "used ancestry as a racial definition and for a racial purpose" and noted "ancestral tracing . . . employs the same mechanisms, and causes the same injuries, as laws or statutes that use race by name." *Id*. at 517. Plaintiffs contend the ICWA preferences are no different than the preferences struck down in *Rice*.

*b. Tribal Membership as a Political Classification*

Defendants respond that the ICWA's placement preferences rely on political classifications like the statute in *Mancari*, rather than racial classifications like the statute in *Rice*, and are

therefore only subject to rational basis review. Fed. Defs.' Resp. Ind. 11, ECF No. 123; Trib. Defs.' Resp. 16, ECF No. 118. In *Mancari*, the plaintiffs sought to declare unconstitutional a BIA hiring standard that gave preference to Indian applicants. *See Mancari*, 417 U.S. at 535. The Supreme Court upheld this hiring preference, concluding it was a political, rather than a racial, preference. *Id*. Because the preference was "an employment criterion reasonably designed to further the cause of Indian self-government and to make the BIA more responsive to the needs of its constituent groups," it was "reasonably and directly related" to a legitimate non-racial goal. *Id*. at 554. The preference was designed to give those Indians who were "members of quasi-sovereign tribal entities" and who chose to apply for jobs at the BIA, an opportunity to govern tribal activities in "a unique fashion." *Id*. at 554. While the Supreme Court held the preference was constitutional, its decision was uniquely tailored to that particular set of facts. *Id*. at 551 ("the Indian preference statute is a specific provision applying to a very specific situation"); *see Rice*, 528 U.S. at 520 ("The [*Mancari*] opinion was careful to note, however, that the case was confined to the authority of the BIA, an agency described as '*sui generis*.'"). Importantly, the preference in *Mancari* applied "only to *members* of 'federally recognized' tribes which operated to exclude many individuals who are racially to be classified as Indians." *Id*. at 555 n.24. And this preference provided special treatment only to Indians living on or near reservations.[8] *Id*. at 552; *see also Rice*, 528 U.S. at 516–

[8] Defendants rely on a number of cases in support of their argument. Those cases confirm however that this authority is directed at Indian self-government and affairs on or near Indian lands. In *Antelope*, the Supreme Court found no equal protection violation because the legislation involved "federal regulation of criminal conduct *within Indian country* implicating Indian interest." 439 U.S. 641, 646 (1977) (emphasis added); *cf. Plains Comm. Bank v. Long Family Land & Cattle Co*., 554 U.S. 316, 330 (2008) ("[E]fforts by a tribe to regulate nonmembers, especially on non-Indian fee land, are presumptively invalid."). Other cases cited by Defendants also relate to Indian affairs occurring in Indian country. *See, e.g.*, *Fisher v. Dist. Court of Sixteenth Judicial Dist. of Montana, in and for Rosebud Cty*, 424 U.S. 382 (1976); *United States v. Mazurie*, 419 U.S. 544 (1975); *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30 (1996); *U.S. v. Lara*, 541 U.S. 193 (2004). Even *United States v. McGowan*, 302 U.S. 535 (1938), dealt with prohibitions on Indian land. Similarly, the Fifth Circuit found no equal protection violation in *Peyote Way Church of God, Inc. v. Thornburgh*, where the federal government made an exception under the Controlled Substance Act for a Native American church's use of peyote, when the church limited membership to *only members of federally*

17 ("Simply because a class defined by ancestry does not include all members of the race does not suffice to make the classification neutral"). *Mancari* therefore did not announce that all arguably racial preferences involving Indians are actually political preferences. *Id*. at 554. Instead, the Supreme Court recognized that applying its decision more broadly would raise the "obviously more difficult question that would be presented by a blanket exemption for Indians." *Id*. at 554.

*c. The ICWA Classification*

The specific classification at issue in this case mirrors the impermissible racial classification in *Rice*, and is legally and factually distinguishable from the political classification in *Mancari*. The ICWA's membership eligibility standard for an Indian child does not rely on actual tribal membership like the statute in *Mancari*. *Id*. at 554, n.24 (the preference only applied to members of federally recognized tribes, which "operates to exclude many individuals who are racially classified as 'Indians'"); *see* 25 U.S.C. § 1903(4). Instead, it defines an Indian child as one who is a member "of an Indian tribe" as well as those children simply *eligible* for membership who have a biological Indian parent. *See* 25 U.S.C. § 1903(4). This means one is an Indian child if the child is related to a tribal ancestor by blood. *See e.g.* Navajo Nation Code § 701; *see* CHEROKEE CONST. art. IV, § 1; *see* CONST. OF WHITE EARTH NATION, Chap. 2. Art. 1; *see* Yselta del Sur Pueblo Tribe Code of Laws § 3.01; Ysleta del Sur Pueblo and Alabama and Coushatta Indian Tribes of Texas Restoration Act, Pub. Law 100-89, 101 Stat. 669 (1987). These classifications are similar to the "blanket exemption for Indians," which *Mancari* noted would raise the difficult issue of racial preferences, as well as the classifications declared unconstitutional in *Rice*.[9] 528 U.S. at 499 ("racial discrimination is that which singles out "identifiable classes of

*recognized tribes* who have at least twenty-five percent Indian ancestry. 922 F.2d 1210 (5th Cir. 1991) (emphasis added).

[9] At the hearing, the Federal Defendants identified specific exceptions to the general rule that tribal membership eligibility depends on biological ancestry. Aug. 1, 2018 Hr'g Tr. at 83:1–11. The Federal

persons . . . solely because of their ancestry or ethnic characteristics.").[10] By deferring to tribal membership *eligibility* standards based on ancestry, rather than *actual* tribal affiliation, the ICWA's jurisdictional definition of "Indian children" uses ancestry as a proxy for race and therefore "must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227.

2. Strict Scrutiny Review

Because the ICWA relies on racial classifications, it must survive strict scrutiny. Courts "apply strict scrutiny to all racial classifications to 'smoke out' illegitimate uses of race by assuring that [the government] is pursuing a goal important enough to warrant use of a highly suspect tool." *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003). To survive strict scrutiny review, the classifications must be "narrowly tailored to further a compelling governmental interest." *Id*.

*a. Compelling Interest Requirement*

Here, the Federal Defendants have not offered a compelling governmental interest that the ICWA's racial classification serves, or argued that the classification is narrowly tailored to that end. Rather, the Federal Defendants rest their entire defense to this claim on their argument that the ICWA classified Indians politically, which requires *only* that it be rationally tied to fulfillment of Congress's unique obligation to the Indians. Fed. Defs.' Resp. Ind. 25, ECF No. 123. Given the ICWA is a race-based statute,[11] the Government has failed to meet its burden to show the

---

Defendants noted some tribes may include African Americans who are descendants of freed slaves and that some tribes may include "adopted whites" as members. *Id*. Individual Plaintiffs responded that the Supreme Court addressed similar limited exceptions in *Rice*. *Id*. at 109. Indeed, *Rice* controls on this issue. Defendants in that case argued that the preferential statute did not rely on a racial category because it also could include descendants of "Native Hawaiians" who were not racially Polynesian. *Rice*, 528 U.S. at 514. The Court "reject[ed] this line of argument" and noted immediately thereafter that "Ancestry can be a proxy for race." *Id*.

[10] Notably, in *Adoptive Couple v. Baby Girl*, the Supreme Court mentioned that an interpretation of provisions of the ICWA that prioritizes a child's Indian ancestry over all other interests "would raise equal protection concerns." 570 U.S. 637, 655 (2013); *see* Hr'g Tr. 103 (acknowledging the equal protection violation *Adoptive Couple* referenced was race discrimination).

[11] In *Rice*, after determining that ancestry can be a proxy for race, the Supreme Court noted the legislation at issue used ancestry "as a racial definition and for a racial purpose," and subsequently referred to the

challenged statute is narrowly tailored to a compelling interest. *Fisher*, 758 F.3d at 664 (citation omitted). Because the government did not prove—*or attempt to prove*—why the ICWA survives strict scrutiny, it has not carried its burden to defend the ICWA and Plaintiffs are entitled to judgment as a matter of law on their equal protection claim.[12]

*b. Narrow Tailoring Requirement*

The Federal Defendants argue that "fulfilling Congress's unique obligation toward the Indians" is a legitimate government purpose supporting their rational basis analysis. Fed. Defs.' Resp. Ind. 312 ECF No. 123 (citing *Mancari*, 417 U.S. at 555). Likewise, at the hearing on these motions the Tribal Defendants offered "maintain[ing] the Indian child's relationship with the tribe" as a possible compelling interest. Hr'g Tr. 87: 23–25, ECF No. 163. [13] The compelling interest standard necessarily requires a stronger interest than is required under the broad legitimate government purpose standard. *See Richard*, 70 F.3d at 417 (describing rational basis and strict

legislation as being "based on race." *See Rice* 528 U.S. at 514, 523. Accordingly, as described above, the ICWA uses ancestry as a proxy for race and is therefore race-based.

[12] Both Defendants requested an opportunity to provide additional briefing if the Court concludes the ICWA contains racial preferences. However, Defendants were on notice that Plaintiffs sought judgment on all of their claims. This obligated Defendants to meet their burden. *See Apache Corp. v. W&T Offshore, Inc.*, 626 F.3d 789, 798–99 (5th Cir. 2010) (when a party is on notice that its opponent seeks judgment on all of its claims, it is obligated to respond to all of the claims); *see also United States v. Paradise*, 480 U.S. 149, 193 (1987) (Stevens, J. concurring) ("governmental decisionmaker who would make race-conscious decisions must overcome a strong presumption against them"). The Federal Defendants have failed to do so, nor have they offered a sufficient reason for this failure. Even so, at oral argument the Court permitted them to offer any arguments they desired on this issue even though they failed to brief it. The Federal Defendants failed to articulate any interest they viewed as compelling. *See* Hr'g Tr. 55–61.

[13] The Federal Defendants similarly point to Congress's obligation to Indian tribes to justify Congressional authority to enact the ICWA. To bolster those arguments, it notes that Congress intended the ICWA to "protect the 'continued existence and integrity of Indian *tribes*' by protecting their most vital resources—their children." Fed. Defs.' Resp. Ind. 37, ECF No. 123 (emphasis added) (quoting 25 U.S.C. § 1901(3)). The Federal Defendants note that in congressional hearings about the ICWA there was considerable emphasis "on the impact on the tribes themselves of the massive removal of their children." *Id.* (quoting *Holyfield*, 490 U.S. at 34) (emphasis added). The emphasis on tribes is telling; indeed the Indian Commerce Clause specifically references "Indian Tribes." U.S. CONST. art. I, § 8, cl. 3.

scrutiny review standards). Here, however, the Court will assume these interests are compelling and will evaluate whether the statute is narrowly tailored.

As stated above, a racial statute must be narrowly tailored to a compelling government interest to survive strict scrutiny. *Grutter*, 539 U.S. at 326. In other words, the statute's means must be narrowly tailored to its ends. *Id*. To evaluate whether a statute is narrowly tailored to a compelling interest, the Supreme Court has considered whether the statute covers too many—or too few—people to achieve its stated purpose. *See Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 804 (2011). The Supreme Court labels statutes that fail this test as overinclusive, underinclusive, or both. *See id*. A statute is overinclusive when it "burdens more people than necessary to accomplish the legislation's goal." *Overinclusive*. MERRIAM-WEBSTER'S DICTIONARY OF LAW (2016); *see e.g. Church of the Lukumi Babalu Aye, Inc v. City of Hialeah*, 508 U.S. 520, 578 (1993) (Blackmun, J. concurring) (an overinclusive statute is "one that encompasses more . . . than necessary to achieve its goal"); *see e.g. Mance v. Sessions* (Ho, J. dissenting from denial of rehearing en banc) ("a *categorical* ban . . . is over-inclusive—it prohibits a significant number of transactions that fully comply with state law.") (emphasis added).

Here, the statute is broader than necessary because it establishes standards that are unrelated to specific tribal interests and applies those standards to *potential* Indian children. First, portions of the ICWA preferences are unrelated to specific tribal interests in that the statute includes as a priority a child's placement with any Indian, regardless of whether the child is eligible for membership in that person's tribe. *See* 25 U.S.C. § 1915(a)(3). By doing so, the ICWA preferences categorically, and impermissibly, treat "all Indian tribes as an undifferentiated mass." *United States v. Bryant*, 136 S. Ct. 1954, 1968 (2016) (Thomas, J., concurring). Applying the preference to *any* Indian, regardless of tribe, is not narrowly tailored to maintaining the Indian

child's relationship with his tribe. *See* Br. for the Goldwater Inst. as *Amicus Curiae* in Opposition to Defs.' Mot. to Dismiss 5, ECF No. 133 ("ICWA's placement preferences do *not* depend on tribal or political or cultural affiliation; they depend on generic "Indianness."). The ICWA applies to many children who will never become members of any Indian tribe, 25 U.S.C. § 1903(4), and the first preference is to place the child with family members who may not be tribal members at all. 25 U.S.C. § 1915(1). These provisions burden more children than necessary to accomplish the goal of ensuring children remain with their tribes.

The ICWA's racial classification applies to potential Indian children, including those who will never be members of their ancestral tribe, those who will ultimately be placed with non-tribal family members, and those who will be adopted by members of other tribes. Because two of the three preferences have no connection to a child's tribal membership, this blanket classification of Indian children is not narrowly tailored to a compelling governmental interest and thus fails to survive strict scrutiny review. For these reasons, the Court finds that Plaintiffs' motion for summary judgment on their Equal Protection Claim is **GRANTED.**

### B. Article I Non-Delegation Claim

State Plaintiffs also argue that section 1915 (c) of the ICWA is unconstitutional because it delegates congressional power to Indian tribes in violation of the non-delegation doctrine outlined in Article I of the Constitution. Article I, known as the vesting clause, provides: "All legislative Powers . . . shall be vested in a Congress of the United States." U.S. CONST. I, § 1, cl.1. State Plaintiffs argue that the ICWA impermissibly grants Indian tribes the authority to reorder congressionally enacted adoption placement preferences by tribal decree and then apply their preferred order to the states. State Pls.' Br. 47, ECF No. 74. They also contend that section 23.130 (b) of the Final Rule, which provides that a tribe's established placement preferences apply over

those specified in the ICWA, violates the doctrine.[14] Am. Compl. ¶ 372, ECF No. 35; 25 C.F.R. § 23.130 (b). Tribal Defendants respond that the tribes are permissibly exercising regulatory power subject to an intelligible principle. Tribal Defs.' Br. Supp. Resp. Mot. Summ. J. at 35, ECF No. 118 [hereinafter "Trib. Defs.' Resp."]. If so, Defendants argue the ICWA survives the non-delegation challenge. *Id*.

1. Legislative or Regulatory Power

Distinguishing between permissible and non-permissible delegations of congressional power usually requires asking whether Congress is delegating discretion to *create* law or discretion to *execute* law. *Loving v. United States*, 517 U.S. 748, 758 (1996). Congress plainly cannot delegate its inherent legislative power to create law, defined as the power to formulate binding rules generally applicable to private individuals. *Dep't. of Transp. v. Ass'n of Am. R.R.'s*, 135 S. Ct. 1246 (Thomas, J. concurring); *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935) ("The Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested."); *see Wayman v. Southard*, 10 Wheat. 1, 42–43 (1825) (Marshall, C.J.). On the other hand, Congress may grant a federal agency the regulatory power necessary to execute legislation as well as interpret ambiguities therein. *See City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 296 (2013).

An exercise of regulatory power does not empower an entity to "formulate generally applicable rules of private conduct." *Ass'n of Am. R.R.'s*, 135 S. Ct. at 1252 (Thomas, J. concurring). The core of regulatory power involves factual determination or policy judgment necessary to *execute* the law. *See Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 474–75 (2001) (quoting *Mistretta v. United States*, 488 U.S. 361, 416 (1989) (Scalia, J., dissenting)). To determine

[14] Texas provides that the Alabama-Coushatta-Tribe of Texas has filed with DFPS a notice of different placement preferences. State Pls.' App. at 918, ECF No. 73.

whether a delegation of regulatory power is proper, courts employ the "intelligible principle" standard which states that Congress properly delegates regulatory power to federal agencies when it establishes an "intelligible principle" on which the agency can base decisions. *Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 474 (2001). Defendants are correct that the Supreme Court applies the test liberally and has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those *executing* or *applying* the law." *Id.* at 474–75 (emphasis added).

Here, the Tribes were granted the power to change the legislative preferences Congress enacted in the ICWA, and those changes are binding on the States. *See* 25 U.S.C. § 1915(c); *see also* Br. of *Amicus Curiae* 123 Federally Recognized Indian Tribes *et al*. in Opposition to Pls.' Mots. Summ. J. 22–23, ECF No. 138 (". . . ICWA *confirms* tribes' authority to enact placement preferences for their member children, and as an exercise of Congress' established authority over Indian affairs, requires that state courts, when exercising their concurrent jurisdiction over those children, give effect to those *legislative preferences*.") (emphasis added). The power to change specifically enacted Congressional priorities and impose them on third parties can only be described as legislative. *Ass'n of Am. R.R.'s*, 135 S. Ct. at 1253–1254 (Thomas, J. concurring) ("an exercise of policy discretion . . . requires an exercise of legislative power"). This is particularly true when the entity allowed to change those priorities is not tasked with executing the law. Congress "cannot delegate its exclusively legislative authority at all." *See Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 156 (1980); *White Mountain Apache Tribe v. Arizona*, 649 F.2d 1274, 1281 (9th Cir. 1981). Accordingly, section 1915(c) of the ICWA and section 23.130 (b) of the Final Rule violate the non-delegation doctrine.

2. Federal Actor Requirement

Alternatively, even if Congress granted permissible regulatory power through the ICWA, it impermissibly granted *federal* regulatory power to an Indian tribe. Congress certainly has authority to regulate the Indian tribes. U.S. CONST., art. 1, § 8, cl. 3. Likewise, tribes unquestionably may regulate conduct on tribal lands and reservations. *Atkinson Trading Co., Inc. v. Shirley*, 532 U.S. 645, 650–51 (2001). And, Congress may obtain assistance from its *coordinate* branches by delegating regulatory authority without violating the non-delegation doctrine. *Mistretta v. United States*, 488 U.S. 361, 372 (1989). But, Indian tribes are not a coordinate branch of government. *See* Trib. Defs.' Resp. 36–38, ECF No. 118. (describing the Tribes as an independent separate sovereign); *see also* Lawson, Delegation and Original Meaning, 88 VA. L. REV. 327, 352–53 (2002) (Congress cannot delegate legislative or executive power to a non-federal entity).

Nor is section 1915(c) saved because, as Tribal Defendants argue, Congress recognized that Indian tribes carry a unique, long-held, quasi-sovereign status, and may thus delegate federal authority to them. Trib. Defs.' Resp. 36–37, ECF No. 118. An Indian tribe, like a private entity, is "not part of the [federal] Government at all," which "would necessarily mean that it cannot exercise…governmental power." *Ass'n of Am. R.R.s*, 135 S. Ct.at 1253 (Thomas, J. concurring); *see also id*. at 1237.

Therefore, whatever label is affixed to the tribes by Defendants is inapposite. No matter how Defendants characterize Indian tribes—whether as quasi-sovereigns or domestic dependent nations—the Constitution does not permit Indian tribes to exercise *federal* legislative or executive regulatory power over non-tribal persons on non-tribal land. *Id*. The Court finds Article I does not permit Congress to delegate its inherent authority to the Tribes through section 1915(c) of the

ICWA or the BIA through section 23.130(b) of the Final Rule, which unequivocally states tribal placement preferences apply over those enacted by Congress in the ICWA. Accordingly, Plaintiffs are entitled to judgment as a matter of law on their non-delegation claim. For these reasons, the Court finds that Plaintiffs' motion for summary judgment on their Article I non-delegation claim is **GRANTED.**

### C. Tenth Amendment Anti-Commandeering Claim

Plaintiffs also claim that the ICWA and the Final Rule commandeer the States in violation of the Tenth Amendment. State Pls.' Br. 37, ECF No. 74; Ind. Pls.' Br. 68, ECF No. 80. They specifically challenge the ICWA sections 1901–23 and 1951–52.[15] Am. Compl. ¶ 284, ECF No. 35. The Federal Defendants respond that Congress passed the ICWA pursuant to its enumerated powers and thus authority over Indian children was never reserved to the States. Fed. Defs.' Br. Supp. Resp. States Mot. Summ. J. 29, ECF No. 121 [hereinafter "Fed. Defs.' Resp. States"]. Tribal Defendants argue that, to the extent the ICWA conflicts with state law, state law is preempted by the Supremacy Clause. Trib. Defs.' Resp. 29, ECF No. 118.

The anti-commandeering principle "is simply the expression of a fundamental structural decision incorporated into the Constitution, i.e., the decision to withhold from Congress the power to issue orders directly to the states." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1470, 1475 (2018). The Constitution grants to "Congress not plenary legislative power but only certain enumerated powers." *Id*. at 1476. "Conspicuously absent from the list of powers given to Congress is the power to issue direct orders to the governments of the States" because the Constitution "confers upon Congress the power to regulate individuals, not States." *Murphy*, 138 S. Ct. at 1476. Legislative power that is not enumerated is reserved to the States through the Tenth Amendment,

[15] These provisions include the congressional findings and declaration of policy, definitions, child custody proceedings, record keeping, information availability, and timetables. *See* 25 U.S.C. §§ 1901–23, 1951–52.

and "Congress may regulate areas of traditional state concern only if the Constitution grants it such power." *Adoptive Couple*, 133 S. Ct. at 2566 (2013) (Thomas, J. concurring).

The Court must therefore first consider whether Congress may require state courts and agencies to apply federal standards to exclusively state created causes of action.[16]

1. Commandeering State Courts and Agencies

Plaintiffs argue that the ICWA unconstitutionally requires state courts and executive agencies to apply federal standards and directives to state created claims. State Pls.' Br. 37, ECF No. 74; Ind. Pls.' Br. 68, ECF No. 80. The Federal Defendants respond that the power to enact the ICWA was granted to Congress by the Indian Commerce Clause, was never reserved to the States, and presents no constitutional problem. Fed. Defs.' Resp. States 29, ECF No. 121. The Court finds that requiring the States to apply federal standards to state created claims contradicts the rulings in *Murphy*, *Printz*, and *New York*. *See Murphy*, 138 S. Ct. 1470 (2018); *Printz v. United States*, 521 U.S. 898 (1997); *New York v. United States*, 505 U.S. 144 (1992).

*a. Federal Standards Applied in State Created Claims*

It is unquestionably true that state and federal courts share concurrent jurisdiction in many legal matters. *See generally Mims v. Arrow Fin. Ser., LLC*, 565 U.S. 368 (2012). The law is similarly clear about when a state court must hear a federal claim. In *Testa*, the Supreme Court held that where a state court would hear a comparable state law claim it must also hear a *federal claim*. *See Testa v. Katt*, 330 U.S. 386 (1947) (emphasis added). In other words, Congress may create a private federal cause of action and authorize concurrent jurisdiction in state courts. When it does so, the state courts cannot refuse to hear the federal claim. Later, in *Haywood*, the Supreme

[16] The ICWA includes federal requirements that apply in a state child custody proceedings including: involuntary proceedings, voluntary proceedings, and proceedings involving foster-care, preadoptive, or adoptive placement, or termination of parental rights. *See* 25 CFR §§ 23.103, 23.106.

Court confirmed that states "lack authority to nullify a *federal right or cause of action* they believe is inconsistent with their local policies." *Haywood v. Drown*, 556 U.S. 729, 736 (2009) (emphasis added). The Supreme Court concluded that when "state courts as well as federal courts are entrusted with providing a forum for the vindication of federal rights," state courts may not refuse to adjudicate the federal claim. *Id*. at 735. The controversy here, however, does not involve a federal cause of action that may be adjudicated in a federal forum. *See* 25 U.S.C. § 1915(a). Instead, the ICWA commands that states modify existing state law claims. Congress directs state courts to implement the ICWA by incorporating federal standards that modify *state created* causes of action. *Id*.

*b. The Murphy Standard*

In *Murphy*, the Supreme Court ruled that a federal statute prohibiting state legislatures from authorizing sports gambling violated the anti-commandeering doctrine because it directly regulated States rather than individuals. *See Murphy*, 138 S. Ct. 1461. The Supreme Court outlined three reasons why the anti-commandeering principle is important. First, it is "one of the Constitution's structural protections of liberty." *Id*. at 1477. Second, the principle "promotes political accountability." *Id*. Third, it "prevents Congress from shifting the costs of regulation to the States." *Id*.

Congress violated all three principles when it enacted the ICWA. First, the ICWA offends the structure of the Constitution by overstepping the division of federal and state authority over Indian affairs by commanding States to impose federal standards in state created causes of action. *See* 25 U.S.C. § 1915(a). Second, because the ICWA only applies in custody proceedings arising under state law, it appears to the public as if state courts or legislatures are responsible for federally-mandated standards, meaning "responsibility is blurred." *Murphy*, 138 S. Ct. at 1477.

Third, the ICWA shifts "the costs of regulations to the States" by giving the sole power to enforce a federal policy to the States.[17] *Id*. Congress is similarly not forced to weigh costs the States incur enforcing the ICWA against the benefits of doing so. In sum, Congress shifts all responsibility to the States, yet "unequivocally dictates" what they must do. *Id*.

That this case primarily involves state courts, rather than legislative bodies or executive officers, does not mean the principles outlined in *Murphy*, *New York*, and *Printz* do not apply. In those cases, the Supreme Court relied on the idea that "the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States." *Printz*, 521 U.S. at 920. Here, the ICWA regulates states. As stated above, the ICWA requires that the state "in any adoptive placement of an Indian child under state law, a preference shall be given, in the absence of good cause to the contrary, to a placement with: (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." 25 U.S.C § 1915(a). Similar requirements are set for foster care or preadoptive placements. *Id.* § 1915(b). If the Indian child's tribal court establishes a different order of preferences, the state court or agency "shall follow such order so long as the placement is the least restrictive setting appropriate to the particular needs of the child." *Id.* § 1915(c). That requirement is, on its face, a direct command from Congress to the states. The Court finds that the ICWA directly regulates the State Plaintiffs and doing so contradicts the principles outlined by the Supreme Court in *Murphy*. *Cf.* 138 S. Ct. 1470 (2018). Notwithstanding this impact on the state courts, Texas has also indisputably demonstrated that the ICWA requires its executive agencies to carry out its provisions.[18] Hr'g Tr.

---

[17] As an example, the ICWA and the Final Rule require State Plaintiffs' agencies and courts to maintain *indefinitely* records of placements involving Indian children, and subject those records to inspection by the Director of the BIA and the child's Indian tribe at any time, as opposed to simply transferring those records to the BIA so they may keep them indefinitely. 25 U.S.C. §§ 1915(e), 1917; 25 C.F.R. §§ 23.140–41.

[18] The Texas DFPS must, among other things; serve notice of suit on Indian tribes, verify a child's tribal status, make a diligent effort to find a suitable placement according to the ICWA preferences and show

at 22–23, ECF No. 163; State Pls.' App. Supp. Mot. Summ. J. 28–29, ECF No. 73 [hereinafter State Pls.' App.]. Accordingly, Congress regulates States—not individuals—through the ICWA, and the Constitution does not grant it that power.

Nor does the Indian Commerce Clause save the ICWA's mandate to the states. Federal Defendants assert that the plenary power the Indian Commerce Clause grants Congress permits directing states in child custody proceedings involving Indian children eligible for tribal membership, therefore no power was reserved to the states, and no Tenth Amendment violation is possible. Fed. Defs.' Resp. States 29, ECF No. 121. But regardless of the reach of the Indian Commerce Clause, no provision in the Constitution grants Congress the right to "issue direct orders to the governments of the States," and the Indian Commerce Clause can be no different. *Cf. Murphy*, 138 S. Ct. at 1478. Like in *Murphy*, there is no way to understand mandating state enforcement of the ICWA "as anything other than a direct command to the States. And that is exactly what the anti-commandeering rule does not allow." *Murphy*, 138 S. Ct. at 1481.

2. State Law Preemption

Finally, the Tribal Defendants argue that the anti-commandeering principle does not apply because the ICWA, enacted pursuant to the Indian Commerce Clause, simply preempts conflicting state laws regulating individuals. Trib. Defs.' Resp. 29, ECF No. 118. Preemption generally applies when federal and state law conflict over matters in which they have concurrent jurisdiction. *See Wyeth*, 555 U.S. at 584. While Supremacy Clause preemption may apply to a conflict between state and "federal law that regulates the conduct of private actors," it cannot rescue a law that *directly* regulates states. *Murphy*, 138 S. Ct. at 1481. Even though the ICWA's general policy is directed towards protecting Indian children, 25 U.S.C. § 1902, its specific provisions, like section

---

good cause if the preferences are not followed, ensure a child is enrolled in his tribe before referring him for adoption, and keep a written record of the placement decision. State Pls.' App. 28–29, ECF No. 73.

1915, directly command states to enforce the ICWA without a comparable federal enforcement mechanism and do not "impose any federal restrictions on private actors." *Id*. at § 1915; *Murphy*, 138 S. Ct. at 1481. As such, these commands do not result in a *conflict* between duly enacted state and federal law. Rather, the provisions command states to *directly* adopt federal standards in their state causes of actions. This argument is not unlike the one rejected in *Murphy*, where Congress relied on its commerce clause power, yet even that express power does not permit it to command states in this manner. *Murphy*, 138 S. Ct. at 1479.

Preemption arguments therefore cannot rescue the ICWA's impermissible direct commands to the states. The ICWA is structured in a way that directly requires states to adopt and administer comprehensive federal standards in state created causes of action. Therefore, the Court finds that sections 1901–23 and 1951–52 of the ICWA violate the anti-commandeering doctrine. For these reasons, the Court finds that Plaintiffs' motion for summary judgment on their Tenth Amendment Anti-Commandeering Claim is **GRANTED.**

**D. Administrative Procedure Act Claims**

Plaintiffs also claim that the Final Rule violates the APA because it: (1) purports to implement an unconstitutional law and therefore must be vacated as contrary to law; (2) exceeds the scope of Interior's statutory regulatory authority under the ICWA; (3) reflects an impermissibly ambiguous construction of the statute; and (4) is otherwise arbitrary and capricious. Ind. Pls.' Reply at 16, ECF No. 143; State Pls.' Reply 18, ECF No. 142; *see also* Ind. Pls' Br., ECF 80. Defendants respond that the Final Rule was properly passed and promulgated, deserves *Chevron* deference, and stands after *Chevron* review. Trib. Defs.' Resp. 39–47, ECF No. 118; Fed. Defs.' Resp. States 41, ECF No. 121.

1. Constitutionality Requirement

As a threshold matter, if the Final Rule purports to implement an unconstitutional statute, the Court must hold it unlawful and set it aside. 5 U.S.C. § 706. As previously explained, the Court has concluded sections 1901–23 and 1951–52 of the ICWA are unconstitutional. The challenged sections of the Final Rule that regulate unconstitutional portions of the ICWA, 25 C.F.R. §§ 23.106–112, §§ 23.114–19, §§ 23.121–22, §§ 23.124–28, and §§ 23.130–132 must therefore also be set aside because "the authority of administrative agencies is constrained by the language of the statute they administer." *Texas v. United States*, 497 F.3d 491, 500–01 (5th Cir. 2007) (citing *Massachusetts v. EPA*, 549 U.S. 497 (2007)). For that reason, Plaintiffs' Motion for Summary Judgment on their APA claims is **GRANTED**. Alternatively, the Court will address Plaintiffs' arguments that the Final Rule exceeds the scope of Interior's—and thus the BIA's—statutory regulatory authority under the ICWA, reflects an impermissibly ambiguous construction of the statute, and is arbitrary and capricious.

2. APA Statutory Authority Requirement

Plaintiffs argue that the challenged portions of the Final Rule exceed the scope of the BIA's regulatory authority under the ICWA because the Final Rule issues *binding* regulations—which the BIA previously deemed unnecessary to enforce the ICWA—without the statutory authority necessary to do so. Ind. Pls.' Reply 17–19, ECF 143; State Pls.' Reply 18, ECF No. 142. "Expanding the scope" of a BIA regulation "in vast and novel ways is valid only if it is authorized" by the ICWA. *Chamber of Commerce v. Dep't of Labor*, 885 F.3d 360, 369 (5th Cir. Mar. 15, 2018). "A regulator's authority is constrained by the authority that Congress delegated it by statute. Where the text and structure of a statute unambiguously foreclose an agency's statutory interpretation, the intent of Congress is clear, and 'that is the end of the matter; for the court, as

well as the agency, must give effect to the unambiguously expressed intent of Congress.'" *Id.* (quoting *Chevron, U.S.A., Inc. v. N.R.D.C., Inc.*, 467 U.S. 837, 842–43 (1984)). When an agency waits decades to discover a new interpretation of a rule it "highlights the Rule's unreasonableness," and "gives us reason to withhold approval or at least deference for the Rule." *Id*. at 380. When a court reviews an agency's construction of a statute and determines Congress has spoken directly to an issue, the court must give effect to Congress's unambiguously expressed intent. *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 121 (2000); *City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1874 (2013); *Chevron*, 467 U.S. at 842–43.

Here, Congress expressly and unambiguously granted the Secretary of Interior authority to regulate if *necessary*. Congress stated in the ICWA that "within one hundred and eighty days after November 8, 1978, the Secretary shall promulgate such rules and regulations as *may be necessary* to carry out the provisions in this chapter." 25 U.S.C § 1952 (emphasis added); *see* 44 Fed. Reg. 67,584. The BIA concluded that the ICWA differs from most other federal statutes because the majority of the work required to "carry out the provisions" falls to state courts and administrative agencies, not a federal agency. *See, e.g.*, 25 U.S.C § 1915. The BIA conceded as much when administering the 1979 Guidelines:

> Promulgation of regulations with legislative effect with respect to most of the responsibilities of state or tribal courts under the act, however, is *not necessary to carry out the Act. State and tribal courts are fully capable of carrying out the responsibilities imposed on them by Congress without being under the direct supervision of this Department*. Nothing in the legislative history indicates that Congress intended this Department to exercise supervisory control over state or tribal courts or to legislate for them with respect to Indian child custody matters. For Congress to assign an administrative agency such supervisory control over courts would be an extraordinary step . . . so at odds with concepts of both federalism and separation of powers that it should not be imputed to Congress in the absence of an express declaration of Congressional intent to that effect.

44 Fed. Reg. 67,584, (Nov. 26, 1979) (emphasis added).

Here, as outlined in the Court's findings *supra* on Plaintiffs' anti-commandeering and non-delegation claims, much of the authority to carry out the ICWA was delegated to the States and Indian tribes. The BIA admitted state and tribal courts were fully capable of carrying out the ICWA without direct federal regulation and allowed them to do so for over thirty years. 44 Fed. Reg. 67,584 (Nov. 26, 1979). In establishing the Final Rule, the BIA contradicted their earlier position and asserted that section 1952 of the ICWA granted authority to promulgate binding regulations. The BIA provides justification for the change in position by noting that state courts have applied the ICWA inconsistently, which makes binding regulations necessary. 81 Fed. Reg. 38,785. But when specifically addressing the change in position about statutory authority under section 1952, the BIA simply states that it "no longer agrees with the statements it made in 1979." *Id*. at 38,786. In the analysis that follows, the BIA never addresses the fact that the 1979 BIA determined that "[n]othing in the language or legislative history of 25 U.S.C. 1952 compels the conclusion that Congress intended to vest this Department with such extraordinary power" and that nothing indicated Congress intended the BIA to exercise supervisory or legislative control over the state court. 44 Fed. Reg. 67,584, (Nov. 26, 1979). While the BIA expresses frustration with *how* state courts and agencies are applying the ICWA inconsistently, it does not address how, suddenly, it no longer believes the ICWA primarily tasks those state courts and agencies with the authority to apply the statute as they see fit. 81 Fed. Reg. 38,782–90.[19]

A current agency interpretation "in conflict with its initial position, is entitled to considerably less deference" and is met with "a measure of skepticism." *Chamber*, 885 F.3d at 381

[19] As an example, in 1979 the BIA provided that the good cause standard "was designed to provide state courts with flexibility in determining the disposition of a placement proceeding involving an Indian child." 44 Fed. Reg. 67,584. The Final Rule, however, provided that "courts should only avail themselves of it in extraordinary circumstances, as Congress intended the good cause exception to be narrow and limited in scope." 81 Fed. Reg. 38,839.

(quoting *Watt v. Alaska*, 451 U.S. 259, 273 (1981); *Util. Air Regulatory Grp v. EPA,* 134 S. Ct. 2427, 2444 (2014)). The 1979 BIA acknowledged that "where…primary responsibility for interpreting a statutory term rests with the courts, administrative interpretations of statutory terms are given important but not controlling significance." 44 Fed. Reg. 67,584 (citing *Batterton v. Francis*, 432 U.S. 416, 424–25 (1977)). Because the BIA does not explain its change in position over its authority to "carry out the provisions" and apply the ICWA—and therefore its authority to issue binding regulations—the Court finds those regulations remain not *necessary* to carry out the ICWA. *See* 25 U.S.C § 1952. Accordingly, when the BIA promulgated regulations with *binding* rather than advisory effect, it exceeded the statutory authority Congress granted to it to enforce the ICWA.[20] The Court finds that 25 C.F.R. §§ 23.106–22, §§ 23.124–32 and §§ 23.140–41 are **INVALID** to the extent the regulations are binding on the State Plaintiffs.

Assuming for the sake of argument that Congress granted the BIA statutory authority to implement the legally binding Final Rule, the Court will next consider whether the Final Rule "fills in the statutory gaps" of an ambiguous statute, and is entitled to *Chevron* deference. *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 159.

---

[20] At the hearing, the Federal Defendants argued that the Final Rule's clear and convincing evidence standard is not binding on state courts. Hr'g Tr. 40:7–20. That argument contradicts the Final Rule itself which clearly implements binding regulations to counteract the very discretion Defendants argue states are allowed. *See* 25 CFR 23.132(b); *see* 81 Fed. Reg. 38,782, 38,786, 38,853. ("The Department's current nonbinding guidelines are insufficient to fully implement Congress's goal of nationwide protections for Indian children…State courts will sometimes defer to the guidelines in ICWA cases [but] State courts frequently characterize the guidelines as lacking the force of law and conclude that they may depart from the guidelines as they see fit."; "As described above, the Department concludes today that this binding regulation is within the jurisdiction of the agency, was encompassed by the statutory grant of rulemaking authority, and is necessary to implement the Act."; "The final rule generally uses mandatory language, as it represents binding interpretations of Federal law."). The preamble to the Final Rule does note that the rule "does not categorically require," that the clear and convincing evidence standard be followed, but that statement cannot change the fact that the Final Rule itself was promulgated as a binding regulation. 81 Fed. Reg. 38,843.

3. *Chevron* Deference and the Good Cause Standard

When "a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43; *see, e.g.*, *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). If a statutory term is ambiguous, courts will assume Congress granted the implementing agency implicit authority to fill in the resulting statutory gaps. *Food and Drug Admin.*, 529 U.S. at 159. Commonly referred to as *Chevron* deference, courts will defer to the resulting agency interpretation if it is reasonable. *See Chevron*, 467 U.S. at 837.

Here, Plaintiffs claim that the BIA violated the APA when it promulgated § 23.132(b) of the Final Rule, which limits the evidence that may be considered by courts to determine "good cause" under section 1915 of the ICWA. Ind. Pls.' Resp. 60–63, ECF No. 80; State Pls.' Reply 18, ECF No. 142. Defendants argue that the Final Rule's interpretation of "good cause" is entitled to *Chevron* deference. Trib. Defs.' Resp. 39–47, ECF No. 118; Fed Defs.' Resp. Ind. 45–49, ECF No. 123.

"Where the text and structure of a statute unambiguously foreclose an agency's statutory interpretation, the intent of Congress is clear, and 'that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chamber of Comm.*, 885 F.3d at 369 (quoting *Chevron*, 467 U.S. at 842–43). To determine whether a statute is ambiguous under *Chevron*, a court must: (1) begin with the statute's language; (2) give undefined words their ordinary, contemporary, common meaning; (3) read the statute's terms in proper context and consider them based on the statute as a whole; and (4) consider a statute's terms

in light of the statute's purpose. *Contender Farms, L.L.P v. U.S. Dep't of Agric*, 779 F.3d 258, 269 (5th Cir. 2015). But a current agency interpretation "in conflict with its initial position, is entitled to considerably less deference." *Chamber of Comm.*, 885 F.3d at 381 (quoting *Watt v. Alaska*, 451 U.S. 259, 273 (1981)).

Section 23.132(b) of the Final Rule interprets section 1915(b) of the ICWA, which provides in "any adoptive placement of an Indian child under State law, a preference shall be given, *in the absence of good cause to the contrary*, to a placement with (1) a member of the child's extended family; (2) other members of the Indian child's tribe; or (3) other Indian families." 25 U.S.C. § 1915 (b). The Final Rule states that a "party seeking departure from the placement preferences should bear the burden of proving by *clear and convincing evidence* that there is 'good cause' to depart from the placement preferences." 25 C.F.R. § 23.132(b).

Here, Plaintiffs contend that the Final Rule departs from the BIA's original 1979 interpretation and contradicts the "good cause" standard set by the ICWA because the Final Rule heightens the evidentiary burden. Ind. Pls.' Reply 20–23, ECF No. 143. Defendants argue that "good cause" is an ambiguous term and it was therefore appropriate for the BIA to promulgate—as part of their interpretation of the term good cause—the necessary evidentiary standard. Trib. Defs.' Resp. 44–45, ECF No. 118; Fed. Defs.' Resp. Ind. 45, ECF No. 123. Plaintiffs counter that the default evidentiary standard in civil cases, preponderance of the evidence, applies to section 1915 and accordingly the Final Rule's clear and convincing evidence standard is not a permissible construction of the statute. Ind. Pls.' Reply 20, ECF No. 143. The issue here is whether Congress established an unambiguous evidentiary standard in section 1915 of the ICWA. That determination is distinct from interpreting the meaning of the term good cause.

Congress did not codify a preponderance of the evidence standard in section 1915 of the ICWA. But other portions of the ICWA specifically included heightened evidentiary burdens. *See* 25 U.S.C. § 1912(e) (establishing a clear and convincing evidence standard for foster placements). Notably, unlike those sections, section 1915 does not establish a heightened evidentiary standard in conjunction with the good cause requirement. "It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Food & Drug Admin*, 529 U.S. at 133. Similarly, "where Congress includes particular language in one section of a statute but omits it in another . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Keene Corp. v. United States*, 508 U.S. 200, 208 (1993) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)). Because Congress included the clear and convincing evidence standard in certain sections of the ICWA, but omitted it in section 1915, the Court presumes it did so intentionally.

When interpreting section 1915 the "silence is inconsistent with the view that Congress intended to require a special, heightened standard of proof" and "it is fair to infer that Congress intended the ordinary preponderance [of the evidence] standard to govern . . . " *Grogan v. Garner*, 498 U.S. 279, 286–88 (1991). Here, a holistic reading of the statute and the 1979 BIA guidelines confirms that Congress intended the default preponderance of the evidence standard to apply. Accordingly, defining an evidentiary standard in a way that contradicts the standard intended by Congress, as the BIA did in the Final Rule, is contrary to law.

Because the Court finds that the BIA lacked statutory authority to enact the challenged portions of the Final Rule, and that the evidentiary standard in section 1915 is unambiguous, Defendants are not entitled to *Chevron* deference and the Final Rule's change of standard to clear

and convincing evidence is contrary to law. For these reasons, the Court finds that Plaintiffs' motion for summary judgment on their APA claim is **GRANTED**.

### E. Fifth Amendment Due Process Claim

Individual Plaintiffs alone claim that sections 1910 (a) and (b) of the ICWA, as well as the Final Rule, violate the Fifth Amendment Due Process Clause. Ind. Pls.' Br. 49–55, ECF No. 80. Plaintiffs argue that ICWA's racial preferences "disrupt . . . intimate familial relationships based solely on the arbitrary fact of tribal membership" and that families have a fundamental right "to make decisions concerning the care, custody, and control of their children." *Id.* at 49, 50. The Federal Defendants respond that this Court has no basis to "recognize a fundamental right where the Supreme Court and Fifth Circuit have refused to do so." Fed. Defs.' Resp. Ind. 33, ECF No. 123. Defendants are correct.

The Supreme Court has recognized both custody and the right to keep the family together as fundamental rights. *See Troxel v. Granville*, 530 U.S. 57 (2000); *Moore v. City of East Cleveland*, 431 U.S. 494 (1977). However, the Supreme Court has never applied those rights to foster families. *See Drummond v. Fulton Cnty. Dep't of Family & Children's Servs.*, 563 F.2d 1200, 1207 (5th Cir. 1977) (en banc). Similarly, the Supreme Court has not applied those rights in a situation involving either prospective adoptive parents or adoptive parents whose adoption is open to collateral attack. For these reasons, the Court finds that Plaintiffs' motion for summary judgment on their substantive due process claim is hereby **DENIED.**

### F. Indian Commerce Clause Claim

Plaintiffs also claim Congress did not have the constitutional authority to pass sections 1901–23 and sections 1951–52 of the ICWA under the Indian Commerce Clause. Ind. Pls.' Br. 66, ECF No. 80; State Pls.' Br. 49–52, ECF No. 74. Defendants counter that the Indian Commerce

Clause grants Congress plenary authority over Indian Affairs. Fed. Def's Resp. Ind. 35, ECF No. 123; Trib. Defs.' Resp. 21–28, ECF No. 118. But as shown above, *Murphy* does not permit Congress to directly command the States in this regard, even when it relies on Commerce Clause power. *Murphy*, 138 S. Ct. at 1479. Therefore Plaintiffs' request for a declaration that these sections are unconstitutional is **GRANTED**.

## IV. CONCLUSION

For the reasons stated above, the Court finds that Plaintiffs' Motions for Summary Judgment (ECF Nos. 72, 79) should be and are hereby **GRANTED in part and DENIED in part**.

**SO ORDERED** on this **4th day** of **October, 2018**.

Reed O'Connor
UNITED STATES DISTRICT JUDGE